UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | Case No. 15 CR 252 (S-1) (PKC) |
| ) | |
| v. ) | |
| ) | |
| JUAN ANGEL NAPOUT, et al. ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF JUAN ANGEL NAPOUT'S MOTION TO SEVER AND MOTION FOR SPEEDY TRIAL**

**GREENBERG TRAURIG, LLP**
A. John Pappalardo
Jacqueline Becerra

**PIÑERA-VAZQUEZ LAW FIRM**
Silvia B. Piñera-Vazquez

I.      **INTRODUCTION**

Defendant Juan Angel Napout ("Napout") moves, pursuant to Fed. R. Crim P. 14 and

*Zafiro v. United States*, 506 U.S. 534, 537 (1993) for severance from all defendants and, in the

alternative, from the 16 defendants who have not appeared in this Court.[1]  *See United States v.*

*Pena*, 793 F.2d 486, 489 (2d Cir. 1986) ("Of course, a defendant remains free to move for

severance at any time during a period in which his speedy trial clock has not begun to run

because a codefendant has not been apprehended."). Napout also moves, pursuant to 18 U.S.C. §

3161 *et seq*., for Speedy Trial.[2]

Speedy Trial Act.  Had Napout not been joined with codefendants, Napout claims that his

speedy trial clock would have expired on May 4, 2016 and thus, there is an 18-month delay to

the November 6, 2017 tentative trial date.  Napout claims, *inter alia*, that the "joined defendants"

exclusion is unreasonable under § 3161(h)(6) where there exists indefinite delay to an actual trial

date – on this Superseding Indictment which currently joins all codefendants – caused by the

government's failure to either extradite, predict the completion and/or commence extradition

proceedings of 16 codefendants all of whom are foreign nationals.

In addition,  the "interests of justice/complexity" exclusion under § 3161(h)(7) is not

warranted where the bases for such exclusion arise out of the government's strategic charging

decision to indict 27 foreign nationals and arrest them in foreign countries.  As a consequence,

ten months post-indictment, the government is still engaged in its international "ongoing

---

[1] The 16 defendants who have not appeared are as follows, with the 8 defendants for whom the government states it has no public information noted in italics.  *Ariel Alvarado,* Manual Burga, *Carlos Chavez, Luis Chiriboga*,  Eduardo DeLuca, *Marco Polo Del Nero, Eugenio Figueredo*, Hugo Jinkis, Mariano Jinkis, Nicolas Leoz, Jose Luis Meiszner, *Romer Osuna*, *Rafael Salguero*, *Ricardo Teixiera*,  Reynaldo Vasquez, Jack Warner.

[2] It is submitted that this Motion to Sever and Motion for Speedy Trial does not toll Napout's speedy trial clock where it is filed to enforce his right to speedy trial and the Second Circuit requires that a speedy trial motion based on the joined defendant's exclusion in (h)(6) cannot be filed until a motion to sever is filed and denied. *United States v. Vasquez*, 918 F.2d 329, 336-37 (2d Cir. 1990). *See United States v. Van Sichem*, No. SS 89 CR 813 (KMW), 1990 WL 41746 at *2 n. 2 (S.D.N.Y. Apr. 2, 1990) ("the Court will assume that defendants did not toll the speedy trial clock by filing this motion for severance").

investigation and discovery", efforts to retrieve massive amounts of documentary evidence from "various cooperating individuals entities … other types of organizations" and unknown foreign countries and is attempting to enter into plea negotiations with codefendants.

Motion to Sever.  The severe disparities in the evidence and involvement in the overall scheme and sub-schemes (27 defendants, 92 counts involving 15 schemes and sub-schemes over a 24 year period) will result in substantial risk of prejudicial spillover and transference of guilt to Napout.  The evidence against most of the defendants is substantial and consists of, among other things, recorded statements as well as financial information, including, wire transfers.  For Napout, the government appears to be relying solely on the testimony of cooperating witnesses. Indeed to date, counsel has only received recorded conversations that are exculpatory and has not received any evidence of any money deposited into or wired out of Napout's accounts.

## II.     PROCEDURAL HISTORY RELEVANT TO SPEEDY TRIAL[3]

**A.     Order Excluding December 15, 2015 - January 15, 2016.** Napout immediately waived extradition and made his initial appearance on December 15, 2015, twelve days after his arrest. Hrg. Tr. 2/25/16 at 13. The parties agreed, and the Court ordered, an exclusion of time from December 15, 2015- January 15, 2016 on the grounds of "ends of justice" because of the need for "additional time to prepare for trial due to the complexity of the case." D.E. 126, 266.

**B.     Order Excluding December 16, 2015 - March 16, 2016.** At arraignments on December 16, 2016 in which Napout did not participate, the Court ordered the exclusion of time from December 16, 2015 - March 16, 2016 because "the case [was] previously designated as complex" under (h)(7)(A). D.E. 130, 132.

---

[3] The government contends, and the court has ruled, that the speedy trial clock has not begun to run because of the absence of codefendants who have not yet appeared.  Hrg. Tr. 3/29/16 at 21-22; Hrg. Tr. 8/3/16 at 17-18.

**C.      Order Excluding March 16, 2016 - April 13, 2016 and March 29, 2016**

**Hearing on Napout's Motion for Speedy Trial.** On February 26, 2016, the Court issued an

order rescheduling the next status conference from March 16, 2016 to April 13, 2016 due to the

Court's unavailability. D.E. 264. On March 16, 2016, the government requested that this time be

excluded "given the continued absence of the defendants" and "on the additional grounds that the

case is complex and the evidence in the case continues to be in foreign countries." D.E. 264. On

March 17, 2016, Napout objected to any exclusion beyond the time he had agreed, D.E. 266, and

on March 25, 2016 he filed a Motion for Speedy Trial, or In the Alternative, Motion to Set a

Trial Date ("Motion for Speedy Trial").  D.E. 277, 277-1, 290. On March 28, 2016 the

government reported that, "[w]hile a small handful of defendants are believed to be in countries

that do not extradite their nationals, the government is actively seeking the extradition of all

defendants still overseas… ." D.E. 281.[4]

At the hearing on the Motion for Speedy Trial, counsel argued that the exclusion should

not be granted under § 3161(h)(7) or (h)(6). D.E. 277; Hrg. Tr. 3/29/16 at 7-8. The Court held it

was "complex for purposes of discovery." *Id*. at 8. D.E. 290.

The Court requested the parties discuss grouping stating, "I'm not going to put everything

on halt because we've added a new defendant and that defendant's counsel is stepping in from

scratch."  *Id*. at 10. The government responded, that if defendants are grouped, "there will be a

need to be a formal severance that the defendants in the United States are severed from the ones

who are pending extradition and the government isn't necessarily opposed to that, we can

certainly see the practical reasons." Hrg. Tr. 3/29/16 at 11. As to discovery, the Court stated

---

[4] On March 28, 2016, the government notified Napout that it would provide "financial records from over 300 productions from … FedWire … and from Swiss financial institutions in partial satisfaction of mutual legal assistance treaty requests" and "100 audio files containing dozens of hours of recorded conversations." Ltr. from E. Norris to J. Pappalardo, 3/28/16.

> … I take their representation on face value that they haven't gotten what
> they need and it's voluminous.  I'm not going to stop the clock for forever,
> I'm not going to put you in control of the clock if you don't meet your
> discovery obligations …

*Id*. at 21-22. As to excludable time, the government argued that the speedy trial clock had not

started because of the absence of defendants.  It stated, "again, our understanding, we think

frankly the parties share it and the Court shares it, is that the speedy trial clock hasn't begun at

this point" and the Court ruled in response, "As of this point it has not." *Id*. at 21. The

government requested "that the Court also exclude time "based on complexity and … on the

existence of MLATs overseas." *Id*. D.E. 264.  (Ltr. from AUSA Norris, 3/16/16). The Court held

that it would "continue the exclusion in the interests of justice, the complexity … and attendant

issues of fairness", *id*. at 21-22. D.E. 277, 277-1; 290, and would schedule motions and a trial

date on or shortly after April 13, 2016. Hrg. Tr. 3/29/16  at 21; 3-4; 9; D.E. 290; Notice 4/11/16.

**D.**      **April 13, 2016 Status Conference and Order Excluding April 13 - August 3,**

**2016.** On April 11, 2016 the government reported that as to defendants still overseas it had "no

public information to provide at this time with respect to the status" of 8 of them and that while 9

others are "currently subject to extradition proceedings", the DOJ … "generally does not make

estimates about the length of the time remaining until the conclusion of the extradition process."

D.E. 304. It added that "importantly the government's investigation is ongoing [and that] it will

receive records from a variety of sources including cooperating individuals and entities, as well

as" from MLATs. *Id*. at 3. The government proposed a February 27, 2017 trial date. *Id*. at 4.

At the April 13, 2016 status conference the government agreed to "substantially

completing … discovery in terms of what we have in our possession now" by June 30, 2016 but

that it continued to receive "bank records and other records from foreign countries pursuant to

the MLAT request" and "*substantial records from various cooperating individuals, entities,*

4

*other types of organizations*." Hrg Tr. 4/13/16 at 5-6, 12-13 (emphasis added).  It added it had an "ongoing investigation" and that "other parties" were providing it records. *Id*. at 13-14. It could not "commit to say that by the end of June all discovery will be substantially complete because … more will come in" and that "given the ongoing nature of the case, [there would not be] an artificial moment when discovery will stop." *Id*. Counsel requested a deadline for discovery (with exceptions), an "accelerated" schedule with "less time before the first motions were filed" and that Napout be in any first trial grouping. *Id*. at 14, 17. The Court ordered that motions to sever and those addressed to the face of the indictment be filed August 15, 2016. *Id*. at 16. As to excludable time, it excluded April 13, 2016-August 3, 2016 "given the enormity of the challenges all of you face [,] the responsibility … to provide effective defense" [and] the Court's responsibility to ensure a just resolution. *Id*. at 18-19, 21; D.E. 314.

   **E.**  **Government's July-August 2, 2016 Reports, August 3, 2016 Status Conference and August 29, 2016 Scheduling Order.** On July 1, 2016 the government reported that 8 defendants were overseas subject to extradition proceedings (one had been extradited since April 13) but that it was "unclear how long the … extradition proceedings … will take". D.E. 366. It also reported it had to work out a privilege issue before records from the CONMEBOL search which they received in May are disclosed. It stated "it is continuing to receive *records from cooperating witness*es and entities … as its investigation continues." *Id*. (emphasis added) On July 21 it reported that additional discovery will "exceed" the six million pages already produced and that it "cannot predict with precision when [it] will be ready for production" over the coming weeks. D.E. 372. On August 2, 2016 it reported that it "hopes it will be complete as early as next month" but that it expects to obtain and produce additional materials "from cooperating individuals and entities and by other means as its investigation continues." D.E. 394.

It believed "a spring 2017 trial date is achievable within this framework." *Id*. At the August 3, 2016 conference the government stated that it: "can't give a date" as to when discovery would end (either from "other MLATs" which had been "outstanding for months" and "other types of records") Hrg. Tr. 8/3/16; could not give "a date certain" when outstanding defendants will arrive, *id*. at 8, and expected a Second Superseding Indictment as a result of its "ongoing" and "broad" investigation but did not know when or if additional defendants would be added. *Id*. at 8-9. The Court stated that "realistic or not" it would set a trial date for September 2017 and that Spring 2017 was not realistic because, *inter alia*, of discovery. *Id*. at 6, 13. As to excludable time, the government again argued that the speedy trial clock had not started because of the absence of codefendants and asked that the Court exclude the time "between now and our next date." *Id*. at 17. In response the Court ruled, "[G]iven the findings I have already made, and without prejudice to Mr. Napout and his counsel, I will hear their application and the exclusion will continue." *Id*. at 17-18. The Court excluded from August 3, 2016 to the next status conference and stated it would issue an order with a briefing schedule, status and trial date. *Id*.

F.    **September 19, 2016 Status Conference and Order Excluding August 13 to the Date Pre-Trial Motions are "Resolved".**  At the September 19, 2016 Status Conference, the Court denied Napout's request "to file a motion to sever now, and order[ed] that he "keep with the January [2017] schedule for all the severance motions." Hrg. Tr. 9/19/16 at 20-24. Counsel advised that Napout had been prepared to file his motions for speedy trial and severance, had been permitted to do so on August 3, 2016, Hrg. Tr. 8/3/16 at 10, but then was advised to await a scheduling order. Hrg Tr. 9/19/16 at 23. On September 19, 2016, the Court held that "the difference of three months … including your speedy trial motion, is not significantly impairing your client's right to speedy trial, especially because there is ongoing discovery that I think is

going to be relevant, potentially relevant, especially because there are privilege issues that haven't been resolved as to this particular defendant." *Id*. at 20-24 (the "difference of three and a half months … I do not think it's an unfair delay"). The Court stated, "You're not permitted to file.  Or, you can file it, but I'm not going to consider it." *Id*. at 24.

The Court ordered that all motions to sever be filed by January 17, 2017. As to other pretrial motions such as suppression motions, defense motions are to be filed by March 6, 2017 and defense replies by April 17, 2017. Hrg. Tr. 9/19/16 at 33-34; Docket 9/19/16 Minute Entry.

The government requested time be excluded on the basis of "complexity of the case, and nature and ongoing discovery." *Id*. at 34. The Court held it "will exclude time from now until the end of … for these motions to be resolved." Hrg. Tr. 9/19/16 at 33-34.  It stated:

> So there is still a complex designation for this case, but I do find there's evidence to support based on the number of defendants, the complexity of the evidentiary issues, and the discovery that is still incoming from various sources throughout the world, obviously, and also the nature of the charged against the defendants.
>
> … excluding time specifically is appropriate to allow plea negotiations to continue, because I think that there may still be some, as well as to resolve all the motions that I have now set the schedule for.  So technically I could exclude time until the end of the briefing schedule at a minimum of our last set of motions, because the time could be excluded until I resolve all of these motions.

*Id*. at 34. Minute Entry 9/19/16. As to a possible Second Superseding Indictment, the Court stated "if there are new parties, we're going to have to figure out whether the schedule makes sense to them.  It may be … if they come a little too late, we're just going to have to handle them as a separate case, as not to prolong the proceedings against the existing defendants."  Hrg. Tr. 9/19/16 at 33.

## III.    ALLEGATIONS IN THE SUPERSEDING INDICTMENT

This 27 defendant, 92 count Superseding Indictment spans a 24-year period and also

involves dozens of uncharged coconspirators, 15 schemes and numerous "financial transactions and relationships." Hrg. Tr. 3/29/16 at 18 ; D.E. 304 at 3. The schemes alleged are diverse, including the payment of bribes in connection with purchase of commercial rights for national and internationals soccer tournaments, the sponsorship of the Brazilian national soccer federation, the selection of the host country for the 2010 World Cup, the 2011 FIFA Presidential Election to the UNCAF Region World Cup Qualifiers to the UNCAF Region Friendlies schemes. D.E. 31; Superseding Ind. at ¶¶292-303; 231- 276; 277- 291. The latter two have sub-schemes involving tournaments in certain Central American countries, none of which involve Paraguay.

In addition to being charged with the overarching RICO conspiracy in Count One along with all other defendants,[5] Napout is only charged with participating in two of the 15 schemes – the CONMEBOL Copa Libertadores Scheme #2 in Counts Nine and Ten ("Copa Libertadores Scheme #2") and the CONMEBOL/CONCACAF Copa America Centenario Scheme in Counts Eighty-Three and Eighty-Four ("Copa America Centenario Scheme"). As to both schemes he is charged with wire fraud conspiracy and money laundering conspiracy, in violation of 18 U.S.C. § 1343 and 18 U.S.C § 1956(h).

Of the 26 codefendants named in Count One, 16 are absent. Of the 14 codefendants named in the Copa Libertadores Scheme #2, 12 are absent and of the 13 codefendants named in the Copa America Centenario Scheme, 11 are absent. (The same codefendants are charged in Copa Libertadores Scheme #2 as in the Copa America Centenario Scheme, except for Osuna who is only charged in the Copa Libertadores Scheme #2).[6] Put another way, as to these two

---

[5] Count One alleges RICO predicate acts of honest services wire fraud (18 U.S.C. § 1343); money laundering and money laundering conspiracy (18 U.S.C. § 1956 and §1957); the Travel Act (18 U.S.C. § 1952) and; obstruction of justice and obstruction of justice conspiracy (18 U.S.C. § 1512).

[6] The 14 codefendants named in the Copa Libertadores Scheme #2 are as follows, with those who are absent noted in italics: *Manuel Burga, Carlos Chavez, Luis Chiriboga, Marco Polo Del Nero, Eduardo DeLuca,* Rafael Esquivel, *Eugenio Figueredo, Nicolas Leoz,* Jose Maria Marin, *Jose Luis Meiszner, Romer Osuna, Ricardo Teixeira, Hugo Jinkis and Mariano Jinkis.*

schemes only Napout, Rafael Esquivel and Jose Maria Marin have appeared.

The allegations in the Superseding Indictment as to Napout are as follows:

**A.     Introductory Allegations**

The first group of allegations set forth the positions Napout has held in FIFA and CONMEBOL. Superseding Ind. at ¶41. Between May 29, 2015 and November 23, 2015 he was a member of the FIFA executive committee and a FIFA vice president and "at various times relevant to the indictment he was also a member of FIFA's executive committee and a FIFA vice president, including the disciplinary committee and the organizing committee for the World Cup." *Id*. From August 2014 to "present", he was the CONMEBOL president and prior to that, he was one of CONMEBOL's vice presidents. *Id*. From 2003 to 2013 he was vice president and then president of the Associacion Paraguaya de Futbol, the Paraguayan soccer federation which was a national member association of FIFA and CONMEBOL. *Id*. It is alleged that he was "employed by and associated with the enterprise." *Id*. And, it is also alleged that all defendants conspired "to use their positions … to engage in schemes" involving "the offer acceptance and receipt of undisclosed and illegal payments, bribes, and kickbacks" and sets forth specific acts engaged in by various conspirators to conceal their illegal activities in the United States and elsewhere. *Id*. at ¶¶95-96. It is not alleged which of the specific acts of concealment Napout was purportedly engaged in. *Id*.

**B.     CONMEBOL Copa Libertadores Scheme #2**

Napout is named among "high-ranking CONMEBOL officials" including named defendants who received payment of bribes and kickbacks from Alejandro Burzaco ("Burzaco"), owner of sports marketing businesses such as Torneos, to secure "the broadcasting rights to each edition of the Copa Libertadores, among other tournaments" which rights had been held by

Torneos and its partners from 1999 to present. *Id*. at ¶114. The sports marketing companies paid the bribes at the direction of defendants Hugo Jinkis and Mariano Jinkis and Burzaco, which included moving "millions of dollars among the sports marketing companies and to soccer officials who were the recipients of illicit payments" (*e.g*., Jose Margulies wired $3.5 million into accounts controlled by codefendants Rafael Esquivel, Nicolas Leoz and Eugenio Figueredo from 2003 to 2008). *Id*. at ¶¶115-116.

It is alleged that in 2009, Napout was among "six presidents of … CONMEBOL [that] formed a bloc to obtain greater control over decisions relating to … the sale of CONMEBOL's commercial properties." *Id*. at ¶181. The bloc was led by Luis Chiriboga, Rafael Esquivel and Luis Bedoya ("Bedoya") vice president of CONMEBOL and a member of FIFA's executive committee and the other members of the bloc were Napout, Manuel Burga and Carlos Chavez. *Id*. Starting in about 2009, they "demanded that they, too, receive annual bribe payments in exchange for their support of T&T as the holder of broadcasting rights to the Copa Libertadores" and "Burzaco [paid] annual six-figure bribe payments to Napout, Manuel Burga, Carlos Chavez, Luis Chiriboga, Rafael Esquivel and to Bedoya." *Id*. at ¶182. The allegations name the defendants who solicited and received bribes from Burzaco as well as the defendants Burzaco relied upon as intermediaries to facilitate bribes and kickbacks. *Id*. at ¶¶183-184. Napout is not named in these allegations. In the course of the scheme "various defendants and their coconspirators used wire facilities and financial institutions located in the United States, among other countries, to make and receive bribe payments and to transfer payments related to contracts secured through bribery … and conducted meetings in the United States in furtherance of the scheme." *Id*. at ¶185. Napout is not named in these allegations. *Id*. at ¶¶183-185.

### C.    2016 Copa America Centenario Scheme

It is alleged that in 2013, after meetings with other named defendants as well as with Burzaco and Jose Hawilla, that the company Datisa was newly formed to "obtain and exploit commercial rights to the 2015, 2019 and 2023 editions of the tournament, as well as to a special centennial edition to be held in the United States in 2016." *Id*. at ¶344. In or about August 2013 after a meeting in Buenos Aires between Burzaco, Jose Hawilla and defendants Hugo Jinkis and Mariano Jinkis and a meeting four days later in London, "Datisa agreed to pay tens of millions of dollars in bribes to CONMEBOL officials – all of whom were also FIFA officials – in connection with the 2013 Copa America Contract." *Id*. at ¶348.[7] Napout is not alleged to have been at the meetings. It is next summarily alleged that the "officials who had  solicited and/or were to receive bribes included Napout, ten defendants, coconspirator #1 and Luis Bedoya among others." *Id*. The further allegations detail the use of financial institutions in the United States to make payments, the use of bank accounts in Switzerland to wire money to accounts controlled by CONMEBOL officials throughout the world, and other specific allegations describing the scheme. *Id*. at ¶¶349-361. Napout is not named in these allegations.[8]

## IV.   DISCOVERY PROVIDED BY THE GOVERNMENT

To date the government has provided only exculpatory evidence in its undercover recordings of Napout. The transcripts show that although Napout had no knowledge he was being taped, he clearly and vehemently tells the cooperating witness that he is not involved in any improper activity and that although others may be involved, he is not, and the cooperating witness also knows he is innocent. The cooperating witness agrees with Napout.  As to the

---

[7] The Superseding Indictment also alleges historically that:  In about 1993-2011 Traffic entered into contracts with CONMEBOL, obtained through bribery, which awarded exclusive marketing rights to all editions of the Copa America from 1993-2011; in 2010 Traffic sued CONMEBOL, codefendants Luis Chiriboga, Rafael Esquivel as well as Bedoya with respect to the contract; and in 2013 the law suit was settled.  *Id*. at ¶¶ 341-346.
[8] The only other mention of Napout is in an irrelevant allegation that in August 2014 Napout, who was then CONMEBOL president stated "The Americas are one, it is man who creates frontiers.  I believe in a single America in a working context with CONCACAF and we've reached something real which will go ahead in 2016." *Id*. at ¶358.

documentary evidence, the government has produced approximately over one Terabyte of documents including: electronic and other information including records from all of Napout's bank accounts, which he had identified for the government after his arrest; part or all of the "financial records from over 300 productions from Fed Wire and from Swiss financial institutions;" Clearing House Interbank Payment Systems and; records of numerous other bank and financial institutions. Yet, the government has not identified a single transaction connecting Napout to the alleged conspiracies. Nor are any of his bank accounts or properties listed for criminal forfeiture. The government has produced one document that it appears to have obtained from a cooperator which includes an entry purportedly listing a "Naput" as a person who was to receive a $200,000 bribe. This document, the creation and validity of which will certainly be at issue at trial, fails to show Napout ever asked for or received this, or any, bribe money.

The government has provided 147 tapes containing a total of 113:38:29 hours of recordings. Napout spoke only six times for a total of 7 minutes ranging from 10 seconds to 3 minutes during six recorded conversations made by cooperating witnesses from April 29, 2014 to May 2, 2014. The government did not identify Napout in four of the six conversations, two of which are exculpatory and the rest of which are irrelevant. Excerpts from these recordings are:

1.      On April 29, 2014 at 9:21pm, in response to Promoter #1 saying "Good news," Napout said, "Let's have breakfast tomorrow." Promoter #1 replied, "Yes because I have Coca-Cola" and Napout responded, "Ah, fabulous! I will see you tomorrow." The government did not identify Napout and marked the transcript unintelligible.

2.      On April 30, 2014 at 5:15pm Promoter #2 asked Napout how long he has been married and how many children he has.

3.      On April 30, 2016 at 7:59pm in a crowded room, in response to Napout asking

12

"How is that going?" Promoter #1 said "they want a conference with both of us." Napout said "Yes, we will do it." In response to Promoter #1 asking, "What do you think if we do it after the presentation," Napout replied, "We will do it whenever you want." The government did not identify Napout.

4.      On May 1, 2014 at 11:30am in a crowded lobby Promoter #1 said "Let's have coffee tomorrow" and Napout said "Later, everybody is talking." The government did not identify Napout and misidentifies another person as Napout.

5.      On May 1, 2014 at 8:06pm Napout and Promoter #1 had the following conversation in which the government failed to identify Napout:[9]

| | |
|---|---|
| Napout: | That issue is starting to piss me off.  Today I got one of them. Anybody comes to you and say that I'm in on anything, I'm not in anything.  I am not. |
| Promoter #1: | I know you are not. |
| Napout: | Okay, glad you know that.  If they use my name, f___ them. |
| Promoter #1: | I know and they did and I've known you too long. |
| Napout: | Okay, just … |
| Promoter #1: | And they are liars. |
| Napout: | The other day Eugenio came to me and he said I know you receive money and I said f___ you and he said but they told me so I said, bring the people who say that, bring me the papers, bring me the, give me … |
| Promoter #1: | I know, they are a bunch of assholes and that's their way of doing things. |
| Napout: | I know but I am smarter than they are. |
| Prompter #1: | I know. |
| Napout: | When it comes to the moment; they do not have to play with me. |
| Promoter #1: | I know. |
| Napout: | I am not a snitch do you understand what I am saying? And I don't care about that part so they shouldn't bother me … so if they come and say anything about me … |

On May 2, 2014 at 9:32am, after a meeting of the CONMEBOL Presidents, Napout said to Promoter #1, "This was the best meeting I've had in a long time … The truth is that there are so many lies about this thing. The reality is that I never asked anyone for anything." Promoter #1

---

[9] The government marked Napout as "UM7" and most of the conversation as "unintelligible."

said "I know." Napout continued, "Nothing from anyone.  Now they are saying my name. … I have peace of mind.  But then I am going to get them." The government has not provided a transcript of this recording.

## V.   ARGUMENT

Fed. R. Crim. P. Rule 14 provides that "if the joinder of offenses or defendants in an indictment, or a consolidation for trial appears to prejudice a defendant … the court may sever the defendants' trials …." *Id*. Under *Zafiro*, 506 U.S. 534, a court should grant severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539. Such motions are within the sound discretion of the court. *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003). Severance is warranted because a joint trial would both compromise Napout's specific right to Speedy Trial, particularly under the joined defendants exclusion § 3161(h)(6), and result in prejudicial spillover and transference of guilt which will prevent the jury from making a reliable judgment about his guilt or innocence.

### A.   The Speedy Trial Act

**Joined Defendants – 18 U.S.C. §3161(h)(6) and**
**Ends of Justice / Complexity – § 3161(h)(7)**[10]

Absent being joined with codefendants in this matter, Napout's speedy trial clock would have expired on May 4, 2016 and thus an 18-month delay will occur if he is required to wait until the tentative trial date of November 2017. After having immediately waived extradition, Napout made his first appearance before this Court approximately ten months ago, on December 15, 2015. As requested by the government and specifically held by the Court, the speedy trial clock has not begun to run because there are 16 codefendants outside the jurisdiction

---

[10] For the following reasons and those in the Motion for Speedy Trial, exclusion is also not warranted under the (h)(7) ends of justice/complexity.  D.E. 277-1 at 4-5 citing *e.g.*, *United States v. Gambino*, 59 F.3d 353, 358 (2d Cir. 1995) (indefinite delay will not be tolerated and a continuance based on ends of justice may not be open ended).

of the United States who have not yet appeared and therefore under § 3161(h)(6) the clock will not start until all of them are arraigned. *See e.g.*, Hrg. Tr. 3/29/16 at 21-22; Hrg. Tr. 8/3/16 at 17-18. But – as conceded by the government – some of those defendants will never be extradited. As discussed below, had Napout not been joined for trial with 16 codefendants who may never appear, his speedy trial clock would have run on May 4, 2016. Moreover, while a trial date has been set for November 6, 2017, it cannot be considered an actual trial date on this indictment because it presently joins all codefendants. It is manifestly unreasonable to apply the § 3161(h)(6) joined defendants exclusion under these circumstances.

The Speedy Trial Act requires that a defendant be tried within 70 non-excludable days of his first appearance in court. *Id*. at § 3161(c)(1). Section 3161(h)(6) excludes from the operation of the speedy trial clock "a reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." *Id*. In "cases involving multiple defendants only one speedy trial clock beginning on the dates of the most recently added defendant, need be calculated." *United States v. Pena*, 793 F.2d 486, 489 (2d Cir. 1986) (citing *United States v. Piteo*, 726 F.2d 50, 52 (2d Cir.) *cert. denied*, 466 U.S. 905 (1984)). *United States v. Vasquez*, 918 F.2d 329, 336-37 (2d Cir. 1990) requires that before he may avail himself of the "reasonableness protection" of § 3161(h)(6), he must file a motion to sever (and it must be denied). *Id. United States v. Cephas*, 937 F.2d 816, 822-23 (2d Cir. 1991), *cert. denied*, 502 U.S. 1037 (1991). And, "the duty to inquire into whether a delay caused by a codefendant is reasonable is triggered only when the defendant has sought severance from the particular defendant who is responsible for the delay at issue." *Id.* at 822.

"One benchmark used to assess whether such delay is reasonable [and whether any delay beyond that deadline is reasonable] is the time that would have elapsed on [defendant's] speedy

trial clock had it not been altered by the joinder of new defendants." *United States v. Nguyen*, No. 94 CR 241 (LLS), 1995 WL 380122 (SDNY June 26, 1995) (*citing Piteo*, 726 F.2d at 52-53). In addition to elapsed time on a particular defendant's clock the Second Circuit has suggested that the trial court consider "the totality of the circumstances." *United States v. Gambino*, 59 F.3d 353, 362 (2d Cir. 1995). *See also United States v. Hall*, 181 F.3d 1057 (9th Cir. 1999) (collecting cases discussing "reasonableness"). Here, as of the date of this filing, it has been 322 days since Napout was arraigned on December 15, 2015 and had he not been joined with codefendants, 180 days would have elapsed since Napout's speedy trial clock expired on May 4, 2016. An indefinite amount of days remain before a trial will be held in this matter, and Napout's speedy trial rights are being prejudiced by remaining joined in this action.[11]

"The question thus is whether the [180 day] delay since [May 4, 2016 to date], *and the anticipated delay thereafter*, is unreasonable." *Van Sichem*, 1990 WL 41746 at *1-2 (emphasis added) (delay of three months reasonable under § 3161(h)(7)[12] where remaining defendant had been provisionally arrested in Belgium 6 weeks after two defendants indicted and government had transmitted formal request to extradite).

While is possible to calculate the 180 day delay from May 4, 2016 to present and even the additional 13-month delay to a *tentative trial date* of November 2017 as time which would not have delayed Napout's trial had he not been joined with defendants, it is impossible to calculate the anticipated delay to an *actual trial date* of the present indictment or even to when all pretrial motions will be resolved in this matter. This is because of the following reasons:

First, as of August 3, 2016 the government reported that (a) it does not know when 8 defendants currently subject to extradition proceedings are going to appear and (b) it has "no

---

[11] **Exhibit A** attached, provides counsel's excludable time calculations.
[12] Subsection (h)(7) is now (h)(6).

public information" with respect to 8 additional codefendants which presumably include the "handful of defendants" who it concedes are in countries that do not extradite their nationals. D.E. 366, 304, 281. Napout is not aware of any additional information. With respect to those who are currently subject to extradition proceedings, it may be many months before they appear and, with respect to those whose countries will not extradite, it is likely they will never appear. Indeed, at the hearing on Napout's Motion for Speedy Trial the government as much as conceded that a severance is warranted when it said that if defendants are grouped "there will be a need to be a formal severance" between those who have appeared and those "who are pending extradition" and that "the government isn't necessarily opposed to that."[13] The continuing exclusion of time awaiting extradition of defendants with no prediction of when they will appear and awaiting those who the government admits will never be extradited, is *per se* unreasonable under § 3161(h)(6) as the wait is indefinite.  Under these circumstances, the 18-month delay from May 4, 2016 to a November 2017 tentative trial date is not comparable to a delay caused by one or two un-apprehended defendants which the Second Circuit has held reasonable. *Piteo*, 726 F.2d at 52-53, 25 (two and one half months); *Pena*, 793 F.2d 486 at 489-90 (25 days where two defendants fugitives). *See also United States v. Felton*, 592 F.Supp. 172, 184 (W.D.Pa. 1984) (almost one year was excluded, where one defendant remained a fugitive). In the Second Circuit, under a Sixth Amendment analysis, "it has been suggested there is a 'general consensus' that more than eight months is presumptively prejudicial and merits further inquiry." *United States v. Pennick*, 2016 WL 4089192 *5 (W.D.N.Y. Aug. 2, 2016) (citation omitted). *See also Doggett v.*

---

[13] In similar circumstances, the government *has obtained a superseding indictment that deleted the fugitives*, *see Pena*, 793 F.2d at 488, or simply agreed to proceed to trial without defendants who were in custody in foreign jurisdictions but would not be extradited for many months or were fugitives.  *See United States v. Parga-Rivas*, 689 F.Supp.2d 25, 28 (D.C. Cir. 2009).

*United States*, 505 U.S. 647, 652 n. 1 (1992) (under Sixth Amendment analysis, "post-accusation delay is 'presumptively prejudicial" at least as it approaches one year.")

Second, it is impossible to calculate the anticipated delay to an *actual trial date* in light of the expected Second Superseding Indictment which will result in further delays if defendants and / or charges are added and further discovery is required.  Hrg. Tr. 9/19/16 at 33.

Third, with respect to the "totality of circumstances" approach the Second Circuit applies to a § 3161(h)(6) analysis, it is clear that one of the predominant reasons an actual trial date has not been able to have been set has been because of the government's ongoing investigation during which it continues to obtain additional evidence and discovery from cooperating codefendants, "dozens of others" it has charged (presumably including those by Information), other entities, other types of organizations as well as from MLATs to unknown jurisdictions. As of July 21, 2016 it was unable to estimate when discovery would be complete or when a definite trial date may be set. As of August 3, 2016 the government could not predict an end to its investigation or discovery. Hrg. Tr. 8/2/16 at 8-9,12-13; D.E. 394. ("Court: … at some point we are going to have to call it, absent, of course, any *Brady* obligations that may surface."). At the September 19, 2016 conference the government stated that it was "certainly well past the bulk point" but that they anticipated "another 10 million" which it was getting out the door.  *Id*. at 9-10.  It reported that "from that point … discovery continues" that it "continue[s] to get evidence in" "from a couple of different countries," noting that it had just received "24 binders from the Swiss authorities." *Id*. at 9. It also said that "we anticipate that that process will continue." *Id*. at 9-10. It also noted it had received 350,000 documents received from CONMEBOL. *Id*. at 9-10.

Another aspect that the government has reported on to the Court is that it is engaged in plea negotiations and on September 19, 2016 the Court also ruled that "excluding time

specifically is appropriate to allow plea negotiations to continue, because I think that there may

still be some." Hrg. Tr. 9/19/16 at 35. However, as argued in Napout's Motion for Speedy Trial,

at least two courts have held in analogous circumstances that delays resulting from granting of

excludable time under § 3161(h)(6) while the government attempted to reach plea bargains with

codefendants is unreasonable under that exclusion. *See Hall*, 181 F.3d at 1062-63; *see also*

*United States v. Stephens*, 489 F.3d 647, 655-56 (5th Cir. 2007).[14] Similarly here, the

government's ongoing investigation and efforts to obtain evidence from cooperators, other

entities and unknown foreign jurisdictions which will result in delay the length of which the

government cannot estimate, is unreasonable under the joined defendant's exclusion. Moreover,

there is no exclusion in § 3161(h)(6) for the government to extract pleas from joined

codefendants or continue its worldwide investigation. The government made the strategic choice

to charge 27 foreign nationals, arrest them on foreign soil and unseal the Superseding Indictment

before it had received the evidence it needed. *Pennick, supra* at *8. (dismissal of two counts in

superseding indictment where extensive delays the result of charging decisions). Therefore, the

government should not be granted an exclusion under either § 3161(h)(6) or under § 3161(h)(7)

"ends of justice/complexity" or "discovery/ends of justice" on the basis that the government has

an ongoing investigation and is still, almost a year after the Superseding Indictment, gathering

evidence.[15]  As stated in *Gambino*, 59 F.3d at 358, "the inherent intricacy of the government's

case is not a relevant factor … Were the trial postponed to the next millennium the proof would

---

[14] *Cf United States v. Vassell*, 970 F.2d 1162, 1165 (2d Cir. 1992) (7 month delay in complex case to negotiate plea/cooperation with codefendant reasonable although at "some point the process may become so extreme as to prejudice codefendants who … reject the plea offer").
[15] As further grounds that the "interests of justice/complexity exclusion" should not apply under these circumstances, Napout respectfully incorporates by reference the arguments in his Motion for Speedy Trial filed March 25, 2016.  *See* D.E. 277-1 at 4-7. (Discussing *e.g.*, *Gambino*, 59 F.3d at 358 (2d Cir. 1995))

still be complex." *Id*.  ("Indefinite delay" will not be tolerated and a continuance based on ends of justice may not be "open-ended").

### Foreign Evidence – 18 U.S.C. § 3161(h)(8)

The government requested that the time from March 16, 2016 to April 13, 2016 be excluded on the grounds that "evidence in the case continues to be in foreign countries." *See e.g.*, D.E. 264. As previously argued in Napout's Motion for Speedy Trial, as of March 29, 2016 the Court had made no "finding by preponderance of the evidence that an official request as defined in 3292 of this title has been made for evidence of any such offense and that it reasonably appears … that such evidence is … in such foreign country."  § 3161(h)(8). Hrg. Tr. 3/29/16 at 9 ("I haven't made such a finding. The government has made the representation, it's certainly consistent with what little I do know about the case but I haven't explicitly made the finding"). Under § 3161(h)(8), this delay is "not to exceed one year."  To date, the government has only informed that it has outstanding MLATs. It is still not known from what foreign jurisdictions the requests have been made or when the government will acquire such evidence, which should be the minimal basis on which a finding by preponderance can be made.

Finally, Napout's medical history addresses the impact of this indefinite delay and supports a determination that further exclusion under (h)(6) or (h)(7) is not supportable. *See* D.E. 448 (filed under seal).

### B.  Sixth Amendment Claim

The Sixth Amendment requires that "[i]n all criminal cases the accused shall enjoy the right … to Speedy Trial." U.S. Const. amend. VI. The four factors to be considered in determining whether a defendant's constitutional right to speedy trial has been violated are "Length of delay, the reason for the delay, the defendant's assertion of his right and the prejudice

to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Doggett*, 505 U.S. 647; *United States v. Howard*, 443 Fed. Appx. 596, 599-600 (2d Cir. 2011); *Vasquez*, 918 F.2d at 337-38. These factors "must be considered together with such other circumstances as may be relevant." *United States v. Cain*, 671 F.3d 271 296-97 (2d Cir. 2012) (quoting *Barker*, 407 U.S. at 533).

As to the length of anticipated delay *to an actual trial date*, it is unknown even if the tentative trial date set for November 2017 will occur, and even if it does, this is still an 18-month delay from when Napout's speedy trial clock would have expired absent being joined with codefendants. *See Pennick*, *supra* at *5 (general consensus that more than 8 months is presumptively prejudicial and merits further inquiry). The government has conceded that it does not know when those subject to extradition proceedings will appear and that some of the defendants are "in countries which do not extradite their nationals", so a trial date with those defendants now joined cannot be predicted. Thus far, research has not disclosed a case in which the government has moved to exclude time where it concedes there are some codefendants who are likely never to appear.

As to the reasons for the delay, the burden is on the government to explain the cause and to demonstrate diligence in prosecuting the action, although all parties' actions are considered. *See Doggett*, 505 U.S. at 652. As stated above, the reasons for delay are the result of (1) lengthy extradition proceedings because of the government's strategic charging decision to indict foreign nationals and arrest them in foreign countries, some of which do not extradite their nationals and (2) the government's ongoing investigation and securing of "substantial evidence from various cooperating individuals, entities, other types of organizations." The government has stated that it realizes that it may have to sever those who have made an appearance from those who have not.

As to asserting his right to Speedy Trial, Napout has done so by filing two Motions for Speedy Trial, this Motion to Sever, and repeatedly objecting to the exclusions.

Finally, a showing of "prejudice" suffered as a result of the delay does not require demonstrable trial-related prejudice such as weakening ability to raise specific defenses, elicit specific testimony or produce specific items of evidence. *Doggett*, 505 U.S. at 654-655.[16] Rather, prejudice "is part of the mix of relevant facts, and its importance increases with the length of the delay." *Id*. at 656. *Doggett* also reaffirmed that unreasonable delay between formal accusation and trial "threatens to produce more than one sort of harm including oppressive pretrial incarceration, anxiety and concern of the accused [including but not limited to] the possibility that the defense will be impaired by dimming memories or loss of exculpatory evidence." *Id*. at 655.  (internal quotations omitted). These trial-related risks of prejudice (affected memories, witness unavailability and loss or destruction of potentially exculpatory evidence) exist here particularly in light of an indefinite delay. In addition, Napout has suffered non-trial related hardships – including a significant medical impact. *See* D.E.448 (filed under seal). *See e.g., United States v. Gould*, 672 F.3d 930, 939 (10th Cir. 2012) (special harm suffered which distinguishes an accused's case is considered under prejudice prong in Sixth Amendment speedy trial claim); *United States v. Chavez*, 979 F.2d 1350, 1354 (9th Cir. 1992).

Continuing to exclude time awaiting extradition of codefendants from foreign jurisdictions with no prediction of when they will appear and awaiting those who the government admits will never be extradited, is a violation of his Sixth Amendment right to speedy trial.

### C. Prejudicial Spillover, Severe Disparities in the Evidence and Alleged Involvement in the Overall Scheme, as well as Significant Potential of Antagonistic Defenses Warrant Severance

---

[16] Although the Second Circuit stated in *Cain*, 671 F.3d at 297 that it has "generally required a showing of some significant trial- related disadvantage in order to establish a speedy trial violation", it relied upon *Flowers v. Warden*, 853 F.2d 131, 133 (2d Cir. 1988), a pre-*Doggett* case.

Although the government has alleged 15 conspiracies committed over two decades, aside from the overarching RICO conspiracy naming all defendants, the government has charged Napout only with limited involvement in two discrete conspiracies *i.e.*, the Copa Libertadores Scheme #2 and 2016 Copa America Centenario Scheme. Even with respect to these two conspiracies, the allegations against Napout are conclusory.

The twelve paragraphs describing the Copa Libertadores Scheme #2 reveal that there are no specific allegations against him. His name appears only in the assertion that in 2009 he was one of six CONMEBOL presidents who demanded that they receive annual bribe payments in exchange for their support of T&T as holder of the broadcasting rights to the Copa Libertadores which Burzaco paid and in Counts Nine and Ten which summarily allege the predicate wire fraud and money laundering conspiracies associated with the scheme. Similarly, the twenty paragraphs describing the 2016 Copa America Centenario Scheme reveal that there is no specific act or allegation as to Napout either with respect to the history of bribery associated with the "Copa America" going back to 1999 or with respect to the conduct specifically involving the Copa America Centenario Scheme, which occurred during the limited period of 2013-2015. Napout's name appears only in the allegation that he was one of the CONMEBOL officials who "had solicited and/or were to receive bribes" and in Counts Eighty-Three and Eighty-Four which summarily allege the predicate wire fraud and money laundering conspiracies associated with the scheme. Other than in the two schemes, the only other time Napout's name appears is in conclusory allegations in Count One alleging that he is one of 27 defendants who corrupted the enterprise with soliciting or receiving bribes, *id*. at ¶95, and that "he sought to portray himself as an agent of reform notwithstanding his own long-standing involvement in the solicitation and receipt of bribe[s]." *Id*. at ¶137.

Judging by the allegations and the exculpatory evidence produced as to Napout after its multi-year investigation, it is a veritable certainty that there will be wide disparities in the amount or type of proof offered against the codefendants, in the degrees of involvement by codefendants in the overall RICO scheme, as well as in the two discrete schemes with which Napout is charged. As to the codefendants, there are numerous details limned as to manner and means, overt acts and criminal conduct in carrying out the various schemes and specific allegations as to numerous acts to prevent the detection of their illegal activities.[17]

With respect to the use of wires and financial services companies alleged in the Copa America Centenario Scheme, in or about 2013 "bribe payments were … wired from bank accounts in Switzerland controlled by Datisa and its partners, including codefendants Hugo Jinkis and Mariano Jinkis to accounts controlled by CONMEBOL officials throughout the world, including accounts in the United States." *Id*. at ¶ 350. Similarly, in the Copa Libertadores Scheme #2, "millions of dollars" were moved "to soccer officials who were the recipients of illicit payments" and other named defendants solicited and received bribes using wire facilities in the United States and other countries. *Id*. at ¶¶116, 183.

Yet, discovery to date shows that none of these or any other allegations of specific acts are alleged to, or in fact do, pertain to Napout.  Nowhere in the massive amount of discovery (electronic or otherwise) the government has provided to Napout is there any evidence of money being wired into or out of any of Napout's accounts or, indeed, evidence of any of other transaction which would support these bald allegations. The one

---

[17] For example, it is alleged that various members of the conspiracy used " 'consulting services' agreements and other similar types of contracts to create an appearance of legitimacy for illicit payments; … [used] bankers, financial advisors, and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies, nominees, and numbered bank accounts in tax havens and other secretive banking jurisdictions; the active concealment of foreign bank accounts; the structuring of financial transactions to avoid currency reporting requirements; bulk cash smuggling; the purchase of real property and other physical assets; the use of safe deposit boxes; income tax evasion; and obstruction of justice." *Id*. at ¶ 96.

misspelled ledger entry aside – for which there is no corroborating evidence that it was solicited or paid or in Napout's accounts  – the discovery does not show any, let alone peripheral, involvement by Napout. Rather, it reflects exculpatory evidence, not only in the sense of the lack of any proof that money was ever solicited or received, but also in Napout's vehement assertions during surreptitious recordings, that he had not and would not take bribes. It appears the evidence against Napout will be the uncorroborated testimony of cooperators who themselves have pled guilty. At the February 25, 2016 hearing, in response to the Court asking the government to provide an example of an overt act Napout was alleged to have done in furtherance of the conspiracy, it replied that it "was not required to allege an overt act" and that witnesses had described his conduct. Hrg. Tr. 2/25/16 at 49-50. When asked if Napout was "directly involved in bribe payments *or* some other illegal activities," the government responded, "Yes, and in the agreement that there would be bribe payments." *Id*. The government agreed that its proffer was merely that "he was part of an agreement that was illegal and [did not] want to go farther as to whether he profited from it or not." *Id*. at 51.

*Zafiro* makes clear that severance is warranted "if there is a serious risk that a joint trial would … prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539. Rule 14 does not require *proof of prejudice* but rather, requires an assessment of whether joinder "*appears to prejudice* a defendant." *Id*. (emphasis added). A number of courts, including at least one trial court in this Circuit, have developed the following factors to be considered in determining whether the risk of prejudice resulting from a joint trial warrants severance:

> the number of defendants and the number of counts; the complexity of the indictment; the estimated length of trial; disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict

> between the various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against codefendants but which is inadmissible or excluded as to a particular defendant.

*United States v. Gallo*, 668 F.Supp. 736, 748-49 (E.D.N.Y. 1987), *aff'd*, 863 F.2d 185 (2d Cir. 1988); *United States v. Gatto*, 746 F.Supp. 432, 446 (D.N.J. 1990); *United States v. Scarfo*, Cr. No. 11-740 (RBK), 2012 WL 4120504 *13 (D.N.J. Sept. 19, 2012). "Courts have frequently severed trials based on these factors." *Gatto*, 746 F.Supp. at 446 (collecting and discussing cases). While *Gallo* involved only 16 defendants and 22 counts, it was charged in a manner similar to that here – an overarching RICO conspiracy count with the non-RICO counts concerning crimes alleged as predicate acts in the RICO conspiracy count. *Id*. at 738. In *Gallo*, the court noted that the large number of counts and defendants made it more difficult for the jury to keep straight specific evidence and charges against each defendant, which difficulties were compounded for those defendants against whom only a small portion of evidence is relevant. *Id*. at 750. It found that as a practical matter, the "'inevitable prejudice' to the peripheral defendants is caused by the 'slow but inexorable accumulation of evidence' against the major players." *Id*. (quoting *United States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965), *cert. denied*, 384 U.S. 947 (1966)). It also found that the alleged conspiracies within conspiracies and defendants joining and leaving certain conspiracies would require that the jury heed extraordinarily intricate limiting instructions. *Id*. at 752. Accordingly, the court severed the case into groups, including a group of those charged with acts involving a single discrete episode of criminal activity, and another group whose conduct concerned two primary areas of alleged criminal activity substantively unique to those defendants. *Id*. at 758-60; *see also United States v. Gambino*, 729 F.Supp. 954, 971 (S.D.N.Y. 1990) (court severed trial of 15 defendants charged in 7 count indictment alleging 172 overt acts in furtherance of conspiracy into one group of core conspirators alleged to have committed most acts of violence and second group who oversaw or facilitated the other acts

thereby minimizing prejudicial spillover). *Gatto*, 746 F.Supp. at 446-451 is of similar effect. *Id*. at 449. There, the first count charged a RICO conspiracy in which all 8 defendants were named. *Id*. at 449. The second count set forth three conspiracies each of which involved different defendants in different combinations. *Id*. In applying the *Gallo* factors, the court severed the trial into two groups because (1) in light of "the multiple conspiracies charged in the indictment, the jury may be unable to compartmentalize the evidence against each defendant for each conspiracy"; (2) the trial – in which the government's  case would take three months – "would cause extreme hardship to the court, the jury, the defendants, and counsel"; and (3) "those defendants not charged with violent predicate acts may be prejudiced by substantial proof of violent acts by codefendants." *Id*. at 450-51.

While *Spinelli*, 352 F.3d at 55 noted that "differing levels of culpability and proof … standing alone are insufficient," it also held that "there are, of course, cases in which the sheer volume and magnitude of the evidence against one defendant dwarfs the proof against his codefendant that a severance is required to prevent unacceptable spillover prejudice." *Id*. Even where the Second Circuit has found no abuse of discretion in a trial court's failure to sever, it has cautioned against joint trials in which there are disparities in the degrees of involvement by defendants in the overall scheme. For example, in *United States v. Rittweger*, 524 F.3d 171, 180 (2d Cir. 2008) it noted that the government's closing in lumping together all coconspirators highlighted

> the danger of joining relatively minor participants, who have discrete roles in a larger conspiracy, with the more prominent and active members of overlapping conspiracies.  Rule 8(b) does not provide the government with limitless discretion to join defendants and does not absolve the government from an independent obligation to consider the unfairness that may result from joinder.

*Id.* Courts have also noted the substantial evidentiary difficulties presented where, although all defendants are charged in an overarching RICO conspiracy, different defendants are charged in

different conspiracies. *United States v. Andrews*, 754 F.Supp. 1161, 1175-79 *enforced in part and set aside in part*, 754 F.Supp. 1197 (N.D. Ill. 1990), which involved 29 defendants and 175 counts alleging 250 separate criminal acts committed over 23 years, is particularly instructive on that score. First, the court found that the sheer volume of evidence and the manner in which the case was charged made the admission of evidence complex and subject to "a web of hundreds of complicated and intricate limiting instructions." 754 F.Supp. at 1177. [18] It explained that while "much of the anticipated evidence would be technically relevant to the RICO charges under … Rule 401 as to all of the defendants,  a large part of it would surely be excluded under … Rule 403 against most defendants because it would be cumulative or prejudicial." *Id*. at 1176. It also held that "other evidentiary rules would compel surgical admission of evidence against only selected defendants. With respect to coconspirators statements under Rule 801(d)(2)(E) … the evidence would be admitted on an especially complicated basis due to a multitude of conspiracies charged as subparts to the overarching RICO conspiracy." *Id*. at 1176-77.[19] It noted that the matter was further complicated by conspiracies involved varying combinations of defendants, [which] exist for differing periods of time. *Id*. In addition to the evidentiary difficulties impacting the jury, the court found severance warranted on the independent ground of "gross disparity in the weight of the evidence against the defendants," which presented a danger that some defendants would suffer 'spillover prejudice' and transference of guilt "merely due to the accumulation of evidence against other defendants." *Id*. at 1177. It ruled that this jeopardized "each defendant's fundamental right to an independent determination of his guilt or innocence."

---

[18] *See United States v. Moreton,* 25 FRD 262, 263 (W.D.N.Y. 1960) (indictment charging 17 defendants including 11 counts of conspiracy that did not encompass the same defendants in each conspiracy held prejudicial to defendants because indictment rendered it "difficult, if not impossible, for court to adequately charge a jury").

[19] *See United States v. Romanello*, 726 F.2d 173, 182 (5th Cir. 1984) ("conspiracy trials with their world-girdling potential" in permitting the "admission of hearsay testimony, the use of conspiratorial acts to prove substantive offenses" threaten to undermine fair consideration of individual conspiracy defendants); *United States v. Eiland*, 406 F.Supp.2d 46, 51 (D.D.C. 2005) (concern for inherent prejudice and greater risk "when the conspiracy alleges disparate crimes and smaller sub-conspiracies.")

*Id.* Finally, the court noted that the sheer number of defendants made antagonistic defenses and a significant degree of finger pointing a "virtual certainty" which also weighed heavily in favor of severance." *Id.* at 1179. In sum, severance was warranted either because the "massive and complex evidence [made] it impossible for the jury to separate evidence as it relates to each defendant when determining each defendants innocence or guilt" *or* because of the "gross disparity in the weight of the evidence against the defendants." *Id.* at 1175-79.[20]

Some courts, analyzing these same factors have noted that the prejudice is to the jury system itself in that it impedes the jury's ability to make a reliable judgment about guilt or innocence. *See United States v. Delatorre*, 522 F.Supp.2d 1034, 1050-1055 (N.D. Ill. 2007) (collecting cases); *Gallo*, 668 F.Supp. at 754 (jurors must perform "mental gymnastics of properly considering the various permutations of the many limiting instructions that are given").

Here, applying the *Gallo* factors, there are 27 defendants charged in 92 counts and courts have determined that considerably fewer defendants and counts are too unwieldy to be appropriately joined. The indictment is complex involving 15 diverse schemes (two with sub-schemes) occurring over different time periods in many countries. Different groups of defendants are involved in different conspiracies. There is a severe disparity in the degree of alleged involvement in the overall 24-year scheme and the two schemes with which Napout is charged. In the first instance, this is evident in light of the paucity of allegations against Napout on the one hand and the detailed allegations referencing documentary evidence against the codefendants on the other hand. It cannot be said that even as alleged, he is only a peripheral defendant in a vast global conspiracy. There is a severe and evident disparity in the amount of proof against the

---

[20] *See United States v. Farano*, 749 F.3d 658, 661 (7th Cir. 2014) (defendants should be tried separately if serious risk that joint trial would prevent jury from making a reliable judgment about guilt or innocence such as in "a *complex* case with *many* defendants some of whom might only be *peripherally* involved … The danger is that the bit players may not be able to differentiate themselves in the jurors' minds from the stars.") (emphasis in original).

codefendants, which is apparent simply from the discovery provided as to Napout which reflects exculpatory evidence in both the recorded conversations and complete absence of any bribes or other illicit funds after a years long examination of Napout's accounts. Moreover, the complex involvement of the various defendants and the multiplicity of charges, schemes and sub-schemes alleged in the indictment will make it virtually impossible for the jury to separate evidence as it relates to each defendant and/or to follow limiting instructions when determining each defendant's guilt or innocence. As a result of the massive amount of evidence against the codefendants having nothing to do with Napout, absent severance, there will be inevitable prejudice spillover and consequent transference of guilt.[21]

## CONCLUSION

For the foregoing reasons, Napout respectfully moves for severance from all defendants and, in the alternative, from the 16 defendants who have not appeared in this Court.

Respectfully submitted,

**GREENBERG TRAURIG, LLP**
One International Place
Boston, MA 02110
Tel: (617) 310-6072
pappalardoj@gtlaw.com
becerraj@gtlaw.com

s/A. John Pappalardo
A. John Pappalardo
Jacqueline Becerra

**PIÑERA-VAZQUEZ LAW FIRM**
International Center
1900 Southwest 3rd Avenue
Miami, FL 33129
Tel: (305) 443-0629
sbp@pineravazquezlaw.com

s/Silvia B. Piñera-Vazquez
Silvia B. Piñera-Vazquez

---

[21] An inquiry pursuant to *United States v. Cassamento*, 887 F.2d 1141, 1151-52 (2d Cir. 1989) should be made which would elicit from the prosecutor "a good faith estimate of the time reasonably necessary to present the government's case" with the Court making "an independent assessment based on factors such as the number of defendants, the time and territorial scope of the crimes charged." *Id.* at 1151-52. If the Court determines the government's case will exceed 4 months, the Court "should oblige the prosecutor to provide a reasoned basis to support a conclusion that a joint trial is more consistent with the fair administration of justice than some manageable division of the case into separate trials of groups of defendants" and to provide "an especially compelling justification for a joint trial of more than ten defendants." *Id.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 31, 2016, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that this document is being served simultaneously on all counsel of record in the matter specified, either by transmission of Notices of Electronic Filing generated by CM/ECF, or in another authorized manner.

<u>s/A. John Pappalardo</u>
A. John Pappalardo

*BOS 47987033*