GOVERNMENT
EXHIBIT
**6**
15 CR 252 (PKC) (RML)

1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK

2

3   - - - - - - - - - - - - - - X

4   UNITED STATES OF AMERICA,        :   15-CR-00252(RJD)
                                      :
            Plaintiff,                :

5                                     :
                                      :
6           -against-                 :   United States Courthouse
                                      :   Brooklyn, New York

7                                     :
                                      :
8                                     :   Thursday, February 25, 2016
    JUAN NAPOUT,                      :   11:06 a.m.

9                                     :
            Defendant.                :

10  - - - - - - - - - - - - - - X

11          TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING

12           BEFORE THE HONORABLE ROBERT M. LEVY
               UNITED STATES MAGISTRATE JUDGE

13

14                A P P E A R A N C E S

15

16  For the Government:      ROBERT L. CAPERS, ESQ.
                             United States Attorney

17                           271 Cadman Plaza East
                             Brooklyn, New York 11201

18                           BY:  KRISTIN MACE, ESQ.
                                  Assistant U.S. Attorney

19

20  For the Defendant:       GREENBERG TRAURIG, LLP
                             One International Place

21                           Boston, Massachusetts 02110
                             BY:  JOHN PAPPALARDO, ESQ.

22                                JACQUELINE BECERRA, ESQ.
                                  (telephonically)

23                                and

24                           PINERA-VAZQUEZ LAW FIRM

25                           1900 SW 3rd Avenue
                             Miami, Florida 33129
                             BY:  SILVIA PINERA-VAZQUEZ, ESQ.

*Proceedings*                                                    2

1   Court Reporter:            JOSHUA B. EDWARDS, RDR, CRR
                               225 Cadman Plaza East
2                              Brooklyn, New York 11201
                               joshua_edwards@nyed.uscourts.gov
3
    Proceedings recorded by mechanical stenography; transcript
4   produced by Computer-Assisted Transcription.

5                         *       *       *

6                   (Defendant present telephonically.)

7                   THE COURTROOM DEPUTY:  Criminal cause for bond

8   modification hearing, United States versus Juan Ángel Napout,

9   case number 15-CR-00252.  Please state your appearances for

10  the record.

11                  MS. MACE:  Good morning, Your Honor, for the United

12  States, Kristin Mace.

13                  THE COURT:  Good morning.

14                  PRETRIAL OFFICER ILARIA:  Good morning, Your Honor,

15  Officer Michael Ilaria from Pretrial Services, I-L-A-R-I-A.

16                  THE COURT:  Good morning.

17                  MR. PAPPALARDO:  Good morning, Your Honor, John

18  Pappalardo from Greenberg Traurig.

19                  MS. PINERA-VAZQUEZ:  And Silvia Pinera-Vazquez on

20  behalf of Mr. Napout who is present through the use of the

21  audio in Miami.

22                  THE COURT:  Good morning.

23                  MR. PAPPALARDO:  Also with Jacqueline Becerra of

24  Greenberg Traurig.

25                  THE COURT:  Great.  Mr. Napout, can you hear me?

*Proceedings*                                                          3

1          THE DEFENDANT (telephonically):  Yes, yes, I can.

2          THE COURT:  Good.

3          MS. BECERRA (telephonically):  We can hear you, Your

4     Honor.

5          THE COURT:  And I know that you have waived your

6     appearance here in person today for financial reasons and

7     other reasons.  Are you comfortable appearing by telephone?

8          THE DEFENDANT:  Yes, Your Honor, I am.  I am, Your

9     Honor.

10         THE COURT:  Okay, all right.  So it might make sense

11    just to get a report from Pretrial Services before we go

12    anywhere.  Take your drink, relax.

13         PRETRIAL OFFICER ILARIA:  Thank you, Your Honor.

14    Just briefly, so far the defendant's been monitored, I

15    believe, for approximately a month or two.  So far we have

16    no --

17         MS. PINERA-VAZQUEZ:  Three.

18         PRETRIAL OFFICER ILARIA:  Three months, I apologize.

19    We have had no significant compliance issues.  The case is

20    being supervised by an officer in the Southern District of

21    Florida where the defendant is living.  We have had e-mail

22    contact with that officer and we have gotten that report from

23    her that there has been no issues.

24         We are today recommending that the conditions stay

25    the same.  There is no significant reason why those conditions

*Proceedings* 4

1    need to change.  I know there is going to be some discussion

2    about modifications, but our position as it is in the bail

3    report remains the same, that he remain on bail with the

4    conditions that have been set in place and the bond that has

5    been set in place.

6            We would also just add someone complying is not by

7    itself a reason to modify changes.  The Court and certainly

8    Pretrial Services expects people to honor the agreement they

9    made with the Court, so we don't necessarily give out cookies

10   to people who have done well or complied with those conditions

11   of bail.

12           THE COURT:  And does Pretrial Services have some

13   concerns which you will want to express later about modifying

14   the conditions, or I take it there is a difference between

15   taking no position on this application and stating that you

16   believe the conditions that are present should stay in effect?

17           PRETRIAL OFFICER ILARIA:  Yes, Your Honor, we do

18   have concerns and those concerns were articulated in the bail

19   report, the assessment of nonappearance and danger.  We stand

20   by those risk recommendations.  We feel like the package that

21   has been presented and accepted by the Court is suitable to

22   address those risks.

23           The defendant is on GPS monitoring.  He is on home

24   detention.  That condition does allow for certain activities

25   with approval from Pretrial Services.  And I think it's

*Proceedings*                                                        5

1   flexible enough to allow for whatever I suspect are medical

2   issues that will be discussed today.  I think it's flexible

3   enough to allow for those within reason and the Court's

4   approval, if necessary.

5            THE COURT:  Okay.  So that's the background to this

6   application and we will hear the full application.

7            MS. PINERA-VAZQUEZ:  I just want to address

8   something related to the Pretrial Services officer.

9            THE COURT:  Sure, if you are more comfortable

10  sitting down.

11           MS. PINERA-VAZQUEZ:  Thank you, Judge.  I have

12  primarily been in charge of the Miami angle speaking to August

13  Serrano which is the local Pretrial Services officer.  And her

14  position was outlined in our motion for modification.  And I

15  don't want the Court to feel any that there is any sort of

16  miscommunication.

17           I actually did speak with her again today and her

18  position remains that the 24/7 monitoring along with the

19  electronic ankle bracelet is duplicitous and there is no

20  reason to have the 24/7 security if you are going to have the

21  home detention and the curfew and the electronic monitor.  She

22  is on standby.  I fully recognize as -- I'm sorry; what's your

23  last name?

24           PROBATION OFFICER ILARIA:  Ilaria.

25           MS. PINERA-VAZQUEZ:  Mr. Ilaria just told me that

*Proceedings* 6

1    they are the primary Pretrial Services supervisors. So really

2    she's just a direct contact, the local Pretrial Services

3    officer. But in the end, she's the one who has had contact

4    with him. She is the one who has been able to see him on a

5    weekly basis and dropped in. And her position as stated in

6    there is it's duplicitous because it's unnecessary.

7            Also, the part of the video surveillance, the fact

8    that he can't go in the entire building and has to stay in his

9    room, those are all issues she's dealt with on a direct basis.

10   So we would ask the Court to consider what her position is

11   also as far as being the one who is actually monitoring him.

12           THE COURT: And she is available by phone, correct?

13           MS. PINERA-VAZQUEZ: She is, Your Honor.

14           THE COURT: Are you requesting we hear from her as

15   well?

16           MS. PINERA-VAZQUEZ: Yes, if the Court would like to

17   hear from her, that's fine.

18           PRETRIAL OFFICER ILARIA: Just to briefly touch on

19   that just so it's clear, I did speak to counsel before we went

20   on the record. They have been very nice and they now

21   understand that those communications about proposed bail

22   modifications should start here. It's an Eastern District of

23   New York case. It's a Pretrial Services case. It's our bail

24   report. It's our case.

25           The only reason that officer -- and she's a great

1  officer and she has a lot of experience -- is involved in the

2  case is because this defendant lives in Florida.  There is no

3  other reason.  So when we gave the case to her to supervise,

4  it was a courtesy supervision request.

5          But any time counsel makes an application for bail

6  modifications, those should start with the district that is

7  the controlling district.  That is us.  So even though we

8  appreciate the contact counsel has had with the officer, it is

9  our office that makes the final decision or gives the position

10 of Pretrial Services.  So we certainly take into account what

11 their experience has been directly with a defendant, but that

12 is just one factor in our ultimate decision, whether we

13 consent or object to an application.

14         I just also note that we have FIFA cases here.  We

15 have FIFA cases in other parts of the country.  To my

16 knowledge, there have been no significant modifications like

17 the one will you hear today.  These packages are substantial.

18 They are very unique to Pretrial Services and I think even all

19 the parties involved, and I belive the way this package was

20 structured is addressing every possible need and whatever risk

21 the Court felt was present.

22         THE COURT:  Okay, thank you.

23         MS. MACE:  Your Honor, if I might just make a

24 proposal?

25         THE COURT:  Sure.

*Proceedings*                                                        8

1          MS. MACE:  With regard to Pretrial Services and the

2     role, as Mr. Ilaria explained, Pretrial Services here has done

3     the risk assessment and set it forth in the bail report.  And

4     so Ms. Serrano in Florida has supervised the defendant.  And

5     if there is a question or issue about his compliance with the

6     terms of supervision and so forth, it may be appropriate to

7     get her on the phone.

8          But I actually don't think that there will be a

9     factual issue about that today.  I think the question is the

10    risk assessment and that has been performed by Mr. Ilaria and

11    his office.  So I would just propose we start there with the

12    risk assessment.  If there's a factual dispute about

13    compliance with conditions, then it may make sense to reach

14    out to Florida, but I don't foresee there will be one.

15         THE COURT:  I understand that position, and the risk

16    assessment comes from Pretrial Services here.  I don't think

17    there is an issue about compliance, from what I can tell.  I

18    think that, as Mr. Ilaria said, it sounds as though the

19    compliance was expected.  And so, complying with the terms and

20    conditions doesn't mean that if one or two of those conditions

21    were removed, the risk would increase.

22         The reason it might be useful, and I don't know yet,

23    would be to understand how that 24/77 security works and if

24    there are physical restrictions and limitations, I just heard

25    from defendant's counsel, what that really means.  And then we

1  would factor that back into the risk assessment and see if

2  there is any way to deal with the concerns.  There may not be.

3          MS. MACE:  And I'm prepared to speak from the

4  government's perspective about the purpose of those various

5  different conditions that are in place and why we think they

6  are important and not duplicative.

7          THE COURT:  Great.

8          MS. MACE:  Maybe if we proceed through the arguments

9  today, we will see if there is a factual question about how it

10  actually operates.

11          THE COURT:  Sure, okay.

12          MS. MACE:  If that's acceptable to everybody.

13          MS. PINERA-VAZQUEZ:  That's fine.

14          THE COURT:  Mr. Pappalardo, did you want to start?

15          MR. PAPPALARDO:  Yes, Your Honor.  Thank you very

16  much.  And it's okay to sit down?

17          THE COURT:  Absolutely.  It's probably better.

18          MR. PAPPALARDO:  Thank you.  Your Honor, we filed

19  this motion because we believe that the conditions that were

20  imposed on December 15th and the manner in which they were

21  imposed are both unnecessary and unwarranted.  In addition, we

22  believe that the amounts of bail are excessive and

23  unreasonable.

24          The analysis stems from a historical perspective,

25  and if the Court would indulge me briefly, Mr. Napout is a 57,

1  58-year-old man.  He is an individual that is very different

2  than most of the other defendants in the FIFA case.  And I

3  want to make this point clearly to the Court.  He is a man who

4  at the age of 50 retired.  He was born independently wealthy.

5  He went into football at or about the time he retired.  He was

6  the principal in a large import/export business in Paraguay.

7  By the time he was 50, he had accumulated considerable assets,

8  none of which, of course, are within the question of any

9  indictments that came out in 2015.

10            Approximately -- well, let me fast-forward to the

11  early part of 2015.  Mr. Napout has four children.  He has got

12  three daughters and a son.  He is still married to his first

13  wife.  They have an extremely close family unit.  And at all

14  times, whether in business or otherwise for football, when he

15  traveled, he went back to his home in Paraguay.

16            His family is what defines his existence.  It became

17  clear that a passion of his was football.  He became the head

18  of the Paraguayan football club, and ultimately through a

19  series of events became the president of CONMEBOL in a very

20  quick fashion.

21            As president, he began to institute changes that

22  were very clear from his assessment of what was going on

23  there.  And all of this occurred well before any hint of any

24  government investigation.  But let's fast-forward to June of

25  2015.  As the Court knows, there were a series of arrests in

*Proceedings*                                                             11

1   Switzerland on May 27th of last year.  Mr. Napout was not in

2   that group.  Based upon that, Mr. Napout sought advice.  He

3   hired my firm.  He hired Ms. Pinera-Vazquez.  We spoke to him.

4   We wanted to find out what this was about.  We began an

5   internal investigation.

6           From the time we began that investigation, as

7   somebody who was with the government for 20 years, I'm no

8   stranger to how the government works.  I picked up the phone.

9   I spoke to Mr. Norris.  I said to him, listen, I don't know

10  what this is about, but I will find out.  I want you to know

11  two things.  I want you to know that we represent Mr. Napout,

12  number one, and number two, if there should ever come a time

13  when you think you have enough information to charge him with

14  a crime, please let me know.  We will surrender him.

15          Now, obviously that is not something that the

16  government has to agree with, but I did put them on notice

17  that that was the case.  In fact, we even discussed -- we even

18  discussed at that time that Mr. Napout would be traveling, and

19  he said that wouldn't be a problem.  He also informed me in

20  that conversation that Mr. Napout was a target of the

21  investigation and with this knowledge -- we have that

22  communication -- I called him again several weeks later as we

23  were beginning the investigation and said to him, listen, we

24  are beginning our internal review.  We would like to, you

25  know, maintain contact with you.  And by the way, Mr. Napout

1   is traveling again.

2          He said look, I'm not going to discuss with you

3   anymore about what Mr. Napout does in terms of his travel.  If

4   he travels, he travels.  I'm not going to give you, you know,

5   any notice of whether or not that's okay.  And that's

6   perfectly fine.  So we began our internal investigation.  We

7   looked at all of Mr. Napout's bank records, which were

8   considerable, around the world.  We looked at his holdings.

9   We obviously spoke to him.

10          At some point in time, we were getting to the point

11  in the investigation where it became necessary to sit down

12  with Mr. Napout in the United States.  And in order to do so,

13  we asked for and ultimately secured safe passage to the United

14  States by agreement, by written agreement with the government,

15  which had on it attached to it significant conditions of what

16  Mr. Napout could, but most importantly what he couldn't, do.

17  Mr. Napout was in complete conformity with those restrictions.

18  He was here for the specified period of time.  In fact, I

19  think left a little bit earlier.

20          And we concluded that facet of the internal review

21  that we were conducting.  We were also conducting a review of

22  what was going on in other parts of this case.  On December

23  1st, Your Honor, I spoke to the government.  I said to them

24  two things.  I said, number one, I think we are at a point

25  where we need to sit down and talk.  I have information that I

1    think you would be interested in that I'm fairly certain you

2    have no knowledge about that I'm happy to provide to you.  And

3    I also wanted to discuss with you the status of Mr. Napout.

4            During that conversation, I said to them, you know,

5    I'm happy to set this up as quickly as can be done.  I don't

6    know if you want to wait until the end of the year because we

7    are talking holidays and things of that nature.  I knew there

8    was a hearing in December that related to the larger case.

9    And they said okay, we will get back to you.

10           On December 4th, three days later, Mr. Napout was

11   arrested in Switzerland.  And at that time I was there, I

12   immediately secured Swiss counsel.  And as soon as I could

13   secure Swiss counsel, we waived extradition.  We are the only

14   defendant, Your Honor, in this case to immediately waive

15   extradition.  And the reason for that is consistent with the

16   presentation that I made to the government in the beginning.

17   Mr. Napout at all times wanted to address whatever concerns

18   the government has.  There was no issue about waiver of

19   extradition.  We waived.  We had to wait a week or so to come

20   back and we appeared before you on December 15th.

21           At that time, Your Honor, when I visited Mr. Napout

22   in his holding cell, it was very, very clear to me that he was

23   not of sound mind.  It was very clear to me that he was, you

24   know, he had medical conditions that were significant.  He

25   certainty had the ability to understand.  He certainly wanted

1    to waive extradition which is what he always said and

2    surrender to address the charges.  But he was not in good

3    shape.

4            I brought his attention -- I brought his condition,

5    excuse me, to the attention of the government.  I provided

6    them with approximately ten years of medical records which

7    supported that particular condition in an effort to get him

8    back here in, you know, in a decent frame of mind.

9            At the time, we were also negotiating bail, although

10   it really wasn't much of a negotiation.  What we did was, we

11   voluntarily provided to the government at our client's

12   insistence, a list of all of his financial holdings in banks.

13   We provided a spreadsheet to them which basically showed that

14   he had approximately, in various bank accounts around the

15   world, $20 million in cash.  And we indicated to them that we

16   thought $5 million would be appropriate to secure his

17   presence.

18           And at all times they insisted on not negotiating.

19   I said, look, it's $20 million.  That's the way it is.  I will

20   tell you, Your Honor, that it wasn't much of a negotiation,

21   number one, and number two, we weren't in the position to

22   negotiate.  His medical condition and his state of mind were

23   such that we made the decision to get him out of incarceration

24   as quickly as possible so that he could get medical attention

25   so that he could get on medication and he could be, you know,

1   he could begin to recover from this experience and address the

2   situation and assist us to address the situation.  We had to

3   capitulate.  I appeared before you and said yes to everything,

4   okay, and that was solely for the purpose of getting him out

5   of incarceration.

6           Now, since then, let me bring to the Court's

7   attention some facts and circumstances that probably were not

8   known at the time of the initial appearance.  Number one,

9   Mr. Napout has a home in Florida.  He has lived in Florida for

10  approximately, well, since the 1980s.  He has been in this

11  home for a while.  The home is in a high-rise.  He owns a

12  floor in a high-rise on the beach south -- I'm sorry, north of

13  Miami.

14          And it's in a very secure setting.  The entire

15  compound for this high-rise has electronic surveillance.  It

16  has cameras everywhere.  You can't go and come.  You can't

17  even get into the garage without being monitored.  You can't

18  go from one place to another within the compound without

19  running into a camera.  Mr. Napout is there.  He is there with

20  his family, Your Honor.  He is there --

21          THE COURT:  When you say "his family," you mean his

22  wife and daughters?

23          MR. PAPPALARDO:  Yes, Your Honor, better.  He is

24  there.  His wife has been with him in Florida since she

25  appeared before you in court on December 15th, as well as his

*Proceedings*                                                           16

1    daughter.  He has two other daughters who have been there, and

2    now they have decided to stay there with him.  His son goes

3    and comes, but is there a lot.  He has made arrangements, Your

4    Honor.  He has an 84-year-old mother.  He has made

5    arrangements for her to come and stay.  He has rented a place

6    in the same building so that she could be with him.  His

7    entire family, essentially, Your Honor, is there.  And they

8    will be there until this matter is addressed with finality.

9            He has no place to go, Your Honor.  He is a man,

10   sure, he has property in Paraguay.  I even said to the

11   government, look, he's not a risk of flight.  He wants to

12   address these cases.  I will sign whatever you want.  I will

13   waive extradition from Paraguay or any other country that you

14   wish to designate in advance if you think he's a risk of

15   flight.

16           They declined on that offer.  I understand.  By the

17   way, I'm not beating up on the government here, Your Honor.

18   What I'm saying is their position is, well, no, that can't

19   happen because we have never seen it happen before.  I say

20   this to the Court, Your Honor, because it was a good-faith

21   effort to attempt to address this.  We want address these

22   charges.

23           Let me talk a little bit about the charges.  We have

24   seen the superceding indictment.  Mr. Napout, unlike most of

25   the other defendants, is described in that indictment in a

1   fashion as though he is in a conspiracy, but there are no

2   specific allegations.  There is no specificity to those

3   allegations, unlike other defendants who have, among other

4   things, wire transfers into bank accounts, and things of that

5   nature.  There is no forfeiture count in the indictment as it

6   relates to Mr. Napout.

7          The only thing that is in the indictment, Your

8   Honor, is apparently, and I'm reading between the lines,

9   apparently, there is an individual or more than one

10  individual, I'm guessing a cooperating witness, who has every

11  incentive to give the government what they want and to please

12  the government not only for himself, but for his personal

13  situation saying that somehow, Mr. Napout was in on something.

14         Mr. Napout, Your Honor, was a vice president of

15  CONMEBOL in 2013.  He became president of CONMEBOL in 2014.

16  From the time he was a vice president, he made efforts to

17  institute reforms within that institution in a meaningful way,

18  which reforms are ongoing to this day.  After the original

19  arrests in May of 2015, in fact, before the original arrests

20  in May of 2014, he was in the process of making these reforms

21  in CONMEBOL.

22         Subsequent to the arrest, he hired a well-respected

23  U.S. international firm, McDermott Will & Emery, who was down

24  there and put into place very comprehensive, very robust

25  controls, compliance programs, term limits and everything that

*Proceedings*                                                    18

1   you would want to expect from an institution that was trying

2   to promote transparency.  And this occurred, Your Honor, his

3   effort to do this occurred before there was any hint of

4   knowing about what would then happen at the end of May.

5          The bottom line is, Your Honor, this is a man who

6   wants to address these charges.  I don't know what the

7   government has for evidence.  I'm sure they haven't completed

8   their discovery.  But what I do know is what is not in that

9   indictment.  And what is not in that indictment is any kind of

10  meaningful electronic surveillance.

11         Yes, there is a quote there that Mr. Napout made on

12  the public record talking about the Copa Centenario saying

13  that North America and South America are one, so we should

14  have this great tournament.  And Mr. Napout was very

15  instrumental in putting that together as president of

16  CONMEBOL.  It was in that capacity that he made that quote.

17         I await any evidence that the government may have,

18  but we have having a hearing today, Your Honor, based upon

19  what's before you.  And what I suggest to you is, Your Honor,

20  based upon all of these factors and everything that I have

21  informed the Court, Mr. Napout is not a risk of flight.  With

22  all due respect to the government, with all due respect to

23  Pretrial Services, where is he going to go?  He is in Florida.

24  His family is in Florida.  That is what is important to him.

25  He wants to address these charges.  He has wanted to from the

1   beginning.  He has waived extradition at the earliest possible

2   time.

3            I have tried to interact with the government in an

4   effort to deal with this.  And he is on, at the moment, Your

5   Honor, the most onerous bail of anybody in this case, okay.

6   We have attached a spreadsheet.  Oh, yeah, there are others,

7   Your Honor, that have $20 million in bail.  Mr. Napout has

8   $20 million in cash.  He doesn't have $20 million from a

9   corrupt company stock that he has put up along with, you know,

10  $5 million of property from other people like some other

11  people who have $20 million bails.  He has $20 million in

12  cash.  That cash, Your Honor, is what he has in terms of

13  liquid assets.  That cash is needed to defend himself.  That

14  cash is needed to support his family.

15           The bottom line is, Your Honor, we can parse through

16  everybody's bail in this case.  What I'm most concerned about

17  and what I raised in the context of the motion is that the

18  conditions that he is being held on, Your Honor, are impacting

19  him.  They are impacting him mentally.  You have a report in

20  front of you from a doctor.  The report speaks for itself.

21           And I believe, Your Honor, that report supports what

22  I am telling you.  He is in a setting.  He is in a compound.

23  There is electronic surveillance there.  He is on a bracelet.

24  He doesn't need to spend $75,000 for someone to sleep in the

25  cabana so that they can look up at the things and say, well,

1   geez, I think he's in the apartment, you know, tonight.  It's

2   a waste of money, it's duplicitous and it's not warranted by

3   what I have just informed the Court.

4           The bottom line, Your Honor, is this.  In my view,

5   the bail is excessive.  The conditions are onerous and not

6   required.  He will come up.  He will address the charges.  He

7   is anxious to do so in the context of this case.  We are not

8   going to sit back and wait for things to happen in this case,

9   Your Honor.  We will address these charges and we look forward

10  to doing so.

11          MS. MACE:  Thank you, Your Honor.  Mr. Pappalardo

12  has given a pretty expansive description of his view of the

13  case, but I want to focus in on the specific issue before the

14  Court right now, and I think it's risk of flight.

15          THE COURT:  I think weight of the evidence would be

16  useful, too.

17          MS. MACE:  I will address that, as well.  But as it

18  fits into the determination of whether the defendant is a risk

19  of flight and the extent of that risk.  And so, I just note at

20  the outset no one is seeking to remand the defendant.  This is

21  not a question of whether he should be in or out.  It is a

22  question of whether he is a risk of flight and how significant

23  that risk is.

24          And I think, despite what is in the defense papers,

25  I think everyone agrees or at least the government and

1   Pretrial agrees he is a risk of flight.  And the task is to

2   assess that risk, figure out how substantial it is and try to

3   determine how to effectively mitigate the risk to a tolerable

4   level.  So once again, no one is seeking to have him remanded.

5   It's how to figure out how to keep that risk manageable so he

6   really has an incentive to be here and not to flee.

7          Now, Mr. Pappalardo referred to the chart that is

8   attached.  And I would submit to Your Honor that while that

9   may give some broad context for the case, it is the task of

10  the Court to look at individuals.  And what I want to focus on

11  are the factors that make Mr. Napout unique.  And he is

12  different than many of the other defendants.  And he is a more

13  substantial risk of flight.  And I would encourage the Court

14  to look at him individually and not simply do a comparison

15  between other defendants because each person is different.

16         And I will talk about those factors, but first, I do

17  want to make one comment about the references to the process

18  that has taken place in the court thus far.  In the

19  defendant's papers, he said that the government unilaterally

20  set an excessive bail amount and the Court was somehow

21  unwilling or unavailable to conduct a bail hearing when he

22  arrived and that's obvious not the case.  The government can't

23  unilaterally do anything.

24         THE COURT:  Right.

25         MS. MACE:  We spoke to -- I personally spoke to

*Proceedings* 22

1   Mr. Pappalardo and Mr. Napout's other three lawyers numerous

2   times leading up to his arrival in the United States.  And we

3   did negotiate what led to a joint proposal to the Court, and

4   the Court did conduct a bail hearing.  We were there.  It's on

5   the docket.

6          And the parties were free to make whatever arguments

7   they wanted.  And the defendant could have argued for a lessor

8   bond at that time.  I'm not suggesting he's precluded from

9   doing so now, but there was a bail hearing.  And in the end,

10  the parties decided to present a joint proposal, but that was

11  not required.  And so every appropriate process was afforded

12  to the defendant, and I just wanted to make that point here

13  clear.

14         And in our negotiations, I will say that I did stand

15  firm on having a high or a large bond amount because of the

16  defendant's enormous personal wealth.  And so it's true that I

17  articulated to the defense that I thought it needed to be a

18  large bond that was substantially secured.  We didn't say how

19  much cash it needed to be.  That ended up being a

20  determination that the defense chose.

21         But we negotiated on many points.  For example, the

22  defense asked that Mr. Napout be afforded 90 minutes every day

23  to go out and exercise, and we said fine.  And many other

24  issues like that they raised and we accommodated and jointly

25  presented that to the Court.

*Proceedings*                                                    23

1     They did ask me to consider a lower amount, and I

2  just said frankly, I didn't think a lower amount was

3  appropriate because of his total assets.  And I think that is

4  important.  And this is a distinction between the other

5  defendants, that you have to look at each person individually

6  and how much money actually matters in a real sense and how

7  much could they walk away from and maintain their lifestyle.

8     And here, before I get into the specifics of

9  Mr. Napout's financial situation, I will just note the

10  context, of course, is someone who is a citizen of another

11  country.  His family has joined him, but they are not required

12  to be here and they could leave at any time and the government

13  certainly couldn't prevent them from doing so.  His life has

14  been in Paraguay.  His work has been there.  Mr. Pappalardo

15  said he lived in Miami for 20 years.  I don't understand that

16  to be the case.  He has a $3 million condo that he vacationed

17  at, but I don't see that his primary residence is the United

18  States.

19     MR. PAPPALARDO:  It's not his primary residence,

20  Your Honor.  He comes periodically to the U.S., particularly,

21  you know, during certain times of the year, as does his

22  family.

23     THE COURT:  Let me just ask a question since you

24  raised the family issue.

25     MS. MACE:  Yes.

1          THE COURT:  The defense is relying a lot on the fact

2     that the family has roots in Florida, that his family is

3     there.  Would surrendering the family's passports to Pretrial

4     Services while they are there give the government some comfort

5     on that issue?  Is that something that the family would be

6     willing to do, assuming that they could come back if they

7     wanted to leave, they could get the passports, but Pretrial

8     Services would know, et cetera, et cetera?

9          MR. PAPPALARDO:  We could deal with monitoring their

10    comings and goings in some fashion, Your Honor.  That's not a

11    problem.  The issue, the whole point is the family is moving

12    up here to deal with this while this is outstanding.  And that

13    is what they are doing, including his 84-year-old mother.

14         THE COURT:  I understand that.  And so the question

15    that the government rightly raises is, well, what's to keep

16    them from leaving with him at some point?  And one thought

17    that I had was perhaps, you know, restraining the passports or

18    just depositing the passports might actually help.

19         MS. MACE:  Your Honor, I don't believe the

20    government could actually prevent their travel.  And Your

21    Honor said they have roots in Miami.  That's my understanding.

22         THE COURT:  Well, ties, ties.  Ties can creates

23    roots.

24         MS. MACE:  Well, it's a property that they have

25    enough money that they don't need to work now and they can

*Proceedings*                                                   25

 1   live together and join him.  But if, for example, he fled,

 2   even if the rest of the family's passports were with Pretrial,

 3   Pretrial would have to give them back.  The government cannot

 4   prevent them from travel.

 5          THE COURT:  They could consent.

 6          MS. PINERA-VAZQUEZ:  Judge, I can assure you that

 7   "Gadi" (ph), Napout's wife, in fact, we have discussed a

 8   potential third-party surety which I understand this district

 9   does.  We are not familiar with it in Miami, but I talked to

10   her about it because it was brought to my attention and she

11   would be willing to do that also.  And I'm sure, and

12   Ms. Becerra is with Mr. Napout, but I'm sure that the family

13   will be happy to turn in the passports.

14          And contrary to what Ms. Mace is saying, at least

15   Pretrial Services would know when they are going back because

16   they would have to go physically retrieve their passports.  So

17   that's not going to be a problem.  If the Court would allow us

18   to do that, that would be fine.

19          MS. MACE:  Your Honor, knowing after the fact --

20          MS. PINERA-VAZQUEZ:  Ms. Becerra --

21          MS. BECERRA:  Your Honor, this is Jackie Becerra.

22   I'm also counsel for Mr. Napout.  I'm here with Mr. Napout and

23   his wife, and one of his daughters is present.  And they

24   represented to me that they as well as the siblings would be

25   willing to provide their passports to Pretrial Services while

1  they are in the United States so that if they were to leave

2  again, that they would actually need to contact Pretrial

3  Services to get their passports.

4         MS. MACE:  My point, Your Honor, is contacting

5  Pretrial Services to get your passport after the defendant has

6  fled serves no purpose.  Everyone would have to let them

7  leave.  They have no ties to the U.S. other than this condo,

8  and his life is in Paraguay.  And so, if he chose to flee, and

9  I do want to say some more about the possible scenarios, but

10  if he chose to flee, the fact that, you know, he fled on

11  Sunday, and on Monday the family went to Pretrial and asked

12  for their passports and then the government knew he was long

13  gone, it would serve no purpose.  So I don't think it protects

14  against anything.

15         THE COURT:  Again, I haven't researched this, but

16  isn't there some agreement that they could make that they

17  would not be able to retrieve their passports --

18         MS. PINERA-VAZQUEZ:  Yes.

19         THE COURT:  -- if he fled?

20         MS. MACE:  Under what consequence, though?

21         MS. PINERA-VAZQUEZ:  Contract.

22         THE COURT:  They would have to stay in the States.

23         MS. MACE:  I don't even know what their legal status

24  is in the States.  If they are on a visiting visa, I don't

25  know, but I can't imagine the government could require a

*Proceedings*                                                    27

1   foreign national who is not charged with any crime to not

2   return to his country.  I think that would cause an enormous

3   national incident and we don't have the power to do that.

4           THE COURT:  No, but if they consented, isn't that

5   something they can consent to?

6           MS. MACE:  I don't know they can and I don't know

7   under what authority the government could enforce it.

8           THE COURT:  Well --

9           MS. PINERA-VAZQUEZ:  Your Honor, they could consent.

10  I mean, obviously we waive -- defendants and parties waive

11  rights that they have and are free to exercise all the time.

12  And they consent to it, the third-party surety, the government

13  has done this in the past and they would have enforcement

14  powers over the wife and prevent the wife from leaving under

15  the assumption that the client's going to flee which, of

16  course, our position is he would never flee.

17          So the third-party surety, I think the government

18  has done this in the past in several cases in this district,

19  and they would certainly not be able to refrain the wife who

20  has been with him, Your Honor, for 24/7 since the day he

21  walked out of this courtroom.  So she would certainly have to

22  stay here, and that would assure the government whatever

23  enforcement issues they believe they have, which they don't if

24  we consent to a waiver of leaving the country if he flees.

25          THE COURT:  It's just a question that --

*Proceedings*                                                           28

1          MS. MACE:  Yes, and I just do not believe that the

2    U.S. Attorney's Office could somehow require the Department of

3    Homeland Security to grant a visa or to require to let foreign

4    nationals stay in the country or we could prevent her from

5    leaving, whatever contract she signed.  If she's unlawfully

6    here, she would be deported anyways.  And there would be

7    nothing to prevent it.  I just, I don't see that as

8    substantially affecting anything.  I think the reason is --

9          THE COURT:  But is she lawfully here now?

10          MS. MACE:  I don't know.

11          MR. PAPPALARDO:  Of course they are, Judge.

12          MS. MACE:  No, I just don't know.  I assume she's on

13    a visitor visa that will expire at some point in time.  I

14    don't know the answer, but I'm guessing she's not a citizen as

15    they represented to us.  And I do want to note when we were in

16    our negotiations about the bond package, I expressed that it

17    would be very, very helpful if there were some U.S. suretor,

18    someone with some ties to the U.S. who could sign the bond,

19    and they said they had nobody.  They didn't have a business

20    friend, anybody that could sign.  There was not even a

21    citizen, someone with substantial ties.

22          All they had was his wife and daughter were willing

23    to come.  And none of them, as I understood it, have any

24    substantial ties other than this condo that they use

25    periodically for their family.  And so I asked for that

*Proceedings*                                                    29

1   because I do think that that can make a huge difference.  If

2   you have someone in the U.S. who will be left with the

3   consequences of a bond violation, then that can provide at

4   least moral suasion and even important security in a more

5   substantial way or tangible way.

6           But in this case, they said they didn't have that.

7   And for that reason, I encouraged them to come up with a more

8   secured bond, have a higher level of security for the bond

9   amount, because there was no one in the U.S. to step forward

10  for the defendant.  And essentially, the lack of U.S. ties is

11  something that's noted in the bail report and is something

12  that we find very significant, that the defendant could flee.

13  He could go to Paraguay.  He has an enormous amount of wealth

14  there and he could live very comfortably.  And that creates a

15  very different situation than many of the defendants in this

16  case and it makes him a substantial flight risk.

17          THE COURT:  But yes, I hear what you are saying and

18  I have an open mind as to everything on both sides.  But the

19  fact that someone could flee doesn't necessarily mean that the

20  person will flee.  And that's the connection --

21          MS. MACE:  Yes.

22          THE COURT:  -- I'm waiting for.

23          MS. MACE:  If I could get to my second sort of

24  factor as I see it, there is the lack of U.S. ties and then

25  there is his personal wealth.  And I think this is the most

*Proceedings*                                                        30

1   significant factor, really creates -- makes him a higher risk

2   of flight than many.  And I will just pause for a moment.

3   This is an area that Mr. Pappalardo has spoken generally about

4   today, but I want to talk very specifically about it.  And in

5   the past he asked that not be done in public, so I will pause

6   to see if there is any objection to me proceeding?

7            MR. PAPPALARDO:  In what fashion?

8            THE COURT:  Would you prefer to have a discussion of

9   his personal wealth and assets --

10           MS. PINERA-VAZQUEZ:  Sidebar?

11           THE COURT:  -- as opposed to --

12           MR. PAPPALARDO:  Could we do it at sidebar, Your

13  Honor?

14           THE COURT:  Sure.

15           (Continued in a sealed portion, pages 31-39.)

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  All right.  Is now the time to talk

3    about that issue?

4          MS. MACE:  That's fine, Your Honor.  And it's

5    something that I didn't understand from the defense's motion,

6    either, because I was -- I believe that there was a provision

7    passed by CONMEBOL that Napout's defense would be would paid

8    for by CONMEBOL, but I'm sure Mr. Pappalardo will have more

9    information about that.

10         MR. PAPPALARDO:  I have plenty of information about

11   that, Your Honor.

12         THE COURT:  Okay.

13         MR. PAPPALARDO:  His defense is not being paid by

14   CONMEBOL.  And as a matter of fact, when he was president of

15   CONMEBOL, as the government well knows, efforts were made by

16   others to have their defenses paid which were -- which did not

17   occur and were specifically rejected by counsel at mine and

18   others' direction, but particularly Mr. Napout's direction.

19         If we could go back to the point at sidebar, Your

20   Honor, let me stress that the main reason here to ask the

21   Court to revisit the issue of the entire bail package is to

22   address the bail conditions.  One of those conditions is the

23   amount of money.  There are many ways that the Court can

24   address the amount of money.  I mean, as I sit here, I think

25   $5 million is much more than what is needed.  He has done

1   absolutely nothing in anything he has done, he was told he was

2   a target in June.  If he was going to leave, he could have

3   left.  He didn't.

4           THE COURT:  I'm aware of all those arguments and you

5   have expressed them well.

6           MR. PAPPALARDO:  What I'm saying simply is this.  Is

7   there a risk of flight?  We will concede a risk of flight

8   under the circumstances.  However, the question is whether or

9   not $5 million or something less than $20 million in cash is

10  more than adequate to address that risk of flight.

11          THE COURT:  Right.  But one of the concerns that you

12  raised that I'm concerned about --

13          MR. PAPPALARDO:  Yes.

14          THE COURT:  -- on the Sixth Amendment issues is

15  ability to fund a defense.

16          MR. PAPPALARDO:  And my suggestion, Your Honor,

17  would be to, if it would assist the Court, we could take the

18  money back into the Greenberg's client funds account.  That

19  way the client doesn't have control over it.  We do.

20          MS. PINERA-VAZQUEZ:  Your Honor, if I could just

21  address -- I'm sorry, John.  Thank you.  Yes, there is an

22  issue because of the liquidity.  He has no liquidity.  And

23  it's not only to fund his defense, but as the Court knows

24  because we put in a motion, the 24/7 security is $100 an hour,

25  $75,000 a month, which he is strapped.

*Proceedings*                                                          42

1        And I don't want the Court to get the

2   misunderstanding that nobody in the Napout family is working.

3   They are working.  They are sacrificing to be with their

4   father here.  The son is coming back and forth because he has

5   to work in the family business.  One of the daughters is

6   pregnant.  You had to have husbands.  They are not flying

7   around living on this money.  This is a very, very delicate

8   and difficult time for the family and they chose to stand by

9   their father and help him go through this.

10        As far as the financial resources, $75,000 a month,

11  I mean, that's a significant amount of money in addition to

12  the amount of money he has to pay for his defense fees.  So if

13  the Court would like a round figure, I mean, if that's what

14  the Court is looking for, we will be happy to sort of provide

15  it because as I can see it, we would love to ask for and we

16  are going to ask for a speedy trial.  I would love to be in

17  court in 90 days.

18        I don't anticipate that is going to be the case, so

19  I have a feeling that this may drag on for quite a bit.  He

20  has no liquidity and he is not making money.  He is not

21  working.  He is sitting in Miami in home detention.  He

22  doesn't even have the ability right now to go work.  So there

23  is a significant issue related to the funds.  But also, Judge,

24  we also want to address the conditions.

25        THE COURT:  Yes, I understand all that.  But I just

1   want that one issue now because I think we need to focus on

2   it.

3            MS. PINERA-VAZQUEZ:  Yes.

4            THE COURT:  So there is a liquidity issue.  I need

5   to know what the liquidity needs are.  My understanding from

6   the assets that the government has disclosed and both sides

7   have disclosed is that there is no real dispute about those

8   assets so that he does have assets.  The question is he can't

9   get to them at this point?

10           MR. PAPPALARDO:  Well, precisely, Your Honor.

11           THE COURT:  That is correct.

12           MS. PINERA-VAZQUEZ:  That's correct.

13           MR. PAPPALARDO:  The assets that remain are in

14   properties in foreign countries.  Those are not liquid.

15           THE COURT:  Right.

16           MR. PAPPALARDO:  And while they couldn't be used

17   because the government wouldn't permit it as a basis for

18   posting bail, you know, they are basically sitting there.

19           THE COURT:  Right, so liquidity is an issue.

20           MS. PINERA-VAZQUEZ:  Yes.

21           THE COURT:  But then the next question was, does he

22   have an income stream?  I understand he's not out working 9:00

23   to 5:00.

24           MR. PAPPALARDO:  He is retired.

25           THE COURT:  But he does have business interests.

1   Some people who are retired have stock portfolios.  Others

2   have interests in business.  Is there something that is

3   preventing him from getting liquid assets from any of his

4   other business interests or securities that he holds or

5   brokerage accounts or whatever?

6              MR. PAPPALARDO:  Yes, Your Honor.  He has an

7   interest in companies.  That interest is not what it used to

8   be when he was running the company.  But he does, depending

9   upon how well the company is doing, he does receive, you know,

10  stipends from time to time in connection with a company.  The

11  economy everywhere in South America isn't very good right now,

12  but particularly that area, I mean, Brazil, Paraguay,

13  Argentina.

14             And I cannot represent to the Court that there is no

15  money.  What I can represent to the Court is that the money

16  that was in foreign accounts was basically all of his liquid

17  assets, as the government knows, because they looked at this.

18  They looked at his foreign assets.  The only activity in his

19  foreign bank accounts, Your Honor, the only activity for the

20  past three years was a withdrawal from one of the accounts of

21  $400,000 so his daughter could get married.  That's the only

22  activity, no deposits, all withdrawals.

23             THE COURT:  Okay.  So it would be useful for

24  Mr. Napout to disclose to the government, then, and to the

25  Court, if necessary, any income stream that he does have,

*Proceedings*                                                      45

1   because I think that, reading between the lines, I think that

2   was one of the concerns the government had; is that right,

3   Ms. Mace?

4           MS. MACE:  Yes, it's something that we don't have

5   any clarity on with regard to all of his properties oversees.

6   Some of them it appears may be rental properties.  He is

7   getting income from those.  He has substantial ownership in

8   many companies and we don't have any visibility into what that

9   is worth or how much he is actually receiving.  So that would

10  be very informative.

11          And I will just note again that originally as

12  contemplated and as in the bond that was filed with the Court,

13  only $10 million of cash was to be posted.  And the government

14  is open to revisiting an issue if, for example, he doesn't

15  have liquid assets to pay his lawyer, then we would be open to

16  revisiting taking a million dollars of cash out of that and

17  putting it into the lawyer's escrow account so that they could

18  be paid.

19          And so something incremental like that without

20  changing the total bond amount I think we would be happy to

21  discuss if there really is a liquidity issue.  We haven't seen

22  it yet, but if there is -- if there is a true need and a true

23  basis, then we would certainly entertain those sorts of

24  discussions.

25          THE COURT:  But as I understand the proposal, it's

1   also to have some of the money that's in the registry of the

2   Court transferred to counsel's escrow found?  Is that what you

3   were saying?

4              MR. PAPPALARDO:  I suggested that, Your Honor, only

5   as a way so that it would perhaps address a concern that it

6   would be Mr. Napout's hands and he would have access to flee.

7   Your Honor, again, I mentioned to you that there isn't a

8   single thing that this man has done since the beginning that

9   is consistent with him wanting to leave.  He wants to address

10  these charges.

11             THE COURT:  Yes, I understand all that.  I have

12  heard it clearly.  But what you are saying is that to address

13  the liquidity problems and to fund the defense, you are

14  requesting that a certain amount of the money that has been

15  deposited with Court be transferred to your escrow account?

16             MS. PINERA-VAZQUEZ:  Yes, Your Honor.

17             THE COURT:  And that is something I think you and

18  the government I think at some point during break -- we are

19  not going on forever, but during the break, you might want to

20  discuss whether you can agree what that amount would be.  I'm

21  not sure that is something that needs to be addressed in open

22  court at this point while you are negotiating it.  But I can't

23  see any reason why the government would object to having money

24  to fund the defense go to the escrow account of counsel.

25             MS. MACE:  In principle, no, I just think it should

1  be gauged towards the actually need.

2          THE COURT:  Right.

3          MS. MACE:  And we oppose changing the total amount

4  of the bond.  And if there's an incremental amount that is

5  needed for immediate expenses, and frankly, they could come

6  back if they spend it all and need more, then they come back

7  to the Court and say he needs another $500,000 off the bond or

8  something to pay for expenses.

9          THE COURT:  But and also living expenses?

10         MS. MACE:  If that is a true need.  I haven't heard

11 that yet from them.

12         THE COURT:  I think that should be something that

13 could being worked out.  So continue as to the other issues.

14         MS. MACE:  Yes.

15         THE COURT:  24-hour security.

16         MS. MACE:  I will note with regard to the

17 presentation by Mr. Pappalardo with regard to whether or not

18 he has sort of the desire to flee, that is something that is

19 often difficult for a Court to gauge, and that is why we talk

20 about the risk of flight and we talk about these factors,

21 because we don't know what is in mind.

22         But I think one thing his conduct has shown can be

23 interpreted in a different way than how Mr. Pappalardo has

24 described it.  He certainly waived extradition right away.

25 And he made clear and it's clear in the medical report and

*Proceedings*                                                                48

1    it's clear from what Mr. Pappalardo said that he desperately

2    does not want to be in jail and he wanted to get out of jail

3    as soon as he possibly could and he wanted to do what he could

4    to stay out of jail.

5            Right now he's in the posture that he wants to fight

6    the case, but that could change at any time when he starts to

7    get a better understanding of what the case is about.  And so

8    his dedication to not going to jail, I think, can cut the

9    other way.  And I don't want to make too much of it, but it's,

10   I'm just noting that he has the incentive.  It's a very

11   serious case, very substantial prison term, potentially, and

12   that in addition to his assets that would allow him to do so

13   without much, you know, and still allowing him to live a very

14   comfortable life makes him a very substantial flight risk.

15           With regard to the strength of the case, we

16   respectfully disagree with the defendant's presentation.  And

17   I will just note that the government's evidence includes the

18   testimony of several witnesses that is corroborated by, among

19   other evidence, internal records showing transfers, bank

20   records and contracts that show flow of funds from sports

21   marketing companies and consulting companies and consensual

22   recordings involving co-conspirators that describe the entire

23   conspiracy.

24           And so discovery as Mr. Pappalardo noted is ongoing

25   and will continue to produce that.  And in not too long, we

*Proceedings*                                                    49

1   will be before Judge Dearie to discuss how the case is

2   progressing.  But the evidence is strong against Mr. Napout

3   and we believe that that certainly counts in favor of

4   increasing his risk of flight.

5           THE COURT:  Can we just talk about that for a

6   moment.

7           MS. MACE:  Sure.

8           THE COURT:  So the evidence you are saying includes

9   testimony of witnesses corroborated by records showing

10  transfers, consent all recordings.  So there is some kind of

11  electronic or other evidence?  I think counsel thought there

12  wasn't.

13          MS. MACE:  Yes, and they noted there was, but they

14  believe it doesn't have anything incriminating with regard to

15  a recording of Mr. Napout.  But, of course, this is a

16  racketeering conspiracy case and there is evidence of many

17  recordings of other co-conspirators as well describing the

18  conspiracy and how it worked and who got money.  And so there

19  is that aspect of the case as well.

20          THE COURT:  And so give me an example of one or two

21  things that he is alleged to have done in furtherance of the

22  conspiracy, if you can.

23          MS. MACE:  Your Honor, the government was not

24  required to allege overt acts.  And I will just sort of note

25  this.  I'm not trying to -- the government's witnesses, and as

*Proceedings*                                                    50

1   I said, there are several of them, have described Mr. Napout's

2   conduct in detail which includes agreeing that several

3   federation members would receive bribes in the context of

4   international football.  And I am not inclined to sort of give

5   3500 early and describe, and there is a danger to those

6   witnesses right now, and I don't want to detail what

7   individual witnesses said.

8            But we are very confident about our case about

9   Mr. Napout as well as all the others.  And in a large RICO

10  conspiracy, we will present that full picture to the Court and

11  to the jury of the racketeering conspiracy that involved many

12  different defendants who played different roles.

13           THE COURT:  But you are telling the Court that he

14  was directly involved in bribe payments or some other illegal

15  activities?

16           MS. MACE:  Yes, and in the agreement that there

17  would be bribe payments.

18           THE COURT:  In the agreement that there would be

19  bribe payments?

20           MR. PAPPALARDO:  If I could comment on that, Your

21  Honor, what she is really telling the Court is that there are

22  witnesses who say that others were involved.  Mr. Napout was

23  not captured on tape doing any of this.  The records that she

24  is referring to, I submit to the Court, are nothing more than

25  the people who are bribing everybody, taking money out of

*Proceedings*                                                    51

1    banks accounts to do so.

2          That money doesn't go to Napout.  It doesn't go to

3    his bank accounts like it does to everybody else.  And I would

4    suggest to the Court, and we are not trying the case here, I

5    know who the three witnesses are.  I have a sense of what they

6    are going to say and I can tell you that there is a dramatic

7    incentive for them to say what they are saying to help

8    themselves.

9          THE COURT:  Right.  And obviously we are not trying

10   the case here, but you are also saying that he didn't profit

11   personally from this?

12         MR. PAPPALARDO:  That's exactly right, Your Honor.

13         THE COURT:  And the government seems to be saying

14   that he was part of an agreement that was illegal and doesn't

15   want to go farther as to whether he profited from it or not,

16   but that he was part of illegal agreements.  Is that

17   essentially a fair summary of where we are?

18         MS. MACE:  I think that's what I would proffer

19   today.

20         THE COURT:  Yes.

21         MS. MACE:  And I will note the government can

22   proceed by proffer and we can also not.  You know, we can

23   choose not to and so Your Honor will assess this as he will.

24   But there are reasons including witness security that I don't

25   want to go into more detail.

1          THE COURT:  I understand.

2          MS. PINERA-VAZQUEZ:  Your Honor, may I just say one

3    thing, please, because the government did say something about

4    bank transfers.  There is not one allegation in the indictment

5    that there was a bank transfer to any of Mr. Napout's accounts

6    as opposed to the other defendants.  And indeed, we have

7    received three responses to the standing discovery order of

8    which there is not one bank record that would have contradict

9    is that statement.

10         In addition, Judge, the one recording we have got,

11   one recording, we are here now three months into the

12   arraignment.  The only other discovery we have gotten is a

13   recording where my client basically says, "Hello, how are

14   you?"  That's it.  Are there people talking about the

15   conspiracy and what they are doing?  Sure.  There is tons of

16   incriminating [sic] against other people, but not against

17   Mr. Napout.

18         And this is an important factor, Your Honor, because

19   as we sit here today for this modification request, the Court

20   is obligated to look at what it has before it.  And this is

21   what it has before it.  It doesn't have Jencks materials

22   because we haven't been provided 3500 Jencks materials because

23   the government doesn't want to because they are alleging some

24   security.  I'm not sure exactly if she is trying to make it

25   seem like our client would somehow harm these witnesses.  I

1   would hope not because there is no evidence of that.  So I

2   want to be sure the record is clear.

3          But the most important thing, it goes to the weight

4   of the evidence, which is one of the four factors that the

5   Court should consider.  As we expressed in our request for

6   modification, at this juncture today on February 25th, the

7   evidence that the government has is weak.  And it's a factor

8   that it should consider in fashioning some of the conditions.

9   It's not only the money, it's the conditions.

10         THE COURT:  I think we have exhausted that issue.

11         MS. MACE:  I would like to clarify one point that

12  was made earlier that Mr. Napout is not named in any

13  forfeiture counts.  He is.  He faces forfeiture with regard to

14  the four counts, Counts 8 -- or, excuse me, 9, 10, 83 and 84

15  subject to forfeiture.  So I will just clarify that point.

16         I do want to speak about the specific conditions

17  apart from the money.  If I could move to that, Your Honor?

18         THE COURT:  Yes.

19         MS. MACE:  The defendant is in Miami, and the

20  defense has proposed that he be put on a 7:00 p.m. to

21  7:00 a.m. curfew.  And it's suggested that the GPS and the

22  private security are duplicative or are redundant in some way.

23  And we disagree.  And I actually spoke to another officer at

24  Pretrial yesterday to try to understand this curfew issue and

25  what the benefits and drawbacks are to having a curfew.

*Proceedings*                                                                 54

1        And I think essentially it is the window of time the

2   defendant has to flee, like, how long they have before someone

3   is going to notice that he is gone.  On the defense proposal,

4   he would have 12 hours before anyone noticed.  And for Miami,

5   you can get really far from the United States in 12 hours.  He

6   can be home free.  He doesn't have to go to an airport.  You

7   can leave from Miami, and so we don't think that that is

8   reasonable.

9        And as I said at the beginning, if he needs

10  exercise, we can explore how to do that appropriately or needs

11  fresh air and so forth.  For example, if it the home

12  confinement is now a specific apartment, and I don't know if

13  that's the case, then we would be open to exploring whether it

14  can be the whole compound as Mr. Pappalardo described.  It has

15  the swimming pool and that outdoor areas and so forth.  And I

16  think that would be a reasonable way to address it where you

17  don't just take off all the conditions so you give the

18  defendant this huge period of time in which he can flee.

19        With regard to GPS and the private security, we

20  don't see those as redundant, because neither is perfect.  And

21  so each is intended to make up for some of the problems with

22  the other.  GPS can give, as I understand it, an indication

23  that the defendant is not home, but it takes quite some time

24  for someone to act on that.  And Mr. Ilaria may be better able

25  to speak to that than I can, but I think Pretrial's process is

*Proceedings*                                                                 55

1  when they get an alert, try to call someone, try to locate the

2  guy eventually.  And sometimes it's the next day and sometimes

3  they don't find the next person.

4        And I have a case in this court now where someone

5  did just cut off the bracelet and leave and hasn't been found

6  because before, it's not that the squad cars all come out and

7  try to find someone.  It's quite some time before somebody

8  notices.  And so if you add that on top of the proposal for a

9  curfew, you have a big window in which someone can flee.

10        The private security we view as very important and

11  useful, but it's not perfect in itself either, because it adds

12  the human element.  And I'm certainly not making any comment

13  about the specific company involved, but any time you have a

14  situation where you have human beings making the decision and

15  an extremely wealthy person who has the opportunity to buy

16  someone off, there is that risk.

17        So that's a general risk.  I am not speaking

18  specifically about Mr. Napout or the company, but that is one

19  of the things that is imperfect about the private security and

20  that is why we recommended to the Court to do both.

21        THE COURT:  Have you had instances where there have

22  been problems with private security?

23        MS. MACE:  Frankly, Your Honor, this case is unique.

24  It's the first time I have had a defendant on a private

25  security.  It's a company that the government does not

1   monitor.  We were informed of who it was and we don't see any

2   problem in principle with the company, but we don't know who

3   the individual people are who are watching him.  It's an

4   unknown.  And I don't want make more of it than it is, but

5   it's something that is imperfect is how I will say it.

6           And with regard to movement and his health,

7   obviously his health is important to the Court and everyone

8   agrees he should be in a healthy environment.  If he can move

9   about this compound where he has multiple apartments, a

10  swimming pool, an outdoor area, it is not an overly difficult

11  living situation.

12          And if, and I just note, also, in the medical

13  report, without getting into any detail, the doctor did

14  indicate that Mr. Napout is improving and his treatment and

15  his plan is working and that he is getting back to his

16  baselines the doctor hoped.  And so I noted that it doesn't

17  say he is getting worse.  It says he went through a traumatic

18  experience in getting arrested and the doctor is treating him.

19          If there is a specific thing like access to the

20  swimming pool, then by all means I think we should explore

21  that if that's going to help him.  But that doesn't counsel in

22  favor of changing the amount of the bond or taking off the

23  security that is in place to prevent flight.

24          THE COURT:  Right.  Just for the record, I am

25  looking at the compound now on Google Maps.

*Proceedings*                                                          57

1          MS. MACE:  Oh, really?

2          THE COURT:  Just to see what it looks like.  It is

3    19333 Collins Avenue; is that right, in Miami?

4          MR. PAPPALARDO:  I believe that's right, Your Honor.

5    We can provide information about that, Your Honor, if you

6    would like.

7          THE COURT:  All right.  If the Court, and this is a

8    question for Pretrial Services as well as for the government

9    and the defense, if the Court were not inclined to give a

10   12-hour curfew with 12 hours off monitoring, but were inclined

11   to expand the hours for exercise or moving around the compound

12   or something else, again, I can't tell from this picture, but

13   it looks as though this building is a fairly large building.

14         It looks as though it's got -- maybe counsel who is

15   there can describe it -- looks as though there are areas

16   inside the building that are probably electronically secured

17   so people can't come in or out without a key but that it could

18   go to, I'm guessing to a pool area.  Is the beach back behind

19   it as well?

20         MR. PAPPALARDO:  The beach and the pool area, the

21   pool area is secured.  There's an exercise room on a different

22   floor that is secured.  The entire compound is secured.

23         THE COURT:  Okay.

24         MR. PAPPALARDO:  It's covered by electronic

25   surveillance and it's designed, it's designed to keep people

1   out.  So there is a lot of -- there is a lot of cameras

2   everywhere.  You can't get into the building without being on

3   camera.  You can't leave without being on camera.  But it's

4   the entire compound.

5              THE COURT:  Okay.  And is it a fairly large

6   compound?

7              MR. PAPPALARDO:  Yes.

8              THE COURT:  It looks very large.

9              MS. PINERA-VAZQUEZ:  Yes.

10             MR. PAPPALARDO:  It's a large compound.

11             THE COURT:  Okay.  So talking to Pretrial Services

12  now, to allow, rather than letting him roam through Miami and

13  I may not even want to do that anyway with such a nice place

14  where he is going to be, if he could have access to all the

15  grounds, the exercise room, the pool, what problems would that

16  present for monitoring?

17             PRETRIAL OFFICER ILARIA:  Your Honor, well, first,

18  just so it's clear, Your Honor has seen me tapping on my

19  phone.

20             THE COURT:  Yes.

21             PRETRIAL OFFICER ILARIA:  I just want you to know I

22  have been accessing file documents.  I haven't been texting,

23  just so that's clear.

24             THE COURT:  I know you well enough.

25             PRETRIAL OFFICER ILARIA:  But to speak towards the

1   compound movement, we would want this to be done within the

2   framework of a home detention case.

3           THE COURT:  Yes.

4           PRETRIAL OFFICER ILARIA:  Meaning that I think

5   schedules would be carved out of a home detention bond that

6   would allow him time to go downstairs to the gym or to

7   wherever this is he wants to exercise, rather than give him,

8   perhaps, blanket access to the entire grounds.  I think

9   counsel is respectfully relying on third-party cameras and

10  things like that that are going to catch someone doing

11  something they shouldn't do.  Pretrial Services doesn't use

12  those resources as a way to monitor someone.

13          THE COURT:  Right.  But if he wanted to spend an

14  hour or two down by the pool reading or hanging out with his

15  family or if he wanted to go to another apartment to visit his

16  family or whatever else, that wouldn't be difficult to carve

17  out time to do that with preclearance from Pretrial Services,

18  right?

19          PRETRIAL OFFICER ILARIA:  Yes, Your Honor, although

20  I use the word frivolous here when we are talking about

21  spending time at the pool and those are typically not

22  activities that someone on house arrest does.  We don't

23  typically grant those kind of requests.  If he were to call me

24  and say, hey, I would like to go swimming right now, I would

25  look at the bond and I would tell him no, you can't do that --

1          THE COURT:  Right.

2          PRETRIAL OFFICER ILARIA:  -- unless there is a Court

3     order.

4          THE COURT:  Well, it is really a question of risk of

5     flight.  Would there be a risk of flight if a person who has a

6     mental disorder or an anxiety disorder, panic attacks or

7     whatever else?  Again, I don't know how large this apartment

8     is.  Maybe his apartment is so big, beautiful and wonderful we

9     don't need to worry about that, with a terrace.

10         But there has been literature about confinement, you

11    know, to certain areas what effect that can have on people

12    with mental disabilities.  And my question is, is there some

13    kind of relief from confinement to one area that would both

14    satisfy our security concerns and make it easy for you to

15    monitor?  So, for example, how precise is the GPS monitoring?

16    Will we know where he is in the building?  Is it that close to

17    monitoring, or is it, like, an iPhone, the way you find an

18    iPhone?

19         PRETRIAL OFFICER ILARIA:  Your Honor, that's a great

20    question.  It gives us a pretty good idea of where someone is,

21    I can tell you in handling my own GPS cases there are things

22    like drift zones and points that can affect what kind of

23    reading you are getting.  Just to give the Court perspective,

24    it's not as if there is an officer staring at a screen and

25    smoking a cigarette and refreshing their screen to see where

*Proceedings*                                                        61

1   someone might be in that second.  It's not that kind of an

2   active supervision.

3         We are always just reacting.  Someone makes a

4   choice, we have to react to it.  And as the government pointed

5   out, and she's right, there is a process before we draw a

6   conclusion that someone may have perhaps violated their bail.

7   That's a long process.

8         THE COURT:  But you also have the security person

9   there, too.  I mean --

10         PRETRIAL OFFICER ILARIA:  Correct.

11         THE COURT:  We haven't dispensed with that quite

12   yet.  I would be surprised if we couldn't come up with a way

13   to give him a little more freedom in this building.  I mean,

14   it is house arrest, but to a larger facility with, you know,

15   the possibility to go in and out of those places.  So my

16   question for you really is, does that make it unmanageable?

17   Does it make it too difficult to monitor?

18         PRETRIAL OFFICER ILARIA:  I would want to talk to

19   the officer in Florida to get -- I know she has probably been

20   to the house and been to the compound and could speak more

21   intelligently about that and it's possible.

22         THE COURT:  Should we get her on the line?

23         MS. PINERA-VAZQUEZ:  Yes.

24         PRETRIAL OFFICER ILARIA:  Your Honor, we

25   respectfully ask we not have that conversation on the record.

1   I guess Pretrial Services is here.  We are here representing

2   our position.  And just so it's clear, I don't want to beat a

3   dead horse, but the suggestions made that are outlined in

4   counsel's memo are not the official recommendations of

5   Pretrial Services.

6            THE COURT:  No, I understand that, but it provides

7   facts rather than recommendations.  For example, she could

8   check and see if there are dead spots in the building and keep

9   him away and say he is not authorized to go to those dead

10  spots.  For example, if an outside exercise area is a place

11  the GPS doesn't work, he couldn't go there.

12           PRETRIAL OFFICER ILARIA:  Correct.  And that's

13  something where the officer could, you know, with the home

14  detention framework, could carve out a schedule for him, let's

15  say on a Monday from 2:00 to 4:00 to go to the gym.  We can

16  create something that would help her get a really good idea

17  that he was in the gym for that time.  So yes, in that sense

18  it's workable.  But I guess at some point Pretrial would have

19  concerns if these requests become, what we would consider

20  frivolous, with all due respect in using that word.

21           THE COURT:  But I'm looking at how serious the risk

22  of flight is at this point.  And with a lot of safeguards in

23  effect, the home detention, not being able to leave the

24  building, we are talking about personal liberty being

25  restricted because there is a preponderance of the evidence

1  showing from the government that without these conditions, he

2  would be an unreasonable risk of flight.

3          So I'm not concerned -- he has a right to decide

4  what he wants to do during the time that he has that freedom

5  if he is not a risk of flight.  So I'm just looking to give, I

6  don't care if it's the pool.  I want him to have the amount of

7  liberty that he is entitled to so that he is up to the point

8  where he would become a risk of flight.

9          MS. MACE:  If I could just note that already as part

10  of the bond, there is sort of that concept worked in that we

11  agreed at the proposal of defense counsel that 90 minutes a

12  day was an appropriate amount of time to be out to do those

13  sorts of things.  If now based on having received an

14  additional assessment by a doctor they think that number is

15  not quite right and it should be, you know, an hour in the

16  morning and an hour and a half in the afternoon, then that

17  should be the proposal.

18          And I think that could make sense.  If that is what

19  would be, you know, if the supervising Pretrial Officer in

20  Florida thought that that was workable, and it sounds like she

21  must be already doing that because there's the 90 minutes a

22  day already.  And I suspect there is some kind of schedule or

23  communication to make that work.  And if that's not

24  sufficient, then we should just, you know, make it sufficient.

25  You know, and so if the request is for something specific like

*Proceedings*                                                    64

1   that, like an hour in the morning, then the government

2   wouldn't have an objection to that.

3          PRETRIAL OFFICER ILARIA:  Your Honor, I would also

4   add we have many defendants, of course, who are on house

5   arrest and many of them don't have the luxury of living in a

6   compound.  They are in project housing.

7          THE COURT:  Of course.

8          PRETRIAL OFFICER ILARIA:  They are in tiny

9   apartments that, with all due respect to them, they are

10  terrible.  And they have mental health conditions.  They are

11  actively getting treatment.  So I think the concept that this

12  is almost unbearable, I think is almost unfair to represent

13  that here, I think.  And this is a perfect example of the fact

14  that he already has some time out certain days a week to do

15  certain things I think is a flexibility that was built into

16  the bond from the day he was released.

17         THE COURT:  I understand there's flexibility there.

18  Given the history of what he has done, you know, what I have

19  heard from counsel and the amount of assets that the Court has

20  under its control, I'm not concerned that he would be a risk

21  of flight if his time out were expanded a little bit.

22         I do find that, I do think that the 12 hours, I

23  think the government was persuasive on the 12 hours, at least

24  at this point, is something that I'm less comfortable with and

25  I think that there may be more of a risk of flight there.

1          MS. PINERA-VAZQUEZ:  Your Honor?

2          THE COURT:  A shorter period of time I think we can

3     handle.

4          MS. PINERA-VAZQUEZ:  May I address one thing just to

5     clarify.  I don't want the Court to think that we don't

6     believe that there should be monitoring within those 12 hours.

7     We believe that he should continue with his GPS monitoring,

8     his ankle monitoring.  We are just asking for a curfew from

9     7:00 p.m. to 7:00 a.m., meaning he has to be home during those

10    hours.  But he will continue to be monitored with a GPS and

11    everything, the ankle monitoring.  We are not requesting that

12    that be removed.

13         And I would like to address two things that

14    Mr. Ilaria said.  First of all, certainly mental health is not

15    frivolous.  And sitting by the pool, if that helps your mental

16    health and reading a book, we would respectfully disagree that

17    it's a frivolous request, as the Court I think has recognized.

18         But more importantly, I think that one of the things

19    that we would request is that Ms. Serrano who has been to the

20    compound, and I specifically, I can represent to the Court

21    that I have spoken to her and she did express that it would be

22    probably, that they could monitor Mr. Napout with his GPS in

23    the facility.  In fact, as we all know because Apple is in the

24    news every day and "The Good Wife" just did this episode on

25    TV, monitored by a phone.  In fact, it could be reverse

1    monitoring right here in this courtroom.

2          So for Pretrial Services to come in and say that

3    they can't monitor Mr. Napout in a GPS basically when he's

4    going to the bathroom, I think is really not representing what

5    technology is today.  And I did have this conversation with

6    Ms. Serrano and she did say that they could monitor him within

7    the building.  Now, you are right, there may be hotspots, but

8    he can be monitoring if he goes to the Burger King down the

9    street to get a burger.  He can be monitored if he goes out

10   into the pool area and goes swimming.

11         So that's what we are requesting, that that

12   continue, the monitoring continue.  And if the Court wants

13   more information, maybe we should call Ms. Serrano.  She has

14   been to the building.  She has been in his apartment.  And the

15   analogy to this, Your Honor, is it's like someone on GPS

16   monitoring restricted this his kitchen.  He can't leave his

17   kitchen because that's the apartment, the kitchen.  He can't

18   go into the bedroom.  He can't go to the outdoors, the

19   curtilage, because that's what basically he is restricted to

20   right now in that apartment.

21         And as the Court knows with his mental report that

22   we submitted, that sort of adds to the restrictive nature and

23   the anxiety and the panic attacks.  And that's something that

24   the Court should consider when fashioning the least

25   restrictive measures which I bring back because that's what

1   the Bail Reform Act did, the least restrictive measures in

2   order not to violate the Eighth Amendment and the excessive

3   fines clause, Judge, which we haven't addressed the law issue,

4   but I have some good caselaw on that and how this is excessive

5   as far as the conditions and the Eighth Amendment.

6           THE COURT:  Right.  I think we all know what the law

7   is.  The real question is can we fashion something that will

8   reasonably reduce the risk of flight and still allow this

9   defendant an opportunity to have the liberty that he is

10  entitled to under the Constitution?  And that is the question.

11          And I think the 12 hours out, to me, I'm not

12  comfortable with that based on what I have heard so far.  I do

13  think that we can expand his time and give him more

14  scheduling.  It can be done within the compound, certainly, on

15  a regular basis, and perhaps a little more time out, you know,

16  during the day, but subject to Pretrial Services feeling

17  comfortable through its supervisory office here which has the

18  final comfort level decision, but also through, you know, its

19  officer who is there who is able to monitor the building and

20  know how easy it is to make a decision.

21          So I think that is perfectly reasonable.  He did

22  waive extradition.  He has been in touch with the government

23  for a long period of time.  He has a substantial amount of

24  assets that are being detained.  What to me is very important

25  is that his family is there, moved there with him essentially

*Proceedings*                                                    68

1    and then moving his -- an 84-year-old mother, I think that is

2    not an insignificant issue and I think it shows a commitment

3    to be tied to that area.  So I think without eviscerating the

4    bond, we can still prevent the risk of flight by expanding it.

5            MR. PAPPALARDO:  Your Honor, may I just add one

6    point very briefly in response to what the government has

7    argued.  They indicated that Mr. Napout would be dedicated not

8    to be in jail.  I think if it you look at the quote in that

9    report, that was a reference to not wanting to be in jail

10   because when he was in Switzerland, he was immediately

11   arrested.  They took away his medication, exacerbating his

12   mental condition.  And that is exactly what he was referring

13   to in that report.

14           THE COURT:  I understand.  I don't think you need to

15   say anymore about that.  I can't imagine many defendants

16   wanting to be in jail.

17           MR. PAPPALARDO:  No, I understand.  But to use that

18   as a basis of risk of flight, and given this has not been

19   raised and I throw it out to the Court, given his mental

20   condition which the Court is aware of, somebody would -- the

21   last thing they would want to do is try to get out because

22   they would be, the whole world would focus on them.  This man

23   wants to address these charges.

24           THE COURT:  I understand.  And also he knows that if

25   he does violate the bond --

*Proceedings*                                                    69

1          MR. PAPPALARDO:  Absolutely.

2          THE COURT:  -- he is locked up for the duration.

3          MR. PAPPALARDO:  That would provide substantial

4    evidence for the government, Your Honor, if that happened.

5          PRETRIAL OFFICER ILARIA:  Your Honor, if I may make

6    one minor request, if you are heading towards an order that he

7    have access to the compound, I just would respectfully request

8    that that be so ordered and then I can have contact with the

9    officer in Florida and articulate to her what that means and

10   she can figure out --

11         THE COURT:  Sure.

12         PRETRIAL OFFICER ILARIA:  -- the compound is.

13         THE COURT:  With reasonable limitations and, you

14   know, time periods.  We are not saying 24-hour access to the

15   whole compound, but reasonable access, you know, through the

16   day so he can have some freedom of movement throughout the

17   compound.

18         PRETRIAL OFFICER ILARIA:  Thank you.

19         MS. PINERA-VAZQUEZ:  Your Honor, how about the 24/7

20   security, if I could address that?  As the Court is already

21   tired of hearing about that, here is the thing.  And I

22   actually, I want to briefly refer to a case out of the Eastern

23   District where Judge, I think it's Weinstein described

24   electronic monitoring as being similar to a feral animal.

25   That's electronic monitoring.  You are monitored every day of

*Proceedings*                                                      70

1   every moment and that's electronic monitoring, which he

2   considered was extremely restrictive.  And in this case, he

3   actually --

4           THE COURT:  Is that in the child pornography case?

5           MS. PINERA-VAZQUEZ:  Yes, *Polouizzi* case.  It's

6   actually a great quote, "Feral animal, a wild animal from a

7   domesticated" -- I forgot.  But anyway, I think that we cannot

8   lose sight of the fact that electronic monitoring with home

9   detention with curfews is extremely restrictive.  And it

10  wasn't contemplated under the Bail Reform Act.  This is

11  something that Pretrial Services added and it's part of the

12  condition that can be implemented to sort of mitigate the risk

13  of flight.

14          And we don't have any objection to that.  We agree

15  that that is appropriate in this case.  But we can't lose

16  sight of the fact it is restrictive.  And the addition of the

17  24/7 security takes it just to another level because not only

18  the expense, but also, he walks outside his apartment door and

19  he has got a gentleman there that gets him, takes him to the

20  car, puts him in the car, drives him if he needs to go to our

21  offices, which we have also argued that there could be a

22  certain violation of the defense because we have to let

23  Pretrial Services and FBI know every time he's going to come

24  to our offices.  Let's say we have to go to a site to meet

25  with a witness.

*Proceedings*                                                        71

1      THE COURT:  They are going to know that with the GPS

2  anyway.

3      MS. PINERA-VAZQUEZ:  That's with the GPS, but we

4  don't have to alert FBI.  If he only has GPS, we don't have to

5  alert FBI.  That's an additional condition.  We have to alert

6  FBI.  Our 24/7 security officer has to call Pretrial Services

7  and the FBI agents on this case and let them know, hey, they

8  are going to the lawyers in Miami.

9      I didn't stress it in our argument, but that is sort

10  of an invasion to our defense strategy.  How about if he wants

11  to go visit a witness?  We have got to let the FBI know where

12  we are going, maybe not who we are going to see, but they

13  could have monitoring to see who we are going to see.  They

14  could do some surveillance; I don't know.

15      THE COURT:  Why do you think he has a

16  non-association clause?

17      MS. PINERA-VAZQUEZ:  I'm sorry?

18      MR. PAPPALARDO:  There are witness who have nothing

19  to do.

20      MS. PINERA-VAZQUEZ:  Right, exactly.  So the 24/7

21  security, we submit to the Court is excessive.  The fact that

22  he has the electronic monitoring, the home detention and the

23  ability to move within the facility is more than sufficient

24  combined with the conditions of bail as far as the money is

25  concerned.  His family is here.  I think that that is more

*Proceedings*                                            72

1   than sufficient to assure his appearance in court, which is

2   where the Court should be, the least restrictive conditions.

3          THE COURT:  Okay, any other issue we haven't

4   discussed?

5          MS. MACE:  I don't believe so.

6          THE COURT:  Okay.  What is the government's position

7   on the 24-hour security?  First of all, is that security

8   necessary, and secondly, is there a less restrictive form of

9   that security that would be helpful?

10         MS. MACE:  It's our position that it's necessary for

11  the reasons I stated earlier.  With regard to notice, the last

12  point that was made to the FBI, if defense counsel feels

13  somehow constrained by that for attorney visits, we wouldn't

14  have any objection to lifting that aspect, that there could be

15  notice to just Pretrial Services.

16         THE COURT:  All right.  So let's get back to the

17  financial aspects.  I think it is appropriate to modify the

18  bond with respect to the financial aspects of the bond.  I am

19  going to ask counsel to discuss with each other a mechanism to

20  ensure, without unduly burdening the attorney-client

21  relationship, the free and adequate flow of funds between

22  Mr. Napout and his counsel so that he can fund his defense

23  fully, and the same for living expenses as well, if there is

24  an issue there.  And I don't think you are going to have a

25  disagreement about how to do this.  And I think that both

*Proceedings*                                                     73

1    sides have agreed and the Court thinks it is a good idea that

2    those funds should be transferred to counsel's escrow account.

3            Does that take care of the liquidity issue?

4            MR. PAPPALARDO:  It does, Your Honor.

5            MS. PINERA-VAZQUEZ:  Yes.

6            THE COURT:  All right.  Moving on to whether the

7    amount of the security is excessive at this point, I think if

8    the liquidity is being dealt with and given some of the other

9    concerns and the expansion that I think is appropriate in the

10   defendant's movement, I am going to leave the amount of the

11   bond, the bond amount at the amount that it is.  I'm not going

12   to change that.  And I'm not going to change the amount that

13   has been pledged at this point.

14           If it becomes a hardship or if it seems if, with the

15   passage of time it seems appropriate to make another

16   application, I am not preventing you from doing that.  Given

17   the extent of Mr. Napout's assets, I don't think that it is

18   inappropriate to keep the bond the way it is.  Otherwise with

19   respect to the financial part --

20           MS. PINERA-VAZQUEZ:  I'm sorry, Judge.  I apologize;

21   I don't understand.  So because I just want to make sure, so

22   the bond right now is set at 20 million.

23           THE COURT:  Right.

24           MS. PINERA-VAZQUEZ:  Let's say for the purposes this

25   discussion we are asking for a million.

1              THE COURT:  Right.

2              MS. PINERA-VAZQUEZ:  The bond obviously will be

3    lowered to 19 million, right?

4              MS. MACE:  No, the total amount of the bond --

5              THE COURT:  The total amount of the bond is the

6    same, but the amount that you have to have in the registry of

7    the Court --

8              MS. PINERA-VAZQUEZ:  Okay.

9              MS. MACE:  The security amount.

10             THE COURT:  -- will be different.  The secured

11   amount will be reduced.

12             MS. PINERA-VAZQUEZ:  I understand.  So it will still

13   be 20 million, perfect.

14             THE COURT:  The face amount is the same.

15             MS. PINERA-VAZQUEZ:  Yes.

16             THE COURT:  The secured amount, it will be like a

17   bank account --

18             MS. PINERA-VAZQUEZ:  Right.

19             THE COURT:  -- that is transferred from one to

20   another.

21             MS. PINERA-VAZQUEZ:  Thank you, Judge.

22             THE COURT:  Okay.  With respect to the curfew, as I

23   said, I don't think -- I am not comfortable with the curfew

24   idea at this point.  And I don't want to set an exact amount

25   of time that he can go out to the compound.

*Proceedings*                                                                    75

1          I would like to see what Pretrial Services and the

2    defendant can agree to.  And assuming that it is something

3    that you all can live with, then I am not going to interfere

4    with that, because I think Pretrial Services should have the

5    discretion.  If you can't agree on it, then I am prepared to

6    set a time that I am thinking.  And I don't think that it is

7    inappropriate to allow him to go to any place whether it is

8    something that would be found in a housing project or not.

9          I understand fully the concerns that Pretrial

10   Services has, but he is in this compound and we are talking

11   about a restriction on the liberty that he would otherwise

12   have in the life that he lives, so that it doesn't matter to

13   me whether the time out of his personal apartment would be to

14   allow him to go to a pool area or an exercise area or a

15   closet.  It really doesn't matter.  It's any space he could

16   move to that is monitorable.

17         With respect to health, obviously the bond is

18   flexible enough to allow him to see a doctor as often as he

19   needs to.  I don't think that that's a concern.

20         Notice to the FBI when he leaves the building, I

21   think that is appropriate.  I think that should still take

22   place.  I appreciate the government's offer to suspend that

23   and have only where attorney visits or attorney-related travel

24   is taking place and that would be notice to Pretrial Services,

25   then.

1        And then the security is an interesting issue.  And

2   it is, for me, I would wonder whether there is a way to --

3   whether 24-hour security is necessary, whether there is some

4   lesser time.  But again, I am not sure how the security

5   actually functions.  When he is asleep at night, is there

6   somebody outside the apartment?  Is that how it works?

7        MS. PINERA-VAZQUEZ:  24/7.  There is one person.

8   They have two shifts of 12 hours.  And basically they sit

9   outside the apartment.  And by the way, just so the Court is

10  aware, there is actually video surveillance.  There is a

11  videocamera outside of entrance to his door.

12        THE COURT:  And that goes to the security firm?

13        MS. PINERA-VAZQUEZ:  And that goes to the security

14  firm.  And they also have a cabana downstairs.  So the

15  officer, whoever is in charge that day is with him either

16  outside his apartment or in the cabana.  But he cannot move.

17  He can't do anything outside of his apartment without their

18  presence.  So it's quite restrictive.

19        THE COURT:  So I think we can reduce the security

20  from 24 hours to a shorter amount of time.

21        MR. PAPPALARDO:  Yes.

22        THE COURT:  Yes.

23        MR. PAPPALARDO:  Just on that point, I want to make

24  it clear to the Court we are fine with the idea, for instance,

25  if he has to travel to New York, that he have security.  The

1    firm that he is using was started by the former SAC of the

2    DEA.  His point person was with the FBI last fall.  And, you

3    know, in terms of traveling back and forth for court purposes,

4    we are fine with that.  That's not a problem.

5             But what we are concerned about is that, number one,

6    we believe, we submit to the Court that it is unnecessary.  It

7    is a tremendously added expense on a monthly basis.  It is

8    well over a million dollars a year we don't think he ought to

9    be incurring, particularly with $75,000 a month, Your Honor.

10            THE COURT:  Right.  That isn't a million.

11            MR. PAPPALARDO:  No, you're right.

12            MS. PINERA-VAZQUEZ:  It's 800-something thousand.

13            MR. PAPPALARDO:  The point is it's a significant

14   expense.  It would be to me.  The bottom line is we are not

15   trying to compromise, but we think the Court and we submit the

16   government is adequately protected.

17            THE COURT:  I hear what you are saying.  Is there a

18   way that whenever he leaves the building that there would be

19   some security with him?  Because I just don't know how that --

20            MR. PAPPALARDO:  Certainly we could work that out if

21   he left the building compound, yes.

22            THE COURT:  Yes?

23            MR. PAPPALARDO:  Absolutely.

24            THE COURT:  If you had video surveillance outside

25   his door and downstairs and then security every time he left

1    the building, as well as notice?

2              MR. PAPPALARDO:  That's fine, Your Honor.

3              MS. MACE:  I don't know that that will reduce the

4    cost if that is what they are getting at.

5              MS. PINERA-VAZQUEZ:  Of course.

6              MS. MACE:  It depends on the schedule.

7              THE COURT:  Yes.  That's what I wasn't sure if it

8    was feasible.  I will certainly entertain that.

9              MS. MACE:  And it means that he only goes out once a

10   week so that he only pays security once a week.  I don't know

11   if that's --

12             THE COURT:  However they want to do that.

13             MS. PINERA-VAZQUEZ:  It would be 24/7.

14             THE COURT:  I'm totally fine with not having someone

15   there 24/7.  I am only concerned when he leaves the building.

16             MR. PAPPALARDO:  If we could discuss this amongst

17   ourselves, Your Honor, perhaps we could come up with an

18   agreeable proposal.

19             THE COURT:  And again, your assurance that there

20   will be video surveillance outside the door and downstairs is

21   an important part of this.

22             MR. PAPPALARDO:  There is.  I will represent to the

23   Court I have seen it.  I have witnessed it.

24             THE COURT:  Okay.

25             MR. PAPPALARDO:  And it's there and we can confirm

1   it with Pretrial Services.

2          MS. MACE:  And just for clarification, we are not

3   talking about the building security.

4          MS. PINERA-VAZQUEZ:  No.

5          MS. MACE:  We are talking about the private security

6   company.

7          THE COURT:  Yes.

8          MS. MACE:  And the other end of that camera 24/7, I

9   guess.

10          THE COURT:  Yes.

11          MS. MACE:  That's right?  Okay.

12          THE COURT:  There would have to be somebody

13   monitoring that camera to know whether he left, because that

14   is the gap that Pretrial Services and the government have.

15          MS. MACE:  Thank you, Your Honor.

16          MS. PINERA-VAZQUEZ:  Let me just be clear.  What we

17   request is that we get the physical person being there is

18   gone.  The video surveillance, whoever monitors it, will have

19   to give notice to leave, because he will need security to be

20   able --

21          MR. PAPPALARDO:  To leave.

22          MS. PINERA-VAZQUEZ:  -- to leave.

23          THE COURT:  Exactly.  And that would be arranged, I

24   guess Pretrial Services and the security service would make

25   arrangements.

*Proceedings*                                                                80

1           PRETRIAL OFFICER ILARIA:  Just spitballing here, the

2    defendant has to get permission from the officer first.  Once

3    he has permission, I'm not sure how it has been working.  Does

4    he contact security and they assign somebody to go over there?

5           THE COURT:  Pretrial.

6           MS. PINERA-VAZQUEZ:  I can tell you how it has been

7    working.  What happens is Anthony who is the head, the person

8    in charge of the security, the former FBI agent, contacts

9    Ms. Serrano, sends an e-mail and tells him at 2:00 he has to

10   be at the lawyer's office or he has a medical visit.  And

11   that's how she knows.  We don't need pre-approval for those,

12   by the way.  That is already in the bond.

13           And then at that point with the new structure we

14   would alert Anthony, the company, who then picks him up and

15   drive him to the lawyer, drives him to the doctor, drives him

16   to the groceries, to church, wherever he goes.  And he would

17   always have security when he leaves the building.

18           MS. MACE:  I think she is proposing removing that

19   person who communicates to Pretrial.

20           MS. PINERA-VAZQUEZ:  No, he would be the one in

21   charge still.

22           MS. MACE:  He would be there 24/7?

23           MS. PINERA-VAZQUEZ:  No.  That is what we are trying

24   to --

25           THE COURT:  He is at the office, right?

*Proceedings*                                                                 81

1          MS. PINERA-VAZQUEZ:  He is at the office.

2          MS. MACE:  I see.

3          THE COURT:  He's, like, the case manager.

4          MS. MACE:  I see.

5          MS. PINERA-VAZQUEZ:  Right.  He's a case agent.

6          THE COURT:  Yes, I understand.  Okay, so are we all

7   clear on that?

8          MS. PINERA-VAZQUEZ:  Yes.  We will work on the

9   details with them.

10          THE COURT:  Okay.  So I feel comfortable that any

11   gaps in the GPS would be filled by this arrangement.  Okay,

12   anything else I have missed?

13          MS. MACE:  I don't think so, Your Honor.

14          MS. PINERA-VAZQUEZ:  Let me, can we ask Ms. Becerra.

15          THE COURT:  Absolutely.

16          MS. PINERA-VAZQUEZ:  Ms. Becerra, Jackie?

17          MS. BECERRA (telephonically):  Yes, we are still

18   here.

19          MS. PINERA-VAZQUEZ:  Is there anything else that you

20   feel that we have missed that you need to add?

21          MS. BECERRA:  No.  I'm fine, thank you.

22          THE COURT:  And do you think this is a workable

23   arrangement?

24          MS. BECERRA:  I do, Your Honor.  I am here.  I was

25   with Mr. Napout and his wife.  We went with Pretrial Services

*Proceedings*                                                      82

1   and with Mr. Velasquez (ph), Tony, to make sure everybody

2   understands and that things are all reported, but it does

3   afford him much more movement hopefully in the premises.

4            THE COURT:  Yes, I think it will.  And I think

5   that's it, unless anybody has anything to add.

6            MR. PAPPALARDO:  I think we are fine, Your Honor.

7            MS. MACE:  Thank you, Your Honor.

8            MS. PINERA-VAZQUEZ:  Thank you for your time, Judge.

9            (Discussion held off the record.)

10           THE COURT:  One more thing on the record.  What do

11   we need in writing for Pretrial Services to make this --

12           PRETRIAL OFFICER ILARIA:  Your Honor, I think it's

13   okay there has been an order.  You have made the verbal order.

14           THE COURT:  You are fine with that?

15           PRETRIAL OFFICER ILARIA:  I think that's sufficient,

16   yes.

17           THE COURT:  No, but if you need anything in writing,

18   you should let me know.

19           PRETRIAL OFFICER ILARIA:  Okay.

20           MS. MACE:  Thank you, Your Honor.

21           THE COURT:  Thanks.

22           (Discussion held off the record.)

23           THE COURT:  Just to provide some context, defense

24   counsel provided me a copy of a medical report and asked to

25   put certain conditions on it.  I don't have those conditions

*Proceedings*                                                                83

1   in front of me, but essentially I didn't share it with

2   anybody.  Now they are asking for it to be submitted to the

3   Court or returned to them.  And I believe Mr. Ilaria was not

4   provided a copy of that; is that correct?

5               PRETRIAL OFFICER ILARIA:  Your Honor --

6               MS. PINERA-VAZQUEZ:  He has one.

7               PRETRIAL OFFICER ILARIA:  I do have.

8               THE COURT:  And the Court has a copy as well.

9               MS. MACE:  So just to be clear for the record, I

10  will now do with this whatever defense counsel asks that I do.

11              MS. PINERA-VAZQUEZ:  We will take it back.  Thank

12  you.

13              MS. MACE:  Done (handing).

14              THE COURT:  You want the Court to keep it in case

15  this issue comes up again?

16              MS. PINERA-VAZQUEZ:  Yes, we appreciate it.  You can

17  keep it under seal.

18              THE COURT:  File it under seal?

19              MS. PINERA-VAZQUEZ:  Yes.

20              MS. MACE:  That's fine.

21              THE COURT:  Okay, we will do that.

22              MS. PINERA-VAZQUEZ:  Judge, may we keep the Pretrial

23  Services report?  Can we keep our copy in our files?

24              THE COURT:  Yes.

25              MS. MACE:  No.

*Proceedings*                                                        84

1              MS. PINERA-VAZQUEZ:  I'm sorry?

2              MS. MACE:  No, in this district, they don't allow

3      any of the parties to keep them.

4              THE COURT:  I have been allowing it.

5              PRETRIAL OFFICER ILARIA:  That's fine, Your Honor.

6              THE COURT:  I do allow it.

7              MS. PINERA-VAZQUEZ:  Thank you, Judge.

8              MS. MACE:  May I keep mine as well?

9              THE COURT:  Yes.

10             MS. MACE:  Thank you.

11             THE COURT:  Because if this issue comes up again, I

12     don't want you to have to go back and bother Mr. Ilaria.

13             Okay, we are done.

14             (Time noted:  12:59 p.m.)

15             (Proceedings adjourned as set forth above.)

16

17

18

19

20

21

22

23

24

25

```
 1              R E P O R T E R    C E R T I F I C A T E

 2

 3              I, JOSHUA B. EDWARDS, RDR, CRR, hereby certify that:

 4   (A) the foregoing pages represent an accurate and complete

 5   transcription of the entire record of the proceeding before

 6   the United States District Court for the Eastern District

 7   of New York, The Honorable Robert M. Levy, United States

 8   Magistrate Judge presiding, in the matter of The United States

 9   of America v. Juan Napout, index number 15-CR-00252, held

10   February 25, 2016, and (b) these pages constitute the original

11   transcript of the proceeding.

12              This transcript certification is void if the

13   signature is not originally signed by the court reporter who

14   reported this matter.

15

16

17   _____

18   JOSHUA B. EDWARDS, RDR, CRR
     OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```