```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
                                        15-CR-252(PKC)
UNITED STATES OF AMERICA,
                                        United States Courthouse
        Plaintiff,                      Brooklyn, New York

        -against-                       January 5, 2017
                                        11:30 a.m.
JUAN NAPOUT,

        Defendant.

------------------------------x

      TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
           BEFORE THE HONORABLE PAMELA K. CHEN
                UNITED STATES DISTRICT JUDGE

APPEARANCES

For the Government:      ROBERT L. CAPERS, ESQ.
                         United States Attorney
                         Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                         BY:  KRISTIN MACE
                              SAMUEL NITZA
                         Assistant United States Attorneys


For the Defendant:       GREENBERG TRAURIG, LLP
                         One International Place
                         Boston, Massachusetts 02110
                         BY:  A. JOHN PAPPALARDO, ESQ.



Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, OCR
                         Phone:  718-613-2330
                         Fax:    718-804-2712
                         Email:  LindaDan226@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.
```

PROCEEDINGS                                      2

1           THE COURTROOM DEPUTY:  Criminal cause for bail
2  application, Docket 15-CR-252, United States versus Juan
3  Napout.
4           Will the parties please state their appearances for
5  the record.
6           MS. MACE:  Good morning, Your Honor, Kristin Mace
7  and Sam Nitza for the United States.
8           THE COURT:  Good morning.
9           MR. NITZA:  Good morning, Judge.
10          THE DEFENDANT:  Good morning, Your Honor, Anna Lee
11  from pretrial services.
12          THE COURT:  Good morning, Ms. Lee.
13          MR. PAPPALARDO:  Good morning, Your Honor, John
14  Pappalardo for Mr. Napout, who was previously excused from
15  this hearing.
16          THE COURT:  Good morning, Mr. Pappalardo.  Have a
17  seat.
18          All right, so I'm hoping that you have a good report
19  for me, Ms. Mace, on some agreement between the parties
20  regarding a possible modification to the bail.
21          MS. MACE:  We are not in total agreement, but if I
22  could give Your Honor some -- I mean the issues are a little
23  bit narrowed.
24          Just to give a little bit of context, I think the
25  two issues for the Court were about whether the curfew could

1   be monitored only by video surveillance or if it should be

2   both video and voice ID, and also the hours of the curfew.

3              THE COURT:  I thought -- pardon me, I thought one of

4   the issues was the security team reporting directly to the --

5   oh, is that going to be the second part?

6              MS. MACE:  Yes, I mean that's part of whether or not

7   the video surveillance would be sufficient on its own.

8              THE COURT:  Got it.

9              MS. MACE:  So that was the context, I think, that we

10  left the last hearing in.  And since then, we spoke to

11  pretrial services and the private security company.

12             THE COURT:  Let me ask you one question.  When you

13  say "video surveillance," you mean that which is monitored by

14  the security company?

15             MS. MACE:  Correct.

16             THE COURT:  Okay, go ahead.

17             MS. MACE:  And Ms. Lee hopefully came up with a new

18  proposal to have a different kind of bracelet that is a

19  radio-frequency bracelet that is waterproof and does not

20  require the defendant -- unlike GPS, it allows the defendant

21  to swim.

22             And because it had been our understanding that was a

23  significant consideration to the defendant, we proposed that

24  to defense counsel and he has told us that he's not interested

25  in that because of the feelings of confinement with the

1   bracelet alone, even with the ability to swim, make that
2   unacceptable from their perspective.
3            So if we set that aside and assume that's not an
4   option, we sort of go back to where we were at the last
5   hearing.  And we spoke to the private security company and
6   they can report to the government or the FBI if there is a
7   flight.
8            However, the government still has significant
9   concerns about having the private security be the only way of
10  monitoring the compliance with the curfew, and I can go into
11  the reasons why, but I think essentially Mr. Pappalardo and I
12  have agreed that there is no need to change that.  Mr. Napout
13  is okay with the voice ID calls now, he's no longer seeking to
14  have that condition removed.
15           MR. PAPPALARDO:  Your Honor, there's only one issue
16  that we're here before the Court on, and that is the -- you
17  know, just to interrupt Ms. Mace for a second -- the motion
18  that we filed, as you know, we withdrew several aspects of
19  that.
20           THE COURT:  Right.
21           MR. PAPPALARDO:  The one thing that we learned,
22  thanks to the efforts of pretrial services, was that the
23  manufacturer is not able to change the response time for the
24  call.  Remember we had requested for a 15-minute response time
25  instead of a five-minute response time.

1         THE COURT:  Right.

2         MR. PAPPALARDO:  So that being the case, and I

3  accept that that is the case, because I heard it directly from

4  pretrial services, the only issue, Your Honor, is the scope of

5  the time frame for the curfew.

6         The only thing I would ask the Court to consider is

7  an expansion of the time of the curfew from 7:00 in the

8  morning until 7:00 at night, as opposed from 7:00 in the

9  morning until 5:00 at night.  All other conditions remain in

10 place, and I'm asking the Court to consider -- that's the only

11 thing before the Court at this point, from my perspective.

12        THE COURT:  Right.  So just to recap.

13        Virtually everything else we discussed the last time

14 we were here and the possible modifications that the parties

15 were going to explore, including having the security company

16 report directly to the FBI or to pretrial if Mr. Napout left

17 his apartment during the banned curfew hours, that's no longer

18 even being discussed any further, and the only modification

19 you want is for me to expand the hours upon which he's not

20 subject to curfew or shortening the curfew hours from 7 p.m.

21 to essentially 7 a.m., where he has to stay in his apartment.

22        MR. PAPPALARDO:  That's it, Your Honor.

23        The private security company does have the ability,

24 we checked this out right after the November 22nd hearing, to

25 notify the government directly.  But since we're going to be

1   dealing with the calls any way, it makes no sense to discuss
2   it.
3           So the bottom line is the only thing we're asking
4   the Court to consider is just an expansion of the time which
5   would give him the ability to go to other places in close
6   proximity to his apartment for that two-hour period.
7           THE COURT:  Including his mother's apartment.
8           MR. PAPPALARDO:  Including his mother's apartment.
9           THE COURT:  Okay.
10          Does the government have an objection to
11  expanding -- actually, let me put it the other way around --
12  shortening the curfew by two hours?
13          MS. MACE:  We do, Your Honor, and we would ask the
14  Court to leave the conditions that are currently in place in
15  place with the 5 p.m. to 7 a.m. curfew.
16          And the reason is when we first -- originally,
17  pretrial services recommended home detention with only time
18  out for doctor's visits and so forth.
19          After spending a lot of time negotiating with
20  Mr. Pappalardo going back and forth about what would be
21  reasonable -- what amount of risk is sort of reasonable to
22  assume here, we came up with the agreed time of 5:00.  And
23  that was very considered.  He was asking for a later time at
24  that point as well, but that was very considered.
25          And part of the reason is that the government views

PROCEEDINGS

1   it as important to have a substantial part of the defendant's
2   day be monitored by pretrial and not by this private security
3   company that is retained by the defense, answers to the
4   defense, and is not obligated to report to the Court any
5   violations.  And so it's our view that, you know, it's
6   reasonable to assume the risk of 5 p.m. to 7 a.m., but not
7   more than that.
8           And I understand it's difficult to parse exactly
9   where that line falls, but we originally had, you know,
10  discussed with Mr. Pappalardo a much earlier time.  We
11  originally thought 3 p.m. would be a better time for him to
12  return home, and that would give him sufficient time to
13  exercise and so forth.  But because of the health concerns and
14  his request regarding family and so forth, we negotiated the
15  5 p.m. time and we think that's reasonable.  And nothing has
16  changed since that time, and so we ask the Court to keep the
17  conditions as they are set.
18          THE COURT:  Did you want to say anything, Ms. Lee?
19          PRETRIAL SERVICES OFFICER:  I don't have a whole lot
20  of opinion in terms of if there should be a 5 p.m. return time
21  or a 7 p.m.
22          I do want to share with the Court that we've reached
23  out to Florida, who does the supervision for us, in terms of
24  the layout of the complex, his apartment and so forth, just so
25  that we can have a little understanding of how things are kind

1  of situated with the family.

2           So he has a unit and he lives -- there's a bedroom,
3  bathroom and kitchen for his unit.  There's a connecting unit,
4  which is another apartment, that he basically took that unit
5  so that when family comes to visit him, they stay in that
6  unit.

7           He does have a mom in another -- I believe another
8  building in the same complex, so he would have to go to her
9  building and so forth.  But if he has like other family
10 members who come visit, it's like a connected -- it's like a
11 suite.

12          THE COURT:  Right.  No, I understand that.  Okay.

13          PRETRIAL SERVICES OFFICER:  So I mean I'm not
14 sure -- you know, the argument between 5 p.m. and 7 p.m., I
15 think is more along the lines of having mom -- going to mom's
16 apartment building, which is another building, but I think she
17 can come over, it's not that far, it's in the same complex.

18          MR. PAPPALARDO:  Your Honor, if I may.

19          THE COURT:  You're going to tell me she's elderly --

20          MR. PAPPALARDO:  No, I'm not.  No, I'm not.  I'm
21 going to correct what you've just been told, okay.

22          Mr. Napout has an entire floor of the building.
23 He's always had an entire floor of the building.

24          THE COURT:  Okay.

25          MR. PAPPALARDO:  It's not a big place, okay.  The

```
 1   one section of the floor is for his children.
 2              He's got four adult children, some of whom are
 3   married with grandchildren, and the other section is for
 4   himself.  That has always been the case.
 5              He did rent a smaller portion for his mother, which
 6   is not in another building, it's two floors above him --
 7              THE COURT:  Okay.
 8              MR. PAPPALARDO:  -- in the same building.
 9              THE COURT:  You're not sort of helping yourself
10   here.
11              MR. PAPPALARDO:  Well --
12              THE COURT:  I appreciate the clarification.
13              MR. PAPPALARDO:  -- I want you to understand the
14   facts, Your Honor --
15              THE COURT:  Right.
16              MR. PAPPALARDO:  -- okay, and I will argue this in a
17   moment, but in order to understand where we are, you know,
18   this is what he's always had.  It's not a question of going
19   back and forth and that sort of thing.
20              THE COURT:  Okay.  Well, as I said, that doesn't
21   necessarily aid your cause, because it means that he really
22   has, within extremely close proximity, his family members and
23   the opportunity to see them between, I think, 7 a.m. and
24   5 p.m.  I'm not going to change the condition by two hours and
25   move it back.
```

1              At this point he has a tremendous amount of liberty.
2     The government and pretrial services -- when I say the
3     "government," the U.S. Attorney's Office, I think has really
4     tried to be as reasonable and flexibility as possible to
5     accommodate what he initially characterized as health
6     concerns, namely his ability to swim during the day as opposed
7     to some other form of exercise.
8              I think even coming up with the idea of a bracelet
9     that was waterproof showed, I think, the length that they're
10    willing to go to to try to accommodate his very -- I don't
11    want to say delicate constitution, but his concerns about
12    maintaining his health.
13             I've said before that I am sensitive to that
14    concern.  I am less sympathetic to the notion that he wants to
15    have a life that's perfectly attuned to the rhythms of his
16    family interaction or his desire to have dinner with his
17    mother at a particular time.
18             We've reached the limit of negotiation about this.
19    We've spent an awful lot of time, both yours and the
20    government's, pretrial services, and the Court's, to try to
21    fine tune this.  I think we have reached what to my mind is a
22    perfect balance going forward that accommodates the legitimate
23    interest about his health, to allow him to be free to
24    exercise.  He's free also to go out from his apartment complex
25    during the day from 7 a.m., I think, to 5 p.m.  That is a

1  significant amount of liberty that most people, quite frankly,
2  would be very happy to have.
3            I understand he's paying for it because he has to
4  provide for a security detail, but he's also in the fortunate
5  position of being able to do that.  So we are going to leave
6  things just as they are.  The curfew's 5 p.m. to 7 a.m., all
7  the other conditions remain the same.
8            And just one question for the government.  The
9  security service, to the extent that they report about
10 Mr. Napout's -- or actually, let me take that back.  The
11 security guards will not be reporting back his activities from
12 5 p.m. to 7 a.m., that will be monitored as before with the
13 random voice ID calls, correct?
14           MS. MACE:  The condition that's currently in place
15 is both the random voice ID, as well as the camera on the door
16 that will remain in place as well.
17           THE COURT:  And when the security guard's company
18 sees, if they do, him leave from the apartment, who do they
19 report to now?
20           MS. MACE:  Currently -- we talked yesterday to a
21 representative from the company and we went through various
22 scenarios of what ifs; what would you do, how do you respond
23 to such and such situation, and essentially what their
24 protocol is is if they see something abnormal, then they would
25 try to respond and figure it out.

1          So if the camera goes out, there's no power, they'll
2   figure out if the power is lost in the building and do various
3   things like that.
4          THE COURT:  I'm sorry.
5          MS. MACE:  They're remote.  They get a signal to a
6   smartphone that says there's been motion on a camera, and then
7   one of two people can look at the camera.  There's a live feed
8   on their smartphone to try to see what's going on.
9          And so if Mr. Napout is running, they would see
10  that, conceivable.  If he's already gone, they say they have
11  stored video they can go back and look to see what happened to
12  try to identify if it's a food delivery person at the door,
13  rather than Mr. Napout leaving and so forth.  And so they said
14  they would report it to the police, the local police.  We
15  asked if they would report it to the FBI as well he said, yes,
16  they can.
17         THE COURT:  Okay.  Is that a change from before,
18  though, that's what I was wondering.
19         MS. MACE:  It was never a condition.  It was never
20  ordered by the Court.
21         They have known FBI agents to contact who are here
22  in New York previously, and we encourage them to keep those
23  numbers on hand.  So if they actually believe there is flight,
24  not just a minor violation, that they would call the FBI, and
25  they've agreed to do that.

PROCEEDINGS

1  THE COURT: Okay. So that's what I thought was the
2  revelation from last time, was that there was this possibility
3  of having the security company report directly to pretrial or
4  the agent themselves. So that didn't exist before --
5  MS. MACE: They've always had -- speaking to the
6  representative yesterday, he said he's always had the contact
7  number for pretrial services and for the FBI, and he views it
8  as his responsibility to in the moment determine whether or
9  not there should be an immediate response or whether he should
10 investigate further.
11     So if the power's out, it was our sense that he
12 would investigate it a little bit, he wouldn't make calls
13 right away and try to determine whether or not there's
14 actually reason for a concern.
15     THE COURT: Okay. But I gather that the
16 government's comfortable at this point with leaving everything
17 as it is, and I've just denied the request to shorten the
18 curfew by two hours, and that's all we have today.
19     MS. MACE: Yes.
20     THE COURT: All right. Fair enough.
21     We have motions to decide, I will look forward to
22 seeing you relatively soon on those. Thank you, everybody.
23     MR. PAPPALARDO: Thank you, Your Honor.
24     MS. MACE: Thank you.
25     (Whereupon, the matter was concluded.)

I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.
/s/ Linda D. Danelczyk          January 9th, 2017