**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ : | |
| **UNITED STATES OF AMERICA** : | |
| : | |
| **v.** : | **Case No. 15 CR 252 (S-1)(PKC)** |
| : | |
| **JUAN ANGEL NAPOUT,** : | |
| : | |
| **Defendant.** : | |
| : | |
| _____ : | |

## REPLY IN SUPPORT OF JUAN ANGEL NAPOUT'S MOTION TO SEVER AND MOTION FOR SPEEDY TRIAL

**GREENBERG TRAURIG**
John Pappalardo
Jacqueline Becerra

**PIÑERA-VAZQUEZ LAW FIRM**
Silvia B. Piñera-Vazquez

<u>**REPLY**</u>

**I.**   **THE GOVERNMENT HAS FAILED TO REFUTE THE NEED FOR SEVERANCE BASED ON PREJUDICIAL SPILLOVER, SEVERE DISPARITIES IN THE EVIDENCE AND ALLEGED INVOLVEMENT IN THE OVERALL SCHEME, AND SIGNIFICANT POTENTIAL OF ANTAGONISTIC DEFENSES**

**A.**   **A Joint Trial Will Not Further Judicial Economy Or Avoid Spillover Prejudice Because There Is No Credible Evidence That Mr. Napout Joined The Alleged RICO Conspiracy**

In its Memorandum In Opposition To The Defendants' Motions For Severance [D.E. 546] ("Gov. Opp."), the Government first argues that judicial efficiency and fairness factor against severance, and summarizes its arguments by stating that a joint trial would save time and resources and avoid inconveniencing witnesses.  Gov. Opp., p. 8-13.[1]  The Government next argues that severance is not warranted by a risk of spillover prejudice.  Gov. Opp., p. 13-18.  In claiming that judicial efficiency and fairness supports a joint trial, and that there is no risk of spillover prejudice, the Government relies on one overriding presumption, which is that "[e]vidence of all the defendants' and their co-conspirators' misconduct is proof of the racketeering enterprise . . . and thus is admissible against all the defendants."  Gov. Opp., p. 9.  While these arguments sound appealing at first blush, upon scrutiny the Government's claim does not pass muster when applied to Mr. Napout and the differences between the evidence against him vis-à-vis the other defendants.

The Government's justifications for a joint trial fall apart when applied to Mr. Napout because the Government lacks sufficient evidence to prove its RICO conspiracy charge against

---

[1] The Government also refers to a severance advantaging defendants based on trial order.  However, the court in *United States v. Saltzman*, 153 F.Supp.3d 245, 252 (D.D.C. 2016), explained that any such advantage would be uncertain and slight.

> [I]t may provide Saltzman with a slight advantage insofar as he may benefit from "knowledge of the contents and weaknesses of a witness's testimony" provided in Akinyoyenu's trial. . . . [T]hese burdens do not appear to outweigh the benefits of severance.

*Id.* at 252 (quoting *United States v. Gambino*, 729 F.Supp. 954, 970–71 (S.D.N.Y.1990)).  To the extent there is any trial order advantage from severance, it would apply in every case, and therefore should not be a viable reason to deny an otherwise warranted severance.

Mr. Napout in Count I, and therefore other defendants' conduct in charges unrelated to Mr. Napout would not be admissible and serve only to prejudice Mr. Napout. As Mr. Napout has explained in other briefs, there is a complete lack of evidence showing that Mr. Napout was a member of any criminal conspiracy, including a conspiracy to commit a RICO Act violation (as alleged in Count One), to commit wire fraud (as alleged in Counts Nine and Eighty-Three), or to commit money laundering (as alleged in Counts Ten and Eighty-Four). The Government has produced no documents, recordings or other evidence, let alone credible evidence, showing that Mr. Napout agreed with alleged co-conspirators to commit wire fraud or money laundering, or that he ever had the requisite criminal intent.

The scarcity of evidence of Mr. Napout's alleged membership in the racketeering conspiracy is consistent with the lack of factual allegations in the Superseding Indictment supporting Mr. Napout's membership in the conspiracies at issue. Despite the Superseding Indictment naming 27 defendants, charging 92 counts, and alleging 15 separate schemes over a 24-year period, Mr. Napout is charged in only five Counts and is alleged to be part of only two of the schemes: the CONMEBOL Copa Libertadores Scheme #2 and the 2016 Copa America Centenario Scheme. Superseding Ind., ¶¶ 363, 379, 381, 502, 504. In its Memorandum In Response To The Defendants' Initial Pre-Trial Motions, the Government cites paragraphs 174-185 of the Indictment for the allegations showing the Copa Libertadores Scheme #2 at issue in Counts One, Nine and Eighty-Three, and paragraphs 131, 134, and 341-360 for the allegations showing the Copa América Centenario Scheme at issue in Counts One, Ten and Eighty-Four.

Yet, the actual allegations fall far short of showing that Mr. Napout was a member of these alleged conspiracies. Aside from a paragraph explaining the titles Mr. Napout has held within FIFA and CONMEBOL, the only allegations regarding Mr. Napout are summary and

conclusory allegations claiming Mr. Napout and multiple other Defendants conspired in RICO, wire fraud and money laundering conspiracies in Counts One, Nine, Ten, Eighty-Three and Eighty-Four; naming Mr. Napout among "high-ranking CONMEBOL officials," who allegedly received payment of bribes and kickbacks; naming Mr. Napout among "six presidents of ... CONMEBOL [that] . . . demanded" and received bribes in the Copa Libertadores Scheme #2; and naming Mr. Napout among "officials who had solicited and/or were to receive bribes" in the 2016 Copa America Centenario Scheme.  Superseding Ind. at ¶¶ 41, 95-96, 114, 137, 181-182, 348, 363-64, 379, 381, 502, 504.  Most importantly, there are no specific factual allegations whatsoever showing that Mr. Napout ever actually agreed to enter into a conspiracy,

Tellingly, the only allegations of Mr. Napout receiving money are not borne out by the evidence.  The Government alleges, in conclusory fashion, that Alejandro Burzaco arranged for or paid bribes to Mr. Napout and many others.  *See* Superseding Ind., ¶¶ 114, 182.  Yet the Government has produced no evidence in discovery that Mr. Napout "arranged" to receive or actually received any tainted Burzaco funds.  There are no other allegations in the Superseding Indictment referencing Mr. Napout and any criminal conduct or scheme, conclusory or otherwise.

Importantly, there are also no allegations showing that Mr. Napout engaged in conduct in furtherance of the charged conspiracies.  Mr. Napout is not alleged to have attended the meetings in or about August 2013, in Buenos Aires and London, at which Datisa allegedly agreed to bribe CONMEBOL officials with regard to the 2013 Copa America Contract, and is not named in allegations detailing the use of financial institutions in the United States to make payments, the use of bank accounts in Switzerland to wire money to accounts controlled by CONMEBOL officials throughout the world, and other specific allegations describing the scheme.  *See*

Superseding Ind. at ¶¶ 348-361. Unlike the other defendants, the Government has not alleged that Mr. Napout deposited any illicit funds into any account, and has not listed any of Mr. Napout's bank accounts or properties in the criminal forfeiture portion of the Indictment. Also, contrary to the other defendants, Mr. Napout is <u>not</u> named as having committed any specific acts of bribes or kickbacks. Finally, the Indictment does <u>not</u> allege that Mr. Napout was recorded or intercepted participating in any conspiracy.

The significance of the glaring dearth of evidence, or even factual allegations, of Mr. Napout ever engaging in conduct in furtherance of any conspiracy, including the racketeering conspiracy alleged in Count One, is that the absence of such conduct further demonstrates that he never actually was a member of any such conspiracy.

The Second Circuit in *United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989) required a judgment of acquittal on a charge of conspiracy to possess heroin with intent to distribute where the Government failed to prove that the defendant was a member of the alleged conspiracy. The Second Circuit explained what showing an agreement to conspire requires.

> [T]here must "be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." . . .
> Here, there was ***no direct proof of any knowing agreement between Nusraty and his alleged co-conspirators***. . . . "[f]or a single act to be sufficient to draw an actor within the ambit of a conspiracy to violate the federal narcotics laws, there must be independent evidence tending to prove that the defendant in question had some knowledge of the broader conspiracy, or the single act itself must be one from which such knowledge may be inferred."
> ***Suspicious circumstances . . . are not enough to sustain a conviction for conspiracy***. . . . Nor is this a case in which there was a pattern of acts or incriminating physical evidence reflecting the defendant's participation in a criminal scheme. . . . ***Nor are we presented with evidence of any inculpatory conversations*** between Nusraty and his alleged co-conspirators. . . . Moreover, there is no evidence to show that Nusraty ever took possession, either actual or constructive, of the heroin. . . . Nor was there any evidence that Nusraty ever saw drugs, or was present at a transfer thereof. . . .
> [M]ere presence at the scene of an aborted drug transfer cannot by itself support a

conviction of conspiracy, . . . for *mere presence is not enough to prove knowing conspiratorial agreement* . . . . By the same token, *mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement*.

*Id.* at 763–64 (quoting *United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984) and *United States v. DeNoia,* 451 F.2d 979, 981 (2d Cir. 1971) (per curiam)) (other internal cites omitted; emphases added).[2]

Applying this analysis to the present charges amply demonstrates that the required proof of conspiracy membership is sorely lacking with regard to Mr. Napout.  The Government's evidence focuses on the conduct of alleged co-conspirators, and does not bear at all on whether Mr. Napout ever actually joined the conspiracies at issue.  While acts of alleged co-conspirators can constitute overt acts in furtherance of an alleged conspiracy charge against Mr. Napout, they obviously do not show that Mr. Napout was actually a member of the conspiracy.  The Government has produced no direct proof of any knowing agreement between Mr. Napout and any alleged co-conspirator to commit wire fraud, money laundering, or a RICO Act violation, including with regard to the Copa Libertadores Scheme #2 and the Copa América Centenario Scheme.  There is no evidence of any inculpatory or incriminating conversations between Mr. Napout and any alleged co-conspirator.  Finally, any evidence of Mr. Napout's presence at certain events or association with alleged co-conspirators (which are actually explained by his

---

[2] *See also United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) ("Rosenblatt could not have been validly convicted of conspiracy to make false entries on postal records . . . because he had no knowledge of such a plan; he neither intended nor agreed to commit that offense, or any other offense of which [alleged co-conspirator] Brooks might have been guilty . . . . The only offenses that Rosenblatt 'agreed' to aid and abet were tax evasion . . . and taking kickbacks on government contracts."); *United States v. Gaskins*, 690 F.3d 569, 580 (D.C. Cir. 2012) ("The fact that Gaskins was close to Miller was plainly insufficient to support a conviction. . . . So were the conversations about checks, credit cards, payments, and email. . . . [T]here was no evidence that any of those conversations were related to drugs or drug transactions. And there was no evidence that Gaskins knew they were related."); *United States v. Dellosantos*, 649 F.3d 109, 115–16 (1st Cir. 2011) ("The agreement is the *sine qua non* of a conspiracy, and this 'element is not supplied by mere knowledge of an illegal activity ..., let alone by mere association with other conspirators or mere presence at the scene of the conspiratorial deeds.'") (quoting *United States v. Zafiro,* 945 F.2d 881, 888 (7th Cir.1991)).

professional positions within FIFA and CONMEBOL) likewise would be insufficient to prove membership in an alleged co-conspirator's conspiracy.

The complete absence of evidence on the crucial issue of whether Mr. Napout was a member of the RICO conspiracy in Count One (or the conspiracies to commit wire fraud and money laundering) sets this case apart from the authorities opposing severance, and defeats the Government's underlying premise that all co-defendant misconduct would be admissible against Mr. Napout.  In fact, the case of *United States v. DiNome*, 954 F.2d 839 (2d Cir. 1992), which the Government highlights and quotes in its opposition (p. 14-16), demonstrates the need for severance here.  In *DiNome*, multiple defendants were tried together on RICO and other charges, including bribery, mail and wire fraud.  *Id*. at 842, 844.  The trial judge granted a judgment of acquittal for two of the defendants, Wayne and Judith May Hellman, on the RICO and bribery counts after the Government failed to prove they were part of the RICO and bribery enterprise. *Id*. at 844.  Not only had the Hellmans not previously sought severance before trial, they had "refused the court's earlier offer of a severance."  *Id*. at 845.  Nevertheless, the Second Circuit held that, at that point, the trial judge should have granted a mistrial as to the other charges because the spillover prejudice from the evidence regarding co-defendants' conduct regarding the RICO charge that no longer applied to the Hellmans was so severe that it required severance of the trial for the remaining charges.  *Id*. at 844-45.

> We cannot escape the conclusion that the evidence against the Hellmans' codefendants . . . was prejudicial to the Hellmans. . . . ***Once the RICO charges against the Hellmans were dismissed, all but an infinitesimal fraction of the evidence at this sixteen-month trial lost any relevance to the mail and wire fraud charges against them. Instead of being swamped by this mass of irrelevant evidence, these charges should have been tried separately***.
> . . . Once the RICO charges against them were dismissed, the Hellmans stood in a very different posture with respect to the evidence relevant to the RICO charges. That evidence was then irrelevant yet highly prejudicial in the context of the remaining mail and wire fraud charges. . . .

> After the granting of their Rule 29 motion on the RICO counts, the Hellmans should have been severed for a separate trial on the mail and wire fraud counts. Such a trial could have been completed in a very short period of time, with the risk of spillover prejudice entirely eliminated. The Hellmans' mail and wire fraud convictions must thus be reversed.

*Id*. (emphasis added) (citing *United States v. Branker,* 395 F.2d 881, 887–89 (2d Cir.1968), *cert. denied,* 393 U.S. 1029 (1969) (finding prejudice against some defendants in lengthy trial involving numerous counts unrelated to those defendants) and *Schaffer v. United States,* 362 U.S. 511, 516 (1960) (A "trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear.... [W]here, as here, the charge which originally justified joinder turns out to lack the support of sufficient evidence, a trial judge should be particularly sensitive to the possibility of such prejudice.").

The same analysis holds true when applied to Mr. Napout. The only difference is that this Court does not need to wait until the close of the Government's case at a joint trial. The Government's inability to produce evidence showing that Mr. Napout ever actually joined the alleged RICO conspiracy foreshadows that the same problem that necessitated a mistrial in *DiNome* will rear its head at trial in this case unless Mr. Napout's trial is severed. The absence of evidence of membership in the RICO conspiracy will require that Mr. Napout be acquitted of that Count at the close of the Government's case. Therefore, Mr. Napout is seeking severance well in advance of trial to avoid the mistrial that would become necessary when the lack of evidence of his being a part of a RICO conspiracy mandates acquittal on Count One, which in turn would render a mass of evidence of co-defendant conduct regarding the RICO conspiracy irrelevant and fatally prejudicial as to the remaining charges against Mr. Napout. Thus, contrary to the Government's judicial efficiency argument opposing severance, severance at this juncture will further judicial efficiency, and save time and resources, by avoiding the mistrial and new

trials necessitated after the acquittal on the RICO count in *DiNome*.

The recognition of the Second Circuit that it is fundamentally unfair to permit a defendant to be tried jointly with other co-defendants, under a theory that they are all members of an overarching conspiracy, and where evidence of the defendant's membership in that conspiracy is lacking, is nothing new. The Second Circuit reversed convictions of seven defendants under similar circumstances in *United States v. Bertolotti*, 529 F.2d 149, 157–58 (2d Cir. 1975), and explained the unavoidable spillover prejudice where the evidence does not show that they were members of a conspiracy with other defendants with whom they are tried jointly.

> Under the guise of its single conspiracy theory, the Government subjected each of the seven appellants to voluminous testimony relating to unconnected crimes in which he took no part. Appellants Bertolotti, Thompson and Camperlingo, active participants in the 'Florida quartet' deal, but in no way tied in with any of the other conspiracies nor shown to have dealt with Rossi, Coralluzzo or their associates on any prior or subsequent occasion, were forced to sit through weeks of damaging testimony on the acquisition and distribution of the Flynn cocaine and the cash thefts from Matthews, Harrison and Lucas. Appellants DeLuca and Angley, concededly involved in the Flynn transaction, were likewise subjected to a deluge of evidence relating to at least three other conspiracies in which they played no role. Because of their overlapping involvement in more than one of the proven conspiracies, the prejudice to appellants Capotorto and Guerra is less glaring. . . . We, nevertheless, find clear evidence of prejudice to these two as well. Criminal they may have been, but their guilt did not permit violation of their "right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others.". . . .
> [W]e believe it unnecessary to . . . [recite] the inherent prejudice in the evidence presented. The possibilities of spill-over effect from testimony on these transactions are patent when the number of conspiracies, the number of defendants and the volume of evidence are weighed against the ability of the jury to give each defendant the individual consideration our system requires. . . .

*Id*. at 157 (quoting *Kotteakos v. United States*, 328 U.S. 750, 775 (1946); internal cites omitted).

Significantly, as would be the case with Mr. Napout absent severance, the evidence at trial in *Bertolotti* included numerous taped conversations of co-defendants that did not involve or reference the seven defendants at issue. The court detailed why the admission of these

recordings in the joint trial was an "illustration of the inherent dangers of combining unrelated criminal acts under the roof of an alleged single conspiracy." *Id*.

> No defendant ought to have a jury which is considering his guilt or innocence hear evidence of this sort absent proof connecting him with the subject matter discussed. With respect to at least five of the appellants, no such proof was ever convincingly produced.  Because we cannot say that the errors committed below had no influence on the jury's verdict, we reverse appellants' convictions.

*Id*. at 158; *see also United States  v. Tellier*, 83 F.3d 578, 581–82 (2d Cir. 1996) ("We believe that the reversal of Roy Tellier's RICO convictions also dictates reversal of his Hobbs Act conviction given the enormous amount of prejudicial spillover evidence admitted to prove the RICO 'enterprise' and its extensive criminal activities. . . . [D]efendants who no longer face RICO charges should be severed so that the jury is not exposed to evidence that is irrelevant to the remaining charges.") (citing *DiNome,* 954 F.2d 839, 845); *United States v. Gilbert*, 504 F.Supp. 565, 571 (S.D.N.Y. 1980) (severing trial of defendant charged in 3 of 36 counts, including conspiracy, whose "disproportionate involvement in the overall scheme [ ] raise[d] a substantial risk . . . [of being] prejudiced by the gradually accumulating effect of evidence . . . [as] a jury . . . may tend to associate all investors with the wrongdoing of the architect of the scheme;" and holding that the "risk of prejudicial spillover . . . [when] charged in relatively few counts of a complex indictment, is unacceptable").

Because the Government's authorities against severance differ from the case against Mr. Napout in that the critical component of any evidence supporting Mr. Napout's membership in the alleged RICO conspiracy is missing, the Government's arguments as to judicial economy and denying spillover prejudice are misdirected, and do not negate the need for severance established by Mr. Napout in his Motion and supporting memorandum.[3]

---

[3] Notably, the Government cites *United States v. Spinelli*, 352 F.3d 48 (2d Cir. 2003) for the proposition that joint trials may be appropriate when defendants are charged in the same conspiracy.  Yet, the *Spinelli* court also cautioned

**B.    The Government Has Failed To Refute The Need For Severance Due To The Significant Potential Of Antagonistic Defenses**

The Government next argues that Mr. Napout has not "[a]rticulated [a]ntagonistic [d]efenses," and thus has not shown "any likelihood of prejudice from any possible antagonistic defense." Gov. Opp., p. 19-21. Both the Government's premise and conclusion are wrong.

First, Mr. Napout has presented an antagonistic defense. As quoted in Mr. Napout's Supporting Memorandum (p. 13), on May 1, 2014, Mr. Napout and Promoter #1 had a recorded conversation in which Mr. Napout strongly denied any involvement in any wrongdoing, and complained that those involved in wrongdoing were lying about him receiving money. In the same conversation, Promoter #1 said to Mr. Napout that the people accusing Mr. Napout of being involved "are liars." As also quoted in Mr. Napout's Supporting Memorandum (p. 13), on May 2, 2014, Napout said to Promoter #1, "The truth is that there are so many lies about this thing. The reality is that I never asked anyone for anything." Thus, Mr. Napout is presenting a defense that the people accusing him of being involved in a conspiracy or receiving bribe money are lying to deflect blame away from them. To the extent any co-defendant accuses Mr. Napout of such involvement, Mr. Napout and that co-defendant would undeniably have mutually antagonistic defenses.

Second, Mr. Napout has shown a likelihood of prejudice. Recognizing the axiomatic fact Mr. Napout and those co-defendants who point the finger at him to shift blame away from them would have mutually antagonistic defenses, the Government resorts to arguing that "a significant degree of finger pointing" between defendants being a "virtual certainty" is too "vague" to

---

that "[t]here are, of course, cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice." *Id.* at 55. As explained herein, the utter lack of evidence showing that Mr. Napout joined the RICO conspiracy reflects the same wide discrepancy here.

support severance.  Gov. Opp., p. 21 (quoting Mr. Napout's Supporting Memorandum, p. 29).

However, the Government overlooks that this standard is more than Mr. Napout's mere

assertion.  Rather, as made clear in Mr. Napout's Supporting Memorandum, p. 28 et seq.), it was

the analysis of the court in *United States v. Andrews*, 754 F.Supp. 1161, 1179 (N.D.Ill. 1990)

*enforced in part and set aside in part*, 754 F.Supp. 1197 (N.D. Ill. 1990).  The *Andrews* court

granted motions to sever, and explained as follows:

> The ***sheer number of defendants to be tried makes conflicting trial strategies
> and a significant degree of finger-pointing a virtual certainty***.  This potential
> prejudice is compounded here because the jury may not comprehend the
> individual defense theories due to the mass confusion caused by twenty-two or
> more attorneys vigorously pursuing his or her own course while seeking his or her
> own client's acquittal. Moreover, if any of these separate courses became too
> antagonistic during the trial so as to then mandate severance, a great waste of time
> and judicial resources would result. Although ***this potential prejudice*** may not
> *require* severance at this initial stage, we believe that ***the real possibility of it
> eventually occurring weighs heavily in favor of severing this trial***.

*Id.* at 1179 (emphasis added).

The *Andrews* court cited *United States v. Gallo,* 668 F.Supp. 736, 751 (E.D.N.Y. 1987),

*aff'd*, 863 F.2d 185 (2d Cir. 1988)).  In *Gallo*, the Eastern District of New York similarly

explained that, with sixteen defendants involved, it "anticipate[d] that there may arise some

prejudicial antagonism," and that "[t]his, too, ***weighs in favor of splitting the indictment for

trial***."  *Id.* at 751 (emphasis added).

Based on the foregoing, and contrary to the Government's assertions, it is clear that the

virtual certainty of significant finger pointing and conflicting trial strategies between Mr. Napout

and his co-defendants can support severance.

The cases cited by the Government do not hold otherwise.  For example, the Supreme

Court in *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993), explained that it is within "the

district court's sound discretion" to determine if antagonistic defenses are prejudicial, while

noting that "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened."   The court in *United States v. O'Connor*, 650 F.3d 839, 858 (2d Cir. 2011), likewise addressed a denial of severance under an abuse of discretion standard, and, rather than addressing a virtual certainty of antagonistic defenses with a large number of named defendants, found only that a "***possibility*** that codefendants may mount mutually antagonistic defenses" did not require severance in a two defendant case.   (Emphasis added)   Similarly, the remainder of the cases cited by the Government all considered only whether a trial court had abused discretion in its consideration of alleged antagonistic defenses, and none held that antagonistic defenses could not be a factor favoring severance.   Moreover, none of the cases cited by the Government involved a holding that severance was prohibited under a factual situation akin to Mr. Napout's, where antagonistic defenses and resulting prejudice are a near certainty due to 27 named defendants and recordings of Mr. Napout espousing both his innocence and the dishonesty of others renders.   Importantly and further separating Mr. Napout from the other defendants, Mr. Napout is unaware of other defendants in this action being recorded expressly denying even being involved in the misconduct at issue.

## II.   THE GOVERNMENT HAS FAILED TO REFUTE THE NEED FOR SEVERANCE TO PROTECT MR. NAPOUT'S RIGHT TO SPEEDY TRIAL

### A.   Severance Is Needed To Protect Mr. Napout's Rights Under The Speedy Trial Act

Mr. Napout's Supporting Memorandum (pp. 14-22) established that severance is warranted because a joint trial would compromise Napout's specific right to Speedy Trial, particularly under the joined defendants exclusion 18 U.S.C. § 3161(h)(6).   The Government has not disputed that, absent being joined with co-defendants in this matter, Napout's speedy trial clock would have expired on May 4, 2016, which translates to an 18-month delay if he is

required to wait until the tentative trial date of November 2017. As acknowledged by the Government, the tolling of the speedy trial period permitted by Section § 3161(h)(6) is only for "[a] *reasonable* period of delay when the defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no motion for severance has been granted." (Emphasis added). However, the Government has failed to establish that further the continued delay inherent in denying severance would be reasonable.

The Government's first argument that the motion and trial schedule is reasonable due to "the complexity of the charges, the number of defendants, the volume of discovery, and the filing of lengthy pre-trial motions" (Gov. Opp., p. 23) overlooks – again – that Mr. Napout is in a very different posture from the other defendants. Mr. Napout is only a named defendant in 5 of the 92 charges, and while there is a large volume of discovery, only a small fraction of it bears any relation to Mr. Napout. Moreover, the small fraction of discovery related to Mr. Napout does not include any inculpatory statements or recordings, or any other evidence showing that Mr. Napout was a member of any of the criminal conspiracies with which he is charged. In fact, as discussed above, his only statements in recordings are exculpatory statements denying ever receiving money. In addition, the significant motions filed to date (other than the severance motion at issue) by Mr. Napout have been resolved. Thus, the actual case against Mr. Napout involves 5 counts, limited evidence pertaining to him, no current significant pending motions, and a critical void of any evidence supporting the key threshold element of membership in the charged conspiracies (including the RICO charge the Government is using to bind all defendants together). In short, the Government's attempt to use the nature of the case against Mr. Napout to further toll his speedy trial rights, by opposing severance, is not reasonable.

The Government's second argument, which is that the motion and trial schedule is reasonable due to "the strong interest in favor of joint trials" (Gov. Opp., p. 25), also fails.  As discussed above, the multiple reasons for severing Mr. Napout's case, which include protecting against spillover prejudice and the need for a mistrial on all remaining counts if the Government continues to be unable to prove that Mr. Napout was a member of the RICO conspiracy charged in Count One, far outweigh any interest favoring joint trials if considered in a vacuum.  *See e.g.*, *United States v. Bronco*, 597 F.2d 1300, 1303 (9th Cir. 1979) ("Ordinarily joint trials are permitted to promote judicial economy in spite of the dangers that the jury will be influenced by all the evidence in ruling on each charge . . . [but] it was an abuse of discretion not to grant the motion for severance when clear prejudice would result from a joint trial.").

The Government makes much ado about Mr. Napout not being in custody.  Gov. Opp., p. 25-26.  However, incarceration is not a requirement for severance to preserve a right to a speedy trial, and a violation of the Speedy Trial Act has been found where a defendant was not incarcerated and the delay in a trial was significantly less than the 18-month tolling that will take place with the anticipated trial date is Mr. Napout remains joined with all other defendants.  *See United States v. Messer*, 197 F.3d 330, 338-41 (9th Cir. 1999) (holding that a 1-year delay based on joinder of defendants was unreasonable and violated the Speedy Trial Act, where defendants at issue had objected to continuances and were prejudiced by delay, even though the defendants at issue were not incarcerated and had not moved to sever).

The Government's third argument is that, even without Mr. Napout being joined with numerous other co-defendants, the time period under the Speedy Trial Act would have been tolled because the Court would have designated the case as complex and there would have been

"an official request for overseas evidence pursuant to 18 U.S.C. § 3161(h)(8)."  Gov. Opp., p. 26.

These arguments lack merit and misconstrue the provisions of 18 U.S.C. § 3161.[4]

Regarding the complexity of a case, Section 3161(h)(7) states in pertinent part:

**(h)**The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
. . .
**(7)(A)**
Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.  . . .
**(B)** *The factors, among others, which a judge shall consider in determining whether to grant a continuance* under subparagraph (A) of this paragraph in any case are as follows:
. . .
**(ii)** *Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section*.

18 U.S.C. § 3161(h)(7) (emphasis added).  Thus, a complex case designation does not require a tolling of the Speedy Trial Act.  Rather, it is merely one of several factors to be considered in determining whether being granted a continuance would serve justice in such a way that outweighs the interest of the public and Mr. Napout in having a speedy trial.  In this regard, the Second Circuit has cautioned that:

the length of an exclusion under § 3161(h)(8) [now (7)] for a "complex" case . . . should reasonably be related to the actual needs of the case, and should not be used either as a calendar control device or as a means of circumventing the requirements of the Speedy Trial Act

---

[4] The Government is grasping for straws when it additionally claims that "[t]he speedy trial clock also would have been tolled by the filing of pre-trial motions, including Napout's motions seeking dismissal of the indictment and a bill of particulars, filed on November 21, 2016, and his motion for severance, filed on October 31, 2016, and currently pending before the Court."  Gov. Opp., pp. 26-27.  The motion to dismiss and for bill of particulars have already been resolved, and the instant motion to sever obviously will be resolved when the Court rules on it, and therefore cannot be a separate basis for denying severance or further tolling the Speedy Trial Act after the ruling.

16

*United States v. LoFranco*, 818 F.2d 276, 277 (2d Cir. 1987).

Here, any rationale for continuing the case against Mr. Napout, or scheduling the trial long past the period contemplated under the Speedy Trial Act obviously dissipates if Mr. Napout's case is severed.  Moreover, when the factors in Section 3167(h)(7)(b) are applied to Mr. Napout, the case loses the complexity on which the Government relies.  Mr. Napout is named in only 5 counts, and the overriding issue in the case against Mr. Napout is whether he is actually a member of the criminal conspiracies, including RICO with which he is charged.  The Government's scarcity of evidence on this threshold issue differentiates Mr. Napout from the rest of the case.  Tellingly, the Government has not offered any rationale as to why the evidence against Mr. Napout requires that he be tried outside the Speedy Trial Act period.  Simply put, the case against Mr. Napout is not complex, unusual or novel.  Rather, it is unsupported by evidence, and the Government's real position, which is that a joint trial is more convenient, does not outweigh Mr. Napout's right to a speedy trial.

The Government's assertion that, if Mr. Napout's trial is severed, the Speedy Trial Act would still be tolled due to an official request for evidence from a foreign country is equally misplaced.  The Government offers no support, as it even fails to cite any such request from a foreign country, let alone a "request" pertaining to Mr. Napout, or application to the Court for a delay based on such request, as required by Section 3161(h)(8).  It is also highly likely that the period of any tolling under Section 3161(h)(8) has already passed.  Section 3161(h)(8) expressly limits any delay "not to exceed one year," and therefore the maximum potential delay from any request preceding one year prior (which as of the filing of this Reply would be March 17, 2016) has already lapsed.[5]  Moreover, since Mr. Napout's speedy trial period would have ended almost

---

[5] 18 U.S.C. § 3292 further supports the likelihood that the time of any delay permitted under Section 3161(h)(8) has already passed.  Section 3161(h)(8) applies only to "an official request, *as defined in section 3292* of this title."

a year ago on May 4, 2016, for the Government to now strategically request a further delay as to

Mr. Napout based on a new Section 3161(h)(8) request would be unreasonable and a misuse of

the statute.

The Government's fourth argument, which is that Mr. Napout has contributed to the

length of the pretrial period (Gov. Opp., p. 27), is palpably false.  Other than the instant Motion,

Mr. Napout has filed motions addressing the conditions of his pretrial release, seeking a bill of

particulars (which was granted in part), and challenging the extraterritorial jurisdiction over the

charges against him.  He has not filed motions that are exceptional from criminal cases involving

alleged foreign conduct, and not motion has required an unduly long period to resolve.[6]  He has

not sought extensions or continuances.  The Government cannot credibly claim that Mr. Napout

has engaged in such an extensive motion practice that might justify denying him a speedy trial or

severance at this stage in the case.

**B.**     **Severance Is Needed To Protect Mr. Napout's Right to a Speedy Trial Under The Sixth Amendment**

In Mr. Napout's Supporting Memorandum (pp. 20-22), he established that (1) in the

Second Circuit, a delay of over 8 months is generally considered presumptively prejudicial under

the Sixth Amendment[7]; (2) the tentative November 2017 trial date, which may not even be the

---

(Emphasis added).  Section 3292 addresses the suspension of the statute of limitations "[u]pon application of the United States, filed **before** return of an indictment  . . . if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country."  18 U.S.C. § 3292(a)(1) (emphasis added).   Thus, the clear contemplation under the statute is that official requests are made before return of an indictment.

[6] *United States v. Gregory*, 611 F. Supp. 1033, 1041 (S.D.N.Y. 1985), which is relied on by the Government for the proposition that a defendant's motions can contribute to delay, presents a major distinction from Mr. Napout's motion practice to date.  In *Gregory*, the court explained that the Speedy Trial Act "exclusion was due largely to Vinieris's own motion for a mental competency determination.. . . [and]  subsequent motion to appoint a private psychiatrist, which was filed and granted in early April 1984, and by the fact that the report of this psychiatrist was not submitted until November 21, 1984."  *Id.*  Thus, the motions that caused delay in *Gregory* were uncommon and necessitated extended delay in the progression of the case.

[7] *See United States v. Pennick*, 2016 WL 4089192 *5 (W.D.N.Y. Aug. 2, 2016) (citing *United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir. 1992)).

actual trial date, is an 18-month delay from when his speedy trial period would have elapsed if he was not joined with co-defendants; and (3) continuing to exclude time awaiting extradition of foreign co-defendants for unknown periods, including those that will never be extradited, violates his Sixth Amendment right to speedy trial.   In response (Gov. Opp., p. 29), the Government acknowledges that "courts have found delays approaching one year presumptively prejudicial," and tries to overcome the presumption of prejudice by claiming that the pretrial schedule is appropriate based on the number of defendants, volume of discovery, and the charges.

The Government again misses the point.  The complete lack of evidence that Mr. Napout joined the criminal conspiracies with which he is charged, including the RICO conspiracy, differentiates him from the other defendants.  87 charges that do not name Mr. Napout and voluminous discovery that does not relate to Mr. Napout should not be used as a vehicle to continue to infringe on his Sixth Amendment right.  Moreover, even if the Government's concerns are taken at face value, severance of Mr. Napout's case would alleviate them.

Furthermore, contrary to the Government's claim of no actual prejudice, Mr. Napout's freedom continues to be significantly limited while this case is pending.  The conditions of his pretrial release preclude him from traveling to or conducting business in his home country of Paraguay, and he is under a curfew that prevents him from leaving his residence after 8:00 p.m. His life has been in limbo for 2 years, and it will continue to be in limbo as long as his trial continues to be delayed.

The case of *United States v. Cain*, 671 F.3d 271, 296-97 (2d Cir. 2012), which is relied on by the Government, is inapposite.  In *Cain*, the Second Circuit found a denial of a motion to dismiss an indictment based on a "less than 22 months" delay was not an abuse of discretion.  David Cain, who was the defendant at issue in *Cain*, was the alleged head of a gang accused of racketeering

19

over a 9 year period resulting in 32 counts of various criminal charges, and was convicted of 16 counts.  *Id.* at 278, 296.   Likely since he was the head of the gang, there is no indication in *Cain* that there was a lack of evidence that David Cain was a member in the racketeering conspiracies at issue.  Moreover, the court explained that "a significant factor contributing to the delay was the need to determine whether it would be necessary to disqualify his lawyer . . . due to a conflict of interest," and that this factor was not attributable to the Government.  *Id.* at 296,

In the present case, Mr. Napout stands in stark contrast.  As shown above, he is charged in only 5 counts with no credible evidence that he was even a member of the criminal conspiracies (including RICO), and the delay cannot reasonably be attributed to him.

## CONCLUSION

For the reasons set forth above, Mr. Napout submits that the Court should grant Defendant Juan Angel Napout's motion to sever and motion for speedy trial.

Respectfully submitted,

| | |
|---|---|
| **GREENBERG TRAURIG, LLP** | **PIÑERA-VAZQUEZ LAW FIRM** |
| 333 S.E. 2nd Avenue | International Center |
| Miami, Florida 33131 | 1900 Southwest 3rd Avenue |
| Tel:  (305) 579-0500 | Miami, Florida 33129 |
| pappalardoj@gtlaw.com | Tel:  (305) 443-0629 |
| becerraj@gtlaw.com | sbp@pineravazquezlaw.co |
| | |
| s/ Jacqueline Becerra | s/Silvia B. Piñera-Vazquez |
|    A. John Pappalardo | Silvia B. Piñera-Vazquez |
|    Jacqueline Becerra | |

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on March 17, 2017, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that this document is being served simultaneously on all counsel of record in the manner specified, either by transmission of Notices of Electronic Filing generated by CM/ECF, or in another authorized manner.

<u>s/Jacqueline Becerra</u>
Jacqueline Becerra, Esq.