UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
UNITED STATES OF AMERICA,

        - against -                         **MEMORANDUM & ORDER**
                                                **DENYING SEVERANCE**
ALFREDO HAWIT, *et al.*,                    15-cr-252 (PKC)

                      Defendants.
---------------------------------------------------------X

PAMELA K. CHEN, United States District Judge:

      Defendants Manuel Burga, José Maria Marin, Juan Angel Napout, Costas Takkas, and Hector Trujillo (collectively, "Defendants") are charged in the Superseding Indictment ("SI", Dkt. 102) in this matter with involvement in conspiratorial racketeering, wire fraud, and money laundering allegedly undertaken to enrich themselves by virtue of their various positions in the Fédération Internationale de Football Association ("FIFA"), its continental, regional, and national affiliates, and certain sports marketing companies. Trial is scheduled to begin on November 6, 2017.

      Each of the five Defendants has moved to sever his trial from the other Defendants' trials.[1] Defendant Takkas is also seeking to sever his trial on Count 1 of the Superseding Indictment, which charges him and the other Defendants with racketeering conspiracy, from his trial on the wire fraud and money laundering conspiracy counts in which he is charged.[2] For the reasons set

---

[1] Because Defendant Burga had only recently been arraigned in this matter at the time the severance motions were filed, Defendant Takkas excluded Burga from his severance request. (Takkas Br. (Dkt. 533) at 3 n.2.) However, given that Burga is currently scheduled to go to trial in November 2017, the Court construes Takkas's motion to apply to Burga as well.

[2] Defendant Napout simultaneously made a speedy trial motion, seeking to both sever and advance the date of his trial from the other Defendants' trials. (Dkt. 462.) The Court rejected Napout's speedy trial arguments and denied the motion at the oral argument on Defendants' motions. (Transcript of April 26, 2017 Oral Argument ("Tr."), Dkt. 587, at 83-86, 100.)

forth below, the Court denies all Defendants' motions to sever their trials and also denies Defendant Takkas's motion to sever his trial on the racketeering conspiracy count from his trial on the other counts in which he is charged.

## BACKGROUND

### I. Charges Against Defendants

On November 25, 2015, the grand jury returned a 92-count superseding indictment charging twenty-seven defendants, including the five Defendants, with racketeering conspiracy pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and wire fraud and money laundering conspiracies, among other crimes. These charges are based on the defendants' alleged participation in an overarching RICO conspiracy, as well as in various distinct bribery and kick-back schemes, carried out across the globe over the course of at least twenty-four years, all relating to the operations and governance of FIFA and its constituent confederations and associations.

Defendants are charged as follows in the Superseding Indictment:[3]

| Counts | Charged Crimes | Continental Org'n | Regional Org'n | Nat'l Org'n | Tournament | Charged Defs. |
|---|---|---|---|---|---|---|
| 1 | RICO Conspiracy | ALL | ALL | ALL | ALL | ALL |
| 9 & 10 | Wire Fraud & Money Laundering Conspiracy | CONMEBOL | | | Copa Libertadores Scheme #2 | Napout Marin Burga |
| 11 & 12 | Wire Fraud & Money Laundering Conspiracy | CONMEBOL[4] | | CBF | Copa do Brasil | Marin |
| 42 - 48 | Wire Fraud & Money Laundering Conspiracy | CONCACAF | UNCAF | | UNCAF Region World Cup Qualifiers Schemes (FENAFUTG) | Trujillo |
| 68 - 76 | Wire Fraud & Money Laundering Conspiracy | CONCACAF | CFU | | CFU World Cup Qualifiers Scheme #2 | Takkas |
| 83 & 84 | Wire Fraud & Money Laundering Conspiracy | CONMEBOL/ CONCACAF | | | Copa América Centenario | Napout Marin Burga |

---

[3] "CONMEBOL" stands for "Confederación Sudamericana de Fútbol", which is a continental soccer confederation for South America. "CONCACAF" stands for the "Confederation of North, Central American and Caribbean Association Football", which is a continental soccer confederation for North and Central America, the Carribean, and three South American countries. The United States, and two of its overseas territories, Puerto Rico and the U.S. Virgin Islands, are members of CONCACAF. "UNCAF" is the Central American Football Union, which is a regional federation and member association of CONCACAF. "CFU" stands for "Caribbean Football Union" and is another regional federation and member association of CONCACAF. "CBF" stands for "Confederação Brasileira de Futebol", which is the Brazilian national soccer federation and a member association of CONMEBOL. (SI ¶¶ 1, 16, 17, 24, 45.)

[4] The FIFA member organizations identified in the chart are the ones that were either the direct victims of the alleged conspiracies or the continental organization to which the victim organization belongs.

3

Each Defendant occupied one or more leadership roles within FIFA and/or its constituent confederations and associations:

1. Defendant Burga—(a) between about 2002 and 2014: president of the Peruvian soccer federation, which is a national member association of FIFA and CONMEBOL; and (b) at various times[5]: member of the FIFA development committee, continuing through the date of the indictment (*id.* ¶ 42);

2. Defendant Marin—(a) between about March 2012 and April 2015: president of the CBF, which is a national member association of FIFA and CONMEBOL, *see supra* n.3; (b) at various times: member of multiple FIFA standing committees, including the organizing committees for the Olympic football tournaments, the World Cup and the Confederations Cup; and (c) special adviser to the organizing committee for the Confederations Cup (*id.* ¶ 50);

3. Defendant Napout—(a) between May 29, 2015 and the date of the indictment (November 25, 2015): member of FIFA's executive committee and a FIFA vice president; (b) at various times: member of multiple FIFA standing committees, including the disciplinary committee and the organizing committee for the World Cup; (c) between about August 2014 and the date of the indictment: CONMEBOL president; (d) before August 2014: CONMEBOL vice president; and (e) between 2003 and 2013: vice president and later president of the Paraguayan soccer federation, a national member association of FIFA and CONMEBOL (SI ¶ 41);

4. Defendant Takkas—(a) at various times: general secretary of the Cayman Island Football Association ("CIFA"), a national member association of FIFA and CONCACAF; and (b) attaché to CONCACAF president Jeffrey Webb, when Webb assumed that role (*id.* ¶ 37)[6]; and

5. Defendant Trujillo—general secretary to Federación Nacional de Futbol de Guatemala ("FENAFUTG"), the Guatemalan soccer federation, which is a national member association of FIFA, CONCACAF, and UNCAF (*id.* ¶¶ 33, 38)[7].

---

[5] References to "various times" in the Superseding Indictment are to "various times relevant to the Indictment". (*See*, *e.g.*, SI ¶41.)

[6] At various times, Takkas was also the principal of several businesses, including Kosson Ventures Limited, a British Virgin Islands-registered personal holding company, and CPL Limited, a Cayman Islands-registered personal holding company. (SI ¶ 37.) The Superseding Indictment alleges that Takkas used these companies to carry out the FIFA-related fraud schemes in which he has been charged. (*Id.* ¶¶ 325-37.)

[7] According to the Superseding Indictment, at various times, Trujillo was also a judge on Guatemala's Constitutional Court. (*Id.* ¶ 38.)

4

## II. Procedural History

Pursuant to the Court's scheduling order of January 17, 2017, Defendants Marin, Takkas, and Trujillo filed their severance motions on January 31, 2017. (Dkts. 529-534.)[8] Defendant Burga, who was only arraigned in this matter on December 2, 2016, did not file his own severance motion, but adopted the severance motion of Defendant Marin. (Dkt. 541.) The government filed its omnibus response to all five Defendants' motions on March 3, 2017. (Dkt. 546 ("Govt. Br.").) Defendants filed replies on March 17, 2017. The Court held oral argument on the motions on April 6, 2017, at which, as previously noted, the Court orally denied Napout's speedy trial motion, for the reasons stated on the record. (Tr. 83-86.)

## DISCUSSION

### I. Legal Standard

Federal Rule of Criminal Procedure 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Under this rule, "a non-frivolous conspiracy charge" is generally sufficient to support joinder. *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988). If joinder is proper under Rule 8(b), a defendant may move for severance pursuant to Federal Rule of Criminal Procedure 14(a), under which a court may sever a defendant's trial "[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a); *United States v. Spinelli*, 352 F.3d 48, 54 (2d Cir. 2003). Given the "preference in the

---

[8] Notwithstanding the Court ordering that Defendants' pre-trial motion briefing be done in unison and in stages—first, motions to dismiss; next, severance and speedy trial motions; third, suppression motions; and, finally, *in limine* motions (09/19/16 Minute Entry)—and advising the parties that the Court would not decide any individual defendant's motion that was filed prior to the set deadlines, Napout opted to file his severance and speedy trial motion on October 31, 2016. (Dkt. 462.)

5

federal system for joint trials of defendants who are indicted together," a severance should be granted only where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 537-39 (1993); *see also United States v. Ventura*, 724 F.2d 305, 312 (2d Cir. 1983) ("We have held repeatedly that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried."); *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) ("[T]he defendant [must] demonstrate[] that the failure to sever [would] cause[] him substantial prejudice in the form of a miscarriage of justice."). In addition, even where a defendant shows a risk of prejudice, "less drastic measures" than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539. The determination of whether joinder creates a sufficient risk of prejudice to warrant a separate trial "is highly fact-specific and must be evaluated on a case-by-case basis." *United States v. Barret*, 824 F. Supp. 2d 419, 433 (E.D.N.Y. 2011) (citing *Zafiro*, 506 U.S. at 539).

## II. Defendants' Arguments For Severance

As the Court observed during oral argument on the motions, each Defendant's arguments for severance are variations on the same common theme, *i.e.*, that the majority of the counts that will be decided at trial, and the majority of evidence that will be introduced at trial, do not relate to the given Defendant and will result in prejudicial spillover or transference of guilt as to him. (Marin Br. (Dkt. 530) at 2, 6-7; Napout Br. (Dkt. 462-1) at 2, 29-30; Takkas Br. (Dkt. 533) at 2; Tujillo Br. (Dkt. 533) at 1.) Each Defendant further argues that the criminal conduct and conspiracies in which he allegedly participated are wholly separate and unrelated to the other Defendants' alleged conduct and conspiracies, and that, therefore, the jury will not be able to keep straight which evidence relates to a particular Defendant, thereby creating the risk that a given

Defendant will be convicted based on irrelevant evidence or evidence that would not have been admissible in a trial of that Defendant alone. Each Defendant also argues that, based on the discovery they have received thus far, the bulk of the evidence that will be introduced at trial has nothing to do with him or his conduct, which demonstrates the risk that a given Defendant will be convicted based on irrelevant or inadmissible evidence. (Marin Br. (Dkt. 530) at 1; Napout Br. (Dkt. 462-1) at 24; Takkas Br. (Dkt. 533) at 12, 19; Trujillo Br. (Dkt. 534-1) at 8; *see also* Tr. 10 (Trujillo counsel noting that among the voluminous discovery, there is little evidence relating to Trujillo); Tr. 17 (Marin counsel predicting "mountains of evidence . . . that really have nothing to do with [Marin]"); Tr. 21 (Burga counsel arguing that only "a scant proportion of the evidence" relates to Burga); Tr. 49 (Napout counsel asserting that the overall quantity of evidence "is massive . . . [but] the evidence against Mr. Napout is not").)

Defendants further argue that the government's inclusion of a global, overarching RICO charge, which is the only count in the Superseding Indictment in which all Defendants are charged, is simply being used by the government as a vehicle to introduce evidence in a joint trial that might otherwise be inadmissible as to certain Defendants in separate trials, and that this, again, will result in Defendants being convicted on the basis of guilt by association, and not on the basis of evidence demonstrating their individual guilt. (Marin Br. (Dkt. 530) at 2, 6-7; Napout Br. (Dkt. 462-1) at 2, 29-30; Takkas Br. (Dkt. 533) at 2; Tujillo Br. (Dkt. 533) at 1; *see also* Tr. at 8-9 (Trujillo counsel arguing that RICO statute is being "pushed further and further from its original purpose" and that "government is using the RICO charge to simply get around Rule 403").) Defense counsel argue that, far from justifying a joint trial, the RICO conspiracy charge provides a compelling ground for severance, because less evidence of unlawful acts by other persons would be admitted against each Defendant if he were tried separately. (Marin Br. (Dkt. 530) at 2-3; Napout Br. (Dkt. 462-1)

at 2; Takkas Br. (Dkt. 533) at 18; Tr. 9 (Trujillo counsel arguing that "the question really isn't whether or not the government is technically allowed to introduce evidence of the larger RICO conspiracy against Mr. Trujillo, it is how much of that would they be allowed to introduce if the trials were severed.  We submit that it would be very little, if any, at all.").)

Finally, Defendant Marin argues that, in a joint trial, "there is a high risk that a potentially incriminating statement of a non-testifying co-defendant may be offered at trial, which would require severance to avoid violating the Confrontation Clause."  (Marin Br. (Dkt. 530) at 8 (citing *Bruton v. United States*, 391 U.S. 123, 131-32 (1968), *Crawford v. Washington*, 541 U.S. 36 (2004), and *United States v. Jass*, 569 F.3d 47, 56 n.5 (2d Cir. 2009)).)

### III.     Severance of Napout, Marin, and Burga From Each Other

The Court first disposes of the requests of Defendants Napout, Marin, and Burga to sever their trials from one another.  There is simply no merit to these requests, and little discussion on this issue is required.  All three of these Defendants, in addition to being charged together in the overall RICO conspiracy count, are charged with participating in the same wire fraud and money laundering conspiracies relating to the Copa Libertadores Scheme #2 and the Copa America Centenario scheme.  While the evidence as to each of these Defendants' individual culpability will likely vary to an extent, the government undoubtedly will have to introduce common core evidence as to all three Defendants regarding the existence and execution of the two fraud schemes and the participants in these schemes.  Furthermore, although the prosecution against Burga is only proceeding on the RICO conspiracy charge in Count 1[9], evidence of the Copa Libertadores

---

[9] Burga was only extradited on Count I of the Superseding Indictment because the wire fraud and money laundering conspiracies with which he was charged are not cognizable offenses in Peru and thus could not form the basis of his extradition from that country. (*See* Burga's Notice of Motion (Dkt. 541-1) at 2.)

8

Scheme #2 and the Copa America Centenario scheme, and Burga's involvement in these schemes, would still be admissible in a separate trial of Burga as proof of the existence of a RICO conspiracy and Burga's involvement in it.

The Superseding Indictment alleges that Napout, Marin, and Burga worked together as part of the charged conspiracies. All three Defendants were officials in FIFA, CONMEBOL and/or one of CONMEBOL's constituent confederations or national member associations. In connection with the Copa Libertadores Scheme #2, the Superseding Indictment alleges that "a group of six presidents of the traditionally less-powerful member associations of CONMEBOL formed a bloc to obtain greater control over decisions relating to the governance of CONMEBOL and the sale of CONMEBOL's commercial properties" and that this bloc included Napout and Burga. (SI ¶ 181.) The indictment specifically states that, starting in or about 2009, the members of this bloc, known as the "Group of Six", demanded that they receive annual bribe payments in exchange for their "support" of the company that held the broadcasting rights to the Copa Libertadores, among other soccer tournaments, and that an agreement was made to pay Napout, Burga, and the other four bloc members these annual bribes. (*Id*. ¶ 182.) The indictment also alleges that, at various times, Marin solicited and received bribe and kickback payments from the same conspirators who were paying the Group of Six, for Marin's support of the company holding the broadcasting rights to the Copa Libertadores. (*Id*. ¶ 183.) With respect to the Copa America Centenario scheme, it is alleged that Napout, Marin, and Burga all solicited and/or received bribes in connection with that tournament and that the bribe payments made to them went through the same intermediaries. (*Id*. ¶¶ 348-60.)

In their memoranda, Marin, Napout and Burga all but ignore the obvious factual overlap in their circumstances. Rather than contest this point, these Defendants focus on the alleged risk

9

of prejudicial "spillover" that they will suffer based on the government's introduction of evidence in a joint trial proving the global, overarching RICO conspiracy pleaded in Count 1 of the indictment. (Marin Br. (Dkt. 530) at 1; Napout Br. (Dkt. 462-1) at 24.) As the government rightly argues, however, the very same evidence that Defendants claim will pose a risk of prejudicial spillover would also be equally admissible against each of them in an individual trial as it would be in a joint trial. This is because, as the government emphasizes (Dkt. 546 at 7), the RICO charge in Count 1 of the Superseding Indictment is directed at all Defendants, which means that, even in an individual trial, the government would need to introduce evidence to "prove that each [D]efendant conspired to conduct and participate, directly and indirectly, in the conduct of the affairs of [the] enterprise through the pattern of racketeering." (Dkt. 546 at 7 (quotation marks omitted).) As the Second Circuit explained in affirming the district court's denial of severance in the multi-defendant RICO prosecution in *United States v. DiNome*:

> [In a RICO prosecution,] the government must prove an enterprise and a pattern of racketeering activity as elements of a RICO violation. Proof of these elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant, and the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless.

*United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992); *accord United States v. James*, 712 F.3d 79, 104 (2d Cir. 2013).

Furthermore, the fact that Marin is additionally charged with wire fraud and money laundering conspiracies in connection with a separate scheme relating to the Copa Do Brasil tournament does not justify severance as to Napout and Burga. Indeed, the Second Circuit has long recognized that, "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *Spinelli*, 352 F.3d at 55 (quoting *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983)); *see also DiNome*,

10

954 F.2d at 842 ("There is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence.").

Thus, because the evidence at trial as to Napout, Marin, and Burga will substantially overlap and because these Defendants have offered no justification for overcoming the "preference in the federal system for joint trials of defendants who are indicted together," *Zafiro*, 506 U.S. at 539, this aspect of their motions is denied. Napout, Marin, and Burga (the "CONMEBOL Defendants") will be tried together.

## IV. Severance of Takkas and Trujillo from Each Other and the CONMEBOL Defendants

The Court next resolves whether Defendants Takkas and Trujillo will be tried with the CONMEBOL Defendants and/or with each other. During the time frame relevant to the Superseding Indictment, Defendants Takkas and Trujillo were officials of national soccer federations that were member associations of FIFA and CONCACAF. Takkas was the general secretary of the Cayman Island Football Association, or CIFA, and Trujillo was the general secretary to the Guatemalan soccer federation, FENAFUTG. Takkas also served as the attaché to CONCACAF president Jeffrey Webb.

Like the CONMEBOL Defendants, Takkas and Trujillo are charged in the overarching RICO conspiracy in Count 1, but, unlike the CONMEBOL Defendants, Takkas's and Trujillo's other charges, for wire fraud and money laundering conspiracy, stem from separate and distinct bribery schemes: Takkas is charged with participating in the CFU World Cup Qualifiers Scheme #2, and Trujillo is charged with participating in the UNCAF Region World Cup Qualifiers FENAFUTG scheme. The scheme that Takkas allegedly participated in involved bribes relating to media and marketing rights for the Carribean World Cup qualifying matches. (SI ¶¶ 318-33.)

11

The scheme that Trujillo allegedly participated in involved bribes relating to media and marketing rights for the Guatemalan World Cup qualifier matches.  (SI ¶¶ 263-270.)  Other than the RICO conspiracy charge, there is no obvious factual overlap between Takkas's and Trujillo's cases, nor between their cases and those of the CONMEBOL Defendants.

It is clear that if all five Defendants are tried together, evidence will be introduced that has nothing to do with each of the Defendants.   However, this fact alone is insufficient to defeat the presumption in favor of joint trials.  *See Zafiro*, 506 U.S. at 537-39 (reaffirming the "preference in the federal system for joint trials of defendants who are indicted together"); *Spinelli*, 352 F.3d at 55 ("[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."); *DiNome*, 954 F.2d at 842 ("There is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence.").

The Court also does not find that the volume or type of extraneous evidence that is likely to be introduced at trial will result in "substantial prejudice" to any Defendant.  *Page*, 657 F.3d at 129.  Given the existence of the RICO conspiracy charge as to all five Defendants, the substantial common evidence as to the RICO charge and as to Defendants' other charges, and the Court's ability to mitigate and minimize prejudice to the individual Defendants through reasonable restrictions on the amount of RICO conspiracy evidence that is introduced at trial and the use of curative instructions, the Court finds severance of Defendants' trials unwarranted.[10]

---

[10] In support of their request for severance, Defendants place emphasis on several decisions in this Circuit that granted severance in multi-defendant conspiracy cases. (Marin Br. (Dkt. 530) at 4, 7 (citing *United States v. Gallo*, 668 F. Supp. 736, 749 (E.D.N.Y. 1987)); Napout Br. (Dkt. 462-1) at 26-27 (citing *Gallo*, 668 F. Supp. 736, and *United States v. Gambino*, 729 F. Supp. 954,

The Court also denies Defendant Takkas's request (Dkt. 533 at 21-22) that his RICO conspiracy charge be severed from his wire fraud and money laundering conspiracy counts. As the government notes (Govt. Br. at 4 n.2), the evidence establishing Takkas's involvement in the non-RICO counts would be admissible at a trial on the RICO conspiracy charge, thus making two separate trials duplicative and inefficient. Moreover, Defendant Takkas's request for his RICO charge to be severed from his other charges is premised on the severance of Takkas's trial from the trial of his co-defendants, a request that the Court is denying in this order.

### A. RICO Conspiracy Count and Overlap of Evidence

As previously discussed, the law recognizes a presumption in favor of joinder of co-defendants at trial. "[T]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits." *United States v. Jimenez*, 824 F. Supp. 351, 366 (S.D.N.Y. 1993). A defendant seeking severance, therefore, must show that joinder will result in "substantial prejudice" to the defendant's right to a

---

971 (S.D.N.Y. 1990)); Takkas Br. (Dkt. 533) at 13-17 (citing *Gallo*, *United States v. Burke*, 789 F. Supp. 2d 395, 397 (E.D.N.Y. 2011), *United States v. Branker*, 395 F.2d 881, 887 (2d Cir. 1968), *DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1992), and *United States v. Asaro*, No. 14-cr-26 (E.D.N.Y. Aug. 20, 2014) (Dkt. 124)); Trujillo Br. (Dkt. 534-1) at 12-13 (citing *Gallo* and *Branker*).) The Court finds that each of these decisions is distinguishable, primarily for the following reasons. In *Gallo*, *Gambino*, and *Asaro*, severance was granted to split the trials of defendants accused of violent acts from the trials of co-defendants who were not accused of violent acts; by contrast, no Defendant in this case is accused of violent or obviously inflammatory conduct, and, therefore, there is no corresponding risk that such violent or inflammatory acts would prejudice the jury against the other co-defendants. In *Branker*, the Second Circuit held that six co-defendants in a tax-fraud conspiracy case should have been granted separate trials after the unifying conspiracy charge against them was dismissed. Similarly, in *DiNome*, the Second Circuit held that the district court should have granted a separate trial to one defendant in a multi-defendant RICO conspiracy case, once the unifying RICO claim against that defendant had been dismissed. By contrast, in this case, the unifying charge of RICO conspiracy has not been dismissed, and that charge, together with the factual overlap among the Defendants, weighs strongly in favor of a joint trial.

fair trial, *i.e.*, "prejudice so substantial as to amount to a miscarriage of justice". *Friedman*, 854 F.2d 535, 563.

All five Defendants are charged in Count 1 of the Superseding Indictment with participation in a RICO conspiracy. The government argues that this "non-frivolous conspiracy charge", in itself, "is sufficient to support joinder of [D]efendants", (Govt. Br. at 4-5 (quoting *Nerlinger*, 862 F.2d at 973)), and that there is substantial evidence common to all Defendants that the government would be forced to re-introduce if Defendants were tried separately, thereby justifying joinder. *See Jimenez*, 824 F. Supp, at 361. Defendants counter that the government has used the RICO statute in an unprecedentedly overbroad manner in an effort to circumvent Rule 403 and to convict Defendants through guilt by association, and that requiring all Defendants to be tried together would result in prejudicial spillover sufficient to overcome the presumption of joinder.

While the Court recognizes that the RICO conspiracy charge in this case may well be unprecedented in its scope and breadth, in denying Defendants Napout's and Marin's motions to dismiss that count, the Court found it to be legally proper, at least at the indictment stage. (Dkt. 542 at 18-20.) To establish Defendants' guilt of this offense, the government will have to prove, *inter alia*, that each Defendant conspired "to conduct and participate, directly and indirectly, in the conduct of the affairs of [a common] enterprise" through a pattern of racketeering activity. 18 U.S.C. 1962(d); (SI ¶¶ 363-64). Necessarily then, the government will have to introduce, whether at a joint or individual trial, evidence going beyond each Defendant's individual conduct. That is the nature of any RICO prosecution, and the mere introduction of RICO conspiracy evidence is not prejudicial. *See DiNome*, 954 F.2d at 843; *United States v. Bellomo*, 954 F. Supp. 630, 650 (S.D.N.Y. 1997) ("A RICO charge allows the government to introduce evidence of

14

criminal activities in which a defendant did not participate to prove the enterprise element." (quotation omitted)); *United States v. James*, 712 F.3d 79, 104 (2d Cir. 2013) (affirming denial of severance motion based on supposed prejudicial spillover where allegedly prejudicial evidence of defendant's co-conspirator committing two murders "was [also] relevant to the racketeering charges against [the defendant] to prove the formation, existence, and nature of the racketeering enterprise . . . as well as to show the pattern of racketeering activity"). And, as discussed further below, any *undue* prejudice that might result from what Defendants fear will be a deluge of evidence that relates solely to the RICO conspiracy, and not the individual Defendants, can be addressed through means other than severance, such as *in limine* motions and curative instructions.[11] Thus, as a starting point, the RICO conspiracy charge provides a sufficient basis for Defendants' joinder at trial. *See* Fed. R. Crim. P. 8(a); *Nerlinger*, 862 F.2d at 973; *DiNome*, 954 F.2d at 843.

In addition and importantly, as the government summarizes and describes in its opposition memorandum, there is substantial overlap in the evidence among Defendants not only concerning the RICO conspiracy charge, but also concerning their individual charges of wire fraud and money laundering conspiracies. As a threshold matter, to the extent that any two Defendants are charged in connection with the same "scheme" alleged in the indictment—as is true, for example, for

---

[11] The government suggests in its memorandum that, because of the RICO conspiracy charge, there is virtually no limit to the amount or type of evidence that it can introduce at trial in this matter to prove this offense. (*See* Govt. Mem. at 9 ("At the outset, it must be stressed that, contrary to the defendants' assertions, evidence of *all* schemes detailed in the indictment (among other evidence) is admissible against all the defendants as proof of the racketeering conspiracy they are all alleged in Count One to have joined." (emphasis added)).) The Court does not agree. *See United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (holding that "evidence [relevant] to prov[ing] an essential element of the RICO crimes charged" must nonetheless be subjected to balancing under Federal Rule of Evidence 403). As discussed below, the Court will, if necessary, place reasonable restrictions on the admission of evidence relating solely to the RICO conspiracy charge.

15

Counts 9 and 10, which are asserted against all three CONMEBOL Defendant—any evidence describing that scheme would be common to all such Defendants. Similarly, to the extent the government presents evidence of recurring arrangements between FIFA officials and sports marketers who allegedly paid bribes to FIFA officials, evidence of those arrangements would be common to all schemes to which any such arrangement applied.

As a preview of such overlapping evidence, the government asserts that it will introduce evidence that certain sports media companies—namely, Traffic Group, Media World, and Torneos y Competencias S.A.—had recurring practices of bribing soccer officials to obtain media and marketing rights, including media and marketing rights controlled by Defendants. (Govt. Br. at 11-12.) Furthermore, the government asserts that, "[m]ore generally, [it] will prove the extensive cross-confederation collaboration (and criminality) among officials of CONCACAF, CONMEBOL, and other soccer organizing bodies," all of which would be introduced in a given Defendant's individual trial. Requiring the government to re-introduce this substantial amount of overlapping evidence, which would involve, *inter alia*, calling witnesses from all over the world, is contrary to the principles favoring joinder, such as "conservation of time, money, and scarce judicial resources". *Jimenez*, 824 F. Supp. at 366.

### B.  Potential Prejudice

Defendants strenuously argue that the "mountains of evidence" that will be introduced at a joint trial (Tr. 17)—both in connection with the RICO conspiracy charge and each Defendant's individual charges—will make it impossible for the jury to render a verdict based solely on the evidence that relates to each Defendant. Defendants, however, overstate the potential for undue or unfair prejudice from the introduction of evidence of their co-Defendants' participation in different and separate bribery schemes. First, as just discussed, most, if not all, of the evidence

16

that will be introduced to establish the RICO enterprise and Defendants' direct or indirect participation in it is admissible as to that Defendant and is thus not prejudicial. *See United States v. Stewart*, 590 F.3d 93, 123-24 (2d Cir. 2009) ("[T]he fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately." (quotation omitted)). Second, juries are routinely required to sort out this type of disparate evidence relating to different crimes committed by different members of a criminal organization. *See, e.g.*, *DiNome*, 954 F.2d at 842 ("There is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence."); *United States v. Diaz*, 176 F.3d 52, 104-05 (2d Cir. 1999) (affirming denial of severance in multi-defendant, multi-count RICO action and rejecting argument that "the issues were . . . beyond the jury's competence" due to "the length of trial, the complexity of factual and legal issues, and the large number of defendants, witnesses and crimes charged"); *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989) (affirming denial of severance in twenty-one defendant trial involving numerous criminal counts that "spanned more than seventeen months, produced more than forty-thousand pages of trial transcript, . . . and the testimony of more than 275 witnesses"). Indeed, as the Court noted at oral argument, it should be even easier here than in a typical organized crime or gang case for the jury to keep the distinct bribery schemes and conspiracies separate, since they occurred on different continents and in different countries, and involved different sets of players. (Tr. 32-33.)

Furthermore, to the extent that Defendants can demonstrate substantial prejudice that could result from the introduction of particular evidence, there are means short of severance that can be used to mitigate or eliminate any potential prejudice, such as evidentiary limitations and curative

17

instructions.  *Zafiro*, 506 U.S. at 539.  Indeed, at oral argument, the Court set a schedule for the government's disclosure of "other acts", *i.e.*, acts committed by persons other than Defendants, that the government would seek to introduce at trial, and for Defendants' objections to the admission of such evidence.  (Tr. at 87-90.)  Thus, Defendants will have the opportunity to request limits on the arguably extraneous or prejudicial evidence the government is permitted to introduce at trial.

### C.  Alleged Potential for "Antagonistic" Defenses

Defendants Marin and Napout argue that severance is needed because of the potential for antagonistic defenses between Defendants.  (Marin Br. (Dkt. 530) at 6-7; Napout Reply Br. (Dkt. 555) at 11-13.)  "To obtain severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved." *James*, 712 F.3d at 105.  Although Defendants Marin and Napout argue vaguely that mutually antagonistic defenses are "a near certainty", (Dkt. 555 at 11; *see also* Dkt. 530 at 3), they fail to articulate any reason to believe that any two Defendants will, in fact, present such antagonistic and irreconcilable defenses.  In the absence of any concretely identified antagonistic defenses, the Court will not assume any.  Indeed, this is not a case in which one defendant's assertion of innocence necessarily points the finger at another defendant.  Quite the opposite:  in arguing for severance, each Defendant has maintained that he was not involved in any conspiracy or jointly undertaken activity with any other Defendant.

In short, the Court finds that the potential for antagonistic defenses does not justify severance with respect to the trial of the five Defendants.

### D. Potential *Bruton* Issues

Defendant Marin argues that, in a joint trial, "there is a high risk that a potentially incriminating statement of a non-testifying co-defendant may be offered at trial, which would require severance to avoid violating the Confrontation Clause." (Marin Br. (Dkt. 530) at 8 (citing *Bruton v. United States*, 391 U.S. 123, 131-32 (1968), *Crawford v. Washington*, 541 U.S. 36 (2004), and *United States v. Jass*, 569 F.3d 47, 56 n.5 (2d Cir. 2009)).) To be sure, the Supreme Court's decision in *Bruton* established that "the Confrontation Clause of the Sixth Amendment prohibits the introduction of the confession of a non-testifying codefendant that implicates the defendant in a crime." *United States v. Lung Fong Chen*, 393 F.3d 139, 148 (2d Cir. 2004) (discussing *Bruton*). But neither Marin nor any other Defendant has identified a single out-of-court statement made by a Defendant that implicates another Defendant in the charged crimes or any other criminal activity. Thus, at this juncture, Marin's arguments under *Bruton* are premature and speculative, and cannot serve as the basis for severance. In any event, should such *Bruton* issues arise, they can be addressed in advance of trial through the procedure used for all potential *Bruton* statements, which may include revisions or redactions to such statements, as deemed necessary, pursuant to the Supreme Court's post-*Bruton* decision in *Gray v. Maryland*, 523 U.S. 185, 195-97 (1998). *See, e.g.*, *United States v. Lyle*, 2017 WL 1842503, at *8 (2d Cir. May 9, 2017) (discussing *Bruton* and *Gray*, and noting the Second Circuit's "consistent[]" holdings that "a non-obvious redaction of a co-defendant's confession to eliminate any references to the defendant will eliminate any *Bruton* problem").

19

## CONCLUSION

For the foregoing reasons, the Court denies severance with respect to the trials of Defendants Burga, Marin, Napout, Takkas, and Trujillo. All five Defendants will be tried together, starting on November 6, 2017.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 22, 2017
        Brooklyn, New York