UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| Plaintiff, | ) Case No. 15-CR-252 (PKC) |
| v. | ) |
| JUAN ÁNGEL NAPOUT, et al. | ) |
| Defendant. | ) |

**DEFENDANT JUAN ÁNGEL NAPOUT'S AMENDED AND RENEWED
MOTION FOR JUDGMENT OF ACQUITTAL AND INCORPORATED
MEMORANDUM OF LAW IN SUPPORT THEREOF**

**GREENBERG TRAURIG, LLP**
A. John Pappalardo
Elliot H. Scherker
Jacqueline Becerra

**PIÑERA-VAZQUEZ LAW FIRM**
Silvia B. Piñera-Vazquez

Defendant Juan Ángel Napout, pursuant to Federal Rule of Criminal Procedure 29(a), moves the Court to grant a judgment of acquittal on all counts alleged against him in the Second Superseding Indictment on which the jury returned guilty verdicts.

I.   INTRODUCTION.

The government's case against Mr. Napout rests on three basic propositions:  (i) under FIFA rules and codes, soccer confederation officials have a fiduciary duty to FIFA that prohibits, among other things, the acceptance of "bribes"; (ii) Mr. Napout and other alleged co-conspirators accepted "bribes" in exchange for awarding contract rights in connection with soccer tournaments and other events; and (iii) the monies paid in these alleged "bribes" would otherwise have been paid to FIFA in exchange for contract rights, such that the defendants deprived the organization of funds that would otherwise have been used to promote the sport or for other beneficial activities.  The government's core charge is honest-services fraud, which is a sub-species of wire fraud that may, under appropriate circumstances, be brought as a criminal charge against a private individual who violates a fiduciary duty to an organization or other entity by accepting "bribes" or "kickbacks."

Assuming (solely for the purposes of this motion) that the government presented sufficient evidence to show that Mr. Napout agreed to accept (or accepted) so-called "personal payments," Mr. Napout is nonetheless entitled to a judgment of acquittal.  The government failed to establish that Mr. Napout's receipt of any such payments—which apparently are euphemistically referred to in many countries in South America as "personal payments" that are regularly made in connection with contractual transactions—resulted (or would have resulted) in any identifiable harm to FIFA or any confederation within the FIFA umbrella.  Thus, regardless

whether receiving such payments would technically violate a FIFA code provision, Mr. Napout did not conspire to deprive FIFA of his honest services.[1]  To the contrary, the evidence shows that the transactions with which Mr. Napout was involved produced benefits to the organization, and that any concealment of personal payments would not have been material within the meaning of governing Second Circuit law.

The government established, as Mr. Napout was willing to stipulate before trial, that there existed a long-running RICO conspiracy in international soccer.  The overarching question arising from the government's case against Mr. Napout, however, is whether the government could prove that Mr. Napout ever joined the conspiracy—and the primary purported proof that he did so was his alleged agreement to receive (or receipt of) monies from cooperating witnesses.  Because the government failed to show that Mr. Napout's purported agreement to receive (or receipt of) those monies constituted, or would have constituted, a breach of fiduciary duty, the government failed to establish that Mr. Napout joined the alleged conspiracy.

The convictions also cannot be sustained because—despite this Court's pretrial ruling that the government sufficiently had *alleged* facts to support extraterritorial application of the RICO statute to Mr. Napout—the government failed to present sufficient *evidence* to support extraterritorial application.  First, the jury found Mr. Napout not guilty on the two money laundering conspiracy charges, thus eliminating any basis for extraterritorial application of RICO

---

[1] For the purposes of this motion, it is further assumed that the government could establish a fiduciary duty based solely on FIFA codes, regardless of the governing law in the countries in which the payments allegedly were received.  See Point IV.B., *infra*.  As set forth in his contemporaneously filed motion for new trial, Mr. Napout preserves his argument that the Court was required to allow him to prove—and have the jury instructed—that "commercial bribery" is not a crime in either Argentina or Paraguay, such that a reasonable person in Mr. Napout's position would not believe that a technical violation of any private organization's codes would constitute a breach of any duty owed to the organization.

2

based on an underlying statute that actually has extraterritorial application. Second, the evidence shows, at best, *incidental* use of United States wire facilities in connection with a scheme that was carried out, in its entirety, in South America. That is insufficient domestic conduct to support a wire fraud charge and, accordingly, to allow extraterritorial application of the RICO statute.

## II. THE RULE 29 STANDARD.

Under Rule 29, the dispositive question "is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Downing*, 297 F.3d 52, 56 (2d Cir. 2002) (original emphasis; quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In passing on this motion, this Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (citation omitted).

"A judgment of acquittal can be entered only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (citation and internal quotation marks omitted). But the government "must do more than introduce evidence at least as consistent with innocence as with guilt." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (citation and internal quotation marks omitted). Thus, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Coplan*, 703 F.3d at 69 (alteration in original; citation omitted).

**III.    THE GOVERNMENT'S CASE.**

The Second Superseding Indictment ("SSI") pleads, in pertinent part:

- FIFA's code of ethics prohibits soccer officials "from accepting bribes or cash gifts," and that such officials both owe "a duty of absolute loyalty" to FIFA and "stand in a fiduciary relationship to FIFA and its constituent confederations";

- with revenue derived from "commercializing the media and marketing rights" to soccer tournaments, FIFA "provid[ed] funds" to confederations and member associations "through the Financial Assistance Program and the Goal Program, which were established to support the development of youth academies, soccer fields, technical centers, and other infrastructure projects";

- over a period of many years, numerous high-ranking soccer officials, including officials of FIFA and CONMEBOL, engaged in a wide-ranging conspiracy to obtain bribes from sports marketing companies that did business with soccer organizations;

- these schemes "deprived FIFA, the confederations, and their constituent national member associations, . . . national teams, youth leagues, and development programs that relied on financial support from their parent organizations" of the "full value" of "media and marketing rights";

- "the schemes deprived FIFA, the confederations, and their constituent organizations of their right to the honest and loyal services of the soccer officials involved," which "inflicted significant reputational harm on the victimized institutions, damaging their prospects for attracting conscientious members and

> leaders and limiting their ability to operate effectively and carry out their core missions";
>
> - in 2013, sports marketing companies that had been involved in the conspiracy began making payments to Mr. Napout and his two trial codefendants, as well as other co-conspirators (collectively referred to as the "Group of Six"), in exchange for marketing rights; and
>
> - Mr. Napout became president of CONMEBOL in August 2014, in which role he "continued to receive bribe and kickback payments in exchange for his influence as a soccer official."

(DE:604:5-6, 22-42).

In opening statement, the government told the jury that Mr. Napout, Mr. Marin, and Mr. Burga "had agreed to receive millions of dollars in secret bribes when awarding the TV and marketing contracts" relating to soccer tournaments, in violation of FIFA rules. Trial Transcript (hereinafter "T") at 39-40. The alleged bribes were paid to obtain broadcast, advertising, and sponsorship rights. (T:43). The government asserted that the defendants were "taking away money that could have been spent to promote the sport," because the monies paid to defendants by the sports marketing companies had the effect of "taking money that should have gone to the organizations and to the game." (T:43-44).

At trial, the government introduced various iterations of the FIFA code of ethics. (T:145-52; GX:1222-1226). The currently applicable code, as adopted in 2012, prohibits "personal or undue pecuniary or other advantage in order to obtain or retain business or any other improper advantage to or from anyone within or outside FIFA . . . that is related to their official activities and is contrary to their duties or falls within their discretion." (GX:1226:19). The code also

prohibits accepting commissions in connection with soccer officials' performance of their duties. (GX:1226:19).

The only proffered evidence that the alleged bribes were "taking away money" from FIFA and other soccer organizations, however, was the entirely *theoretical* opinion of Professor Stefan Szymanski.[2] According to Professor Szymanski, if some portion of the potential purchaser's budget "is going in the form of bribes to officials . . . , then that's less money for the soccer organization" and the organization "end[s] up having less money . . . to promote interest in soccer more generally," which "affects the organization and . . . the development of soccer." (T:190-91). He testified that, if a sports marketing company "were to pay, say $10 million for a contract and pay $1 million in a bribe to a soccer official in order to secure the contract," the soccer organization has "lost $1 million directly from the bribe, so that's $1 million to spend on their activities which they no longer have." (T:192).[3]

Professor Szymanski asserted that, if a sports marketing company "pay[s] out money in bribes that's money that they would have been willing to allocate to acquire the rights, and that's . . . money that the soccer organization has lost." (T:193). On cross-examination, however, he admitted that he had not reviewed either CONMEBOL's financial information or any of the

---

[2] Mr. Napout preserves his objection to Professor Szymanski's testimony, as set forth in his contemporaneously filed motion for new trial.

[3] The witness further speculated:
> [T]he soccer organization is less able to pursue its activities . . . because of the lost revenue. But in addition, if it was known that there was bribery involved, competition may have been discouraged in the market and that may mean . . . it's not just $10 million that would have been paid . . . . Maybe somebody would have paid $50 million if they had not known that there was bribery and corruption. So, the soccer organization may actually lose more than the 1 million.

(T:193).

6

"specific marketing contracts," and that he also had not performed a "statistical analysis" to determine how alleged "bribes" might have affected any individual contract. (T:199-201).

The government relied heavily on Professor Szymanski's opinion in its arguments to the jury. In closing, AUSA Mace specifically told the jury: "I want to direct you again to Professor Szymanski's testimony . . . about how there actually can be harm in situations like this," because "if a federation president takes a $1 million bribe, that's $1 million it could have gone to the federation itself and it could have been used for various things." (T:4288). AUSA Mace conceded that, "[o]f course, [Professor Szymanski] didn't talk about this case." (T:4288). In rebuttal, AUSA Nitze repeated that concession. (T:4504) ("of course he didn't review the documents in the case").[4] As AUSA Nitze explained, "the purpose of [Professor Szymanski's] testimony was to provide expert testimony so you would understand it's an economic principle"—indeed, an "intuitive" principle—that, "if a business is willing to pay . . . 15 million and 10 million goes to the contract and 5 million goes to bribes, the 5 million is not going to the holder of the rights," which otherwise would "have that money." (T:4504-05).[5]

---

[4] Neither prosecutor explained why, as a matter "of course," the government's expert witness "didn't review the documents in [this] case."

[5] One of the primary CONMEBOL deals on which the government relied was the contract with Full Play for the Copa America (GX:183-T), as to which two cooperating witnesses (Alejandro Burzaco and Luis Bedoya) testified that Mariano Jinkis had paid $1 million to each of the "Group of Six" presidents, including Mr. Napout and his co-defendants. (T:4220-22). For additional pertinent testimony regarding the Full Play deal for the Copa America, see *infra* Point IV.B.

## IV. ARGUMENT.

### A. Honest-Services Fraud.

In the wake of *McNally v. United States*, 483 U.S. 350 (1987), Congress adopted 18 U.S.C. § 1346, which added to a "scheme or artifice to defraud" in 18 U.S.C. §§ 1341, 1343, "a scheme or artifice to deprive another of the intangible right of honest services." The term "honest services" is undefined, which led the Supreme Court to hold that "Congress intended § 1346 to refer to and incorporate the honest-services doctrine," as recognized by federal appellate courts "before *McNally* derailed the intangible-rights theory of fraud." *Skilling v. United States*, 561 U.S. 358, 404 (2010).

Before *McNally*, "[t]he 'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Skilling*, 561 U.S. at 407 (citations omitted). And, in *Skilling*, "[h]olding that honest-services fraud does not encompass conduct more wide-ranging than the paradigmatic cases of bribes and kickbacks," the Supreme Court "resist[ed] the Government's less constrained construction absent Congress' clear instruction otherwise." *Id*. at 411. Instead, the Court—intent on avoiding "vagueness problem[s]"—held that the Section 1346 is confined "to these paramount applications," as it "criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." *Id*. at 404, 408-09 (original emphasis); *accord United States v. DeMizio*, 741 F.3d 373, 381 (2d Cir. 2014); *United States v. Botti*, 711 F.3d 299, 310 (2d Cir. 2013); *United States v. Mahaffy*, 693 F.3d 113, 126 (2d Cir. 2012). That "solid core . . . involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes," such that "Congress' reversal of *McNally* and

reinstatement of the honest-services doctrine . . . can and should be salvaged by confining its scope to the core pre-*McNally* applications." *Skilling*, 561 U.S. at 407-08.[6]

Thus, "[a] close examination of the Supreme Court's opinion in *Skilling* reveals that embedded in the Court's holding . . . is the implication that a breach of fiduciary duty is an element of honest services fraud." *United States v. Smith*, 985 F. Supp. 2d 547, 591 (S.D.N.Y. 2014) (ellipsis in original; citation omitted), *aff'd*, 664 F. App'x 23 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1361 (2017). To be sure, however, "difficulty inheres in any attempt to describe in the abstract the 'fiduciary duty' the violation of which all honest-services-wire-fraud prosecutions might require." *Id.* at 592.

Before *McNally*, "the honest services doctrine became applicable" to "general categories of defendants," including government officials "who defraud the public of their own honest services," and "private actors who abuse fiduciary duties by . . . taking bribes." *Smith*, 985 F. Supp. 2d at 594 (quoting *United States v. Rybicki*, 354 F.3d 124, 133 (2d Cir. 2003) (en

---

[6] Justice Scalia's dissent, reviewing pre-*McNally* case law, found no "universal agreement concerning the *source* of the fiduciary obligation—whether it must be positive state or federal law, or merely general principles, such as the 'obligations of loyalty and fidelity' that inhere in the 'employment relationship.'" *Skilling*, 561 U.S. at 417-18 (Scalia, J., dissenting) (original emphasis; citations omitted). The dissent observes that "the duty remained hopelessly undefined," with "[s]ome courts describ[ing] it in astoundingly broad language," *e.g.*, the "[l]aw puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the reflection of moral uprightness, a fundamental honesty, fair play and right dealing in the general and business life of members of society." *Id.* at 418 (citations and internal quotation marks omitted). "Moreover, the demands of the duty were said to be greater for public officials than for private employees, but in what respects (or by how much) was never made clear." *Id.* at 418-19 (internal citations omitted). The majority noted the dissent and the pre-*McNally* "divisions in the Courts of Appeals regarding the source and scope of fiduciary duties." *Id.* at 407 n.41. But the majority gave the uncertain state of law short shrift, because "these debates were rare in bribe and kickback cases," in which "[t]he existence of a fiduciary relationship . . . was usually beyond dispute," citing as examples "public official-public," "employee-employer," and "union official-union members." *Id.* (internal citations omitted). The Second Circuit has acknowledged the "uncertainties" that remain in *Skilling*'s aftermath. *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1118 (2017).

banc)). In its pre-*Skilling* decision in *Rybicki*, the Second Circuit, rejecting a claim that Section 1346 is unconstitutionally vague when applied to private actors, concluded—again based on pre-*McNally* case law—that "the term 'scheme or artifice to deprive another of the intangible right honest services' . . . when applied to private actors, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly *to act in his or her or the defendant's own interests instead*." 354 F.3d at 141-42 (footnote omitted; emphasis added).[7] "[T]he duty of loyalty 'requir[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.'" *Smith*, 985 F. Supp. 2d at 600 (second alteration in original; citation omitted).[8]

---

[7] "[C]ourts have looked to a smorgasbord of sources to find the fiduciary duty that, after *Skilling*, presumably underpins all honest-services-fraud prosecutions." *Smith*, 985 F. Supp. 2d at 597. For example, the Second Circuit, in *United States v. Szur*, 289 F.3d 200 (2d Cir. 2002), relied on state, federal, and common-law to ascertain "the circumstances under which . . . brokers would be under a legal duty to disclose [their] commissions to their clients." *Id*. at 210; *Smith*, 985 F. Supp. 2d at 596. "[S]tate law will likely be a *sufficient*, but not *necessary*, source of that duty, as such duty may derive from other sources as well." *Smith*, 985 F. Supp. 2d at 597 (original emphasis); *contra United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (en banc) (imposing requirement of "state-owed duty"; "if the official does all that is required under state law, alleging that the services were not otherwise done 'honestly' does not charge a violation of the mail fraud statute"). And due process concerns may well arise if, for example, "a situation arose in which a defendant was charged with honest-services wire fraud, and the fiduciary duty that the defendant allegedly breached existed under federal law, but not under state law, or vice-versa." *Smith*, 985 F. Supp. 2d at 598. See *supra* n.1.

[8] The court in *Smith* cited New York law because the charges in that case arose from bribery schemes related to New York elections. 985 F. Supp. 2d at 598-99. Here, the SSI alleges, in part, that the RICO conspiracy included agreements to commit "multiple acts involving bribery," in violation of New York (and New Jersey) statutes. (DE:604:46). Even if it may be appropriate, as in *Smith*, to rely on New York fiduciary duty law, "there is no meaningful

*Rybicki* makes it clear that "actual or intended economic or pecuniary harm to the victim need not be established," but, at the same time, "the misrepresentation or omission at issue for an 'honest services' fraud conviction must be 'material,' such that the misinformation or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct." 354 F.3d at 145. Citing its pre-*McNally* precedent, the court emphasized that "[a] *material* misrepresentation is an element of the crime." *Id*. at 146 (original emphasis) (citing *United States v. Bronston*, 658 F.2d 920, 926-27 (2d Cir. 1981) ("the concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other is a violation of the statute")); *accord United States v. McDonough*, 56 F.3d 381, 391 (2d Cir. 1995) (government's theory that defendant defrauded county "by means of nondisclosure and concealment of information about the kickback scheme that he had a duty to disclose" established by evidence that defendant had "successfully opposed" plan to obtain insurance at "reduced cost[]," "recommend[ing] increasing insurance expenditures," and that "county in fact paid lower insurance fees before and after the scheme began than it did while the scheme was ongoing").

**B.    The Government Failed to Prove That Mr. Napout Joined a RICO Conspiracy to Deprive FIFA or CONMEBOL of Honest Services.**

To engage in a RICO conspiracy under 18 U.S.C. § 1962(d), "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). "The relevant inquiry is whether

---

difference between the federal and New York law standards for determining whether a fiduciary duty exists." *Halloran,* 821 F.3d at 338.

the defendant agreed with his criminal associates to form the RICO enterprise," that is, to conduct the enterprise's affairs "through a pattern of racketeering." *United States v. Applins*, 637 F.3d 59, 77 (2d Cir. 2011) (citation and internal quotation marks omitted). "[T]he conduct prong requires only that conspirators reached a meeting of the minds as to the operating of the affairs of the enterprise through a pattern of racketeering conduct." *Id*. (citations omitted). "A RICO conspiracy charge is proven if the defendant embraced the objective of the alleged conspiracy, and agreed to commit . . . predicate acts in furtherance thereof." *Id.* (ellipsis in original; citation omitted).

Even assuming that FIFA's code creates a fiduciary duty, the violation of which can give rise to a charge under Section 1346, and assuming further that the government proved that Mr. Napout received (or agreed to receive) any of the monies alleged in the SSI to have been paid to him, Mr. Napout is nonetheless entitled to a judgment of acquittal. The evidence fails to establish that he joined a conspiracy to deprive FIFA or CONMEBOL of honest services. This is so because the government failed to establish that the payment of alleged "bribes" would have injured FIFA or CONMEBOL by depriving those organizations of monies that would otherwise have been paid in exchange for contract rights.

There indisputably was no *direct* evidence that such deprivation occurred. Rather, the government's case rests on Professor Szymanski's entirely *theoretical* testimony, as set forth in Point III, *supra*.[9] Even if that testimony is somehow admissible, it provides no factual basis for a

---

[9] During Agent Berryman's testimony, the government published minutes of a May 12, 2015 CONMEBOL executive committee meeting. (T:3698-99; GX:1374-T). At that meeting, a committee member identified as Alejandro Dominguez expressed his concern that "CONMEBOL is not getting the best returns for the federations and clubs, and request[ed] that intermediaries be put aside, in the belief that CONMEBOL could take better advantage" if it

conviction, because the witness did not perform any analysis of the actual contracts at issue and could not opine as to whether any contract upon which the government relied was adversely affected by the payment of alleged bribes.

While an expert such as Dr. Szymanski can provide "background knowledge" to assist a jury in assessing underlying *factual* testimony, "there must be corroborative evidence" to establish a factual matter as to which the expert has no "direct knowledge." *United States v. Gallo*, 118 F.R.D. 316, 317-18 (E.D.N.Y. 1987) (federal agents can testify to "methods of operation of organized crime" but not to "adjudicative facts"). The government all but conceded in closing that there was *no* such evidence (T:4288, 4504-05), directing the jury to Dr. Szymanski's testimony about "how there actually *can* be harm in situations like this," but acknowledging that "he didn't talk about this case," and only theorized that "if a federation president takes a $1 million bribe, that's $1 million it could have gone to the federation itself and it *could* have been used for various things." (T:4288) (emphasis added).

And the *only* actual evidence on the viability of the key contract in which Mr. Napout was involved—the CONMEBOL deal with Full Play—was that CONMEBOL's termination of its prior contract with Traffic and its new contract with Full Play (which was approved by all CONMEBOL members) "increased the value of Copa America from 18 million *to 80 million*," and that all of the member federations would receive "$8 to $9 million for their country's soccer

---

"signed directly." (GX:1374-T:24). Mr. Dominguez also requested "all information" regarding CONMEBOL's contract with Full Play. (GX:1374-T:24). That statement is both rank hearsay and utterly insufficient to prove that CONMEBOL's deal with Full Play was in fact disadvantageous to the organization. Mr. Napout's response to Mr. Dominguez's remarks, in which he stated that "the Institution is willing to discuss everything with regards to the signed contract," but cautioned against rescinding a signed agreement because "the Confederation's coffers . . . ha[d] been greatly improved" by its contractual arrangements (T:3700; GX:1374-T:25), is consistent only with his innocence.

13

programs." (T:1783-84) (emphasis added). Mr. Bedoya, testifying as a cooperating witness, acknowledged that the Full Play-CONMEBOL contract "was a successful good contract for CONMEBOL." (T:1784).[10] To be sure, Mr. Bedoya also testified that Full Play, through Mariano Jinkis, made $1 million payments to each of the "Group of Six" presidents in connection with the deal, with similar payments to be made for forthcoming Copa America tournaments (T:1789-90), but—as the government acknowledged in closing arguments—there was no evidence that these additional funds would otherwise have redounded to CONMEBOL's benefit.

There was no "corroborative evidence" here to show that any soccer organization's finances were adversely affected by the alleged conspiracy or, for that matter, would have been so affected. It is a fundamental proposition that "a conviction based on speculation and surmise alone cannot stand." *D'Amato*, 39 F.3d at 1256.

### V. THE EVIDENCE DOES NOT SUPPORT EXTRATERRITORIAL APPLICATION OF THE RICO STATUTE AGAINST MR. NAPOUT.

Mr. Napout adopts the arguments set forth in his Motion to Dismiss All Charges for Lack of Extraterritorial Jurisdiction and supporting memorandum of law. (DE:491; DE:491-1). In denying that motion, this Court recognized that 18 U.S.C. § 1343 does not apply extraterritorially. (DE:542:8) (citing *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 140-41 (2d Cir. 2014), *aff'd in part, rev'd in part*, 136 S. Ct. 2090 (2016)). The Court rejected the government's "extreme position" that "'nothing more' than a single transmission across U.S. wires is sufficient to sustain a 'domestic' application of the wire fraud statute," relying on the

---

[10] Mr. Bedoya also testified that, following the "Group of Six" attaining preeminence in CONMEBOL, the Copa Libertadores and Copa Sudamericana contracts were respectively enhanced by $4 million and $2 millon. (T:1778-81).

Second Circuit's decision in *Petroleos Mexicanos v. SK Engineering and Construction Co.*, 572 F. App'x 60 (2d Cir. 2014). (DE:542:9-10).

Judge Garaufis's subsequent decision in *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693 (E.D.N.Y. June 1, 2017), adopted a test under which the "scheme to defraud" is perceived as the appropriate focus for extraterritorial application of the wire fraud statute. *Id*. at *7. That test requires the government to satisfy three elements to establish a domestic application of the wire fraud statute: (i) the defendant or co-conspirator or "commits a substantial amount of conduct in the United States"; (ii) "the conduct is integral to the Commission of the scheme to defraud"; and (iii) "at least some of the conduct involves the use of U.S. wires in furtherance of the scheme to defraud." *Id*. at *8 (quoting *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 103 (D.D.C. 2017)). Accordingly, something "more than U.S.-based wire transfers" is required "to demonstrate domestic application," because "Congress's focus in enacting the wire fraud prohibition was to regulate frauds, and not solely a means of perpetrating a fraud." *Gasperini*, 2017 WL 2399693, at *8.

Here, unlike in *RJR Nabisco*, the government failed to prove that Mr. Napout or his alleged co-conspirators "hatched schemes to defraud *in the United States,* and . . . used the U.S. mails and wires in furtherance of those schemes and with the intent to do so."[11] 764 F.3d at 142 (emphasis added). That is, as the government conceded in its closing argument, the scheme was "hatched" and directed in South America by Full Play, and particularly by Mr. Burzaco and Mariano Jinkis. (T:4270-71).

These co-conspirators used "cambistas" to obtain U.S. dollars via wire transfers from various banks. (T:4270-71). But, unlike the allegations upon which the Court relied to deny Mr. Napout's motion to dismiss, the wired fraud conspiracies were *not* "being directed from or to

---

[11] The Court's denial of Mr. Napout's motion to dismiss is not dispositive; it is entirely proper to renew an extraterritoriality defense after the government has presented "further detail on the alleged domestic conduct." *Gasperini*, 2017 WL 2399693, at *9.

the United States." (DE:542:15). *Cf. Gasperini,* 2017 WL 2399693, at *8 ("click fraud" scheme charged as wire fraud conspiracy "was supported in large part by domestic conduct," including use of server "to make . . . wire transfers in furtherance of the scheme to more than 800 compromised computers in the United States"). The conspiracies were being directed "from" Argentina and were directed—according to the government's witnesses—toward co-conspirators, allegedly including Mr. Napout, *in Argentina*. (T:4270-71). *Cf. United States v. Hussain*, No. 16-cr-00462-CRB-1, 2017 WL 4865562, at *6 (N.D. Cal. Oct. 27, 2017) (indictment alleged "domestic conspiracy" to commit wire fraud, "because the *objects* of the conspiracy were instances of domestic wire fraud" (emphasis added)); *United States v. Hayes*, 99 F. Supp. 3d 409, 421 (S.D.N.Y. 2015) ("the co-conspirators purportedly used the manipulated LIBOR to be published to servers in the United States and used United States wires to memorialize trades affected by that rate," such that "[t]he culpable conduct . . . occurred in the United States").

As the Court noted in its order on the motion to dismiss, Section 1343 does not apply extraterritorially. (DE:542:8) (citing *RJR Nabisco*, 764 F.3d at 140-41). The RICO statute, 18 U.S.C. § 1962(d), may only be applied extraterritorially "to the extent that the predicates alleged in [the] case themselves apply extraterritorially." (DE:542:7) (quoting *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2102 (2016)). Because the not guilty verdicts on the money laundering conspiracy counts leave only the wire fraud conspiracy counts as a potential basis for extraterritorial application of the RICO statute, the government's failure to satisfy the test for extraterritorial application of the wire fraud statute requires a judgment of acquittal on all counts.

## CONCLUSION

Mr. Napout requests the Court to grant a judgment of acquittal on all counts.

Respectfully submitted,

| | |
|---|---|
| **GREENBERG TRAURIG, LLP** | **PIÑERA-VAZQUEZ LAW FIRM** |
| One International Place | International Center |
| Boston, MA 02110 | 1900 Southwest 3rd Avenue |
| Tel: (617) 310-6000 | Miami, FL 33129 |
| pappalardoj@gtlaw.com | Tel: (305) 443-0629 |
| scherkere@gtlaw.com | sbp@pineravazquezlaw.com |
| becerraj@gtlaw.com | |
| | s/ Silvia B. Piñera-Vazquez |
| s/ Elliot H. Scherker | Silvia B. Piñera-Vazquez |
| A. John Pappalardo | |
| Elliot H. Scherker | |
| Jacqueline Becerra | |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 22, 2018, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that this document is being served simultaneously on all counsel of record in the matter specified, either by transmission of Notices of Electronic Filing generated by CM/ECF, or in another authorized manner.

s/ Elliot H. Scherker<br>
Elliot H. Scherker