# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA    )
)
         Plaintiff,    )   Case No. 15-CR-252 (PKC)
)
v.    )
)
JUAN ÁNGEL NAPOUT, et al.    )
)
         Defendant.    )
_____)

## DEFENDANT JUAN ÁNGEL NAPOUT'S MOTION FOR NEW TRIAL
## AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

**GREENBERG TRAURIG, LLP**
A. John Pappalardo
Elliot H. Scherker
Jacqueline Becerra

**PIÑERA-VAZQUEZ LAW FIRM**
Silvia B. Piñera-Vazquez

Defendant Juan Ángel Napout, pursuant to Federal Rule of Criminal Procedure 33, moves the Court to grant a new trial on all counts on which the jury returned a guilty verdict.

## I.    INTRODUCTION.

This motion is filed, pursuant to Federal Rule of Criminal Procedure 33(a), to renew Mr. Napout's objections to the Court's erroneous and prejudicial rulings, both prior to and during the trial of this case, and to address those rulings in the overall context of the trial.  Additionally, pursuant to Federal Rule of Criminal Procedure 33(b), Mr. Napout seeks a new trial based on his discovery of previously unavailable evidence that would directly have contradicted the key testimony by the critical witness against him, Alejandro Burzaco—which evidence the government had within its actual or constructive possession, such that the government's failure to disclose favorable evidence requires a new trial.  Moreover, so critical is the newly discovered evidence that a new trial would be warranted even absent the government's suppression of the favorable evidence.

Rule 33 empowers the Court to grant a new trial whenever "the interest of justice so requires," upon a timely filed motion.  Fed. R. Crim. P. 33(a).[1]  Mr. Napout submits that the Court denied him a fair trial by:  (i) declaring foreign law irrelevant and preventing Mr. Napout from establishing the so-called "commercial bribery" or "personal payments" law of Argentina or Paraguay; (ii) allowing the government to introduce prejudicial evidence obtained in violation of the work-product doctrine; (iii) allowing the government to introduce purported "obstruction" evidence, *i.e.*, the removal of a CONMEBOL computer for Mr. Napout's office after his arrest; and (iv) allowing the government to introduce "expert" testimony on the purported impact of the

---

[1]  On December 27, 2017, this Court extended Rule 33's 14-day deadline, ordering that Mr. Napout file his Rule 33 motion on or before January 22, 2018.

alleged offenses on FIFA and CONMEBOL, without any evidentiary link between the witness's opinion and the facts of the case.[2]

Mr. Napout's motion for new trial under Rule 33(b)(1) is based on his discovery, while the jury was deliberating, of documentary evidence that directly establishes that Mr. Burzaco lied at trial when he testified that he had met with Mr. Napout in Asunción in October 2014 to discuss the purported bribery scheme. At trial, the government elicited from Mr. Burzaco that he had traveled to Asunción in October 2014 for a CONMEBOL meeting, where he had met with Mr. Napout and Marco Polo Del Nero, for an extensive discussion of the purported scheme. The government's disclosure of Mr. Burzaco's statements included only a vague reference to Mr. Burzaco's attendance at a CONMEBOL meeting at some point in 2014 after Julio Grondona's death in July of that year. The government did not disclose the testimony that it deliberately elicited at trial as to the date of the meeting that Mr. Burzaco purportedly attended, the location of his purported meeting with Mr. Napout and Mr. Nero, or the details of their alleged discussion.

After hearing that testimony for the first time at trial, Mr. Napout's counsel undertook to obtain travel records to determine whether Mr. Burzaco had indeed been in Paraguay on October 24, 2014, which was the date of the only CONMEBOL board meeting in that month. The minutes of that meeting, which were disclosed in discovery, do not reflect that Mr. Burzaco was present at that meeting, and Mr. Napout's counsel accordingly had no reason to believe that the government would elicit testimony that he had traveled to Asunción for the October 24, 2014 meeting.

---

[2] On this last point, Mr. Napout adopts the argument set forth in Mr. Marin's Rule 33 motion.

Counsel initially was able to obtain only fragmentary immigration records.  Following up on Mr. Burzaco's previously undisclosed testimony that he had traveled to Asunción with Luis Segura, the president of the Argentinian soccer association, counsel were able to discover—by dint of painstaking research into Paraguayan airport records—that Mr. Segura and other soccer officials had traveled to Asunción by private aircraft on the morning of October 24, 2014 and had departed on the same aircraft immediately following the CONMEBOL board meeting.  The manifest for the flights, both inbound and outbound, reflects that Mr. Burzaco did not accompany Mr. Segura on either flight.  This documentary evidence directly contradicts a key component of Mr. Burzaco's testimony as to Mr. Napout's involvement in the alleged RICO conspiracy.

Mr. Napout's counsel were first able to compile the flight records on December 20, 2017, while the jury was deliberating.  It was not until January 3, 2018, however, that counsel were able to secure the Apostille certification.  Although the records readily qualify as newly discovered evidence under Rule 33(b)(1), the government's failure to disclose Mr. Burzaco's trial testimony prevented counsel from undertaking this investigation before trial—and the government's awareness that Mr. Burzaco would testify as he did a trial constitutes the undisclosed testimony as favorable evidence.  This is so because that testimony led directly to the ultimate discovery of contradictory evidence.  Moreover, as established by the government's introduction of extensive air travel documents at trial, the evidence that Mr. Napout's counsel ultimately obtained would have been readily available to the government and the government should indeed have obtained that evidence before presenting Mr. Burzaco's false testimony at trial.

No one involved in this trial—least of all the government—would deny that Mr. Burzaco's testimony was the critical evidence against Mr. Napout. Indeed, in light of the not guilty verdicts on the money-laundering conspiracy counts, it is undeniable that the jury accepted Mr. Burzaco's inculpatory testimony, at least in the main, in convicting Mr. Napout. To be sure, Mr. Burzaco was extensively impeached at trial, and the breadth of that impeachment may well explain, at least partially, the lengthy jury deliberations before the verdict was returned against Mr. Napout. Evidence that Mr. Burzaco was not in Asunción on October 24, 2014, and therefore could not have met with Mr. Napout, much less had the extensive discussion that he related at trial, however, would be the only *direct* contradiction of his trial testimony as to that supposed event, and surely would have weighed heavily in the jury's deliberations. Whether the newly discovered evidence is treated as undisclosed favorable evidence or only as newly obtained evidence, its discovery entitles Mr. Napout to a new trial.

## II.   THE COURT'S EVIDENTIARY RULINGS DENIED MR. NAPOUT A FAIR TRIAL.

### A.   The Court's Exclusion of Evidence That "Commercial Bribery" Is Not a Criminal Offense in Either Paraguay or Argentina.

Mr. Napout adopts and incorporates his prior submissions on the foreign law issues. (DE:748; DE:836; DE:844). The Court's ultimate ruling, as memorialized in its December 12, 2017 Memorandum & Order Regarding Motion *In Limine* (DE:853), was that the only permissible means by which foreign law could be presented to the jury would be that a defendant who testified at trial "would be permitted to testify to as to his beliefs about foreign law and how those beliefs influenced his understanding of the duties he owed to FIFA or another relevant soccer organization." (DE:853:18). That is, "[i]f a Defendant wishes to testify that he believed the relevant codes of conduct did not prohibit him or other soccer officials from accepting the payments in question, either wholly or partly because of his belief about his own country's laws, the Court will allow him to do so." (DE:853:27 n.11). Presenting a defendant with this "difficult

choice," the Court ruled, would not impinge on Fifth Amendment rights because "that choice is no different in any other case in which the defendant has unique knowledge known only to himself and must choose whether to testify in order to present that knowledge to the jury." (DE:853:27-28).

But this case is not in any respect like *United States v. Singh*, 811 F.2d 758 (2d Cir. 1987), on which the Court relied. Unlike the defendant in that case, *id*. at 762-63, Mr. Napout has *no* "unique knowledge known *only to himself*" (DE:853:27-28) (emphasis added), as to whether commercial bribery is legal under Paraguayan or Argentinian law. Whether commercial bribery is illegal under the law of those nations is, under Federal Rule of Criminal Procedure 26.1, is a question of *law* for the district court, *e.g., United States v. Simpson*, 929 F. Supp. 2d 177, 188 (E.D.N.Y. 2013)—not a jury question as to which a defendant's belief, one way or the other, is in any respect dispositive. There is no logical nexus between requiring a defendant to waive his or her Fifth Amendment privilege and providing a foundation for proving foreign law.[3]

Similarly, the government's concern, by which the Court was greatly influenced, that the presentation of "voluminous" foreign-law evidence to the jury at trial "would only draw the jury's attention away from the relevant issues in the case, causing them to focus on the irrelevancies of foreign law" (DE:853:25), is entirely unwarranted. Again, it is for the district court, and not the jury, to determine foreign law, Fed. R. Crim. P. 26.1, as Mr. Napout argued to this Court.  (DE:836:6).  The district court "may consider any relevant material or source— including testimony—without regard to the Federal Rules of Evidence." Fed. R. Crim. P. 26.1. Thus, even if, in the unlikely event, "voluminous" foreign-law evidence could be required to

---

[3] Indeed, no criminal defense lawyer worth his or her salt would advise a defendant to waive the privilege so as to secure the dubious "benefit" that the Court held out to Mr. Napout.  To do so would be to open a lay defendant to withering cross-examination about the basis for his or her purported belief and the defendant's lack of a legal background—and, indeed, might compel the defendant to waive the attorney-client privilege if the basis for belief is advice of counsel—all without the defendant being able to counter such an attack by proving that his or belief is, in actuality, entirely *correct.*

resolve the issue, it would have been the Court, and not the jury, that would have heard the evidence.  Mr. Napout requested the Court to determine the state of pertinent foreign law and then merely instruct the jury according to that determination.  (DE:836:7).

Finally, the Court misapprehended Mr. Napout's reliance on *United States v. Schultz*, 333 F.3d 393 (2d Cir. 2003).  The Court rejected *Schultz* as governing authority because, in that case, it was the government that sought to prove foreign law and that the defendant, who was charged under the Antiquities Act, was actually aware of that law, whereas here, the government need not prove that of any defendant or co-conspirator.  (DE:853:19-20).  But the basis on which the Court declined to apply *Schultz* is entirely beside the point.

The government indeed was out to prove the defendant's knowledge and intent in *Schultz*.  333 F.3d at 400.  The government had no reason to do in this case—but *Mr. Napout* certainly did, in proving his defense.  In *Schultz*, the Second Circuit ruled that the government could prove that which it sought to prove by having the district court determine Egyptian law, and then by eliciting from witnesses with whom the defendant had done business that they knew about Egyptian law, so as to allow the jury to infer that the defendant also knew about Egyptian law.  *Id*. at 398-400, 414-15.  Here, the question is whether a defendant is entitled to take the same approach, *i.e.*, to prove up foreign law and to elicit from witnesses with whom Mr. Napout had business dealings whether they had conducted their businesses affairs as they did because they had believed that doing so was legal under Paraguayan or Argentinian law.  *Schultz* approves of a *methodology*, rather than a theory of prosecution or substantive admissibility, and it is fully applicable here.

*Schultz* provides the model that this Court should have followed: a judicial determination of foreign law, followed by appropriate instructions to the jury on the Court's legal determination—accompanied, to the extent deemed appropriate, by any limiting instructions that would caution the jury against nullification or other legitimate countervailing concerns.  *Id*. at 413.  The Court's failure to do so constitutes prejudicial error.

**B.      The Court's Admission of Evidence Obtained in Violation of the Work-Product Doctrine.**

Mr. Napout adopts the arguments set forth in his November 7, 2017 letter brief (DE:786), his sealed November 13, 2017 letter brief, and presented at the sealed November 9, 2017 hearing, which arguments the Court rejected in its November 13, 2017 Memorandum & Order Regarding Motions *In Limine*.  (DE:799:5-10).  In support of his assertion that the introduction of the WhatsApp "chat messages" between Mr. Napout and Mr. Burzaco was unfairly prejudicial, Mr. Napout points the Court to the government's closing argument.

Immediately after telling the jury that she was "going to move" to addressing Mr. Napout, AUSA Mace focused the jury's attention on the Napout-Burzaco "chat messages," arguing that "on nearly every page of those chats, you can tell that Napout trusted Burzaco." Trial Transcript (hereinafter "T") at 4257.  The government quoted Mr. Napout's statements to Mr. Burzaco that "I live for my friends," and that he hoped that Mr. Burzaco would "remember what I told you . . . about only trusting you."  (T:4258).  From that purported predicate, the government launched into a recitation of Mr. Burzaco's testimony to conversations with Mr. Napout.  (T:4258-59, 4262-63).  On rebuttal, the government argued that Mr. Burzaco's and Mr. Napout's "closeness screams out of the pages of the chats between the two of them." (T:4535).

To be sure, on direct examination of Mr. Burzaco, the government methodically parsed Mr. Napout's WhatsApp messages.  (T:540-63).  But at no other point in the trial did the government introduce any corroborating evidence as to this purportedly "trust[ing]" relationship, much less that the two men shared a close relationship or friendship.  Without the erroneous admission of the WhatsApp messages, which were compiled under work-product protections, the jury could have relied only on Mr. Burzaco's testimony; no other witnesses testified and no other exhibits demonstrated the "close[]" relationship between Mr. Burzaco and Mr. Napout.  The government thus exploited the Court's erroneous admission of the "chat messages" to unfair advantage.

C.     The "Obstruction" Evidence.

Before trial, the government moved *in limine* to admit evidence "about the removal of electronic devices from Napout's CONMEBOL office, at Napout's direction, on the morning of Napout's December 3, 2015 arrest in Zurich, Switzerland and the subsequent recovery and search of these devices by U.S. law enforcement." (DE:673:3). The government argued that Mr. Napout's alleged "obstruction" was related "to the other acts or obstruction in the racketeering pattern," was also relevant to " as proof of the racketeering conspiracy more generally," and was admissible under Federal Rule of Evidence 404(b) to prove Mr. Napout's knowledge and intent with regard to the charged crimes. (DE:673:5-9). Over Mr. Napout's objection (DE:688:2-3), the Court granted the government's motion, ruling that "obstruction of justice . . . to conceal criminal activities undertaken as part of the conspiracy, is relevant to showing that these criminal activities were related to the conspiracy and each other," based on the government's proffer that the "acts of obstruction were carried out in order to protect the conspiracy and to allow it to continue to achieve its 'central objectives' of engaging in corrupt acts in connection with the operation of FIFA." (DE:715:7-8). The Court further ruled that the evidence was admissible under Rule 404(b) "to prove Napout's knowledge and intent with regard to the charged crimes through evidence of his consciousness of guilt." (DE:673:7-10).

At trial, however, the government utterly failed to prove that which it had proffered to the Court. The only evidence of the purported "obstruction" came in through the testimony of Nelson Sanabria, the assistant to Mr. Napout's assistant at CONMEBOL, who testified that he had received a telephone call from an unidentified man on the morning of Mr. Napout's arrest in Zürich, and was instructed to go to Mr. Napout's CONMEBOL office. (T:3124).[4] Mr. Sanabria

---

[4] Mr. Sanabria testified that he never spoke with Mr. Napout directly regarding the removal of the computer (T:3123), and affirmed that the person who called him was *not* Mr. Napout. (T:3195). Mr. Sanabria had "doubts" about the caller's identity, but believed it was either Alfredo Montanaro or Cristobal Caceres (T:3201), both of whom were lawyers for CONMEBOL. (T:3186, 3196).

did so, and upon his arrival, telephoned Mr. Caceres, a CONMEBOL lawyer. (T:3196). Mr. Caceres came to the office with his son, and asked whether it was possible to remove the hard drive from the CONMEBOL computer in Mr. Napout's office. (T:3124-26). Because the hard drive could not be removed, they removed the computer and took it from Mr. Napout's office, with either Mr. Caceres or his son placing a jacket over the computer as they carried it out. (T:3126-27).

Because the computer was CONMEBOL property, Mr. Sanabria did not believe that it was being taken unlawfully by Mr. Caceres, acting as a CONMEBOL lawyer, and he testified that nothing had been removed from the computer. (T:3196).[5] Mr. Napout never instructed Mr. Sanabria to remove anything from the computer; he had only been told at some earlier point, by Mr. Napout's assistant, that if Mr. Napout were to be arrested, Mr. Caceres would come to the office to secure the computer. (T:3122-23).

In closing argument, the government referred to the "stolen computer." But never attempted to suggest that the computer had been "stolen" at Mr. Napout's request. (T:4266, 4276, 4278-79). AUSA Mace acknowledged that there were no "records of the bribes" on the computer, and did not suggest that any evidence had been removed from the device. (T:4278). Instead, the government argued that the presence of photographs, including photographs of co-conspirators and an apartment provided to Mr. Napout, constituted evidence of guilt. (T:4278).

## III.   NEWLY DISCOVERED EVIDENCE REQUIRES A NEW TRIAL.

### A.   The Newly Discovered Evidence.

Mr. Burzaco testified at trial that he had attended a CONMEBOL board meeting in Asunción in mid-to-late October 2014, for which he had traveled with Luis Segura, the president of the Argentinian soccer federation. (T:566). Mr. Burzaco testified that he and Marco Polo Del

---

[5] Mr. Sanabria, at Mr. Napout's request, previously had transferred family photographs from Mr. Napout's cellular telephone to the computer. (T:3163-65).

Nero had met with Mr. Napout in the Bourbon Hotel, near the CONMEBOL headquarters in Asunción, and allegedly had extensive discussions concerning the bribery scheme. (T:568-76). The government relied heavily on that testimony in closing argument. (T:4258-59, 4262-63, 4508-09).

But Mr. Burzaco's trial testimony was the first time that Mr. Napout or his counsel learned that Mr. Burzaco would testify as to the date, time, or place of the alleged meeting, or that Mr. Burzaco allegedly had traveled with Mr. Segura to that meeting. Documents provided by the government in discovery reflect only that Mr. Burzaco had a conversation with Mr. Napout and Mr. Nero at some point in 2014 after the death of Julio Grondona (who had been the CONMEBOL president before Mr. Napout) in July of that year.[6] The CONMEBOL meeting minutes for October 24, 2014, do not reflect that Mr. Burzaco was present (GX:1366-T), although minutes of other meetings for which he was present reflect that he was in attendance. (GX:1352-T:3; GX:1371-T).

Mr. Napout's counsel undertook an investigation during trial as to the veracity of Mr. Burzaco's assertion that a meeting occurred in Asunción on October 24, 2014, the actual date of the CONMEBOL board meeting that month. A search of Paraguayan immigration records initially revealed no evidence that Mr. Burzaco had entered the country that month, but those records are not conclusive.[7] There followed an exhaustive and painstaking search of Paraguayan airport records, which ultimately revealed, on December 20, 2017 (during jury deliberations), that Mr. Segura had traveled from Argentina to Paraguay on October 24, 2014, in the company of two other soccer officials, arriving that morning and departing that afternoon in the company of those officials and another soccer official.[8]

---

[6] The government provided Mr. Burzaco's statements in its pretrial production.

[7] A true and correct copy of the relevant Paraguayan immigration records, along with the Apostille certification and English translation, is attached hereto as Exhibit A.

[8] A true and correct copy of the relevant flight records, along with the Apostille certification and English translation, is attached hereto as Exhibit B.

Mr. Burzaco's name does not appear on the manifest for either flight.[9]  His assertion that he traveled with Mr. Segura to the October CONMEBOL meeting is thus demonstrably false, and belies the entirety of his testimony as to the supposed events on that date, including the critical conversation that he testified had occurred with Mr. Napout at the hotel—upon which, as previously noted, the government heavily relied as evidence of Mr. Napout's participation in the RICO conspiracy.

**B.    Mr. Napout Is Entitled to a New Trial.**

    **1.    *Brady*.**

A recent decision in this district has summarized the familiar *Brady* standards:

> *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed. 2d 215 (1963) and its progeny requires the Government to disclose material evidence which is favorable to a criminal defendant.  *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004). There are three components to a *Brady* violation that the Defendant must establish: "(1) that the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the 'evidence must have been suppressed by the State, either willfully or inadvertently'; and (3) 'prejudice must have ensued.'"  *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948, 144 L.Ed. 2d 286 (1999)); *see also United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003).
>
> The third component, otherwise known as the materiality component hinges on whether there is a "'reasonable probability' of a different result."  *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L.Ed. 2d 490 (1995). "This is not a test for sufficiency of evidence; the defendant must show that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  *Jackson*, 345 F.3d at 73-74 (quoting *Kyles*, 514 U.S. at 434).

*United States v. Williams*, No. 10-cr-622 (ADS), 2017 WL 5483744, at \*4-5 (E.D.N.Y. Nov. 15, 2017).

    Here, the first *Brady* prong is readily satisfied:  disclosure of Mr. Burzaco's statement that a meeting with Mr. Napout occurred on October 24, 2014, is inconsistent with the general

---

[9] *Id.*

assertion of a meeting at some point after Mr. Grondona's death in July 2014. More importantly, that statement is inconsistent with what is now revealed by the newly discovered evidence.[10]

As to the suppression prong, the government deliberately and carefully elicited the testimony about the supposed October 24, 2014 meeting at trial, and gave the testimony great weight in closing argument. There is not the slightest indication that the government was surprised in any way by Mr. Burzaco's purported recollection of the meeting's date, time, or place. Favorable evidence is presumptively suppressed within the meaning of *Brady* when it is not revealed in an FBI 302 setting forth the witness's statements to the government. *United States v. Liew*, 856 F.3d 585, 595, 604-05 (9th Cir. 2017).

As to whether materiality is satisfied, Mr. Burzaco indisputably was the key government witness against Mr. Napout, as the government's closing argument establishes beyond question. Especially in light of Mr. Napout's acquittal on the money-laundering conspiracy charges, Mr. Burzaco's testimony becomes all the more critical in establishing the only other predicate act, *i.e.*, wire fraud conspiracy. While Mr. Burzaco was certainly—and appropriately—subjected to extensive cross-examination as to his credibility, in light of his many years of criminal activity and his deal with the government in exchange for what he hopes will be no incarceration, the suppressed evidence is the only *direct* proof that he testified falsely at trial. This would have been no small matter at trial. Without any direct evidence of false statements, Mr. Napout's counsel asked the jury to consider the absence of "any corroborating evidence whatsoever that [Mr.] Burzaco was even in Paraguay that day," including immigration records or air travel records. (T:4335-36). The government predictably responded that, while the defense "called

---

[10] The government introduced copious documentary evidence to show the travels of witnesses and defendants, including foreign hotel records, flight records, and border crossing records. (DE:875:15-16, 32-35). And the government relied extensively on those records in closing argument. (T:4262-63, 4272-73, 4277, 4281). The government's failure to present any such records of Mr. Burzaco's purported visit to Asunción on October 24, 2014, is telling, especially in light of the newly discovered evidence.

[Mr. Burzaco] a liar, . . . they don't point out anything about his testimony that is inconsistent with the evidence." (T:4486). The newly discovered evidence indeed provides an objective basis for calling Mr. Burzaco a liar.

As the Supreme Court has recently reaffirmed, this Court is required to determine, "in the context of the entire record," whether "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (citations omitted). That standard is readily satisfied here.

Evidence that the key meeting with Mr. Napout to which Mr. Burzaco testified did not happen and could not have happened would have had an undeniable impact on the jury, which deliberated for an extended period of time and evidently did not find the government's case against Mr. Napout to be overwhelming. Proof that Mr. Burzaco was not only testifying in exchange for considerable benefits, but also that he lied at trial could well have tipped the balance in Mr. Napout's favor.

### 2.    Newly Discovered Evidence.

Even if the government is not deemed to have suppressed Mr. Burzaco's testimony about the October 2014 meeting—or even if that testimony is not deemed "favorable" within *Brady*'s meaning—it constitutes newly discovered evidence, which, due to the government's failure to disclose the date, time, or place of the alleged meeting, was unavailable to Mr. Napout until Mr. Burzaco revealed the purported date, time, and place at trial. Under Rule 33, a defendant seeking new trial on the basis of newly discovered evidence must show: "(1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007); *accord United States v. Forbes*, 790 F.3d 405, 406-07 (2d Cir. 2015). "As stated in the fifth requirement, the 'newly discovered evidence must be of a sort that could, if believed, change the verdict.'" *Williams*, 2017 WL 5483744, at

13

*5 (quoting *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) (additional citations omitted)).

Evidence that Mr. Burzaco lied at trial is sufficient even to satisfy the stringent newly-discovered-evidence standard.  If the jury believed the undeniable documentary evidence, and therefore that the meeting described by Mr. Burzaco never happened, it readily could have discarded his entire testimony, particularly in light of Mr. Burzaco's admitted motivation in cooperating with the government.  Without Mr. Burzaco's testimony, the jury certainly would have seen the case against Mr. Napout as wholly insubstantial.

## CONCLUSION

Mr. Napout requests the Court to grant a new trial.

Respectfully submitted,

**GREENBERG TRAURIG, LLP**
One International Place
Boston, MA 02110
Tel:  (617) 310-6000
pappalardoj@gtlaw.com
scherkere@gtlaw.com
becerraj@gtlaw.com

s/ Elliot H. Scherker
A. John Pappalardo
Elliot H. Scherker
Jacqueline Becerra

**PIÑERA-VAZQUEZ LAW FIRM**
International Center
1900 Southwest 3rd Avenue
Miami, FL 33129
Tel:  (305) 443-0629
sbp@pineravazquezlaw.com

s/ Silvia B. Piñera-Vazquez
Silvia B. Piñera-Vazquez

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 22, 2018, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that this document is being served simultaneously on all counsel of record in the matter specified, either by transmission of Notices of Electronic Filing generated by CM/ECF, or in another authorized manner.

s/ Elliot H. Scherker
Elliot H. Scherker
