PT:SPN/MKM/KDE
F.#2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                      Docket No. 15-CR-252 (S-2) (PKC)

JUAN ÁNGEL NAPOUT and
JOSÉ MARIA MARIN,

               Defendants.

– – – – – – – – – – – – – – – – – –X

THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO THE DEFENDANTS'
MOTIONS FOR ACQUITTAL OR A NEW TRIAL

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Samuel P. Nitze
M. Kristin Mace
Keith D. Edelman
Assistant United States Attorneys
      (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 1

    I.     The Trial Indictment .................................................................................. 1

    II.    The Trial .................................................................................................... 3

    III.   The Verdict ................................................................................................. 4

ARGUMENT .......................................................................................................... 4

    I.     The Defendants' Motions for Acquittal Under Rule 29 Should be Denied ........... 5

        A.    Legal Standard ................................................................................. 5

        B.    The Government Was Not Required To Prove that the Victims Were "Injured" ........................................................................................... 6

        C.    The Evidence Established Domestic Application of the Wire Fraud Statute In Connection with Napout's Convictions ................................ 11

        D.    The Evidence Was Sufficient to Establish That Marin Received Bribes In Exchange for Official Action ..................................................... 19

    II.    The Defendants' Motions for a New Trial Under Rule 33 Should Be Denied ..... 24

        A.    Legal Standard ............................................................................... 24

        B.    The Court Properly Limited Introduction of Foreign Law Evidence ....... 24

        C.    The Court Properly Admitted Napout's WhatsApp Messages ................ 30

        D.    The Court Properly Admitted Evidence of the Removal of Napout's Computer  From His Office on the Day of His Arrest ............................ 32

        E.    The Court Properly Admitted the Expert Testimony of Dr. Stefan Szymanski ..................................................................................... 42

        F.    The Court Properly Excluded Hearsay Evidence as to Marco Polo Del Nero ................................................................................................ 48

        G.    The Court Properly Admitted Recorded Co-Conspirator Statements ....... 49

        H.    The Court Properly Admitted Documents Seized From the Klefer Safe .. 50

        I.    Napout's Claim of Newly Discovery Evidence is Meritless ................... 52

        J.    Marin is Not Entitled To a New Trial Based on the "Weight of the Evidence" ...................................................................................... 65

CONCLUSION ....................................................................................................... 66

<u>TABLE OF AUTHORITIES</u>

Cases

<u>Atkins v. New York City</u>,

    143 F.3d 100 (2d Cir. 1998)...................................................................... 24

<u>Brady v. Maryland</u>,

    373 U.S. 83 (1963)................................................................................... 52

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,

    509 U.S. 579 (1993)........................................................................... 42, 43

<u>DiSimone v. Phillips</u>,

    461 F.3d 181 (2d Cir. 2006)...................................................................... 53

<u>Dowling v. United States</u>,

    493 U.S. 342 (1990)................................................................................ 39

<u>Elsevier, Inc. v. Grossman</u>,

    199 F. Supp. 3d 768 (S.D.N.Y. 2016)........................................................ 18

<u>United States v. Ferguson</u>,

    246 F.3d 129 (2d Cir. 2001)...................................................................... 24

<u>Hewitt v. Metro-North Commuter Railroad</u>,

    244 F. Supp. 3d 379 (S.D.N.Y. 2017)........................................................ 43

<u>Huddleston v. United States</u>,

    485 U.S. 681 (1988)................................................................................ 39

<u>Ida v. United States</u>,

    207 F. Supp. 2d 171 (S.D.N.Y. 2002)........................................................ 59

<u>In re Grand Jury Subpoena Dated July 6, 2005</u>,

    510 F.3d 180 (2d Cir. 2007)...................................................................... 31

<u>In re Grand Jury Subpoenas Dated Mar. 19 & Aug. 2,</u>

    <u>2002</u>, 318 F.3d 379 (2d Cir. 2003)............................................................. 30

<u>Jackson v. Virginia</u>,

    443 U.S. 307 (1979)................................................................................. 5

i

Leka v. Portuondo,
257 F.3d 89 (2d Cir. 2001)......................................................................... 53

McDonnell v. United States,
136 S. Ct. 2355 (2016).............................................................................. 20

Musacchio v. United States,
136 S. Ct. 709 (2016)................................................................................ 10

Nimely v. City of New York,
414 F.3d 381 (2d Cir. 2005)....................................................................... 43

Petroleos Mexicanos v. SK Eng'g & Constr. Co.,
572 F. App'x 60 (2014) ............................................................................ 17

Restivo v. Hesseman,
846 F.3d 547 (2d Cir. 2017)............................................................... 43, 44, 47

RJR Nabisco, Inc. v. European Comm.,
136 S. Ct. 2090 (2016).............................................................................. 19

Salinas v. United States,
522 U.S. 65 (1997).................................................................................... 12

Schmuck v. United States,
489 U.S. 705 (1989).................................................................................. 17

Skilling v. United States,
561 U.S. 358 (2010)................................................................................... 9

Smith v. Carpenter,
316 F.3d 178 (2d Cir. 2003)....................................................................... 24

Strickler v. Greene,
527 U.S. 263 (1999).................................................................................. 53

United States v. Acosta,
17 F.3d 538 (2d Cir. 1994)......................................................................... 14

United States v. Agurs,
427 U.S. 97 (1976)............................................................................... 53, 57

United States v. Alessi,
638 F.2d 466 (2d Cir.1980)........................................................................ 58

ii

United States v. Alfisi,
    308 F.3d 144 (2d Cir. 2002)..........................................................................20

United States v. All Assets Held at Bank Julius,
    251 F. Supp. 3d 82 (D.D.C. 2017)................................................................18

United States v. Al-Moayad,
    545 F.3d 139 (2d Cir. 2008)..........................................................................50

United States v. Autuori,
    212 F.3d 105 (2d Cir. 2000)............................................................................5

United States v. Avellino,
    136 F.3d 249 (2d Cir. 1998)....................................................................54, 63

United States v. Bahel,
    662 F.3d 610 (2d Cir. 2011)..........................................................................17

United States v. Bedoy,
    827 F.3d 495 (5th Cir. 2016) ........................................................................41

United States v. Bergstein,
    2017 WL 4535944 (S.D.N.Y. Oct. 10, 2017) .............................................30

United States v. Bout,
    651 Fed. App'x 62 (2d Cir. 2016)............................................................50, 51

United States v. Bruno,
    661 F.3d 733 (2d Cir. 2011)..........................................................................21

United States v. Canady,
    126 F.3d 352 (2d Cir. 1997)............................................................................5

United States v. Canova,
    412 F.3d 331 (2d Cir. 2005)..........................................................................54

United States v. Cassese,
    428 F.3d 92 (2d Cir. 2005)..............................................................................5

United States v. Ciccone,
    312 F.3d 535 (2d Cir. 2002)..........................................................................12

United States v. Costello,
    255 F.2d 876 (2d Cir. 1958)..........................................................................54

United States v. Crowley,
  318 F.3d 401 (2d Cir. 2003)...............................................................................5

United States v. Devin,
  918 F.2d 280 (1st Cir. 1990)............................................................................40

United States v. Facen,
  812 F.3d 280 (2d Cir. 2016)...............................................................................9

United States v. Farhane,
  634 F.3d 127 (2d Cir. 2011).............................................................................45

United States v. Forbes,
  790 F.3d 403 (2d Cir. 2015).......................................................................58, 59

United States v. Gambino,
  59 F.3d 353 (2d Cir. 1995)...............................................................................54

United States v. Gasperini,
  No. 16-CR-441, 2017 WL 2399693 (E.D.N.Y. June 1, 2017) ..........................17, 18

United States v. Henry,
  325 F.3d 93 (2d Cir. 2003).................................................................................5

United States v. Imran,
  964 F.2d 1313 (2d Cir. 1992)...........................................................................54

United States v. Jackson,
  335 F.3d 170 (2d Cir. 2003)...............................................................................6

United States v. James,
  239 F.3d 120 (2d Cir. 2000)...............................................................................6

United States v. Lincoln,
  630 F.2d 1313 (8th Cir. 1980) .........................................................................24

United States v. Locascio,
  6 F.3d 924 (2d Cir.1993)..................................................................................43

United States v. Lombardozzi,
  491 F.3d 61 (2d Cir. 2007).................................................................................6

United States v. Lorenzo,
  534 F.3d 153 (2d Cir. 2008)...............................................................................6

iv

United States v. Lusk,

    2017 WL 508589 n.5 (S.D. W. Va. Feb. 7, 2017) ................................................... 20

United States v. Lyle,

    856 F.3d 191 (2d Cir. 2017)........................................................................... 33, 35

United States v. Lyles,

    593 F.2d 182 (2d Cir. 1979)................................................................................. 42

United States v. Matera,

    489 F.3d 115 (2d Cir. 2007)................................................................................. 46

United States v. McCourty,

    562 F.3d 458 (2d Cir. 2009)................................................................................. 24

United States v. Meislin,

    108 F. Supp. 3d 38 (N.D.N.Y 2015) .................................................................... 40

United States v. Owen,

    500 F.3d 83 (2d Cir. 2007)............................................................................. 53, 61

United States v. Parker,

    903 F.2d 91 (2d Cir. 1990)................................................................................... 62

United States v. Parkes,

    497 F.3d 220 (2d Cir. 2007)................................................................................. 64

United States v. Persico,

    645 F.3d 85 (2d Cir. 2011)................................................................... 53, 54, 62

United States v. Pitre,

    960 F.2d 1112 (2d Cir. 1992)................................................................................ 6

United States v. Provenzano,

    615 F.2d 37 (2d Cir. 1980).................................................................................... 6

United States v. Rea,

    958 F.2d 1206 (2d Cir. 1992)................................................................................ 5

United States v. Riggi,

    541 F.3d 94 (2d Cir. 2008).................................................................................... 6

United States v. Rosen,

    716 F.3d 691 (2d Cir. 2013)......................................................................... 20, 21

United States v. Rybicki,

    287 F.3d 257 (2d Cir. 2002) .......................................................................... 7, 8

United States v. Rybicki,

    354 F.3d 124 (2d Cir. 2003) .......................................................................... 7, 10

United States v. Sanchez,

    969 F.2d 1409, 1413 (2d Cir. 1992) ............................................................ 24, 65

United States v. Sayre,

    No. 08-50519, 434 Fed. App'x 622 (9th Cir. 2011) ................................... 46

United States v. Scott,

    677 F.3d 72 (2d Cir. 2016) ............................................................................ 40

United States v. Sepulveda,

    15 F.3d 1161 (1st Cir. 1993) ......................................................................... 42

United States v. Shultz,

    333 F.3d 393 (2d Cir. 2003) .......................................................................... 27

United States v. Silver,

    864 F.3d 102 (2d Cir. 2017) .......................................................................... 20

United States v. Skelos,

    707 Fed. App'x 733 (2d Cir. 2017) ............................................................. 20, 21

United States v. Smith,

    985 F. Supp. 2d 547 (S.D.N.Y. 2014) ......................................................... 9

United States v. Spruill,

    808 F.3d 585 (2d Cir. 2015) .......................................................................... 42

United States v. Stewart,

    433 F.3d 273 (2d Cir. 2006) .......................................................................... 63

United States v. Stofsky,

    527 F.2d 237 (2d Cir. 1975) .......................................................................... 59, 61

United States v. Tin Yat Chin,

    371 F.3d 31 (2d Cir. 2004) ............................................................................ 50

United States v. Vayner,

    769 F.3d 125 (2d Cir. 2014) .......................................................................... 50

United States v. Williams,
    506 F.3d 151 (2d Cir. 2007) ................................................................................ 43

United States v. Wong,
    78 F.3d 73 (2d Cir. 1996) ............................................................................ 54, 64

United States v. Zichettello,
    208 F.3d 72 (2d Cir. 2000) ................................................................................ 13

Untied States v. Paulino,
    445 F.3d 211 (2d Cir. 2006) .............................................................................. 58

Williams v. Senkowski,
    No. 02-CV-2074 (JBW), 2003 WL 22956999 (E.D.N.Y. Oct. 9, 2003) .................................. 53

## Statutes

18 U.S.C. § 1343 .................................................................................................. 2

18 U.S.C. § 1346 .................................................................................................. 7

18 U.S.C. § 1503(c)(1) ........................................................................................ 41

18 U.S.C. § 1512 ........................................................................................... 33, 40

18 U.S.C. § 1521(c)(1) ........................................................................................ 41

18 U.S.C. § 1956(f) ............................................................................................. 19

18 U.S.C. § 3500 ........................................................................................... 58, 60

## Rules

Fed. R. Crim. P. 26.1 ........................................................................................... 28

Fed. R. Crim. P. 29 ........................................................................................... 1, 5

Fed. R. Crim. P. 33 .......................................................................................... 1, 49

Fed. R. Evid. 403 ....................................................................................... 25, 26, 49

Fed. R. Evid. 602 ................................................................................................ 48

Fed. R. Evid. 702 ................................................................................................ 43

Fed. R. Evid. 703 ................................................................................................ 48

Fed. R. Evid. 404(b)................................................................................................... 32, 40

Fed. R. Evid. 901(a)................................................................................................... 50

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the post-trial motions of defendants Juan Ángel Napout and José Maria Marin (together, "the defendants"). On December 22, 2017, following a six-week jury trial, the defendants were convicted of various offenses charged in the second superseding indictment. They now have moved for judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29, arguing that the government failed to prove particular elements of the counts of conviction, and for new trials pursuant to Federal Rule of Criminal Procedure 33, based on claimed error in certain rulings by the Court. See ECF Dkt. Nos. 888 ("JAN 29 Br."); 889 ("JAN 33 Br."); 887 ("JMM Br."). For the reasons set forth below, the defendants' motions are meritless and should be denied in their entirety.

BACKGROUND

I.     The Trial Indictment

On May 20, 2015, a grand jury in the Eastern District of New York returned a 47-count indictment charging 14 individuals, including Marin, with racketeering conspiracy and wire fraud and money laundering offenses, among other crimes. See United States v. Webb et al., 15-CR-252. This original indictment was unsealed on May 27, 2015, following the arrests of some of the charged defendants. On November 25, 2015, the grand jury returned a 92-count superseding indictment charging 16 additional defendants, including Napout and Manuel Burga, with the same racketeering conspiracy, among other crimes. See United States v. Hawit et al., 15-CR-252 (S-1) (hereafter, "S-1"). S-1 was unsealed on December 3, 2015, following the arrests of some of the newly charged defendants. On June 14, 2017, following the guilty pleas of several defendants and in anticipation of the trial scheduled to commence on November 6, 2017,

the grand jury returned a seven-count second superseding indictment against Napout, Burga, and

Marin.  See United States v. Napout et al., 15-CR-252 (S-2) (hereafter, "indictment" or "Ind.").

The racketeering conspiracy charged in the indictment alleged an enterprise

consisting of a group of legal entities associated in fact, specifically the Fédération Internationale

de Football Association ("FIFA"), its six constituent continental confederations (including the

confederations covering North America, Central America, and the Caribbean ("CONCACAF")

and South America ("CONMEBOL")), affiliated regional federations, national member

associations (also known as "federations"), and sports marketing companies (the "Enterprise").

See Ind. ¶ 1.  The defendants and their co-conspirators were charged with conspiring to conduct

the affairs of the Enterprise through a pattern of racketeering activity during the period 1991 to

2015.  As alleged in the indictment and proven at trial, the Enterprise was corrupted by a pattern

of racketeering activity through which the defendants and their co-conspirators conducted and

conspired to "conduct and participate, directly and indirectly, in the conduct of the affairs of

[the] enterprise," including through multiple acts indictable under 18 U.S.C. § 1343 (wire fraud,

including honest services wire fraud) and §§ 1956 and 1957 (money laundering and money

laundering conspiracy).  Id. ¶ 122-23.

In addition to the racketeering conspiracy charged in Count One, for which Burga

was tried together with the defendants, the indictment alleged six other counts:

Count Two: Wire Fraud Conspiracy – Copa Libertadores

Count Three: Money Laundering Conspiracy – Copa Libertadores

Count Four: Wire Fraud Conspiracy – Copa do Brasil (Defendant Marin)

Count Five: Money Laundering Conspiracy – Copa do Brasil (Defendant Marin)

<u>Count Six</u>: Wire Fraud Conspiracy – Copa América

<u>Count Seven</u>: Money Laundering Conspiracy – Copa América

II.     <u>The Trial</u>

Over the course of a six-week trial, the government called 28 witnesses, who testified about a lucrative and powerful international racketeering conspiracy that spanned many years and many countries.  The witnesses described how the defendants, each a powerful soccer official, entered into secret deals with sports marketing companies and took bribes for themselves at the expense of the organizations they had a fiduciary duty to serve.  Among the government's witnesses were: Alejandro Burzaco and José Hawilla, who had led powerful sports marketing companies and paid bribes to the defendants and their co-conspirators; Eladio Rodriguez and Santiago Peña, the former financial managers of two sports marketing companies, who had each separately kept ledgers of the bribe payments made and owed to the defendants and their co-conspirators; Luis Bedoya, the former president of the Colombian soccer federation, who testified about joining the conspiracy with defendants Napout and Burga, among other CONMEBOL officials, to receive bribes in exchange for granting contracts to certain sports marketing companies; and Steven Berryman, a special agent with the Internal Revenue Service who traced funds transferred as part of the racketeering conspiracy as they moved around the world and to, from, and through bank accounts in the United States.  Through this evidence, as well as voluminous bank records, consensual recordings, emails, photographs, and other documents, the government proved the defendants' guilt beyond a reasonable doubt.[1]

-------------------

[1] Because the Court is familiar with the record and evidence in this case, the government has highlighted here and detailed below only those facts relevant to adjudication of the defendants' post-trial motions.

Although the defendants introduced certain exhibits through the government's witnesses, each of the defendants elected not to testify or call any witnesses.

III.    The Verdict

On December 22, 2017, after deliberating for five days, the jury convicted Napout on Counts One, Two, and Six and found him not guilty on Counts Three and Seven.  The jury convicted Marin on Counts One, Two, Three, Four, Six, and Seven and found him not guilty on Count Five.  The jury found Burga not guilty on Count One.[2]

ARGUMENT

The defendants challenge their convictions on several grounds.  Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, Napout moves for a judgment of acquittal based on his claim that the evidence was insufficient (1) to prove that Napout's receipt of bribe payments "resulted (or would have resulted) in any identifiable harm to FIFA or any confederation within the FIFA umbrella," JAN 29 Br. at 1-2; and (2) to support extraterritorial application of the RICO and wire fraud statutes because the evidence purportedly showed only "incidental use of United States wire facilities."  Id. at 2-3.  Marin moves for a judgment of acquittal based on the claim that the evidence "failed to establish Mr. Marin's participation in a quid pro quo agreement."  JMM Br. at 1.

_____

[2] Because Burga was extradited to the United States solely on the racketeering conspiracy charge, the government did not proceed at trial against Burga on Counts Nine, Ten, Eighty-Three, and Eighty-Four of the first superseding indictment, which charged Burga with wire fraud and money laundering conspiracies in connection with the Copa Libertadores and Copa América tournaments.  Those counts remain open.

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, the defendants move for a new trial based on claims of error in several of the Court's evidentiary rulings.  <u>See</u> JMM Br. at 11-19; JAN 33 Br.  In addition, Marin seeks a new trial on the ground that the verdict against him was "against the weight of the evidence."  JMM Br. at 20.  Given the number of separate contentions in the defendants' motions, the government responds to their arguments <u>seriatim</u>.  For the reasons set forth below, the defendants' motions should be denied.

I.      <u>The Defendants' Motions for Acquittal Under Rule 29 Should be Denied</u>

        A.      <u>Legal Standard</u>

        Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29.  A judgment of acquittal may be granted only if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  <u>United States v. Cassese</u>, 428 F.3d 92, 98 (2d Cir. 2005).  Put differently, a jury verdict must be allowed to stand if "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000) (emphasis in original) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)).  "In challenging the sufficiency of the evidence, the defendant faces an uphill battle, and bears a very heavy burden."  <u>United States v. Crowley</u>, 318 F.3d 401, 407 (2d Cir. 2003) (internal quotation marks and citation omitted).

        In ruling on a Rule 29 motion, the evidence must be viewed in the light most favorable to the government, with all reasonable inferences drawn in its favor.  <u>See United States v. Henry</u>, 325 F.3d 93, 103 (2d Cir. 2003).  Moreover, the reviewing court must "resolve all issues of credibility in the government's favor."  <u>United States v. Canady</u>, 126 F.3d 352, 356 (2d Cir. 1997).  "Matters of the choice between competing inferences, the credibility of the

5

witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments." United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992) (citations omitted); see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (instructing that "[c]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal").

The government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offenses beyond a reasonable doubt. See United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008); United States v. James, 239 F.3d 120, 123-24 (2d Cir. 2000) (on a challenge to the sufficiency of the evidence, the court "is required to view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor"). Moreover, the testimony of one witness is sufficient to convict. See United States v. Riggi, 541 F.3d 94, 110 (2d Cir. 2008) (holding that conviction may be supported by "uncorroborated testimony of a single accomplice" and that lack of corroboration "goes merely to the weight of the evidence, not to its sufficiency").

The high standard of deference to the jury's verdict in evaluating sufficiency claims is "especially important when reviewing a conviction of conspiracy." United States v. Lombardozzi, 491 F.3d 61, 67 (2d Cir. 2007) (quoting United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992)). The Second Circuit has held that such deference is particularly appropriate in those cases "because a conspiracy by its very nature is a secretive operation, and it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" Id. (quoting United States v. Provenzano, 615 F.2d 37, 45 (2d Cir. 1980)).

6

B.      The Government Was Not Required To Prove that the Victims Were "Injured"

Napout first argues for a judgment of acquittal on the wire fraud conspiracy counts (Counts Two and Six), and derivatively on the racketeering conspiracy count (Count One), based on his claim that "[t]he evidence fails to establish that [Napout] joined a conspiracy to deprive FIFA or CONMEBOL of honest services . . . because the government failed to establish that the payment of alleged 'bribes' would have injured FIFA or CONMEBOL by depriving those organizations of monies that would otherwise have been paid in exchange for contract rights." JAN 29 Br. at 12. In making this argument, Napout fails to cite any authority to support the proposition that proof of "injury" is an element of the crimes of conviction.

To the contrary, it is settled law that "in order to convict a defendant based upon a scheme to defraud another of the intangible right of honest services, as contemplated by 18 U.S.C. § 1346, it is unnecessary to prove that the defendant intended economic or pecuniary harm or that any such harm actually resulted from the fraud." United States v. Rybicki, 287 F.3d 257, 259-60 (2d Cir. 2002) ("Rybicki I"), modified on reh'rg by United States v. Rybicki, 354 F.3d 124, 145 (2d Cir. 2003) (en banc) ("Rybicki II") ("[W]e agree with the Rybicki panel's observation that . . . actual or intended economic or pecuniary harm to the victim need not be established."). "[T]he only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services." Rybicki I, 287 F.3d at 262; see also Rybicki II, 354 F.3d at 145. While the misrepresentation or omission at issue in the scheme to defraud must be "material," it need not be "economic." Rybicki II, 354 F.3d at 145-46.

Here, the evidence at trial established that, by the time of his arrest, Napout had collected well over $3 million in bribes in exchange for his support of the Copa América, Copa Libertadores, and World Cup Qualifier contracts and had agreed to receive much more. See,

7

e.g., GX-601 ("Honda" Tab); Tr.[3] at 1157-90 (testimony of S. Peña); Tr. at 600 (A. Burzaco's

testimony that Torneos and Torneos' partners paid Napout $4.5 million in bribes and agreed to

pay him more than $9 million in bribes through 2015). The government argued that since the

contracts had been tainted by fraud for years with no benchmark for fair market prices, one could

not infer from increases in contract price over the years that the contracts had been sold at good

or fair market prices. Tr. at 4225-26. The government further argued that the contract prices

were at least undervalued in the amount of the bribes because the sports marketing companies

clearly were willing to pay those additional amounts to obtain the rights at issue. See, e.g., Tr. at

4288; Rybicki I (noting government argument that even though ultimate insurance settlements

procured through bribery were reasonable, they were inflated at least by the amount of bribes

paid to middlemen and adjusters since those amounts never reached the personal injury

plaintiffs), 287 F.3d at 260; Rybicki II, 354 F.3d at 146. The jury was then instructed, without

objection, that "[t]he Government need not prove that the conspirator intended to cause

economic or pecuniary harm or that any such harm actually resulted from the fraud." Tr. at

4607.[4]

---

[3] The trial transcript is referred to herein as "Tr." All other transcripts are referred to by
the date of the applicable hearing or conference before the Court.

[4] Until now, Napout has never taken the position that the government was required to
prove actual or intended pecuniary harm. In its Request to Charge filed on November 7, 2017,
before the start of trial, the government requested that the Court instruct the jury that "[t]he
government need not prove that the conspirator intended to cause economic or pecuniary harm or
that any such harm actually resulted from the fraud," and specifically cited to Rybicki I. ECF
Dkt. No. 782 at 45. In the Defendants' Request to Charge filed on November 17, 2017, the
defendants did not request any specific instruction as to proof of pecuniary harm and, as to
materiality, asked the Court to instruct the jury that "if you find a particular statement or
representation false, you must determine whether that statement or representation was one that a
reasonable person might have considered important in making his or her decision." ECF Dkt.

Napout does not dispute that the jury was properly instructed, that <u>Rybicki</u> is controlling,[5] or that "actual or intended economic or pecuniary harm to the victim need not be established."  JAN 29 Br. at 11.  Nevertheless, he moves for a judgment of acquittal on the basis that there was "no <u>direct</u> evidence" that the victims had been "injured" by depriving victim organizations "of monies that would otherwise have been paid in exchange for contract rights."  <u>Id.</u> at 12 (emphasis in original).  Unsurprisingly, Napout offers no legal authority in support of his argument.  <u>See id.</u> at 11-14.  Rather, he simply complains that the government's expert witness Dr. Stefan Szymanski provided testimony only about the applicable economic principles rather than analyzing the contracts themselves and that this is insufficient to support a conviction.  <u>Id.</u> at 12-13.  In doing so, however, Napout ignores the fact that his arguments are as to the sufficiency of the evidence of an element that does not exist.  <u>Cf. United States v. Facen</u>, 812 F.3d 280, 289 (2d Cir. 2016) (observing that "the sufficiency of the evidence to support a

---

No. 809 at 25.  In its Draft Jury Instructions distributed to the parties before the charge conference, the Court included the instruction proposed by the government as to proof of harm not being required, and also included the language requested by the defendants as to the definition of materiality (which the government had also requested).  <u>See</u> ECF Dkt. No. 847 at 42, 44.  At the December 12, 2017 charge conference, the Court noted to the defendants that "you can't say you cannot find them guilty of honest services fraud simply because they made money for CONMEBOL."  Tr. at 3588.  Counsel for Napout stated, "[t]hat's not our position," and then later explained more fully that, "[o]ur defense in this case is that our client didn't accept any money.  Not that he accepted money, but still did a really good job for CONMEBOL or FIFA."  Tr. at 3588, 4170.  Counsel for the defendants did not raise any objections to the Court's proposed instruction that the government need not prove intended or actual harm.  <u>Id.</u> at 4170-73.  The instruction was included in the Court's final Jury Instructions without objection.  <u>See</u> ECF Dkt. No. 872 at 43.

[5]  Although <u>Rybicki</u> predated <u>Skilling v. United States</u>, 561 U.S. 358 (2010), it remains valid authority "upon which the Second Circuit nevertheless continues to rely even in Skilling's wake."  <u>United States v. Smith</u>, 985 F. Supp. 2d 547, 593 (S.D.N.Y. 2014), <u>aff'd sub nom.</u> <u>United States v. Halloran</u>, 664 Fed. App'x 23 (2d Cir. 2016).

conviction is measured against the actual elements of the offense, and not against an expanded

list of elements contained in an erroneous jury instruction") (citing Musacchio v. United States,

136 S. Ct. 709, 715 (2016)); see also Rybicki II, 354 F.3d at 145-46 (holding that harm is not an

element of honest services wire fraud and the "material" misrepresentation or omission required

for conviction need not be "economic").  Napout's motion for an acquittal on the basis that the

government failed to prove that the victims were deprived of "monies" is not based in any

governing law – or supported by the facts[6] – and should be rejected.

---

[6] Although not required to do so, the government did establish harm to the victims as part of its evidence of materiality.  See Mem. & Order, dated Nov. 11, 2017 (ECF Dkt. No. 799) at 3-4 (finding that "Dr. Szymanski's proposed testimony is highly probative on the issue of materiality . . . , which is an element of wire fraud conspiracy"); see, e.g., Tr. at 190-91, 197-98 (testimony by Dr. Szymanski concerning how an official's receipt of illicit bribes potentially harms a soccer organization); see also Tr. at 334 (testimony of A. Burzaco that the $400,000 annual bribe payments relating to the Copa Libertadores were "going to come out from CONMEBOL out of increases [to the contract prices] that they told Grondona . . . [T]his was not a private amount on top of increase but for them to take out of CONMEBOL's revenues and treasury"); Tr. at 374-77 (testimony of A. Burzaco regarding the 2012 Copa Libertadores contract (GX-165T): "[S]igning such a long-term contract in the context of more competition and growing and including the macroeconomic circumstances in South America, it was definitely bad for CONMEBOL and good for the counterpart."); Tr. at 1932-33 (testimony of L. Bedoya concerning increases in contract prices and failure of the conspirators to determine the market value of the rights or obtain any competing bids); GX 1709-T at 2-3 (M. Jinkis stating that conspirators would earn $100 million in profit from each edition of the Copa América under the Datisa contract procured through bribery).  Although Napout now tries to argue that the simple fact of an increase in the contract prices indicates a lack of harm, see JAN 29 Br. at 13-14, Dr. Szymanski explained the fallacy of this reasoning.  See, e.g., Tr. at 193 ("So, in a world in which the value of these rights are escalating very rapidly, the soccer organization may actually be losing [out].  Even though on the face of it the value of the contract went up, maybe the value of the contract would have gone up many times more if there had been an open competitive process.").  In any event, if the jury had been called upon to find whether there was economic harm, it certainly could have relied upon the evidence set forth above.

C.     The Evidence Established Domestic Application of the Wire Fraud Statute In
       Connection with Napout's Convictions

Napout seeks a judgment of acquittal on the ground that the conspiratorial

racketeering and wire fraud offenses for which he was convicted are invalid because they involve

improper extraterritorial application of the relevant statutes.  Napout acknowledges that the

Court rejected the defendants' pre-trial motion to dismiss the indictment based on the same

argument, holding that the government had properly alleged domestic violations of the wire

fraud statute and a racketeering conspiracy based on domestic or properly extraterritorial

racketeering activity.  See Mem. & Order, dated Feb. 7, 2017 (ECF Dkt. No 542).  Napout

argues here that the government's proof at trial failed to establish the alleged ties to the United

States relied upon by the Court in its pre-trial ruling.  This argument ignores the scope of the

government's trial proof and misapplies the relevant legal standard.[7]

Napout's extraterritoriality argument rests on two claims.  First, he argues that his

acquittal on Counts Three and Seven, charging money laundering conspiracies in connection

with the Copa Libertadores and Copa América tournaments, respectively, necessarily means that

wire fraud was the only type of racketeering activity found by the jury in connection with its

guilty verdict on the RICO conspiracy charge.  See JAN 29 Br. at 15.  Second, he argues that the

wire fraud conspiracy counts of conviction, as well as predicate racketeering activity involving

---

[7] The government incorporates by reference its recitation of the relevant legal authorities
and their application to the allegations in this case as set forth in its motion in opposition to the
defendants' motion to dismiss the indictment.  See Gov.'s Mem. in Opp'n to Def. Mot., dated
Dec. 21, 2016 (ECF Dkt. No. 516) at 26-48.

11

wire fraud, improperly rely on extraterritorial application of the wire fraud statute.  See id.[8]

Napout is wrong on both points.

Whatever the jury's reason for declining to convict Napout on the money

laundering conspiracy counts, money laundering and money laundering conspiracy remain viable

as predicate racketeering activity in support of Napout's conviction for RICO conspiracy.  That

is, the acquittals on Counts Three and Seven did not preclude the jury from finding that the

racketeering acts Napout and his co-defendants agreed would be committed by at least one

conspirator (which need not be Napout) included money laundering and/or money laundering

conspiracy offenses.  As the Supreme Court held in Salinas v. United States, 522 U.S. 65 (1997),

a racketeering conspiracy is not a conspiracy to commit the alleged predicate acts, but rather a

conspiracy to participate in the affairs of an enterprise through a pattern of racketeering activity –

and thus to agree to further the overall objective of the enterprise and its conspiratorial members.

Therefore, "a conspirator charged with racketeering conspiracy need not commit or even agree to

commit the predicate acts that are elements of a substantive count to be found guilty of the

racketeering conspiracy, for 'it suffices that he adopt[ed] the goal of furthering or facilitating the

criminal endeavor.'"  United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) (quoting

Salinas, 522 U.S. at 65).  This is so because "there is no rule requiring the government to prove

that a [RICO] conspirator knew of all criminal acts by insiders in furtherance of the conspiracy.

_____

[8]  This argument, like Napout's argument regarding a purported requirement to prove
financial harm to the victim of honest services wire fraud, is contradicted by Napout's concession
that the government established "a long-running RICO conspiracy in international soccer."  See
JAN Br. at 2.  Napout cannot plausibly argue that the charged RICO conspiracy was improperly
extraterritorial as to him alone.

No theory requires co-conspirators to have such knowledge.  To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy." United States v. Zichettello, 208 F.3d 72, 100 (2d Cir. 2000).

Here, under the applicable legal standards, the jury may properly have found evidence insufficient to convict Napout of participating in the charged money laundering conspiracies but sufficient to support money laundering and money laundering conspiracy as types of racketeering activity to be carried out by at least one of Napout's co-conspirators in connection with the charged racketeering conspiracy that the jury found he joined.  As but one example, the jury could have found that Napout agreed that other conspirators would commit money laundering and money laundering conspiracy relating to the Copa Libertadores and the Copa América (which would qualify as racketeering activity under Count One) but that he did not personally participate in those money laundering schemes (which would require that he be acquitted of Counts Five and Seven).  The jury also could have found that Napout committed (or agreed that a conspirator would commit) money laundering or money laundering conspiracy in connection with his receipt of bribes relating to World Cup qualifying matches hosted by the Paraguayan soccer federation, which were alleged as part of the racketeering conspiracy but not as stand-alone counts.  In any event, Napout's acquittal on two particular money laundering conspiracies does not mean that the court's extraterritoriality analysis for Count One is confined to acts of wire fraud.[9]

_____

[9] Marin's arguments that insufficiency as to the wire fraud and money laundering conspiracies of which he was convicted would necessarily require a finding of insufficiency as to the RICO conspiracy charge is similarly misplaced under the standard articulated in Salinas.  See JMM Br. at 10.  In any event, as discussed herein, all of the counts of conviction were supported by overwhelming evidence.  In addition, although there is no inconsistency in the verdict here,

13

Napout's argument concerning the wire fraud offenses is similarly unavailing.  In rejecting the defendants' pre-trial motion to dismiss the indictment, the Court held that in determining whether the wire fraud statute is being applied domestically or extraterritorially, it "must conduct a more holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of the U.S. wires."  Mem. & Order, dated Feb. 17, 2017 (ECF Dkt. No 542) at 10.  The Court went on to hold that the indictment "more than adequately" alleged Napout's involvement in a conspiracy to commit domestic violations of the wire fraud statute and listed a series of allegations tying the charged offenses to the United States.  Id. at 11.  Those allegations were proved at trial, along with numerous additional ties to the United States.

For example, the proof at trial established that the defendants and their co-conspirators variously:

· met in the United States to further the charged schemes (see, e.g., Tr. at 531 (May 2014 announcement of the Copa América Centenario tournament); Tr. at 2836-37, GX-1709 (testimony of J. Hawilla regarding recorded conversation with Marin at Copa América Centenario announcement about various bribe payments));

· maintained bank accounts in the United States, which were used to pay and receive bribes in connection with the Copa Libertadores and Copa América tournaments, among other events (see e.g., Tr. at 1411-1420 (testimony of J. L. Chiriboga that he received $2.8 million from Full Play on behalf of his father at bank accounts located in the United States); GX-511 (bank records for Firelli International Limited, controlled by Marin, at Morgan Stanley in New York); GX-518 (Cross Trading at Bank of America in Miami); GX-521 (Flemick SA, controlled by Luis Bedoya, at Bank Hapoalim in Miami); GX-524 (Traffic Sports International at Delta Bank in Miami); GX-534 (Grupo Esquivel, controlled by Rafael Esquivel, at Bank of America in Miami); GX-536 (Somerton Ltd., controlled by José Margulies, at JP Morgan Chase in New York); GX-537 (Valente Corp., controlled by José Margulies, at JP

---

the government notes that "inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty."  United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994).

Morgan Chase in New York); GX-551 (Somerton at Bank of Boston in New York); GX-553 (Lisburn Strategies, controlled by Sergio Jadue, at UBS in Miami); GX-556 (Luis Chiriboga at Citibank in New York); GX-557 (Valente at Bank of Boston); GX-561-62 (Benz Holdings and Manolis Ltd., controlled by Rafael Esquivel, at UBS in Miami); GX-405 (email attaching payments relating to Copa do Brasil scheme, including $450,000 wire transfer from Traffic Sports International at Delta Bank in Miami to Klefer at Banco Itau in New York));

· maintained bank accounts in the United States, which were used to make contract payments in connection with the charged schemes (see, e.g., GX-524 (bank records for Traffic Sports International at Delta Bank in Miami); GX-532 (Traffic Sports USA at Citibank in Miami); GX-533 (Yorkfields at Bank Hapoalim in Miami); GX-535 (Cross Trading at Lehman Brothers in New York); GX-554 (T&T Sports Marketing at Interaudi Bank in Miami));

· maintained bank accounts outside the United States, which were used to send and/or receive payments through the United States in connection with the charged schemes (see, e.g., GX-501 (Bayan S.A. at Bank Hapoalim in Switzerland), GX-502-03 (Cross Trading at Bank Hapoalim in Switzerland); GX-504 (Arco Business and Development at Bank Julius Baer in Switzerland); GX-505 (FPT Sports at Bank Julius Baer in Switzerland); GX-512-13 (Expertise Travel and Support Travel at Andorra Banc Agricol Reig in Andorra); GX-514 (T&T Sports Marketing at Credit Suisse in Switzerland); GX-515 (T&T Sports Marketing at ING Bank in the Netherlands); GX-517 (Datisa at Bank Hapoalim in Switzerland); GX-519 (FPT Sports at Credit Suisse in Switzerland); GX-520 (Arco Business and Development at Credit Suisse in Switzerland); GX-522 (Flemick SA at Bank Hapoalim in Switzerland); GX-538 (Full Play Group at Credit Suisse in Switzerland); see also Tr. at 1514-16 (testimony of expert Sean O'Malley, explaining GX-1605, which demonstrates how wire transfers from overseas originator to overseas beneficiary may still be routed through the United States));

· as to defendant Napout specifically, used an email account hosted in the state of Washington in furtherance of the schemes (see, e.g., emails marked between GX-800-975, including GX-944, in which Napout emailed to his wife pictures of apartment rented by Jinkises as a bribe); Tr. at 2428-30, 2510-11 (testimony of Hotmail custodian C. Kalaveshi explaining that the janb107@hotmail.com email account was stored on a server in Washington));

· maintained businesses in the United States that were used to further the charged schemes (see, e.g., Tr. at 239 (testimony of A. Burzaco relating to Fox Sports in the United States); Tr. at 2701 (testimony of J. Hawilla relating to Traffic Sports USA in Miami; see also Tr. at 2969, 3017 (testimony of F. Tordin relating to Traffic Sports USA and Media World in Miami));

15

· generated profits from the schemes through the sale of broadcasting and other commercial rights in the United States (see, e.g., Tr. at 373-74 (testimony of A. Burzaco explaining the importance of the U.S. market to the increase in rights for the Copa Libertadores); Tr. at 481-83 (explaining that the "idea of a centennial [Copa América] tournament to be played in the U.S. [was a] very appealing prospect for DATISA"); see also Tr. at 180-83 (testimony of S. Szymanski explaining the importance of the U.S. market to the sale of commercial rights to soccer events));

· corrupted a tournament in which the United States national team played and, in the case of the Copa América Centenario, was to be played all across the United States (see, e.g., Tr. at 2522-25, 2539-40 (testimony of U.S. Soccer Federation witness J. Berhalter));

· defrauded, among other entities, FIFA, which included the U.S. Soccer Federation as a member (see Tr. at 108 (testimony of FIFA witness S. Maennl)), and CONCACAF, which was headquartered in the United States (see Tr. at 2515-16 (testimony of J. Berhalter));

· relied on the financial system of the United States to clear U.S. dollar transactions related to the schemes (see, e.g., GX-507, GX-525 (records from Clearinghouse Interbank Payment System ("CHIPS") and Federal Reserve Bank of New York-Fedwire, respectively, relating to over 2,500 wire transfers involving Arco Business and Development, Bayan Group, Cross Trading, Datisa, Expertise Travel, FPT Sports, Full Play Group, Support Travel, T&T Sports Marketing, and Torneos Traffic Sports Marketing); Tr. at 1041-44, 1520 (testimony of R. Pepitone and S. O'Malley, explaining that all CHIPS and Fedwire transactions were cleared through the United States)); and

· flew into and out of the United States in furtherance of the schemes (see, e.g., GX-702A-702Q, GX-703 (border crossing records of the defendants and certain co-conspirators)).

Although not necessary to establish domestic violations of the charged statutes, the government's proof at trial also established that Napout himself attended meetings in furtherance of the schemes in the United States and received bribe payments from U.S. bank accounts. See Tr. at 562-66 (testimony of A. Burzaco concerning a September 2014 meeting with Napout, L. Bedoya, A. Burzaco, and others in Miami relating to the Copa Libertadores); GX-701C (records from Swiss Airlines showing that Napout traveled on September 14, 2014 from Newark to Miami); GX-700B (records from American Airlines showing that Burzaco

16

traveled on September 14, 2014 from Las Vegas to Miami); GX-702B (border crossing records

showing that Bedoya traveled on September 15, 2014 from Colombia to Miami); see also Tr. at

2532-34 (testimony of J. Berhalter concerning meeting of the Copa América Centenario

Executive Committee in Miami, which Napout attended).  It also revealed that bribe payments

made for Napout's benefit were sent from, among other places, Cross Trading's account at Bank

of America in Miami.  See, e.g., Tr. at 3558-66 (testimony of S. Berryman tracing bribe

payments for Napout relating to rental of an apartment in Uruguay).  This to say nothing of the

wire activity in furtherance of the contracts procured through bribery, see, e.g., GX-1007 (letter

signed by Napout requesting that $1,000,000 contract payment relating to the 2015 Copa

América be wired through the United States), which also constituted wire fraud.  See, e.g.,

Schmuck v. United States, 489 U.S. 705, 712 (1989) (holding that mailings in mail fraud

prosecution need not contain fraudulent representations so long as they are "incident to an

essential part of the scheme" (internal quotation marks omitted)); accord United States v. Bahel,

662 F.3d 610, 641-42 (2d Cir. 2011) (applying Schmuck to wire fraud statute).[10]

      Napout urges the Court to apply a test for extraterritoriality articulated by Judge

Garaufis in United States v. Gasperini, No. 16-CR-441, 2017 WL 2399693 (E.D.N.Y. June 1,

2017), apparently derived from district court cases in the District of Columbia and the Southern

---

[10]   In it pre-trial ruling, the Court relied in part on Petroleos Mexicanos v. SK Eng'g &
Constr. Co., 572 F. App'x 60, 61 (2014) (summary order), in concluding that a court must
conduct a holistic test to assess a claim of improper extraterritorial application of a statute and
observed that in Petroleos, the Second Circuit held that "three minimal contacts with the United
States" alleged as part of the wire fraud scheme were insufficient due to the absence of "any
allegations that the scheme was directed from (or to) the United States."  Here, as detailed above,
there were numerous allegations proved at trial that the charged conspiracies had more than
minimal contact with the United States and were directed from and to the United States.

District of New York.  See United States v. All Assets Held at Bank Julius, 251 F. Supp. 3d 82, 103-04 (D.D.C. 2017) (citing test set forth in Elsevier, Inc. v. Grossman, 199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016)).  Under the test set forth in the Gasperini jury instructions, the government would be required to prove that "(1) a defendant or coconspirator commits a substantial amount of conduct in the United States, (2) the conduct is integral to the commission of the scheme to defraud, and (3) at least some of the conduct involves the use of U.S. wires in furtherance of the scheme to defraud."  2017 WL 2399693, at *8 (internal quotation marks omitted); see 16-CR-441 (NGG) (ECF Dkt. No. 150) at 40-41.

        The government notes that Napout did not propose this instruction in his request to charge or during the charge conference.  Cf. Court's Draft Jury Instructions, dated Dec. 10, 2017 (ECF Dkt. No. 847) at 45 (proposing for the first time that the jury must find that "the scheme to defraud must make substantial use" of the U.S. wires); see also Tr. at 4177 (statement of the Court that it changed the instruction from "substantial" use to "more than minimal" use of the U.S. wires, adding, "I have to note that the defense didn't propose this in the beginning").  The government respectfully submits that, for the reasons set forth in its opposition to the defendants' motion to dismiss the indictment, the standard set forth in Gasperini is overly restrictive.  However, the Court need not reach the question because the government's proof at trial easily satisfied the heightened requirements articulated in Gasperini.  As described above, the defendants and their co-conspirators participated in bribery schemes that involved, among other ties to the United States: (1) the sale of U.S. broadcasting rights; (2) reliance on the U.S. market for soccer events; (3) a tournament to be played in the United States; (4) matches played by the U.S. national team; (5) meetings in the United States; and (6) a sustained reliance on the U.S. financial system.

In sum, even under the standard urged by Napout, the government alleged and proved domestic wire fraud violations in proving the charged wire fraud conspiracies and predicate wire fraud conduct.  It also properly alleged and proved violations of the applicable money laundering statutes and predicate money laundering conduct.[11]

D.     The Evidence Was Sufficient to Establish That Marin Received Bribes In
Exchange for Official Action

Marin argues that the Court must enter a judgment of acquittal as to all counts of conviction because "[c]onspicuously absent from the government's case was evidence of the existence of a quid pro quo agreement between Mr. Marin and the various sports marketing companies."  JMM Br. at 2.  Recognizing that the jury was properly instructed about the quid pro quo requirement and the definition of an "official act," Marin nevertheless asserts that the evidence was insufficient to establish this element because the proof at trial only revealed Marin's "mere expression of support" for the sports marketing companies.  Id. at 7.[12]  The argument is meritless.

---

[11] In its pre-trial ruling on the defendants' motions to dismiss the indictment, the Court held that the government had properly alleged extraterritorial violations of the money laundering statute.  Mem. & Order, dated Feb. 7, 2017 (ECF Dkt. No. 52) at 16-18.  The government respectfully maintains that it alleged and proved domestic violations of the money laundering statute, but whether interpreted as domestic or extraterritorial applications of the statute, the money laundering allegations constitute valid predicate racketeering activity.  See RJR Nabisco, Inc. v. European Comm., 136 S. Ct. 2090, 2105-06 (2016) (RICO charge alleging pattern of activity consisting of "predicate offenses that were either committed in the United States or committed in a foreign country in violation of a predicate statute that applies extraterritorially" does not involve an impermissibly extraterritorial application of RICO); 18 U.S.C. § 1956(f) (money laundering statute reaches conduct involving non-U.S. citizens in which, among other things, "the conduct occurs in part in the United States").

[12] The government requested that the jury be instructed that bribes and kickbacks involve the exchange of money or other thing of value for "official action" consistent with the Supreme Court's McDonnell decision.  The government did so in an abundance of caution and in light of

19

1.      Legal Standard

To establish honest services wire fraud, the government is required to prove that the official received "a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority," in other words a quid pro quo.  United States v. Skelos, 707 Fed. App'x 733, 738 (2d Cir. 2017) (summary order) (internal quotations and citations omitted).  The term "official act" includes a decision or action on a matter involving the formal exercise of the organization's power.  United States v. Silver, 864 F.3d 102, 117-18 (2d Cir. 2017); see also McDonnell v. United States, 136 S. Ct. 2355, 2374-75 (2016).  Granting a contract is "indisputably" an "official act."  Skelos, 707 Fed. App'x at 739.  And the quid pro quo element may be established even if the "resulting actions are otherwise 'routine' – such as voting in a certain manner or supporting grants to certain businesses."  Id. (quoting United States v. Rosen, 716 F.3d 691, 701-02 (2d Cir. 2013), abrogated on other grounds by McDonnell) (citing United States v. Alfisi, 308 F.3d 144, 151 (2d Cir. 2002) ("[T]here is no lack of sound legislative purpose in defining bribery to include payments in exchange for an act to which the payor is legally entitled.")).

The government is not required to prove an explicit promise at the time of payment to perform certain acts.  Rosen, 716 F.3d at 701.  Rather, the requisite quid quo pro may

_____

the overwhelming evidence of the defendants' agreement to receive bribes in exchange for what would clearly be "official" acts if they were performed by government officials.  See Gov't Request to Charge, ECF Dkt. No 784.  However, the law is not settled as to whether McDonnell's "official act" analysis applies in the context of commercial bribery.  See United States v. Lusk, 2017 WL 508589, at *11 n.5 (S.D. W. Va. Feb. 7, 2017) (observing that "honest-services theories in the public-sector context . . . has its own and separate requirements") (emphasis omitted) (citing McDonnell's "'official act' requirement of a public-sector honest services offense").

be satisfied upon a showing that an official received a benefit in exchange for his promise to perform official acts as specific opportunities arise, in other words, through a stream of benefits. Id.; see Skelos, Fed. App'x at 738 ("A promise to perform such acts as the opportunities arise is sufficient.") (quoting United States v. Bruno, 661 F.3d 733, 744 (2d Cir. 2011)).  Thus, the honest services fraud statute criminalizes schemes involving payments at intervals in exchange for specific official acts as the opportunities to commit those acts arise, even if the opportunity to undertake the requested act has not arisen, and even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise particular kinds of influence.  Rosen, 716 F.3d at 700.  A scheme to defraud a victim of honest services need not be shown by direct evidence, but rather can be established "from evidence of benefits received and subsequent favorable treatment."  Skelos, 707 Fed. App'x at 738 (quoting Bruno, 661 F.3d at 744).

      2.   Discussion

      Here, the evidence was more than sufficient for a rational jury to find beyond a reasonable doubt that the government established a quid pro quo involving official action.  Over the course of the trial, the government presented overwhelming evidence of the corruption of the soccer industry through the payment of bribes to soccer officials in exchange for media rights held by the organizations to which the officials owed a fiduciary duty.  Citing just a few examples of testimony about express conversations about bribe payments, Marin ignores the detailed testimony from numerous witnesses about the purpose of these bribe payments.  See JMM Br. at 5-9.  Viewed as a whole (and in the light most favorable to the government, as it must be), the evidence clearly established that, as Marin and his co-conspirator soccer officials

21

understood, the purpose of the bribe payments they received was to secure "official acts" in the form of official support for contracts awarding valuable media rights.

For example, Alejandro Burzaco, the former CEO of Torneos, testified that he "bribed" defendant Marin and others, and explained that by using the word "bribe," he meant "paying money, in this case soccer officers, in exchange for them signing contracts, new contracts, renewing them, extending them, sometimes not breaking them, avoiding competitors." Tr. at 232.  More specifically, he testified that he paid bribes to Marin from 2012 to 2015, when he was president of the Brazilian soccer federation ("CBF").  Tr. 234.  Burzaco went on to testify in detail about the specific contracts at issue on specific dates and the amount of bribe money given to Marin and his co-conspirators in exchange for their support of Burzaco's company, Torneos, in seeking and maintaining the contracts with CONMEBOL.  See, e.g., Tr. at 290, 354-60, 419-20, 461, 494, 500.

Luis Bedoya, former president of the Colombian federation, also testified that bribes were paid to soccer officials "for the approval of contracts for the TV rights for [CONMEBOL]."  Tr. at 1562-63.  Specifically, he detailed how CONMEBOL officials received bribes in exchange for the signing of the Copa América contracts, first with Full Play, and later with Datisa (which consisted of Full Play, Torneos, and Traffic).  See, e.g., Tr. at 1582 (regarding the 2010 Copa América contract: "Q. What was your understanding of why you were being offered a million dollars?  A.  It was a way of ensuring that the contract would become formal and that it would move forward."); Tr. at 1927 (indicating that if a majority of the presidents did not agree to accept bribes the contract for 2010 Copa América "would hardly go forward"); see also, e.g., Tr. at 2068-69 (testimony of E. Rodriguez that the purpose of the payments to the soccer officials, including specifically to Marin, "was to maintain a fluid

22

relationship with CONMEBOL and to get their approval to sign the contracts."); Tr. at 1063-64 (testimony of S. Peña that he understood payments to soccer officials were made to gain influence "in connection with the purchase of broadcasting rights or sponsorship rights of [soccer] events"); Tr. at 1409-10 (testimony of J.L. Chiriboga, the son of the former president of the Ecuadoran federation, that in receiving money for his father he "was part of a system" and that "these other countries were part of a system as well" to receive bribes in exchange for tournament rights); Tr. at 2822 (testimony of J. Hawilla, the founder of Traffic, that he agreed to join Brazilian sports marketing executive Kleber Leite in making annual bribe payments to Marin and his fellow Brazilian soccer official Marco Polo Del Nero, along with former CBF president Ricardo Teixeira, in connection with contracts for the Copa do Brasil); GX-1705-T at 5 (statement by Traffic finance director Flavio Grecco indicating that bribe payment for Copa do Brasil was recorded internally as "a partial cost for the purchase of rights").

This testimony and other evidence presented by the government throughout the trial clearly established that bribes were paid and received in exchange for the soccer officials' support in awarding and maintaining contract rights, and that Marin and other soccer officials understood the purpose of the payments they received and were promised. Although none of the co-conspirators had the ability to award the rights unilaterally, they banded together, each to get his share of the bribes in exchange for supporting the contracts at issue. In sum, the evidence was more than sufficient to support the jury's finding of quid pro quo agreements.

II. The Defendants' Motions for a New Trial Under Rule 33 Should Be Denied

A. Legal Standard

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Second Circuit has

held that "[g]enerally, a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir. 2003) (quoting Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998)). Though the Court is entitled to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses," United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992) (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)), the Court "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury," United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001).

A trial court's discretion to grant a new trial under Rule 33 must be "exercised sparingly," and "only with great caution and in the most extraordinary circumstances." Sanchez, 969 F.2d at 1414. "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33," United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009), and the crucial question for the court is whether "it would be a manifest injustice to let the guilty verdict stand." Sanchez, 969 F.2d at 1414. A "manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a "real concern" exists "that an innocent person may have been convicted." Id.

B.       The Court Properly Limited Introduction of Foreign Law Evidence

Napout and Marin both seek a new trial on the ground that the Court erred in its rulings before and during trial precluding certain evidence as to whether specified foreign jurisdictions criminalize commercial bribery. Napout argues that the Court erred in declining to make a judicial determination, and instruct the jury accordingly, as to whether commercial

24

bribery is illegal in Paraguay and Argentina.  JAN 33 Br. at 4.  Marin argues that the Court erred

in preventing him from cross-examining government witnesses concerning their understanding

of whether Brazil criminalizes commercial bribery.  JMM Br. at 11-16.  Both defendants refer

the Court to their previous filings and the Court's rulings on the foreign law issues raised before

and during trial.  The government does the same and hereby incorporates its previous arguments

by reference.  See ECF Dkt. Nos. 718 (government motion in limine), 837 (supplemental letter

brief), 843 (responsive letter brief); Tr. at 3461-79 (oral argument on Dec. 8, 2017).  The Court

did not err in its rulings, much less commit the sort of error that warrants a new trial under Rule

33.

    1.  The Challenged Rulings

    On November 8, 2017, the Court granted the government's motion in limine to

preclude the defendants from introducing evidence of foreign law, ruling orally from the bench

that the relevance of such evidence, if any, would be substantially outweighed by the risk of

confusing the jury and of inviting jury nullification.  See Nov. 8, 2017 Tr. at 90:21-91:16

(holding that probative value of such evidence "has too much baggage that comes with it that is

too dangerous" and thus "I ultimately think the prejudice is too great, I think the probative value

is too little"); Fed. R. Evid. 403.  On December 1, 2017, the Court revisited the question sua

sponte, requested briefing from the parties, and, after oral argument, issued an amended order.

The Court largely confirmed and restated its previous ruling but left open the possibility that the

defendants could put on evidence, including through their own testimony, regarding their own

understanding of the relevant foreign law, on the ground that direct evidence of that

understanding by the defendants had some marginal relevance in support of an argument that a

defendant was unaware of the fiduciary duties imposed on him by the codes of ethics

implemented by FIFA, CONMEBOL, and the federations.  See Mem. & Order, dated Dec. 12, 2017 (ECF Dkt. No. 853) at 23 (positing that "to the extent a Defendant in fact based his understanding of the relevant codes of conduct on his understanding of the laws of his home country (or any other country), that understanding is arguably relevant under" Rule 401).

The Court did not, as the defendants now claim, limit the defendants to providing such evidence through their own testimony or not at all.  Rather, the Court made clear during oral argument (and in its later written ruling) that the defendants simply had not proffered any other admissible evidence on this subject that would survive a Rule 403 balancing test, stating, "[T]his is not a hard and fast rule either, you could have other evidence that I think might be more compelling but I haven't heard any . . . . I'm making a finding that what you're proffering will not be enough. . . . That is highly prejudicial and the probative value is almost non-existen[t] based on what I've heard so far."  Tr. at 3601-03; see also id. at 3616-18; see also Mem. & Order, dated Dec. 12, 2017, at 25 ("Accordingly, . . . the Court assigns extremely low probative value to the proffered evidence.  On the other side of the Rule 403 balance, there is a compelling reason to preclude defense counsel from eliciting evidence or arguing about foreign law.").[13]

2.    The Court's Ruling Was Correct

Napout presses here the same argument he advanced during trial: that the Court erred in declining to make a judicial determination as to whether commercial bribery is unlawful

---

[13] To make its Rule 403 determination, the Court invited the defendants to proffer what evidence (whether through cross-examination of government witnesses or during any defense case) it sought to offer.  During trial, the defendants only proffered testimony of Santiago Peña and José Hawilla about their own understanding of whether commercial bribery is illegal in their respective home countries (and proof of the foreign law itself) and have not offered any new evidence they were precluded from introducing.

in Paraguay and instruct the jury accordingly.  He offers nothing new in support of his argument and does not meaningfully engage with the Court's analysis under Rule 403, which was entirely correct.

First, as to relevance, Napout fails to explain how a bare statement of Paraguayan law with respect to commercial bribery, without more, has more than passing relevance to his own understanding or belief about the law.  In addition, a defendant's knowledge of local law is marginally relevant, if at all, to his state of mind as to FIFA and CONMEBOL's codes of ethics. See Mem. & Order, dated Dec. 12, 2017, at 22 n.9 ("[T]he existence of foreign law and other witnesses' knowledge of that foreign law—especially where that law is not necessarily the law of Defendant's country—[is] of virtually no relevance, since the only potential relevance of foreign law is how that knowledge of foreign law influenced a Defendant's belief about the fiduciary duties owed to a relevant soccer organization.").  And, as held by the Court, whatever marginal relevance existed was substantially outweighed by the "genuine risk of jury nullification" and "juror confusion."  Id. at 25.

Napout also continues his misplaced reliance on United States v. Shultz, 333 F.3d 393 (2d Cir. 2003), yet again failing to comprehend the critical difference between that case and this one.  Napout 33 Br. at 6.  In Schultz, the government was required to prove (1) that the relevant antiquities were "stolen" within the meaning of the National Stolen Property Act, which required the Court to hold a hearing pursuant to Fed. R. Crim. P. 26.1 to determine whether the property at issue was owned by the Egyptian government; and (2) that the defendant knew the antiquities were "stolen."  See 333 F.3d at 414-15.

Here, neither the state of foreign law nor the defendants' knowledge of that law was an element of the charged offenses.  Rather, the government was required to prove only the

27

defendants' knowledge and understanding of their fiduciary duties, as defined by the relevant FIFA and CONMEBOL statutes and Codes of Ethics.  Thus, while in <u>Shultz</u> a witness's knowledge of foreign law was arguably relevant to the defendant's knowledge of that law – <u>i.e.</u>, to knowledge that was an element of the charged offense – here, even if a witness's knowledge of foreign law were suggestive of the defendant's knowledge of foreign law, that knowledge is still a leap removed from the knowledge at issue – <u>i.e.</u>, knowledge of the applicable statutes and codes of ethics.  Accordingly, as the Court held, other witnesses' belief about foreign law is of "virtually no relevance," Mem. & Order, dated Dec. 12, 2017, at 20 n.9, and in no way would sanction a finding under Rule 26.1 as to the actual state of any foreign jurisdiction's law.[14]

Marin argues that he should have been permitted to elicit some unspecified evidence, during either the government's case-in-chief or a defense case, about other witnesses' beliefs about the legality of commercial bribery under Argentinian and Brazilian criminal law, respectively.  <u>See</u> Marin Br. at 13-16.  His idea, it seems, is that if a witness such as José Hawilla thought his conduct was lawful under Brazilian law, Marin likely shared the same belief, and if Marin thought his conduct was lawful under Brazilian law, he may not have read or understood the FIFA code of ethics.

_____

[14] As the Court initially stated in precluding evidence of foreign law, Napout failed to comply with the notice requirement of Fed. R. Crim. Proc. 26.1, which requires "reasonable written notice."  <u>See</u> Tr. at 3611 ("Procedurally I think the defendants are way out of line. . . . . [T]he notion that somehow you complied with your discovery obligations under Rule 26 by now in response to the government . . . really flies in the face of what Rule 26 is about.").  But the Court ultimately stated that the "Rule 26 procedural problem was surmountable," <u>id.</u> at 3614, and denied the motion for a Rule 26.1 hearing on the merits.  Accordingly, whether Marin's stated intention to introduce proof of his <u>belief</u> of foreign law (rather than the law itself) required notice under Rule 26.1, <u>see</u> JMM Br. at 12 n.6, is beside the point.

The argument is entirely unpersuasive. As acknowledged by Marin's counsel and established at trial, Marin was a lawyer, a successful politician, a businessman, and, during the period relevant to the charges against him, president of the CBF. To the extent Marin's background suggests that he would have understood the laws of his home country, it similarly suggests that he would have understood the statutes and rules of FIFA and CBF, an organization he served as president, thereby diluting the relevance of his understanding of local law as an indicator of his intent or state of mind with respect to his duties as a soccer official. In any event, the risk of juror confusion and unfair prejudice in the form of an invitation to nullification clearly and significantly outweighed any probative value of the proffered evidence, particularly in light of the dueling testimony likely to have been presented as to how commercial bribery is treated in various foreign jurisdictions.[15] The Court nevertheless agreed, over the government's objection, to allow evidence of Marin's understanding of Brazilian law through his testimony or other direct evidence that required less speculation than that required to tie others' belief to Marin's. Marin, however, proffered no evidence that came close to satisfying the requirements of Rule 403. This determination was not erroneous and in no event constitutes a "manifest injustice" requiring a new trial.

---

[15] Notably, a Paraguayan court has approved the extradition of Nicolás Leoz to the United States to face essentially the same RICO, wire fraud, and money laundering charges for which Napout was tried, recognizing that although Paraguay's "regulatory framework does not regulate private bribe [sic] as a punishable act per se," Article 192 of the Paraguayan Criminal Code prohibits an analogous crime, which is punishable by five years' imprisonment. See Napout Ltr. dated Dec. 5, 2017, Ex. E (ECF Dkt. No. 836-5) at 34 (describing Article 192 of the Paraguayan Criminal Code as criminalizing "a property damage" by someone who "has undertaken the obligation to protect a property interest [of a] third party" based on a "law, an administrative resolution, or contract").

29

C.     The Court Properly Admitted Napout's WhatsApp Messages

Napout argues that the Court improperly admitted into evidence a set of

WhatsApp communications between Napout and Burzaco that Napout argues were protected by

the work product doctrine.  Napout raised the same argument on the eve of trial, prompting

briefing, a hearing, a ruling by the Court that the document at issue, marked Government Exhibit

976 ("GX-976"), was not privileged, a motion for reconsideration, and an oral ruling affirming

the original order.  See, e.g., ECF Dkt. Nos. 786 (Napout Letter); 794 (Gov't Letter); 796

(Court's Mem. & Order (sealed)); 797 (Mot. for Reconsideration); Tr. at 15:3-9 (denying motion

to reconsider).  In his post-trial brief, Napout refers the Court to his previous arguments on the

subject without offering any additional support for his position.  See JAN 33 Br. at 7.  The

government similarly incorporates by reference its pre-trial arguments in opposition to Napout's

motion to bar introduction of GX-976.  The Court should reject the defendant's argument again,

and for the same reasons.  Put simply, Napout has failed to advance a remotely plausible

argument that GX-976 constitutes privileged work product.

It is settled law that the work-product protection "generally applies only to

materials prepared by an attorney or his or her agent," and not to the underlying facts or

materials themselves.  See United States v. Bergstein, 2017 WL 4535944, at *2 (S.D.N.Y. Oct.

10, 2017).  A document does not gain work product status merely because it was compiled for or

sent to an attorney.  See In re Grand Jury Subpoenas Dated Mar. 19 & Aug. 2, 2002, 318 F.3d

379, 384-85 (2d Cir. 2003).  "[T]he principle underlying the work product doctrine – sheltering

the mental processes of an attorney as reflected in documents prepared for litigation – is not

generally promoted by shielding from discovery materials in an attorney's possession that were

prepared neither by the attorney nor his agents."  Id. at 384; see also id. at 385 (noting that the

30

limited "selection and compilation" exception is applied only narrowly, such as "where a request is made for documents already in the possession of the requesting party, with the precise goal of learning what the opposing attorney's thinking or strategy may be").

Here, the document marked GX-976 was not sent to Napout's attorneys, does not include any reference to, let alone statements of, Napout's attorneys, and reveals nothing about the thought processes of Napout's attorneys.  Other than the date and subject header, GX-976 consists entirely of communications between Napout and Burzaco dating to June and July 2014, long before the government's investigation became public and, so far as the government knows, long before Napout retained counsel in connection with this case.  In sum, both the law and the facts support the Court's ruling that Napout failed to demonstrate a "real, rather than speculative, concern that counsel's thought processes in relation to pending or anticipated litigation" were or would be exposed through disclosure or use at trial of GX-976.  In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 183 (2d Cir. 2007) (internal quotation marks omitted).

> D.   The Court Properly Admitted Evidence of the Removal of Napout's Computer From His Office on the Day of His Arrest

Napout next argues that he was denied a fair trial by the government's introduction of evidence of "the removal of a CONMEBOL computer [from] Mr. Napout's office after his arrest."  JAN 33 Br. at 1.  In support of this argument, Napout claims only that "the government utterly failed to prove that which it proffered to the Court."  Id. at 8.  However, although Napout made clear after pretrial briefing that he reserved the right move at trial to strike evidence about the computer's removal if the probative value was substantially outweighed by the prejudicial effect, he did not make any such motion.  Even if he had, however, such a motion would have been properly denied under Federal Rules of Evidence 404(b) and 403.

31

1.      The Pretrial Briefing and the Court's Ruling

On September 22, 2017, the government moved in limine for, among other things,

admission of evidence of certain conduct by Napout as racketeering evidence and, in the

alternative, pursuant to Federal Rule of Evidence 404(b).  See ECF Dkt. No. 673.  In support of

the motion, the government proffered that "[w]itnesses are expected to testify about the removal

of electronic devices from Napout's CONMEBOL office, at Napout's direction, on the morning

of Napout's December 3, 2015 arrest in Zurich, Switzerland, and the subsequent recovery and

search of those devices by U.S. law enforcement."  Id. at 3.[16]  In his opposition brief of October

3, 2017, and at oral argument on October 10, 2017, Napout opposed the motion and argued that,

in order for the evidence to be admissible, the government must establish the specific intent

element of obstruction of justice under 18 U.S.C. § 1512 and "disprove" any statements by

Napout suggesting that his motive was to protect family photographs.  See ECF Dkt. No. 688 at

3; Oct. 10, 2017 Tr. at 34.  Napout further argued, among other things, that the Court could not

"definitively rule pretrial" and must allow Napout to object to the admission of the evidence at

trial.  ECF Dkt. No. 688 at 3; Oct. 10, 2017 Tr. at 18 (counsel for Napout indicating that he

wished to reserve the right to make objections at trial "with respect to the introduction of the

evidence relating to Mr. Napout's personal electronic devices").  In response, the Court

confirmed that there would be "no definitive ruling" on the admissibility of the evidence as to

---

[16] The government also noted that it intended to offer at trial racketeering evidence
obtained through the search of the computer removed from Napout's CONMEBOL office and
that, because the computer was not seized directly from Napout or his office, but rather was
recovered outside of Paraguay more than a year after his arrest, evidence of the removal of the
computer was part of the foundational evidence the government would need to present to
establish that the seized racketeering evidence was in Napout's possession prior to his arrest.  Id.
at 7 n.7.

Napout's computer, Oct. 10, 2017 Tr. at 19, and indicated that counsel "can and should" make any objections at trial, id. at 18.  Later during the hearing on the motion, the Court repeated to counsel for Napout: "You also have reserved the right to object, if you think that there's so little probative value to this evidence,  . . . then you will renew your argument, as I understand it, because you say that the evidence will be prejudicial then."  Id. at 35.

Thereafter, the Court granted the government's motion in part.  See ECF Dkt. No. 715.  In particular, the Court ruled that the admissibility of evidence of Napout's conduct "to prove the alleged RICO conspiracy generally is conditioned upon the government introducing evidence that at least one other person involved in the obstructive conduct, besides Napout, was a member of the charged conspiracy prior to the alleged obstruction."  Id. at 9 n.7.  It further ruled, however, that "evidence relating to alleged obstruction of justice by Napout is admissible to show his knowledge and intent under Rule 404(b)."  Id. at 11.  In reaching this decision, the Court found that, based on the government's proffer, the "removal of electronic devices" is "not any more 'sensational or disturbing' than the alleged bribery scheme with which Defendants are charged, which spanned decades, involving one the world's preeminent sports organizations, and resulted in vast amounts of money being paid as bribes and kickbacks."  Id. at 12 (referencing earlier quoted language from United States v. Lyle, 856 F.3d 191, 207 (2d Cir. 2017)).

2.    The Evidence at Trial

At trial, the government called witness Nelson Sanabria, who testified that, during Napout's CONMEBOL presidency, Mr. Sanabria was the more junior of Napout's two assistants.  Tr. at 3085.  Mr. Sanabria testified that, on May 27, 2015, he learned about the first indictment when "several people [] were arrested in Switzerland, members of the executive committee of CONMEBOL."  Id. at 3201.  After the first wave of arrests, additional attorneys

33

were hired at CONMEBOL, including Alfredo Montanaro, Cristobal Caceres, and Alvaro

Caceres.  Id. at 3104-05.  Mr. Sanabria was given a form to sign committing "not to destroy any

information or documentation."  Id. at 3105.  Napout signed the same form, and the copy bearing

Napout's signature was admitted into evidence as GX-1385.  Id. at 3105-06.  Among other

things, the form described the U.S. government's investigation and directed that the signers not

destroy any materials concerning certain people, including several indicted soccer officials and

sports marketing officials such as Rafael Esquivel, Eugenio Figueredo, Nicolas Leoz, José Maria

Marin, Hugo Jinkis, and Mariano Jinkis.  Id. at 3107-10.

       In the early morning of December 3, 2015, Mr. Sanabria learned that Napout had

been arrested in Zurich, Switzerland.  Id. at 3121-24.  A month or two earlier, Mr. Sanabria had

been instructed by Napout's senior assistant that "in case Mr. Napout was arrested, Mr. Cristobal

Caceres Frutos would go get the computer at the office" and that Mr. Sanabria was "to give him

access if that happened because Mr. Napout's offices were always locked."  Id. at 3122-23.  On

the morning of December 3, 2015, Mr. Sanabria received a call asking him to get to the office as

early as he could.  Id. at 3124.  Mr. Sanabria was uncertain whether the call was from Cristobal

Caceres or Alfredo Montanaro, who had a similar voice to that of Cristobal Caceres and was in

Zurich with Napout at the time.  Id. at 3200-01.  After Mr. Sanabria arrived at the office and was

joined by Cristobal and Alvaro Caceres, Mr. Sanabria unlocked the door to Napout's office.  Id.

at 3124-25.  Cristobal Caceres first asked if the computer on the table belonged to Napout and if

the hard drive could be removed.  Id. at 3126.  Mr. Sanabria confirmed that it was Napout's

computer but said that the hard drive could not be removed.  Id. at 3126.  After asking if there

were security cameras, to which Mr. Sanabria responded that there were, one of the Cacereses

took off his jacket, covered Napout's computer, and removed it from the office.  Id. at 3126-27.

On the way to the garage, Cristobal Caceres told Mr. Sanabria that Caceres "was proceeding that way" because he had "offered himself" to Napout "to do that." Id. at 3127. Cristobal Caceres told Mr. Sanabria that Napout had indicated that he was afraid "that the pictures might be leaked, the pictures of his family." Id.

In a photograph admitted as GX-1057, Mr. Sanabria identified Napout at his CONMEBOL desk with his work computer, a Sony Vaio "all-in-one," with a CONMEBOL circular logo on the back. Id. at 3090-92. Mr. Sanabria then viewed GX-350, a Sony Vaio computer with a circular mark on the back, which appeared to be where a sticker had been removed. Id. at 3095-96. Mr. Sanabria testified that GX-350 (the computer present in court) was "just like the computer that Mr. Napout used" and that the circular sticker shown in the photograph in GX-1057 "appears to have been removed from the computer, Exhibit 350." Id. at 3096-97.

After Napout's computer was removed from his office on the day of his arrest, a different computer was placed on Napout's desk. Id. at 3129. Approximately a month later, in January 2016, Paraguayan law enforcement executed a search at the CONMEBOL headquarters at the request of the U.S. government and seized the replacement computer. Id. at 3129-33. Mr. Sanabria did not tell law enforcement at that time that Napout's computer had been removed or that the seized computer was a replacement. Id. at 3133. Counsel for Napout did not object to the admission of any of the exhibits introduced during Mr. Sanabria's testimony.

The government then called F.B.I. Special Agent Noah Singer, who was stationed in Buenos Aires in 2017. Id. at 3205-06. Agent Singer testified that, on February 17, 2017, he was informed that a person who was "nervous about traveling in" would be flying into Buenos Aires to voluntarily turn over some digital devices. Id. at 3207. Agent Singer then met Cristobal

Caceres at the U.S. Embassy in Buenos Aires, and Caceres turned over the computer that had been removed from Napout's CONMEBOL office more than a year earlier. Id. at 3208. Agent Singer then identified GX-350 as the computer that had been turned over by Cristobal Caceres. Id. at 3210-12. The Court admitted GX-350 over Napout's objection. Id. at 3213.

The government also introduced material recovered from the computer, including photographs of Napout with his co-conspirators, such as Hugo and Mariano Jinkis and the others who had been listed on the preservation letter signed by Napout. See GX-1385, 1385-T (preservation letter); GX-1004-1117 (exhibits from the Sony Vaio); GX-1016 (photograph of Napout with Marin and Del Nero making a victory sign); GX-1028 (photograph of Napout with Figueredo); GX-1029 (photograph of Napout with Leoz); GX-1037 (photograph of Napout with Esquivel and Burga); GX-1069 (photograph of Napout with Mariano and Hugo Jinkis). The government also recovered from the computer photographs of the apartment in Punte del Este, Uruguay that Hugo Jinkis had rented for Napout and his family as a bribe payment, which was recorded in Santiago Peña's bribe ledger. See GX-1097-1102 (photographs of apartment); GX-601 (bribe ledger at "Honda" tab); Tr. at 1182-88 (testimony of S. Peña). Some of the transfers for these bribe payments – evidenced by the photographs on the computer removed from Napout's office – were made from Bank of America in the United States. See Tr. at 1370-79 (testimony of J. Haggerty); Tr. at 3562-66 (testimony of S. Berryman).

Napout then introduced numerous photographs of his family members and asked Mr. Sanabria to identify members of Napout's family, including his young granddaughter. See N-25 to N-76; N-80 to N-105; Tr. at 3178-81. At no point during the trial did Napout argue that the probative value of the evidence of the removal of his computer from his office on the day of his arrest was substantially outweighed by the prejudicial effect, or otherwise move to strike the

36

evidence, as the Court had expressly invited him to do.  See Oct. 10, 2017 Tr. at 35.  Instead, he

made the strategic decision to capitalize on the recovered photographs of his family by putting

before the jury more than 50 pictures of Napout with his friends and family, which portrayed

Napout in a sympathetic light and which he could not have introduced if he had moved to strike

the computer evidence.

3.   Closing Arguments and the Court's Limiting Instruction

Although the government respectfully disagreed with the Court's ruling that at

least two co-conspirators in the racketeering conspiracy must be involved in obstructive conduct

for it to be admissible as evidence of the racketeering conspiracy, see Tr. at 4117, 4129-30, the

government complied with the Court's ruling and did not argue at trial that the removal of

Napout's computer was evidence of the racketeering conspiracy generally or as evidence of a

predicate act of obstruction of justice.  Instead, the government limited its arguments to a

consciousness of guilt theory under Federal Rule of Evidence 404(b).  In particular, the

government briefly recounted Mr. Sanabria's testimony and showed some of the photographs

recovered from the computer.  See Tr. at 4278-79.  In its rebuttal summation, the government

showed GX-1050 and GX-1069, two of the recovered photographs showing Napout's very close

relationship with Hugo and Mariano Jinkis, and commented that removal of the computer

"reflects a consciousness of guilt, that is to say somebody who may want to argue I don't really

know the Jinkises, those are business people, why would I be getting – how would I get cash

from the Jinkises, these are not people I'm close to."  Tr at. 4531-32.  For his part, Napout

argued in summation that he wanted to make sure that pictures of his daughters in bikinis would

not surface in the press, but also argued that "[t]he person who removed the computer never told

Nelson [Sanabria] that he was following any instructions from Juan.  The bottom line is that the

37

computer was given to the government.  And there was zero evidence that it had been tampered

with.  Zero evidence."  Tr. at 4350-51.

In its Draft Jury Instructions distributed to the parties before the charge

conference, the Court included a proposed limiting instruction with regard to the evidence of the

removal of the computer.  See ECF Dkt. No. 847 at 11-12.  Napout objected to the inclusion of

the limiting instruction, but the Court denied the request to have the instruction removed.  See

Tr. 4123-24 ("we object to this instruction because as far as the evidence is concerned there is no

testimony before this jury that Mr. Napout even knew that the computer was being taken"); Tr.

4128 (Court: "I'm going to deny the request to remove this instruction. . . . [Counsel for Napout]:

Judge, may we preserve our objection to that without having to reiterate it before the jury goes

out?").  At no point during the trial did Napout move to strike the admitted evidence about the

removal of his computer from his office on the day of his arrest.

4.      Discussion

The Court's admission of evidence of the removal of Napout's computer from his

office on the day of his arrest was proper.  Given that Napout's post-trial brief does not make any

legal arguments or cite any authority, the government assumes that he is relying on the

arguments he made before trial.  See JAN 33 Br. at 8-9.  In particular, Napout appeared to argue

before trial that the evidence was inadmissible because he was not involved in removing the

computer, and if he was, the government must prove the specific intent element of the crime of

obstruction and "disprove" that Napout was trying to shield personal photographs.  See ECF Dkt.

No. 688 at 2-3; Oct. 10, 2017 Tr. at 34.  Neither argument has any merit.

First, Napout argued that "[o]ther-acts evidence 'is relevant only if the jury can

reasonably conclude that the act occurred and that the defendant was the actor.'"  ECF Dkt. No.

688 at 2 (quoting <u>Huddleston v. United States</u>, 485 U.S. 681, 689 (1988)).  Napout does not seem

to dispute that the act – removal of his computer – occurred, but appears to argue that the

government did not establish by a preponderance that Napout "had a role in that act."  <u>Id.</u> at 3

(quoting <u>United States v. Basciano</u>, No. 03-CR-929 (NGG), 2006 WL 385325, at *5 (E.D.N.Y.

Feb. 17, 2006)); <u>see also</u> <u>Dowling v. United States</u>, 493 U.S. 342, 348 (1990) (before a jury can

consider facts relating to another act as proof of an element of the presently charged offense, "the

jury must conclude by a preponderance of the evidence that the act occurred and that the

defendant was the actor.") (internal quotations and citations omitted).

As set forth above, the evidence established, among other things, that: Caceres

offered to Napout to remove Napout's computer in the event of his arrest; Napout was aware that

the computer contained material relevant to the government's investigation, including

photographs demonstrating Napout's close relationship with charged co-conspirators, as well as

evidence of one of Napout's bribe payments through a bank in the U.S., namely, the apartment in

Punte del Este; Napout had signed a preservation letter after the first indictment acknowledging

that such material would not be destroyed; Caceres entered Napout's office on the day of his

arrest and removed Napout's computer from his office; and that the computer, with the

CONMEBOL logo removed, was recovered more than a year later when Caceres brought it to

the U.S. Embassy in Buenos Aires.  This proof certainly established by at least a preponderance

of the evidence that the act occurred and that Napout had a role in it.  Accordingly, it was proper

for the government to argue the inference of Napout's consciousness of guilt.

Second, Napout's suggestion that the government must prove all of the elements

of the crime of obstruction and "disprove" the contention that Napout was motivated by a desire

to shield personal photographs is without any legal support.  <u>See</u> ECF Dkt. No. 688 at 3.  As an

initial matter, the plain text of Rule 404(b) makes clear that "other act" evidence need not

establish a federal criminal offense to be admissible.[17]  See Fed. R. Evid. 404(b) (governing

admissibility of evidence of "crimes, wrongs, or other acts") (emphasis supplied); see also

United States v. Meislin, 108 F. Supp. 3d 38, 45 (N.D.N.Y 2015) (government not required to

establish elements of crime in offering other acts evidence under Rule 404(b) (citing United

States v. Scott, 677 F.3d 72, 78 (2d Cir. 2016) ("Rule 404(b) extends to non-criminal acts or

wrongs")); United States v. Devin, 918 F.2d 280, 286 (1st Cir. 1990) (holding the "disjunctive

terminology [of Rule 404(b)] shows unmistakably that [it] reaches conduct which is neither

criminal nor unlawful so long as the conduct is probative of, and revelatory as to, a permitted

purpose").   Indeed, it would be absurd to argue that other acts evidence is only admissible if the

act rises to the level of a crime, which would mean that only the most serious (and presumably

most prejudicial) other acts evidence would be admissible.

　　　　　In addition, even if the government had set out to prove beyond a reasonable

doubt the crime of obstruction of justice, it would not have been required to "disprove" that

Napout was motivated by a desire to avoid embarrassment through disclosure of personal

photographs.  The evidence clearly showed that Napout was aware of the U.S. government's

investigation and yet accepted Caceres' offer to remove the computer that contained evidence of

---

[17] Although the government argued in the hearing on the motion that it intended to prove all of the elements of obstruction of justice under 18 U.S.C. § 1512, it did so in support of its argument that the obstruction should be admitted as proof of the racketeering conspiracy.  See Oct. 10, 2017 Tr. at 31.  Only later did the Court rule that the evidence would not be admitted for this purpose unless at least two co-conspirators in the racketeering conspiracy were involved in obstructive conduct.  The government did not seek to offer at trial evidence that any racketeering conspirators other than Napout participated in this obstruction, so the government did not proceed on this basis, as set forth above.

his crimes in the event of Napout's arrest.  See 18 U.S.C. § 1503(c)(1); Sand, Modern Federal

Jury Instructions, Inst. 46-66 ("The law does not require that the federal proceeding be pending

at the time of defendant's actions as long as the proceeding was foreseeable such that defendant

knew that his actions were likely to affect the proceeding.").  Needless to say, targets of

investigations often have as part of their motivation in obstructing justice the desire to keep

highly personal or embarrassing information out of the public sphere, but this does not negate

intent.  Cf. United States v. Bedoy, 827 F.3d 495, 515 (5th Cir. 2016) (evidence supporting 18

U.S.C. § 1512(c)(1) charge was sufficient where a married police detective instructed a prostitute

from whom he received sexual favors in exchange for law enforcement information to get rid of

her phone and "had a motive for wanting to get rid of the phone, namely, to cover up his

relationship with [the prostitute]").

        Here, the government proved a bad act and Napout's participation in it.  See Tr. at

4122-23 (Court noting that "[Caceres] offered himself and therefore the logical implication is

that that was accepted.  That certainly is evidence that there was a plan.").  No more was needed.

Moreover, had Napout moved to strike the evidence of the obstruction after Mr. Sanabria's

testimony or at any point in the trial, the proper ruling from the Court would have been to deny

the motion because the evidence was probative of Napout's consciousness of guilt and, as the

Court had found earlier, "removal of electronic devices" was "not any more 'sensational or

disturbing' than the alleged bribery scheme with which Defendants are charged, which spanned

decades, involving one the world's preeminent sports organizations, and resulted in vast amounts of money being paid as bribes and kickbacks."  ECF Dkt. No. 715 at 12.[18]

Napout's motion for a new trial based on the admission of evidence of the removal of the computer from Napout's office on the day of his arrest should be denied.

E.   The Court Properly Admitted the Expert Testimony of Dr. Stefan Szymanski

Marin moves for a new trial based on his claim that the Court erred in permitting Dr. Szymanski "to provide opinion testimony about the harms caused to soccer organizations by the receipt of bribes or kickbacks in connection with the sale of the organizations' media and marketing rights."  JMM Br. at 17.  Napout joins in Marin's motion.  See JAN 33 Br. at 2, n.2.

1.   Legal Standard

Expert testimony is admissible pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Under these standards, the Court must make a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without

_____

[18] This is especially so the case in light of Napout's strategic decision not to move to strike the evidence, which would have denied him the opportunity to show the sympathetic family photographs to the jury.  Cf.  United States v. Lyles, 593 F.2d 182, 194 (2d Cir. 1979) ("While the practicalities of proof may require that a particular statement be admitted subject to connection . . . if at the close of the Government's case the connection has not been proved, the court must, upon motion, strike the insufficiently connected item and direct the jury to disregard it.") (emphasis supplied) (internal quotations and citations omitted); United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993) ("The party at whom the evidence is aimed must object to the statement when it is offered; and, if the district court accepts the evidence de bene, must then ask the court at the close of all the relevant evidence to strike the statement, i.e., to consider whether the proponent fulfilled the requisite foundational requirements by a preponderance of the evidence."); see also United States v. Spruill, 808 F.3d 585, 597 (2d Cir. 2015) (explaining that "fail[ure] to assert an objection in the district court" is reviewable only for plain error whereas a "defendant's intentional decision not to assert a right" constitutes unreviewable waiver).

enlightenment from those having a specialized understanding of the subject involved in the dispute." United States v. Locascio, 6 F.3d 924, 936 (2d Cir.1993) (internal quotation marks omitted). If the jury could benefit from such testimony, the court must act as a "gatekeeper" to ensure that the expert presents "reliable" testimony. United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (quoting Daubert, 509 U.S. at 597).

"Although it establishes a 'gatekeeper' function for expert testimony, the Daubert test is nonetheless 'a liberal' and 'permissive' standard of admissibility." Hewitt v. Metro-North Commuter Railroad, 244 F. Supp. 3d 379, 385 (S.D.N.Y. 2017) (quoting Nimely v. City of New York, 414 F.3d 381, 395-96 (2d Cir. 2005)). "[I]n analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case." Restivo v. Hesseman, 846 F.3d 547, 575 (2d Cir. 2017) (internal quotations marks omitted). Expert testimony should be excluded "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Restivo, 846 F.3d at 577 (internal quotation marks omitted). Absent this degree of unreliability, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Id. (internal quotation marks omitted); see also United States v. Herron, No. 10-CR-615 (NGG), 2014 WL 1871909, at *6 (E.D.N.Y. May 8, 2014) (observing that the standard for admissibility of expert testimony in the Second Circuit is "especially broad" and the court "starts with the assumption that a well-qualified expert's testimony is admissible" and thus the "rejection of expert testimony is the exception rather than the rule" (internal quotation marks omitted)). On appeal, the Second Circuit employs the "highly deferential" abuse-of-discretion

43

standard of review under which "a ruling on the admissibility of expert testimony is to be sustained unless manifestly erroneous."  Restivo, 846 F.3d at 575.

2.    <u>The Court's Pre-Trial Ruling and the Evidence at Trial</u>

Prior to trial, Marin argued that Dr. Szymanski's testimony should be excluded as "entirely speculative" because he had not "done any empirical analysis of actual data relating to FIFA or any of its constituent entities."  Marin Mot. to Preclude, dated Oct. 23, 2017 (ECF Dkt. No. 732) at 2-3.  The Court found that "Dr. Szymanski's research and scholarship regarding the market for international sports media and marketing rights [] provide sufficient support for his proffered expert opinions."  Mem. & Order, dated Nov. 11, 2017 (ECF Dkt. No. 799) at 5.  The Court further held that the fact Dr. Szymanski did not do an analysis of the "empirical data" in the case "goes to weight – and is properly the subject of cross-examination – and not its admissibility under <u>Daubert</u>."  <u>Id.</u> at 4.  The Court denied Marin's motion.  <u>Id.</u> at 4-5.

At trial, Dr. Szymanski did not testify about the particular contracts at issue in this case, but rather explained core economic principles, which testimony was offered to help the jury understand the operation of the market for media and marketing rights to soccer events, including the distorting effects caused by the illicit receipt of bribes by soccer officials.  <u>See, e.g.</u>, Tr. at 190-91 (testifying generally about the types of effects corruption and bribery can have on soccer organizations).  In his cross-examination, counsel for Marin questioned Dr. Szymanski extensively about the fact that he did not "review any empirical data . . . of the actual prices or revenues that were generated by the media or marketing contracts involved in this case."  Tr. at 198; <u>see also</u> Tr. at 195-204 (cross-examination regarding lack of empirical analysis specific to the facts of the case).

44

3.      Discussion

Following their convictions, the defendants now repeat their argument that Dr. Szymanski's testimony regarding certain economic principles in the sale of media and marketing rights in the soccer industry should have been excluded because there was no "evidentiary link between the witness's opinion and the facts of the case."  See JAN 33 Br. at 2 and n.2; see also JMM Br. at 17-18.  It thus appears that the defendants are continuing to argue that, because Dr. Szymanski testified about economic principles in the soccer industry rather than analyzing the specific contracts and bribes in this case, his testimony was necessarily "speculative" and inadmissible.[19]  JMM Br. at 17-18.  They are wrong.

Courts commonly admit testimony about specialized areas of expertise even where the expert has not conducted any analysis of the specific evidence in the case.  See, e.g., United States v. Farhane, 634 F.3d 127, 158-59 (2d Cir. 2011) (affirming admission of expert testimony concerning al Qaeda that was based on (1) education; (2) employment at an organization focused on the relevant topics; (3) "authorship of various academic papers and a book on al Qaeda"; (4) his provision of "consulting services" to federal agencies; and (5) his

_____

[19] The defendants also claim that Dr. Szymanski's testimony was "extremely prejudicial" because "no other witness called by the government offered evidence to show any economic harm from the conduct charged."  JMM Br. at 17-18.  The government has already addressed the defendants' arguments as to proof of injury or harm in Part I.B above, including by noting some of the other evidence of harm introduced at trial.  See supra n.6.  The government also incorporates by reference its arguments as to the probative value and lack of any unfair prejudice of Dr. Szymanski's testimony in its pre-trial brief on the issue, which explained, among other things, the significant probative value of Dr. Szymanski's testimony on the question of "materiality" and the absence of any potential prejudice in light of the fact that Dr. Szymanski did not testify about the specific bribes received by the defendants.  See Opp'n to Mot. to Preclude, dated Nov. 1, 2017 (ECF Dkt. No. 766) at 30-37.

"ongoing efforts to collect, analyze, and catalogue" materials relevant to his area of expertise);

United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007) (affirming admission of expert

testimony about the composition and structure of New York organized crime families based on

experience investigating organized crime as a New York City Police Department Detective).[20]

       In United States v. Diallo, a defendant who had swallowed condoms filled with

heroin before entering the United States sought to bolster his defense that he thought the

condoms contained gold dust by calling a commodities consultant as an expert to testify that

smuggling gold from Benin (where the defendant's trip to the United States originated) was more

profitable than exporting it legally from that country.  40 F.3d 32, 34 (2d Cir. 1994).  After the

district court precluded the testimony and the defendant was convicted at trial, the Second

Circuit then reversed for abuse of discretion, finding that "[r]elying on his expertise in precious

metals, [the expert] could have testified about the market price of gold in the United States and

the profit to be made by smuggling gold out of Benin."  Id. at 35.

       As in Diallo, Dr. Szymanski testified about a particular market – here, media and

marketing rights to soccer events, an area in which he indisputably qualifies as an expert.[21]  Dr.

Szymanski, like the expert in Diallo, relied on his work and scholarship in the particular field in

---

    [20] In support of their argument, the defendants rely upon a single unpublished decision from the Ninth Circuit, United States v. Sayre, No. 08-50519, 434 Fed. App'x 622, 624 (9th Cir. 2011), where the court found that the district court had not abused its discretion in excluding testimony regarding who qualifies as a "reasonable investor" and what sorts of information the "reasonable investor" relies upon.  Sayre is neither binding nor informative as to the question before the Court.

    [21] The defendants do not dispute that Dr. Szymanski, who has a PhD in economics from the University of London, see Tr. at 162, was properly qualified as an expert, but instead argue that only "certain testimony" by Dr. Szymanski should have been excluded.  JMM Br. at 17.

46

forming his particular opinions.  Compare Diallo, 40 F.3d at 35 (proper for expert to rely generally on his "expertise in precious metals") with Tr. at 159-60 (Dr. Szymanski describing his expertise in the business and economics of sports, his use theoretical models to explain how markets work, and his gathering of data and use of statistical models to test his theories); Tr. at 203 (Dr. Szymanski testifying on cross-examination that his opinions are based on his "extensive expertise in the market" as well as information in the public domain about "these contracts and the experience of the history of soccer broadcasting in South America and related contracts" ).

        And finally, like the expert in Diallo who would have testified about the hypothetical profit to be made under a certain type of venture, Dr. Szymanski testified about the potential effects of bribery on the sale of media and marketing rights in the particular market for soccer events.  Diallo, 40 F.3d at 34-35; Tr. at 191-93.  That no "data" from the evidence in the specific case was analyzed, but rather that the industry and market forces were described more generally, in no way undercuts the admissibility of the testimony where, as here and in Diallo, the expert relied on information of a type that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject."  Fed. R. Evid. 703; Diallo, 40 F.3d at 35; Tr. at 205 (Dr. Szymanski testifying that more than 100 of his scholarly articles in his area of expertise have been peer-reviewed).

        Dr. Szymanski's testimony based on his research and scholarship clearly was not "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." Restivo, 846 F.3d at 577.  Thus, the defendants' "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony," id., and were an appropriate area for cross-examination, which the defendants fully made use of, see Tr. at 195-204.  The testimony of Dr. Szymanski was properly admitted.

F.     The Court Properly Excluded Hearsay Evidence as to Marco Polo Del Nero

Marin argues that the Court erred in sustaining the government's objection to questions seeking to elicit hearsay testimony from Agent Berryman relating to CBF president (at the time of trial) Marco Polo Del Nero's current position with the CBF and FIFA's response to the indictment of Del Nero.  JMM Br. at 16.  The argument is meritless and omits important context relating to the nature and scope of the Court's ruling.

The Federal Rules of Evidence provide that witnesses must testify based on personal knowledge, and that, subject to certain exceptions, hearsay is inadmissible.  See Fed. R. Evid. 602, 802.  In addition, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  Id. 403.

Here, during cross-examination of Special Agent Berryman, counsel for Marin sought to question Berryman about his understanding as to Del Nero's status in CBF, and FIFA's response to the charges against Del Nero.  See Tr. at 3760.   The government objected on the ground that the question sought hearsay testimony, as Berryman had no first-hand knowledge of Del Nero's current position or about FIFA's handling of the U.S. charges against Del Nero.  See Tr. at 3765.  Outside the presence of jury, the Court suggested that counsel for Marin could have cross-examined government witness Stephanie Maennl, Deputy Head of Corporate Legal in FIFA's legal department, about the organization's handling of the charges against Del Nero.  See Tr. at 3764:22-24; 3778:20–3779:9.  Counsel for Marin stated that Del Nero's current status had already been put before the jury and clarified that he wished to argue from FIFA's apparent determination not to ban Del Nero that FIFA did not take its own rules seriously.  Tr. at 3770:18-3771:2.  The Court ultimately sustained the government's objection both on the ground that the questions called for hearsay (Tr. 3766:2; 3775:23-3776:02) and because, under a Rule 403

48

balancing test, the minimal relevance of any testimony Special Agent Berryman might provide

on the subject would be substantially outweighed by the risk of unfair prejudice, including the

risk that the jury would speculate about the import of FIFA's disciplinary process without

supporting evidence.  See Tr. at 3771-72; 37743776:3-20; 3775:5-6; 3777:11-20 (prejudice).

Marin has not identified any error in this ruling, much less an error warranting a

new trial.  See United States v. Soto, No. 12 CR 556 RPP, 2014 WL 1694880, at *7 (S.D.N.Y.

Apr. 28, 2014), aff'd sub nom. United States v. Ramos, 622 Fed. App'x 29 (2d Cir. 2015) ("This

Court joins the majority of courts in this Circuit in finding that, in the absence of a manifest

injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier

evidentiary decisions.").

G.      The Court Properly Admitted Recorded Co-Conspirator Statements

Marin next seeks a new trial on the ground that the Court improperly admitted

audio recordings made by cooperating witness José Hawilla.  Specifically, he argues that the

statements contained on the recording excerpts and transcripts introduced into evidence at trial

fall outside of the co-conspirator exception to the rule against hearsay because the conversations

"concerned separate conspiratorial conduct unrelated to Mr. Marin" or, in some instances, were

not in furtherance of the conspiracy.  Marin incorporates by reference arguments he advanced

before trial in opposition to the government's motion to admit the recordings.  The government

refers the Court to its motion to admit the recordings, to its reply to Marin's opposition, and to

the Court's order admitting the evidence.  See ECF Dkt. Nos. 718 (Motion in Limine), 766

(Reply), 853 (Order granting Motion in Limine).  Marin's post-trial brief does nothing to

undermine the Court's original ruling.  Indeed, the testimony and documentary evidence adduced

at trial only further support the admissibility of the recordings, in that multiple witnesses and

documentary evidence placed Marin squarely at the heart of the charged conspiracies.

     H.    <u>The Court Properly Admitted Documents Seized From the Klefer Safe</u>

     Marin argues, as he did at trial, that the Court improperly admitted notes and

related documents recovered from the offices of Brazilian sports marketing company Klefer

Producoes e Promocoes Ltda. on the ground that the government failed to authenticate the

documents.  Marin is wrong for the reasons set forth below and in the government's letter to the

Court dated December 12, 2017 in support of the admissibility of the Klefer documents (ECF

Dkt. No. 826), incorporated herein by reference.

     In order to establish an exhibit's authenticity, the government must "produce

sufficient evidence to support a finding that the item is what the proponent claims it is."  Fed. R.

Evid. 901(a).  That standard is met when "sufficient proof has been introduced so that a

reasonable jury could find in favor of authenticity or identification."  <u>United States v. Tin Yat

Chin</u>, 371 F.3d 31, 38 (2d Cir. 2004) (internal quotation marks omitted).  The standard is "not

particularly high."  <u>United States v. Bout</u>, 651 Fed. App'x 62, 64 (2d Cir. 2016) (summary order)

(internal quotation marks omitted).  "[P]roof of authentication may be direct or circumstantial,"

<u>United States v. Al-Moayad</u>, 545 F.3d 139, 172 (2d Cir. 2008), and such proof may include

distinctive characteristics of a document offered into evidence, such as the document's

"appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in

conjunction with the circumstances," <u>United States v. Vayner</u>, 769 F.3d 125, 130 (2d Cir. 2014).

Proof of a chain of custody also may suffice to authenticate evidence, and the chain need not be

free of defects.  "Alleged breaks in the chain typically do not bear upon the admissibility of

evidence, only the weight of the evidence." Bout, 651 Fed. App'x at 64 (internal quotation marks omitted).

Here, the government established the authenticity of the Klefer documents well beyond the required preponderance standard.  At trial, the government introduced into evidence consensual recordings in which Kleber Leite, the principal of Klefer, stated to Hawilla that he kept records of bribe payments in a safe in his offices.  See GX-1706-T at 3-5.  In addition, José Schettino, a federal prosecutor from Brazil, testified that (1) on the day after the unsealing of the original indictment in this case, his colleagues received a request from the U.S. government to conduct a search at Klefer's offices, (2) Schettino obtained judicial authorization to search the premises, (3) Schettino participated in the search, (4) a safe was found on the premises in which documents, including contracts and hand written notes, were recovered, and (5) those materials were placed in evidence bags and sent to the court for delivery to the United States.  See generally Tr. at 2571-2609.  In reviewing the exhibits from the witness stand, Schettino testified further that he recognized the folders in which the documents were held and some of the individual documents, and that the exhibits he did not specifically recognize looked similar to those recovered from Klefer's offices.  Tr. at 2582:2-21.

The government also provided the Court with the cover letter from the Brazilian Ministry of Justice, National Secretariat of Justice, Department of Assets and Recovery and International Legal Assistance to the United States Office of International Affairs.  See ECF Dkt. No. 827, Exhibit C.  In this letter, the Brazilian authorities referenced the United States government's request for mutual legal assistance dated May 26, 2015, that requested, among other things, "search and seizure measures."  The letter explains that the Brazilian government was transmitting "documentation gathered during the search and seizure measure . . . ."  The

51

Office of International Affairs provided these materials to the United States Attorney's Office under a letter dated August 20, 2015, which was also included in Exhibit C.

Finally, the appearance and contents of documents provided powerful proof of authenticity. For example, Government Exhibit 306 is a piece of paper with handwritten notes with the title "MPM" that states, among other things, "Copa do Brasil – R$1,000,000," matching the amount of money that Leite indicated on the consensual recording was owed to "Marco Polo" and "Marin," or "MPM." Other tournaments and schemes also were referenced in the notes. Marin makes much of the presence of a note apparently reflecting information concerning Hawilla's cooperation, but, as noted during trial, the presence of this note was consistent with (and corroborative of) Burzaco's testimony that Hugo Jinkis learned of Hawilla's cooperation from Leite in October 2014, after the consensual recordings were made. Tr. at 587:6-18.

In light of the foregoing, the government clearly adduced sufficient proof to permit a reasonable jury to find that the documents at issue – bound in blue folders of the Brazilian federal justice system, sent to the U.S. government by Brazilian authorities following the search described by Mr. Schettino, exhibiting characteristics matching the descriptions captured on consensual recordings, referencing tournaments and bribe amounts at issue in the charged schemes – were, in fact, recovered from Klefer's offices.

I.     Napout's Claim of Newly Discovery Evidence is Meritless

Defendant Napout seeks a new trial pursuant to Rule 33 on the ground that he has discovered new evidence, improperly withheld by the government in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963), that undercuts important elements of cooperating witness Alejandro Burzaco's testimony. JAN 33 Br. 9-14. Specifically, Napout argues that immigration and flight records purporting to show that Burzaco did not travel to Asunción,

Paraguay on October 24, 2014, establish that Burzaco perjured himself when he testified that he traveled to Asunción in October 2014 to attend a CONMEBOL executive committee meeting and that during this visit he met with Napout and Del Nero to discuss various bribe payments. The argument is riddled with factual and legal errors and should be rejected in its entirety.

      1.   <u>Legal Standards</u>

To establish a <u>Brady</u> violation, a defendant must show, among other things, that evidence favorable to the defense was in the government's possession and was suppressed, even if inadvertently.  <u>Leka v. Portuondo</u>, 257 F.3d 89, 98 (2d Cir. 2001), citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999).  To be suppressed, information must be "known to the prosecution but unknown to the defense."  <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976); <u>see also</u> <u>Williams v. Senkowski</u>, No. 02-CV-2074 (JBW), 2003 WL 22956999, at *11 (E.D.N.Y. Oct. 9, 2003) (observing that <u>Brady</u> rule "is logically limited to evidence actually known to the prosecution or those associated with the State").  Evidence is not "suppressed" for Brady purposes if the defendant "either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."  <u>DiSimone v. Phillips</u>, 461 F.3d 181, 197 (2d Cir. 2006) (internal quotation marks omitted).

For a court to grant a motion for a new trial based on newly-discovered evidence, the defendant must demonstrate that "(1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal."  <u>United States v. Owen</u>, 500 F.3d 83, 88 (2d Cir. 2007); <u>see also</u> <u>United States v. Persico</u>, 645 F.3d 85, 109 (2d Cir. 2011).

When seeking a retrial on the basis of undisclosed or newly-discovered impeachment evidence, defendants bear a heavy burden.  "In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to a crime."  United States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998).  "Undisclosed impeachment evidence is not material in the Brady sense when, although possibly useful to the defense, it is not likely to have changed the verdict."  Id. at 257 (internal quotation marks and citations omitted).  The Second Circuit has repeatedly declined to grant new trials on the basis of additional impeachment evidence that is merely cumulative and hence not material.  See, e.g., id.; United States v. Gambino, 59 F.3d 353, 363-67 (2d Cir. 1995); see also Persico, 645 F.3d at 111.

A motion for a new trial based on newly-discovered evidence is "not favored and should be granted only with great caution."  United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958).  Indeed, such motions are appropriately granted "only in the most extraordinary circumstances."  United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992) (emphasis omitted).  "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. . . . There must be a real concern that an innocent person may have been convicted."  United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005) (citations and internal quotation marks omitted).  A motion for a new trial is committed to the discretion of the district court, and its decision will be reversed only for an abuse of discretion.  See United States v. Wong, 78 F.3d 73, 78 (2d Cir. 1996); Gambino, 59 F.3d at 364 (the district court's discretion is "broad" because "having presided over the trial, it is in a better position to decide what effect the newly discovered materials might have had on the jury") (citations omitted).  Factual findings are reviewed for clear error.  See Imran, 964 F.2d at 1318.

54

2. <u>Discussion</u>

Napout's argument in support of a new trial based on newly discovered evidence rests on a misleading recitation of the factual record and falls far short of satisfying the applicable legal standards.

a. <u>The Claimed "Newly Discovered" Evidence</u>

The "newly discovered" evidence proffered by Napout comprises two sets of documents, attached as Exhibits A and B to his motion ("DX A" and "DX B," or collectively, the "Napout Exhibits"). DX A includes what purports to be a letter dated December 6, 2017 (the "December 6, 2017 letter" or the "letter") from the immigration authorities of Paraguay, stamped by the Ministry of the Interior, to José Maria Montero Z., Esq.,[22] stating that the "Entry-Exit Computer System" recorded a single entry into Paraguay by Alejandro Burzaco during 2014, specifically, on December 3, 2014.[23] The December 6, 2017 letter states that the information was being provided to Mr. Montero in response to a request dated December 5, 2017 seeking information concerning Mr. Burzaco's entry into Paraguay during 2014. The letter indicates that "the Institution" – an apparent reference to the entity responding to Mr. Montero's request – received Mr. Montero's request on December 6, 2017 and provided a response that same day.[24] The letter also references an attached "Immigration Report" that is not included with DX A.

---

[22] It is the government's understanding that Mr. Montero is the brother of Mr. Napout's son-in-law, Juan Montero.

[23] DX A also includes a certified translation of the December 6, 2017 letter and an untranslated certificate.

[24] The certified translation of the December 6, 2017 letter was prepared in New York, New York, also on December 6, 2017.

55

DX B includes a letter dated December 20, 2017 from Luis Manuel Aguirre Martinez, identified as President of the National Office of Civil Aeronautics ("DINAC"), to Mr. Montero, identified as counsel to Mr. Napout, that purports to enclose a "report" prepared by the Department of Air Traffic Service Notifications.  The government assumes that the report comprised the two flight manifests, as Napout describes them, enclosed with DX B.  The manifests appear to set out passenger details for two private flights on October 24, 2014, one from San Fernando, Argentina to Asunción and the other from Asunción to Punta del Este, Uruguay.[25]  The passengers listed on the incoming flight into Paraguay are Luis Segura, then-president of the Argentine soccer federation; José Luis Meiszner (misspelled on the manifest as "Meizner"), then-general secretary of CONMEBOL; and Eladio Rodriguez, then a Torneos employee, who subsequently testified at trial.  The manifest for the outbound flight to Uruguay lists the same three men along with "Lee Leonardo Ellember," an apparent reference to Leonardo Ellenberg, then another employee of Torneos.

> b.      There Was No *Brady* Violation

Napout argues first that he is entitled to a new trial on the ground that the government withheld evidence in violation of its obligations under Brady.  The argument is nonsensical, not least because he fails to identify any evidence, favorable or otherwise, that was suppressed by the government.

_____

[25] DX B includes translations of the December 20, 2017 cover letter, the two manifests, and an "apostille" certificate.  The translation certificate is dated January 8, 2018, and purports to cover the translation of a document titled "Napout – Travel Record Final."  The government assumes that the document "Napout – Travel Record Final" comprises the translated documents in DX B.

It is well settled that, in order to establish a violation of Brady, a defendant must show, among other things, that the government suppressed favorable evidence that was in its possession.  See, e.g., Agurs, 427 U.S. at 103.  Here, as Napout all but concedes, the government did not know of, much less possess, the Napout Exhibits or the information contained therein until the government received Napout's post-trial brief.[26]  Thus, even assuming arguendo that the Napout Exhibits contain material, exculpatory information (which they do not, as discussed below), Napout's Brady challenge must fail.

Napout apparently seeks to avoid this result by suggesting that the defendants were entitled to a detailed preview before trial of Mr. Burzaco's expected testimony concerning his meeting with Napout and Del Nero in October 2014, and that the government's alleged failure to provide such a preview constitutes a Brady violation.  The argument is difficult to follow,[27] but it fails, however interpreted, for at least two reasons.  First, the government is not required to provide the defense with a preview of its witnesses' anticipated testimony.  Second, as discussed in greater detail below, the government did, in effect, provide the defendants with

---

[26] In the introduction to his brief, Napout suggests that the evidence at issue was within the government's "constructive possession," but he does not offer any facts or authority in support of this position or attempt to explain it.  JAN 33 Br. at 2.

[27] Napout argues that "Mr. Burzaco's statement that a meeting with Mr. Napout occurred on October 24, 2014, is inconsistent with the general assertion of a meeting at some point after Mr. Grondona's death in July 2014," but does not explain how those two statements are inconsistent.  Napout goes on to state that the government "deliberately and carefully elicited the testimony about the supposed October 24, 2014 meeting at trial" without giving "the slightest indication that the government was surprised" by Burzaco's testimony.  It is true that the government deliberately elicited the testimony of Burzaco, as it did the testimony of all of its witnesses.  It is also true that the government was generally unsurprised by the testimony of its witnesses.  Napout should not have been surprised either because, as noted infra, he received the substance of the testimony in the government's disclosure of 3500 materials, including an indication that Burzaco would testify that he traveled to Asunción in October 2014.

such a preview of Mr. Burzaco's testimony, including his testimony concerning the October

2014 meeting with Napout and Del Nero, through early disclosure of witness statements pursuant

to 18 U.S.C. § 3500.   Accordingly, Napout's motion for a new trial based on Brady should be

denied.  See, e.g., Untied States v. Paulino, 445 F.3d 211, 224 (2d Cir. 2006) (discussing Brady

factors).

c.      A New Trial is Not Warranted

Napout argues in the alternative that the immigration and travel records filed in

the Napout Exhibits constitute newly discovered evidence warranting a new trial pursuant to

Rule 33.  Napout is wrong.

i.      The Evidence is Not Newly Discovered

For evidence to be considered "newly discovered" for Rule 33 purposes, a

defendant must show both that the evidence was discovered after trial and that it could not have

been discovered sooner with the exercise of due diligence.  See, e.g., United States v. Forbes,

790 F.3d 403, 408–09 (2d Cir. 2015); United States v. Alessi, 638 F.2d 466, 479 (2d Cir.1980).

Napout can make neither showing.

On December 6, 2017, well before the close of the government's case, Napout

obtained the immigration records contained in DX A, which purport to demonstrate that the only

date on which Burzaco entered Paraguay during 2014 was on December 3, 2014.  Napout

therefore could have called Burzaco during a defense case to elicit testimony concerning

Burzaco's travels to Asunción in 2014 or sought to introduce the immigration records or

information contained therein into evidence in support of an argument that Burzaco lied during

his testimony.  See Trial Tr. at 2141:19-20 (Ms. Pinera-Vasquez: "We will call Burzaco, if we

want to . . . ."); 2141:22 (Court: "Mr. Burzaco will be made available as necessary."); 3242:3-7

58

(government offering to make its witnesses available to be called by the defense).  Whatever

Napout's reasons for not making use of the evidence – perhaps he recognized the limited

impeachment value of the documents and preferred to hold them back in hopes of bolstering a

post-trial motion – Napout cannot now be heard to argue that the relevant evidence was

discovered after trial.[28]  See United States v. Stofsky, 527 F.2d 237, 244-46 (2d Cir. 1975)

(rejecting new trial motion where evidence was delivered to defendants six days before close of

defense case and could have been used to "recall and cross-examine" witnesses); Ida v. United

States, 207 F. Supp. 2d 171, 181 (S.D.N.Y. 2002) ("Rule 33 does not permit a defendant to make

a tactical trial decision not to call certain witnesses and then to seek a new trial later if the tactic

does not result in an acquittal.").

        In any event, Napout cannot establish, as he must under the applicable standard,

that the immigration and travel records filed with his brief "could not with due diligence have

been discovered before or during trial."  United States v. Forbes, 790 F.3d 403, 409 (2d Cir.

2015) (internal quotation marks omitted).  It bears emphasizing that on September 25, 2017,

more than seven weeks before the start of Mr. Burzaco's testimony on November 14, 2017, the

government produced witness statements pursuant 18 U.S.C. § 3500.  These materials included

reports and notes documenting Burzaco's recollection that he traveled to Asunción to attend a

---

[28] Perhaps recognizing that his motion fails on this ground, Napout argues that the
immigration records constituting DX A to his brief were "not conclusive," suggesting that he did
not have the relevant information until he received the records contained in DX B.  JAN 33 Br. at
10.  The government agrees that the documents are not conclusive.  None of the Napout Exhibits
comes close to establishing that Burzaco did not travel to Asunción in October 2014 or that he
lied in his account of his meetings with Napout and Del Nero in Asunción.  But the immigration
records in DX A hold essentially the same impeachment value as the manifests filed as DX B.

CONMEBOL meeting during the months following Grondona's death in July 2014 and that

during his visit to Asunción he had a detailed discussion with Napout and Del Nero concerning

the continuing allocation of bribe payments to various CONMEBOL officials.  One set of notes

provided on September 25, 2017 makes clear that Burzaco recalled that the trip to Asunción and

meeting with Del Nero and Napout took place in October 2014.  See 3500-AB-11(b) at 6 ("Still

October 2014 conversation").[29]  Even if the notes had not referenced the particular month of the

meeting, however, Napout was on notice that Burzaco would testify that he traveled to Asunción

during the final months of 2014 to a CONMEBOL executive committee meeting – there were

only two held in Asunción during that period, one in October, the other in December – and that

during his visit he discussed bribe payments with Napout and Del Nero.  Napout thus had every

incentive and opportunity to obtain immigration and travel records if he thought they might

prove valuable in impeaching Burzaco on this point.[30]

Notably, Napout was able to obtain the immigration records in a single day,

perhaps because of Napout's close connections to the government in Paraguay, including his

personal friendship with the president of Paraguay, Horacio Cartes.  See, e.g., GX 976-T at 20

("I just spoke to Horacio, he is expecting me for his birthday."), 22 (arranging to obtain World

---

[29] If the Court no longer has its copy of the 3500 Materials provided during trial, at the Court's request the government will provide another copy of the relevant materials.

[30] Napout seeks to overcome his lack of due diligence by suggesting that he could not have known Burzaco would testify that the meeting took place in October because Burzaco's name was not listed in the CONMEBOL minutes for October.  The argument is meritless for the reasons stated above, among others.  The minutes also fail as an explanation for why Napout delayed in seeking immigration and travel records until after Burzaco's testimony because Burzaco's name does not appear in the minutes for the CONMEBOL executive committee meeting held in December of 2014, either.  (See GX 1369).

Cup tickets on behalf of Cartes's daughters).[31]  As to the manifests, they took at most two weeks

to obtain, since Napout sought the records after obtaining the immigration records contained in

DX A on December 6, 2017, see JAN 33 Br. at 10 (noting that search of "Paraguayan airport

records" began after receipt of the immigration records), and received the records on December

20, 2017.  Had he sought those records even a month after receiving the 3500 Materials for

Burzaco he would have received them well before the start of Burzaco's testimony.[32]

In sum, Napout's motion for a new trial for newly discovered evidence should be

denied on the ground that the evidence was available at trial and, in any event, clearly could have

been obtained through exercise of due diligence.  See Owen, 500 F.3d at 89-90 (reversing district

court's grant of new trial where evidence was not "newly discovered" under applicable

standard); United States v. Stofsky, 527 F.2d at 244-46 (rejecting new trial motion where

evidence was available twelve days before end of trial and delivered to defendants six days

before close of defense case and observing that defense could have sought continuance if more

time were needed to exploit the evidence).

---

[31] The government, by contrast, introduced into evidence flight records obtained through subpoenas but does not have ready access to records from Paraguayan airports or immigration authorities.

[32] Even if Napout had sought the records on November 16, 2017, the day after Burzaco's testimony concerning the meeting at issue, he would have received them well before the close of the government's case.

        ii.     The Information Contained in the Napout Exhibits is
                  Cumulative and Impeaching, Not Material

Even if Napout were able to meet the requirements for newly-discovered evidence under Rule 33 – which he has not – the motion would fail because he has not established that the evidence was material and not merely cumulative or impeaching. See Persico, 645 F.3d at 109.

Assuming arguendo that the documents at issue are authentic and admissible – which the government does only because the Court need not reach the question of authenticity[33] – they at most would have provided a marginally useful additional avenue for impeachment of Burzaco. Contrary to Napout's argument, the records hardly establish that Burzaco was not in Asunción in October 2014, let alone that he committed perjury in testifying about his meeting with Napout and Del Nero.

As an initial matter, the documents provided in the Napout Exhibits are far from definitive evidence. The immigration letter provided in DX A states that it does not include information from "Immigration Control Posts without an ONLINE connection to the Data Transfer System." DX A at 2; see also Trial Tr. at 289 (Burzaco's testimony that upon arrival in

---

[33] In order for newly discovered evidence to be material it must be admissible at trial. See, e.g., United States v. Parker, 903 F.2d 91, 103 (2d Cir. 1990) (statement of allegedly unavailable witness would not have been admissible under hearsay rules). In their current form, the documents contained in the Napout Exhibits clearly are inadmissible. Needless to say, had the defendant called a records custodian or other witness in an attempt to authenticate the documents and establish an exception to the rule against hearsay, the government would have vigorously cross-examined that witness. The Napout Exhibits contain several irregularities, some of which are noted herein. In addition, the government is highly skeptical of the documents' reliability in light of Napout's demonstrated willingness to engage in obstructive and deceitful conduct, and record evidence that he is willing to use his position of power in Paraguay, including his connections to government officials, to influence judicial processes. See GX-976 at 5 (referencing conversation with Paraguayan president Horacio Cartes in which Cartes indicated he provided assistance with a trial), 19-20 (seeking World Cup tickets for the attorney general of Paraguay apparently in order to seek influence in an ongoing trial).

Asunción it was not uncommon for delegations from Brazil and Argentina to be picked up at the

airport and driven to CONMEBOL headquarters without passing through immigration). The

manifests provided in DX B also are inconclusive. The manifest for the incoming flight into

Paraguay does not include the name of Leonardo Ellenberg, for example, but he, like Rodriguez,

was a Torneos employee, and he clearly traveled to Asunción, since his name does appear on the

manifest for the outbound flight to Uruguay. See DX B at 4 (inbound) and 5 (outbound). In

addition, Ellenberg's name appears to have been typed into the outbound manifest in a manner

that altered the formatting of the document, suggesting it may have been typed in at a different

time from the other names. See DX B at 5. That Ellenberg arrived in Asunción but was not

listed on the inbound manifest suggests that either he (and perhaps other Torneos executives)

traveled to Asunción on a different flight, or that the incoming manifest was incomplete.

Moreover, even if the documents were deemed reliable, they fall well short of

establishing that Burzaco perjured himself. See United States v. Stewart, 433 F.3d 273, 297 (2d

Cir. 2006) ("[W]hen the newly discovered evidence focuses on the perjury of a witness, a

threshold inquiry is whether the evidence demonstrates that the witness in fact committed

perjury." (internal quotation marks omitted)). Here, even assuming arguendo that Burzaco did

not, in fact, travel to Asunción on October 24, 2014, and that the information contained in the

Napout Exhibits is accurate, at most the documents would give rise to competing arguments –

from the defense that he lied, and from the government that he was mistaken about the timing of

his meeting with Napout and Del Nero, but not about the fact that it happened.

Finally, Burzaco was "subject to extensive attack by reason of other evidence."

United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998). The law is clear that "new

impeachment evidence is not material, and thus a new trial is not required when the suppressed

impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (emphasis in original) (internal quotation marks and alterations omitted).

### iii.   The "Newly Discovered" Evidence Proffered By Napout Would Not Have Resulted in Acquittal

Finally, Napout comes nowhere close to establishing that the "newly discovered" evidence "would probably [have led] to an acquittal.'" United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007).  As argued above, the information in the Napout Exhibits holds marginal impeachment value and at most would have provided an additional avenue for cross-examination of Burzaco.  In any event, Napout's guilt also was established by overwhelming evidence entirely independent of Burzaco's testimony, including, for example:

· Testimony of cooperating witness Bedoya that he and Napout agreed to receive bribes, including in connection with the Copa América and Copa Libertadores, and had multiple conversations about the bribe payments, including conversations during which Napout confirmed that he was receiving payments and expressed concern about the security of the payment method.  See, e.g., Tr. at 1563, 1584, and 1634-37.

· Consistent testimony from multiple witnesses, including Peña, José Luis Chiriboga, Bedoya, Rodriguez, and Hawilla, that Napout was a member of the "Group of Six" presidents who formed a bloc in or around 2009 and received bribe payments in exchange for their support.  See, e.g., Tr. at 1079 and 1087-88 (Peña); 1407, 1410-11, and 1422-23 (Chiriboga); 1567, 1572, and 1614 (Bedoya); 2088-89, 2098-99, and 2103 (Rodriguez); 2717-18, and 2720-22 (Hawilla).

· Contemporaneous ledgers maintained by Rodriguez documenting bribe payments for members of the Group of Six.  See GX 623 and 624.

· A contemporaneous ledger maintained by Peña that included a spreadsheet page for Napout documenting millions of dollars in bribe payments credited and paid to Napout over the course of several years along with contemporaneous payment orders and wire instructions.[34]  See, e.g., GX 601, 609.

_____

- Testimony of Peña that the Jinkises told him that they were paying Napout, and that he was tasked with obtaining cash for delivery to Napout, often via wire transfers from a U.S. bank account.  See, e.g., Tr. at 1159-63.

- Voluminous bank records, emails, travel records, and other documents, along with testimony of Special Agent Steven Berryman, that provided thorough, detailed corroboration of the Rodriguez and Peña ledgers, including as to payments to the Group of Six and, specifically, Napout.  See generally, e.g., Tr. at 3483-3569 (testimony of Berryman referencing certain corroborative exhibits).

- Consensual recordings by Hawilla in which Hugo Jinkis, Mariano Jinkis, and Alejandro Burzaco variously discuss bribe payments to all members of CONMEBOL (except for one "honest" president from Uruguay).  See, e.g., GX 1710-T at 3 (detailing breakdown of bribe payments), GX 1709-T (M. Jinkis stating that he wants to "coexist with and make all the presidents rich").

In light of the foregoing, the Court should reject Napout's motion for a new trial based on newly discovered evidence.

J.      Marin is Not Entitled To a New Trial Based on the "Weight of the Evidence"

Finally, Marin moves for a new trial "because the jury's verdict was against the weight of the evidence."  JMM Br. at 20.  In so moving, Marin simply refers back to his arguments as to the sufficiency of the evidence, to which the government has responded above. In doing so, Marin certainly has not established "that an innocent person may have been convicted."  Sanchez, 969 F.2d at 1414.  As the Court is aware, the government presented devastating evidence of Marin's guilt, from Alejandro Burzaco's testimony that he bribed Marin

---

[34] Although Napout of course had no burden to put on a defense, when his counsel tried to explain away the Peña ledger, the best he could come up with was that the detailed accounting of Napout's bribes – which used Napout's initials, listed cash payments on dates when Napout was in Argentina, referenced wires for Napout's benefit, and included a complex formula for tracking bribe payments owed to Napout for the rights to Paraguayan World Cup Qualifier matches – was in fact used by Mariano Jinkis, a 50% owner of Full Play, as his "cash account." Tr. at 4354.  That counsel felt the need to advance some argument, however far-fetched, to try to undercut the ledger is indicative of how powerful the evidence was.

(Tr. at 232-34), to Eladio Rodriguez's testimony and bribe ledger demonstrating that he carried out the bribe payments to Marin (Tr. at 2065-69), to Agent Steven Berryman's tracing of funds to Marin in the Eastern District of New York in the name "Firelli International Limited" and Marin's lavish expenditures, such as $20,977.15 at a Hermes store in Paris and $50,000 at a Bulgari store in Las Vegas (see, e.g., Tr. at 3437-46; see GX-512-B, GX-513-B, GX-502C, GX-502E, GX-503C, GX-508B, GX-511B, GX-511C, GX-550B, GX-623), to recordings on which Marin discussed the bribe payments and stated, among other things, that it was "about time" for the money to be "coming our way." GX 1709-T at 23. The jury found Marin guilty because it was presented with overwhelming proof of his guilt. There has been no miscarriage of justice.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the defendants' motions are without merit and should be denied.

Dated:  Brooklyn, New York
      February 21, 2018

                  Respectfully submitted,

                  RICHARD P. DONOGHUE
                  UNITED STATES ATTORNEY
                  Eastern District of New York
                  271 Cadman Plaza East
                  Brooklyn, New York 11201

Samuel P. Nitze
M. Kristin Mace
Keith D. Edelman
Assistant United States Attorneys
      (Of Counsel)