UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JUAN ÁNGEL NAPOUT, et al. <br><br> Defendant. | ) <br> ) <br> ) <br> ) Case No. 15-CR-252 (PKC) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**DEFENDANT JUAN ÁNGEL NAPOUT'S REPLY TO RESPONSE TO AMENDED AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF**

**GREENBERG TRAURIG, LLP**
A. John Pappalardo
Elliot H. Scherker
Jacqueline Becerra

**PIÑERA-VAZQUEZ LAW FIRM**
Silvia B. Piñera-Vazquez

I.     **INTRODUCTION.**

In response to Mr. Napout's arguments on the sufficiency of the evidence to establish a conspiracy to deprive FIFA or CONMEBOL of honest services, the government focuses on the Second Circuit's decision in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc). (DE:898:7-10). It is certainly true, as stated in *Rybicki*, that "the intent to deprive another of the intangible right of honest services" is the "only *intent* that need be proven in honest services fraud," 354 F.3d at 145 (emphasis added; citation omitted), and the government correctly cites the decision for that proposition. (DE:898:7). But the government ignores the Second Circuit's careful creation of its "materiality" standard—under which, although the government need not demonstrate "reasonably foreseeable harm" from the alleged conduct, the requirement that a misrepresentation be material sweeps within its ambit the likelihood of economic harm. *Rybicki*, 354 F.3d at 146. Stated otherwise, while "actual or intended economic or pecuniary harm to the victim need not be established," *id*. at 145, the government, *in this case*, did not allege "*non-economic*, yet serious, harm" to FIFA or CONMEBOL. *Id*. at 146 (emphasis added). Rather, the government relies solely on the premise that, "since the contracts had been tainted by fraud for years with no benchmark for fair market prices, one could not infer from increases in contract price over the years that the contracts have been sold at good or fair market prices." (DE:898:8). The government's reliance on an unsupported *negative* inference is hardly a substitute for proof beyond a reasonable doubt that would satisfy the *Rybicki* materiality standard.

With regard to the extraterritorial application of the wire fraud statute, the government attempts to support the verdict, the jury's acquittals on the two money laundering counts notwithstanding, on the *supposition* that the jury could "properly have found evidence insufficient to convict Napout of participating in the charged money laundering conspiracies but

1

sufficient to support money laundering and money laundering conspiracy as types of racketeering activity to be carried out by at least one of Napout's co-conspirators," *e.g.*, "the jury could have found that Napout agreed that other conspirators would commit money laundering and money laundering conspiracy relating to the Copa Libertadores and the Copa América." (DE:898:13). Just as the government relies on pure inference or speculation to support convictions for theft of honest services, it does so here in a fruitless attempt to sweep money laundering back in as a basis for extraterritorial jurisdiction, despite the not-guilty verdicts on the money laundering conspiracy counts. While this Court correctly looked to the substantive charges to determine if the alleged predicate acts would allow for the exercise of extraterritorial RICO statute, the government seems to think that the Court should now speculate that the jury—which determined that the government had failed to prove money laundering conspiracy as alleged—*might* have believed that Mr. Napout was involved in some *other* money laundering conspiracy, such that the government can claim the benefits of the money laundering statute's extraterritorial application. The government should not even be heard to make that request.

As to the wire fraud statute, which has no extraterritorial application, the government relies on a laundry list of contacts between various defendants in the United States, and asks the Court to disregard the comprehensive analysis in *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693, at *7-8 (E.D.N.Y. June 1, 2017), as "overly restrictive." But *Gasperini* applied the same "holistic" approach adopted by this Court in its order denying Mr. Napout's motion to dismiss. Because the alleged fraud was both directed *from* other countries and *to* other countries—and, at least as alleged in the SSI, caused injury *in* other countries—the government cannot sustain extraterritorial application of the RICO statute based on the wire fraud counts.

2

## II. THE RULE 29 STANDARD.

The parties agree on the governing Rule 29 standard. (DE:888:3; DE:898:5-6).

## III. THE GOVERNMENT'S CASE.

The parties generally agree with respect to the government's case at trial. (DE:888:4-7; DE:898:3-4). To the extent that there is disagreement as to the application of governing law to the facts presented at trial, such disagreements will be addressed in the argument section of this reply.

## IV. ARGUMENT.

### A. Honest-Services Fraud.

The government does not appear to disagree with Mr. Napout's explication of the law governing honest services fraud. (DE:888:8-11; DE:898:7). What the government does instead is suggest that Mr. Napout has misstated governing law, to the extent that, "in order to convict a defendant based upon a scheme to defraud another of the intangible right of honest services, as contemplated by 18 U.S.C. § 1346, it is unnecessary to prove that the defendant intended economic or pecuniary harm or that any such harm actually resulted from the fraud." (DE:898:7) (quoting *United States v. Rybicki*, 287 F.3d 257, 259-60 (2d Cir. 2002), *modified on reh'g en banc*, 354 F.3d 124 (2d Cir. 2003)). Inasmuch as Mr. Napout's Rule 29 motion quotes directly from the Second Circuit's en banc *Rybicki* decision, *i.e.*, "actual or intended economic or pecuniary harm to the victim need not be established" (DE:888:11) (quoting *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc)), it is difficult to see how the government can suggest that Mr. Napout has attempted to mislead the Court on Second Circuit precedent.

The panel decision in *Rybicki*, after having reviewed the various iterations of honest services fraud in the Circuits, selected the "reasonably foreseeable harm" standard, which "focuses the inquiry on whether the scheme at issue created a foreseeable risk of economic or

3

pecuniary harm to the victim, which is consistent with traditional notions of fraud and fraudulent harm." 287 F.3d at 265. The en banc court, however, *rejected* that standard (as noted in Mr. Napout's Rule 29 motion), in favor of "the 'materiality' test because it has the virtue of arising out of fundamental principles of the law of fraud"—that is, "[a] *material* misrepresentation is an element of the crime." *Rybicki*, 354 F.3d at 146 (original emphasis).

The en banc court was careful to note that its holding does *not* mean that the government need *never* prove economic harm, intended or otherwise: "[i]n the case of private actors, . . . the 'materiality' test captures those cases covered by the *Rybicki* panel opinion's version of the 'reasonably foreseeable harm' test." *Rybicki*, 354 F.3d at 146. "Where it is 'reasonably foreseeable that the scheme would cause some [non-*de minimis*] economic or pecuniary harm to the victim,' the misrepresentation is material because in such cases the victim's knowledge of the scheme would tend to cause the victim to change his or her behavior." *Id*. (alteration in original; citing to panel opinion). The only difference is that "[t]he reasonably foreseeable harm test of the . . . panel opinion . . . is limited to 'economic or pecuniary harm,'" such that "'materiality' may be a somewhat broader test," which "may capture some cases of *non-economic*, yet serious, harm in the private sphere." *Id*. (emphasis added). It is not that the Second Circuit's "materiality" standard takes actual or intended economic harm out of the honest services fraud statute, but rather that something *other* than economic harm may, under appropriate circumstances, provide a basis for a charge under the statute.

Here, however, the government specifically alleged *economic* harm. The SSI alleges that, "[b]y conspiring to enrich themselves through bribery and kickback schemes relating to media and marketing rights, among other schemes, the defendants deprived FIFA, the confederations, and their constituent organizations—and, therefore, the national member

4

associations, national teams, youth leagues, and development programs that relied on financial support from their parent organizations—of the full value of those rights." (DE:604:22). Additional economic harm, including, "anti-competitive effects, distorting the market for the commercial rights associated with soccer and undermining the ability of other sports marketing companies to compete for such rights on terms more favorable to the rights-holders," was also alleged. *Id.*[1] Thus, as Mr. Napout has argued (DE:888:11-12), the government was obligated to prove intended or actual economic harm. The analysis then turns to the question whether it did so.

> B. **The Government Failed to Prove That Mr. Napout Joined a RICO Conspiracy to Deprive FIFA or CONMEBOL of Honest Services.**

The government asserts that, "if the jury had been called upon to find whether there was economic harm, it certainly could have relied," in the first instance, on Dr. Szymanski's testimony. (DE:898:10 n.6). The government relies on this Court's ruling on the *admissibility* of Dr. Szymanski's testimony, and specifically the Court's ruling that "Dr. Szymanski's proposed testimony is highly probative on the issue of materiality." (DE:799:3-4; DE:898:10 n.6).[2] The government, however, ignores the Court's final ruling on Dr. Szymanski's testimony—that "Defendants will suffer no unfair prejudice from the admission of this part of Dr. Szymanski's

---

[1] The SSI also alleged that "the schemes deprived FIFA, the confederations, and their constituent organizations of their right to honest and loyal services of the soccer officials" because, "in the aggregate, such deprivations inflicted significant reputational harm on the victimized institutions, damaging their prospects for attracting conscientious members and leaders and limiting their ability to operate effectively and carry out their core missions." (DE:604:22-23). Even the government does not suggest that it prove such "reputational harm." (DE:898:7-10).

[2] In light of the discussion in the previous section, it is noteworthy that the Court's *full* recitation of its ruling, including the phrase elided from the government's quotation is that the testimony "is highly probative on the issue of materiality, *i.e.*, 'how an official's receipt of illicit bribes *harms a victim*,' which is an element of wire fraud conspiracy." (DE:799:3-4) (internal citation omitted). Indeed, the elided passage is quoted from the government's own *in limine* submission. *Id*.

5

testimony, *especially given that he will not testify about any of the facts of this case.*" (DE:799:5) (emphasis added).

Regardless whether the Court correctly ruled that Dr. Szymanski's testimony is *admissible*, for such purposes as the government may have sought to introduce it, his testimony was not "about any of the facts of this case." Simply stated, Dr. Szymanski's testimony does not *prove* that CONMEBOL or FIFA actually suffered any injury, or that any receipt of bribes by Mr. Napout or alleged co-conspirators was likely to cause such injury.

Looking to the analogous question presented under the Sentencing Guidelines on loss, U.S.S.G. § 2B1.1 cmt. n.3(C) (evidence must allow court to make "reasonable estimate of the loss"), as to which "a district court's findings must be grounded in the evidence and not derive from mere speculation." *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012). If speculation is insufficient to calculate loss under the guidelines, when the government is obligated to prove "the loss amount by a preponderance of the evidence," *United States v. Binday*, 804 F.3d 558, 597 (2d Cir. 2015), it is self-evidently insufficient on an element of a crime for which a defendant is on trial.[3]

---

[3] Indeed, even in civil cases, in which the same less-onerous burden applies, an award of economic damages may not be "rooted in speculation." *Alla v. Verkay*, 979 F. Supp. 2d 349, 375-76 (E.D.N.Y. 2013). Thus, in an action for breach of contract, a plaintiff may not recover damages that are "merely speculative, plausible or imaginary"; damages must be "capable of measurement based upon known reliable factors without undue speculation." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (citation omitted). Contract damages "must be reasonably certain and directly traceable to the breach." *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 980 F. Supp. 2d 400, 413-14 (E.D.N.Y. 2013) (citation omitted). Dr. Szymanski's testimony as to potential losses to soccer organizations if officials accept bribes would have been insufficient had CONMEBOL or FIFA brought civil actions against Mr. Napout or other defendants. It cannot possibly support a finding of guilt under the RICO or wire fraud statutes.

That leaves the government relying on two *non-expert* witnesses—Alejandro Burzaco and Luis Bedoya. (DE:898:10 n.6). The government relies on Mr. Burzaco's testimony that certain bribes, at one point in time, were "going to come out from CONMEBOL," rather than as "a private amount on top of increase." (T:334) (quoted in government's response). Not only did the government make no effort to qualify Mr. Burzaco as an expert witness, it also made no effort to satisfy the requirements of Federal Rule of Evidence 701 to introduce lay opinion testimony.[4]

"[L]ay opinion must be the product of reasoning processes familiar to the average person in everyday life," *United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013) (citation omitted), and the government's introduction of Dr. Szymanski's expert testimony on soccer organization finances establishes, beyond question, that the subject is very much one for expert economists and not lay witnesses.[5] Thus, while a high-ranking company official or a business owner is presented to testify to damages or loss calculations based on personal knowledge, such testimony will be allowed as admissible lay opinion testimony, provided "the data and method used" are "based on personal knowledge, usually from experience gained as an owner or officer." *Metro. Hosp. Partners, Ltd. v. Lexington Ins.*, 84 F. Supp. 3d 553, 564-65 (S.D. Tex. 2015); *Sprint Nextel Corp. v. Simple Cell Inc.*, 248 F. Supp. 3d 663, 675 (D. Md. 2017). The government

---

[4] Had the government attempted to do so, Mr. Napout would have objected—because the government failed to establish that any lay opinion from Mr. Burzaco would have been "rationally based on the witness's perception," and not "on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

[5] If Mr. Burzaco has any truly identifiable expertise, it is most likely in bribery—that is, he has certainly gained significant personal knowledge of that activity through his many years of bribery, during which he bribed at least 30 individuals with a total of $160 million. (T:824-25).

cannot, *post hoc*, convert Mr. Burzaco's off-the-cuff observations into admissible—much less probative—testimony as to potential (or actual) losses suffered by CONMEBOL or FIFA.

Moreover, the government takes Mr. Burzaco's testimony entirely out of context. Mr. Burzaco testified that, once he became the CEO of Torneos, he paid bribes to Julio Grondona, continuing an "existing practice" that predated his taking that position, "all the way until [Mr. Grondona] passed away in July 2014." (T:289). The bribes were paid "in exchange for a continuous extension of . . . contracts; in support for, in some cases, keeping away certain competitors." (T:290). Mr. Burzaco also paid bribes, "[w]ith a few notable exceptions," to members of the CONMEBOL executive committee, CONMEBOL's secretary general and other officers, "and always, also, the CONMEBOL president" between 2006 and 2015. (T:291-92). In 2009, Mr. Burzaco had a meeting with the Jinkises about the Copa Libertadores contract, in which it was agreed that "the total amount of payment was going to be $400,000 per president, per year," and that the funds were "going to come out from CONMEBOL out of increases," *i.e.*, "this was not a private amount on top of increase, but for them to take out of CONMEBOL's revenues and treasury." (T:333-34). The government seizes on this last bit of testimony to argue that it established actual injury to CONMEBOL at trial. (DE:898:10 n.6).

What the government overlooks is that—according to Mr. Burzaco—this arrangement was simply a reconfiguration of a long-standing bribery structure. Mr. Burzaco's testimony certainly did not establish that he or his co-conspirators were dipping their hands into the CONMEBOL treasury to remove monies that had been paid to CONMEBOL for the purpose of bribing CONMEBOL officers. Indeed, Mr. Burzaco characterized the arrangement as "profit sharing." (T:417). And the structure changed again in 2013, with the creation of Datisa, in connection with the settlement of litigation in the United States, reverting to direct payments to

8

the bribe recipients. (T:417-21).[6] When read in context, Mr. Burzaco's testimony does not show that any injury occurred, or was intended to occur, with respect to CONMEBOL.

And, without proper qualifications, neither Mr. Burzaco nor Mr. Bedoya was competent to testify to any *other* injury to CONMEBOL, despite the government's attempt to transform their casual observations into probative evidence of injury to CONMEBOL. Having failed to prove threatened or actual injury—the burden that the government assumed in alleging the offenses against Mr. Napout—the government's case on RICO and wire fraud fails.

## V. THE EVIDENCE DOES NOT SUPPORT EXTRATERRITORIAL APPLICATION OF THE RICO STATUTE AGAINST MR. NAPOUT.

The thrust of the government's response on extraterritoriality, as raised in Mr. Napout's motion (DE:888:14-16), is, in actuality, a *rejection* of the analysis employed by this Court in denying Mr. Napout's motion to dismiss. That is, the Court looked to the government's specific allegations in the money laundering conspiracy and wire fraud counts to determine whether the government sufficiently had alleged facts to allow the exercise of federal jurisdiction over extraterritorial application of the RICO statute. (DE:542:19-20). Having ruled that the wire fraud counts sufficiently alleged domestic applications of the wire fraud statute, and that the money laundering conspiracy counts adequately allege extraterritorial applications of the statute pursuant to Section 1956(f), the Court further ruled that, because the "extraterritorial reach of the

---

[6] As Mr. Burzaco explained, "CONMEBOL authorities or some of CONMEBOL authorities decided that the bribes that were paid out of CONMEBOL's official in-flows, . . . shouldn't be paid anymore from CONMEBOL's own money but the bribe should be paid independently of CONMEBOL's right to collect for those tournaments." (T:491). It could not be clearer that the difference between paying bribes out of monies that went to CONMEBOL and paying those bribes out separately were simply two means of accomplishing the same end, and nothing more.

9

RICO statute is coterminous with that of the underlying predicate offenses," the government could proceed on an alleged extraterritorial application of the RICO statute:

> Here, the money laundering conspiracies charged against Napout as predicates to the RICO conspiracy . . . have extraterritorial application, and the wire fraud conspiracies charged against Napout constitute domestic applications of the wire fraud statute. *See supra*. Thus, Count One properly charges a RICO conspiracy as to Napout based on extraterritorial applications of the money laundering statute and domestic applications of the wire fraud statute, as predicate offenses.

(DE:542:19).

But the government, faced with the jury's not guilty verdicts on the two money laundering conspiracy charges, argues that the jury, despite having acquitted Mr. Napout on the money laundering conspiracy counts, might have believed that the evidence was nonetheless "sufficient to support money laundering and money laundering conspiracy as types of racketeering activity to be carried out by at least one of Napout's co-conspirators in connection with the charged racketeering conspiracy." (DE:898:13). That is, according to the government, "the jury could have found that Napout agreed that other conspirators would commit money laundering and money laundering conspiracy relating to the Copa Libertadores and the Copa América (which would qualify as racketeering activity under Count One) but that he did not personally participate in those money laundering schemes (which would require that he would be acquitted of Counts Five and Seven)." *Id*.

The government's suggestion that it was required to demonstrate that Mr. Napout "personally participate[d]" in the money laundering for him to be found guilty of money laundering conspiracy is somewhat striking—particularly because, as the government argues on the preceding page of its response, a defendant need not have "personally participate[d]" in underlying acts to be found guilty of conspiracy. *United States v. Yannotti*, 541 F.3d 112, 123 (2d Cir. 2008); *United States v. Mayes*, No. 12-CR-385 (ARR), 2014 WL 25569, at *7 (E.D.N.Y.

10

Jan. 2, 2014). Indeed, the jury was so instructed, at the government's request. (DE:872:21-22) (government "need not prove that the defendant actually committed the unlawful act or acts charged as the objective of the conspiracy").[7] The jury's rejection of the money laundering conspiracy charges must be given its due weight.

Turning to the wire fraud allegations, the government sets forth a laundry list of contacts between various co-defendants and the United States, in addition to the alleged wire transfers, to argue that the evidence established a basis for domestic application of the wire fraud statute as a predicate offense for the RICO count. (DE:898:14-16). The government urges the Court to reject the analysis set forth in *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693 (E.D.N.Y. June 1, 2017), in determining whether the government sufficiently alleged domestic application of the wire fraud statute, suggesting that "the standard set forth in *Gasperini* is overly restrictive." (DE:898:17-18). But the *Gasperini* construct is identical to that applied by this Court in ruling on the motion to dismiss, under which the question was whether the wire fraud conspiracies were "being directed from or to the United States." (DE:542:15). The overarching goal of the RICO conspiracy, as the government itself asserts, was to "enter[] into secret deals with sports marketing companies and [take] bribes for themselves at the expense of the organizations they had a fiduciary duty to serve." (DE:898:3). Those organizations are the individual soccer federations and CONMEBOL. (DE:898:7-8).

---

[7] The government's unvarnished speculation that the jury might have believed Mr. Napout had joined some *other* money laundering conspiracy (DE:898:13), not only departs from this Court's careful analysis of the underlying offenses actually *charged* in the SSI, but also improperly attempts to substitute mere speculation for actual evidence. *E.g., United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("conviction based on speculation and surmise alone cannot stand").

11

The alleged fraud was thus aimed at organizations that are based in South America and, as the government itself asserts, the fraud was directed in South America. (T:4270-71). The acts listed by the government could have taken place—and, indeed, actually *did* take place—in locations around the world. (DE:898:14-16). There is absolutely no basis for the government's unsupported assertion that "the charged conspiracies . . . were directed from and to the United States." (DE:898:17 n.10).

The government continues to conflate actual alleged frauds, and "a means of perpetrating a fraud." *Gasperini*, 2017 WL 2399693, at *8. And, in the end, the government maintains the "extreme position" that this Court has already rejected. (DE:542:9-11).

Respectfully submitted,

| | |
|---|---|
| **GREENBERG TAURIG, LLP** | **PIÑERA-VAZQUEZ LAW FIRM** |
| One International Place | International Center |
| Boston, MA 02110 | 1900 Southwest 3rd Avenue |
| Tel: (617) 310-6000 | Miami, FL 33129 |
| pappalardoj@gtlaw.com | Tel: (305) 443-0629 |
| scherkere@gtlaw.com | sbp@pineravazquezlaw.com |
| becerraj@gtlaw.com | |
| | s/ Silvia B. Piñera-Vazquez |
| s/ Elliot H. Scherker | Silvia B. Piñera-Vazquez |
| A. John Pappalardo | |
| Elliot H. Scherker | |
| Jacqueline Becerra | |

12

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 14, 2018, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that this document is being served simultaneously on all counsel of record in the matter specified, either by transmission of Notices of Electronic Filing generated by CM/ECF, or in another authorized manner.

s/ Elliot H. Scherker
Elliot H. Scherker
