**quinn emanuel** trial lawyers | washington, dc

1300 I Street NW, Suite 900, Washington, District of Columbia 20005-3314 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8120**

WRITER'S EMAIL ADDRESS
**williamburck@quinnemanuel.com**

August 15, 2018

The Honorable Pamela K. Chen
U.S. District Judge
U.S. District Court for the Eastern District of
New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re:   *United States v. Napout* – Docket No. 15-cr-252 (PKC)

Dear Judge Chen:

    We represent the Fédération Internationale de Football Association ("FIFA") in connection with its request for restitution from Defendant Juan Ángel Napout. We are filing this victim statement in accordance with the Court's July 11, 2018 Order calling for victim submissions in connection with Napout's sentencing to be filed by August 15, 2018.

    Napout, a former member of the FIFA Executive Committee, was convicted on December 14, 2017 of conspiracy to commit racketeering and conspiracy to commit wire fraud in connection with the corruption of international soccer. Napout grossly abused his positions of trust in the soccer community to enrich himself, while causing significant direct and proximate harm to FIFA and its members.[1] FIFA has suffered considerable financial harm, including but not limited to losses for benefits paid to Napout during the period he was breaching his duties to FIFA, as well as investigative costs incurred by FIFA in connection with the U.S. government's criminal investigation into Napout's and his co-conspirators' illegal actions.

---

[1] The actions attributed to Napout and his co-conspirators in this victim statement are based upon (1) the Superseding Indictment in this case, *United States v. Webb, et al.*, 15-cr-252, Dkt. No. 102 (E.D.N.Y. Nov. 25, 2015) (the "Superseding Indictment"); (2) the Second Superseding Indictment in this case, Dkt. No. 603 (June 14, 2017) (the "Second Superseding Indictment"); (3) the trial transcript in this case (the "Trial Transcript"); and (4) public media.

The damage done by Napout's and his co-conspirators' greed cannot be overstated. Their actions have impaired FIFA's ability to use its resources for positive action throughout the world, and to meet its global mission of developing the game of soccer. As a victim of Napout's and his co-conspirators' crimes, FIFA is entitled to recover restitution under the Mandatory Restitution to Victims Act, 18 U.S.C. § 3663A *et seq.* ("MRVA").[2] We understand that to date, the U.S. government has ensured the forfeiture of more than $300 million in assets and identified, recovered, or frozen more than $100 million in the United States and abroad relating to the defendants' felonious schemes.[3] These funds should be used to compensate the victims of Napout's crimes, including FIFA, so that actions can be taken to repair the damage that he has done to the international soccer community.

I. **BACKGROUND**

During his career in international soccer, Napout held positions of trust and responsibility with a number of organizations, including:

1) Vice President of FIFA and a member of FIFA's Executive Committee from May through December 2015;

2) President of Confederación Sudamericana de Fútbol (the South American Football Confederation or "CONMEBOL"), a continental confederation of FIFA, from August 2014 through December 2015;

3) President of the Paraguayan Football Association, a member association of FIFA and CONMEBOL, from 2007 through August 2014; and

4) Member of the FIFA Disciplinary Committee from 2002 to May 2015.

As a member of the FIFA Executive Committee, Napout owed a fiduciary duty to FIFA both (1) as a member of a FIFA committee according to the FIFA Statutes and applicable FIFA rules and regulations, in particular the FIFA Code of Ethics,[4] and (2) by virtue of Swiss statutory

---

[2] Funds seized from and forfeited in these actions should be used first to compensate victims, either as restitution under the MRVA or through remission or restoration under 28 C.F.R. Part 9.

[3] *See* Press Release, *Sixteen Additional FIFA Officials Indicted For Racketeering Conspiracy And Corruption*, U.S. Dep't of Justice (Dec. 3, 2015), *available at* https://www.justice.gov/usao-edny/pr/sixteen-additional-fifa-officials-indicted-racketeering-conspiracy-and-corruption.

[4] *See* FIFA Statutes, General Provisions (2012) (FIFA officials defined as "every board member [and] committee member in FIFA, a Confederation, Association, League or club"); FIFA Statutes § 7.1 (2012) ("Officials must observe the . . . Code of Ethics of FIFA in their activities.").

2

law governing his mandate agreement with FIFA.[5] Furthermore, as President of the Paraguayan Football Association and CONMEBOL at various times, Napout was subject to the FIFA Code of Ethics and thus owed a fiduciary duty to FIFA, the confederations, and the member associations.[6]

Napout was one of 27 officials named in the Superseding Indictment unsealed on December 3, 2015, and was arrested in Switzerland the same day.[7] In the Second Superseding Indictment filed on June 14, 2017 in anticipation of Napout's trial, Napout was charged with five counts of (1) conspiracy to commit racketeering, (2) conspiracy to commit money laundering, and (3) conspiracy to commit wire fraud, all in connection with schemes to sell marketing and media rights to South American soccer tournaments.[8]

Napout was convicted after trial of one count of conspiracy to commit racketeering and two counts of conspiracy to commit wire fraud.[9] At trial, the Government presented overwhelming evidence, including voice recordings, witness testimony, and bank records, showing that Napout agreed to receive bribes and kickbacks in connection with the above-referenced tournaments in the amount of approximately **$10.5 million**.[10]

## II. NAPOUT'S CONDUCT HARMED FIFA

As the Second Superseding Indictment stated, Napout's and his co-conspirators' illegal schemes "deprived *FIFA*, the confederations, and their constituent organizations of their right to the honest and loyal services of the soccer officials involved."[11] The Second Superseding Indictment went on to note the significant harm that FIFA had suffered as a result of Napout's and his co-conspirators' actions, including by "limiting [FIFA's] ability to operate effectively and carry out [its] core mission."[12] U.S. Attorney General Loretta Lynch also publicly recognized that FIFA

---

[5] *See, e.g.*, Swiss Code of Obligations Art. 398 para. 2 (2016) (mandating that agents in Switzerland owe their principal the faithful and diligent performance of the work entrusted to them).

[6] *See* FIFA Code of Ethics § 15 (2012) ("Persons bound by this Code shall have a fiduciary duty to FIFA, the confederations, associations, leagues and clubs.").

[7] *See* Press Release, *Sixteen Additional FIFA Officials Indicted for Racketeering Conspiracy and Corruption*, U.S. Dep't of Justice (December 3, 2015), *available at* https://www.justice.gov/opa/pr/sixteen-additional-fifa-officials-indicted-racketeering-conspiracy-and-corruption.

[8] *See* Second Superseding Indictment ¶¶ 121–127, 132–135.

[9] *See* Jury Verdict Sheet, Dkt. 873.

[10] *See* Trial Transcript at 4302:4–14; *see also* Government Exs. 100, 601, 1710-T; Trial Transcript at 232:20–233:2, 234:4–6, 380:1–20, 388:9–24, 419:1–14 (testimony of Alejandro Burzaco).

[11] Second Superseding Indictment ¶ 62 (emphasis added).

[12] *Id.*

3

suffered harm at the hands of Napout and his co-conspirators when she publicly noted that "this corruption essentially hurts . . . the organization [*i.e.*, FIFA] itself."[13] Another DOJ official added that "certainly FIFA," among others, "are victims in the case . . . . If there comes a point in time that victims such as those . . . can come before the court and apply for restitution, we're certainly hopeful that those types of true victims . . . can get some of these forfeitures money that have been collected."[14]

> **A. Napout Obtained Benefits From FIFA Under False Pretenses and FIFA Should be Awarded Restitution in the Full Amount of Benefits It Paid to Napout**

As noted above, by virtue of his status as a FIFA official while President of the Paraguayan Football Association and later a member of the FIFA Executive Committee, Napout owed a fiduciary duty to FIFA.[15] At trial, the jury found that Napout knowingly and intentionally conspired to defraud FIFA when he accepted the illicit payments while he owed that fiduciary duty.[16] Napout's conduct was entirely at odds with what FIFA expects from its officials and violated numerous FIFA regulations, including the FIFA Code of Ethics, as well as applicable Swiss law.[17]

The Preamble to the FIFA Code of Ethics makes clear that FIFA officials, broadly defined, are not mere employees or independent contractors. Rather, they are stewards of international soccer and charged with the ethical administration of the game. It states:

> ***The conduct of persons bound by this Code shall reflect the fact that they support the principles and objectives of FIFA, the confederations, associations, leagues and clubs in every way and refrain from anything that could be harmful to these aims and objectives.*** They shall respect the significance of their allegiance to FIFA, the confederations, associations, leagues and clubs, and represent them and behave towards them honestly, worthily, respectably and with integrity. ***They shall further respect the core value of fair play in every aspect of their functions.***[18]

---

[13] Press Conference, *Attorney General Lynch on FIFA Arrests*, U.S. Dep't of Justice (Dec. 3, 2015), *available at* http://www.c-span.org/video/?401555-1/attorney-general-loretta-lynch-fifa-arrests&start=2835.

[14] *Id.*

[15] *See* supra n. 4.

[16] *See* Second Superseding Indictment ¶¶ 121–127, 132–135; Jury Verdict Sheet, Dkt. 873.

[17] *See, e.g.*, FIFA Code of Ethics § 13.4 (2012) ("Persons bound by this Code shall . . . act with complete credibility and integrity."); *id.* at § 13.5 ("Persons bound by this Code shall not abuse their position in any way, especially to take advantage of their position for private aims or gains.").

[18] FIFA Code of Ethics, Preamble (2012) (emphasis added).

The FIFA Code of Ethics also includes specific provisions governing the conduct of FIFA officials, namely that, "Persons bound by this Code shall show commitment to an ethical attitude. They shall behave in a dignified manner and act with complete credibility and integrity."[19] Further, "Persons bound by this Code may not abuse their position in any way, especially to take advantage of their position for private aims or gains."[20]

Napout repeatedly and grossly violated specific provisions of the FIFA Code of Ethics. These include the relevant provisions on bribery and corruption, which state that FIFA officials must not "offer, promise, give or accept any personal or undue pecuniary or other advantage in order to obtain or retain business or any other improper advantage to or from anyone within or outside FIFA. Such acts are prohibited, regardless of whether carried out directly or indirectly through, or in conjunction with, intermediaries or related parties as defined in this Code."[21] The bribes that Napout took clearly and incontrovertibly violated these specific provisions.

But Napout also violated the spirit and the general provisions of the FIFA Code of Ethics, which required him to conduct himself in an ethical and transparent manner in all issues related to international soccer. Rather than protect and promote the integrity of soccer, as was his duty, Napout's conduct undermined it.

By depriving FIFA of his honest services, Napout unfairly obtained money from FIFA in the form of daily *per diems* and travel expenses when attending FIFA events while he was supposed to be honestly conducting his FIFA responsibilities. Between June 2009 and December 2015, Napout received a net total of **$121,446.30** in benefits from FIFA, as described below in Figure 1.

| **Figure 1: FIFA Payments to Napout** | | |
|---|---|---|
| **Payment Date** | **Reason for Payment** | **Amount of Payment** |
| 6/30/2009 | Daily allowances for attendance at FIFA Confederations Cup 2009 in South Africa in June 2009 | $3,750.00 |
| 10/26/2009 | Daily allowances for attendance at FIFA Associations Committee meeting in Zurich in October 2009 | $1,000.00 |
| 4/15/2010 | Daily allowances for attendance at FIFA Disciplinary Committee meeting in Zurich in April 2010 | $1,250.00 |
| 5/6/2010 | Airfare for attendance at FIFA Disciplinary Committee meeting in Zurich in April 2010 | $5,310.00 |

---

[19] FIFA Code of Ethics § 13.3 (2012).

[20] FIFA Code of Ethics § 13.4 (2012).

[21] FIFA Code of Ethics § 21.1 (2012). At Napout's trial, Ms. Maennl testified that the 2004, 2006, and 2009 versions of the FIFA Code of Ethics also contained provisions (1) imposing a duty of loyalty on FIFA officials; and (2) prohibiting FIFA officials from accepting bribes or other undisclosed cash payments or gifts. *See* Trial Transcript at 149:25–153:19.

| | | |
|---|---|---|
| 5/18/2010 | Daily allowances for attendance at FIFA Disciplinary Committee meeting in Zurich in May 2010 | $1,000.00 |
| 6/11/2010 | Daily allowances for attendance at 2010 FIFA World Cup in South Africa in June and July 2010 | $10,250.00 |
| 8/24/2010 | Airfare for attendance at FIFA Disciplinary Committee meeting in Zurich in May 2010 | $5,210.70 |
| 10/26/2010 | Daily allowances for attendance at FIFA Disciplinary Committee meeting in Zurich in October 2010 | $1,250.00 |
| 11/18/2010 | Daily allowances for meeting with President of Bolivia in September 2010 | $500.00 |
| 10/19/2011 | Daily allowances for attendance at FIFA Associations Committee meeting in Zurich in October 2011 | $1,000.00 |
| 10/19/2011 | Airfare for attendance at FIFA Associations Committee meeting in Zurich in October 2011 | $6,188.00 |
| 11/29/2011 | Daily allowances for attendance at FIFA Task Force Transparency and Compliance Meeting in Zurich in November 2011 | $1,250.00 |
| 1/19/2012 | Daily allowances for attendance at FIFA Task Force Transparency and Compliance Meeting in Zurich in January 2012 | $1,000.00 |
| 2/27/2012 | Daily allowances for attendance at FIFA Task Force Transparency and Compliance Meeting in Zurich in February 2012 | $1,000.00 |
| 7/23/2014 | Daily allowances for attendance at 2014 FIFA World Cup Brazil in June and July 2014 | $9,250.00[22] |
| 9/8/2014 | Daily allowances for attendance at FIFA Task Force Qatar 2022 meetings in Zurich in September 2014 | $1,000.00 |
| 10/10/2014 | Airfare and daily allowances for attendance at meeting of confederation presidents in Zurich in September 2014 | $8,927.94 |
| 12/18/2014 | Airfare for two and daily allowances for attendance at 2014 FIFA Club World Cup in Morocco in December 2014 | $15,776.00 |
| 3/19/2015 | Airfare for two and daily allowances for attendance at confederation presidents meeting in Zurich in March 2015 | $37,023.86 |
| 5/26/2015 | Daily allowances for attendance at FIFA Congress in Zurich in May 2015 | $6,750.00[23] |
| 7/20/2015 | Daily allowances for attendance at FIFA Executive Committee Meeting in July 2015 | $3,000.00 |
| 9/8/2015 | Daily allowances for attendance at the preliminary draw for the 2018 FIFA World Cup in July 2015 | $4,500.00 |
| 10/19/2015 | Daily allowances for attendance at FIFA Executive Committee Meeting in September 2015 | $5,250.00 |
| 10/20/2015 | Daily allowances for attendance at FIFA Executive Committee Meeting in October 2015 | $3,000.00 |
| 11/9/2015 | Daily allowances for attendance at 2015 FIFA Under-17 World Cup in October 2015 | $5,250.00 |
| 12/2/2015 | Daily allowances for attendance at FIFA Executive Committee Meeting in December 2015 | $3,750.00 |

---

[22] Note that while FIFA actually transferred $9,343.89 to Napout at this time, it appears that FIFA inadvertently added $93.89 to Napout's claimed amount of $9,250. Therefore, FIFA is only requesting the $9,250 that Napout claimed in connection with this trip.

[23] Note that while supporting documentation indicates that Napout was entitled to receive an additional $36,913.02 in airfare expenses in connection with this trip, that amount was never transferred to him.

6

| 2/24/2016 | Payment to Swiss hotel for Napout's hotel costs for attendance at FIFA meeting in Zurich in November and December 2015 | $7,235.78 |
| --- | --- | --- |
| 8/10/2017 | Reimbursement to FIFA of funds recovered from Napout's prepaid Visa card | -$29,225.98 |
| | NET TOTAL: | $121,446.30[24] |

Napout was not entitled to those payments because he did not give FIFA the full value of his honest services in return. FIFA is therefore entitled to restitution for all benefits paid to Napout, even benefits that are not salaries. *See, e.g.*, *United States v. Donaghy*, 570 F. Supp. 2d 411, 429 (E.D.N.Y. 2008) (rejecting defendants' argument that restitution should be limited to salary only and holding, "to the same extent that the NBA suffered loss in the form of salary payments for dishonest services, so too did it suffer loss when it paid Donaghy's expenses for traveling to games at which he did not perform his services honestly"), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009); *United States v. Fiorentino*, 149 F. Supp. 3d 1352, 1360 (S.D. Fla. 2016) (rejecting defendants' argument that restitution should only be awarded for defendants' "base pay and benefits" and instead awarding restitution based on all benefits paid to defendants on theory that "Systemax paid all compensation on the understanding that Defendants would provide wholly honest services to the company"); *see also United States v. Bahel*, 662 F.3d 610, 649 (2d Cir. 2011) (affirming restitution order for part of convicted UN employee's salary because "[t]here is no question that a portion of an individual's salary can be subject to forfeiture where, as here, an employer pays for honest services but receives something less"); *United States v. Skowron*, 839 F. Supp. 2d 740, 745 (S.D.N.Y. 2012) (awarding an employer partial return of compensation paid to employee convicted of an insider trading scheme because the "offenses of conviction directly and proximately harmed [the employer] . . . . [The] crimes deprived [the employer] of the honest services of its employee, diverted valuable corporate time and energy in the defense of [the employee and the employer], and injured [the employer's] reputation."), *aff'd*, 529 F. App'x 71 (2d Cir. 2013).

Often, where the fraud victim is an employer seeking restitution for salary and benefits paid to a dishonest defendant, courts have held that the proper measure of restitution is "the difference in the value of the services that [the defendant rendered to the victim] and the value of the services that an honest [defendant] would have rendered." *Bahel*, 662 F.3d at 650 (quoting *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998)). However, numerous courts have recognized that such a calculation is complex, at best. *See, e.g.*, *Bahel*, 662 F.3d at 649 ("Indeed, the district court explicitly noted that the record showed that 'it would be unduly complex to try to delineate which part of the $876,000 [the amount Bahel earned in salary between 1999 and 2006, the period covered by the fraud] was paid for honest services and which part was paid for the dishonest services.'").

Faced with this calculation, some courts have reasoned that, once the government has made the initial showing by a preponderance of the evidence that the victim is entitled to recover salary

---

[24] Note that this amount does not include Napout's salary for his time on the FIFA Executive Committee, as though FIFA credited that amount to Napout's account with FIFA, Napout never arranged for it to be transferred to him.

and benefits payments made to the defendant, the burden switches to the defendant to demonstrate the amount of legitimate services that he provided in order to offset the restitution amount. *See United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011).

In *Bryant*, the defendant politician received a "low-show" job from a university as part of a corrupt arrangement with a University official, and the court determined that the university could recover the salary paid to the politician as restitution. *See id.* at 237. Though the court agreed that the politician should be able to "offset" the salary portion of the restitution award to the university by the amount of legitimate services he rendered, the court put the burden on the defendant to prove the value of those services. *See id.* at 254 ("Likewise, with respect to an offset for services rendered, we believe that, because [t]he restitution statute allocates the various burdens of proof among the parties who are best able to satisfy those burdens [,] ... the defendant should know the value of any [legitimate services] he has already provided to the victim[, and so] ... the burden should fall on him to argue for a reduction in his restitution order." (internal quotation omitted)).

When the defendant in that case could not prove the value of the legitimate services, the court awarded the university restitution in the amount of 100% of the salary and benefits paid to the politician. *Id.*; *see also United States v. Crawley*, 533 F.3d 349, 359 (5th Cir. 2008) (awarding victim employer restitution in the amount of 100% of the salary and benefits paid to the defendant because "the MRVA requires the defendant to return any ill-gotten property which has been acquired by, *inter alia,* fraud on the victim").

Here, Napout was a FIFA official, including at one time a member of its highest executive body, for almost ten years. Despite his obligations to FIFA and international soccer under the FIFA regulations, including the FIFA Code of Ethics, and applicable Swiss statutory law, Napout participated in an unprecedented campaign of corruption, the exposure of which shook the sport to its core. In addition to the central offense of agreeing to accept over $10 million in bribes to improperly steer marketing and media rights contracts to favored companies, Napout participated in multiple meetings with sports marketing executives paying bribes to FIFA officials, including to negotiate higher bribes and coordinate overall strategy for the illegal schemes after Julio Grondona's death.[25]

In fact, Napout's and his co-conspirators' conduct, considered as a whole, compromised the entirety of FIFA's mission to develop and promote international soccer in an ethical, transparent manner.[26] Among the schemes that Napout and his co-conspirators were charged with

---

[25] *See, e.g.*, Trial Transcript at 508:21–509:11, 537:3–20, 538:24–539:24, 552:8–553:2, 568:15–570:4.

[26] Defendants convicted of roles in conspiracies are liable in restitution for the full loss to the victims, including losses attributable to uncharged or unconvicted counts, and losses based on the actions of co-conspirators. *See, e.g.*, *United States v. Hatfield*, 2015 WL 13385926, at *4 (E.D.N.Y. Mar. 27, 2015); *see also United States v. Smith*, 513 Fed. Appx. 43, 46 (2d Cir. 2013) ("Because [the defendant] was convicted of a conspiracy to commit access device fraud, the district court properly ordered restitution for all losses caused by [the defendant], as well as by the reasonable foreseeable actions of her coconspirators.").

and various individuals pleaded guilty to were schemes involving all key aspects of FIFA's administration, including: (1) the selection of the FIFA World Cup™ host country[27]; (2) the sale of media rights to FIFA, confederation, and member association tournaments and matches[28]; (3) the election of the FIFA President[29]; and (4) the organization of international friendly matches.[30] These functions comprise many of FIFA's core responsibilities.

Further, it bears repeating that Napout was a member of the FIFA Executive Committee for a time, in addition to the President of CONMEBOL. The executives that hold these lofty positions are the face of international soccer to fans around the world, and the additional power they wield in administering the game is accompanied by added responsibilities to ensure that its development is carried out in a responsible and even-handed manner. Napout's crimes are particularly egregious because, as a member of the FIFA Disciplinary Committee for over a decade, Napout was responsible for investigating and sanctioning the very conduct that he was engaged in on a near-daily basis. Napout thus owed a duty to FIFA, the confederations, and the member associations to protect their interests and bring a stop to his co-conspirators schemes, but he instead decided to participate in, and in some cases direct, the illegal schemes to profit at the expense of international soccer.

In sum, Napout's fundamental responsibility as a FIFA official was to act as a steward for the ethical development of soccer around the world. To say that Napout and his co-conspirators failed spectacularly is an understatement. Their actions compromised FIFA's core functions, from the selection of a FIFA World Cup™ host to the sale of media rights for international soccer tournaments to the election of the FIFA President. It is difficult to imagine more dishonest services that Napout could have rendered, and FIFA is entitled to restitution for those dishonest services. Napout should bear the burden of establishing the value of the honest services he provided, if any.

FIFA respectfully submits that Napout cannot carry this burden and show any legitimate services, and therefore he should be ordered to provide restitution to FIFA in the amount of

---

[27] *See* Superseding Indictment at ¶¶ 216–230 (alleging scheme in which multiple of Napout's co-conspirators agreed to receive bribes in order to change their votes for the 2010 FIFA World Cup™ host country).

[28] *See, e.g.*, Superseding Indictment at ¶¶ 143–194, 202–215 (alleging numerous schemes involving Napout and his co-conspirators in which they accept bribes in connection with the sale of media rights to multiple international soccer tournaments, including the FIFA World Cup™, CONMEBOL Copa América, CONCACAF Gold Cup, CONMEBOL Copa Libertadores, and CBF Copa de Brasil).

[29] *See* Superseding Indictment at ¶¶ 292–303 (alleging scheme in which at least one of Napout's co-conspirators agreed to assist a candidate in the 2011 FIFA presidential election pay bribes to electors).

[30] *See* Superseding Indictment at ¶ 138 (alleging scheme in which at least one of Napout's co-conspirators agreed to pay bribes in connection with organization of the Salvadoran national team's friendly matches in Washington, D.C. and Chile).

**$121,446.30**, or 100% of the net benefits, *per diems*, and travel expenses FIFA paid to Napout during his period of misconduct.

> **B.    Napout and His Co-Conspirators Caused FIFA to Incur Significant Attorney Fees and Legal Costs**
>
> **1.    FIFA Should be Awarded the Attorney Fees and Legal Costs it Incurred in Investigating Napout's and His Co-Conspirators' Criminal Conduct**

FIFA has incurred substantial costs investigating Napout's and his co-conspirators' misconduct and assisting the U.S. government's investigation and prosecution of it. And as a victim of Napout's fraud, FIFA's investigative costs in connection therewith are recoverable as restitution from Napout.

The MRVA states that fraud victims like FIFA are entitled to restitution from the defendant for "expenses incurred during participation in the investigation or prosecution of the offense." *See* 18 U.S. Code § 3663A(b)(4) (emphasis added). The Second Circuit has definitively concluded that the "expenses" referenced in the statute include attorney fees and legal costs incurred by the victim during an internal investigation of the defendant's fraud, where the internal investigation is conducted at the government's request or invitation alongside the government's own criminal investigation. *See, e.g.*, *United States v. Amato*, 540 F.3d 153, 159–60 (2d Cir. 2008) (under Section 3663A(b)(4), "'other expenses' incurred during the victim's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense may include attorney fees and accounting costs").

Further, the Second Circuit has held that courts have significant discretion in awarding attorney fees as restitution, even where the scope of the victim's investigation exceeded the precise limits of the government's own investigation. *See, e.g.*, *United States v. Cuti*, 778 F.3d 83, 93 (2d Cir. 2015) ("In *Amato*, we affirmed a restitution award of attorney's fees and accounting costs incurred as a result of an internal investigation that uncovered fraud notwithstanding that not all of the effort and expense was requested by the government." (internal quotation omitted)); *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) ("[T]he internal investigations paid for by the victims unmasked fraud and led to investigations conducted by the authorities. The expense of the internal investigations was necessary because the entity had interests to protect (the integrity of its ongoing operations and reputation, at the least) as well as a duty to protect those interests when faced with evidence, indicia, or a grounded suspicion of internal misconduct, and the investigation was a means calculated to achieve the protection of those interests.").

The Supreme Court recently considered the scope of the MRVA's restitution provisions in instances where the victim conducts an internal investigation in response to the defendant's fraud. In *Lagos v. United States*, GE Capital was the victim of defendant Lagos's fraudulent scheme to secure a business line of credit. 138 S. Ct. 1684 (2018). When Lagos confessed the scheme to GE Capital, it revoked the line of credit and started an internal investigation. *See id.* at 1687. It wasn't until some time later that Lagos and his co-conspirators were indicted by the U.S. government. *See id.* at 1690. In the meantime, GE Capital had incurred almost $5 million in attorney fees in

10

connection with its internal investigation and a related bankruptcy proceeding involving Lagos's company. *See id.* at 1685. At Lagos' sentencing, GE Capital sought and was awarded restitution in the entire amount of its attorney fees (among other costs). *See id.*

Though it denied GE Capital's request for restitution, the Supreme Court affirmed that attorney fees incurred by the victim in connection with a U.S. government investigation or criminal proceeding were recoverable, so long as the victim's investigation was conducted during the pendency of the U.S. government's investigation or prosecution. *See id.* at 1688, 1690. As such, *Lagos* confirms FIFA's entitlement to restitution from Napout for the cost of its internal investigation. There can be no doubt that FIFA's legal costs were incurred in connection with assisting a U.S. government investigation or criminal proceeding. Over 40 individuals and entities in international soccer have been indicted for their participation in the corrupt schemes, over 25 have pleaded guilty or entered into deferred prosecution agreements, and two, including Napout, were found guilty at trial.

Further, FIFA did not begin its investigation until May 27, 2015—the date the first U.S. criminal indictment was unsealed and numerous conspirators were arrested in Zurich, Switzerland. Indeed, there was no need for such investigation before the criminal indictment was unsealed, as FIFA did not receive advance notice of the indictment or the planned arrests. As such, all of the attorney fees FIFA requests restitution for were incurred during the pendency of the U.S. government's investigation and prosecution.

In sum, under both well-settled Second Circuit law and the Supreme Court's recent *Lagos* decision, FIFA is entitled to restitution for the legal costs it incurred in investigating Napout's and his co-conspirators' conduct.

### 2. FIFA Incurred Substantial Attorney Fees Attending Napout's Trial and Investigating His and His Co-Conspirators' Conduct

FIFA has incurred substantial attorney fees assisting the U.S. government's wide-ranging investigation in the more than three years since the U.S. criminal indictment was unsealed on May 27, 2015. During that time, FIFA has wholeheartedly cooperated with the U.S. government in numerous ways, including by investigating areas of interest to the U.S. government and sharing the results of its investigation. The scope of FIFA's investigation has been enormous, as the defendants were charged with, and pleaded guilty to or were convicted for their involvement in, a multitude of unique schemes spanning decades and related to FIFA World Cup$^{TM}$ hosting rights, FIFA World Cup$^{TM}$ qualifying matches, confederation tournaments, friendly matches, and more. And as the U.S. government's investigation continues, so too does FIFA's cooperation.

FIFA's request for restitution of its attorney fees is comprised of two parts. First, FIFA was asked to prepare and produce a witness for the prosecution at the trial of Manuel Burga, José Maria Marin, and Napout.[31] FIFA's fees related to this witness's testimony fall squarely within

---

[31] Ms. Stephanie Maennl, Deputy Head of Corporate Legal for FIFA, was called on November 13, 2017 as the U.S. government's first witness. *See* Trial Transcript at 97:1–158:19.

11

the MRVA and the *Lagos* decision, as the U.S. government requested that a FIFA witness testify at trial. FIFA also incurred reasonable fees by having one of its external lawyers attend the six-week long trial to closely monitor the proceedings. Napout should be held jointly and severally liable with his convicted co-defendant, Marin, for FIFA's attorney fees in connection with the trial in the amount of **CHF 125,030.33**.[32]

Second, FIFA conducted a comprehensive internal investigation into Napout's and his co-conspirators' conduct in response to the U.S. criminal indictment. In fact, as a member of the FIFA Executive Committee in May 2015 when the U.S. criminal indictment was unsealed, Napout was informed of the proposed investigation into the allegations and approved the scope and subject matter of the investigation (along with the other members of the FIFA Executive Committee). Napout therefore cannot dispute that the investigation was a reasonable and necessary response to the crimes that he and his co-conspirators committed. Further, these fees fit squarely within the text of the MRVA, Second Circuit precedent, and the *Lagos* decision, as FIFA's investigation (1) began after the May 27, 2015 criminal indictment was filed—that is, "during" the U.S. government's criminal investigation—and (2) was performed in consultation with the U.S. government and the results of the investigation were shared with the U.S. government.[33]

Napout should be held jointly and severally responsible for FIFA's attorney fees to conduct the investigation, comprised of (1) Quinn Emanuel attorneys to investigate the defendants' conduct, prepare written reports and transmit them to the U.S. government, and represent FIFA before the U.S. government; and (2) digital forensics consultants to collect, process, and host the data reviewed as part of the investigation.[34]

First, after the U.S. criminal indictment was unsealed on May 27, 2015, Quinn Emanuel attorneys designed, implemented, and conducted a comprehensive internal investigation into Napout's and his co-conspirators' misconduct. The overwhelming majority of the investigation was spent reviewing schemes (1) explicitly alleged in the U.S. indictment, or (2) suggested to FIFA by the U.S. government as areas to investigate. FIFA therefore requests as restitution (1) Quinn Emanuel's fees related to designing, implementing, and conducting the review, or **CHF 16,586,493.74**, as well as (2) Stroz Friedberg's fees related to hosting and processing the reviewed data, or **CHF 9,774,410.42**.

---

[32] FIFA required its service providers to invoice it in Swiss Francs for the duration of the investigation.

[33] *See* Press Release, *FIFA completes internal investigation, shares findings with authorities*, FIFA (Mar. 31, 2017) ("FIFA understands and has agreed that the reports will also be made available to the U.S. authorities."), *available at* https://www.fifa.com/governance/news/y=2017/m=3/news=fifa-completes-internal-investigation-shares-findings-with-authorities-2878303.html.

[34] FIFA is only requesting restitution for a portion of the legal fees it incurred since the U.S. criminal indictment was unsealed on May 27, 2015.

Second, FIFA prepared investigative reports based on its findings from the above-referenced investigation. These reports bore directly on schemes described in the U.S. criminal indictment, and were ultimately transmitted to the U.S. government. The fees for preparing the thousands of pages of reports and tens of thousands of pages of exhibits, and transmitting them to the Swiss and U.S. governments are **CHF 1,716,262.63**.

FIFA respectfully requests that Napout be held jointly and severally liable for FIFA's total investigative costs of **CHF 28,077,166.79**, along with the remaining defendants to be sentenced. Through their criminal schemes to pay or receive bribes, these individuals corrupted international soccer. The revelation of these schemes in the U.S. criminal indictment led directly to FIFA's investigation, and all are equally liable for the fees that FIFA incurred in conducting that investigation.

*   *   *

In conclusion, as a victim of Juan Ángel Napout's criminal conduct, FIFA respectfully requests restitution for the benefits Napout wrongfully induced FIFA to pay to him, as well as the legal fees FIFA incurred in investigating Napout's and his co-conspirators' illegal conduct. Further information and supporting documentation is available upon request, and we are available to discuss any of the above-raised issues. Restitution is appropriate and should be awarded for:

(a) Benefits, travel expenses, and other compensation FIFA paid to Napout in the amount of **$121,446.30**;

(b) FIFA's costs to participate in Napout's trial at the U.S. government's request, totaling **CHF 125,030.33**, jointly and severally with Marin; and

(c) FIFA's legal fees incurred during its participation in the investigation and prosecution of Napout's and his co-conspirators' crimes, totaling **CHF 28,077,166.79**, jointly and severally with the remaining defendants to be sentenced.

Very truly yours,
Quinn Emanuel Urquhart & Sullivan LLP

William A. Burck
Thomas Werlen
Stephen M. Hauss

*Attorneys for Fédération Internationale de Football Association*

CC: All counsel of record (via ECF)