**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **Case No. 15 CR 252 (S-1)(RJD)** |
| **JUAN ANGEL NAPOUT,** | : | |
| **Defendant.** | : | |

---

### SENTENCING MEMORANDUM ON BEHALF
### OF JUAN ÁNGEL NAPOUT

**PIÑERA-VAZQUEZ LAW FIRM**
Silvia B. Piñera-Vazquez

**HUGHES HUBBARD & REED LLP**
Marc A. Weinstein
Edward J.M. Little

Attorneys for Juan Ángel Napout

92142103_2

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT .......................................................................1

        A.      A Contrast in Human Nature .........................................................1

        B.      The Jury Verdict ............................................................................2

        C.      The Presentence Investigation Report ..........................................3

II.     JUAN NAPOUT'S PERSONAL BACKGROUND AND CHARACTER.......................5

        A.      Personal History, Education and Career .......................................5

        B.      Family Life.....................................................................................11

        C.      Involvement in Sports....................................................................14

        D.      Compassion and Generosity ..........................................................15

        E.      Humanitarian Efforts in Paraguay ...............................................18

III.    THE ADVISORY SENTENCING GUIDELINES CALCULATION............................20

        A.      Section 2B1.1(b)(10) Does Not Apply ..........................................20

        B.      Application of Section 3B1.3 Would Constitute Impermissible
                Double Counting.............................................................................23

        C.      Mr. Napout Did Not Obstruct Justice ...........................................25

        D.      A Leadership Role Enhancement Is Not Warranted.......................29

        E.      The Government Grossly Overstates the "Loss" Figures Under
                § 2B1.1(b)(1)..................................................................................33

IV.     THE § 3553(a) FACTORS CALL FOR A NON-GUIDELINES
        SENTENCE ..........................................................................................48

        A.      An Individualized Assessment of Juan's Character and
                Background Mitigate Against Substantial Additional Incarceration ....................52

        B.      The Nature and Circumstances of Juan's Conviction Do Not
                Warrant a Sentence of Substantial Additional Incarceration ................................53

        C.      Substantial Additional Incarceration is Not Necessary to Satisfy
                the Goals of Section 3553(a)(2)....................................................54

92142103_2

      D.      Consideration of Other Sentencing Collateral Consequences ...............................58

V.      THE GOVERNMENT FAILED TO ESTABLISH AN ADEQUATE BASIS FOR FORFEITURE ...............................................................................62

      A.      Alleged Bribe Payments .......................................................................63

      B.      Salaries and Honoraria .........................................................................64

VI.      THE COURT SHOULD NOT IMPOSE A FINE ............................................64

VII.      CONCLUSION.................................................................................................65

92142103_2

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ...........................................................48, 49, 51

*Honeycutt v. United States*, 137 S.Ct. 1626 (2017) ................................................62, 63

*Kimbrough v. United States*, 552 U.S. 85 (2007) ..........................................................48

*Koon v. United States*, 518 U.S. 81 (1996)..............................................................1, 51

*Nelson v. United States*, 555 U.S. 350 (2009) ...............................................................48

*Pepper v. United States*, 131 S.Ct. 1229 (2011) ...............................................................1

*Rita v. United States*, 551 U.S 338.....................................................................48, 50

*Skilling v. United States*, 561 U.S. 358 (2010) ..............................................................25

*Spears v. United States,* 555 U.S. 261 (2009)................................................................50

*United States v. Adelson*, 441 F.Supp. 2d 506 (S.D.N.Y 2006), *aff'd* 301
    Fed.Appx 93 (2d Cir. 2008)........................................................................50, 51

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016)...............................................51

*United States v. Block*, No. 16 Cr. 595 (S.D.N.Y.)........................................................57

*United States v. Booker*, 543 U.S. 220 (2005) ...............................................................48

*United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995) ...............................................24

*United States v. Collins*, No. 07 Cr. 1170 (S.D.N.Y.) (Preska, J.) ................................57

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ...................................................50

*United States v. Defeo*, 36 F.3d 272 (2d Cir. 1994).......................................................26

*United States v. Faibish*, No. 12-CR-265 (E.D.N.Y. 2015)(Vitaliano, J.) ......................3

*United States v. Ferguson*, 584 F.Supp. 2d. 447 (D. Conn. 2008) ................................51

*United States v. Graham*, No. 06 Cr. 137 (D. Conn.) (Droney, J.)................................57

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) (Rakoff, J.) ..................49

*United States v. Hudson*, 972 F.2d 504 (2d Cir. 1992)....................................23, 24, 25

92142103_2

*United States v. Johnson*, No. 16 Cr. 457 (E.D.N.Y.) ....................................................57

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ....................................................49

*United States v. Khandrius*, 613 F. App'x 4 (2d Cir. 2015) ........................................34

*United States v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995) .................................................5

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) .............................50, 51

*United States v. Pedragh*, 225 F.3d 240 (2d Cir. 2000) ...............................................23

*United States v. Shkreli*, No. 15 Cr. 637 (E.D.NY.) .....................................................57

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ..................................................58

*United States v. Studley*, 47 F.3d 569 (2d Cir. 1995) ............................................34, 35

*United States v. Thavaraha*, 740 F.3d 253 (2d Cir. 2014) ...........................................58

*United States v. Volpe*, 224 F.3d 72 (2d Cir. 2000) .....................................................23

*Williams v. People of State of N.Y.*, 337 U.S. 241 (1949) ..............................................1

**Statutes and Rules**

18 U.S.C. § 1346.............................................................................................................25

18 U.S.C. § 3553.............................................................................................................49

18 U.S.C. § 3553(a) .................................................................................................*passim*

18 U.S.C. § 3553(a)(1)...................................................................................................51

18 U.S.C. § 3553(a)(2)(A) .............................................................................................48

18 U.S.C. § 3553(a)(2)(B) .............................................................................................48

18 U.S.C. § 3553(a)(2)(C) ...........................................................................48, 53, 54, 55

18 U.S.C. § 3553(a)(2)(D) .............................................................................................48

18 U.S.C. § 3553(a)(6)...................................................................................................56

18 U.S.C. § 3572(a)(5)...................................................................................................64

18 U.S.C. § 3572(b)........................................................................................................64

Telemarketing Fraud Prevention Act of 1998, Pub. L. No. 105-184, § 6(c)(2), 112
    Stat. 520, 521 (1998)..............................................................................................21

U.S.S.G § 1B1.3 ...................................................................................................34, 37

U.S.S.G § 1B1.3(a)(1)(B) .............................................................................................33

U.S.S.G. § 2A2.2(b)(2) .................................................................................................25

U.S.S.G. § 2A2.4(c) ......................................................................................................25

U.S.S.G. § 2B1.1 ...........................................................................................20, 23, 24, 47

U.S.S.G. § 2B1.1(a)(1) ............................................................................................20, 24

U.S.S.G. § 2B1.1(b)(1) ...........................................................................................33, 48

U.S.S.G. § 2B1.1(b)(10) ...........................................................................20, 21, 22, 23

U.S.S.G. § 2C1.1 ...........................................................................................................25

U.S.S.G. § 2F1.1 ...........................................................................................................24

U.S.S.G. § 2F1.1(a) ......................................................................................................24

U.S.S.G. § 2F1.1(b)(5) .................................................................................................21

U.S.S.G § 3B1.1 ...........................................................................................................29

U.S.S.G § 3B1.3 ..............................................................................................23, 24, 25

U.S.S.G § 3C1.1 .....................................................................................................26, 27

**Others/ Miscellaneous**

Amendments to the Sentencing Guidelines (April 30, 2015) .......................................22

https://www.cia.gov/library/publications/the-world-factbook/geos/pa.ht .....................5

Lauren-Brooke Eisen, Inside Private Prisons:  An American Dilemma in the Age
 of Mass Incarceration (Columbia Univ. Press 2018) ...............................................61

U.S. SENTENCING GUIDELINES MANUAL app. C, ammnd. 577 (U.S. Sentencing
 Comm'n 2016), at 506 ..........................................................................................21, 22

United States Sentencing Commission, *Recidivism Among Federal Offenders*
 (2004) .......................................................................................................................55

*www.ussc.gov/Research/Research Publications/Recidivism/200405 Recidivism
 First Offender.pdf* ...................................................................................................56

I.      PRELIMINARY STATEMENT

        A.      A Contrast in Human Nature

By all accounts, before December 3, 2015, Juan Ángel Napout was a simple and caring father, grandfather, husband and son.  A faithful, compassionate friend who did not hesitate to help one in need.  A loyal employer who afforded opportunities to his staff, treated everyone equally and was extremely generous.  Despite being born into a wealthy family, Juan Napout remained humble and worked hard alongside the employees to further expand the family business. A sportsman who actively supported and encouraged the development of a wide range of sports in his country, including expanding opportunities for women on and off the field.  A proud Paraguayan who contributed to many charitable causes within his country to advance the future of his countrymen both nationally and internationally.  Most telling, Juan Napout was a pacifist who avoided conflict and sought to bring people together through collaboration and respect.

The testimony that the court heard during the six week trial only presented a small snapshot of Juan's 60-year life span.  It failed to portray his true nature and vocation to duty and service. When viewed through a wider lens, Juan Napout's conviction stands in stark contrast to the manner in which he led his life and adhered to the rule of law.

As the Supreme Court has recognized on several occasions, it is the whole of an individual's life that is at issue at sentencing.  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (*quoting Williams v. People of State of N.Y.*, 337 U.S. 241, 247 (1949)).

No doubt, imposing sentence on a fellow human being is one of the most difficult tasks for a judge to undertake.  In most instances, the court is familiar with the crime charged, but not the history of the person standing before it.  It is, however, Juan's entire life history and character that are of significance when fashioning an appropriate sentence to fit his conviction.  As more fully detailed below for the Court's consideration, this is the unheard story of Juan Napout's life and the strong core values that guided and defined his very existence.  A life story that stands in contrast to the conviction in this case.

**B.**     **The Jury Verdict**

On December 22, 2017, the jury returned a verdict finding Juan Napout guilty of three conspiracy counts: RICO (Count 1); conspiracy to commit wire fraud - Copa Libertadores (Count 2); and conspiracy to commit wire fraud - Copa America (Count 6).  Tellingly, the jury found him ***not guilty*** on the two companion money laundering conspiracy counts for Copa Libertadores (Count 3) and Copa America (Count 7).

The evidence showed that Juan was an affable and passionate man who fervently pursued his desire to become president of the South American Football Confederation  (CONMEBOL),[1] an organization tightly controlled by three men - Julio Grondona from Argentina, Ricardo Teixiera from Brazil and Nicolas Leoz from Paraguay.  For over thirty years, this power trio led CONMEBOL in complete secrecy and were strongly resistant to change.  Juan, along with other federation presidents almost all a generation younger, sought to gain a greater voice in CONMEBOL and decided to join forces as a political voting block to move the organization

---

1.   CONMEBOL, the Confederacion Sudamericana de Futbol, is the governing body of association football in South America and is one of FIFA's six continental confederations.

forward. Utilizing his collaborative skills and respectful demeanor, Juan interacted with the federation presidents regarding the future of CONMEBOL.

While the jury may have perceived this interaction as evidence of joining an illegal agreement under our broad conspiracy laws, it is the structure of the institution and Juan's non-confrontational personality that dictated his actions. Juan does not adhere to the "divide and conquer" mentality; his philosophy has always been to listen and respect different points of views in an attempt to find common ground.

### C.     The Presentence Investigation Report

According to the Presentence Investigation Report (PSR), the Sentencing Guidelines calculations suggest life imprisonment, a sentencing range that grossly overstates not only the offense conduct here, but for virtually every defendant who might appear before the Court, save for the most horrific crimes and criminals. As a threshold matter, the PSR's calculations are flawed in almost every respect. As addressed in Section III herein, none of the requested enhancements for foreign conduct, abuse of trust, obstruction of justice, or leadership role applies. Moreover, the loss amounts purportedly attributable to Juan drastically overstate the evidence presented at trial against him. In essence, the PSR seeks to hold Juan solely responsible for a broad swath of soccer-related corruption without regard to his particular circumstances, which the Second Circuit has repeatedly cautioned against.

Moreover, even if the law permitted a loss amount finding of over $150 million based on acts of 20 alleged co-conspirators (which it does not), we respectfully submit that this should not be the starting point of the Court's sentencing consideration and urge the Court to use its common sense in applying the guidelines. *See United States v. Faibish*, No. 12-CR-265 (E.D.N.Y. 2015) (Vitaliano, J.) (refusing to "peg [the defendant's] fate to a guidelines-computed loss amount"

where using "common sense," the court found that "a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [the defendant's] sentencing range beyond any reasonable proportion to his crimes.")

Accepting the jury verdict of guilt for purposes of sentencing, we respectfully submit that when balanced against Juan Napout's entire life, a substantially shorter sentence than that proposed in the PSR is warranted to achieve the sentencing goals of Section 3553(a) for the following reasons:

- The Sentencing Guidelines (even when drastically reduced for the reasons set forth in Section III) significantly overstates Juan's criminal conduct;

- Juan was acquitted of money laundering;

- After his arrest and detention in Switzerland, Juan agreed to extradition[2] to the EDNY and spent over 24 months under strict home confinement requirements prior to trial away from his home country, Paraguay;

- Juan has already served eight months at MDC, essentially a maximum security facility, with limited visits from his family;

- Juan is a foreign national who will face significantly more restrictive conditions of confinement and will not have the opportunity to take advantage of certain BOP programs offered to United States citizens allowing for early release;

- Juan is a first time non-violent offender who has led an exemplary life generously contributing his time, talents and treasure to his community without seeking recognition;

- Juan is not a danger to the community[3] and does not require specific deterrence.[4]

---

2.  This stands in stark contrast to many of the other charged defendants who have contested extradition, some of whom will not be extradited to face charges in the United States.

3.  Throughout the government's five year investigation and prosecution of this case, not one shred of evidence has been presented that Juan is violent.  Moreover, Juan will be removed to Paraguay upon completion of any sentence imposed and will no longer be a member of this community.

4.  Following his arrest, Juan immediately resigned from CONMEBOL and FIFA and agrees to not participate in these organizations in the future.

As the Second Circuit has cautioned, "the Sentencing Guidelines 'do not require a judge to leave compassion and common sense at the door to the courtroom.'" *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995).

As the over 200 letters submitted on his behalf demonstrate, Juan is a humble, hard working, generous and compassionate man who has greatly contributed to the well-being of his community and his country. We respectfully urge the Court to consider Juan Napout's lifetime of good acts against the conspiracy conviction in this case and use its compassion and common sense when imposing sentence.

## II.     JUAN NAPOUT'S PERSONAL BACKGROUND AND CHARACTER

### A.     Personal History, Education and Career

#### 1.     Early Life

Juan Ángel Napout was born sixty years ago in Asuncion, Paraguay,[5] to Miguel Ángel and Teresa Napout. The oldest of three siblings, Oscar (57) and Virginia (56), Juan was raised in a traditional and loving environment surrounded by his grandparents and cousins. His father, Miguel Ángel, inherited a goods importation business started by his father, Emilio, and through the years developed it into one of the most important businesses in Paraguay. By the time Juan was born, the Napout family was one of the most respected in the country. Teresa worked as a teacher in the public school system while at the same time raising three children, all born in the span of four

---

5.    Paraguay is a landlocked country located in central South America, bordered by Argentina to the south and southwest, Brazil to the east and northeast, and Bolivia to the northwest. As of 2017, it had a population of approximately 6.9 million mostly concentrated in the southeast region of the country where the capital, Asuncion, is located. Unlike other South American nations, Paraguay maintains a highly influential indigenous language and culture. It has a market based economy featuring the re-export of imported goods to neighboring countries and a significant agricultural market. *See* CIA World Factbook Paraguay Page, found at https://www.cia.gov/library/publications/the-world-factbook/geos/pa.ht

years.  Believing in the value of "giving-back," the Napout family also participated in numerous cultural and charitable causes.

Aside from stressing the importance of academic education, Juan's parents and grandparents instilled in all three siblings the "values of respect, honesty, discipline and solidarity."[6]  They also inherited a tradition of love for sports and learned the power it has to transform a community and even a country.  *Id.*  All three siblings participated in various sports, but Juan's passion was always soccer.  *Id.*  "Since he was a child [Juan] would carry a soccer ball everywhere he went."[7]  He spent his days playing with the neighborhood kids for hours at the local club and on Sundays, the entire family would attend football matches at the stadium.  *Id.*

In addition to encouraging participation in sports, Teresa Napout, Juan's 86-year old mother, recounts that his "father and grandfather were philanthropists of sports" and routinely demonstrated the value of "giving back" to a community.[8]  For example, Juan's grandfather, an avid tennis player, is credited with donating the lights that illuminated the first tennis courts in the country over fifty years ago.[9]  Shortly thereafter, the first Paraguayan professional tennis player, Victor Manuel Pecci, fought his way into the top ten best tennis players in the world placing the young country on the international tennis map.  As Mr. Pecci, today the Minister of Sports in Paraguay, describes:

> [The Napout family] stood out locally for helping athletes of different disciplines, supporting and promoting them nationally and internationally, as well as organizing

---

6.  Ex. A:  LETTERS0014 (Maria Virginia Napout Ltr.).  Letters provided in support of Juan Napout are attached by category as Exhibits A through G, with each letter in its original language followed by an English translation if needed.

7.  Ex. D:  LETTERS0363 (Marko Sljivich Ltr.).

8.  Ex. A:  LETTERS0013 (Teresa Napout Ltr.).

9.  Ex. A:  LETTERS0014 (Maria Virginia Napout Ltr.).

92142103_2

important sporting events, giving citizens the opportunity to appreciate and participate in top-level sporting events."[10]

Tennis was not the only sport the Napout family actively supported. They were also actively involved in the development of soccer in Paraguay. Not only did they contribute to support soccer players with limited economic means, but they also generously contributed to the building of sports facilities so that access was granted to all. Indeed, one of the soccer facilities is named after Juan's grandfather, Emilio Napout, in recognition for all the support received.[11] Following the example set by his grandfather, Juan's father donated multiple parcels of land for soccer development and the lights at one of the main soccer clubs in Asuncion, Cerro Porteno.

This successful combination of sports and philanthropy left such a strong impression in Juan's early life that he continued the tradition into his adult years and passed these values to his children.

## 2. Education

Juan attended a local Jesuit school in Asuncion until his graduation in 1976. He was a dedicated and popular student, participating in sports and making life-long friends. As expressed in many of the letters from his classmates, Juan was a simple and generous friend even at this young age. Although he "belonged to a family of high social class" he never discriminated against any of his classmates.[12] On the contrary, as his classmate and friend Roberto Vargas recounts, Juan was unfailingly generous:

> I would like to highlight an event that marked my life from a very young age, when Juan learned that my family was going through financial hardships because they mortgaged our house and because we did not have the resources to raise that

---

10. Ex. E: LETTERS0384 (Victor Manuel Pecci Ltr.).

11. Ex. D: LETTERS0344 (Roque Ramirez Ltr.).

12. Ex. B: LETTERS0123 (Roberto Vargas Ltr.).

92142103_2

mortgage.  My friend Juan did not hesitate to resort to his parents and to provide me with the amount to pay off that debt, and also to express to me that it was a gift from his family for the appreciation they had for us.  *Id.*

Even in high school, Juan was a conscientious young man, uniquely aware of his fortunate financial circumstance and his responsibility to help others in need.  He observed the Bible verse, "[e]veryone to whom much was given, of him much will be required and from him to whom they entrusted much, they will demand more."  Luke 12:48.[13]  He did not avoid a request for help or disclose anyone's hardship; he quietly assisted and never bragged.

Following graduation, Juan complied with the mandatory military service imposed by the country's dictatorship.  Rather than attempt to skirt the mandatory nature of the service, Juan adhered to the rule of law and received his training as every other young male citizen.[14]  As these actions demonstrate, Juan never used his social position or wealth to bypass the rules that many in his economic stature exploited.

Upon completion of military service, Juan entered the Catholic University in Asuncion to study Business Administration.  It was during this time that Juan's collaborative and positive leadership skills developed.  He was elected president of the Sports Council and continued his family tradition of helping those in need and promoting the development of athletes and sports.  As described by former classmate Marcelo Bedoya, "Juan Angel became the greatest benefactor of social, sports and cultural activities . . . [offering] help through scholarships and social assistance, granting athletes unique and differentiated conditions with his own money."[15]

---

13.  As expressed in several of the letters, when questioned about his generosity, Juan's standard response was "give what you have, I have money...".  Juan is a "[b]eliever in the human being and in his Christian values." Ex. C: LETTERS0299 (Juan Bai Bessone Ltr.).

14.  Ex. B:  LETTERS0179 (Manuel Maria Burro Ltr.).

15.  Ex. B:  LETTERS0067 (Marcelo Bedoya Ltr.).

-8-

Following his university graduation, Juan decided to expand his language skills in order to improve his ability to compete in the international marketplace. He studied English in London and French in Paris, while at the same time perfecting his knowledge of Portugese and Italian. Upon his return to Paraguay, he focused on becoming fluent in the local indigenous dialect, Guarani, so that he could directly interact with a large portion of his fellow Paraguayans.

###    3.    Career

By the time Juan started working in the family business, the company was one of the most successful in the country and the Napout family's wealth firmly established in Paraguay. Essentially, there was no need for Juan to work, he could have dedicated himself to a life of leisure and sports. But it was not in Juan's nature "to take the easy way out."

Rather, Juan enthusiastically joined the family business and started working from 6:00 in the morning until late in the evening learning the business. He started from the bottom up and worked back to back with the rest of the employees. As Maria Cristina Galeano highlights, "even though [Juan] was born in an upper-class family, he was always a working man."[16] He never expected, nor did he receive, any special treatment. On the contrary, if anything, his father demanded more from Juan than other employees.

In 1992, Juan's father and the family patriarch passed away. By then Juan had worked at the company for several years and had gained valuable experience as he rose through the ranks. As a result of his hard work and discipline, Juan succeeded his father in running the company.[17] Juan also stepped into the shoes of his father as the family patriarch and assumed responsibility

---

16. Ex. D: LETTERS0322 (Maria Christina Galeano Ltr.).

17. Ex. D: LETTERS0367 (Carlos Vallejo Ltr.).

for taking care of his mother and other family members.  *Id.*  He was only 34 and charged with enormous professional and personal responsibility that he accepted without complaint or remorse.

Upon succeeding his father, Juan entered into partnerships with other businesses in Paraguay and through the years significantly expanded the company's profits and workforce. "Juan helped the family business grow, maintaining them with success to keep giving jobs" to hundreds of men and women in Paraguay.  Although he was no longer "one of the workers," Juan maintained his humble disposition and continued to respect the employees.  As Ivan Dumot, who worked alongside Juan for 18 years, explains:

> Businesses do not work if you do not have people who are committed to the company and who make things happen.  For this Juan Angel also has exceptional leadership qualities, and has always managed to get our people to have a high degree of commitment with him and with the company.  There are many people in this team, and especially those of lower profile, who admire him for his simplicity and human quality, for being a leader close to his people and their needs, despite the high positions he had to play in life, and the privileges of those circumstances, which often cause people to lose their essence.[18]

While Juan's humble and generous disposition made him a popular leader, he was also a demanding and professional boss urging adherence to the rule of law.  As the former internal auditor explains, Juan's instructions "were to do everything correctly, always complying with the legal provisions, and respecting the people involved in the whole reorganization process."[19]  Juan's policy was to "provide a correct treatment to workers, respecting their rights and promoting a cordial and harmonious work environment."  *Id.*  Juan's business leadership skills were consistent with his collaborative and peaceful demeanor.

---

18.  Ex. C:  LETTERS0233 (Ivan Dumot Ltr.).

19.  Ex. C:  LETTERS0236 (Cynthia Murdoch Ltr.).

### B.    Family Life

The one constant in Juan's sixty year life span is his belief that "family always comes and must come, first."  As almost every single letter submitted describes, Juan is a family man first, and despite his demanding work and travel schedule, he always made the time to be with his family, participate in family events and maintain a united family.[20]  While his priority was always his wife and children, Juan's "family" was and continues to be quite large.  It includes his mother, sister, brother and their immediate family, along with his wife's siblings and their families.  He is the glue that held the Napout family together after his father passed away over 25 years ago.

Juan is a beloved husband, father, grandfather and son.  Not only is this sentiment expressed in the letters submitted by the family, but the Court was able to observe this first hand during trial.  Every day of the six-week trial, the Napout family accompanied Juan to court and sat in the first bench observing the proceedings.  As the days passed, other family members and friends traveled from Paraguay to attend the trial to support Juan.  This seemingly simple gesture by so many speaks louder than words and demonstrates the strong bond that Juan established with his family years ago.  As the Court is aware, this family bond is not created overnight and takes years of work to create, cultivate and maintain.

Thirty-eight years ago Juan met a quiet, intelligent girl, five years his junior and fell madly in love with Karin Forster.  Unlike Juan, whose gregarious and confident personality naturally drew people to him, it was Karin's calm demeanor and quiet strength that captivated him.  As Karin confirms, "[w]hat first attracted me to [Juan] was his extroverted personality, I am a very shy and quiet person, he is very joyful and funny."[21]  While initially attracted to Juan's outgoing

---

20.  For example, *see* Ex. D:  LETTERS0368, LETTERS0367 (Alberto Saucedo, Carlos Vallejo Ltrs.).

21.  Ex. A:  LETTERS0002 (Karin Napout Ltr.).

-11-

personality, it was his "character and good heart" that Karin fell in love with.  Aside from having the same fundamental values of love for family and respect for elders, Karin describes how Juan's enormous generosity to all and ability to unite people through his conciliatory nature, cemented their union.  *Id.*

Five years later, Juan and Karin married and soon started a family.  They have four children: Andrea (31), Veronica (30), Paulina (27), and Juan Angel Jr. (25), and four grandchildren between the ages of 8 months and 4 years old.  From the beginning, Juan and Karin agreed to raise their children with the same values and priorities that had dominated their lives.  As Karin describes, despite his demanding work schedule, Juan was a very loving and present father attending sports lessons without missing a competition, encouraging his children to study and taking them to the family business to teach them "the example of work ethics and responsibility." *Id.*  He also used every opportunity to ingrain in his children the importance of helping others.

These core values are echoed in each of the four letters submitted by his children.  Andrea, the oldest, describes how her father, "despite his countless work and leadership activities, always found time and energy to share time with" them by stressing the importance of eating daily dinner together and actively participating in their sporting events.[22]  In particular, she recounts how her father recognized her swimming abilities at a young age and encouraged her to compete, always accompanying her to every competition and supporting the team.  *Id.*  This support did not only extend to family, but as Andrea explains, "[s]ince we were little my siblings and I could observe how he helped people in need, people who worked for him and his friends."

---

22.  Ex. A:  LETTERS0005 (Andrea Napout Ltr.).

Juan's commitment to helping others was firmly embedded in each of his children. Veronica, his second daughter, explains how her father "showed us how to be humble, to be generous and help people in need."[23] She describes Juan "as a man who beams generosity, without expecting anything in return." *Id*.

Similarly, Paulina, Juan's youngest daughter, writes how as a little girl she envisioned her dad as a super hero until she discovered he was just a human.[24] This realization, however, did not change her view of her father. "As I was growing and leaving my childhood I realized that you do not have to fly or walk on water to be a superhero; fighting for justice, working for a greater good, pursuing your dreams, helping those in need, those are super hero qualities and now I can safely say that my dad is and always will be a superhero to me and also to many other people who really know him." *Id*.

His son and namesake, Juan Ángel ("Junior"), describes how his father never missed a family or school event and placed his family first, while helping "more people than you or I can imagine."[25] He explains the importance of sports in his father's life and how [Juan] always believed in sports as a tool to educate children and young people . . . getting them away from drugs and violence amongst other things." *Id*.

Juan's commitment to family, sports and generosity are repeated in many of the letters submitted by numerous family members. He is considered a "second father" by many of his nieces and nephews; an affectionate and respectful father-in-law; a compassionate and peaceful man who used sports to help others and bring a community together.

---

23. Ex. A:  LETTERS0007 (Veronica Napout Ltr.).

24. Ex. A:  LETTERS0009 (Paulina Napout Ltr.).

25. Ex. A:  LETTERS0011 (Juan Napout Ltr.).

### C.      Involvement in Sports

As was ingrained in him by his parents, Juan viewed sports as a means to bring people together and help the community.  The neighborhood club where he was raised, Club Deportivo Colon, describes Juan's passion for sports and generous spirit:  "[a]s a child he was always a friend of all the boys, regardless of their condition and origin, sharing moments of expansion with them, always willing to help those who needed it."[26]  Not only did Juan participate in many of the club sports, including volleyball and bocce, but also donated to the maintenance of the facilities.

While he participated in many sports, Juan's passion was soccer.  He started playing as a toddler and continued through his high school years.  Like most young boys in South America, he dreamed of being a top soccer player but quickly realized that his likelihood of success on the field was minimal.  Thus, following in his father's footsteps, Juan became involved in the local soccer club, Cerro Porteno, and was elected president in 1989 at the age of 31.

During his tenure, Cerro Porteno became champions of the local tournament and at the end of his term, Juan left the institution without any debt.  To this day, Cerro Porteno's respect for Juan's successful management is reflected in the letter submitted by the Club describing him as "a straight man, honest, capable, efficient [and] whose intentions have always been directed towards good."[27]

Juan's success as president of Cerro Porteno led to his election to the Board of Directors of the Paraguayan Soccer Association (APF).  As a member of APF for the next several years, Juan helped many of the athletes and teams by personally providing funds for uniforms,

---

26.  Ex. E:  LETTERS0389 (Ramona Fernandez Ltr.).

27.  Ex. E:  LETTERS0395 (Club Cerro Porteno Ltr.).

92142103_2

transportation and facilities.  As reflected in many of the letters submitted, Juan became a soccer leader because of his love for the sport and "not because he needed anything from it."[28]

In 2007, Juan was elected president of the Paraguayan Soccer Association and gained a seat on CONMEBOL.  Although his stature within international soccer grew, Juan remained committed to helping local Paraguayan soccer clubs.  During his tenure, the Paraguayan national team reached the quarter-finals of the 2010 World Cup, for the first time in World Cup competition.

### D.      Compassion and Generosity

Juan's generous and compassionate spirit saw no boundaries.  In most instances, there was no request for help.  It was simply that Juan learned of the writer's plight and extended a hand without expectation of return or any benefit.  At that moment in the writer's life, Juan's words of kindness or encouragement, unexpected favor, financial help or physical presence in times of illness or emotional need, made a significant impact in their life.

As repeatedly mentioned in the letters, Juan has helped hundreds of people during his life. Since it would be impossible to recount all of Juan's acts of kindness during his 60 year lifespan, the following are a few examples attesting to Juan's empathy and generosity.

- Long-time friend and grade school classmate Marcial, describes how throughout their friendship of 48 years he has "witnessed many times how Juan Angel attended and helped many people for different situations and more for cases of illness. Not only financially but dedicating his time to visit, comfort and encourage the friend in need. I never saw him arrogant, but rather the opposite, always human and fraternal."[29]

- Childhood friend Carlos describes a particular harrowing time in his life when his wife was suddenly diagnosed with a brain tumor and he did not have the funds to pay for the surgery.  Much to his surprise, he received a call from Juan, who was out of the country at the time, offering to help.  As a result of Juan's generosity, Carlos' wife pulled through and is alive and well today.  Tellingly, Carlos explains

---

28.  Ex. E:  LETTERS0452 (Hugo Elizeche Ltr.).

29.  Ex. B:  LETTERS0130 (Marcial V. Leiton Ltr.).

that Juan's only condition was "that in exchange [he] not tell anybody of this great gesture."  While Carlos has honored this promise until now, he felt an "obligation to tell this breaking the pact I had with him" to reveal "some of the virtues of a friend."[30]

- Ulises Jose, Juan's long time driver and personal protector, describes how about five years ago, he broke his meniscus playing sports in the neighborhood and when "Juan Angel saw me walking with difficulty asked me what had happened, he found out about my situation and sent me to his personal doctor, he paid the medical consultations and the operation, without ever even telling me how much it all cost, he just took the trouble to ask me how I was and if my family was all right."[31]

- Juan's sister-in-law, Marian Estela, recounts the difficult time when her triplets were born 27 years ago and one of them, Robert, was born with a heart condition that required surgery or he would die.  With limited resources, the family scheduled little Robert's operation in Asuncion, despite the lack of technology and experience for such a delicate surgery. "When Juan Angel heard of it, he stepped in and told us not to operate Robert here in Asuncion but in a specialized clinic in Sao Pablo, Brazil where doctors were better trained and had better equipment.  To achieve this, Juan Angel took charge of all the expenses of the operation since we did not have the necessary money. The surgery was a success and today Robert works as a commercial pilot in an airline."[32]

- Former grade school classmate Edmundo recounts the critical impact of Juan's inspirational words after he suffered a cervical spinal-cord injury in 2003 that left him a quadripelgic.  "Juan Angel came to see me, we couldn't stop the tears and stay in silent for a minute or so, just smiling, and then he said 'Danilo, I know this may be tough, but I trust in you, in your strength combative spirit and courage, in your intelligence and creativity, in your integrity, you still have a lot to give, perhaps in a somewhat different way, and do not forget you have a wonderful family and friends to support you don't give up! And by the way, anything you need to rebuild this, do not hesitate to ask us."

- Edmundo characterizes Juan's "spontaneous and generous behavior in that precise moment" as very helpful "because it showed me, a new door, opened a new horizon, where the fight for life, with God's help would be worthwhile"[33]

---

30. Ex. B:  LETTERS0078 (Carlos Bueno Cabral Ltr.).

31. Ex. C:  LETTERS0239 (Ulises Jose Irun Ltr.).

32. Ex. A:  LETTERS0047 (Maria Estela Rojas Forster Ltr.).  Maria Estela further writes "that there are thousands of people who were once supported and helped by [Juan], either with wheelchairs, operations, studies for young people who could not afford the university, etc." *Id.*

33. Ex. B:  LETTERS0114 (Edmundo Danilo Paredes Galeano Ltr.).

- Long-term employee Manuela, who met Juan when "he was a kid" explains that not only does she own her home as a result of his "generous help" but describes the personal attention that Juan gave her family.  "In 2008 I had to have hip surgery and Mr. Napout ran with all the expenses.  Also in 2014 when my mother fell ill, and finally died, he did not hesitate to pay the burial expenses."[34]

- Elvio Ramon, who met Juan in 2007 through soccer in Paraguay, attests to how Juan saved his life.  After a serious traffic accident that left him in critical condition, his family did not have the financial resources to take him to a private hospital.  Somehow, Juan found out and "showed up at Medical Emergencies and arranged all the necessary precautions so that I could be transferred to a private hospital and have all the necessary elements to save my life."  Elvio goes on to explain that Juan's actions meant the difference between life and death for him.  For this reason he closes his letter by stating he would switch places with Juan today: "I would gladly lose my freedom in exchange for his, because in the balance of justice, he gave me back my life, and I would only be paying off that debt with my freedom."

**Mentoring and Support**

- Leryn Franco, a three time Olympic athlete in javelin throwing  (Athens 2005, Beijing 2008 and London 2012), credits Juan with introducing her to sports by providing her with her first tennis shoes when she was seven years old and paying for her tennis lessons.  She cautions, however, that it was not only Juan's financial support that helped her achieve success, but his constant encouragement to believe in herself and "to excel beyond national competitions."  Leryn goes on to recount that she was one of many athletes that Juan supported.[35]

- Eladio Franco, a professional golfer in Paraguay, describes how Juan supported him on the youth golf circuit and throughout his thirty year career without asking for anything in return.[36]

- Maria Cristina describes how Juan "made it possible for sports to reach everybody without distinction of kind."  In doing so, he "made young people thrill by making them play games with others and in that way keeping them out of vices that are a menace nowadays and endanger their families and the youth themselves." The writer laments how "[h]ow each day we are missing more and more altruism that drove him to help the youth, the needed ones, and sports."[37]

---

34.  Ex. C:  LETTERS0281 (Manuela Cardozo Roda Ltr.).

35.  Ex. E:  LETTERS0402 (Leryn Franco Ltr.).

36.  Ex. E:  LETTERS0407 (Eladio Franco Ltr.).

37.  Ex. D:  LETTERS0346 (Maria Cristina Rivarola Vda. De Prieto Ltr.).

### E.    Humanitarian Efforts in Paraguay

As the letters submitted demonstrate, Juan's compassion and generosity was not limited to family, friends, employees and sports-related causes.  Rather, Juan has actively participated and donated to causes important to his beloved country of Paraguay.  While Juan pursued sports to place Paraguay on the international stage, he has always been cognizant of domestic concerns and supported several causes.  The following are a few of the domestic causes that Juan has been associated with:

- **Franciscan Museum in Caazapa**

   This is a national museum that preserves cultural patrimony from the colonial era. As Patricia Silva, a professor at the National University of Asuncion, explains it was Juan Ángel Napout in collaboration with his mother that made this museum possible. "For creation of the Museum, Mr. Napout sponsored the research and gathering of information and objects that were restored and conserved for the diffusion of what constitutes tangible memory and intangible of the history of a town." To further support "the development of education and equality" for all in Paraguay, Juan collaborates "with a free entrance for all visitors."[38]

- **International Union Against Cancer (UICC)**

   This international organization awarded a project to a former classmate of Juan in Asuncion, Gloria Capello, in the detection of cancer related to sports.  Gloria explains that although cancer research is not given much importance in Paraguay, Juan always supported this cause.  The organization was in the process of obtaining property in Asuncion with Juan's help.[39]

- **Kuña Aty Foundation**

   This Foundation is a civil nonprofit organization that defends human rights of women and aims to provide complete information and specialized attention to all women in general and those with limited resources in particular.  Director Gloria Godoy recounts that Juan has "collaborated for several years" with the Foundation and always helped with donations or held events to raise funds.[40]

---

38.  Ex. F:  LETTERS0466 (Patricia Silva Ltr.).

39.  Ex. F:  LETTERS0462 (Gloria Capello Riveros Ltr.).

40.  Ex. F:  LETTERS0460 (Gloria Godoy de Rubin Ltr.).

92142103_2

- **A Todo Pulmon - Paraguay Respira**

  A Paraguayan NGO that designs, develops and executes campaigns and environmental projects with the goal to create conscience, promote good practices for sustainable production and generate strategies that contribute to mitigate the effects of climate change involved in environmental projects centered on clean air. As the president of the organization, Humberto Rubin, attests, Juan was the financial supporter to this environmental cause and assisted in the collection of funds for the different projects.[41]

- **Athletes In Action**

  In 2010 this ministry produced a DVD with the personal testimony of professional soccer players who participated in the World Cup which was distributed in more than 120 countries and translated into different languages.  As the ministry's national director explains, due to Juan's financial assistance in Paraguay the materials were presented to over 12,000 students from 85 different schools and given to all the professional soccer teams for free.[42]

- **The Humanitarian Organization Mission for Education and Sports**

  Two years ago, this organization inaugurated a public school for the children of the Mbachio neighborhood, one of the poorest neighborhoods in Asuncion, and as the president of the organization reveals, "Juan Angel was one of the 7 benefactors that made possible the construction of the school that currently has twelve classrooms all equipped with air conditioning, which no public school in [Paraguay] has."

  At the time of recognizing the benefactors with a plaque, Juan requested that his name not be listed, rather that of his father, Miguel Ángel. The president explains, "[t]his is why Juan Angel is recognized in our country, because he has always been a man who has collaborated with the neediest people without asking for anything in return."[43]

- **Comedores Ko'eju Chacarita**

  This entity runs "soup kitchens" to feed poor children in Paraguay and is exclusively funded by private donation as the state does not provide any aid. Minister Luis Ricardo Manfredi explains that the two kitchens he manages feed "approximately 200 kids between 0 and 14 years of age" on a daily basis. The Minister explains that Juan has always supported the kitchens and helped with acts

---

41.  Ex. F:  LETTERS0464 (Humberto Rubin Ltr.).

42.  Ex. F:  LETTERS0470 (Atletas en Accion Ltr.).

43.  Ex. F:  LETTERS0473 (Luis Zubizarreta Ltr.).

of charity.  For example, he has been "a sponsor to a lot of orphan kids who are in the street."[44]

In addition to these organizations, Juan has anonymously contributed to many more local charities.

As was common with Juan, he preferred to help without recognition.

## III.   THE ADVISORY SENTENCING GUIDELINES CALCULATION

We agree that the relevant Sentencing Guidelines section for purposes of the counts of conviction is Section 2B1.1, and that a base offense level of 7 applies pursuant to Section 2B1.1(a)(1).  Beyond that, the government's application of the Guidelines is erroneous on each front, as set forth below.  Indeed, the notion that the Guidelines can be applied in a manner suggesting a life sentence is nothing short of absurd.

### A.   Section 2B1.1(b)(10) Does Not Apply

Section 2B1.1(b)(10) provides for a two-level enhancement if:

> (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials;
>
> (B) a substantial part of a fraudulent scheme was committed from outside the United States; or
>
> (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

The government seeks a two-level enhancement under either subsection (B) or (C) (*see* PSR ¶ 87), neither of which should be applied here.

It is hard to quibble with the fact that the literal words of subsection (B) apply to the facts of this case, although that would be true for any case in which the government investigates foreign individuals who work for foreign employers, a common occurrence in recent times.  Because the

---

44.  Ex. F:  LETTERS0458 (Minister Ricardo Manfredi).

Sentencing Commission could not possibly have intended to punish a foreign citizen more harshly than a U.S. citizen simply because the foreigner lives and works abroad,[45] the subsection must, and indeed does, mean more.  The original predecessor to Section 2B1.1(b)(10), the old Section 2F1.1(b)(5), was promulgated in 1998 in response to Congress' directive to the Sentencing Commission under the Telemarketing Fraud Prevention Act of 1998.  As part of an effort to combat telemarketing fraud, Congress directed the Commission to "provide an additional appropriate sentencing enhancement, if the offense involved sophisticated means, including but not limited to sophisticated concealment efforts, such as perpetrating the offense from outside the United States."  Telemarketing Fraud Prevention Act of 1998, Pub. L. No. 105-184, § 6(c)(2), 112 Stat. 520, 521 (1998).  From that directive, what is now Section 2B1.1(b)(10) was born.

The Sentencing Commission explained that the relevant portion of Sentencing Guidelines Amendment 577 was "to provide an increase for fraud offenses that involve conduct, such as sophisticated concealment, that makes it difficult for law enforcement authorities to discover the offense or apprehend the offender."  *See* U.S. SENTENCING GUIDELINES MANUAL app. C, ammnd. 577 (U.S. Sentencing Comm'n 2016), at 506.  The Commission further noted that subsections (A) and (B) of this new enhancement "address conduct that the Commission has been informed often relates to telemarketing fraud," that the "fraudulent telemarketers increasingly are conducting their operations from Canada and other locations outside the United States," and that "telemarketers often relocate their schemes to other jurisdictions once they know or suspect that enforcement authorities have discovered the scheme.  Both types of conduct are specifically covered by the new enhancement."  *Id*.  Not surprisingly, the commentary to the new enhancement focused (and still

---

45.  Indeed, to punish a category of people, foreign citizens, more harshly than U.S. citizens, for nothing more than their status as foreigners working for foreign companies, would violate both the Equal Protection and Due Process Clauses of the United States Constitution.

does) on the use of multiple locations for telemarketing operations as an example of conduct warranting an enhancement.

While the enhancement is not limited to telemarketing cases, its application must address fraud schemes in which the location or relocation of the criminal conduct was intended as a sophisticated method to avoid detection in the United States. Here, the conduct was not located or relocated outside of the United States for such a purpose. Rather, Mr. Napout's foreign location was a mere consequence of where he was born and lived his entire life, and where he also obtained employment – in Paraguay. There is nothing about Mr. Napout's birthplace or place of employment that warrants a sentencing enhancement, and to apply an enhancement under subsection (B) would not serve either Congress' goal in requiring the Commission to promulgate the enhancement, or the Commission's goal in doing so.

Nor is subsection (C) applicable to Mr. Napout. Subsection (C) requires both that the offense conduct involved sophisticated means <u>and</u> that the individual defendant "intentionally engaged in or caused the conduct constituting sophisticated means." The second prong of subsection (C) was added to the Guidelines in 2015, as the Sentencing Commission concluded that "basing the enhancement on the defendant's own intentional conduct better reflects the defendant's culpability." *See* April 30, 2015 Amendments to the Sentencing Guidelines, at 29-30. Here, the government cannot satisfy the second prong – that Mr. Napout intentionally engaged in or caused the conduct constituting sophisticated means. To the contrary, the government's theory as to Mr. Napout is that he wanted any bribes paid to him to be in the simplest form -- cash. There was no evidence or even suggestion that Mr. Napout used fictitious entities, corporate shells, or offshore financial accounts (*see* § 2B1.1, cmt. n. 9(B) (providing examples of sophisticated means)) to effectuate the scheme, or that he caused anyone else to do so. For these reasons, a two-level

-22-

enhancement under Section 2B1.1(b)(10) does not apply, and the total offense level should be reduced by two.

**B.      Application of Section 3B1.3 Would Constitute Impermissible Double Counting**

The Government seeks a two-level enhancement for abuse of a position of trust under Section 3B1.3 (*see* PSR ¶ 90), but to do so would lead to impermissible double counting.

Double counting occurs when application of a Guidelines section increases a defendant's punishment on account of a harm that is already fully accounted for by application of another Guidelines section. *United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000). Double counting should be "avoided if it is not required." *United States v. Pedragh*, 225 F.3d 240, 247 (2d Cir. 2000) (citations omitted). Indeed, double counting is impermissible when the conduct necessary to trigger the base offense level is also the conduct that justifies the enhancement. *See, e.g.*, *United States v. Hudson*, 972 F.2d 504 (2d Cir. 1992).

Section 3B1.3 explicitly prohibits an abuse of trust enhancement when abuse of trust is encompassed by the base offense level:

> This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

U.S.S.G § 3B1.3. Where, as here, the crime is honest services fraud, which necessarily involves a breach of a fiduciary duty, it amounts to an abuse of trust itself. As a result, the offense conduct for which the base offense level is applied under Section 2B1.1(a)(1) encompasses abuse of trust. Applying an abuse of trust enhancement under Section 3B1.3 thus would be impermissible double counting because the harm captured by the abuse of trust enhancement is already fully accounted for in the Section 2B1.1 base offense level.

92142103_2

In *United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995), the Second Circuit reversed a district court's application of the abuse of trust enhancement in a fraud case for this very reason. The defendant in *Broderson* was a high ranking official at Grumman convicted of fraud for filing false certifications in connection with pricing proposals for contracts with NASA.  In rejecting the application of the abuse of trust enhancement, the Second Circuit held:

> The government's position is wrong for a second reason. Section 3B1.3 does not apply if the abuse of trust is already "included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3.  The conduct that is the basis of the conviction must be independently criminal, as in the Commentary's examples noted above, and not itself the abuse of trust. Broderson's fraudulent conduct was signing the certificate stating that Grumman had complied with TINA and FAR.  Any abuse of trust was therefore "included in the base offense level" of six for fraud and deceit. *See* U.S.S.G. § 2F1.1(a).[46]

67 F.3d at 456.  Because the basis for Mr. Napout's conviction is not independently criminal, but is in fact the abuse of trust itself, the base offense level under Section 2B1.1 necessarily includes the abuse of trust, and the Guidelines preclude application of a separate abuse of trust enhancement.

The Second Circuit's decision in *Hudson* is also instructive.  In *Hudson*, the defendant was convicted of assaulting a federal officer, specifically for driving at two United States Marshals seeking to detain him.  At sentencing, the District Court applied the base offense level for "aggravated assault" under Section 2A2.4(c) based upon the use of the car as a dangerous weapon, as well as a four-level enhancement under Section 2A2.2(b)(2) because the defendant had otherwise used a dangerous weapon in carrying out the offense.  972 F.2d at 505-06.  The Second Circuit reversed, finding impermissible double counting.  The Circuit reasoned that unlike assault

---

46.  The *Broderson* Court was addressing the prior Guidelines section for fraud offenses – Section 2F1.1.

with a firearm or other common weapon, a defendant cannot be guilty of assault with a non-inherently dangerous object such as a car unless the car was used in a dangerous way.  In such circumstances, the same act – using a non-inherently dangerous weapon in a dangerous way, underlies the base offense level for aggravated assault as well as the enhancement.  *Id.* at 507.  Similarly here, unlike many fraud offenses, the base offense level for a fraud charge rooted in theft of honest services necessarily encompasses abuse of trust as that is inherent in the charge itself.  *See Skilling v. United States*, 561 U.S. 358, 408-09 (2010) (confining the scope of honest services fraud under Section 1346 to cases in which a defendant violates a fiduciary duty by participating in a bribery or kickback scheme).  There is no basis to apply an additional enhancement for abuse of trust based on the same act for which the base offense level was applied.

Not applying the enhancement in the context of an honest services fraud conviction is also consistent with the Guidelines' treatment of the enhancement in the analogous context of bribery of a public official (*see* Guidelines § 2C1.1), where the offense necessarily involves abuse of a position of trust due to the public official's position.  There, the Guidelines similarly preclude an abuse of trust enhancement since the base offense level necessarily captures that conduct.  *See* U.S.S.G. § 2C1.1, cmt. n. 6 ("Inapplicability of § 3B1.3 – Do not apply § 3B1.3").  For the same reason, an abuse of trust enhancement should not be applied here.  The total offense level should be reduced by two levels.

## C.    Mr. Napout Did Not Obstruct Justice

Despite the lack of any obstruction of justice charges or jury findings on those allegations, the government seeks a two-level enhancement for obstruction of justice under Section 3C1.1, contending that Mr. Napout concealed a CONMEBOL computer "with the intent to impair the computer's availability for use in the trial against him."  PSR ¶ 74.

An obstruction of justice enhancement is not appropriate absent a judicial finding that the defendant "had the 'specific intent to obstruct justice, *i.e.*, that the defendant consciously acted with the purpose of obstructing justice.'" *United States v. Defeo*, 36 F.3d 272, 276 (2d Cir. 1994). The government failed to establish that Mr. Napout acted with a specific intent to obstruct justice, that is, to conceal evidence for use at trial.

No trial witness testified that Mr. Napout intended to conceal, alter, or destroy any potential trial evidence, or that he even suggested or inferred as much. The government presented only one witness at trial about the computer, Nelson Sanabria, who testified that Mr. Napout was concerned that private, family photographs on the computer might be released to the press.[47] (Tr. 3127, 3181, 3194). Sanabria confirmed that he had personally downloaded pictures of Mr. Napout's wife, children and granddaughter, and many others, from Mr. Napout's phone to the computer over time, including pictures of his family on vacation at the beach. (Tr. 3180-81, 3094). A selection of those pictures were admitted at trial, and the government conceded that there were many more on the computer. (Tr. 2993, 3001, 3094, 3130, 3165, 3178-81). According to Sanabria, Mr. Napout had thousands of pictures on the computer. (Tr. 3181-82).

Nor does the government's attempted inference of obstruction make sense given the absence of any incriminating or material evidence on the computer. For starters, the government forensically analyzed the computer and found absolutely no tampering with the data on the

---

47. In fact, the government never presented any evidence that Mr. Napout instructed or directed anyone to remove the computer from CONMEBOL's offices, regardless of intent. Sanabria never spoke to Mr. Napout about such an instruction. (Tr. 3123). Rather, Sanabria was informed by his supervisor that if Mr. Napout was ever arrested, CONMEBOL's lawyer, Cristobal Caceres, would take the computer, but he did not know if Mr. Napout asked anyone to remove the computer. (Tr. 3123, 3193-95). Moreover, while Sanabria testified that Caceres removed the computer, he made clear that as CONMEBOL's attorney, Caceres was not stealing the computer. (Tr. 3196). Moreover, according to various government 302s, Caceres made it known to CONMEBOL's General Counsel, and successor General Counsel, that he had the computer. Thus, while the computer was removed by Caceres, its existence was not concealed from CONMEBOL.

-26-

computer.  If Mr. Napout had actually been concerned about the use of incriminating evidence on the computer, one would expect that he would have directed the deletion of incriminating files upon the computer's removal.  No such tampering occurred.

Moreover, the government admitted few exhibits from the untainted computer, none of which was incriminating or even material to the proceeding.  With over 90,000 photographs and numerous documents to choose from, all the government admitted from that computer at trial were (1) two emails, one about a FIFA Executive Committee Meeting (Exhibit 1004) and one requesting an advance payment from FIFA (Exhibit 1007); (2) a draft quote about the Centennial Copa America coming to the U.S. (Exhibit 1117); and (3) about 60 photographs or videos.  The photographs showed exactly what one would expect of a person in Mr. Napout's position – that he attended meetings or events with the presidents of other CONMEBOL member nations, numerous other football officials, and football media and marketing representatives.  None of the admitted evidence can be considered material to the case.  *See* § 3C1.1, cmt. n. 4(D) (noting as an example of covered conduct the destruction or concealment of evidence that is <u>material</u> to the judicial proceeding or that resulted in a <u>material</u> hindrance to the prosecution of the offense).  It defies common sense to conclude that Mr. Napout would have thought photographs of himself with others associated with FIFA and CONMEBOL would be considered material to the investigation and worthy of concealment, as those relationships were publicly and widely known.  He simply would not have and did not in fact contest that he had those relationships.

The timeline of relevant events further undermines the government's obstruction theory.  As of May 27, 2015, Mr. Napout was aware that the government was investigating bribery within FIFA and CONMEBOL, and had criminally charged various football officials.  Yet the government presented no evidence that Mr. Napout sought to conceal, alter or destroy evidence

-27-

once the investigation was known.  If Mr. Napout thought that the computer contained incriminating evidence, under the government's theory he would have sought to conceal such evidence upon learning of the investigation in May 2015.  He did nothing of the sort.  To the contrary, during the six months between the initial indictment and Mr. Napout's arrest, he took steps to ensure that evidence at CONMEBOL was preserved:  he participated in hiring United States counsel to collect and review evidence, required CONMEBOL employees to sign a document retention notice, and cooperated when an independent IT team forensically imaged CONMEBOL's server and computers and collected emails and other documents from them.  ((Tr. 3186-90); *cf.* Tr. 1327-28 (Pena deleted emails in Full Play's computers after the indictment was unsealed and was only stopped when Full Play subsequently hired outside lawyers); 2275-77 (Rodriguez testified that he witnessed T&T legal counsel shredding documents)).  Sanabria also confirmed that Mr. Napout never asked him to destroy any photographs or other documents, and that no document shredding or destruction occurred at CONMEBOL.  (Tr. 3185-86, 3197, 3202).  This stands in stark contrast with efforts by other individuals and companies in this case, including the government's cooperating witnesses, who destroyed relevant documents and servers.  (*See, e.g.*, Tr. 932-33 (Burzaco testified that Rodriguez destroyed his computer), 1116-18 (Pena took a binder of key documents from Full Play's office for a full year after the May 2015 indictment), 2275-78 (Rodriguez testified that he ordered the destruction of a server in Uruguay because it contained evidence of bribes around the world), 2265-72 (Rodriguez testified that he had provided a pen drive containing evidence of illegal activity to Eugenio Burzaco to transfer to Alejandro Burzaco)).

In short, there is simply no evidence, much less a preponderance of evidence, that Mr. Napout had the specific intent to obstruct justice by concealing, destroying, or tampering with

92142103_2

potential trial evidence.  The Court should not apply an enhancement for obstruction of justice, and the total offense level should be reduced by two levels.

**D.      A Leadership Role Enhancement Is Not Warranted**

An enhancement for a leadership role under Section 3B1.1 is unwarranted.  The government charged a 25-year-long global bribery conspiracy.  The government seeks a four-level role enhancement (*see* PSR ¶ 89) even though it does not allege that Mr. Napout was a participant for the first 20 years of the conspiracy, much less as a leader, or that he participated in all aspects even after he allegedly began to participate.

The government alleges that Mr. Napout joined the conspiracy in 2010, approximately 20 years into the ongoing conspiracy.  Even as to that period, the government does not contend that Mr. Napout participated in, much less led, various aspects of the conspiracy, such as the selection of World Cup sites,[48] World Cup qualifier matches of all member nations other than Paraguay, the Copa do Brasil, the Gold Cup, the CONCACAF Champions League, and numerous friendlies, as well as bribes for footwear, apparel, accessories, and equipment sponsorships, among others. Rather, the government's case against Mr. Napout focused on a much smaller portion of the overall alleged conspiracy: CONMEBOL's Copa America and Copa Libertadores.

But even as to this smaller, CONMEBOL portion of the alleged conspiracy, the government's cooperating witnesses made plain that Julio Grondona, otherwise known as "papa" or "the pope", was the undisputed leader of the conspiracy concerning CONMEBOL, as part of a leadership triumvirate including Nicolas Leoz and Ricardo Teixeira.  Burzaco repeatedly testified that all bribe-related issues had to go through Grondona.  Grondona "would have the last word in

---

48.  To the contrary, Bedoya testified that Mr. Napout rejected substantial bribe offers in connection with the 2022 World Cup site selection process.  (Tr. 1595-95).

the sense of authorizing, giving a green light, to each single payment of bribes." (Tr. 292). Bedoya likewise confirmed that Grondona approved all decisions, promotions and changes. (Tr. 1710-11, 1720-21). According to Hawilla, Grondona was the most powerful person at CONMEBOL, even though he was not the President. (Tr. 2931-32; *see also* Tr. 2678). Hawilla described Grondona, Leoz and Teixeira as the "real power trio" at CONMEBOL (Tr. 2932) who were the "bosses of everything" (Tr. 2685).

In addition to Grondona, Leoz, and Teixeira on the CONMEBOL side, Jinkis and Burzaco exercised significant leadership roles. Their companies gained the most from the bribes. They paid bribes to leaders around the globe for a decade or more, starting well before the government alleges that Mr. Napout got involved. According to Hawilla, Mariano Jinkis affirmatively offered bribes in order to control people and have them "in his pocket." (Tr. 2948). Consistent with that description, Mariano Jinkis himself approached Bedoya with a proposal to bribe members of the Group of Six for the Copa America tournaments, and Jinkis orchestrated the signing of the contract in South Africa. (Tr. 1582-86). Similarly, it had been Burzaco, who had a long history of working with Grondona, Leoz, and Teixeira, who had secured that power trio's support for the same contract by offering $3 million to each. (Tr. 397-98). Senior CONMEBOL officials would go to Burzaco to complain about delays in bribe payments. (*See* GX 412). Moreover, both Burzaco and the Jinkises kept tight control over information about the amounts they were paying alleged conspirators and to the ledgers tracking the payments. (Tr. 1287-88 (Pena testified that Mariano Jinkis's permission was necessary to show any one conspirator their portion of the Full Play ledger); 2295 (Rodriguez testimony that only he had access to the T&T ledger)). Perhaps most illustrative of the fact that the Jinkises and Burzaco, along with Grondona, led the conspiracy, is

Burzaco's testimony that he, the Jinkises and Grondona discussed and determined that Burga would be cut off from the Copa Libertadores scheme in 2014.  (Tr. 528).

With this backdrop, the allegation that Mr. Napout played a leadership role in the alleged conspiracy is incongruous with the facts in the record.  In fact, even within the Group of Six, Bedoya and Chiriboga had more prominent positions relative to Mr. Napout.  According to Bedoya himself, he was approached by Mariano Jinkis to broach the subject of bribes to federation presidents, and he conveyed Jinkis's message to each member of the Group of Six.  (Tr. 1583).

Similarly, Chiriboga's leadership position was apparent in connection with the termination of Traffic's contract for the Copa America tournaments.  Hawilla testified that when Grondona informed him of that development, Hawilla demanded a meeting with the Group of Six, and ultimately met with Chiriboga, who "was the one commanding everything." (Tr. 2721).  Chiriboga took full responsibility for the decision when, in response to Hawilla's complaint that he could not just rip up a valid contract, Chiriboga stated: "I can and I've already done that."  (Tr. 2722).  Indeed, during the trial, the Court even noted that once the Group of Six had established a power base, it was Chiriboga who is alleged to have "demanded" and "negotiated bribes for . . . them." (Tr. 2738.)  Demonstrating the prominence of Bedoya and Chiriboga among the Group of Six, Bedoya admitted that both he and Chiriboga received 50% more than the others.  (Tr. 1612; 1826-27).[49]

---

49.  According to the Government's chart for the Copa Libertadores (PSR ¶ 53):

- of the 12 alleged bribe recipients in 2011, Mr. Napout received the lowest ($400,000) of the three tiers ($600,000 and $1 million);

- of the 13 alleged bribe recipients in 2012, Mr. Napout received the second lowest ($400,000) of the five tiers ($300,000, $600,000, $1 million, and $1.2 million);

- of the 15 alleged bribe recipients in 2013, Mr. Napout, along with six others, received the fourth of six tiers; and

Presumably the government will base its request for an enhancement on Mr. Napout's position as President of CONMEBOL from August 2014 to May 2015, a nine-month period on the tail end of a 25-year conspiracy.   But his position as President does not mean he became a leader of the criminal activity.   Moreover, the evidence concerning Mr. Napout during that short period does not warrant an enhancement, particularly in light of the broad conspiracy charged.   For starters, the lack of any allegations of Mr. Napout's participation in large swaths of the charged conduct remains true even after he became President.   And with respect to the Copa America and Copa Libertadores tournaments, the relevant contracts were signed well before August 2014. There was no evidence that Mr. Napout, as the President of CONMEBOL, negotiated, approved, or improperly influenced a single contract that is the subject of the conspiracy charges.   Similarly, the alleged bribes associated with the subject contracts were agreed upon well before August 2014.

We expect that in seeking this enhancement, the Government will rely primarily on one snippet from Burzaco, which testimony was not only vague in details, but which was subsequently discredited.   During trial, Burzaco testified that in October 2014, after Mr. Napout became President, Burzaco met with both Mr. Napout and Marco Polo Del Nero in Paraguay and explained the bribes made to various CONMEBOL officials.[50]   (Tr. 566-69).  Burzaco claimed that during that meeting, Mr. Napout and Del Nero decided to raise the bribe amounts received by them and

---

- of the 11 alleged bribe recipients in 2014, Mr. Napout received the second lowest ($400,000) o the six tiers ($300,000, $450,000, $600,000, $1 million, and $1.2 million).

  Similarly, when the Copa America contract with Datisa was inked, Mr. Napout allegedly received payments on par with nine others, while Grondona, Leoz and Figueredo were slated to receive three times as much as the others.  (PSR ¶ 49).  These numbers belie a leadership role for Mr. Napout.

50. Even if credited, this part of Burzaco's testimony undermines the Government's theory that Mr. Napout was a leader prior to that time, or that Mr. Napout was even aware of the bribes offered to each of the other members of the conspiracy.  If Mr. Napout had such knowledge and a leadership role prior to that meeting, there would have been no reason for Burzaco to explain those basic details to him at such a late date.

-32-

others.  (Tr. 573).  Yet only after Mr. Burzaco testified did the defense discover that Mr. Burzaco was not in Paraguay at the time,[51] and thus could not have attended such a meeting.  Such flimsy evidence cannot support a four-level sentencing enhancement.

Given the dramatic impact that this proposed enhancement has on Mr. Napout's sentencing exposure, the Court, in its discretion, should reject this piece of Burzaco's testimony, and find that a leadership role enhancement is inapplicable.  To put this in perspective, according to the PSR, Mr. Napout's offense level is 43, with a corresponding Guidelines range of life in prison, capped at 60 years based on the statutory maximum for the three counts of conviction.  Without the proposed four-level leadership role enhancement (prior to considering the other necessary reductions in offense level detailed herein), the offense level drops to 39, with the low end of the corresponding Guidelines range at 262 months (a range which is also entirely unjust and which should be reduced for the numerous reasons set forth in this brief).  **This single issue has more than a 38-year impact on the starting point for Mr. Napout's sentencing determination.**

### E.    The Government Grossly Overstates the "Loss" Figures Under § 2B1.1(b)(1)

The final and by far most outsized enhancement is the "intended loss" amount under Section 2B1.1(b)(1).  For loss calculation purposes, Guidelines Section 1B1.3(a)(1)(B) permits a court to include as relevant conduct the acts of co-conspirators in furtherance of the conspiracy that are "reasonably foreseeable" to the defendant.  The Second Circuit requires a court to make particularized findings both as to the scope of criminal activity agreed upon by the defendant, and,

---

51.  Travel records revealed that, contrary to Burzaco's testimony, he did not fly to Paraguay with Luis Segura by private plane for that meeting, did not otherwise legally cross the border into Paraguay for that meeting, and did not actually attend the CONMEBOL meeting.  *See* Napout Post-Trial Motion for New Trial at 9-11, Ex. A (Paraguayan immigration records revealing no entry by Burzaco in October 2014); Ex. B (flight logs showing Segura and other officials on the private flights to and from Paraguay, but not Burzaco); and GXs 1366-T, 1352-T, and 1371-T (CONMEBOL meeting minutes reflecting Burzaco's presence at certain meetings but not the October 24, 2014 meeting).

-33-

"only if it finds that the scope of the activity to which the defendant agreed was sufficiently broad to include the conduct in question . . . as to whether the activity was foreseeable to the defendant." *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).

"Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." § 1B1.3, cmt. n.3(B). Acts of others that were not within the scope of the criminal activity agreed upon by the defendant are not relevant conduct "even if those acts were known and reasonably foreseeable to the defendant." *Id*. "[E]ven important participation in one aspect of a conspiracy with awareness of others does not necessarily establish responsibility for the whole of the conspiracy's activities." *United States v. Khandrius*, 613 F. App'x 4, 7 (2d Cir. 2015). "[N]either 'knowledge of another participant's criminal acts, nor 'aware[ness] of the scope of the overall operation' alone is enough to deem the defendant responsible for the acts of co-conspirators." *Id*. (*quoting Studley,* 47 F.3d at 575).

In addition, "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." *Id*. In determining the scope of activity agreed upon by the defendant, a court should consider "(1) whether the participants pool their profits and resources, or whether they work independently; (2) whether the defendant assisted in designing and executing the illegal scheme; and (3) what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct."

The PSR does not undertake any analysis of Mr. Napout's agreed upon scope of criminal activity, much less whether each of the bribes paid or promised to a large number of different

-34-

individuals – 20 – over a period of six years was reasonably foreseeable to him.  Rather, the PSR

merely lists those 20 individuals and alleged amounts in two charts, totals up the amounts to more

than $150 million, and assumes that Mr. Napout should be held accountable for that entire amount.

Plainly that is insufficient for sentencing purposes, and does not provide the Court with any basis

to make the particularized findings required in *Studley*.  Indeed, that amount must be significantly

reduced because the government failed to adduce sufficient evidence at trial for the Court to make

particularized findings as to Mr. Napout for each of the bribes in the PSR's Copa America and

Copa Libertadores charts, or with respect to the Paraguayan World Cup Qualifiers.  Moreover,

because the bribe payments are not a sufficient proxy for intended loss, and the government still

has not attempted to provide any market analysis establishing losses, the bribes are better

characterized as gain to the conspirators, and such gain must be limited to actual, not potential

future, gain.

        **1.**       **The Government Did Not Establish That Each of the Alleged Bribes Was Within Mr. Napout's Agreed Upon Scope or Was Reasonably Foreseeable to Mr. Napout**

The charts in the PSR presumably come largely from the ledgers the government presented

at trial.  However, the testimony by both bookkeepers, Santiago Pena and Eladio Rodriguez, was

clear that access to the information contained in those ledgers was extremely limited.  For example,

Pena testified that Jinkis controlled the information disclosed to the Group of Six about bribe

payments, only allowing members to view, at most, their own portions of the ledger.  (Tr. 1287-

88, 1335). Thus, the fact that a ledger exists with a lot of names and numbers does nothing to

establish that Mr. Napout was aware of the payments or promises to others.  Indeed, it compels the

opposite inference – that the information was closely guarded to prevent any one person from

having knowledge of bribe payments and promises to others.  Nor did the government present a

single document at trial that suggested Mr. Napout was aware of bribes promised or paid to others. And the few witnesses at trial who claimed knowledge of any bribes offered few specifics about Mr. Napout's alleged knowledge of particular bribe payments or promises to the 20 people identified in the PSR charts.[52]

Indeed, Burzaco confirmed that, during the period in which bribes were promised in exchange for the media and marketing rights for the relevant Copa America and Copa Libertadores tournaments, only one person other than the bribe givers, Julio Grondona, had knowledge of the full scope of the bribe scheme. (*See* Tr. 293). Burzaco testified that other alleged conspirators organized themselves into "clusters" via which they communicated with Grondona and, in certain circumstances, arranged the mechanism by which they allegedly received bribes. (*Id.*). Moreover, the clusters did not exist in a political vacuum. For example, while more powerful CONMEBOL officials, such as Grondona and Leoz, may have been aware that members of the Group of Six were receiving bribes, there is little or no evidence that the reverse is true.[53] This testimony

---

52. Neither Rodriguez (Torneos' bookkeeper) nor Pena (Full Play's bookkeeper) testified about any discussions with Mr. Napout about bribes paid or promised to others, so for these purposes their testimony is inconsequential.

53. The government will likely argue that declarations made by members of the Group of Six can be imputed to Mr. Napout by dint of his membership therein. However, such arguments are fundamentally flawed and, moreover, disproven by the record. For example, Hawilla testified that in terminating the Traffic contract for Copa America, Chiriboga stated that he knew of Traffic's past payments to the "three," *i.e.* Grondona, Leoz, and Teixeira. (Tr. 2722). However, it does not follow that every member of the Group of Six had been aware of those prior payments or had even approved Chiriboga's actions. Indeed, Hawilla's subsequent lawsuit to recover Traffic's rights to the Copa America targeted Chiriboga, Bedoya, and Esquivel even though Hawilla had allegedly been told that the decision to cancel Traffic's contract had been spurred by the alleged collective action of the Group of Six. (*See* Tr. 2720-21.). Similarly, Rafael Esquivel's alleged 2009 statement to Burzaco that the Group of Six knew that bribes were being paid in connection with Copa Libertadores is insufficient to show that Mr. Napout knew or had reason to foresee that any Conmebol officials were receiving bribes in connection with that tournament. This knowledge gap is confirmed by Burzaco's testimony that Mr. Napout allegedly needed an explanation in October 2014 as to who received bribes and in what amounts. (Tr. 569).

-36-

demonstrates the limitations on both the agreed upon scope of the alleged conspiracy by its various members and the reasonable foreseeability by Mr. Napout of bribes paid or promised to others.[54]

As set forth below, the government failed to produce such testimony to support any particularized finding that the scope of any agreement by Mr. Napout to commit the charged offenses included conduct by each of the 20 individuals, or that each of bribe payments or promises to those 20 people were reasonably foreseeable to him.

(a)    Webb/Sanz

The PSR's Copa America chart includes a $10 million bribe payment to Jeffrey Webb and/or Enrique Sanz (PSR ¶ 49), presumably for CONCACAF's signature for the 2016 Copa America Centenario.   The government, however, failed to introduce evidence establishing (or even suggesting) that Mr. Napout participated in or was aware of an agreement to pay bribes to Webb and Sanz, or that any agreement to pay bribes to these CONCACAF officials would have been reasonably foreseeable to Mr. Napout.   The government elicited brief testimony related to the alleged agreement to pay bribes to Webb and Sanz from three cooperating witnesses:  Burzaco, Pena, and Hawilla.  *See* Tr. 484-88, 531-33, 580-81 (Burzaco); 1219 (Pena); 2732-34, 2773-75, 2784-85 (Hawilla).[55]  While the government had every incentive to link this alleged agreement to Mr. Napout (and his co-defendants), none of the cooperating witnesses testified that Mr. Napout knew, or should have known, about an agreement to pay bribes to CONCACAF officials.  In fact,

---

54.  To the extent the government relies on the same testimony from Burzaco about an October 24, 2014 meeting in Paraguay to establish loss amount, that testimony is no more reliable here than in determining a leadership role enhancement.  *See* supra, p. 32-33.  Moreover, even if credited, the fact that Mr. Napout might have learned about some of the identified bribes after the fact is insufficient to hold him accountable for such bribes for sentencing purposes.  "A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct."  § 1B1.3, cmt. n.3(B).

55.  Another cooperating witness, Bedoya, testified that he was not aware of specific bribes to CONCACAF officials.  (Tr. 1604).

the government's witnesses did not testify that any CONMEBOL officials (including Mr. Napout) were involved in the negotiations to pay bribes to CONCACAF officials, or that the alleged CONCACAF bribes were discussed during the dozens of meetings that Mr. Napout attended with other FIFA and sports marketing officials between 2011 and 2015.   Tellingly, in its closing argument and rebuttal, the government made several references to the alleged agreement to pay bribes to CONCACAF officials, but never argued (nor could it have) that Mr. Napout knew or had a reasonable basis to know about those bribes.   (*See* Tr. 4225, 4291-92, 4298-99, 4495.)   Yet now the government seeks to enhance Mr. Napout's loss calculation for conduct it never attributed to him at trial.   Because the evidence at trial did not establish (and the government did not argue) that bribes to CONCACAF officials were part of Mr. Napout's agreed upon scope of criminal activity, or that the alleged bribes to Webb and Sanz were reasonably foreseeable to Mr. Napout, those bribes should not be included in the total amount of intended loss attributable to him.   The loss amount should be reduced by $10 million.

(b)   <u>Bauza</u>

The PSR includes an alleged 2013 payment of $400,000 to Sebastian Bauza (the only alleged payment to Bauza), the President of the Uruguayan Soccer Federation, in connection with the alleged Copa Libertadores scheme.   PSR ¶ 53.   The government has not provided any evidence that Mr. Napout knew or could have reasonably foreseen that the alleged payment would be made to Bauza.   Bedoya testified that he never spoke to Bauza about bribes.   (Tr. 1795).   Burzaco testified that the payment had been made to Eugenio Figueredo at Figueredo's request, ostensibly because Bauza, who was not a member of the Group of Six, felt "left out."[56]   In the absence of any

---

[56]. Burzaco conceded that he could not confirm that the funds ever reached Bauza.   (Tr. 351-52).

evidence that anyone other than Figueredo or Burzaco discussed or knew about this alleged payment, there is no basis to support the conclusion that Mr. Napout could have reasonably foreseen that it would be made.  The loss amount should be reduced by $400,000.

(c)     Jadue

The PSR includes alleged payments or promises of $8.8 million to Sergio Jadue, who the government suggests became a seventh member of a Group of Six.  However, the government has not provided any evidence that Mr. Napout was aware that Jadue had even joined the conspiracy, let alone been promised any bribes in connection with either the Copa Libertadores or the Copa America contracts.  No witness testified about any meeting or conversation with Mr. Napout during which bribes to Jadue was discussed.  The loss amount should be reduced by $8.8 million.

(d)     CONMEBOL Executive Committee Members

The PSR attributes to Mr. Napout bribes paid or promised to the following individuals who served on CONMEBOL's Executive Committee: (i) Eduardo De Luca; (ii) Romer Osuna; (iii) Eugenio Figueredo; (iv) Jose Luis Meizsner; (v) Ricardo Teixeira; (vi) Nicolas Leoz and (vii) Julio Grondona.  According to Burzaco, these bribe recipients communicated and arranged mechanisms for payment in "clusters," with only Grondona having a full knowledge of the recipients and amounts paid.[57]  The government failed to present evidence that Mr. Napout had reason to know of the existence of bribes, or their amounts, paid to these individuals.

---

57.  (*See* Tr. 293) ("Grondona would communicate with Leoz, with Eugenio Figueredo or with Riccardo Teixeira. Sometimes Juluio Grondona would speak with Eduardo Deluca…Those three gentlemen, Romer Osuna, Eugenio Figueredo and Eduardo Deluca would be a group by itself, with each internal arrangements and banking instructions and fake contracts.  Each cluster or each group had its own characteristics. Julio Grondona knew everything.")

(1)     De Luca

The PSR includes an alleged one-time bribe payment of $600,000 to De Luca in connection with the 2011 Copa Libertadores tournament.  Burzaco testified that De Luca was a member of a particular "cluster" of senior CONMEBOL officials, also including Figueredo and Osuna, who made their own financial arrangements for payment from T&T.[58]  The government offered no evidence that Mr. Napout was part of this small cluster, agreed upon the scope of that cluster's criminal activity, or had any awareness of a bribe payment made to De Luca.  The loss amount should be reduced by $600,000.

(2)     Osuna

The PSR incudes alleged bribes of $1.8 million to Osuna in connection with the Copa Libertadores.  As with De Luca, Burzaco testified that Osuna was a member of a particular "cluster" of senior CONMEBOL officials, also including Figueredo and De Luca, who made their own financial arrangements for payment from T&T.  The government presented no evidence that Mr. Napout was part of that cluster, agreed upon the scope of that cluster's criminal conduct, or had any insight into payments made to Osuna.  The loss amount should be reduced by $1.8 million.

(3)     Figueredo

The PSR incudes alleged bribes of $6.5 million to Figueredo.  Figueredo was part of the small cluster with De Luca and Osuna, and the government provided no evidence of Mr. Napout's participation in that cluster, agreement to the scope of that cluster's criminal activity, or awareness of bribes paid to Figueredo.  The loss amount should be reduced by $6.5 million.

---

58.  (Tr. at 293; *see also* Tr. 507-08 (Burzaco's testimony of email between himself and Rodriguez stating that Figueredo and Osuna directly interceded with him regarding outstanding payments).

(4)      Meiszner

The PSR includes alleged bribes of $5.6 million to Meiszner.  No witness testified about any meeting or conversation with Mr. Napout during which bribes to Meiszner was discussed.  The government offered no other evidence that Mr. Napout had any awareness of bribes made or promised to Meiszner, or that such bribes were reasonably foreseeable to Mr. Napout.  The loss amount should be reduced by $5.6 million.

(5)      Teixeira

The PSR includes alleged bribes of $1.6 million to Teixeira.  Teixeira had been receiving bribes from T&T since at least 2006, discussing his bribe payments directly with Grondona (Tr. 293; 295) and establishing the mechanism for their payment directly with T&T (Tr. 299-300). Information about Teixeira's receipt of bribes was so closely held that Burzaco and Grondona had needed to meet with Del Nero just to brief him.  (*See* Tr. 905-912).   The government failed to present any evidence that Mr. Napout had any awareness of bribes made or promised to Teixeira, or that such bribes were reasonably foreseeable to Mr. Napout.  The loss amount should be reduced by $1.6 million.

(6)      Leoz

The PSR includes alleged bribe payments of $6 million to Leoz between 2011 and 2013. Like Teixeira, Leoz was another member of the CONMEBOL Executive Committee that spoke directly with Grondona about his receipt of bribes.  (Tr. 293).  The government failed to provide any evidence that Mr. Napout had any awareness of bribes made or promised to Leoz, or that such bribes were reasonably foreseeable to Mr. Napout.  Thus, the loss amount should be reduced by $6 million.

92142103_2

(7)      Grondona

The PSR includes alleged bribe payments of $10.6 million to Grondona.  As a threshold matter, the PSR has improperly calculated the amounts allegedly paid to Mr. Grondona in connection with the Copa Libertadores between 2012 and 2014.  While Burzaco alleged that Grondona's annual bribe payments in connection with this scheme were increased to $1.2 million per-year in 2012 (Tr. 282), his statements are contradicted by Eladio Rodriguez, who testified that the alleged bribes paid to Grondona in connection with Copa Libertadores did not increase beyond $1 million per year.  (Tr. 2077).[59]  Thus the loss amount should be reduced by at least $600,000.

More fundamentally, the government has failed to provide any evidence that Mr. Napout had any awareness of bribes paid or promised to Grondona, or that such bribes were reasonably foreseeable to Mr. Napout.  No evidence has been provided that Mr. Napout ever discussed the topic of bribes with Grondona.  Indeed, the information that Burzaco allegedly provided to Mr. Napout in October 2014 included a summary of the bribes received by Grondona in connection with Copa Libertadores (Tr. 569-76) -- something that would not have been required had Mr. Napout had prior knowledge.  Nor has the government offered any evidence that Mr. Napout could have reasonably foreseen the bribes paid to Grondona in connection with Copa America—bribes which Burzaco himself secured for each of Grondona, Leoz, and Teixeira (Tr. 397-98) and about which even more prominent members of the Group of Six would not have spoken with Grondona. (*See e.g.*, Tr. 1795 (Bedoya testimony that he never spoke with Grondona about Copa America bribes)).

---

59.  *See also* Exhibits GX-623 at FIFA00012789 ("Pago C. Libertadores al Papa…1,000,000…Libertadores 2013") and GX-624 at FIFA00012822 ("Pago al Papa 50% Libertadores Ano 2014...500,000.00….")).

While the government may point to testimony that Mr. Napout ultimately had a close relationship with Grondona, discussed his political ambitions with Grondona, and even requested that Burzaco convey Mr. Napout's trustworthiness to Grondona "all about the code" (Tr. 802), Mr. Napout's deference to Grondona's political power is not proof of criminal conspiracy, but rather of political diplomacy.  The loss amount should be reduced by $10.8 million.

(e)   Marin

The PSR includes alleged bribe payments or promises of $8.2 million to Marin.  However, the government did not provide any evidence that Mr. Napout was aware that Marin was receiving bribes in connection with either the Copa Libertadores or Copa America schemes, or that such bribes were reasonably foreseeable to him.  While they were co-defendants at trial, not a single witness placed Marin and Mr. Napout at a meeting together during which bribes were discussed, or testified about any conversations with Mr. Napout about bribes made to Marin (or vice versa).  Nor did the government try to make such a connection during closing arguments.  The loss amount should be reduced by $8.2 million.

(f)   Del Nero

The PSR includes alleged bribe payments or promises of $17.8 million to Del Nero.  However, with the exception of the alleged October 2014 meeting between Burzaco, Del Nero, and Mr. Napout, the record is devoid of evidence that Mr. Napout agreed to or would have had reason to foresee such bribes.  Accordingly, as a threshold matter, the intended loss should be reduced by, at the very least, the amount of bribes allegedly paid or promised to Del Nero before the October 2014 meeting, *i.e.* $3.8 million.

Second, as noted *supra*, compelling evidence discredits Burzaco's testimony that he was in Paraguay on the night the alleged meeting was held.  Furthermore, while the government will

-43-

likely argue that Mr. Napout's alleged formation of a political alliance with Del Nero in 2014 is sufficient evidence to impute knowledge of Del Nero's bribes to Mr. Napout, political association is not proof of criminal culpability.  Thus, in the absence of credible evidence that Mr. Napout ever engaged in a discussion with Del Nero about bribes, the loss should be reduced by $17.8 million.

(g)     Segura

The PSR includes alleged bribe payments or promises of $2.4 million to Segura.  This calculation can only be based on Burzaco's testimony about the alleged October 24, 2014, meeting, because there was no other evidence at trial that bribes to Segura were within the scope of any agreed upon conduct by Mr. Napout, or were otherwise reasonably foreseeable to him.  Because Burzaco's testimony about that particular meeting has been discredited, and there is no other evidence to attribute these bribes to Mr. Napout, the loss amount should be reduced by $2.4 million.

(h)     The Group of Six

While the trial contained a significant amount of testimony about the Group of Six's political origins and goals, it is also replete with evidence that its members were not equal members of the alleged conspiracy.  Moreover, significant testimony by the government's cooperating witnesses shows that at least certain members of the Group of Six, including Mr. Napout, were left in the dark about the conspiracy's scope and would have had no reasonable basis to foresee: (i) that each member of the Group of Six was receiving bribes in connection with the Copa Libertadores and Copa America; and (ii) that certain members within the Group of Six were receiving larger amounts in bribes than others.

-44-

For starters, the PSR includes $6.4 million in bribe payments or promises to Manuel Burga (*see* PSR ¶¶ 49, 53), even though he was acquitted of having been a member of the charged conspiracies, and thus could not be within the scope of any agreed upon conduct by Mr. Napout. For that reason alone, the loss amount should be reduced by $6.4 million.

Turning to the Copa Libertadores scheme, the record is clear that at least until October 2014, Mr. Napout did not know that his political allies in the Group of Six—as well as others outside that group, were receiving bribes. The government did not provide any evidence that the Group of Six reached a collective agreement to receive bribes in connection with Copa Libertadores.[60] Instead, as Bedoya testified, discussions between members of the Group of Six members regarding the Copa Libertadores scheme were "very sporadic[]" (Tr. 1614). In fact, Bedoya testified that he only spoke to Mr. Napout about those bribes at some time after Leoz and Osuna left CONMEBOL. (*See id*). There was no testimony that this conversation occurred prior to October 2014.

In addition, Burzaco's testimony proves that Napout would not have known about the Copa Libertadores bribes—to members of the Group of Six or otherwise—prior to October 2014. Specifically, Burzaco testified that in October 2014, he informed Mr. Napout which CONMEBOL officials, including members of the Group of Six, were receiving bribes and that each was receiving $400,000 per year. (Tr. 573). The very fact that Mr. Napout needed such a briefing in late 2014 demonstrates, at the very least, that he was not aware of such bribes at an earlier time.

---

60. Burzaco's testimony that Esquivel demanded bribes in the Group of Six's name is insufficient in this regard. No evidence was provided that Mr. Napout actually agreed to receive bribes in connection with the Copa Libertadores, or that he was aware others did so.

-45-

The testimony of other government witnesses confirms, both directly and indirectly, Mr. Napout's lack of knowledge.  For example, Bedoya testified that he had first been offered bribes in connection with Copa Libertadores in 2012, when he was allegedly informed by Mr. Grondona that "from now on we're going to pay [Los Muchachos] some money for Copa Libertadores." (Tr. 1612).  Despite Burzaco's testimony that Rafael Esquivel had demanded bribes in connection with Copa Libertadores in 2009 (Tr. 330-31), Bedoya's testimony that the Group of Six was first corrupted from its political mission by the Copa America scheme—*i.e.* in 2010[61]—clearly establishes that he had not been aware of Esquivel's alleged 2009 demand.  (*See* Tr. 1923-24).

Finally, even if Mr. Napout had been aware that each member of the Group of Six had received bribes in connection with the Copa Libertadores scheme, he would not have been aware of the amounts that they received.  (*See* Tr. 573-74).  Thus, he would have had no reasonable basis to foresee that Bedoya and Chiriboga had received an extra $200,000 in bribes per year starting in 2013.

With respect to the Copa America, the government has not provided any evidence that Mr. Napout specifically agreed to a Group-wide conspiracy to accept bribes.  The only government witness who testified that he personally spoke to Mr. Napout about the Copa America scheme was Bedoya.  He testified that after Mariano Jinkis approached him with an offer to provide Group members with $1 million dollars each, he agreed to convey that offer to each member of the Group of Six.  (Tr. 1582).  However, in testifying about his conversations with Group members, it is. Bedoya did <u>not</u> say that each member of the Group of Six was aware that all six members had agreed to receive bribes.  (Tr. 1585).  Nor did Bedoya testify that the Group of Six ever collectively

---

61.  Bedoya testified that he could not recall any company other than Traffic being interested in the Copa America prior to 2010.  (*See* Tr. 1580; 1582-84 (Bedoya's testimony that it was he that conveyed Mariano Jinkis's Copa America offer to the Group of Six)).

-46-

discussed Jinkis' offer, or that he had any conversations with other members of the Group of Six in which each jointly agreed to bribes for the Group.  (*See* 1600-1603).  Thus, payments to the Group of Six should be reduced from the loss amounts, other than perhaps Bedoya, who at least testified to having allegedly discussed the matter with Mr. Napout.

(i)      The Paraguayan World Cup Qualifiers

The PSR includes in the loss amount $2.5 million in bribes Mr. Napout allegedly agreed to receive in connection with a 2011 media and marketing contract between APF and Ciffart Sport for the 2014 and 2018 Paraguayan World Cup Qualifiers.  The government failed to establish the existence of such a scheme at trial, much less Mr. Napout's agreed upon scope of criminal activity with others for sentencing purposes.  Not a single witness at trial testified about the negotiations for that contract, the bidding or lack of bidding in connection with that contract, or the offer and acceptance of bribes in exchange for that contract.  Moreover, Burzaco, who concededly had nothing to do with the Ciffart contract, testified that he heard from the Jinkises that Mr. Napout was not defending those contracts or providing loyalty to the Jinkises in that respect (Tr. 581-82).  That testimony undermines the notion that there was any agreement by Mr. Napout as regards the Ciffart contract.  The government will no doubt point to Pena's testimony that it was his understanding, obtained third-hand, that Mr. Napout was to receive payments for those Qualifiers, but Pena had no personal knowledge of such an agreement, could not provide any details of such an agreement, and conceded that Mr. Napout was not involved with the Ciffart contract.  (Tr. 1302).  No trial witness actually had first-hand knowledge of any such agreement, and no witness testified about any conversation with Mr. Napout in which he acknowledged such an agreement.  Hawilla and Tordin also testified about agreements concerning Qualifiers, but those were for other countries, not Paraguay, and did not involve Mr. Napout.  (*See, e.g.*, Tr. 2973-76, 3018-19, 3024).

-47-

Given the dearth of evidence establishing a bribery scheme surrounding the 2011 Ciffart contract, the loss amount should be reduced by $2.5 million.

### 2.      Only Actual Gain, Not Intended Gain, Can Be Included

Section 2B1.1 of the Guidelines permits the Court to use gain as an alternative to loss when loss "reasonably cannot be determined." 2B1.1, cmt. n. 3(B). In calculating gain, the Court must use the gain "that resulted from the offense," *see id.*, rather than unrealized future gain. Here, any actual loss cannot reasonably be determined, as the government has never attempted to present a market analysis of the purported undervaluation of any contract which the government alleges was granted in exchange for bribes. Bribes are, quite naturally, gain to the bribe recipients. Thus, it is proper for the Court to use this gain to the recipients as an alternative to loss, and in doing so, the Court must calculate only the bribes actually received that the Court finds were both within Mr. Napout's agreed upon scope of criminal activity and reasonably foreseeable to him. The Court should reduce the calculated amount under Section 2B1.1(b)(1) that does not fit within those parameters.

## IV.   THE § 3553(a) FACTORS CALL FOR A NON-GUIDELINES SENTENCE

In fashioning an appropriate sentence, the Supreme Court has made abundantly clear that a district court must consider all Section 3553(a) factors prior to making a decision, not just the Sentencing Guidelines calculations. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). Indeed, since its seminal holding in *United States v. Booker*, finding that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment, the Supreme Court has stressed the advisory nature of Guidelines. 543 U.S. 220, 226-46 (2005). The Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

A within-guidelines sentence, without equal consideration to all the Section 3553(a) factors, is no longer presumed to be reasonable.  *See Nelson v. United States*, 555 U.S. 350 (2009) (citations omitted).  As the *Nelson* Court emphasized:

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.  In *Rita* we said as much, in fairly explicit terms: 'We repeat that the presumption before us is an appellate court presumption . . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'  And in [*Gall*] we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, 'may not presume that the Guidelines range is reasonable.'

*Id.* at 352.

Section 3553(a) specifically instructs district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing.  18 U.S.C. § 3553(a).  *See Kimbrough*, 552 U.S at 101 (citing the sentencing goals outlined at 18 U.S.C. § 3553(a)(2)(A)-(D)).  The court must consider the following: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553 (a)(1)-(7).

In essence, a district court is no longer required to justify a below-guidelines sentence by finding that a particular Section 3553 factor is "extraordinary" or sufficient to take the offense

-49-

outside the "heartland" of the Guidelines.  *See Gall*, 552 U.S. at 47.  Rather, the district court must make an "'individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in §3553(a)."  *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008).  *See United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.) ("Imposing a sentence on a fellow human being is a formidable responsibility.  It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.  The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.  Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.").

Moreover, when a sentencing court finds that the Guidelines fail to properly reflect the Section 3553(a) factors, reflect "unsound judgment" or when "the case warrants a different sentence regardless," the judge is free to disagree with the guideline calculations and impose a reasonable sentence.  *See Rita v. United States*, 551 U.S 338, 351, 357.  The Supreme Court subsequently clarified this discretion:

> [E]ven when a particular defendant . . . presents no special mitigating circumstances -- no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post-offense rehabilitation -- a sentencing court may nonetheless vary downward from the advisory guideline range . . . . The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines . . . .

*Spears v. United States,* 555 U.S. 261, 263-64 (2009).

Courts in the Second Circuit have not hesitated to disagree with the guideline calculations and imposed sentences far below the advisory guideline range in order to avoid injustice.  For example, in *United States v. Adelson*, a stock manipulation case, where the guidelines calculation

-50-

was based on a $260 million loss, the court disagreed with the guidelines results finding that they place an "inordinate emphasis on the loss calculations" and were "wildly off-base."  441 F.Supp. 2d 506, 509, 515 (S.D.N.Y 2006), *aff'd* 301 Fed.Appx 93 (2d Cir. 2008).  Exercising his discretion, Judge Rakoff explained, "where as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."  *Id.* at 515. After considering the Section 3553(a) factors, Judge Rakoff sentenced Adelson to 42 months imprisonment.  *Id* at 507, 515.  *See also United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (finding 20 year sentences for $300 billion dollar fraud was "not merely harsh" but "dramatically more severe than c[ould] be justified"); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (imposing a 60 month sentence in a securities fraud case notwithstanding an advisory guidelines range of 360 months to life and supporting the *Adelson* proposition that the fraud guidelines "have so run amok that they are patently absurd on their face"); *United States v. Ferguson*, 584 F.Supp. 2d. 447 (D. Conn. 2008) (court gave five defendants sentences ranging from one year and one day to four years' incarceration for their role in a $500 million fraud despite an advisory guideline range of life in prison).  Indeed, in *United States v. Algahaim*, the Second Circuit itself remanded a fraud case for resentencing, inviting district courts to consider non-Guidelines sentences where a low base offense level for a fraud offense is dwarfed by a loss enhancement.  842 F.3d 796, 800 (2d Cir. 2016) (recognizing the imbalance of a base offense level of six for fraud with a 12-level enhancement for loss amount, which amounted to a three-fold increase in the defendant's offense level).

The advisory guidelines range in this case places an unreasonable reliance on loss and is "patently absurd."  The suggested loss enhancement alone represents a near five-fold increase in Mr. Napout's offense level, and screams out for a substantial variance from the Guidelines.  *See Algaheim*, 842 F.3d at 800.  We respectfully request that the Court consider all the Section 3553(a) factors and impose a merciful sentence sufficient, but not greater than necessary, to meet the ends of justice.

### A.   An Individualized Assessment of Juan's Character and Background Mitigate Against Substantial Additional Incarceration

The first Section 3553(a) factor instructs the court to consider the "history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  In making this assessment, a sentencing judge is "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall,* 552 U.S. at 52 (citing *Koon v. United States*, 518 U.S. 81, 98 (1996)).  Thus, while Juan stands convicted before this court as a first time-offender, the manner in which he led his life and interacted with others in his country of Paraguay is a critical consideration.

As described above and in the hundreds of letters presented to the Court, since an early age Juan recognized his good fortune and made a conscious decision to use his talents and treasure to help others.  This was not a decision that was imposed on him, but one that he voluntarily undertook and sought no recognition for.  During his 60 years, Juan has helped numerous family members, friends, co-workers, athletes and charitable organizations.  His commitment to helping others has gone far beyond financial support.  He was a light of encouragement for friends going through difficult times or suffering from medical issues.  Juan's support never wavered and his commitment to improving his community has been extraordinary.

Despite his social and economic standing, Juan remained a humble and simple man.  He treated everyone equally and never used his position to take advantage of employees or those less fortunate.  As repeatedly described in the letters, Juan treated each individual with respect and dignity.  His outgoing personality naturally attracted people and led him to positions of leadership within several sports organizations.  As described by many, Juan did not enter sports to make money, he had more than enough, but rather his goal was to improve the conditions for others.  Juan used his position in sports to bring the community together and foster national pride.

One of Juan's most revealing characteristics as expressed in the letters submitted is his peaceful demeanor and disdain for conflict.  Throughout his life Juan sought to avoid confrontation by respecting opposing points of views and used his collaboration skills to bring people together.  Many of the letters submitted describe Juan as: a "pacifist" that "never showed hatred or revenge"; a "maximum collaborator" who "always sought to "strike a balance"; "a loyal companion" with a "huge heart"; a "simple and generous" man who always had a friendly smile"; and, a "believer in the human being."

In this case, Juan's long history of compassion and characteristics of devotion to family and service to others do not warrant substantial additional incarceration.  Recognizing that the jury has rendered its verdict, we respectfully submit that Juan's conviction represents a stark departure to the long life he has led with honesty, generous spirit and a commitment to the well-being of others.

**B.    The Nature and Circumstances of Juan's Conviction Do Not Warrant a Sentence of Substantial Additional Incarceration**

While Juan was convicted on three conspiracy counts, he was acquitted on the two money laundering counts, reflecting the fact that the jury distinguished his conduct from others charged.  Unlike defendants in other fraud cases, the government did not present any evidence during trial

92142103_2

that Juan used any ill-gotten gains to fund a lavish lifestyle.  Moreover, this is not a case involving any violence or danger to the community, or any hint of such violence or danger in the future.

    **C.**    **Substantial Additional Incarceration is Not Necessary to Satisfy the Goals of Section 3553(a)(2)**

        **1.**    **Substantial Additional Incarceration is Not Necessary to Reflect the Seriousness of the Offense, to Promote Respect for Law, or to Provide Just Punishment for the Offense**

There are several reasons why substantial additional incarceration would not serve the needs of justice.  First, Juan has already served eight months of his sentence under the stringent conditions of MDC.[62]  Following the verdict, Juan was immediately taken into custody and as a first-time offender was suddenly confronted with the harsh reality of a complete loss of freedom and housed with violent criminals.  This experience alone is sufficient to deter an individual with Juan's background from committing any offense in the future.

Second, prior to trial, Juan spent two years under strict house arrest in Florida away from his home in Paraguay. While we recognize that the Bureau of Prisons does not take this pre-incarceration time into consideration, we respectfully request that the Court consider the significant loss of freedom that Juan suffered during this time.  During these two years, a significant portion of the supervision was under 24/7 surveillance by a private security firm, Andrews International, which reported directly to Pretrial Services.   Not only were all his movements monitored, but he was restricted to a limited area.  Despite these stringent conditions, Juan never once violated his conditions of release.

---

62. Juan also spent ten days incarcerated in Switzerland following his arrest in Zurich despite his voluntary extradition to the United States.

As reflected in the letter submitted by former FBI Special Agent Anthony Velazquez of Andrews International, Juan was "very polite, professional, but more importantly adamant about complying with every aspect of the bond conditions set forth by the court."[63]  Even during Hurricane Maria, which was a Category 5 hurricane that hit South Florida last September requiring the evacuation of Juan from his residence, Mr. Velazquez describes how Juan and his son  "waited for  [him] to arrive at their residence so [he] could surveille the relocation to a residence approved by probation which was previously notified." *Id.*  Juan's actions demonstrate his respect for the rule of law and adherence to the strict conditions set by the court.

### 2. Substantial Additional Incarceration Will Not Further the Goals of Deterrence or the Need to Protect the Public

For a man who has lived his entire life without any prior criminal record, Juan has suffered extreme shame and his life changed forever as a result of his trial and conviction.  Under Section 3553(a), a sentencing court is required to consider the need to provide specific deterrence and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

Deterrence is achieved by sending a message to a defendant that his criminal actions have consequences.  Juan has received this message and endured the consequences of his actions for the last three years.  During this time, he has lived away from his home in Paraguay under severely strict pretrial release conditions and been incarcerated for the last eight months.  He has missed many family milestones.  Family and friends passed away and Juan was not able to attend services.  He was not able to celebrate birthdays or holidays with his family.  The significant suffering that Juan has endured during this separation and the threat of future prolonged separation from his family is itself a significant punishment to warrant specific deterrence.

---

63.  Ex. G:  LETTERS0485 (Anthony Velazuez Ltr.).

Further, Juan's life in the international soccer world ended the day he was arrested.  While in custody in Zurich, Juan resigned from all positions in FIFA and CONMEBOL.  His conviction prohibits his participation in either of these organizations thus not warranting any additional deterrence.

Lastly, as many of the letters submitted make clear, Juan is not a criminal from whom the public needs protection.  Rather, to this day Juan is a well-known and respected member of his community in Paraguay.  He is considered a peaceful and generous man who spent his life helping others.  As a 60 year-old first-time offender, Juan is statistically similar to other Category I offenders and is not likely to recidivate.  Moreover, Juan has a high level of education, was employed his entire life, does not use drugs and is a devoted son, husband, father and grandfather.  Based on these variables, Juan is in the lowest risk factor, with almost no chance of committing future crimes, according to the Sentencing Commission report on recidivism.  *See* United States Sentencing Commission, *Recidivism Among Federal Offenders* (2004) (reporting that recidivism rates decrease with age and educational level; and that marriage and children are all associated with lower recidivism).[64]

### 3.    A Sentence of Substantial Additional Incarceration Would Result in Unwarranted Sentencing Disparities

In determining the correct sentence, the Court must consider "the need to avoid unwarranted sentenc[ing] disparities."  18 U.S.C. § 3553(a)(6).  This consideration involves both sentences imposed on other defendants in the same case and sentences imposed in similar cases.  An analysis of both supports the conclusion that a sentence of additional substantial incarceration would result in unwarranted sentencing disparity.

---

64.  *See www.ussc.gov/Research/Research Publications/Recidivism/200405 Recidivism First Offender.pdf.*

92142103_2

Despite the numerous defendants in this case that have plead guilty since the initial
indictment was unsealed on May 28, 2015, only two defendants have been sentenced - Costas
Takkas and Hector Trujillo.  Mr. Takkas pled guilty to a money laundering conspiracy count and
was sentenced to 15 months imprisonment.  Mr. Trujillo pled guilty to two wire fraud conspiracy
counts and was sentenced to 8 months imprisonment.  Although both Mr. Takkas and Mr.
Trujillo were named in the RICO conspiracy, the government dismissed that charge once each
pled guilty and was sentenced.

As reflected in the record, the Guidelines calculations for both sentenced defendants was
significantly higher and the court applied a much lower sentence after applying the Section
3553(a) factors.  Likewise, as to Juan, the Court should review the Section 3553(a) factors and
fashion a similarly considered variance from the Guidelines.

While this global, decades-long soccer conspiracy is factually unique, the
disproportionate impact that the loss amount enhancement has on the Guidelines offense level in
this case is actually quite common in the Second Circuit.  Aside from the cases described
previously, below are a few illustrative cases for the Court to consider in order to avoid
"unwarranted disparities."

- *United States v. Johnson*, No. 16 Cr. 457 (E.D.N.Y.): former London-based
  HSBC foreign exchange executive was convicted on eight counts of wire
  fraud and conspiracy for participating in a fraudulent $3.5 billion currency
  swap.  Notwithstanding the $3.1 million loss calculation based on HSBC's
  gain from the offense and the government's request for a seven-year sentence,
  the court sentenced Johnson well below the guidelines.  Making it clear that
  he did not agree with the effect of loss enhancements in white collar
  sentences, Judge Garaufis sentenced this first-time offender to two years'
  incarceration.

- *United States v. Shkreli*, No. 15 Cr. 637 (E.D.NY.): former pharmaceutical
  executive was convicted of several securities fraud violations with a loss
  amount in excess of $9.5 million.  Despite a guidelines range of 324 to 405
  months' imprisonment and the government's request for a 15-year sentence,

-57-

Judge Matsumoto sentenced the defendant to 7 years' incarceration, notwithstanding several exacerbating factors not present here.

- *United States v. Block*, No. 16 Cr. 595 (S.D.N.Y.): the former CFO of a publicly traded real estate investment trust was convicted of manipulating the company's financial results by fraudulently inflating a key performance metric used by investors. Probation assessed the loss at $3 billion, resulting in a guideline range of life imprisonment. The court concluded that while it was clear the defendant's fraud directly caused significant shareholder losses, the calculation was not sufficiently reliable, and the court declined to impose a loss enhancement. Noting, among other things, that the defendant had otherwise led a law-abiding life, and had been punished by the loss of his profession, the court imposed a sentence principally of 18 months' imprisonment.

- *United States v. Collins*, No. 07 Cr. 1170 (S.D.N.Y.) (Preska, J.): the defendant was a lawyer at Mayer Brown who the court found to be an indispensable party to the massive fraud at Refco. For several years, the lawyer prepared legal documents that concealed the company fraud that resulted in thousands of victims and billions of dollars in losses. Although the Guidelines called for life imprisonment, the court imposed a sentence of one year and one day imprisonment.

- *United States v. Graham*, No. 06 Cr. 137 (D. Conn.) (Droney, J.): the defendant, an in-house lawyer, was convicted of conspiracy and fraud charges for his role in a massive fraudulent reinsurance scheme. Although finding that the fraud caused over $500 million loss to stockholders and the defendant played a significant role in preparing the fake documents and concealing the fraud, the court discarded the advisory Guidelines sentence of life imprisonment and sentenced the defendant to one year and one day imprisonment.

These are but a few of the many examples of the courts in this Circuit eschewing the draconian Guidelines numbers in fraud cases. In accordance with these cases, we respectfully submit that a sentence of any substantial additional incarceration for Juan will be contrary to that imposed on defendants in similar cases in this Circuit, thus resulting in "unwarranted sentencing disparities."

### D.    Consideration of Other Sentencing Collateral Consequences

Prior to fashioning an appropriate sentence, the Second Circuit has expressly instructed district courts to take into consideration the collateral consequences of a particular sentence. "It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the

-58-

collateral effects of a particular sentence."  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).  The collateral effects of a conviction and sentence are varied depending on the case and the defendant's history.  For example, potential deportation, loss of a defendant's career and livelihood, separation from family, mental health consequences, loss of reputation and conditions of incarceration, are some of the factors a court should consider prior to imposing a sentence.  *See United States v. Thavaraha*, 740 F.3d 253, 262-63 (2d Cir. 2014) (taking into consideration impact of deportation); *Stewart*, 590 F.3d at 141 (recognizing destruction of a defendant's career and livelihood as collateral consequence).



92142103_2



92142103_2

Lastly, as detailed in the affidavit submitted by Joel A. Sickler, head of the Justice Advocacy Group,[68] as a foreign national Juan will be subject to much harsher conditions of confinement than an identically situated American defendant.  As an initial matter, Juan will not be eligible for minimum-security camp and most likely will be designated to a low-risk security prison thus resulting in greater punishment.  As a "deportable alien," Juan's confinement will most likely be in a private prison facility under contract with the government.  *See* Ex. H at 3.  "The security protocols and living conditions" between the two are far different.  *Id*.

Private prison facilities have been consistently criticized for providing substandard conditions and overcrowding.[69]  The actual institution is usually much smaller than a federal prison thus resulting in cramped housing and less space.  *See* Ex. H at 3-8.  The medical care is inadequate, the food bad and allegations of violence and sexual abuse are common place.  *Id*.  To a large extent, these private prisons are viewed as a dumping ground for aliens who will never be able to set foot in the United States again.

Second, Juan will not be eligible for pre-release and re-entry transitioning because he is a foreign national.  *See* Ex. H at 11.  This disparate treatment will increase Juan's sentence by at least six months.  Upon completion of any term of imprisonment, Juan could face the risk of additional detention with removal proceedings.  Accordingly, if imprisoned for additional time in the United States, Juan would suffer much more than an American defendant due simply because

---

68. The Justice Advocacy Group is a consortium of legal professionals that focuses on federal sentencing and federal prison related matters. Additionally, Mr. Sickler was a correctional counselor in the Department of Corrections. *See* Sickler Affidavit, dated August 21, 2018, attached as Exhibit H hereto.

69. Lauren-Brooke Eisen, Inside Private Prisons:  An American Dilemma in the Age of Mass Incarceration (Columbia Univ. Press 2018).

-61-

of his nationality.  We request that the court take this into account when fashioning an appropriate sentence.

Upon removal from the United States, Juan will not be able to return to this country without the permission of the Attorney General or his designate.  This alone is a significant punishment for Juan, who loves this country and has been visiting with his family since he was a teenager. Juan has had a home in Florida for the last thirty years and now he will be prohibited from visiting. Among the various collateral consequences he faces, Juan's inability to travel to the United States, a country he has always admired, is a punishment that will accompany him the rest of his life.

## V.   THE GOVERNMENT FAILED TO ESTABLISH AN ADEQUATE BASIS FOR FORFEITURE

The PSR suggests forfeiture of $3,374,025.88, which it alleges Mr. Napout "personally obtained for his own benefit," as well as an unidentified amount of salaries and honoraria Mr. Napout purportedly received in his positions with FIFA and CONMEBOL from 2012 through 2015.  (PSR ¶ 148).  Because the government did not establish that Mr. Napout actually obtained any amounts of money for his own benefit, or that he received any salary or honoraria from FIFA or CONMEBOL (much less that such salary or honoraria were derived from criminal activity), no forfeiture should be imposed.

The Supreme Court has made clear that forfeiture is only appropriate for property a defendant personally acquired as a result of the crime.  *Honeycutt v. United States*, 137 S.Ct. 1626, 1631, 1634 (2017) (holding that there is no joint and several liability for forfeiture).  The government did not establish that Mr. Napout personally obtained any money derived from the offense.

### A.    Alleged Bribe Payments

The PSR does not provide any calculation to get to $3,374,025.88 – the amount of bribes Mr. Napout allegedly received -- so it is impossible to know what is included in that amount, or why it is in such an odd amount.  It was incumbent on the PSR to include such information in order for Mr. Napout to address each aspect of the forfeiture sought by the government.  Regardless, at trial the government failed to establish that Mr. Napout actually received any bribe money, and thus forfeiture of that or any other amount is not warranted.

While the government maintains that Mr. Napout received bribes for each of Copa America, Copa Libertadores, and Paraguayan qualifiers, in cash, it did not produce any evidence at trial that Mr. Napout actually received any cash.  No trial witness actually observed a single dollar delivered to Mr. Napout or anyone on behalf of Mr. Napout.  (*See, e.g.*, Tr. 1910 (Bedoya); 1331-32 (Pena); 2333 (Rodriguez); *cf*. Tr.1136 (Tico Lozada's son picked up bribes requested by his father and ultimately booked against commitments made to Carlos Chaves); 1148-49 (Jose Luis Chiriboga received bribe payments to his account for his father).  There were no wire transfer records of money sent to Mr. Napout, and the government did not trace any bribe money into any account held by Mr. Napout.  Mariano Jinkis, the person purportedly responsible for delivering cash to Mr. Napout, did not testify at trial, and thus did not confirm whether he provided any cash payments to Mr. Napout, and if he did, in what amounts.  While Pena testified that Jinkis told him that Jinkis provided cash to Mr. Napout, Pena never provided cash to Mr. Napout, never discussed the receipt of bribes with Mr. Napout, and had no knowledge whether such payments were actually made.  (Tr. 1227).  The government also suggested that Mr. Napout instructed his driver, Ramon Sanabria, to transfer bribe payments by car from Argentina to Paraguay, but Sanabria did not

-63-

testify, and no witness observed him picking up, possessing, transporting, or delivering any cash.[70]
Nor did any witness speak to Sanabria to confirm this speculation.

In short, in order to seek forfeiture of a sum of money, the government must establish that the defendant actually came into possession of it, *Honeycutt*, 137 S.Ct. at 1632-33, and the government failed to do so here. As a result, the Court should not impose forfeiture of the amount sought by the government.

### B. Salaries and Honoraria

The PSR does not identify an amount of salary or honoraria to be forfeited for good reason – Mr. Napout never took a salary or received an honoraria from either FIFA or CONMEBOL. Indeed, in the August 15, 2018 letters submitted by FIFA and CONMEBOL to the Court concerning Mr. Napout, neither identifies any such salary or honoraria. Moreover, it is our understanding that the government is no longer seeking salary or honoraria that might have been received from FIFA or CONMEBOL. (*See* Gov't Sentencing Submission As To Defendant Jose Maria Marin, at p. 27, n. 7). Consequently, the Court should not order any such forfeiture.

## VI. THE COURT SHOULD NOT IMPOSE A FINE

Restitution takes precedence over a fine, and to the extent that a fine will impair a defendant's ability to make restitution, a fine should not be imposed. *See* 18 U.S.C. § 3572(b). In light of both the forfeiture amount sought by the government, and the restitution amounts sought by FIFA, CONMEBOL, and CONCACAF,[71] the Court should not impose a fine. Moreover, a

---

70. Mr. Napout's assistant, Nelson Sanabria, testified that he only saw the driver with cash on a few occasions, usually with a few hundred dollars and once with $4,000 before a "really long vacation[]." (Tr. 3100-01). Only Chiriboga testified about the driver purportedly picking up cash payments in Argentina, but he had no first-hand knowledge of this as he heard it fourth-hand from his father (who he admitted also would not have had personal knowledge), and could not provide any details about a single instance of such a cash delivery. (Tr. 1467-68).

71. Because any restitution is to be determined and imposed by the Court at a later date, upon the consent of the government and approval of the Court, Mr. Napout does not specifically address restitution in this

-64-

fine is not necessary to deprive Mr. Napout of the proceeds of the offense, *see* § 3572(a)(5), as any such amounts would be covered by a forfeiture order.  While Mr. Napout does not dispute that he has financial means, a good part of his assets were used to fund his trial defense.  His current assets pale in comparison to the restitution amounts sought, and would thus be insufficient to satisfy such a restitution order, much less pay an additional amount in fines.[72]

## VII.   CONCLUSION

Empathy, compassion and generosity are human characteristics that have slowly lost their value in our divisive world.  These are, however, the core values that have defined Juan's 60 year life.  From simply giving tennis shoes to a young girl in need; to routinely visiting a friend involved in a car accident that left him a paraplegic and encouraging him to be strong; to assisting family and friends undergoing medical or financial hardship; to donating supplies, uniforms and funds to various sports teams and athletes so that they could participate in national and international competitions; to supporting charity organizations in Paraguay, Juan's compassion and generosity has never failed.  He has treated everyone with respect and dignity regardless of their position and sought to bring people together through his collaborative nature.  Juan is simply a decent man.  His conviction in this case stands in stark contrast to the manner in which he has led his life.

Juan's long-standing exemplary life, with the exception of this conviction, certainly stands to mitigate any additional sentence.  As Judge Rakoff summarized in *Adelson*:

> [S]urely, if ever a [person] is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life, hereto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which

---

memorandum and will do so on September 21, 2018, the date set by the Court.

72.  The PSR provides no basis for its conclusion that Mr. Napout "appears able to pay a fine, in addition to the required restitution."  (PSR ¶ 135).

is basic to all religions, moral philosophies, and systems of justice, was part of what Congress had in mind when it directed courts to consider, as a necessary factor, 'the history and characteristics' of the defendant.

*Adelson*, 441 F. Supp. 2d at 513-14.

We respectfully urge the court to apply the Section 3553(a) factors and combine common sense with mercy in order to reach a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing.

Respectfully submitted,

**PIÑERA-VAZQUEZ LAW FIRM**
International Center
1900 Southwest 3rd Avenue
Miami, Florida 33129
T. 305.443.0629
sbp@pineravazquezlaw.com
s/ Silvia B. Piñera-Vazquez
Silvia B. Piñera-Vazquez

**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, NY 10004-1482
T. 212.837.6000
marc.weinstein@hugheshubbard.com

s/ Marc A. Weinstein
Marc A. Weinstein
Edward J.M. Little

-66-

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 21, 2018, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that this document is being served simultaneously on all counsel of record in the manner specified, either by transmission of Notices of Electronic Filing generated by CM/ECF, or in another authorized manner.

s/Silvia B. Piñera-Vazquez
Silvia B. Piñera-Vazquez, Esq.

92142103_2