SPN/MKM/KDE
F.#2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

           - against -                Docket No. <u>15-CR-252 (S-2) (PKC)</u>

JUAN ÁNGEL NAPOUT,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


**THE GOVERNMENT'S SENTENCING SUBMISSION**
<u>**AS TO DEFENDANT JUAN ÁNGEL NAPOUT**</u>


                              RICHARD P. DONOGHUE
                              UNITED STATES ATTORNEY
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


Samuel P. Nitze
M. Kristin Mace
Keith D. Edelman
Assistant U.S. Attorneys
     (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this sentencing memorandum in anticipation of the defendant Juan Ángel Napout's sentencing for his conspiratorial racketeering and wire fraud counts of conviction following the six-week jury trial in November and December 2017, and in response to Napout's sentencing memorandum dated August 21, 2018.  See ECF Dkt. No. 994 ("JAN Br.").

In his sentencing memorandum, Napout challenges the description of the offense conduct and most aspects of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") calculation detailed in the Presentence Investigation Report ("PSR"), which results in an applicable Guidelines range of 720 months' imprisonment, including the application of offense level enhancements based on the total bribe amounts intended by the defendant and his coconspirators in the jointly undertaken schemes, the use of sophisticated means to carry out the offenses and offense conduct outside of the United States, the defendant's leadership role in the offenses, and his obstruction of justice.  Napout argues that the applicable Guidelines range, even without the challenged enhancements, overstates his culpability.  By largely ignoring the seriousness of his crimes and the deep need for deterrence in the unique circumstances of this case, Napout argues that "substantial additional incarceration is not necessary" because, among other things, the eight months that he has spent in jail is sufficient to deter "an individual with Juan's background," meaning, of course, a man who has lived a life of extreme privilege.  See JAN Br. at 54.

Napout, a former leader in international soccer and in the proven bribery schemes, is among the most culpable of the conspirators and is personally responsible for perpetuating and expanding the corruption of soccer at a time when it was most in need of reform.  The Court should reject Napout's request for special treatment and instead impose a sentence that will

1

demand respect for the law – even from the privileged and powerful – and deter further corruption.

For the reasons set forth below, the defendant's challenges to the PSR are meritless, and the Court should adopt the PSR's Guidelines calculation and recitation of the relevant facts, except as noted in the government's letter to the Probation Department dated August 8, 2018.  The government respectfully submits that the applicable Guidelines range and the relevant factors under 18 U.S.C. § 3553(a) warrant a term of imprisonment of no less than 240 months, in light of the sentences previously imposed by the Court in connection with this case.  The Court should also order payment of forfeiture, restitution, and a substantial fine.

FACTUAL BACKGROUND

The Court is intimately familiar with the offense conduct in this case, having presided over the six-week trial of Napout and his codefendants José Maria Marin and Manuel Burga.  The Court has already detailed some of the trial evidence and made related factual findings in denying defendants Napout and Marin's post-trial motions for acquittal or for a new trial.  In addition, the PSR provides a detailed summary of the relevant offense conduct based on the evidence presented at trial.  The following factual summary is intended to provide an overview sufficient to situate the government's arguments with respect to sentencing in the relevant factual context, but not to provide a comprehensive recitation of the full procedural history or all aspects of the offense conduct proven at trial.

I.     The Investigation and Indictments

Since approximately 2010, the government has been investigating bribery and corruption in the world of international soccer.  See PSR ¶ 15.  That investigation resulted in an indictment unsealed on May 27, 2015 (the "First Indictment"), charging 14 soccer officials and/or sports marketing executives with racketeering conspiracy, including predicate acts of

2

honest services wire fraud and money laundering, among other offenses.  The First Indictment

detailed multiple bribery and kickback schemes relating to, among other things, the purchase and

sale of media and marketing rights to various soccer tournaments organized by FIFA, the

international organizing body of soccer, as well as CONCACAF and CONMEBOL, the

continental confederations responsible for soccer in North and South America, respectively.  See

Original Ind., ECF Dkt. No. 1.

On December 3, 2015, the government unsealed a superseding indictment (the

"First Superseding Indictment") that charged an additional 16 soccer officials, including Napout

and Manuel Burga of Peru, and detailed more bribery and kickback schemes.  See First Super.

Ind., ECF Dkt. No. 102.  That same day, Napout was arrested in Switzerland pursuant to a

provisional arrest request by U.S. authorities.  See PSR ¶ 67.  After waiving extradition, Napout

arrived in the United States on December 15, 2015, and was released on bond.  See id.

Following pretrial litigation, in June 2017, Napout, Burga, and Marin were

together charged in an indictment (the "Second Superseding Indictment") that alleged, among

other things, their participation in the Copa América, Copa Libertadores, and, as to Napout only,

the Paraguayan World Cup Qualifiers Schemes.  See 2d Superseding Ind., ECF Dkt. No. 604, at

¶¶ 86-114.  Napout was charged in the Second Superseding Indictment with five counts:

racketeering conspiracy (with predicate acts of wire fraud, money laundering, and money

laundering conspiracy), two counts of wire fraud conspiracy, and two counts of money

laundering conspiracy.  See id.

Napout, Marin, and Burga were tried on the Second Superseding Indictment in

November and December 2017.  Following a six-week trial, which included testimony from 28

witnesses, the admission of thousands of pages of documents, and multiple consensual

recordings, Napout was convicted of racketeering conspiracy and two stand-alone counts of wire

3

fraud conspiracy (relating to the Copa América and the Copa Libertadores Schemes).  Marin was convicted of racketeering conspiracy, three counts of wire fraud conspiracy, and two counts of money laundering conspiracy.  Following the guilty verdict, Napout and Marin were remanded on December 22, 2017.  On August 22, 2018, Marin was sentenced to a term of imprisonment of 48 months.  The Court has indicated that it will resolve the issue of restitution as to Napout and Marin following a hearing scheduled for October 4, 2018.  See Scheduling Order, ECF Dkt. Entry dated Aug. 21, 2018.

II.     The Offense Conduct Proven at Trial

    A.     Background

        The evidence presented at trial revealed that for over twenty years, soccer officials including Napout had violated the fiduciary duties they owed to FIFA, CONMEBOL, and other soccer organizations by receiving bribes and kickbacks in connection with, among other things, the sale of media and marketing rights for a variety of soccer tournaments.  See PSR ¶ 44.  Frequently relying on the United States financial system and growing market for soccer events, the coconspirators corrupted the game they were supposed to protect, defrauding the institutions of hundreds of millions of dollars that should have gone to those organizations to be spent on programs such as development and women's and youth leagues.  See id.

    B.     The Copa América, Copa Libertadores, and Paraguayan World Cup Qualifiers Schemes

        Among the tournaments and events corrupted by Napout and his coconspirators were the Copa América, the Copa Libertadores, and the Paraguayan World Cup Qualifiers.  The government sets forth below a brief synopsis of those bribery schemes and then details Napout's personal involvement in the racketeering conspiracy.

4

1.      Copa América

Beginning with the 1987 edition of the Copa América tournament, CONMEBOL officials solicited and received millions of dollars in bribes from the Traffic Group ("Traffic"), a sports marketing company owned by José Hawilla, in exchange for awarding the media and marketing rights to that tournament.  Traffic paid bribes when the various contracts were signed and when the tournaments were played to, among others, Nicolás Leoz, the president of CONMEBOL, Julio Grondona, the long-time president of the Argentine soccer federation ("AFA"), and Ricardo Teixeira, the long-time president of the CBF.  See PSR ¶ 46.

In 2010, CONMEBOL terminated its relationship with Traffic and sold the rights to the 2015, 2019, and 2023 editions of the Copa América (among other tournaments) to sports marketing company Full Play Group ("Full Play"), which was owned by coconspirators Hugo and Mariano Jinkis (the "2010 Contract").  See PSR ¶ 47.  Full Play, which had entered the market for soccer events by acquiring the rights to other matches played by some of the traditionally less powerful nations, was able to secure the 2010 Contract in part due to the promise of $1 million bribe payments to a group of federation presidents known as the "Group of Six," which included Napout and Burga.  See, e.g., Trial Tr. at 1581-86 (testimony of L. Bedoya, the former president of the Colombian soccer federation).  This contract caused Traffic to file a lawsuit in Miami, Florida in 2011.  See Trial Tr. at 412.

To resolve the lawsuit, Traffic, Full Play, and a third sports marketing company, Torneos y Competencias (together with its affiliates, "Torneos"), which was operated by Alejandro Burzaco, formed a new company called Datisa that, in May 2013, signed a new contract with CONMEBOL to acquire the rights to the 2015, 2019, and 2023 editions, as well as the special 2016 Copa América Centenario tournament, which was to be played in the United States (the "Datisa Contract").  See Trial Tr. at 412-18; PSR ¶¶ 48-49.  Unlike the 2010 Contract,

which paid Full Play a percentage of income from the sale of the rights to the tournaments, leaving CONMEBOL with 75% of the income, less certain expenses, the Datisa Contract paid CONMEBOL a fixed amount of $80 million per edition with no profit sharing over that amount, even if the value of the rights increased over time.  See id.  Neither the 2010 Contract nor the Datisa Contract were put out to bid.

To sign the Datisa Contract, nearly all CONMEBOL officials agreed to receive bribes.  As detailed in the chart set forth in paragraph 49 of the PSR, all of the presidents of CONMEBOL's members (except for Uruguay) agreed to receive at least $1 million for the signature of the Datisa Contract as well as each edition of the tournament.  Napout, like each of the other members of the Group of Six, agreed to receive $1 million for the signature of the contract, plus $1 million for each of the 2015, 2016, 2019, and 2023 editions of the tournament. See PSR ¶ 49.  In total, the various CONMEBOL officials, along with certain CONCACAF officials who were also bribed in connection with the 2016 Copa América Centenario, agreed to receive a total of $79,300,000 in bribes, which is attributable to criminal activity jointly undertaken by Napout and his coconspirators.  See id.

2.    Copa Libertadores

Like the Copa América, the Copa Libertadores tournament was corrupted by bribery for decades.  In 2005, Alejandro Burzaco began to manage the day-to-day operations of Torneos and learned of the company's practice of making annual bribe payments to CONMEBOL officials in exchange for their support of Torneos as holder of the broadcasting rights to the Copa Libertadores.  See PSR ¶ 52.  That practice expanded over time such that nearly every CONMEBOL official, including federation presidents as well as CONMEBOL's president and treasurer, received between $600,000 and $1.2 million in annual bribe payments, as set forth in the chart in paragraph 53 of the PSR.  As a result of these annual bribe payments,

6

in 2012, the CONMEBOL officials voted to extend Torneos's contract rights through 2022 in exchange for annual bribe payments. This extension was not put out to bid and the contract committed CONMEBOL to a set price under a long-term contract, despite the fact that the value of rights was expected to rise over time. See PSR ¶ 52. In total, for the 2011 to 2022 editions, the various CONMEBOL officials agreed to receive a total of $73,600,000 in bribes as part of the Copa Libertadores Scheme, all of which is attributable to criminal activity jointly undertaken by Napout with his coconspirators. See PSR ¶ 53.

3.      Paraguayan World Cup Qualifiers Scheme

As president of the Asociación Paraguaya de Fútbol ("APF"), Napout agreed to receive and did receive bribes in connection with the sale to Full Play of media and marketing rights to the World Cup Qualifier matches played by the Paraguayan national team, through an intermediary called "Ciffart Sport S.A." ("Ciffart"). See PSR ¶ 60. In particular, Napout caused the APF to enter into a contract with Ciffart covering the 2014 and 2018 cycles of the World Cup Qualifier matches, in exchange for personally receiving from Full Play a $1 million bribe for the 2014 cycle and a $1.5 million bribe for the 2018 cycle. See PSR ¶ 60; Trial Tr. at 1168-73; GX 209; GX 601 ("Honda" tab). Under the contract, Full Play was to pay $10 million for the two cycles to Ciffart, which bought the rights from the APF. See Trial Tr. at 1170; GX 209; GX 601. Thus, Full Play was willing to pay at least $12.5 million for the rights, of which Napout diverted $2.5 million for his own benefit.

Based on the applicable contract terms, the APF was not paid the full amount due for the rights upon the signing of the contract, but rather was to be paid in installments. See PSR ¶ 60. Similarly, the bribe payments to Napout were to be paid in conjunction with each contract installment. See id. At the time of the unsealing of the First Indictment in May 2015, only a

7

portion of the contract payments had been made and only $1,124,859 of the intended bribes had been credited to Napout.  See id.

C.    Napout's Participation in the Bribery Schemes

Since at least 2010, Napout has abused his position as president of the Paraguayan soccer federation and, later, vice-president of CONMEBOL, president of CONMEBOL, and vice-president and Executive Committee member of FIFA to enrich himself with millions of dollars in illicit proceeds.  The evidence presented at trial revealed that Napout was a member of the "Group of Six" (the presidents of the federations for Paraguay, Peru, Venezuela, Colombia, Bolivia, and Ecuador), which banded together to exert control over CONMEBOL and to receive millions of dollars in bribes along the way.  See, e.g., Trial Tr. at 1565-69 (testimony of L. Bedoya).

Through their newly obtained power, Napout and the other members of the Group of Six immediately sought to receive bribes just like the old guard, i.e., Julio Grondona of Argentina, Ricardo Teixeira of Brazil, and Nicolás Leoz of Paraguay (and the president of CONMEBOL).  With respect to the Copa América, Napout initially agreed to receive $1 million for each edition of the Copa América plus another $1 million for signing the Datisa Contract. See PSR ¶ 49.  With respect to the Copa Libertadores, Napout initially agreed to receive $400,000 for each year of the tournament.  See id. ¶ 53.

As Napout rose through the ranks at CONMEBOL, he solicited more and more bribes.  For instance, in connection with the contract for the 2014 and 2018 Paraguayan World Cup qualifying matches, which was signed in October 2011, Napout agreed to receive $2.5 million in bribes.  See GX 209; PSR ¶ 60.  After Teixeira resigned in March 2012 and Leoz resigned in April 2013 amidst their own bribery scandals, Napout (along with nearly every other CONMEBOL official) signed the Datisa Contract in May 2013 in exchange for another $1

8

million bribe.  With respect to the Copa Libertadores, after Leoz resigned and Romer Osuna, the one-time CONMEBOL treasurer, left his position, Napout stated that he and the other members of the Group of Six were entitled to more bribes in connection with the Copa Libertadores.  See Trial Tr. at 1614 (testimony of L. Bedoya that the Copa Libertadores bribes "had to be corrected because it had to be a better amount" in light of the resignation of other CONMEBOL officials who were receiving bribes).  And after Napout succeeded in becoming CONMEBOL president in August 2014, he agreed to receive the "presidential treatment."  That is, Napout agreed to begin receiving $1.2 million per year for the Copa Libertadores and $3 million for each edition of the Copa América.  See PSR ¶ 69.

Throughout these bribery schemes, Napout took pains to try to ensure that he would never be caught.  See, e.g., Trial Tr. at 1584 (testimony of L. Bedoya that Napout "always expressed a concern that it was fine that we do it [i.e., receive bribes] as long as it was always done in a safe way, that we should not be expose or our names at any time, as was happening with others"); id. at 1635 (testimony of L. Bedoya that Napout was "concerned about the manner in which these payments could be made and the manner in which Full Play could handle it," directing Bedoya to speak with Mariano Jinkis about the matter); id. at 1636 (testimony of L. Bedoya that Napout told him that he was receiving bribes "in a secure way").  Secrecy was so important because Napout portrayed himself publicly as an agent of reform who sought to change the ways of CONMEBOL, which had been plagued by years of corruption.  See PSR ¶ 71.  Instead, Napout continued to cheat the sport he was supposed to protect, took millions of dollars in bribes despite his extraordinary wealth, and encouraged and facilitated others' participation in the crimes.  In fact, on the very day that the First Indictment was unsealed, May 27, 2015, Napout was scheduled to meet with Burzaco and discuss the bribe payments owed to Eugenio Figueredo and Carlos Chavez.  See Trial Tr. at 588-89.

In all, the evidence at trial established that, by the time of his arrest, Napout had collected well over $3 million in bribes in exchange for his support of the Copa América, Copa Libertadores, and World Cup Qualifier contracts and had agreed to receive more than $20 million more.  As reflected in the secret ledger maintained at Full Play, between October 2010 and March 2015, Napout received bribes on more than 25 separate occasions, most often in cash (including up to $250,000 at a time), plus Paul McCartney concert tickets worth over $10,000, the economic rights to a soccer player worth $100,000, and the rental of an apartment in Punta del Este, Uruguay worth over $40,000.  See GX 601 ("Honda" tab).

D.    Napout's Conduct After May 27, 2015

The unsealing of the First Indictment in May 2015 forced Napout to stop receiving his bribe payments.  It did not inspire in him a newfound respect for the law.

As described in more detail below, after May 2015, Napout participated in a plan to have his computer removed from his CONMEBOL office in the event of his arrest.  See PSR ¶ 72.  And pursuant to this plan, on December 3, 2015, one of CONMEBOL's attorneys who had been hired by Napout, entered the office and removed the computer under a coat.  See id.  Before the Paraguayan authorities were able to conduct a search of the office pursuant to a mutual legal assistance request from the United States, the computer was replaced with a decoy.  See id.  Over a year later, the government was able to recover Napout's computer, which, in addition to pictures of his family, contained evidence of his crimes, which was introduced by the government at trial.[1]  See id.

_____

[1] This obstructive conduct is consistent with evidence that Napout is willing to use his position of power in Paraguay, including his connections to government officials, to influence judicial processes.  See GX 976-T.2 at 5 (referencing conversation with Paraguayan president Horacio Cartes in which Cartes indicated he provided assistance with a trial), 19-20 (seeking World Cup tickets for the attorney general of Paraguay apparently in order to seek influence in an ongoing trial).

Napout exploited his position at CONMEBOL in other ways, too.  Rather than resigning after the unsealing of the First Indictment or otherwise attempting to address the corruption that had pervaded nearly all of the confederation, Napout used the resources of the organization to protect his own personal interests.  As found by Magistrate Judge Levy, after May 27, Napout, through his personal criminal defense attorney, retained another firm to represent CONMEBOL in connection with the government's ongoing investigation.  See Mem. & Order dated Mar. 10, 2017, ECF Dkt. No. 549, at 3.  According to Napout's defense counsel, Napout did not want CONMEBOL to "cause him problems" with the government.  See id. Despite CONMEBOL's status as a victim of Napout's crimes, counsel for Napout and CONMEBOL attempted to enter into a common-interest agreement to shield documents from the government's review.  See id. at 3-4.  As Judge Levy ruled in rejecting the validity of such an agreement, "the extensive testimony at the hearing clearly establishes that the purpose of the agreement was to allow Napout to 'run everything by' his defense attorneys in an effort to shield himself from criminal liability from the government's ongoing investigation."  Id. at 7; see also id. at 8 ("[T]he record before me describes an arrangement whereby information would flow in only one direction – from CONMEBOL to Napout – and only for Napout's benefit.").  Until his arrest in December 2015, Napout placed his personal interests above those of the organization he was duty-bound to serve.

SENTENCING

I.   Legal Framework

Sentencing courts have the authority to fashion a reasonable and appropriate sentence in each case, and must consider the Guidelines in doing so.  United States v. Booker, 543 U.S. 220, 259-62 (2005).  The "Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007).  Next, a sentencing judge should

11

consider all of the factors in 18 U.S.C. § 3553(a) to determine the appropriate sentence in each case. Id. at 49-50. Those factors include, among other things, the nature and circumstances of the offenses; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and avoid unwarranted disparities between similarly situated defendants. In considering the relevant factors, the sentencing court may not presume that the Guidelines range is reasonable. Rather, the court "must make an individualized assessment based on the facts presented." Id. (citation and footnote omitted).

II.     The Applicable Guidelines Range

The Guidelines calculation detailed in the PSR is accurate and, based on a total offense level of 43 and criminal history category of I, results in an advisory Guidelines range of life in prison. In light of the statutory maximum sentence of twenty years on each of the three counts of conviction, however, the applicable restricted Guidelines range is 720 months' imprisonment. See ¶ 137. The government agrees with the offense level calculation in the PSR, as set forth below:

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2B1.1(a)(1)) | 7 |
| Plus: Loss Greater Than $150 Million (§§ 2B1.1(b)(1)(N)) | +26 |
| Plus: Outside the U.S. / Sophisticated Means (§ 2B1.1(b)(10)) | +2 |
| Plus: Organizer or Leader (§ 3B1.1(a)) | +4 |
| Plus: Abuse of Position of Trust (§ 3B1.3) | +2 |
| Plus: Obstruction of Justice (§ 3C1.1) | +2 |
| Total Offense Level: | 43 |

Napout objects to the calculation of the intended loss amount and to offense-level enhancements related to offense conduct committed abroad and the use of sophisticated means to

12

carry out the offenses, his role as an organizer or leader, his abuse of a position of trust, and his obstruction of justice.[2]

A.    <u>The Loss Amount Exceeds $150 Million</u>

Napout challenges the PSR's calculation of an overall intended loss amount of $155,400,000 and the resulting 26-point offense-level enhancement on three bases: (1) that the absence of a "market analysis of the purported undervaluation of any contract" prevents the Court from calculating the intended loss; (2) that the specified intended bribe amounts promised to other soccer officials are not properly attributed to Napout for purposes of sentencing; and (3) that the Paraguayan World Cup Qualifiers bribes were not proven at trial. <u>See</u> JAN Br. at 33-48. All three arguments are meritless.

1.    <u>The Agreed Bribe Amount Is a Reasonable Estimate of the Intended Loss</u>

Napout is wrong that a "market analysis" is required to support a finding of intended loss. The Guidelines provide that the loss amount for fraud offenses is the greater of the actual loss or intended loss. U.S.S.G. § 2B1.1, app. note 3(A). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," while intended loss is the pecuniary harm the defendant intended to cause. <u>Id.</u> The law is clear that the sentencing court need only "make a reasonable estimate of the loss, given the available information." <u>United States v. Reifler</u>, 446 F.3d 65, 107 (2d Cir. 2006) (internal quotation marks omitted); <u>see</u>

---

[2] Napout and the government objected to certain aspects of the PSR in letters to the Probation Department dated August 8 and August 20, 2018. The Probation Department issued an addendum to the PSR on August 22, 2018. Most of the substantive objections raised in Napout's objections to the PSR are repeated in his sentencing memorandum, which the government addresses here.

U.S.S.G. § 2B1.1, app. note 3(C) ("The court need only make a reasonable estimate of the loss . . . based on available information . . . .").[3]

       Here, the evidence, as well as common sense, supports the conclusion that the amount of the agreed bribe payments is properly viewed as the minimum intended harm or loss to the organizations selling the media rights.  As detailed in the Court's June 22, 2018 Order:

> At trial, the government's expert, Dr. Szymanski, was qualified under FRE 702 and <u>Daubert</u> to testify as an expert in the business of sports with an emphasis on the sport of soccer.  (Tr. 159-164, 195.)  Among other things, Dr. Szymanski testified about the sale of "broadcast rights" for international soccer competitions, including the Copa America and Copa Libertadores.  (Tr. 172-177.)  Based on his examination of the market for broadcasting rights in international soccer, Dr. Szymanski testified that, in recent years, broadcasting rights have become "by far the most important" asset that an international soccer organization owns.  (Tr. 175.)  Dr. Szymanski identified "two immediate effects" of personal payments made to officials who have authority over the sale of broadcasting rights on behalf of international soccer organizations.  (Tr. 191, 198.)  First, because sports marketing companies typically have a specified amount they are willing to spend on broadcasting rights, "if some of that budget is going in the form of bribes to officials and executives, then that's less money for the soccer organization."  (Tr. 191.)  When a sports media company pays a bribe to a soccer official in exchange for the award of broadcasting rights, the amount paid to the soccer official is "lost [by the soccer organization] . . . directly from the bribe."  (Tr. 192.)  Second, when a market for broadcasting rights is influenced by secret bribe payments, competitors in the market are "not likely to enter into competition to win the [media] right[s], so that the total amount paid is going to be less than you would get in a competitive environment." (Tr. 191.)
>
>    . . .  The economic principles that Dr. Szymanski explained based on his examination of the market for sports media rights – in particular, the principle that bribe payments made to a soccer official in exchange for the awarding of a valuable contract right directly translates into "less money for the soccer organization" – provided

---

[3] A district court's factual findings on loss amount are reviewed for clear error.  <u>See</u> <u>United States v. Carboni</u>, 204 F.3d 39, 46 (2d Cir. 2000); <u>see also</u> U.S.S.G. § 2B1.1, app. note 3(C) ("The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.  For this reason, the court's loss determination is entitled to appropriate deference.") (citing 18 U.S.C. § 3742(e) and (f)).

the jury with a sufficient basis on which to conclude that the specific bribe payments in this case resulted in lower contract prices for the relevant soccer organizations.

Mem. & Order dated June 22, 2018 Regarding Post-Trial Mots., at 14-15; see also Trial Tr. at 374-77 (testimony of A. Burzaco regarding the 2012 Copa Libertadores contract (GX 165T): "[S]igning such a long-term contract in the context of more competition and growing and including the macroeconomic circumstances in South America, it was definitely bad for CONMEBOL and good for the counterpart."); GX 1709-T at 2-3 (M. Jinkis stating that conspirators would earn $100 million in profit from each edition of the Copa América under the Datisa contract procured through bribery).

Based on this evidence, the amount of the agreed bribes, which "directly translated into 'less money for the soccer organization,'" Mem. & Order dated June 22, 2018 Regarding Post-Trial Mots., at 15, is a "reasonable estimate of the loss, given the available information," Reifler, 446 F.3d at 107.

2.      The Identified Bribes Are Part of Napout's Relevant Conduct

Napout also argues that the evidence is insufficient to support a finding that the bribes paid or promised to be paid to other soccer officials with whom he conspired were part of criminal activity jointly undertaken by Napout. JAN Br. at 33-48.

The Guidelines provide that relevant conduct for determining the offense level and applicable enhancements includes both the defendant's conduct and, in the case of jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of that activity. See U.S.S.G. § 1B1.3(a)(1)(B). Thus, the loss amount attributable to a particular defendant includes not only the loss caused or intended by the defendant's own acts and omissions, but also losses caused or intended through the reasonably foreseeable acts of coconspirators in the furtherance of jointly undertaken criminal activity. Id.; see also United

15

States v. O'Neil, 118 F.3d 65, 74 (2d Cir. 1997) ("[A]ll reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity are taken into consideration in calculating the amount of loss attributable to the defendant") (internal quotation marks omitted), accord United States v. Cutler, 520 F.3d 136 (2d Cir. 2008).

In determining whether a defendant is responsible for jointly undertaken criminal activity, a district court must first determine the "scope of the criminal activity agreed upon by the defendant." United States v. Mulder, 273 F.3d 91, 118 (2d Cir. 2001) (internal quotation marks omitted). Second, if it finds that the scope of the activity to which the defendant agreed includes the conduct in question, "the court must make a particularized finding as to whether the activity was foreseeable to the defendant." Id. (internal quotation marks omitted); see also United States v. Getto, 729 F.3d 221, 234 (2d Cir. 2013). In determining the scope of the criminal activity the particular defendant agreed to jointly undertake, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3, app. note 3(B).

Here, the evidence at trial established that Napout jointly undertook with fellow soccer officials and certain sports marketing executives to carry out schemes through which the soccer officials together awarded lucrative contracts to companies controlled by the sports marketing executives in exchange for annual six-, and sometimes seven-, figure bribe payments. The $155,400,000 intended loss attributed to Napout in the PSR comprises losses intended by Napout and his coconspirators in connection with three tournaments – the Copa América ($79,300,000), Copa Libertadores ($73,600,000), and Paraguayan World Cup Qualifiers ($2,500,000) – and excludes the intended losses from aspects of these schemes not jointly undertaken by Napout and which occurred before Napout joined the conspiracy, as well as other schemes within the racketeering conspiracy. See PSR ¶ 73. The intended loss amount reflects

16

bribes paid or intended to be paid to Napout and other soccer officials who had the authority to approve or administer lucrative media and marketing contracts relating to the specified tournaments. All of these losses were intended in furtherance of jointly undertaken criminal activity involving Napout.

        In determining the scope of the jointly undertaken criminal activity properly attributable to Napout, it is important to consider the trial proof as a whole as it relates to the schemes at issue, evidence Napout ignores in his sentencing submission. With respect to the Copa América and Copa Libertadores Schemes, the evidence established that Napout, first as president of the APF and later as president of CONMEBOL, along with other national federation presidents responsible for approving contracts at CONMEBOL, collected millions of dollars in bribe payments from, variously, Torneos, Full Play, and Traffic executives in exchange for the officials' support of the bribing entities as they sought the rights to the tournaments at issue. See, e.g., PSR ¶¶ 46-53, 59-61. The evidence established that none of the presidents who received bribes in connection with the 2013 Datisa Contract, which awarded rights to four editions of the tournament to Datisa, or in connection with contracts for the Copa Libertadores, including the renewal and extension of rights for Torneos in 2012, took steps to put the contracts out to bid or to meaningfully test the commercial value of the rights in hopes of securing the true market value for the confederation. See, e.g., Trial Tr. at 310-13 (testimony of A. Burzaco relating to the 2012 Copa Libertadores extension); Trial Tr. at 1932-33 (testimony of L. Bedoya concerning increases in contract prices and failure of the conspirators to determine the market value of the rights or obtain any competing bids); GX 183-T (Napout's signature on the Datisa Contract approved without bids or market valuation); Trial Tr. at 362-65 (A. Burzaco testimony that Burzaco and Hugo Jinkis organized an unofficial meeting at the Faena Hotel in Buenos Aires immediately before the official CONMEBOL meeting and that Napout and other bribe

17

recipients at the meeting "agreed to go back later to the CONMEBOL executive committee meeting at the Hilton Hotel a few blocks away and to vote" in favor of Torneos, which Napout did); GX 1352-T at 4, 9 (minutes of executive committee meeting on October 24, 2014, in which Napout participated in renewing the Copa Libertadores contract for Torneos and barring a competitor from presenting a competing bid, and in which conspirator Luis Chiriboga proposed Napout and Bedoya to be in charge of establishing the commercial guidelines for the Copa América Centenario for Full Play, one of the bribe payers).  From these facts alone, it is clear that Napout was one of a group of conspirators who agreed, collectively, to receive bribes at the expense of the institutions they were trusted to serve in connection with particular contracts and tournaments.

The evidence further established that Napout was well aware of the bribe schemes that he had joined and actively participated in them.  As early as approximately 2009, Rafael Esquivel, then-president of the Venezuelan federation, met with Burzaco following a CONMEBOL executive committee meeting in Asunción, Paraguay and explained that he and the other members of the Group of Six (namely, Napout, Luis Bedoya, Luis Chiriboga, Manuel Burga, and Carlos Chavez) controlled a majority of the votes in CONMEBOL and therefore they must be included in "every single decision regarding Copa Libertadores [] contracts" and "that they were annoyed that they had been kept out of the bribe payments, which they knew were going on, and that as from that moment onwards, they should be receiving between 400,000 to $500,000 per year, each one of these six members, for their support, continued support, for those Copa Libertadores [] contracts."  Trial Tr. at 331-33.

Then, during 2013 and 2014, Napout traveled frequently to Buenos Aires, Argentina, where he would meet with coconspirators Julio Grondona and Alejandro Burzaco.  In those meetings, Napout not only discussed the ongoing bribe payments, but also expressed his

18

interest in becoming the next CONMEBOL president.  See PSR ¶ 69; Trial Tr. at 380-81

(testimony of A. Burzaco).  Once Napout had succeeded in becoming president of CONMEBOL

in 2014, he requested and received an explanation of the total bribes the CONMEBOL officials

were receiving from Torneos.  See PSR ¶ 69; Trial Tr. at 569 (testimony of A. Burzaco).

Ultimately, Napout was one of only three soccer officials – Julio Grondona, Marco Polo Del

Nero, and Napout – who received the full information about all of the bribes in connection with

the CONMEBOL tournaments.  See PSR ¶ 69; Trial Tr. at 294 (testimony of A. Burzaco).[4]

Napout maintained an awareness of the bribes being received by other CONMEBOL officials,

and, when certain officials left CONMEBOL, noted that the bribe amounts should be increased

for the remaining officials.  See PSR ¶ 69; Trial Tr. at 1614 (testimony of L. Bedoya).    In fact,

Napout positioned himself to receive the "presidential treatment," or $1.2 million per year for the

Copa Libertadores (rather than the $500,000 that other soccer officials were receiving), and $3

million per edition for the Copa América (rather than the $1 million per edition that the other

soccer officials were to receive).  See PSR ¶ 69; Trial Tr. at 298, 418-19, 461, 573, 576, 600

---

[4] Napout cites the trial transcript at 293 in support of his claim that "only one person,
other than the bribe givers, Julio Grondona, had knowledge of the full scope of the bribe
scheme."  JAN Br. at 36.  To the contrary, Burzaco testified that "[t]hen people that took his
[Julio Grondona's] role in knowing everything, and there was a big flow of
information."  Trial Tr. at 293.  In particular, "[a]fter Julio Grondona passed away, Marco Polo
del Nero and Juan Angel Napout received and learned the overall picture of all the CONMEBOL
bribes."  Id. at 293-94.  Napout suggests that, because he was first informed of all of the specific
details of each of the bribes only in 2014, he cannot be held accountable for the bribes that came
earlier.  JAN Br. at 37 n.54 (citing U.S.S.G. § 1B1.3, app. note 3(B) ("A defendant's relevant
conduct does not does not include the conduct of members of a conspiracy prior to the defendant
joining the conspiracy, even if the defendant knows of that conduct.").  But Burzaco's testimony
was not that Napout first learned in 2014 that others were receiving bribes; rather, it was the first
time Napout received full details concerning the amounts his coconspirators were receiving.  See
Trial Tr. at 572-75 (describing the bribe amounts that the other officials were receiving,
including Grondona (prior to his death)).  As discussed herein, Napout jointly undertook to sell
the influence of CONMEBOL's leaders in exchange for bribe payments long before 2014, and in
the course of his conduct the amounts of the bribes paid were either specifically known or
reasonably foreseeable to him.

(testimony of A. Burzaco).    On the day of the unsealing of the First Indictment, May 27, 2015,

Napout was scheduled to meet with Burzaco in Zurich to discuss demands by other soccer

officials for additional bribe payments.  See PSR ¶ 69; Trial Tr. at 588-89 (testimony of A.

Burzaco).  Burzaco left Switzerland before the meeting could occur.

        The well-supported conclusion that these Copa América and Copa Libertadores

Schemes were jointly undertaken activities and that the specific bribe payments were foreseeable

to Napout is reinforced by other evidence, including evidence that the conspirators spoke to one

another about the bribes, albeit in sub-groups, see Trial Tr. at 292-93 (testimony of A. Burzaco

that the soccer officials spoke about the bribes in clusters), id. at 1422-23 (testimony of J.L.

Chiriboga that his father understood how each member of the Group of Six received his bribe

payments, indicating close communication across the group); and that the soccer officials were

working together to increase the bribe amounts, see GX 1709-T at 3-4 (statement of M. Jinkis

that "nowadays, the presidents know that we [i.e., Datisa] will have $100 million of profit.  The

presidents have Internet, they are not Nicolas Leoz; they have Internet, they talk on Facebook,

uh, they talk to the clients in every country . . . I don't want to earn too much in one deal"

because otherwise the officials would demand more bribes).  The photographic evidence also

strongly corroborates and reinforces the personal closeness of the conspirators and the fact that

Napout did not maintain an arms-length relationship with the bribe payers with whom he was

supposed to be negotiating contracts and representing CONMEBOL's interests.  See, e.g.,

Attachment A, attached hereto.[5]

---

[5] Attachment A includes: GX 961 at 2 (Napout huddling with Julio Grondona and José
Maria Marin); GX 1026 (Napout dining with Julio Grondona); GX 1046 (Alejandro Burzaco
with Napout, Sergio Jadue, and Luis Bedoya); GX 1069 (Napout, Mariano Jinkis, and Hugo
Jinkis with arms around each other, flashing thumbs-up signs); GX 1050 (Napout with his arm
around Hugo Jinkis); GX 1051 (Napout and Hugo Jinkis exiting a private jet); GX 1076
(champagne with Napout, Bedoya, Jadue, and Mariano and Hugo Jinkis); GX 1020 (Napout,

In context, the Copa América and Copa Libertadores Schemes are each properly viewed as a single, jointly undertaken criminal activity rather than as a set of separate criminal activities, each corresponding to a different soccer official.  Cf. U.S.S.G. § 1B1.3, app. note 4(C)(viii) (providing an analogous example of multiple conspirators involved in drug trafficking and noting that "the scope of the jointly undertaken criminal activity may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities").

The law is clear, for example, that, among other factors, jointly pooled resources and sharing of profits are a sign of jointly undertaken criminal activity.  See United States v. Iannuzzi, 372 F. App'x 98, 100 (2d Cir. 2010) (summary order).  Here, the media rights contracts, the key economic resource of the confederation, were a shared resource, and the overall amount of bribes that could be sustained by the sports marketing companies – Torneos in the case of the Copa Libertadores; the Datisa partners in the case of the Copa América – was divided among the conspirators through the controlling influence of Julio Grondona and, later, Napout and Del Nero.  See, e.g., Trial Tr. at 293-94 (testimony of A. Burzaco about Napout's knowledge of the "overall picture of all the CONMEBOL bribes."); Trial Tr. at 588-89

---

Marin, Del Nero, and Bedoya laughing near a private jet); FIFA15053809 C (Napout smoking cigars with Jeffrey Webb and Angel Villar) (arrested as part of a corruption investigation in Spain); GX 1016 (Marin, Del Nero, and Napout flashing victory signs); GX 1023 (Napout dancing with Marin, Carlos Chavez, and Del Nero); GX 1032 (Napout dining with Bedoya and Jose Luis Meiszner); GX 1028 (Napout embracing Eugenio Figueredo); GX 1043 (Napout embracing Chiriboga); GX 1044 (Napout smoking cigars with Rafael Esquivel); GX 1077 (Napout and Jadue on a boat); GX 1066 (Napout embracing Chiriboga, Jadue, Bedoya, and Manuel Burga).  The government recognizes, of course, that soccer officials brought together through professional circumstances can be expected to attend soccer events and socialize together as colleagues typically do, and that photographs showing such associations do not, standing alone, establish criminal conduct.  But the photographs in evidence reveal particular closeness among the conspirators, including between Napout and members of the Group of Six, and between Napout and the bribe-paying sports marketing executives.

21

(testimony of A. Burzaco about plan to discuss with Napout demands by other soccer officials

for additional bribe payments); Trial Tr. at 191-92 (testimony of expert S. Szymanski that the

bribe payor "will typically have in mind a budget as to how much they're prepared to spend to

acquire the rights," which is split between the contract price and bribe amounts); Trial Tr. at 461-

63 (testimony of A. Burzaco referring to a total amount of bribes for the signature of the Datisa

Contract, as well as other amounts for each edition of the tournament, that was to be distributed

to various CONMEBOL officials); Trial Tr. at 2093-99 (testimony of E. Rodriguez regarding

block of $2.4 million in bribes being sent to Full Play to pay bribes to the Group of Six for the

Copa Libertadores); GX 413-T (e-mail from E. Rodriguez to himself referring to total amount of

bribes owed for 2015, 2016, 2019, and 2023 editions of the Copa América); GX 1710-T at 1, 6

(statements of A. Burzaco that the Datisa partners "set 40 million aside" in bribes for the 2015

Copa América and for the signature of the Datisa Contract, as well as "Twenty [million] for 2019

and 20 [million] for 2023"); GX 1709-T at 5-6 (statement of M. Jinkis that the total bribes for the

2015 to 2023 editions of the Copa América, including the signature of the Datisa Contract and

bribe payments to CONCACAF officials, is "more – than 100 million . . . That's 110 [million]");

GX 1709-T at 10 (statement of M. Jinkis that "I want to coexist with and make all the presidents

rich . . . Not three only.  This is my philosophy and my way of thinking").

Another relevant factor is whether the defendant assisted in designing and

executing the illegal scheme.  See Iannuzzi, 372, F. App'x at 100.  Here, Napout participated in

the execution of the schemes by signing contracts along with his coconspirators, joining his

coconspirators in refusing to put the rights out to bid, supporting contract renewals for the bribe-

paying entities, and maintaining secrecy, including in the face of a requirement under

CONMEBOL's Code of Ethics that the officials report any knowledge of bribe offers.  See, e.g.,

Trial Tr. at 1635-36 (testimony of L. Bedoya that Napout expressed concern about how Full Play

22

handled the bribes and asked Bedoya to speak to Mariano Jinkis about it, which he did, and

Jinkis indicated that the bribes were made through companies other than those that received

funds for the CONMEBOL tournaments and that the officials' names were not associated with

the payments); Trial Tr. at 1123 (testimony of S. Peña that Full Play discontinued its prior

practice of using the soccer officials' initials in its records of the bribes, and started using

"fantasy names" to hide the true identities of the bribe recipients); Trial Tr. at 1636 (testimony of

L. Bedoya that Napout later assured Bedoya that Napout was receiving his bribe payments in a

"secure way" and indicated that he was receiving his payments in cash); GX 1310-T, at 9 (2013

CONMEBOL Code of Ethics, Art. 21(1)); GX 1362-T (minutes of the December 12, 2013

CONMEBOL Executive Committee meeting, in which Napout participated and the Code of

Ethics was adopted).

        In arguing that the evidence is insufficient to support a finding that he jointly

undertook with his coconspirators to take bribes in connection with the specified tournaments in

specified years, Napout relies on United States v. Studley, 47 F.3d 569 (2d Cir. 1995), JAN Br.

at 34, which is readily distinguishable, as the Court has already noted.  See Marin Sentencing Tr.

at 13.  In Studley, the Second Circuit held that a salesman who was defrauding customers was

not responsible for the frauds of his coworkers because the defendant did not contribute

resources to the scheme, "had no interest in the success of the operation as a whole, and took no

steps to further the operation beyond executing his sales."  47 F.3d at 576.  There was no

evidence in that case that the defendant "assisted other sales representatives with their sales,

shared in the profits, or participated in any way in the management of the operation."  Id. at 572.

Here, as argued above, Napout had a strong interest in the success of the operation as a whole

because he only stood to receive his own bribes if the other officials also agreed to sign the

contracts in exchange for bribes.  He therefore took steps to further the broader operation and

23

participated in the management of the key resource at issue, the contracts.  See, e.g., GX 1352-T

at 1, 4 (CONMEBOL Executive Committee meeting minutes dated October 24, 2012, during

which voted in favor of the contract with Torneos for the Copa Libertadores rights, which were

obtained through bribes); GX 1357-T at 1, 11 (CONMEBOL Executive Committee meeting

minutes dated May 29, 2013, during which Napout voted with the other officials who were

receiving bribes to approve the contract with Datisa for the Copa América rights).  Put simply,

here, the schemes' existence and viability required that they be jointly undertaken.

Napout urges the Court to look conspirator-by-conspirator to determine whether

each was in Napout's "cluster" of bribe recipients.  See JAN Br. at 37-47.  In doing so, however,

he overlooks the nature of the schemes at issue.  As the Court has already found, the soccer

officials who participated in these schemes "coordinated their efforts on a continual basis" and

did so in order to receive massive bribes "in exchange for awarding contracts for media and

marketing rights to various companies who were bribing them."  Marin Sent. Tr. at 9.  In order

for these bribery schemes to succeed, Napout and the other soccer officials "had to vote together

to insure that the contracts were awarded to the bribing companies, to insure that no competitive

bidding happened from other companies, and, also, to insure that the secrecy of these schemes

was maintained."  Id.  The bribes were paid by the sports marketing companies Torneos, Full

Play, and Traffic, and, as a result of the bribes, Napout and his coconspirators collectively chose

not to bid out these contracts.  See id. at 9-10.  The CONMEBOL meeting minutes, as well as the

photographs and other evidence, show that Napout and the other soccer officials "coordinated all

these activities, even if tacitly, to insure the success of the plan."  Id. at 10.  From this context,

and from the evidence cited above concerning the conduct of Napout and his coconspirators, the

court can, at a minimum, "fairly infer" an agreement to jointly undertake the criminal activity

24

specified in support of the loss amount set forth in the PSR.  See U.S.S.G. § 1B1.3, app. note 3(B).

        3.        <u>The Evidence Established the Paraguayan World Cup Qualifiers Bribes</u>

As to the Paraguayan World Cup Qualifiers Scheme, Napout is the only soccer official that received bribes in connection with the contract for the 2014 and 2018 cycles, and therefore only the loss intended in connection with the bribes for Napout, namely $2.5 million, is included in the loss amount calculation.  Napout's only argument against including these bribes in the loss calculation is that no trial witness had "first-hand knowledge" of Napout's agreement to receive these bribes – suggesting, against settled authority, that only testimony from Mariano or Hugo Jinkis would suffice.  JAN Br. at 47.  Napout apparently would like the Court to ignore the evidence actually admitted at trial establishing that: secret bribe payments were made to soccer officials to influence them in connection with the purchase of broadcasting and sponsorship rights in connection with the Copa América, Copa Libertadores, and World Cup Qualifier matches, Trial Tr. at 1062-63; it was important for Full Play's business to accumulate multiple sets of rights for qualifier matches from different countries, <u>id.</u> at 1066; the "Cuentas" (or Excel ledger) in GX 601 accurately reflected the bribes owed to soccer officials, as well as the distribution of such bribes to the officials, <u>id.</u> at 1122-23; Napout was to personally receive from the Jinkises a $1 million bribe for the 2014 cycle and a $1.5 million bribe for the 2018 cycle of the Paraguayan qualifiers, <u>id.</u> at 1168-73; GX 209; and this $2.5 million was recorded as part of the bribes owed to Napout on the tab labeled "Honda" in the Cuentas in a detailed spreadsheet that included a formula designed to track the periodic accrual of bribe payments owed to Napout as the qualifier contract progressed over time, Trial Tr. at 1126, 1167-73; GX 601 ("Honda" tab).  This evidence established beyond a reasonable doubt, and certainly well beyond a preponderance of the evidence, that Napout agreed to receive $2.5 million in bribe

payments in connection with the contract for the 2014 and 2018 Paraguayan World Cup Qualifier rights.

In sum, the trial evidence established by at least a preponderance of the evidence that Napout and his coconspirators jointly undertook to receive bribes in exchange for their official support of the bribe-paying entities in the granting of the rights to certain editions of the Copa América ($79,300,000) and Copa Libertadores ($73,600,000) tournaments, and that Napout also agreed to receive bribes in connection with the Paraguayan World Cup Qualifiers contract ($2,500,000). Accordingly, the loss amount of $155,400,000 set forth in the PSR is accurate and should be adopted by the Court.[6]

B.    The Enhancement For Use of Sophisticated Means and Overseas Conduct is Warranted

Napout challenges the PSR's application of a two-point offense-level enhancement under U.S.S.G. § 2B1.1(b)(10) based on the use of "sophisticated means" or substantial overseas conduct in furtherance of the offenses of conviction. Napout argues that the enhancement is inapplicable because (1) he did not intentionally engage in or cause conduct constituting sophisticated means, and (2) the enhancement was not meant to apply to conduct committed overseas by defendants who were born, live, and work overseas. JAN Br. at 20-23. Neither argument has any merit.

---

[6] Napout argues that the "advisory guidelines range in this case places an unreasonable reliance on loss and is 'patently absurd.'" JAN Br. at 52. Although the Guidelines range in this case is high, that is because of the enormous scope of Napout's fraud and the length and extent of the criminal conduct engaged in by the defendant and his coconspirators for years. While Napout would prefer that the Court ignore the magnitude of the bribes and the indelible stain they have left on international soccer, the Guidelines range reflects the breadth of the racketeering conduct for which Napout must be held accountable and should not be ignored. See U.S.S.G. § 2B1.1, bkgd. commentary ("ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes").

Under U.S.S.G. § 2B1.1(b)(10)(C), a two-point enhancement is warranted if the defendant "intentionally engaged in or caused" there to be "sophisticated means," that is, "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, app. note 9(b). The Guidelines instruct that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Id. The two-point enhancement is also required under § 2B1.1(b)(10)(B) if "a substantial part of a fraudulent scheme was committed from outside the United States."

Napout's conduct, as well as that of his coconspirators, easily satisfies both the "sophisticated means" and the "outside the United States" prongs of the § 2B1.1(b)(10) enhancement. With respect to the use of sophisticated means, the proof at trial established by beyond a preponderance of the evidence that the enhancement properly applies. Indeed, the methods employed by Napout and his coconspirators to generate the more than $3 million in cash bribes that Napout was able to collect before his arrest was one of the very reasons that Napout was able to conceal his crimes for so long. See Trial Tr. at 3299 (testimony of money laundering expert R. Adams about the use of cash in committing crimes: "Cash is untraceable in most cases. There's no paper trail. It's not like a check that has to go through the banking system or a cashier's check or a wire. There's no paper trail. So, cash is king."). The evidence showed, among other things, that:

> In an effort to conceal his criminal conduct, Napout arranged to receive his bribe payments predominantly in cash, in Buenos Aires, a foreign capital outside of his home country of Paraguay, see, e.g., GX 601 (documenting cash payments to Napout in detail); Trial Tr. at 1159-61 (testimony of S. Peña that M. Jinkis "was going to deliver the cash to Mr. Napout" in Buenos Aires, that the payment were in cash at Napout's request, to ensure confidentiality, and that payments were to be kept secret); Trial Tr. at 1584 (testimony of L. Bedoya regarding Napout's concern that bribes always be "done in a safe way" to avoid exposure, or use of coconspirators' names);

27

· Bribes paid by Burzaco to Napout and the other members of the Group of Six in connection with the Copa Libertadores tournament were routed to Mariano and Hugo Jinkis, who handled the direct payments to the Group of Six, through the use of various offshore entities and shell corporations, including Arco Business and Development, which maintained a bank account in Switzerland, and Valente, which maintained its bank accounts in the United States. <u>See, e.g.</u>, GX 504B (account opening documents at Swiss bank for Arco Business and Developments Ltd., domiciled in the British Virgin Islands); GX 557B, 166B (account opening documents at U.S. bank and sham contract relating to Valente, domiciled in Panama); GX 623-T, 624-T (ledgers maintained by E. Rodriguez reflecting payments for benefit of the Group of Six through or from FPT and Valente accounts); Trial Tr. at 3407 (testimony of S. Berryman regarding wire transfers for benefit of the Group of Six); Trial Tr. at 2096-109 (testimony of E. Rodriguez explaining ledger entries documenting payments to the Group of Six); Trial Tr. at 3513-69 (testimony of S. Berryman describing the transactions that generated cash for Napout);

· The Jinkises, in turn, set up various mechanisms for generating cash on the ground in Buenos Aires, to distribute both the bribes from Burzaco for the Copa Libertadores and also the bribes owed by the Jinkises in connection with the Copa América and Paraguayan World Cup Qualifiers Schemes. One method involved the use of "cambistas," or foreign exchange dealers, who would provide wiring instructions for offshore bank accounts in the name of shell entities and, upon receipt of funds, provide U.S. dollars in Buenos Aires. <u>See, e.g.</u>, Trial Tr. at 1160-61 (testimony of S. Peña about use of cambistas to generate cash in Buenos Aires); Trial Tr. at 3513-69 (testimony of S. Berryman describing the complex transactions that generated cash for Napout). Full Play often wired the money to the cambistas from a bank account in the United States held in the name of a Seychelles company called "Cross Trading S.A." <u>See</u> GX 518-C; Trial Tr. at 3401 (testimony of S. Berryman); <u>see also</u> Trial Tr. at 3298 (testimony of R. Adams about the use of intermediaries to conceal the source or nature of funds). Mariano Jinkis would then deliver the U.S. dollars to Napout at a hotel in Buenos Aires. <u>See</u> Trial Tr. at 1160-65 (testimony of S. Peña);

· In order to pick up his cash, Napout would travel to Buenos Aires, sometimes using the services of his personal driver to move the cash across the border to Asuncion, Paraguay, 15 hours away. <u>See</u> Trial Tr. at 1422-23, 1425, 1467 (testimony of J.L. Chiriboga); 1638-39 (testimony of L. Bedoya); 381-82 (testimony of A. Burzaco);

· On other occasions, Napout received his bribes, at his request, through wire transfer payments by the Jinkises for the economic rights to a soccer player, the purchase of concert tickets, and the rental of a luxury vacation property in Uruguay, all with no direct traceability to Napout except through private emails and the secret ledger maintained by Santiago Peña. <u>See, e.g.</u>, Trial Tr. at 3548-51, 3554-55, 3558-66 (testimony of S. Berryman tracing these bribe payments); GX 944 (email from Jinkises to Napout including pictures of the vacation property);

· In order to further conceal evidence of his receipt of bribe payments, records of Napout's bribes, like those of other members of the Group of Six, were recorded

under code names in the ledger maintained by Peña.  See, GX 601; Trial Tr. at 1157 (testimony of S. Peña).  Napout's bribe payments were recorded by Full Play under the code name of "Honda" to hide his true identity.  See GX 601; Trial Tr. at 1157 (testimony of S. Peña); id. at 1585 (testimony of L. Bedoya that Napout said, with respect to the Jinkis's bribes, "he always expressed a concern that it was fine that we do it as long as it was always done in a safe way, that we should not be exposed or our names at any time, as was happening with others").

In light of the foregoing evidence, Napout's argument that his receipt of bribes came "in the simplest form – cash" is close to frivolous.  JAN Br. at 22.  Similarly unavailing is the argument that whatever complexity or sophistication there may have been, Napout did not cause it.  To the contrary, Napout arranged for the delivery of his bribes in cash, in U.S. dollars, in Buenos Aires, with a premium to be placed on secrecy and lack of traceability.  Napout understood and intended, of course, that, given the need for secrecy, Burzaco and the Jinkises were not going to move money for the ultimate benefit of the bribe recipients through easily traceable means, regardless of whether the final distribution was to be made in cash or through deposits into bank accounts.  Indeed, the whole point of using offshore entities, Swiss bank accounts, complex wire transfer arrangements, and code names in secret ledgers was to avoid detection.  Napout thus bears responsibility, along with his coconspirators, for the mechanics that followed from his demand for cash payments and secrecy, and the groups' collective effort to prevent detection of their schemes.

It also bears noting that through the course of the trial, and even in the sentencing memorandum filed just days ago, Napout continues to rely on his sophisticated means of concealment to deny responsibility, stating that "[t]here were no wire transfer records of money sent to Mr. Napout, and the government did not trace any bribe money into any account held by Mr. Napout."  JAN Br. at 63; see also id. at 62 (arguing that forfeiture should not be ordered because "[t]he government did not establish that Mr. Napout personally obtained any money derived from the offense").

29

In sum, the evidence clearly establishes the applicability of the sophisticated means enhancement – indeed, it would be hard to imagine a course of conduct more fitting to its purpose.  See, e.g., United States v. Clements, 73 F.3d 1330, 1340 (2d Cir. 1996) (upholding application of enhancement under tax-evasion provision where the defendant used multiple cashier's checks and his wife's separate bank account, which "undeniably made it more difficult" for law enforcement to detect the crime); United States v. Becker, 965 F.2d 383, 390 (2d Cir. 1992) (upholding application of enhancement where the defendant used a "warehouse bank" to hide assets under numbered account and deposited earnings in son's account); see also United States v. Lewis, 93 F.3d 1075, 1083 (2d Cir. 1996) (holding, in tax case, that sophisticated means enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return").

The Court need not reach Napout's argument that the challenged enhancement also does not apply to his substantial criminal overseas conduct, but that argument fails as well. The trial record is replete with evidence that "a substantial part of a fraudulent scheme was committed outside the United States," and Napout does not argue otherwise.  See JAN Br. at 20-22 ("It is hard to quibble with the fact that the literal words of subsection (B) apply to the facts of this case.").  Napout instead asserts that the enhancement was not meant to apply to his overseas conduct because his "foreign location was a mere consequence of where he was born and lived his entire life, and where he also obtained employment – in Paraguay."  JAN Br. at 22.  In support of that argument, Napout engages in a lengthy discussion of the purposes behind the enhancement, which was, in part, to "address fraud schemes in which the location or relocation of the criminal conduct was intended as a sophisticated method to avoid detection in the United States."  JAN Br. at 22.  The government does not disagree.  But the fact that some of the

30

conduct took place because Napout was based overseas does not remove his conduct from the plain reach of the provision, and Napout cites no case holding otherwise.[7]

The Guidelines instruct that "[o]ffenses that involve the use of financial transactions or financial accounts outside the United States in an effort to conceal illicit profits and criminal conduct involve a particularly high level of sophistication and complexity. These offenses are difficult to detect and require costly investigations and prosecutions. Diplomatic processes often must be used to secure testimony and evidence beyond the jurisdiction of United States courts." U.S.S.G. § 2B1.1, bkgd. commentary. The offenses of conviction are just these sorts of offenses. See, e.g., United States v. Parnell, 524 F.3d 166, 171 (2d Cir. 2008) ("Because the Guidelines are clear, the District Court did not err . . . .") (citing United States v. Sloley, 464 F.3d 355, 359 (2d Cir. 2006) ("We [give] the Guidelines language its plain meaning and force . . . .") (alterations in Parnell); see also United States v. Reed, 629 F. App'x 19, 21 (2d Cir. 2015) (summary order) (rejecting arguments against application of a certain Guidelines provision as "inconsistent with the plain text"); see also United States v. Okagbue-Ojekwe, 38 F. App'x 646, 648 (2d Cir. 2002) (summary order) (upholding application of enhancement under the predecessor to § 2B1.1(b)(10)(C) where documents containing false statements were sent from a foreign country).

_____

[7] Napout argues that "[t]here is nothing about Mr. Napout's birthplace or place of employment that warrants a sentencing enhancement." Id. This argument might have some thin rhetorical appeal if Napout had lived, worked and committed his crimes in Paraguay. But he did not. The crimes of conviction were domestic offenses that relied heavily on the wire facilities and financial system of the United States, derived profits from the United States, and involved meetings and other conduct in the United States. With respect to the overseas conduct required to support the challenged enhancement, it bears emphasizing that Napout did not, as his argument might lead one to believe, receive cash in Paraguayan Guaraní, delivered in Paraguay, for deposit in a Paraguayan bank under Napout's own name. As discussed herein, Napout made use of many offshore (non-U.S. and non-Paraguayan) jurisdictions in the commission of his crimes and the concealment of their fruits.

Section 2B1.1(b)(10)(B) applies, without qualification, where a "substantial portion" of the offense occurred "outside the United States."  Because that occurred here, the two-point enhancement under Section 2B1.1(b)(10)(B) is warranted on this basis as well.

C.      The Enhancement For Abuse of Position of Trust is Warranted

Napout contests the application of a two-level enhancement for abuse of a position of private trust, pursuant to U.S.S.G. § 3B1.3, on the ground that application of the enhancement results in impermissible double-counting since his honest services wire fraud conspiracy convictions by definition include an abuse of trust.  JAN Br. at 23-25.  The argument is meritless.

Section 3B1.3 of the Sentencing Guidelines provides for a two-level enhancement if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  In the case of a fraud conviction, an abuse of trust enhancement may not be imposed on a defendant solely because in committing the fraud, he violated a legal obligation to be truthful.  See United States v. Santoro, 302 F.3d 76, 79–80 (2d Cir. 2002); United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001).  Rather, the defendant must abuse a relationship of trust and confidence with the victim that enabled the defendant to commit the crime or escape detection.  See Santoro, 239 F.3d at 79.  Whether a defendant occupied a position of trust within the meaning of § 3B1.3 is considered from the victim's viewpoint.  See United States v. Thorn, 446 F.3d 378, 388 (2d Cir. 2006).  A defendant's position in this relationship is characterized by "substantial discretionary judgment that is ordinarily given considerable deference" by the victim. U.S.S.G. § 3B1.3 cmt. 1; United States v. Laljie, 184 F.3d 180, 194 (2d Cir. 1999) ("[T]he primary trait that distinguishes a position of trust from other positions is the extent to which the position provides

32

the freedom to commit a difficult-to-detect wrong.") (alteration in original) (internal quotation marks omitted).

Napout does not contest that his various positions as a FIFA official, including his roles as president of the APF, president of CONMEBOL, and a member of CONMEBOL's executive committee, constitute positions of trust that facilitated his ability to commit and conceal the charged offenses. Rather, he argues that the enhancement does not apply because Section 3B1.1 provides that it "may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. He argues that because honest services wire fraud necessarily involves a breach of a fiduciary duty, the "harm captured by the abuse of trust enhancement is already fully accounted for" in the base offense level, and that inclusion of the enhancement therefore constitutes double-counting. The argument relies on a misapplication of the relevant Guidelines provision.

The enhancement for abuse of trust is available for the offenses of conviction because, contrary to Napout's argument, an abuse of trust is not included in either the base offense level or the specific offense characteristics set forth in the relevant Guidelines provision. With respect to the base offense level, although the government was required to prove Napout's agreement that someone would steal of honest services as an element of the two wire fraud conspiracy offenses of conviction, not every fraud that results in an offense level of six under Section 2B1.1 requires a breach of a fiduciary duty or similarly culpable abuse of a position of trust. For instance, a wire fraud in which one stranger defrauds another by selling him a car and lying about its physical condition carries the same base offense level as an honest services fraud scheme in which a director who agreed to operate in the best interests of his company accepts an unlawful bribe. The Guidelines, however, recognize that the abuse of trust involved in the latter offense warrants additional punishment, and therefore provide for a two-point offense-level

33

enhancement.  See United States v. Moskowitz, 215 F.3d 265, 272–73 (2d Cir. 2000), abrogated

on other grounds by Crawford v. Washington, 541 U.S. 36 (2004) (abuse of trust was "not

included in the base offense level" of § 2F1.1, the predecessor to § 2B1.1);  United States v.

Laurienti, 611 F.3d 530, 555 (9th Cir. 2010) (holding that abuse of trust enhancement is not

included in base offense level under Guideline § 2B1.1); United States v. Gallant, 537 F.3d 1202,

1243 (10th Cir. 2008) ("[I]t is well-established that an abuse of trust is not incorporated in the

base offense level for fraud under § 2[B]1.1."); United States v. Buck, 324 F.3d 786, 792–93 (5th

Cir. 2003) (same); United States v. Bracciale, 374 F.3d 998, 1006 (11th Cir. 2004) ("[T]he base

offense level of six in [§ 2B1.1] is for various forms of fraud and is not dependent on how the

defendant committed the fraud or the elements of the particular fraud crime involved.  For

sentencing guideline purposes, [defendant's] abuse of his position of trust or breach of his

fiduciary duty is captured only by the abuse-of-trust enhancement.").

       An abuse of trust also is nowhere to be found in the specific offense

characteristics set forth in Section 2B1.1, let alone in the narrow subset of those provisions that

were incorporated into Napout's Guidelines range in the PSR.  See U.S.S.G. § 2B1.1(b)(1)-(19)

(listing specific offense characteristics for fraud); see also Moskowitz, 215 F.3d at 272-73

("Because abuse of a position of trust is not a specific offense characteristic and is not included

in the base offense level [of § 2B1.1], the abuse of trust enhancement was properly applied.");

United States v. Levy, 992 F.2d 1081, 1084 (10th Cir. 1993) ("The specific offense

characteristics listed in § 2B1.1 likewise do not include an abuse of trust.").

       The Second Circuit has at times suggested that it reads the provision precluding

the enhancement where abuse of trust is a specific offense characteristic merely to require

something more than the breach of trust inherent in all frauds.  In United States v. Jolly, 102 F.

3d 46, 49-50 (2d Cir. 1996), for example, the Circuit held that the basic victim reliance that "is

34

the hope of every defendant who engages in fraud" is a specific offense characteristic and

therefore insufficient to support the enhancement.  The Court held that something more is

required, such as "a fiduciary or personal trust relationship," for the abuse of trust enhancement

to apply.  Id. (internal quotation marks omitted); see also United States v. Huggins, 844 F.3d

118, 125 (2d Cir. 2016) ("[A]n abuse of trust enhancement must involve a fiduciary-like

relationship that goes beyond simply the reliance of the victim on the misleading statements or

conduct of the defendant.") (internal quotation marks omitted).[8]

        In support of his argument, Napout notes that the Guidelines section applicable to

bribery of a public official, U.S.S.G. § 2C1.1, instructs that the enhancement for abuse of trust

should not be applied for such a conviction.  JAN Br. at 25.  But this provision only supports the

applicability of the enhancement in this case.  The base offense level under § 2C1.1 is 14 (if the

---

[8] Napout relies heavily on United States v. Broderson, 67 F.3d 452 (2d Cir. 1995), in which the Second Circuit stated, in a brief alternate holding, that the enhancement did not apply because "[t]he conduct that is the basis of the conviction must be independently criminal . . . and not in itself the abuse of trust."  Id. at 456.  The court reasoned that because the offense conduct – involving the signing of false certificates – constituted the fraud, any abuse of trust "was included in the base offense level of six for fraud and deceit."  Id.  Broderson is inapposite both because it does not address the applicability of the enhancement to an honest services conviction and because the decision has since been cabined significantly by subsequent Second Circuit opinions.  See, e.g., Moskowitz, 215 F.3d at 272-73 ("Because abuse of a position of trust is not a specific offense characteristic and is not included in the base offense level [of § 2B1.1], the abuse of trust enhancement was properly applied."); United States v. Ntshona, 156 F.3d 318 (2d Cir. 1998) (declining to read Broderson broadly; stating that "the abuse of trust need not be entirely unrelated to the commission of the base offense"); see also United States v. Evergreen Int'l, 206 F. App'x 71, 78 (2d Cir. 2006) (summary order) (upholding application of abuse of trust enhancement despite defendant's citation to Broderson because "in that case, we rejected the enhancement . . . because the defendant's relationship with his counterparty was arms'-length in nature.  By contrast, [the defendant in Evergreen sought to] induce the trust of its victims"); United States v. Bracciale, 374 F.3d 998, 1008 (11th Cir. 2004) (noting that "the Second Circuit has retreated from its conduct-based approach in Broderson").  Even on Napout's reading of Broderson, his argument fails because he was convicted of racketeering conspiracy, which does not inherently criminalize any abuse of trust.  Rather, the offense punishes generally the agreement for someone to commit two or more predicate acts as part of his association with an enterprise.

defendant was a public official), not 7 (as it is under § 2B1.1 for frauds with a maximum

sentence of at least 20 years, like any wire fraud or bank fraud).  In other words, the base offense

level for § 2C1.1 already reflects the increased culpability for someone who abuses a position of

trust unlike the generic fraud provision, § 2B1.1, which does not.  Furthermore, the fact that the

Guidelines specifically instruct not to apply the abuse of trust enhancement for convictions

evaluated under § 2C1.1, but does not so instruct for those evaluated under § 2B1.1, further

establishes that the Sentencing Commission intended for the abuse of trust enhancement to be

available for § 2B1.1 offenses.[9]

In light of the foregoing, Napout's double-counting argument fails.  Because his

position at the top of CONMEBOL and the APF clearly facilitated his commission of the

offense, the two-level enhancement for abuse of trust applies.  Indeed, the enhancement applies

here not just because Napout was a fiduciary of FIFA, CONMEBOL, and the APF, but also

because those entities entrusted him with discretion and authority well beyond that necessary to

create a fiduciary relationship.  That is, his abuse of trust was more culpable still than even the

typical case warranting the enhancement under Section 2B1.1.

D.      A Leadership Role Enhancement is Warranted

Napout argues that the four-level leader or organizer role enhancement pursuant

to Guidelines Section 3B1.1(a) is unwarranted because Napout did not join the 25-year

---

[9] Napout cites United States v. Hudson, 972 F.2d 504 (2d Cir. 1992), in which the court
held that a four-level enhancement for assault on a federal officer with a dangerous weapon
based on the defendant's use of a car to run over a U.S. Marshal resulted in impermissible
double-counting because the base offense level had already been increased to reflect an
aggravated assault based on the same use of the car.  The case is wholly inapposite, not least
because there is no similar increase in base offense level here for abuse of a position of trust.
Rather, the appropriate increase comes through application of the abuse of trust enhancement –
that is precisely its purpose.

conspiracy alleged by the government until 2010, long after it started, and because, in any event, he did not play a leading role even as to the schemes relating to CONMEBOL in which he was an active participant.  JAN Br. at 29-33.  The evidence at trial established otherwise and fully supports the enhancement and supporting narrative provided in paragraph 69 of the PSR.

Under section 3B1.1(a) of the United States Sentencing Guidelines, a defendant's base offense level should be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." To qualify for the enhancement, the defendant must have been the organizer or leader "of one or more other participants" in the criminal activity.  U.S.S.G. § 3B1.1, app. note 2.  The court determines whether a role enhancement is applicable based on all relevant conduct as defined by Guidelines Section 1B1.3, see U.S.S.G. § 3B1.1, introductory commentary, and considers factors such as the defendant's "exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others," id., app. note 4; see also United States v. Katsman, 551 F. App'x 601, 603 (2d Cir. 2014) (summary order).

Because the role adjustment focuses on the relevant conduct of the defendant, it is of no moment that Napout joined the racketeering conspiracy in 2010.  Similarly unavailing is Napout's reliance on the longstanding leadership role played by Julio Grondona in an effort to portray his own role as insignificant by contrast.  See United States v. Huerta, 371 F.3d 88, 92 (2d Cir. 2004) ("[T]he fact that others in the conspiracy also played leadership or managerial roles is not dispositive of whether [the defendant] played such a role.") (internal quotation marks omitted); see also U.S.S.G. § 3B1.1, app. note 4 ("There can, of course, be more than one person

who qualifies as a leader or organizer of a criminal association or conspiracy.").  The relevant inquiry is whether Napout's own conduct was that of an organizer or leader in the context of his schemes to receive bribes in exchange for the rights to the Copa América and Copa Libertadores. The evidence showed that it was.

After the formation of the Group of Six, Napout over time gained power in the group and more broadly in CONMEBOL, in part by cultivating his relationship with Grondona and Burzaco.  See, e.g., GX 976-T.2 at 1 (chat in which Napout expresses trust in Burzaco dating back to 2010); Trial Tr. at 546-47 (testimony of A. Burzaco explaining 2010 conversation in which Napout put full trust in Burzaco and Napout's subsequent efforts to curry favor with Grondona).  In 2013 and 2014, Napout traveled frequently to Buenos Aires to meet with Burzaco and Grondona with an eye to increasing his chances of securing the CONMEBOL presidency. See Trial Tr. at 380-81 (testimony of A. Burzaco).  Napout's interactions with Burzaco during the World Cup in 2014, when Napout was moving toward the CONMEBOL presidency, also illustrate the level of control he exerted over the Group of Six.  See, e.g., GX 976-T.2, at 9 (chat in which A. Burzaco advised Napout, "You hold down *your* troops," referring to the members of the Group of Six) (emphasis supplied); Trial Tr. at 550 (testimony of A. Burzaco that he was advising Napout to keep the Group of Six together as a unified front in order for Napout to take the presidency); Trial Tr. at 557 (testimony of A. Burzaco explaining chat in which he was advising Napout to "keep *your block* together," referring to the Group of Six) (emphasis supplied).

Napout also took an increasing interest in the payment of bribes to his coconspirators over time and directed various coconspirators in furtherance of their schemes. Luis Bedoya testified that after longtime CONMEBOL president Nicholás Leoz and treasurer Romer Osuna had resigned – both in 2013, see, e.g., GX 1355-T; Trial Tr. at 298 – Napout

determined that the remaining bribe recipients should receive more money, indicating his general knowledge of and intent to organize payments. See Trial Tr. at 1614. Napout directed Bedoya to speak with Mariano Jinkis to ensure that bribe payments were being handled securely, for example, see id.. at 1635-36; directed his driver to pick up payments, see id. at 1423, 1425, 1467 (testimony of J.L. Chiriboga), 1638-39 (testimony of L. Bedoya), 381-82 (testimony of A. Burzaco); directed the Jinkises to pay him in cash, see id. at 1159-1160 (Testimony of S. Peña on request for cash and secrecy); and directed the Jinkises to make a bribe payment through the purchase of economic rights of a soccer player, see id. at 1180 (testimony of S. Peña).

In 2014, after Grondona's death, Napout became president of CONMEBOL and, along with Del Nero, took over Grondona's role as orchestrator of bribe payments to the various coconspirators. See Trial Tr. at 294 (testimony of A. Burzaco that after Grondona's death, "Marco Polo del Nero and Juan Angel Napout received and learned the overall picture of all the CONMEBOL bribes").[10] He also arranged to enjoy an increased share of the riches secured through bribery, including an increase to $1.2 million per year for the Copa Libertadores for himself and for the Brazilian officials Del Nero and Marin, and to $3 million per edition of the Copa América – the so-called "presidential treatment." Trial Tr. at 573-76.

---

[10] The Court should reject Napout's renewed attempt to discredit the testimony of Alejandro Burzaco on this point. Napout relies on the same suspect documents he submitted in support of his motion for a new trial under Federal Rule of Criminal Procedure 33, and makes similar arguments, ignoring the irregularities and inconsistencies in the proffered documents and Burzaco's testimony that CONMEBOL officials routinely entered Paraguay without passing through immigration. As reflected by the jury's verdict, Burzaco provided credible, overwhelming testimony against Napout. See generally Gov. Mem. of Law in Opp. to Defs. Mot. for Acquittal or a New Trial, ECF Dkt. No. 898, at 62-65 & n.33. Even crediting Napout's documents, and even assuming that the coconspirators always passed through immigration, the records would at most suggest that Burzaco was incorrect about the date of the meeting, not that it never occurred.

The evidence summarized above is more than sufficient to establish that Napout was an organizer or leader warranting a four-level role enhancement under Guidelines Section 3B1.1(a).  Indeed, the enhancement can apply where a defendant directs just one person in a criminal enterprise involving more than five or more participants.  Napout's status as a leader and organizer extended far beyond that minimum threshold.  See United States v. Mi Sun Cho, 713 F.3d 716, 722-23 (2d Cir. 2013) (defendant used taxi drivers to transport prostitutes; defendant may be subject to a four-level leadership enhancement even if the defendant managed only one other participant); United States v. Russell, 513 Fed. App'x 67, 70 (2d Cir. 2013) (summary order) (four-level leadership enhancement warranted where defendant recruited another participant to act as driver to purchase drugs and controlled her activities during the commission of the offense); United States v. Diamreyan, 684 F.3d 305, 308-09 (2d Cir. 2012) (enhancement for manager or supervisor of criminal activity involving five or more participants does not require that defendant himself managed more than one other person, so long as the criminal activity involved at least five participants); United States v. Hertular, 562 F.3d 433 (2d Cir. 2009) (that others may have played still larger roles in the criminal activity does not preclude a defendant from qualifying for sentencing enhancement for having been a manager or supervisor in criminal activity).

That Napout rose to the presidency of CONMEBOL is also significant, in that he was entrusted with leadership of the group of soccer officials who were selling their influence for bribes.[11]  His position at the top of the organization is a significant factor particularly when

---

[11] It is also notable that Napout secured a position on the executive committee responsible for organizing the Copa América Centenario, meaning he was able to lead his fellow coconspirators, including the Datisa partners and others, in developing the joint CONMEBOL-CONCACAF tournament that was to provide the bribe payors with substantial profits and the means to pay Napout and the other soccer officials millions of dollars in bribes.  See, e.g., GX 1368-T, 1371-T (minutes of Centenario executive committee meetings reflecting Napout's

coupled with his active participation in the scheme.  See United States v. Huerta, 371 F.3d 88, 92

(2d Cir. 2004) (holding that district court was inappropriately dismissive of significance of

defendant's role at top of organization); United States v. Duncan, 42 F.3d 97, 106 (2d Cir. 1994)

(holding leadership role enhancement was warranted because defendant was president of real

estate development corporation that was "the primary vehicle" through which bribes were made,

and it was established that the defendant "knew of and profited from [the] corruption."); United

States v. DeRiggi, 72 F.3d 7, 9 (2d Cir. 1995) (per curiam) (holding that "when a business's top

officer knows of corruption in the business and implicitly approves it by participating in the

corruption, a four-level enhancement . . . is proper").

    In sum, the PSR's recommended inclusion of the four-level leadership role

enhancement is amply supported by the evidence at trial and should be adopted by the Court.

    E.  Napout Obstructed Justice

    Napout argues that the Guidelines calculation should not include an enhancement

for obstruction of justice.  Section 3C1.1 of the Guidelines provides that:

> If (A) the defendant willfully obstructed or impeded, or attempted
> to obstruct or impede, the administration of justice with respect to
> the investigation, prosecution, or sentencing of the instant offense
> of conviction, and (B) the obstructive conduct related to (i) the
> defendant's offense of conviction and any relevant conduct; or (ii)
> a closely related offense, increase the offense level by 2 levels.

    The enhancement includes a willfulness requirement.  See United States v.

Dunnigan, 507 U.S. 87, 95 (1993).  Accordingly, the Second Circuit has "generally limited the

application of the Guideline to those cases in which the defendant had a specific intent to

obstruct justice."  United States v. Khedr, 343 F.3d 96, 102 (2d Cir. 2003) (internal quotation

---

leadership role); GX 1709-T at 1-2 (recorded statement of M. Jinkis that the Datisa partners
earned "100 million only from the United States"); Trial Tr. at 2532-33 (testimony of U.S.
Soccer Federation employee J. Berhalter on Napout's role on Centenario Executive Committee).

marks and citations omitted).  "In some cases, however, conduct may be 'so inherently obstructive of the administration of justice' that the enhancement should be applied if the defendant deliberately engaged in that conduct, regardless of her specific purpose."  Id. (citation omitted).  "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence.  In determining the intent with which a defendant acted, a district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence."  Id. (citations omitted).

   The evidence is more than sufficient to prove at least by at least a preponderance that Napout participated in the removal of his computer from his CONMEBOL office with the intention of obstructing the government's investigation.  At trial, the government called witness Nelson Sanabria, who testified that, during Napout's CONMEBOL presidency, Mr. Sanabria was the more junior of Napout's two assistants.  Trial Tr. at 3085.  Mr. Sanabria testified that, on May 27, 2015, he learned about the First Indictment when "several people [] were arrested in Switzerland, members of the executive committee of CONMEBOL."  Id. at 3201.  After the first wave of arrests, additional attorneys were hired at CONMEBOL, including Alfredo Montanaro, Cristobal Caceres, and Alvaro Caceres.  Id. at 3104-05.  In addition, Napout was informed through his personal attorney by early June 2015, that he was a target of the investigation.  See Hr'g Tr., dated October 25, 2016, at 21 (Counsel for Napout: "[I]n early June of 2015, I was informed by the government that my client, who at the time was the president of CONMEBOL, was a target of their investigation.").

   Shortly thereafter, Mr. Sanabria was given a form to sign committing "not to destroy any information or documentation."  Trial Tr. at 3105.  With the understanding that he was a target of the investigation, Napout signed the same form on June 26, 2015.  See GX 1385; Trial Tr. at 3105-06.  Among other things, the form described the U.S. government's

investigation and directed Napout to preserve and not destroy any materials concerning certain people, including several indicted soccer officials and sports marketing officials such as Rafael Esquivel, Eugenio Figueredo, Nicolas Leoz, José Maria Marin, Hugo Jinkis, and Mariano Jinkis, as well as anything having to do with sports marketing companies, like "Full Play" and its related company "Cross Trading."  Trial Tr. at 3107-10; GX 1385.

In the early morning of December 3, 2015, Mr. Sanabria learned that Napout had been arrested in Zurich, Switzerland.  Id. at 3121-24.  A month or two earlier, Mr. Sanabria had been instructed by Napout's senior assistant that "in case Mr. Napout was arrested, Mr. Cristobal Caceres Frutos would go get the computer at the office" and that Mr. Sanabria was "to give him access if that happened because Mr. Napout's offices were always locked."  Id. at 3122-23.  On the morning of December 3, 2015, Mr. Sanabria received a call asking him to get to the office as early as he could.  Id. at 3124.  After Mr. Sanabria arrived at the office and was joined by Cristobal and Alvaro Caceres, Mr. Sanabria unlocked the door to Napout's office.  Id. at 3124-25.  Cristobal Caceres first asked if the computer on the table belonged to Napout and if the hard drive could be removed.  Id. at 3126.  Mr. Sanabria confirmed that it was Napout's computer but said that the hard drive could not be removed.  Id. at 3126.  After asking if there were security cameras, to which Mr. Sanabria responded that there were, one of the Cacereses took off his jacket, covered Napout's computer, and removed it from the office.  Id. at 3126-27.  On the way to the garage, Cristobal Caceres told Mr. Sanabria that Caceres "was proceeding that way" because he had "offered himself" to Napout "to do that."  Id. at 3127.  Cristobal Caceres told Mr. Sanabria that Napout had indicated that he was afraid "that the pictures might be leaked, the pictures of his family."  Id.

After Napout's computer was removed from his office on the day of his arrest, a different computer was placed on Napout's desk.  Id. at 3129.  Approximately a month later, in

43

January 2016, Paraguayan law enforcement executed a search at the CONMEBOL headquarters

at the request of the U.S. government and seized the replacement computer.  Id. at 3129-33.  Mr.

Sanabria did not tell law enforcement at that time that Napout's computer had been removed or

that the seized computer was a decoy.  Id. at 3133.  The FBI was able to recover the stolen

computer (GX 350) from Caceres in February 2017, more than a year after it was take from

Napout's office at the time of his arrest.

   The government also introduced material recovered from the computer, including

photographs of Napout with his coconspirators, such as Hugo and Mariano Jinkis and the others

who had been listed on the preservation letter signed by Napout.  See GX 1385, 1385-T

(preservation letter); GX 1004-1117 (exhibits from the Sony Vaio); GX 1016 (photograph of

Napout with Marin and Del Nero making a victory sign); GX 1028 (photograph of Napout with

Figueredo); GX 1029 (photograph of Napout with Leoz); GX 1037 (photograph of Napout with

Esquivel and Burga); GX 1069 (photograph of Napout with Mariano and Hugo Jinkis).  The

government also recovered from the computer photographs of the apartment in Punte del Este,

Uruguay that Hugo Jinkis had rented for Napout as a bribe payment, for which the Jinkises paid

over $40,000 to a rental company called "Ruibal" using a Cross Trading account, and which was

recorded in Santiago Peña's bribe ledger for Napout.  See GX 1097-1102 (pictures of the

apartment rented for Napout as a bribe recovered from Napout's CONMEBOL computer); GX

601 ("Honda" tab showing the Punta del Este apartment rented through "Ruibal"); GX 609

(records of payments of more than $40,000 to "Ruibal" through "Cross Trading" for the

apartment secured for Napout as a bribe); Trial Tr. at 1182-85 (testimony of S. Peña about the

payments to "Ruibal" for Napout).  Some of the transfers for these bribe payments – evidenced

by the photographs on the computer removed from Napout's office – were made from Bank of

America in the United States.  See Trial Tr. at 1370-79 (testimony of J. Haggerty); Trial Tr. at

44

3562-66 (testimony of S. Berryman). Napout then introduced numerous photographs of his family members and asked Mr. Sanabria to identify members of Napout's family. See N-25 to N-76; N-80 to N-105; Tr. at 3178-81.

Napout makes two arguments against application of the obstruction enhancement. First, Napout argues that an enhancement for engaging in obstruction of justice should not be applied because there were no "obstruction of justice charges or jury findings on those allegations" at the trial. JAN Br. at 25. Of course, neither is required for the sentencing enhancement to apply. Cf. United States v. Vaughn, 430 F.3d 518, 521 (2d Cir. 2005) (district courts may find facts relevant to sentencing by a preponderance of the evidence, and take into account even acquitted conduct when sentencing defendants); U.S.S.G. § 3C1.1, app. note 7 (obstruction of justice enhancement does not apply where a defendant is convicted of the crime of obstruction of justice).

Second, Napout argues that the enhancement should not apply because no witness testified at trial about Napout's "specific intent to obstruct justice." JAN Br. at 26. Notably, Napout does not argue that he did not participate in the removal of his CONMEBOL computer on the day of his arrest, which the Court has already found. See Mem. & Order dated June 22, 2018 Regarding Post-Trial Mots., at 28 ("The evidence at trial was more than sufficient to conclude, by a preponderance of evidence, that Napout was involved in the removal of his computer from his CONMEBOL office."). Rather, Napout argues that the evidence is insufficient to infer that he intended to obstruct the government's investigation. To the contrary, the evidence supporting the inference as to Napout's intent well exceeded that which is required for a preponderance finding.[12]

_____

[12] Napout argues further that if he had been concerned about incriminating evidence on the computer, he would have deleted it. JAN Br. at 27. But instead Napout arranged to have an

After learning of the first round of arrests of soccer officials on charges relating to bribery for sports marketing contracts, and learning that he was a target of the government's ongoing bribery investigation, Napout was specifically instructed to preserve in the CONMEBOL offices anything that might have to do with the government's investigation, including anything related to several soccer officials, as well as the Jinkises, Full Play, and Cross Trading. Napout then instructed a CONMEBOL attorney to remove his computer in the event of his arrest. Although, in doing so, he referenced his family photographs on the computer (thus giving an innocuous-sounding explanation to the attorney), the computer also contained direct evidence of his crimes.[13] Contrary to Napout's claim that nothing recovered from the computer "was incriminating or even material to the proceeding," JAN Br. at 27, not only did the computer contain photographs showing the closeness of Napout and his racketeering coconspirators, but it also contained direct evidence of Napout's receipt of bribes, namely photographs of the $40,000 apartment in Punta del Este rented for him by the Jinkises as part of the bribe payments. Napout, aware of the investigation, had been specifically instructed that the government was looking for this type of evidence as part of its investigation of which he knew he was a target. At Napout's direction, the evidence was gone by the time a search warrant could be executed. With this context, it can easily be inferred that Napout specifically intended to conceal this material

---

attorney secret the computer out of his office under a jacket, notwithstanding the hold notice he had signed, so there was no need to delete anything.

[13] One wonders, if all Napout was concerned about was removal of family photographs, an innocent motive presumably understandable to all, including those close to him in the office who understood the risks of the Paraguayan press, why didn't he just delete the photographs from the computer and leave it where it was? Or, in the alternative, remove the computer with this simple explanation, instead of arranging to have it smuggled out under cover of a jacket? The answer is he intended something else entirely.

46

evidence from U.S. law enforcement.  The two-level obstruction of justice enhancement should be applied.

III.    Financial Penalties and Restitution

    A.    Forfeiture

        Napout argues that he should not be required to pay forfeiture.  He does not dispute, however, that criminal forfeiture statutes empower the government to confiscate property derived from or used to facilitate criminal activity.  See Honeycutt v. United States, 137 S. Ct. 1626, 1631 (2017); JAN Br. at 62.  "Such statutes serve important governmental interests such as 'separating a criminal from his ill-gotten gains,' . . . and 'lessen[ing] the economic power' of criminal enterprises."  Id. (quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 629-30 (1989)).  Rather, he simply argues that the government failed to prove that he received any bribe payments and that "it is impossible to know what is included in [the $3,374,025.88] amount [in the PSR], or why it is such an odd amount."  JAN Br. at 63.

        This amount is the amount of the bribe payments received by Napout, rather than the full amount committed to him.  It is the sum of the amounts reflected in the Peña bribe ledger under the "Honda" tab (Napout's tab) under the payments column, from the $10,000 Paul McCartney tickets in October 2010 through years of cash payments and other bribes in the following amounts:

|      |              |
|------|--------------|
| 2010 | $10,175.88   |
|      | $200,000.00  |
|      | $50,000.00   |
| 2011 | $200,000.00  |
|      | $50,000.00   |
|      | $100,000.00  |
|      | $100,000.00  |

| 2012 | $150,000.00 |
| | $150,000.00 |
| | $30,000.00 |
| | $170,000.00 |
| 2013 | $150,000.00 |
| | $100,000.00 |
| | $250,000.00 |
| | $150,000.00 |
| | $100,000.00 |
| | $3000.00 |
| 2014 | $115,800.00 |
| | $4,200.00 |
| | $140,000.00 |
| | $150,000.00 |
| | $4,500.00 |
| | $50,000.00 |
| | $96,000.00 |
| | $4,000.00 |
| | $250,000.00 |
| | $50,000.00 |
| | $144,000.00 |
| | $6,000.00 |
| | $20,000.00 |
| | $150,000.00 |
| | $18,000.00 |
| 2015 | $51,500.00 |
| | $154,500.00 |
| | $2,350.00 |
| **TOTAL** | **$3,374,025.88** |

GX 601 ("Honda" tab); Trial Tr. at 1157-90. This detailed record, in conjunction with the testimony about how Napout received the bribe payments, is sufficient to prove by at least a preponderance of the evidence that Napout personally received $3,374,025.88 in bribe payments. He should be ordered to forfeit those ill-gotten gains.[14]

_____

[14] The government does not seek to establish that Napout acquired or maintained any salaries and honoraria through his criminal conduct. The Court should, however, order Napout to compensate his victims for salaries and honoraria to the extent such outlays are recoverable through restitution. See, e.g., United States v. Bahel, 662 F.3d 610, 649 (2d Cir. 2011) ("There is no question that a portion of an individual's salary can be subject to forfeiture [under the Mandatory Victims Restitution Act] where, as here, an employer pays for honest services but receives something less.").

B.    <u>Restitution</u>

Under the Mandatory Victim Restitution Act of 1996 ("MVRA"), restitution is mandatory for certain crimes, including "any offense committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii).  Because the MVRA applies to the offenses at issue here, the Court must order restitution where "an identifiable victim or victims has suffered a . . . pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B).  The Court has indicated that it will enter a final restitution order no later than November 20, 2018, within the period allowed by statute.  <u>See</u> Electronic Order, dated August 2, 2018; 18 U.S.C. § 3664(d)(5).

C.    <u>Fine</u>

Napout objects to the Probation Department's recommendation that he be ordered to pay a fine.  Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his or her dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a).  The Guidelines provide, in turn, that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," and employs a similar eight-factor test to determine the amount of any such fine.  U.S.S.G. §§ 5E1.2(a), 5E1.2(d).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  <u>Id.</u>  The defendant bears the burden of demonstrating an inability to pay a

fine.  See United States v. Camargo, 393 F. App'x 796, 798 (2d Cir. 2010) (summary order);

United States v. Salameh, 261 F.3d 271, 276 (2d Cir. 2001).

        Here, the PSR states that the statutory maximum fine for Counts One, Two and

Six is $250,000 on each count.  See PSR ¶ 142.  As noted in the government's August 8, 2018

letter objecting to the PSR, however, 18 U.S.C. § 3571(d) provides, in relevant part, that "[i]f

any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a

person other than the defendant, the defendant may be fined not more than the greater of twice

the gross gain or twice the gross loss."  Here, Napout's gross gain is $3,374,025.88, see PSR

¶ 75, and so the maximum fine is $6,748,051.76.[15]

        The Guidelines fine range for the offenses of conviction is $25,000 to $250,000.

PSR ¶ 145 (citing U.S.S.G. § 5E1.2(c)(3)); see also United States v. Gushlak, 495 F. App'x 132,

136 (2d Cir. 2012) (summary order).  Napout has an individual net worth of well over $5 million,

in addition to the $13 million that is currently securing his bond, and it is not in dispute that he

has the ability to pay a fine,[16] nor has he demonstrated that the payment of a fine would be a

burden.  See PSR ¶ 135.  For the reasons detailed herein, there is a strong need for a substantial

---

[15] As set forth above, the government respectfully submits that the calculation of the total
loss (which affects restitution) should be resolved after sentencing.  For purposes of sentencing,
therefore, the maximum possible fine is no less than twice the gross gain, i.e., $6,748,051.76.

[16] Napout "does not dispute that he has financial means" to pay a fine.  JAN Br. at 65.
Rather he merely claims that "a good part of his assets were used to fund his trial defense."  Id.
The government notes that Napout previously sought to remove a substantial portion of the
security for his bond, but declined to inform the Court if, and to what extent the money was for
use in connection with his defense.  See Electronic Order dated Nov. 1, 2017.  Based on the
information before the Court, all that is known is that "some portion of the defendant's legal fees
for defending the criminal case was covered by applicable insurance policies."  See PSR
Addendum at 3.  Without more, there is no basis to reduce the amount of an otherwise
appropriate fine.

financial penalty in light of the seriousness of Napout's crimes, his disregard for the law, and the need for deterrence.

IV.     3553(a) Factors

In fashioning the appropriate sentence, the Court must consult the Guidelines and balance all of the factors set forth in 18 U.S.C. § 3553(a).  The government respectfully submits that this analysis should result in a sentence of no less than 240 months' imprisonment, in light of the other sentences that have been imposed by the Court in this case.

A.     The History and Characteristics of the Defendant, the Nature and Circumstances of the Offenses, and the Need to Provide Just Punishment All Support a Lengthy Sentence

The government agrees with the defense that a close look at the history and characteristics of the defendant and the nature and circumstances of the offenses is warranted in determining an appropriate sentence that will provide just punishment for the defendant's crimes. See JAN Br. at 52-53; 18 U.S.C. § 3553(a)(1), (a)(2)(A).  The government does not agree, however, that these factors weigh in favor of leniency.

Napout has lived a life of privilege.  He "belonged to a family of high social class" and, as a matter of birthright, has always had "social and economic standing."  JAN Br. at 5-7 ("By the time Juan was born, the Napout family was one of the most respected in the country."); see id. at 52-53.  Napout's sentencing submission, and the many letters of support filed on his behalf, reveal that not only has he lived a comfortable life, but he has developed a broad and devoted network of friends and family that has supported him in every way.  Napout was taught from a young age "the value of 'giving back' to a community" and came from a family known for its philanthropy.  Id. at 6.  When Napout joined soccer's leadership, it was "not because he needing anything from it."  Id. at 15.  With these privileges, Napout had every

51

opportunity to do great things and to use "the power [of sports] to transform a community and even a country," especially in soccer, which he views as his lifelong "passion."  Id.

Based on his own account, when Napout entered international soccer as the president of the APF, he "fervently pursued his desire to become president of the South American Football Confederation (CONMEBOL), an organization tightly controlled by three men – Julio Grondona from Argentina, Ricardo Teixiera from Brazil and Nicolas Leoz from Paraguay."  Id. at 2.  He decided to join forces with five other federation presidents – the Group of Six – "as a political voting block to move the organization forward."  Id.  And yet, instead of pursuing the reforms the sport so badly needed, Napout and the other members of the Group of Six squandered their chance to chart a new course and, like those who came before them, sold their influence for money.  Even after Leoz and Teixiera had resigned amid scandals, and after Grondona died, freeing CONMEBOL from the grip of the old guard, Napout, the new president of CONMEBOL, maintained and perpetuated the corruption that benefitted him so much.

Napout took bribes – money he did not need – from the moment he gained enough power and influence to do so.  Although he understood that soccer could be a great force for good, he turned his back on this possibility as soon as it was his turn to collect.[17]  Napout abused his position of trust for over five years, receiving more than $3 million in bribes and agreeing to receive more than $20 million more.  The only conclusion one can draw is that Napout, a man of enormous wealth, power, and influence, acted from pure greed.  The need to provide just punishment in light of the nature and circumstances of his criminal conduct, including his sustained and flagrant disregard for his obligations as a FIFA official, for the

---

[17] The government acknowledges that many in Napout's community view him as a decent and generous man, and that he appears to have made good use of his wealth on many occasions.  Such generosity, however, is considerably less admirable when it is accompanied by years of theft from the organizations that he was supposed to serve.

interests of the sport he was meant to serve, and for the integrity of the U.S. financial system, support the imposition of a lengthy incarceratory sentence.  See 18 U.S.C. § 3553(a)(1), (2)(A).

      B.     <u>A Lengthy Prison Sentence Would Serve the Goals of Specific and General Deterrence</u>

      Napout contends that a substantial sentence of incarceration is not necessary to serve the goal of specific deterrence because the eight months he has spent in jail to date "is sufficient to deter an individual with Juan's background from committing any offense in the future."  JAN Br. at 54.  This sentiment, that a person from a privileged background should receive a lesser sentence than others, is wrong, and the Court should reject it.

      The nature of Napout's criminal conduct, spanning more than five years and continuing even after he achieved his goal of becoming president of CONMEBOL, coupled with Napout's repeated demonstrations of a lack of respect for the law and continuing lack of remorse, make clear that the need for specific deterrence should be an important factor in the Court's sentencing analysis.  As noted, Napout continued to receive bribes, and to support his coconspirators in their receipt of bribes, even after he assumed the presidency of CONMEBOL and was in a particularly strong position to prevent further corruption of the sport.  In his chats with Burzaco during the 2014 World Cup, Napout openly displayed his willingness to use his connections and position of power – including his access to World Cup tickets – to influence judicial proceedings in which he took an interest.  See GX 976-T.2 at 5, 19-20.  After the First Indictment was unsealed in this case on May 27, 2015, revealing racketeering and related charges against some of Napout's coconspirators, Napout did not step aside to make way for honest leaders.  Instead, he sought to present himself as an agent of reform, notwithstanding his own long-standing involvement in the solicitation and receipt of bribes.  During this time, Napout engaged in conduct designed to maintain his position as CONMEBOL president and

prevent CONMEBOL from cooperating fully with the Government's investigation. See supra at 11 (citing Mem. & Order dated Mar. 10, 2017, ECF Dkt. No. 549, at 3-8). During the same period, Napout sought to obstruct justice by arranging to have a CONMEBOL attorney remove a computer from his office in the event of his arrest. Other employees were under strict instructions not to remove relevant materials from their offices, but Napout felt entitled to operate by his own rules.

Napout's continued unwillingness to acknowledge that bribery within soccer is wrong and damaging to the sport – which he could easily do while preserving his appellate arguments – demonstrates a profound lack of appreciation for the gravity of his conduct. See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); accord United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order). Napout's lack of remorse for his years of criminal activity and his apparent belief that for him, a special standard applies, demonstrate the need to protect the public from further crimes by the defendant.[18] Only a significant term of incarceration, no shorter than the term requested here, will ensure that Napout does not seek to regain the power and influence he once held through corrupt means.[19]

---

[18]   The government notes that if Napout were to serve twenty years, the sentence that the government seeks, he would be approximately the age that coconspirator José Maria Marin was when he first joined the charged conspiracies.

[19] The Court should reject Napout's request that his time on pretrial release, under conditions he describes as "severely strict," be considered in fashioning his sentence. JAN Br. at 54-55. The government acknowledges that Napout's inability to travel home to Paraguay to see his family undoubtedly presented a hardship, but such hardships are commonplace for defendants awaiting trial. Napout lived in a beachfront condominium complex in Sunny Isles Beach, Florida, with an adjoining condominium for use by visiting family members and access to

As for general deterrence, which is largely ignored in Napout's brief, the legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" <u>United States v. Martin</u>, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); <u>see also</u> <u>United States v. Mueffelman</u>, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white collar crime is "of central concern to Congress").  Courts have found it to be an important sentencing factor in fraud cases, because it is believed to be most effective in such cases.  <u>Martin</u>, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks and citation omitted)); <u>see also</u> <u>Harmelin v. Michigan</u>, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  The nature of fraud generally renders it more difficult to uncover, since individuals engaged in fraud often take affirmative steps to conceal their conduct, as Napout did here.  Accordingly, additional sanction is necessary to counterbalance the lower risk of apprehension, particularly for an individual like Napout, who obstructed the investigation into his conduct.

This Court already referenced the need for general deterrence in imposing sentence on codefendants José Maria Marin, Héctor Trujillo, and Costas Takkas.  The need for deterrence is even stronger here.  From one of the highest positions in the sport – the presidency

---

a pool and other facilities.  PSR ¶ 115; <u>see also</u>, <u>generally</u>, Bail Hearing Tr. (Nov. 22, 2016).  Napout's statement that he was on strict house arrest is incorrect.  His conditions of release included a generous curfew, extended on consent of the government, allowing him to leave the complex from 7 a.m. to 5 p.m.  Many defendants are not able to post security sufficient to warrant pretrial release at all, and very few of those can live in accommodations as luxurious as those available to Napout.

of CONMEBOL – Napout continued the corruption of one of the most powerful soccer organizations in the world.  For far too long, officials responsible for administering the sport of soccer have enriched themselves with impunity.  Simply put, a significant term of incarceration is warranted to deter others who would abuse their positions in sports governance to enrich themselves, and to assure the public here and abroad that when corrupt sports officials abuse the U.S. wire facilities and the broader financial system to carry out fraudulent schemes, they will be held to account and punished appropriately.

> C.    The Need to Avoid Unwarranted Sentencing Disparities Supports Imposition of a Lengthy Sentence

In imposing sentence, the Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Although this factor is difficult to apply, as comparisons are often imperfect, the government submits that it also weighs in favor of a significant incarceratory sentence.

Napout identifies five other defendants' sentences in support of a request for a downward variance under 18 U.S.C. § 3553(a)(6).  See JAN Br. at 57-58.  That list does not provide the Court with much guidance, however, as every case has its own circumstances and every example has a counter-example.  See, e.g., United States v. Lange, 10-CR-968 (DLI) (E.D.N.Y.) (sentence of 262 months' imprisonment for securities and wire fraud where the Guidelines were 210 to 262 months with a loss amount of over $10 million); United States v. Aronson, 12-CR-245 (ADS) (E.D.N.Y.) (sentence of 124 months' imprisonment for securities fraud where the Guidelines were 292 to 365 months with a loss amount of over $7 million); United States v. Galanis, 16-CR-371 (RA) (S.D.N.Y.) (sentence of 173 months' imprisonment for securities and other fraud where the Guidelines were 188 to 235 months with a loss amount

56

of $60 million); United States v. Jaramilo, 17-CR-04 (LTS) (S.D.N.Y.) (sentence of 144 months'

imprisonment for commodities and wire fraud where the Guidelines were 78 to 97 months with a

loss amount of $1.2 million); United States v. Rajaratnam, 09-CR-1184 (LAP) (S.D.N.Y.)

(sentence of 132 months' imprisonment for securities fraud where the Guidelines were 235 to

293 months' imprisonment with a loss amount of more than $50 million); United States v.

Ahmed, 14-CR-277 (DLI) (E.D.N.Y.) (sentence of 156 months' imprisonment for health care

fraud where the Guidelines were 188 to 235 months with a loss amount of $85 million); United

States v. Liounis, 12-CR-350 (ILG) (E.D.N.Y.) (sentence of 292 months' imprisonment for

securities and wire fraud where the Guidelines were 292 to 365 months with a loss amount of

$15 million).

       The government notes, however, that the Court has already imposed sentence on

three defendants charged in this case, two of whom expressed remorse for their crimes, all of

them significantly less culpable than Napout.  On October 31, 2017, the Court sentenced Costas

Takkas, an attaché to former CONCACAF president Jeffrey Webb who helped Webb launder a

$3 million bribe paid in exchange for one contract, but did not himself receive any financial

benefit.  Takkas spent 10 months in Swiss prison prior to extradition and received a sentence of

15 months' imprisonment.  On October 25, 2017, the Court sentenced Héctor Trujillo, who

agreed to receive two bribes totaling $415,000, and ultimately received less than $200,000, to

eight months in prison.  The Court found that Trujillo had significant health problems, including

"declining mobility and other health issues that would make prison and incarceration

considerably harder on him than other defendants who are younger and more fit," and had

committed many "good works" and "public service."  Trujillo Sentencing Tr. at 66-67.  On

August 22, 2018, the Court sentenced José Maria Marin, who received more than $3 million in

bribes over three years and agreed to receive nearly $7 million more.  In light of his age – 86

57

years old – the Court sentenced Marin to 48 months.  See Marin Sentencing Tr. at 75-76

(describing Marin's advanced age as "a significant factor and perhaps the only genuine factor, I

think, in terms of mitigation of a prison sentence").

        Here, every sentencing factor weighs in favor of a substantially lengthier sentence

than that imposed on Takkas, Trujillo, or Marin, and Napout's age – 60 years old – is not a

mitigating factor, as it was for defendant Marin.

        D.      "Collateral Consequences" Do Not Warrant Leniency

        Finally, Napout urges the Court to consider potential collateral consequences in

fashioning an appropriate sentence, including the hardship Napout will face owing to his distance

from his home country and the likely effects of incarceration on his health.  The government

agrees that Mr. Napout's health conditions warrant consideration by the Court, but notes that the

BOP is able to provide medical treatment to inmates in its care.  None of the collateral

consequences identified by Napout is unique to him or warrants a sentence below the 240 month

term of incarceration sought by the government.

CONCLUSION

      For the reasons set forth above, the government respectfully submits that a sentence of 240 months is sufficient but not greater than necessary to achieve the goals of sentencing.

Dated:       August 24, 2018
              Brooklyn, New York

                      Respectfully submitted,

                      RICHARD P. DONOGHUE
                      United States Attorney,
                      Eastern District of New York

          By:                  /s/
                      Samuel P. Nitze
                      M. Kristin Mace
                      Keith D. Edelman
                      Assistant United States Attorneys
                      (718) 254-7000