**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

|  | : |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 15 CR 252 (S-2)(PKC)** |
| | : | |
| **JUAN ANGEL NAPOUT,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

---

## MEMORANDUM CONCERNING RESTITUTION ON BEHALF
## OF JUAN ÁNGEL NAPOUT

**HUGHES HUBBARD & REED LLP**
Marc A. Weinstein
Edward J.M. Little

Attorneys for Juan Ángel Napout

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ..........................................................................................................................2

I.     LOST REVENUES.......................................................................................................2

       A.     Applicable Law ................................................................................................3

       B.     CONMEBOL ....................................................................................................3

       C.     CONCACAF .....................................................................................................6

II.    LEGAL FEES ...............................................................................................................8

       A.     Section 3663A(b)(4) and the *Lagos* Decision.........................................9

       B.     FIFA's Legal Fee Request ..............................................................................12

              1.     Internal Investigation ..........................................................................12

              2.     Trial Witness Costs ..............................................................................14

       C.     CONMEBOL's Legal Fee Request ...............................................................15

       D.     CONCACAF's Legal Fee Request ................................................................15

III.   SALARY, BENEFITS, AND OTHER EXPENSES ............................................16

       A.     FIFA ................................................................................................................16

       B.     CONMEBOL ..................................................................................................18

IV.    THE COURT SHOULD APPORTION LOSSES AMONG DEFENDANTS.................18

CONCLUSION.......................................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Lagos v. United States*, 138 S. Ct. 1684 (2018) .................................................... *passim*

*Robers v. United States,* 134 S. Ct. 1854 (2014) ...............................................3, 6

*United States v. Amato*, 540 F.3d 153 (2d Cir. 2008) ......................................12, 15, 18

*United States v. Arutunoff,* 1 F.3d 1112 (10th Cir. 1993) ..........................................3

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) ......................................16, 18, 21

*United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) ....................................17, 21, 23

*United States v. Boccagna*, 450 F.3d 107 (2d Cir. 2006) ...................................3, 5, 11

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) ...............................................21

*United States v. Donaghy*, 570 F. Supp. 2d 411 (E.D.N.Y. 2008) .........................20, 21

*United States v. Faibish*, No. 12-CR-265 (ENV), 2017 WL 3634599 (E.D.N.Y. Aug. 22, 2017) ..............................................................................................15

*United States v. Fiorentino*, 149 F. Supp. 3d 1352 (S.D. Fla. 2016) ...........................21

*United States v. Lacey*, 699 F.3d 710 (2d Cir. 2012) ............................................2, 3

*United States v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998) ........................................21

*United States v. Schwamborn,* 467 F. App'x 35 (2d Cir. 2012) ..................................11

*United States v. Skowron,* 529 F. App'x 71 (2d Cir. 2013) ........................................21

*United States v. Skowron*, 839 F. Supp. 2d 740 (S.D.N.Y. 2012) ................................21

*United States v. Stevens*, 657 F. App'x 69 (2d Cir. 2016) ...........................................3

**Statutes and Rules**

18 U.S.C. § 2248(b) ...............................................................................................13

18 U.S.C. § 2259(b) ...............................................................................................13

18 U.S.C. § 2264(b) ...............................................................................................13

18 U.S.C. § 2327(b) ...............................................................................................13

18 U.S.C. § 3663A(a)(2)................................................................................................2, 6

18 U.S.C. § 3663A(b)(1)(B)(ii) ........................................................................................3

18 U.S.C. § 3663A(b)(4)....................................................................................12, 13, 14

18 U.S.C. § 3664(e) ................................................................................................2, 15, 18

18 U.S.C. § 3664(h) ........................................................................................................22

Juan Ángel Napout respectfully submits this memorandum in connection with the restitution portion of his sentencing proceeding.

## PRELIMINARY STATEMENT

Three entities – FIFA,[1] CONMEBOL,[2] and CONCACAF[3] – have submitted letters to the Court seeking restitution for alleged losses in the following categories: (i) lost revenues from the undervaluation of contracts signed for the Copa America and Copa Libertadores tournaments, or in the alternative, the amount of bribes paid to the co-conspirators as a substitute measure of loss, (ii) attorney and related fees purportedly incurred to investigate the government's allegations and to prepare trial witnesses, and (iii) reimbursement of salary, benefits and other expenses paid to Mr. Napout.  These requests should be denied.

First, CONMEBOL and CONCACAF fail to establish any lost revenue from the various tournaments.  Neither provides a reliable estimate of alleged undervaluation of the sale of media rights, and any losses to both CONMEBOL and CONCACAF have been offset by the renegotiation and return of media rights for those tournaments.

Second, while the three entities combined seek in excess of $50 million in legal and related fees, they have not produced a single invoice to support the reasonableness of the fees or to demonstrate how they relate to Mr. Napout's conduct.  Moreover, the Mandatory Victims

---

1.   FIFA submitted two letters, dated August 15 and August 31, 2018: Letter to Hon. Judge Chen, ECF No. 988 (hereinafter "FIFA Aug. 15 Ltr.") and Letter to Hon. Judge Chen, ECF No. 1006 (hereinafter "FIFA Aug. 31 Ltr."). The second letter is merely a five-page summary of the first, 13-page letter, and provides no new information.

2.   CONMEBOL submitted one letter: Letter to Hon. Judge Chen, ECF No. 989 (hereinafter "CONMEBOL Ltr.").

3.   CONCACAF submitted two letters: Letter to Hon. Judge Chen, ECF No. 986 (hereinafter "CONCACAF Aug. 31 Ltr.") and Letter to Hon. Judge Chen, ECF No. 1013 (hereinafter "CONCACAF Sept. 7 Ltr.").

Restoration Act does not permit restitution for fees incurred for private internal investigations. Further, FIFA's claim for the cost of witness preparation is unsupported and unreasonable.

Third, both CONMEBOL and FIFA fail to provide adequate factual support to substantiate their claims for reimbursement of expenses paid to Mr. Napout.

## ARGUMENT

Under the Mandatory Victims Restoration Act ("MVRA"), a victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). In "the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim is "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* Restitution is only available for a victim's "actual loss," not any loss merely intended by the defendant. *United States v. Lacey*, 699 F.3d 710, 721 (2d Cir. 2012) ("We note that unlike the loss calculation for the purposes of sentencing, which may incorporate a merely intended loss in order to punish a culpable defendant, restitution is designed to make the victim whole … and must therefore be based only on the actual loss caused by the scheme."). It is the government's burden to demonstrate the amount of actual loss incurred by each victim resulting from an offense. 18 U.S.C. § 3664(e).

## I.   LOST REVENUES

FIFA does not seek any lost revenues. In the CONMEBOL and CONCACAF letters to the Court, each seeks restitution from Mr. Napout in the amount that the broadcast rights to the various soccer tournaments were undervalued or, as an alternative, in the amount of bribes he and other co-conspirators allegedly received. Neither, however, discloses to the Court that any alleged losses have been more than offset by the return and renegotiation of the media rights to the various tournaments. CONCACAF's request further fails as its estimate of lost revenue is based

on a series of flawed assumptions, and because Mr. Napout did not cause any of CONCACAF's losses.

    A.    <u>Applicable Law</u>

        The MVRA provides that in calculating restitution owed to a victim, the court must subtract "the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B)(ii). As the "purpose of restitution is essentially compensatory," *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006), the MVRA prohibits victims from receiving "'a windfall,' i.e., more in restitution than [they] actually lost," *id. at* 117 (quoting *United States v. Arutunoff,* 1 F.3d 1112, 1121 (10th Cir. 1993)). An offset is required whether or not the defendant himself returned the property, as long as the victim recouped some or all of the value it had lost. *See, e.g.*, *Robers v. United States,* 134 S. Ct. 1854, 1856 (2014) (affirming, under the MVRA, the lower court's offset of the value of a bank's sale of a home the defendant had procured through mortgage fraud from the initial loss to the bank for restitution purposes); *United States v. Stevens*, 657 F. App'x 69, 72 (2d Cir. 2016) (citing *United States v. Lacey*, 699 F.3d 710, 721 (2d Cir. 2012)).

    B.    <u>CONMEBOL</u>

        CONMEBOL seeks an undefined amount of restitution, "possibly reaching hundreds of millions of dollars," for undervaluation of the broadcasting rights to various editions of the Copa America and the Copa Libertadores, or alternatively seeks $85.4 million for bribes allegedly received by various CONMEBOL officials from the years 2010 to 2015 (CONMEBOL Ltr. at 15.) Neither CONMEBOL nor the government has attempted to quantify the alleged undervaluation of the sale of marketing and media rights for the Copa tournaments, and thus the government has not met its burden of proof in valuing any loss to CONMEBOL beyond the value

of the bribes received.[4]   CONMEBOL provides no support that such losses "might possibly total hundreds of millions of dollars," which plainly is not a sufficient basis upon which to impose restitution.

CONMEBOL alternatively seeks the amount of bribes allegedly paid to all co-conspirators in connection with the Copa America and Copa Libertadores schemes.  For starters, the amount of bribes CONMEBOL asserts were actually paid is incorrect.  Mr. Napout did not receive $10.5 million in bribes, nor does the government allege so.  The government alleged that Mr. Napout actually received approximately $3.3 million, not $10.5 million.  *See* Order of Forfeiture, at 2, ECF No. 1010.  And the $3.3 million included $1.25 million allegedly received in connection with the Paraguayan qualifiers, which was not a CONMEBOL tournament.  CONMEBOL concedes it is not entitled to that amount.  (*See* CONMEBOL Ltr. at 8 n.25).  Moreover, CONMEBOL's $85.4 million figure overstates by at least $20 million the amount the government alleged was actually paid to the co-conspirators for those tournaments.[5]

More significantly, CONMEBOL is not entitled to any restitution from Mr. Napout for bribes received by him or his alleged co-conspirators, as any loss CONMEBOL suffered for those amounts has been offset by its sale of the marketing rights to the Copa Libertadores for the years 2016 through 2022, the sale of its marketing rights for the Copa Centenario, and the return of its property rights for the 2019 and 2023 Copa America.  Conspicuously absent from

---

4.   In connection with both trial and sentencing, Mr. Napout objected to any argument or finding that the alleged bribes are an alternative measure of loss to CONMEBOL.  Because the Court has rejected Mr. Napout's objections on more than one occasion, Mr. Napout incorporates but does not repeat those objections herein.

5.   Mr. Napout's PSR identifies $24.8 million allegedly paid to conspirators for the broadcasting rights to the Copa America tournaments and $33.2 million for the Copa Libertadores.  PSR ¶¶ 49, 53.  Thus, at most CONMEBOL's losses would be $58 million based on bribes actually paid.

4

CONMEBOL's lengthy submissions is any mention of these subsequent agreements which more than make CONMEBOL whole for losses attributable to the paid bribes.

In 2015, after the first indictment was unsealed, CONMEBOL renegotiated the contracts for the 2016 through 2022 editions of the Copa Libertadores.  Pursuant to those renegotiated contracts, CONMEBOL received $450 million from the sale of the broadcasting rights to the 2016 through 2018 editions of Copa Libertadores and $1.4 billion for the broadcasting rights to the 2019 through 2022 editions.  CONMEBOL's losses in the amount of bribes paid to the co-conspirators are more than offset by the $1.85 billion CONMEBOL received from its sale of the 2016 through 2022 editions of the Copa Libertadores.  Because any losses to CONMEBOL have been more than offset, to award CONMEBOL any amount in restitution for lost revenues would grant CONMEBOL an impermissible windfall.  *See Boccagna*, 450 F.3d at 115.

Moreover, with respect to the Copa America 2019 and 2023 tournaments, CONMEBOL entered into an agreement with Datisa effective July 20, 2018 in which CONMEBOL represented that "the rights with respect to the 2019 and 2023 editions of the Copa America under the CONMEBOL Rights Contract have been returned and restored to it by this Agreement and, as a result, CONMEBOL **has suffered no loss** as to the 2019 and 2023 editions."[6] (*See* Rights Transfer and Settlement Agreement § 4(f) (July 20, 2018) (Bates No. FIFA18839073) (emphasis added).)  This is consistent with applicable law, even if CONMEBOL has not yet monetized the property rights returned to it.  *See Robers v. United States*, 134 S. Ct. 1854, 1856

---

6  The government produced the CONMEBOL/Datisa contract to the defense on September 18, 2018, pursuant to the terms of the protective orders governing this case.  The government consented to general references to the agreement as part of this restitution submission, and to specific references and quotations from the provision cited herein.  To the extent the Court requires a copy of the agreement itself, Mr. Napout requests that the government provide the agreement to the Court or otherwise consent to Mr. Napout's submission of the agreement to the Court.

(2014) (holding that under the MVRA a victim recovers its property when it receives the specific property it lost).

     C.    <u>CONCACAF</u>

       CONCACAF seeks between $27.7 million and $32.7 million for the purported undervaluation of its rights for the Copa Centenario, or alternatively $10 million for a bribe paid to Jeffery Webb. (CONCACAF Sept. 7 Ltr. at 1–6.)

       There is no basis to impose restitution as to Mr. Napout for any category of alleged loss by CONCACAF. CONCACAF is not a victim of Mr. Napout: Mr. Napout was not a member of CONCACAF. He did not sign any contracts on behalf of CONCACAF, he did not have the authority to approve a contract or otherwise act on CONCACAF's behalf, and he did not cause anyone at CONCACAF to sign a contract. He neither solicited nor received bribes for CONCACAF. Nor was there any evidence at trial that Mr. Napout even knew of the bribe intended for Mr. Webb. As detailed in Mr. Napout's August 21, 2018 sentencing memorandum (*see* ECF No. 994, at 37–38), while certain witnesses discussed the bribe payment to Webb, none of those witnesses testified that Mr. Napout was involved or even aware of the payment, nor did the government argue otherwise. Rather, CONCACAF's losses stem from the fact that CONCACAF officials independently decided to enter into the contract on behalf of CONCACAF in exchange for a bribe payment.

       Separate and apart from the lack of any involvement by Mr. Napout in causing CONCACAF's losses, which should be dispositive as to CONCACAF's request, CONCACAF's estimated loss of $27.7 million to $32.7 million is based on a series of unwarranted assumptions (any one of which makes the estimate unreliable for restitution purposes), including:

- CONCACAF argues that any contract for the Centenario should have contained the same 75/25 percent structure of the 2010 Full Play contract. (*Id.* at 3.) CONCACAF was not a party to the 2010 contract, and the Centenario tournament

6

was not subject to that contract.  CONCACAF offers no basis to assume that a similar fee structure should have been employed for its contract.

- CONCACAF urges the Court to use projected revenue estimates of $250 million and $270 million rather than the actual $220 million in media rights revenue the tournament actually generated.

- CONCACAF's projected estimate is based largely on a recorded conversation in which two co-conspirators boast about the contract potentially generating $100 million in profit.   It strains credulity to assume that such boasting was based on any serious financial analysis.  Yet CONCACAF not only argues that the Court should rely on this conspiratorial boasting to calculate restitution, but should do so in place of using actual revenue figures for the tournament.  Moreover, even if the conspiratorial boasting should be used as the basis for the calculation, one cannot then skip the next sentence in the recording transcript in which Mariano Jinkis lowers the expectation to a range of $80 million to $100 million. (GX 1709-T at 2.) If one takes the low end of the $80 million to $100 million range rather than the high, there would be less than a 5% difference between the estimate and the actual revenue from the tournament.

- CONCACAF assumes that Datisa's profit was spread evenly among the four tournaments.   Because there was an additional $35 million payment to CONCACAF for the 2016 tournament (on top of the $80 million CONCACAF states was paid to CONMEBOL), CONCACAF's profit for the 2016 edition might well be lower than the $80 million to $100 million figure thrown about by Jinkis.

- CONCACAF contends that the actual sales were lower than the projections due to "a severely shortened sales window before the event, and the reality of a badly tarnished product." (*Id.* at 5.)  But CONCACAF does not provide a single example of a contract that was lost or undervalued by this supposed "shortened sales window."  Moreover, the contract was renegotiated years after the original contract, and thus at a time when the market value was much higher.  Thus, CONCACAF obtained the benefit of a higher market than the market that should be used as a comparison.  The assertion that the value of the event was tarnished is belied by the fact that the 2016 tournament was deemed a resounding success, in terms of broadcast rights, ticket sales, and overall public reception.[7]

- CONCACAF provides no support for its net revenue figure of $34.8 million.  (*Id.* at 5.)  Moreover, CONCACAF compares this number to what it claims its revenue should have been – $62.5 million to $67.5 million – and seeks restitution for the difference.  (*Id.*)  Yet CONCACAF provides no analysis to show whether the same methods were used to deduct expenses or other payments to arrive at the actual net

---

7.  *See Historic 2016 Copa America Centenario Delivers Record-Breaking Event*, Cision PR Newswire (Jun3 24, 2016), https://www.prnewswire.com/news-releases/historic-2016-copa-america-centenario-delivers-record-breaking-event-300289950.html.

revenues and the purported estimated net revenue.  For example, under the 2015 Termination, Assignment and Release Agreement ("2015 Renegotiated Contract"), which renegotiated the rights to the 2016 Copa America, CONMEBOL and CONCACAF together were to receive 82.5% of the revenue on contracts Datisa had sold as of the date of the 2015 Renegotiated Contract.  (*See* Termination, Assignment and Release Agreement § 6(a); *id.* Exhibit B.)  Thus, CONMEBOL and CONCACAF would have received 82.5% of the $220 million in media rights that was actually sold, for a total $181.5 million.  CONCACAF should have been entitled to 1/3 of this amount, or $60.5 million.  This number far exceeds the $34.8 million CONCACAF claims as its "net" earnings on the 2016 Copa America. CONCACAF provides no explanation for the discrepancy.

In sum, CONCACAF's flawed assumptions make its estimated loss figure unreasonable.  While a victim's loss need not be calculated with precision, "rough estimates" (much less rampant speculation) are insufficient to establish a loss amount under the MVRA.  *See United States v. Schwamborn,* 467 F. App'x 35, 38 (2d Cir. 2012).

Alternatively, CONCACAF seeks the $10 million paid to Mr. Webb as a bribe. Even if that payment can be attributable to Mr. Napout (it cannot), that amount must be offset by the amount CONCACAF obtained through the renegotiation of the Centenario contract.  As detailed above, CONCACAF negotiated for the return of its media and marketing rights for the Centenario, and at a time when the market value had risen.  The renegotiations provided for a better deal to CONCACAF than the 75/25% split which CONCACAF urges the Court to use as a baseline.  In the renegotiations, Datisa received 17.5% of revenue from sales already made and only 4% for sales made subsequently.  Thus, any alleged losses are more than offset by the subsequent agreements.  *See Boccagna*, 450 F.3d at 115.

## II.   LEGAL FEES

Each of the three entities seeks millions in legal fees, totaling more than $50 million combined.  Not only do the requests lack any documentation, they are precluded under the MVRA, as the Supreme Court held in *Lagos v. United States*, 138 S. Ct. 1684 (2018).

A.     Section 3663A(b)(4) and the *Lagos* Decision

Section 3663A(b)(4) requires defendants convicted of certain crimes to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."   In *Lagos*, the Supreme Court addressed this provision and narrowly construed what may properly be imposed as restitution.   The Court specifically addressed the meaning of the terms "investigation" and "proceedings" and held that they do not include private investigations undertaken by the victim or the costs of related civil proceedings.[8]   *Id.* at 1688–90. Rather, restitution is limited to costs of participating in a government investigation and criminal proceedings, such as a witness's travel costs in getting to and from the courthouse.   *Id.*

While the Supreme Court left open whether certain aspects of a company's internal investigation might fit within the restitution statute if pursued "at a government's invitation or request," *id.* at 1690, it did not suggest that a private investigation fits within the statute merely because the entity decides to share investigative findings with the government.   In fact, the Supreme Court's rationale for denying the costs of private investigations dictates that the legal fees sought here, even if done in part at the government's behest, cannot form the basis of a restitution order.

First, as in *Lagos*, the language of § 3663A(b)(4) suggests that internal investigations, even if pursued at the behest of a government, do not qualify for restitution. "[T]here would be an awkwardness about the statute's use of the word "participation" to refer to a

---

8.   Any attempt by CONMEBOL, CONCACAF and FIFA to rely on Second Circuit case law prior to *Lagos* is unwarranted as *Lagos* specifically identified the Second Circuit's position on whether private investigations are covered by the MVRA as being overturned.   138 S. Ct. at 1687, 1690 (overruling *United States v. Amato*, 540 F.3d 153 (2d Cir. 2008)).

victim's role in its own private investigation." *Id.* at 1688.  Indeed, a victim "opting to pursue a private investigation of an offense would be more naturally said to 'provide for' or 'conduct' the private investigation (in which he may, or may not, actively "participate").  *Id.*

Second, the principle of *noscitur a sociis*—that words are known "by the company they keep"—also supports the conclusion that § 3663A(b)(4) does not cover internal investigations.  *Id.*  Section 3663A(b)(4) lists lost income, necessary child care, and transportation as costs for which a victim may receive restitution.  The section "says nothing about the kinds of expenses a victim would often incur when private investigations . . . namely, the costs of hiring private investigators, attorneys, or accountants," are undertaken.  *Lagos*, 138 S. Ct. at 1684. Similarly, unlike other restitution statutes, the MVRA does not "specifically require restitution for the 'full amount of the victim's losses,' defined to include 'any ... losses suffered by the victim as a proximate result of the offense.'"  *Id.* at 1689 (comparing § 3663A(b)(4) with 18 U.S.C. §§ 2248(b), 2259(b), 2264(b), 2327(b)) (modifications in original).  Thus, regardless of whether an investigation began at the government's behest, the limited language of § 3663A(b)(4) indicates that it does not provide for restitution for legal fees incurred during internal investigations.

Third, internal investigations, even if performed at the invitation of the government, would still "create significant administrative burdens."  *Id.*  Such a reading would "invite disputes" over what expenses were "really 'necessary' to the investigation."  *Id.*  "Such disputes may become burdensome in cases involving multimillion dollar investigation expenses for teams of lawyers and accountants.  A district court might, for example, need to decide whether each witness interview and each set of documents reviewed was really 'necessary' to the investigation."  *Id.* That problem could not be more stark here, with the three entities seeking over $50 million combined for lawyers and accountant fees.  The Supreme Court's concern that Congress would

10

not legislate so as to produce such administrative burdens reinforces the conclusion that § 3663A(b)(4) does not provide restitution for internal investigations, regardless of whether those investigations occurred at the behest of the Government.

       Moreover, CONMEBOL's suggestion that the MVRA "clearly applies" to a private investigation undertaken "*during* participation in the investigation or prosecution of the offense" finds no support in *Lagos*. (*See* CONMEBOL Ltr. at 12 n.34.) As discussed above, the rationale of *Lagos* cuts against CONMEBOL's reading. In addition, in *Lagos* the Supreme Court read § 3663A(b)(4) to require restitution only for "other expenses" that are "*necessary*" to the prosecution, a requirement CONMEBOL ignores entirely. 138 S. Ct. at 1688 (emphasis in original).

       FIFA remarkably contends that *Lagos* decided in FIFA's favor the very issue the Supreme Court stated it did not address. FIFA asserts: "Though it denied GE Capital's request for restitution, the Supreme Court affirmed that attorney fees incurred by the victim in connection with a U.S. government investigation or criminal proceeding were recoverable, so long as the victim's investigation was conducted during the pendency of the U.S. government's investigation or prosecution." (FIFA Aug. Ltr. at 11.) Yet, on the exact page of *Lagos* cited in FIFA's letter, the Supreme Court specifically made clear that it did not address this issue: "We therefore need not address in this case whether this part of the Mandatory Victims Restitution Act would cover similar expenses incurred during a private investigation that was pursued at a government's invitation or request." 138 S. Ct. at 1690.

       Even assuming fees for internal investigations are potentially recoverable depending on the circumstances, the government bears the burden of proving the amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e); *see also United States v.*

11

*Faibish*, No. 12-CR-265 (ENV), 2017 WL 3634599, at *1 (E.D.N.Y. Aug. 22, 2017).  When addressing restitution for legal fees (prior to the Supreme Court's *Lagos* decision), the Second Circuit found the burden under § 3664(e) met where victims provided invoices documenting the legal fees and sworn declarations explaining how the legal services related to investigations into the conduct for which the defendant was convicted.  *See, e.g.*, *United States v. Amato*, 540 F.3d 153, 162–63 (2d Cir. 2008) (legal fees request supported by over 200 pages of invoices and declaration by attorney describing cooperation with the government throughout the investigation and prosecution of the crimes), *abrogated on other grounds by Lagos*, 138 S. Ct. 1684; *United States v. Bahel*, 662 F.3d 610, 648 (2d Cir. 2011) (restitution supported by billing records from law firm that conducted investigation).

        B.        <u>FIFA's Legal Fee Request</u>

        1.        <u>Internal Investigation</u>

        As per FIFA's August 15 letter, Mr. Napout was a Vice President of FIFA and member of FIFA's Executive Committee for a very short period of time – May through December 2015 – and only after the first indictments were unsealed.  Nevertheless, FIFA seeks in excess of $28 million in legal and other fees purportedly associated with its post-indictment investigation.  FIFA, however, does not submit a single invoice or other document to support the request.  A victim cannot simply state an amount it claims to have incurred in legal fees reimbursable under the MVRA, much less $28 million worth, and expect the parties and the Court simply to take that unsupported representation on faith.  Mr. Napout has no ability to challenge the reasonableness of those fees, whether the fees are related to criminal conduct for which Mr. Napout was convicted, or whether any portion of otherwise reasonable fees should be apportioned among various co-conspirators.  Nor has the Court received anything upon which to base a restitution order.

Indeed, it is highly likely that the legal fee figure is grossly inflated and entirely unwarranted as concerns Mr. Napout.  For example, FIFA asserts that Mr. Napout participated in schemes such as the selection of the FIFA World Cup host country, the sale of media rights to FIFA tournaments, the election of the FIFA President, and the organization of international friendly matches.  (FIFA Ltr. at 8-9 & nn.27–30).  Yet, not only was there no evidence at trial that Mr. Napout participated in any one of those alleged schemes, the Government has never alleged such participation by Mr. Napout.  One would expect the lion's share of any of FIFA's legal fees to relate to these schemes for which Mr. Napout was not a participant.  Of course, we cannot know for sure because FIFA has failed to provide any documentation, despite ample opportunity by the Court to do so.  *Cf. United States v. Battista*, 575 F.3d 226, 234 (2d Cir. 2009) (affirming restitution award for legal fees where, based upon an analysis of billing records and affidavits submitted by the victim, "[t]he district court meticulously parsed out the fees and costs submitted by the NBA in determining which expenses were associated with each defendant and whether they were incurred while assisting the government in ascertaining the extent of the criminal conspiracy and in preparing for Battista's criminal proceedings."); *United States v. Gupta*, 925 F. Supp. 2d 581, 587 (S.D.N.Y. 2013), *aff'd*, 747 F.3d 111 (2d Cir. 2014)  (victim request for legal fees supported with 542 pages of billing records including time entries which "specify the work performed with sufficient particularity to assess what was done, how it was done, and why it was done").

Further, it is uncertain how FIFA's internal investigation contributed and was necessary to the government's investigation and prosecution of Mr. Napout.  FIFA prepared "thousands of pages of reports" (FIFA Ltr. at 13), yet there is no evidence that the government relied on any of these reports in the investigation or prosecution of Mr. Napout.  To the contrary, the government was able to investigate and file the May 2015 indictment without FIFA's help or

even awareness of any investigation.  And it is unlikely that FIFA provided any report to the government prior to the filing of the indictment charging Mr. Napout.  In short, there is no evidence that FIFA's work-product was "necessary" for the investigation or prosecution of the offenses. *See Lagos*, 138 S. Ct. at 1688.

FIFA's request for legal fees as part of Mr. Napout's restitution should be denied.

### 2.    Trial Witness Costs

FIFA seeks CHF 125,030.33 (approximately $129,000) in legal fees it claims it incurred to prepare and produce a witness at trial, and to have one of its lawyers attend each day of the six-week long trial.  These fees are both unsubstantiated and unreasonable.   To begin, as with the legal fees for its internal investigation, FIFA has provided no documentation to support its request.  *See* pp. 12, *supra*.  As a result, the burden of proof has not been met and FIFA cannot be awarded restitution for these fees.  *See* 18 U.S.C. § 3664(e); *Amato*, 540 F.3d at 162–63; *Bahel*, 662 F.3d at 648.

Regardless of the lack of documentation, the request is unreasonable.  A single FIFA witness, Stephanie Maendl, testified at trial as the first trial witness and for approximately thirty minutes.  (Trial Tr. at 97–157.)  Ms. Maendl's testimony provided background information regarding FIFA's governance structure and lasted no more than part of a morning.  Yet FIFA has turned that witness's limited trial role into a request for approximately $129,000.  While the MVRA permits a witness to seek reimbursement for the cost of appearing at trial, such as the cost of the witness's transportation to and from court, childcare costs, and lost income for the date of the appearance, *see Lagos*, 138 S. Ct. at 1688, it does not permit an entity to seek fees for its attorneys to prepare that witness to testify, and it certainly does not permit FIFA to recover legal fees to have an attorney attend the trial on a daily basis after the FIFA witness finished her trial role thirty minutes into the trial.  FIFA has not identified any actual cost for that witness to appear

14

at trial, and thus its request for restitution from Mr. Napout concerning trial attendance should be denied.

### C.   CONMEBOL's Legal Fee Request

CONMEBOL seeks $8,231,859.39 in fees incurred for a post-indictment investigation. (CONMEBOL Ltr. at 12.) To begin, any legal fees sought by CONMEBOL for internal investigations must be denied under *Lagos* for the same reasons discussed in connection with FIFA's request. Further, like FIFA, CONMEBOL has offered nothing more than naked assertions for the amount of money it spent on legal fees. *Cf. Amato*, 540 F.3d at 162–63. This lack of evidence is especially concerning as CONMEBOL baldly admits to seeking legal fees for activities that were not part of its internal investigations. (*See* CONMEBOL Ltr. at 12 (seeking fees for "related litigations".) Restitution for "related litigation" is explicitly precluded by the *Lagos* decision. *See* 138 S. Ct. at 1688–90. Because CONMEBOL has failed to provide any billing invoices, neither Mr. Napout nor the Court has any way of determining which part, if any, of the over $8 million is reimbursable under the MVRA.

### D.   CONCACAF's Legal Fee Request

CONCACAF seeks restitution for $15,216,634 in legal fees, or almost twice the amount sought by CONMEBOL despite the fact that Mr. Napout was never associated with CONCACAF. (CONCACAF Sept. 7 Ltr. at 7.) Specifically, it claims $1,927,123 for its purported participation in the criminal investigation starting in 2012; $13,027,981 for an internal investigation done "with the encouragement" of the government; and $261,530 for assisting FIFA in its internal investigation. (*Id.* at 7–8.) As with FIFA and CONMEBOL, the claims fail because CONCACAF provides zero evidence to substantiate them and any claims for internal investigations (or assisting FIFA with its internal investigations) must be denied under *Lagos*. Further, because Mr. Napout was never employed by and never owed any fiduciary duties to

15

CONCACAF, CONCACAF's internal investigation likely had little to do with Mr. Napout. Finally, as argued above, CONCACAF is not a victim of Mr. Napout's conduct, and it cannot claim over $15 million in legal fees when there was no evidence at trial that Mr. Napout even knew of the bribes paid to CONCACAF officials.  *See* pp. 6, *supra*.

III.   **SALARY, BENEFITS, AND OTHER EXPENSES**

    A.   FIFA

       FIFA concedes that Mr. Napout never took a salary as a member of FIFA's Executive Committee or for his service on any other FIFA committee.  (*See* FIFA Ltr. at 7 n.24). In addition, although FIFA provided Mr. Napout with a pre-paid Visa card with $30,000 on it (as FIFA did for each of its Executive Committee members), Mr. Napout essentially never used it.  As a result, FIFA was able to deposit $29,225.98 from Mr. Napout's pre-paid Visa card.  (*Id*. at 7).

       Despite the lack of any salary or related benefits provided to Mr. Napout, FIFA seeks to recoup more than $120,000 it reimbursed Mr. Napout for various trip expenses from 2009 through 2015.  (FIFA Aug. 15 Ltr. at 5).  FIFA does not provide any evidence tying any of the events listed in its chart to the conduct for which Mr. Napout was convicted.  As a result, FIFA's claim to restitution for these amounts must be denied because restitution is only available for benefits which were directly linked to the charged conduct.  In *United States v. Donaghy*, 570 F. Supp. 2d 411, 429 (E.D.N.Y. 2008), for example, the government charged a professional basketball referee with providing inside information to sports bettors relevant to the potential outcome of games he was assigned to referee.  The court limited restitution for salary and travel expenses to only those NBA games at which the defendant sent inside information to his co-conspirators.  570 F. Supp. 2d 411, 429 (E.D.N.Y. 2008) ("In this case, it is undisputed that Donaghy dishonestly refereed 16 games during the 2006-07 season, and a corresponding portion of his compensation for these games is the appropriate measure of the NBA's loss."), *aff'd sub*

16

*nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009).   The court did not impose any restitution, partial or otherwise, for travel expenses associated with games in which the government did not establish any such misconduct.   Unlike what FIFA suggests this Court should do here, the court in *Donaghy* did not impose restitution for travel expenses for all 82 NBA games and require the defendant to prove that honest services were provided at most of those games.   Rather, the court imposed restitution only in connection with those games where misconduct was established.

        Even if FIFA had attempted to tie one or more of the listed trips to the charged conduct, FIFA would not be entitled to full reimbursement for such trips.   The amount of restitution a defendant owes to his employer is not the total amount of salary and benefits the organization paid to the defendant; rather it is "the difference in the value of the services that [the defendant] rendered [to the organization] and the value of the services that an honest [employee] would have rendered."   *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998); *see also United States v. Skowron,* 529 F. App'x 71, 74 (2d Cir. 2013) (adopting the reasoning in *Sapoznik*).   The government bears the burden of proving the amount actually lost by the organization.[9]   *Sapoznik*, 161 F.3d at 1121.   In this context, *Donaghy* is distinguishable as Donaghy's sole duty in traveling to the NBA games was to provide honest referee services, which was compromised by his criminal

---

9   FIFA's attempt to shift the burden to Mr. Napout to prove he rendered honest services is misguided.   (*See* FIFA Aug. 15 Ltr. at 7–8.)   In *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011), cited by FIFA, the court ordered restitution for the defendant's full salary because the job was "created to accommodate" the defendant. *Id.* at 254– 55 n.24. The court highlighted the fact that "a false job description was drafted and the subsequent hiring process was a sham" and reasoned that "absent the *quid pro quo*, the position would not have been made and filled, and thus in this case the full amount of the salary and bonus is" appropriate.   *Id.*   Aside from the unique circumstances of *Bryant*, FIFA does not cite a single case in which the defendant had the burden to prove honest services.   Rather, the burden remains with the government.   Moreover, in the remaining cases cited by FIFA, the district courts awarded a fraction of the defendant's salary/benefits in restitution, and without shifting the burden to the defendant in doing so.   *See, e.g.*, *Behal*, 662 F.3d at 650 (awarding less than 10% of United Nations' officials salary in theft of honest services case); *Sapoznik*, 161 F.3d at 1121-22 (25% of salary); *United States v. Skowron*, 839 F. Supp. 2d 740, 752 (S.D.N.Y. 2012) (ordering 20% of compensation for the period of the offense), *aff'd*, 529 F. App'x 71 (2d Cir. 2013); *United States v. Fiorentino*, 149 F. Supp. 3d 1352, 1361 (S.D. Fla. 2016) (same).

conduct.  Thus, it made sense to impose restitution for the full amount of trip expenses for games in which the government established misconduct.  Here, by contrast, even assuming FIFA had established misconduct on any of the trips for which it seeks restitution, FIFA would not be entitled to full restitution for the trip expenses unless the entire purpose for Mr. Napout's attendance at the event/meeting was compromised by the misconduct.  There is no evidence that is the case.

B.     CONMEBOL

CONMEBOL's forensic investigation revealed that Mr. Napout was scheduled to receive $1,369,150 in salary and reimbursements from 2011 through 2015, and that in the final years of his leadership he was entitled to $480,000 per year in salary, but that in fact he did not receive these amounts.  (CONMEBOL Ltr. at 9–10.)   Thus, CONMEBOL's forensic audit confirmed what Mr. Napout has said all along – he never took a salary from CONMEBOL.

CONMEBOL seeks restitution for a much lower number, $105,000, which it states was "legitimately wire transferred to Mr. Napout over the years."  (CONMEBOL Ltr. at 9).  But CONMEBOL fails to identify a single transfer or the purpose behind any of the transfers, and falis to explain why restitution should be imposed for money "legitimately" transferred to Mr. Napout. Thus, CONMEBOL has not provided the Court with the essential information necessary to make a determination on loss associated with the criminal conduct, or for Mr. Napout to challenge whether the amount is subject to restitution.

IV.     **THE COURT SHOULD APPORTION LOSSES AMONG DEFENDANTS**

Pursuant to 18 U.S.C. § 3664(h), where more than one defendant contributes to a victim's loss, the Court may apportion liability among defendants "to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  Here, with respect to restitution for any lost revenues or legal fees incurred, apportionment is warranted.

18

The only basis upon which either CONMEBOL or CONCACAF has provided a lost revenue amount is the amount of bribes allegedly received by each participant.   Thus, the Court is uniquely situated to apportion to each participant the exact amount that recipient received and thus caused in loss to the victim.  It is not only simple, but it is just, to require each participant to return the amount of money that each participant received.  For example, Jeffrey Webb is the only logical choice to provide restitution to CONCACAF for the $10 million bribe he received. And while Mr. Napout has some financial means (substantially drained by the costs of the criminal proceedings), he certainly does not have sufficient means to pay the levels of restitution sought by the three entities.  Thus, there is no compelling reason to impose joint and several liability for each of the bribes forming the basis of any restitution order for lost revenues.

Similarly, if the Court orders restitution for any legal fees incurred, the amounts should be apportioned to the fees relevant to investigate the conduct of any particular defendant. Of course, such an analysis is impossible absent any billing records to support the fee requests. But conceptually, for example, one can imagine that little, if any, of CONCACAF's legal fees were spent to investigate conduct by Mr. Napout.  Thus, if the Court is provided with any documentation to assess the reasonableness of each entity's requested legal fees, Mr. Napout requests an opportunity not only to challenge the reasonableness of such fees, but to seek appropriate apportionment.  *Cf. Battista*, 575 F.3d at 232 n.5 (noting the district court apportioned legal fees related to each defendant's conduct).

19

## CONCLUSION

For the reasons set forth herein, Mr. Napout respectfully requests that the Court deny the restitution claims submitted by FIFA, CONMEBOL, and CONCACAF.

Respectfully submitted,

**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, NY 10004-1482
T. 212.837.6000
marc.weinstein@hugheshubbard.com
/s/ Marc A. Weinstein
Marc A. Weinstein
Edward J.M. Little

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on September 21, 2018, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that this document is being served simultaneously on all counsel of record in the manner specified, either by transmission of Notices of Electronic Filing generated by CM/ECF, or in another authorized manner.


                /s/Marc A. Weinstein
                Marc A. Weinstein, Esq.