

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SPN/MKM/KDE

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 26, 2018

By ECF

The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    United States v. Juan Ángel Napout, et al.
                Criminal Docket No. 15-252 (S-2) (PKC) (RML)

Dear Judge Chen:

      The government respectfully submits this letter in advance of the October 4, 2018 hearing scheduled by the Court on the subject of restitution as it relates to trial defendants Juan Ángel Napout and José Maria Marin and in response to submissions by Napout and Marin (the "Defendants") and by potential victims. See ECF Dkt. Nos. 1025, 1026 (submissions by Napout and Marin, respectively, "JAN Br." and "JMM Br."); 966, 988, 1006 (submissions by FIFA); 968, 989, 1003 (submissions by CONMEBOL); 967, 986, 1013 (submissions by CONCACAF); 965, 1007 (other victim submissions, including from former employees of Traffic Sports USA, Inc.); 1022 (submission by Traffic entities); ECF Dkt. Entries dated Aug. 21 and Sept. 19, 2018 (setting and amending briefing and hearing schedule).[1]

      As discussed below, the government respectfully submits that the record before the Court (1) establishes that FIFA, CONMEBOL, and CONCACAF (hereinafter, the "Victim Entities") are victims of the defendants' conduct; (2) is sufficient to substantiate some, but not all, of the restitution claims submitted by the Victim Entities; and (3) does not support a finding that former employees of Traffic USA, Inc. ("TUSA" and "the TUSA employees") who submitted claims are properly viewed as victims of the defendants' criminal conduct. With respect to lost revenues claimed by CONMEBOL in connection with broadcasting rights to the Copa Libertadores and the Copa América, and lost revenues claimed by CONMEBOL and CONCACAF in connection with the Copa América Centenario, the record presently before the

---

[1] In light of the complexity of factual and legal issues that remain in dispute, the government reserves the right to supplement this submission based on argument and additional evidence, if any, presented by the defendants, victims, or other interested parties in connection with the restitution hearing scheduled for October 4, 2018.

Court supports the conclusion that the claimed losses have been mitigated to a significant extent by the return of rights to the entities and subsequent resale of those rights. With respect to salary and expenses paid to or on behalf of Napout and Marin by FIFA and CONMEBOL, the record is sufficient for the Court to require the Defendants to repay a substantial percentage of such expenditures. With respect to legal feels and related expenses incurred by the Victim Entities, although a portion of the identified fees are compensable through restitution, the Victim Entities have yet to provide invoices or other documentation sufficient to substantiate the entirety of the claimed losses.[2]

I.   Legal Framework

Under the Mandatory Victim Restitution Act of 1996 ("MVRA"), restitution is mandatory for certain crimes, including "any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). Because the MVRA applies to the offenses at issue here, the Court must order restitution where "an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B).[3]

The goal of restitution is to restore qualifying victims to the positions they occupied before they sustained injury, to the extent money can do so. See United States v. Battista, 575 F.3d 226, 229 (2d Cir. 2009). "Since the purpose of restitution is compensatory and the MVRA limits restitution to the amount of each victim's losses, a restitution order must be tied to the victim's actual, provable, loss." United States v. Finazzo, 850 F.3d 94, 117 (2d Cir. 2017) (internal quotation marks omitted). A sentencing court cannot order restitution that provides a victim with "a windfall, i.e., more in restitution than he actually lost." United States v. Boccagna, 450 F.3d 107, 117 (2d Cir. 2006) (internal quotation marks omitted).

The Government bears the burden of proving a victim's actual loss by a preponderance of the evidence. See, e.g., Finazzo, 850 F.3d at 117. However, the MVRA "requires only a reasonable approximation of losses supported by a sound methodology." United States v. Gushlak, 728 F.3d 184, 196 (2d Cir. 2013). The MVRA provides that restitution may not be imposed if the determination of complex issues of fact relating to causation would unduly "complicate or prolong the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). "[T]his latter provision reflects Congress's intent that sentencing courts not become embroiled in intricate issues of proof, and that the process of determining an appropriate order of restitution be streamlined." United States v. Marino, 654 F.3d 310, 317 (2d Cir. 2011) (internal quotation marks omitted).

A district court's restitution order is reviewed for abuse of discretion, and will be reversed only if the reviewing court finds that the order rests on an error of law, a clearly

---

[2] FIFA, CONMEBOL, and CONCACAF have indicated that they may seek leave to submit further support for the claimed restitution amounts in connection with the October 4 Hearing.

[3] The Court has indicated that it will enter a final restitution order no later than November 20, 2018, within the period allowed by statute. See Electronic Order, dated August 2, 2018; 18 U.S.C. § 3664(d)(5).

erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions.  See, e.g., United States v. Messina, 806 F.3d 55, 67 (2d Cir. 2015).

II.     Discussion

The Victim Entities seek compensation in connection with purported losses arising from, variously, (1) lost revenues from tournament rights contracts corruptly sold at below-market rates; (2) salaries and benefits paid to the defendants for services dishonestly rendered; and (3) attorneys' fees and related expenses incurred in connection with the government's investigation and prosecution of the case, as well as legal fees incurred as a direct result of Napout placing his personal interests above those of CONMEBOL, the entity to which he owned honest and loyal services.  The former TUSA employees seek compensation for salaries and commissions lost as a result of TUSA's termination of their employment following the unsealing of the first indictment in this case on May 27, 2015.

A.      Lost Media and Marketing Revenues

CONMEBOL and CONCACAF each seek substantial restitution awards in the amount of revenues the entities argue they lost as a result of the Defendants' corruption in the sale of commercial rights to various editions of the Copa América and (solely with respect to CONMEBOL) the Copa Libertadores.  See ECF Dkt. Nos. 989 (CONMEBOL Ltr. dated Aug. 15, 2018 ("CSF Ltr.")), 1013 (CONCACAF Ltr. dated Sept. 7, 2018 ("CONC. Ltr.")).  CONMEBOL seeks restitution in the amount of "possibly hundreds of millions of dollars in lost revenues" as a result of undervalued rights contracts to the two tournaments, or, in the alternative $85.4 million, the total amount of bribes CONMEBOL argues was promised to CONMEBOL officials during the period between 2010 and 2016.[4]  CSF Ltr. at 2, 12, 15.  CONCACAF, in turn, claims compensable losses of between $27.7 million and $32.7 million in connection with the corrupt sale of its share of the commercial rights to the Copa América Centenario or, in the alternative, $10 million corresponding to the bribe promised to former CONCACAF president Jeffrey Webb in connection with the Centenario contract.  CONC. Ltr. at 2, 6.  The government agrees that CONMEBOL and CONCACAF are victims of the defendants' conduct[5], but submits

---

[4] CONMEBOL also argues that the government has forfeited more than $250,000,000.  The government has secured agreements for forfeiture in excess of that amount, but much of the money has yet to be forfeited.  In addition, although the government has agreed in certain contexts to request permission to apply forfeiture payments to judgments of restitution, it has made no promises about whether that will occur because the decision "lies within the sole and exclusive discretion of the Attorney General or his or her designee."  (See, e.g., GX 3500-AB-3.)  Because restitution is a victim-centered approach, the Defendants' restitution obligations should not be conditioned on the Department of Justice's decision with regard to other coconspirators made at some point in the future.  See United States v. Torres, 703 F.3d 194, 203 (2d Cir. 2012) (stating that the "purpose of restitution in criminal cases is to compensate victims for harm suffered as result of criminal activity" (citing Restatement (3d) of Restitution and Unjust Enrichment § 1 cmt. e (2011)).

[5] Marin argues that the Victim Entities are not victims at all under the MVRA because they are coconspirators and cannot receive restitution.  See JMM Br. at 7-10.  As Marin recognizes, however, the organizations are by definition victims of the Defendants' theft of

3

that the claimed restitution amounts overstate the amounts of actual losses demonstrated by the Victim Entities in light of, among other things, the return of certain rights to the defrauded entities in the wake of the government's first indictment in this case.

1. Copa Libertadores

As established at trial, defendants Napout and Marin, along with their coconspirators at CONMEBOL, arranged to receive annual bribe payments in exchange for their support of Argentine sports marketing company Torneos y Competencias ("Torneos") and its partners as holders of the commercial rights to the Copa Libertadores. Torneos CEO Alejandro Burzaco and other coconspirators agreed to pay a total of more than $6 million in bribes each year to CONMEBOL officials to secure the rights to each edition of tournament through a series of contracts and renewals, including a contract signed in 2012 that covered the 2018 through 2022 editions of the tournament. From 2011 to 2015, the total amount of bribes promised to the CONMEBOL officials was $35.1 million. JAN PSR ¶ 53. An additional $38.5 million was promised in connection with the 2016 to 2022 editions of the tournament. Id. After the unsealing of the first indictment in this case on May 27, 2015, however, Torneos and its partners in the acquisition of the Copa Libertadores rights, including Fox Sports Latin America and other Fox affiliates, entered into a Release Agreement pursuant to which the rights were returned to CONMEBOL, which has secured new contracts pursuant to which the government understands CONMEBOL is to receive $435 million for the 2016-2018 editions of the tournament and $1.4 billion for the 2019-22 editions.[6] See JAN Br. at 9.

The return and resale of the Copa Libertadores rights clearly bears on the question of restitution. See, e.g., United States v. Lacey, 699 F.3d 710, 721 (2d Cir. 2012) (remanding restitution order where court failed to credit collateral received by victim because restitution must "be based only on the actual loss caused by the scheme"). At a minimum, the record currently before the Court supports a finding that CONMEBOL's renegotiated contracts for the 2016-2022 editions of the Copa Libertadores fully remediated losses the confederation otherwise would have suffered for those years. Napout goes further, suggesting that the return of rights to CONMEBOL at a time when the confederation was able to tap into a growing market for soccer rights offset all of the entity's claimed losses. JAN Br. at 5. But Napout offers little support for that conclusion other than the figures themselves. Indeed, the difference between the amount CONMEBOL received under the corrupt contracts and the amount secured post-indictment suggests that the rights procured through bribery were sold at rates well below market value and

---

honest services and cannot be considered to have defrauded themselves. None of the cases cited by Marin involve honest services fraud; rather, they address the situation where an employee committed a crime in part in furtherance of his employer's interests. See United States v. Block, No. 16-CR-595 (JPO), 2018 WL 722854, at *3 (S.D.N.Y. Feb. 6, 2018) (stating that the defendant "was acting both within the scope of his employment as an executive officer of the company and, importantly, to benefit the company) (emphasis in original).

[6] The government is in the process of obtaining the relevant remediated contracts not presently before the Court and will file them separately, under seal, in advance of the October 4, 2018 hearing.

that the losses suffered for those editions may well have been far greater than the amount of the bribes.

Absent further factual development on this point, the government submits that the record before the Court supports an order that Napout pay restitution in the amount of $35.1 million, or the amount of bribes promised to be paid for the 2011 to 2015 editions of the Copa Libertadores, as an estimate of unmitigated losses for those editions of the tournament, with Marin to be held jointly and severally liable for $28.3 million, the amounts corresponding to the 2012-2015 editions.[7] See United States v. Boyd, 222 F.3d 47, 50 (2d Cir. 2000) (holding that MVRA provides for restitution "payable by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions" and collecting cases).[8]

---

[7] The government submits that, as a general matter, the amount of bribes agreed to be paid in connection with the award of a contract forms a sound, conservative basis for an estimate of loss to the defrauded entities. Indeed, courts commonly apply this basic economic logic to order restitution in the amount of commercial bribes paid to a disloyal servant at the expense of the victim entity. See, e.g., United States v. Madison, 657 F. App'x 67, 69 (2d Cir. 2016) (summary order) (affirming restitution award in which the district court ordered defendant convicted of honest services fraud to pay back the victim company the amount of bribes he received from third-party vendor); United States v. Gaytan, 342 F.3d 1010, 1012 (9th Cir. 2003) ("[A]n employer suffers a loss in the amount of secret profits accepted by its agent and is entitled to restitution in that amount."); United States v. Gamma Tech Indus., Inc., 265 F.3d 917, 929 (9th Cir. 2001) (district court did not err in ordering the defendant to pay restitution to his former employer in the amount of kickbacks he received because the ill-gotten gains belonged to the employer under applicable agency law). Cf. United States v. Vaghela, 169 F.3d 729, 736 (11th Cir. 1999) (holding that "it is not unreasonable to assume that [the victim] was overcharged in the amount of the kickbacks, and that the loss [the victim] suffered was equivalent to that amount"). The government notes that in this context, contrary to Napout's argument, see JAN Br. at 4 n.5, the amount of bribes promised to be paid, not actually paid, is the proper measure of loss. Bribe amounts agreed to be paid, absent corruption, would have been part of the contract, in which case they would have been owed, and presumably paid, to the Victim Entities.

[8] Napout claims that the Court should not order any restitution on a joint and several basis but should instead apportion liability among defendants "to reflect the level of contribution to the victim's loss and economic circumstances of each defendant," 18 U.S.C. § 3664(h), i.e., require "each participant to return the amount of money that each participant received." JAN Br. at 18-19. He thus asks the Court not to apportion payment of restitution between Napout and Marin but rather among the defendants before the court as well as individuals who have been convicted but not yet sentenced, charged but not yet convicted, and apparently those who have not even been charged. The Court cannot enter a restitution order against anyone not before it, of course, and it should not endeavor to do so and thereby require victims to await compensation.

5

2.     <u>Copa América</u>

As established at trial, in May of 2013, Datisa, a consortium of the sports marketing companies Traffic, Full Play, and Torneos, secured a contract with CONMEBOL for the rights to the 2015, 2019, and 2023 editions, as well as the special 2016 Copa América Centenario tournament, which was to be played in the United States (the "Datisa Contract"). The Datisa partners agreed to pay millions of dollars in bribes to secure the contract, including bribes to be paid in connection with each edition of the tournament covered by the contract and a total of $16.5 million to be paid to CONMEBOL officials for their signatures on the contract. <u>See</u> JAN PSR ¶ 49. In addition, the Datisa partners agreed to pay $10 million to CONCACAF president Jeffrey Webb to secure CONCACAF's agreement to organize and participate in the Centenario tournament. The Datisa Contract took the place of a previous agreement between Full Play and CONMEBOL for the same rights, a contract secured through bribery in 2010 (the "2010 contract") that caused CONMEBOL to break from its longtime relationship with Traffic.

On October 15, 2015, several months after the unsealing of the first indictment, Datisa, CONMEBOL, and CONCACAF entered into a Termination, Assignment and Release Agreement that, in substance, returned the rights to the Centenario to the confederations. CONMEBOL and CONCACAF continued to promote the tournament, which was played in June 2016 as scheduled and was, as acknowledged by CONMEBOL, deemed a success. <u>See</u> CSF Ltr. at 4. In addition, in July of 2018, Datisa entered into a Rights Transfer and Settlement Agreement with CONMEBOL pursuant to which Datisa returned the rights to the 2019 and 2023 editions of the Copa América to CONMEBOL, which stated in the document that CONMEBOL had suffered no losses in connection with those edition of the tournament. <u>See</u> ECF Dkt. No 1023 (filing by Traffic entities), Exs. A (2015 Termination, Assignment and Release Agreement) and B (2018 Rights Transfer Agreement).

In fashioning an appropriate restitution order, the Court must evaluate the extent to which the return of Copa América rights mitigated losses claimed by CONMEBOL and CONCACAF in connection with the tournament. The government submits that the record supports a finding that CONMEBOL has suffered no losses with respect to the 2019 and 2023 editions of the Copa América, given the timing of the return of rights well in advance of the relevant tournaments and CONMEBOL's acknowledgement that it suffered no losses for those editions. <u>See</u> CSF Ltr. at 14. The Centenario contract presents a closer question, given that the rights were returned during a period of tumult in the world of soccer triggered by the government's indictment, but also after FIFA had approved the tournament and after it had generated strong commercial interest, factors not present at the time the Datisa Contract was signed. CONCACAF acknowledges that after the rights were returned to the confederations, the confederations generated total media and sponsorship revenue of approximately $220 million in connection with the tournament. CONC. Ltr. at 5.

CONMEBOL does not meaningfully address the return of the Centenario rights in its restitution submission. CONCACAF argues that the return of rights was insufficient to mitigate the confederation's estimated losses of between $27.7 million and $32.7 million. In support of its claimed losses, CONCACAF offers a framework for estimating the revenues it would have received but for the defendants' conduct. The proposed framework, however, rests on a number of thinly supported assumptions, including that (1) the revenue split of roughly 25%

6

for Full Play, 75% for CONMEBOL set forth in the (corrupt) 2010 contract would have continued had a clean contract been negotiated in 2013; (2) against that baseline allocation of revenue, CONCACAF would have received one-third of 75% of the revenues drawn from the marketing of the Centenario; (3) total revenues, but for the defendants' corruption, would have been between $250 and $270 million; and (4) the estimated revenues would have resulted in earnings for CONCACAF of between $62.5 and $67.5 million in non-corrupt sales. CONCACAF argues that in fact, it only earned $34.8 million from the sale of its Centenario rights, thereby establishing the claimed loss range. In the alternative, CONCACAF seeks the amount of the $10 million bribe agreed to be paid to Webb as a more conservative estimate of its loss.

Napout argues that he should not be ordered to pay restitution to CONCACAF because the confederations claimed losses did not arise from his conduct, and that, in any event, the amounts of losses claimed by CONCACAF are too speculative to support the requested restitution order. Napout's argument that he is not liable for losses caused by the conspiratorial conduct he participated in, including the bribes paid in connection with the Centenario, is unavailing. This Court rejected a version of the argument in sentencing Napout and Marin when the Court held that the Centenario bribes, including the amounts promised to Webb, were part of criminal conduct jointly undertaken by Napout and Marin. See United States v. Smith, 513 F. App'x 43, 45 (2d Cir. 2013) (summary order) ("Because [the defendant] was convicted of a conspiracy to commit access device fraud, the district court properly ordered restitution for all losses caused by [the defendant], as well as by the reasonably foreseeable actions of her coconspirators.") (emphasis in original).

Napout's second argument, however, has more force. Among other things, it is unclear from the documentation submitted by CONCACAF precisely how the $220 million in revenue generated for the two confederations resulted in $34.8 million in earnings for CONCACAF, or how the Court would go about comparing the handling of expenses under the remediated contract to CONCACAF's hypothetical estimate of lost revenue.[9] Absent further factual development, the government submits that the record presently before the Court is insufficient to establish that CONMEBOL or CONCACAF suffered losses not mitigated by the return of rights to the confederations in advance of the Centenario tournament.

Accordingly, the government submits that the record currently before the Court supports an order of restitution holding Napout and Marin jointly and severally liable to CONMEBOL for lost revenues of $19,425,000, based on $15.3 million in bribes agreed to be paid for the 2015 Copa América plus one quarter of the $16.5 million agreed to be paid in

---

[9] There are other problematic assumptions in CONCACAF's framework. For example, the government notes that CONCACAF's framework assumes a 25%/75% revenue split based on the 2010 contract between CONMEBOL and Full Play when in fact, under the 2010 contract, CONMEBOL was not entitled to a full 75% of revenues. Rather, the contract indicates that Full Play would take 25% of total income as its fee, then deduct from total income the amount necessary to cover production and marketing expenses, then provide the remainder to CONMEBOL. See GX 178-T, at 5.1 (provided at CONC. Ltr. at 15).

7

connection with the signature of the Datisa Contract (a pro rata, per-tournament share relating to the 2015 edition).

B.     Salaries and Benefits

Under § 3663A(b)(1), a victim is entitled to recover from a defendant the amount of "property" unlawfully taken from the victim. "There is no question that a portion of an individual's salary can be subject to [restitution] where . . . an employer pays for honest services but receives something less." United States v. Bahel, 662 F.3d 610, 649 (2d Cir. 2011) (citing United States v. Sapoznik, 161 F.3d 1117, 1121 (7th Cir. 1998) ("We may assume that [the employer] would not have hired [the defendant] had it known of his intentions, and in that event it would not have paid him four years' salary. . . . [W]hat [the employer] lost . . . [was] the difference in the value of the services that [the defendant] rendered . . . and the value of the services that an honest [employee] would have rendered.")); see also United States v. Skowron, 529 F. App'x 71, 73-74 (2d Cir. 2013) (summary order) (upholding restitution order requiring a defendant convicted of honest services fraud to pay "20% of [the defendant's] salary for the period of his offense"). The same is true for expenses spent by the victim for travel and other incidentals. See United States v. Donaghy, 570 F. Supp. 2d 411, 429 (E.D.N.Y. 2008), aff'd on other grounds sub nom. Battista, 575 F.3d 226 (rejecting the distinction between salary and "expenses for flights and room and board" because "[t]o the same extent that the [victim] suffered loss in the form of salary payments for dishonest services, so too did it suffer loss when it paid [the coconspirator's] expenses for traveling to games at which he did not perform his services honestly").[10]

FIFA and CONMEBOL request that Marin and Napout pay 100% of the salary and other benefits paid to them. The government submits that, in accordance with Bahel and Skowron, the Court should award a substantial portion of the provable salary and expenses in restitution. The trial evidence demonstrated that the defendants routinely failed to deliver to their organizations the full amount of honest services owed. Indeed, by engaging in multiple illicit bribery schemes and by falsely portraying themselves as honest stewards of the sport, the defendants violated a central tenet of their organizations' by-laws. Nonetheless, the government recognizes that the defendants did provide some services to their employers such that they should not be required to repay the full amount of the salary and expenses. Rather, as other courts in the

---

[10] FIFA asserts that once the government establishes that the victim is entitled to recover salary and benefit payments, the burden switches to the defendant to prove the amount of legitimate services he provided to reduce the restitution amount. See ECF Dkt. No. 988 at 7-8 (citing United States v. Bryant, 655 F.3d 232, 254 (3d Cir. 2011)). In Bryant, the Third Circuit placed the burden on the defendant to demonstrate the amount of actual services because the defendant's job was created as part of the corrupt arrangement. See 655 F.3d at 254 n.24. The court recognized that in cases where the "employer would have hired an 'honest' public servant and paid him or her the same amount . . . the loss may be the difference in the value of the services that the corrupt employee rendered and the value of the services that an honest employee would have rendered." Id. (internal quotation marks and alterations omitted). Here, the defendants' crimes fall in this latter category of offenses as their jobs were not created solely through corruption; rather, they failed to provide all of the honest services expected by their employers and therefore the burden shifting suggested by Bryant is not warranted.

8

Second Circuit have done in the honest services context, the defendants should be required to pay a substantial percentage of the salary and expenses they received. See, e.g., Skowron, 529 F. App'x at 73-74 (upholding restitution order requiring defendant to pay "20% of [the defendant's] salary"); Bahel, 662 F.3d at 650 (upholding order that required paying back the salary during the period he provided "no services at all," which amounted to less than 10% of the defendant's total salary); see also Sapoznik, 161 F.3d at 1121-22 (upholding restitution order requiring the defendant to pay back one year's salary, which comprised 25% of his total salary, even though it was an "arbitrary fraction" as it "rather generously credit[ed the defendant] with being worth to the employer three-fourths of his salary even though he was corrupt").[11]

With respect to the amount to be ordered in restitution for salaries and benefits, the government submits that the documentation offered thus far provides the Court with a sufficient basis to award a substantial percentage of the amounts requested by FIFA and CONMEBOL.[12]

C.   Attorneys' Fees and Investigative Expenses

FIFA, CONMEBOL, and CONCACAF seek in restitution attorneys' fees and investigative expenses incurred during their respective participation in the investigation and prosecution of the offenses of conviction of Napout and Marin. Separately, CONMEBOL also seeks restitution of attorneys' fees incurred by CONMEBOL at the direction of Napout following the unsealing of the first indictment on May 27, 2018, which were billed to CONMEBOL by Esteban Burt, Esq. and lawyers at McDermott, Will & Emery who represented Napout's interests rather than CONMEBOL's.

---

[11] In arguing that no expenses are compensable, Napout asserts that FIFA has not tied "any of the events listed in its chart to the conduct for which [he] was convicted." JAN Br. at 16 (citing Donaghy, 570 F. Supp. 2d at 429). In Donaghy, an NBA referee was convicted of providing inside information to sports bettors on particular games (not honest services fraud) and the court awarded restitution for all of the salary and expenses paid in connection with specific games that were compromised. Here, by contrast, the defendants' offenses are not limited to specific dates or events. Each time the defendants appeared at an event, or gave a speech, the victim organizations expected the defendants to provide full, complete, honest services, which they failed to do. Just as awarding 100% of the salary and expenses of the tainted games in Donaghy was a reasonable approximately of the harm caused, so too is ordering that the defendants pay back a substantial percentage of their salary and expenses.

[12] Napout asserts that CONMEBOL cannot recover this amount because it has not "identif[ied] a single transfer or the purpose behind any of the transfers." JAN Br. at 18. To the contrary, CONMEBOL has asserted that its audit revealed that Napout was entitled to receive over $1.3 million in "official payments and reimbursements" but only could demonstrate "with absolute certainty that Napout received $105,000.00 in legitimate wire transfers from CONMEBOL out of the total . . . compensation and reimbursements owed." ECF Dkt. No. 989 at 9. The government believes that this proffer is sufficient to document the amount of expenses that may be subject to restitution and does not understand CONMEBOL's use of the word "legitimate" to imply otherwise.

1. Fees and Expenses Incurred During Participation in the Investigation and Prosecution of the Offenses of Conviction

   a. Legal Standard

Under the MVRA, a qualifying victim is entitled to recover, among other things, its "lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4) (emphasis added). Prior to the Supreme Court's recent holding in Lagos v. United States, 138 S. Ct. 1684 (2018), the emphasized clause had permitted victims to recover much of their attorneys' fees and related costs for an internal investigation, whether initiated on its own or in response to government requests for assistance. See United States v. Amato, 540 F.3d 153 (2d Cir. 2008).

In Amato, the defendants defrauded a victim into paying them for work they never received, and as a result, the victim was awarded reimbursement under the MVRA for the cost of "its own internal investigation as well as its participation in the government's investigation and prosecution of defendants' offenses," including attorneys' fees. Id. at 162. The Second Circuit upheld the award, concluding that the victim's "attorneys fees and auditing costs" were a "direct and foreseeable result" of the defendants' crimes and therefore they were obligated to pay all such expenses, including the victim's "internal investigation of the fraud and then reporting the fraud to the government," as well as the costs of attending "meetings with the government and assist[ing] in gathering and producing evidence necessary to the government's prosecution, as well as responding to document requests made by the defendants." Id.; see United States v. Maynard, 743 F.3d 374, 381 (2d Cir. 2014) (describing Amato as "impos[ing] restitution for attorney's fees and accounting costs incurred by an internal investigation that uncovered fraud—notwithstanding that not all of the effort and expense was requested by the government"). Based on Amato, courts in this Circuit have awarded restitution for the costs of an internal investigation undertaken by a victim on its own accord as well as the costs of responding to government requests for information and assistance. See, e.g., United States v. Sazonov, No. 17-CR-657 (SDA), 2018 WL 922151, at *2 (S.D.N.Y. Feb. 16, 2018); United States v. Gupta, 925 F. Supp. 2d 581, 585 (S.D.N.Y. 2013), aff'd, 747 F.3d 111 (2d Cir. 2014); United States v. Skowron, 839 F. Supp. 2d 740, 748-49 (S.D.N.Y. 2012), aff'd, 529 F. App'x 71 (2d Cir. 2013) (summary order); United States v. Levis, No. 08-CR-181 (TPG), 2011 WL 497958, at *2 (S.D.N.Y. Feb. 10, 2011); see also Battista, 575 F.3d at 233-34.

Earlier this year, however, the Supreme Court abrogated Amato with its decision in Lagos. In Lagos, the victim of a fraud scheme detected the scheme, conducted "its own investigation of the fraud" and participated in the defendant's company's bankruptcy proceedings, which occurred prior to the government's investigation. 138 S. Ct. at 1687. Even though the victim later shared the results of its investigation with the government, the Court held that such expenses did not constitute costs incurred "during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4). The Court ruled that the statute's text and structure, among other things, compelled the result that the "investigation" and "proceedings" relate to the criminal investigation and prosecution, not a private investigation or civil matter. See Lagos, 138 S. Ct. at 1688-89.

10

The Supreme Court explicitly left open the question of whether the MVRA permits recovery of "expenses incurred during a private investigation that was pursued at a government's invitation or request." Id. at 1690. Because the costs at issue in Lagos were those incurred before the victim participated in the government's investigation—that is, "the expenses of conducting [the victim's] investigation, not those of sharing the results from it"—they were not recoverable because the MVRA only allows reimbursement for such expenses incurred "<u>during</u> participation in the investigation or prosecution of the offense." Id. (quoting 18 U.S.C. § 3663A(b)(4)) (emphasis in Lagos). The Court therefore limited its holding to the rule that the MVRA "does not cover the costs of a private investigation that the victim chooses on its own to conduct." Id.

The question left open by Lagos, however, is still governed by Amato and its progeny. That is, a victim may recover the necessary costs of a private investigation undertaken at the government's "invitation or request." See Amato, 540 F.3d at 162 (permitting recovery of costs incurred as part of its "participation in the government's investigation and prosecution"); Sazonov, 2018 WL 922151, at *2 (awarding restitution for the victim's "incurred expenses in assisting the Government with respect to investigating and prosecuting [the defendant's] crime"); Levis, 2011 WL 497958, at *2 (awarding legal expenses incurred "as a result of requests from the Government for interviews and other information both in relation to [the defendant's] criminal trial and other matters"); cf. Maynard, 743 F.3d at 381 (observing that Amato permitted recovery of all costs of an investigation "notwithstanding that <u>not all</u> of the effort and expense was requested by the government") (emphasis added). The victim may not, however, recover costs of a private investigation (1) incurred before its participation in the government's investigation or prosecution, see Lagos, 138 S. Ct. at 1690; or (2) undertaken by its own choice, even if during the period of its participation in the government's investigation, see Battista, 575 F. 3d at 234 (commenting favorably on the district court's decision not to award recovery of attorneys' fees "associated with counseling [the victim] on its public response" to a coconspirator's guilty plea as they "were not associated with assisting the government in the investigation and prosecution of the defendants' criminal offenses"). In sum, the victim may recover necessary costs incurred during the criminal investigation or prosecution that are part of its "participation" in the criminal case. 18 U.S.C. § 3663A(b)(4). Whatever the line between "participation" in the criminal case (which are compensable) and actions the victim "chooses on its own to conduct" (which are not), the category of reimbursable expenses includes, at a minimum, those incurred at the government's invitation or request.[13]

---

[13] In framing the issue in Lagos, the Court recognized the "circuit split" between the Second Circuit in Amato (among others), and the D.C. Circuit in United States v. Papagno, 639 F.3d 1093 (D.C. Cir. 2011). In Papagno, the court ruled that the use of the term "participation" in § 3663A(b)(4) "exclude[s] an organization's internal investigation—at least one that has not been required or requested by criminal investigators or prosecutors." 639 F.3d at 1099. That Lagos resolved the "split" in favor of the D.C. Circuit and declined to address the issue that was also not in dispute in Papagno—i.e., the compensability of the costs of an internal investigation undertaken at the invitation or request of the government—suggests that the Papagno rule controls, that is, aside from the costs undertaken at the government's invitation or request, a victim cannot be compensated for any internal investigation expenses. See United States v. Conrelsen, 893 F.3d 1086, 1091 (8th Cir. 2018) (stating that Lagos runs contrary to prior Eighth Circuit precedent that permitted recovery of "privately incurred investigative costs" caused by

11

FIFA asserts that the Supreme Court in <u>Lagos</u> held that a victim's attorneys' fees incurred "in connection with" and "during the pendency of" the government's investigation are compensable. <u>See</u> ECF Dkt. No. 988 at 11. CONMEBOL asserts that <u>Lagos</u> permits recovery of internal investigation expenses that are "conducted at the specific request of the Government after the U.S. Department of Justice [unsealed its investigation]." ECF Dkt. No. 988 at 11 n.34. CONCACAF asserts that a portion of its expenses are compensable because they were incurred after the unsealing of the investigation and done "with the encouragement of the United States Attorney's Office." ECF Dkt. No. 1013 at 8. Marin agrees that expenses incurred at the government's invitation or request are compensable, but asserts that none of the entities have satisfactorily established that they in fact spent specific sums on tasks at the government's request. <u>See</u> JMM Br. at 4-5 & n.6. Napout maintains that no internal investigative costs, "even if done in part at the government's behest," are recoverable. <u>See</u> JAN Br. at 9-11.

As set forth above, the government respectfully submits that to be compensable, internal investigation expenses must have been necessary and incurred (1) during the pendency of the criminal investigation or prosecution; and (2) as part of the victim's "participation" in the criminal case, which includes, at a minimum, those portions of an internal investigation conducted at the government's "invitation or request." The government submits that, contrary to FIFA's reading of <u>Lagos</u>, simply incurring expenses "during" the criminal case is insufficient. If that were true, there would have been no reason for the Supreme Court to state, as it did, that it was not deciding whether expenses incurred at the government's invitation or request could be included in a restitution award because those would automatically be compensable if they were during the proper timeframe. And allowing all expenses "in connection with" the government's case would raise the same practical concerns addressed in <u>Lagos</u>. <u>See</u> 138 S. C.t at 1689 (observing the "practical" concern that requiring district courts to determine whether internal investigation expenses were "necessary," as required under the MVRA, "may become burdensome in cases involving multimillion dollar investigation expenses for teams of lawyers and accountants"). Indeed, even under preexisting Second Circuit case law, expenses that served another purpose for the victim (such as public relations expenses), which were incurred "during" and arguably "in connection" with the case, are not recoverable. <u>See, e.g.</u> <u>Battista</u>, 575 F. 3d at 234.

At the same time, Napout's assertion that no internal investigation expenses are recoverable is also incorrect. JAN Br. at 8-11. The <u>Lagos</u> court was careful to state that its holding was limited to precluding "the costs of a private investigation that the victim chooses on its own to conduct," and did not opine on whether or not expenses incurred at the government's "invitation or request" were compensable. <u>Lagos</u>, 138 S. Ct. at 1690. Because the Second Circuit ruled in <u>Amato</u> and thereafter that such expenses are recoverable, the government submits that they remain so after <u>Lagos</u>.

---

the defendant's crimes); <u>United States v. Razzouk</u>, No. 11-CR-430 (ARR), 2018 WL 3574868, at *2 & n.4 (E.D.N.Y. July 25, 2018) (staying restitution order in light of <u>Lagos</u>, which the court interpreted as holding that "a defendant cannot be forced to reimburse a victim for expenses incurred during an internal investigation of the defendant's illegal actions, as distinct from a government investigation into or prosecution of those actions," noting that the record was "not clear as to whether [the victim's] investigation before [the guilty plea] was in part at the government's behest").

b. FIFA's Request for Reimbursement Relating to the Testimony of Stephanie Maennl and Attending the Defendants' Trial

FIFA requests reimbursement for, among other things, the expenses incurred in identifying and preparing the testimony of trial witness Stephanie Maennl, including having an attorney attend the trial last year (in the amount of CHF 125,030.33). The government agrees that these costs are compensable because preparation of Ms. Maennl, including gathering documents that she introduced at trial, was done at the request of the government. Further, the costs of FIFA's attorney to attend the criminal trial is explicitly permitted. See 18 U.S.C. § 3663A(b)(4) (permitting recovery of "other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense) (emphasis added). As the victim of the Defendants' offenses, FIFA had a right to attend the trial, see 18 U.S.C. § 3771(a)(3), and therefore the expenses incurred during attending those proceedings is compensable under the MVRA.

Marin observes that Lagos "does not disturb the merit, in theory" of the request for restitution relating to Ms. Maennl. JMM Br. at 6. Both Marin and Napout assert, however, that FIFA's request is unsubstantiated because it has not demonstrated the need for preparing Ms. Maennl's testimony and because FIFA did not submit detailed billing records supporting the request. See JMM Br. at 6; JAN Br. at 14-15. As set forth below, although the government agrees that the lack of specific billing records or other evidence prevents the Court from properly assessing the Victim Entities' requests for reimbursement relating to its internal investigation, because FIFA is entitled to recover all necessary costs of preparing Ms. Maennl to testify (including gathering requested documents and trial exhibits) as well as attending the trial, the government submits that the sworn affirmation of FIFA's attorney, William Burck, sufficiently documents these expenditures. See Burck Aff., ECF Dkt. No. 1006-1, ¶¶ 12-13. Accordingly, the government submits that Napout and Marin should be jointly and severally liable to FIFA for CHF 125,030.33.

c. The Investigative Expenses of FIFA, CONMEBOL, and CONCACAF

As set forth above, the government submits that under Second Circuit law surviving Lagos, a victim is entitled to recover under the MVRA all necessary internal investigation expenses incurred both (1) as part of its participation in the criminal case, which includes, at a minimum, at the government's invitation or request; and (2) during the pendency of the government's investigation or prosecution. FIFA, CONMEBOL, and CONCACAF all incurred costs in performing specific tasks at the request of the government for which they properly may receive compensation. It is also the case, however, that all three organizations have incurred costs that were not part of its participation in the government's case (and certainly not at the government's invitation or request) but rather served other interests, such as learning the full scope of corruption that had occurred, eradicating themselves of bad actors, cooperating with foreign governments, and/or conducting public relations efforts.[14] The government

---

[14] As one example, and as addressed more fully below, the expenses of McDermott Will & Emery and Esteban Burt were not incurred as part of CONMEBOL's participation in the

13

understands that the three organizations intend to submit more detailed billing records or other evidence to assist the Court in determining what expenses were necessary and incurred as part of their participation in the criminal case, including at the government's invitation or request during the investigation or prosecution. Absent further specification, however, the government does not believe that there is sufficient proof that such expenses (except those relating to Ms. Maennl and attendance at trial) are recoverable under the MVRA.

2. Legal Fees for Napout's Personal Benefit

CONMEBOL also seeks restitution in the amount of the legal fees that Napout caused CONMEBOL to incur "as a direct result of Napout placing his personal interests above those of the organization to which he owed honest and loyal services." See ECF Dkt. No. 989 at 11. In particular, prior to Quinn Emanuel's representation of CONMEBOL, Napout caused CONMEBOL to incur substantial legal fees for Paraguayan lawyer Esteban Burt and lawyers with McDermott, Will & Emery ("McDermott"). Napout responds to CONMEBOL's request by arguing that restitution should not be ordered absent evidentiary support, such as billing invoices, as he also argued in response to the request for Quinn Emanuel's attorneys' fees incurred during CONMEBOL's participation in the investigation and prosecution of the offenses. See JAN Br. at 15. Napout has failed to acknowledge, however, that the factual record lends substantial support to CONMEBOL's request for the McDermott and Burt legal fees.

The record before the Court establishes that, despite CONMEBOL's status as a victim of Napout's crimes, Napout caused CONMEBOL to retain counsel that would protect Napout's interests and enter into a purported common interest agreement to shield documents from the government's review and protect Napout from, rather than cooperate with, the government's investigation. See Mem. & Order dated Mar. 10, 2017, ECF Dkt. No. 549, at 3-4. As Magistrate Judge Robert M. Levy ruled in rejecting the validity of such an agreement following an evidentiary hearing on the matter, "the extensive testimony at the hearing clearly establishes that the purpose of the agreement was to allow Napout to 'run everything by' his defense attorneys in an effort to shield himself from criminal liability from the government's ongoing investigation." Id. at 7; see also id. at 8 ("[T]he record before me describes an arrangement whereby information would flow in only one direction – from CONMEBOL to Napout – and only for Napout's benefit."). Judge Levy found it significant that "Napout, acting in his individual capacity, apparently authorized both parties [himself and CONMEBOL] to enter into the common interest agreement and [post-arrest] now seeks to constrain the entity's exercise of control over corporate communications." Id. at 8. In light of the "inherent divergent interests of a target president in his personal capacity and a purported victim entity," Judge Levy concluded that a valid common interest agreement had not been created. Judge Levy also concluded that "Mr. Burt was representing both the target and the victim simultaneously during the relevant time period." Jan. 19, 2017 Telephonic Hearing Tr. at 23.

Of particular significance to the government's investigation, based on the purported common interest agreement, Napout sought to assert privilege over CONMEBOL

---

criminal case nor at the government's invitation or request. Rather, they were funds that Napout caused CONMEBOL to incurred for his personal benefit and are therefore outside the Lagos framework entirely.

14

materials and prevent their review by the government, despite the fact that CONMEBOL waived its privilege with minor exceptions. Although Napout succeeded in delaying for more than a year the government's review of records seized from CONMEBOL and certain disclosures to the government by CONMEBOL, the government ultimately was able to review these documents after Mr. Burt and McDermott were replaced as counsel to CONMEBOL.

Similarly, under the guidance of McDermott and Mr. Burt, CONMEBOL took other actions that were in Napout's, rather than CONMEBOL's, interest. For example, although CONMEBOL had an interest in "push[ing] out" and collecting restitution from those within CONMEBOL responsible for the wrongdoing for which Napout was under investigation (see Oct. 25, 2016 Hearing Tr. at 34), there is an absence of any evidence in the record that Mr. Burt or McDermott ever disclosed to CONMEBOL that Napout was a target of the government's investigation. In fact, McDermott went so far as to indicate that CONMEBOL would only seek restitution from the other former CONMEBOL presidents who had been charged, but not Napout. (See Hearing Ex. GX-7 (McDermott's February 26, 2016 letter announcing its intention to seek restitution from Nicolás Leoz and Eugenio Figueredo, two former CONMEBOL presidents who had been charged, without specifically referencing Napout, who was also charged at the time of the letter)).

These, and other examples, demonstrate that at least some of McDermott's fees that Napout caused CONMEBOL to incur were indeed "a direct result of Napout placing his personal interests above those of the organization to which he owed honest and loyal services" and that CONMEBOL suffered a pecuniary loss as a result. Upon a showing from CONMEBOL of the amount of that loss, through billing records or otherwise, the Court may order restitution to restore CONMEBOL to the position it occupied before it sustained this injury as a result of Napout's breach of his duty of honest services to CONMEBOL. See Battista, 575 F.3d at 229.

D. The Former TUSA Employees

Former TUSA employees Marcelo Radice, Miguel Pazcabrales, and Matthew Neidl seek to be designated as victims of the conduct of Napout and Marin on the ground that, but for the defendants' criminal conduct, their employment at TUSA would have continued beyond 2015. ECF Dkt. No. 1007 (TUSA Empl. Ltr. dated Aug. 31, 2018). The TUSA employees seek restitution in the estimated amount of lost salaries and commissions. The thrust of their argument appears to be that: Napout and Marin conspired with, among others, José Hawilla, the owner of TUSA, to receive bribe payments in exchange for contract rights; Hawilla, as a coconspirator of the Defendants, engaged in criminal conduct on behalf of his company that eventually resulted in his pleading guilty to felony charges; as a result of Hawilla's guilty plea and public attention to the case more broadly, TUSA was required to wind down certain of its operations; as a result of TUSA's wind down, the TUSA employees lost their jobs, which in turn resulted in their losing salaries and commissions of unspecified amounts.

The causal link between the Defendants' conduct and the TUSA employees' loss of employment is too attenuated for the employees to qualify as victims under the MVRA, which defines victims as "a person directly and proximately harmed" as a result of the offense of conviction. 18 U.S.C § 3663A(a)(2) (emphasis supplied). The former TUSA employees rely heavily on United States v. Marino, 654 F.3d 310 (2d Cir. 2011), but the case is inapposite. The

15

appellant in Marino participated in a classic Ponzi scheme and was ordered to pay restitution to investors who lost money as a result of that scheme based in part on the appellant's admission that he was aware of, failed to report, and actively concealed the fraud (he was convicted of misprision of felony). 654 F.3d at 315-16. The losses asserted by the TUSA employees, by contrast, did not directly arise from the criminal conduct of the Defendants. See United States v. Reifler, 446 F.3d 65, 135 (2d Cir. 2006) (citing MVRA requirement that victims must be directly and proximately harmed by defendant's conduct in course of conspiracy, and that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation" (internal quotation marks omitted)); see also ECF Dkt. No. 1023 (Ltr. from Traffic entities regarding restitution), Exs. D, E, and F (reflecting that the TUSA employees signed severance agreements that included broad releases).

III.     Conclusion

For the reasons set forth above, the government respectfully submits that based on the evidence now before the Court, Napout and Marin should be held jointly and severally liable for restitution payments (1) to CONMEBOL in the amount of $19,425,000 in connection with the Copa América contracts and $35.1 million in connection with the Copa Libertadores contracts covering the 2011 through 2015 editions (with Marin's joint and several liability capped at $28.3 million on the latter amount); (2) to the Victim Entities a substantial percentage of the documented salaries and benefits paid to the Defendants; and (3) to FIFA, CHF 125,030.33 to cover documented expenses incurred to attend and provide assistance to the government in connection with trial. Additional restitution amounts likely are warranted, including to all three Victim Entities in connection with compensable legal fees, subject to further documentation, as discussed above.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/
Samuel P. Nitze
M. Kristin Mace
Keith D. Edelman
Assistant U.S. Attorneys
(718) 254-7000

cc:     Counsel of record (by ECF)
        Clerk of Court (PKC) (by ECF)