UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JUAN ANGEL NAPOUT,<br><br>Defendant. | Case No. 15 CR 252 (S-2)(PKC) |

**REPLY MEMORANDUM CONCERNING RESTITUTION ON BEHALF
OF JUAN ÁNGEL NAPOUT**

**HUGHES HUBBARD & REED LLP**
Marc A. Weinstein

Attorneys for Juan Ángel Napout

## TABLE OF CONTENTS

**Page**

I.  FIFA, CONCACAF, AND THE TUSA EMPLOYEES ARE NOT VICTIMS OF THE ALLEGED OFFENSE CONDUCT ..................................................1

II. CONMEBOL AND CONCACAF HAVE NOT ESTABLISHED ANY LOST REVENUES ..................................................................................................3

III. THE ENTITIES HAVE NOT ESTABLISHED ENTITLEMENT TO LEGAL FEES ..............................................................................................................6

    A.  The MVRA Does Not Permit The Claims For Investigative Fees ..........................7

    B.  FIFA Has Not Established The Necessity Of Its Trial Attendance Expenses ..................................................................................................................10

IV. FIFA AND CONMEBOL FAIL TO IDENTIFY SALARY, BENEFITS OR OTHER EXPENSES SUBJECT TO RESTITUTION ................................................11

    A.  FIFA ..........................................................................................................................11

    B.  CONMEBOL ..........................................................................................................12

V.  RESTITUTION SHOULD BE APPORTIONED ..............................................................13

CONCLUSION ................................................................................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amato v. United States*, 540 F.3d 153 (2d Cir. 2008) ................................................................. 7, 8

*In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144 (2d Cir. 2015) ............................... 7

*Lagos v. United States*, 138 S. Ct. 1684 (2018) ..................................................................... 7, 8, 9

*OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197 (2d Cir. 2007) ........................................... 7

*Pappas v. City of Lebanon*, 331 F. Supp. 2d 311 (M.D. Pa. 2004) ............................................... 7

*Skilling v. United States*, 561 U.S. 358 (2010) ......................................................................... 1, 11

*United States v. Archer*, 671 F.3d 149 (2d Cir. 2011) ................................................................... 2

*United States v. Donaghy*, 570 F. Supp.2d 411 (E.D.N.Y. 2008) ............................................... 11

*United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) ................................................................... 4

*United States v. Gamma Tech Industries, Inc.*, 265 F.3d 917 (9th Cir. 2001) ............................... 4

*United States v. Gaytan*, 342 F.3d 1010 (9th Cir. 2003) ............................................................... 4

*United States v. Madison*, 657 F. App'x 67 (2d Cir. 2016) .......................................................... 4

*United States v. Marino*, 654 F.3d 310 (2d Cir. 2011) ................................................................. 2

*United States v. Maynard*, 743 F.3d 374 (2d Cir. 2014) ............................................................... 3

*United States v. Papagno*, 639 F.3d 1093 (D.C. Cir. 2011) ......................................................... 7

*United States v. Smith*, 513 F. App'x 43 (2d Cir. 2013) ............................................................... 2

*United States v. Vaghela*, 169 F.3d 729 (11th Cir. 1999) ............................................................. 4

*United States v. Zangari,* 677 F.3d 86 (2d Cir. 2012) ............................................................... 3, 4

**Statutes and Rules**

18 U.S.C. § 1346 ............................................................................................................................ 1

18 U.S.C. § 3663A(b)(4) ................................................................................................................ 8

18 U.S.C. § 3664(e) ....................................................................................................................... 5

18 U.S.C. § 3771(a)(3)............................................................................................................10

Mr. Napout respectfully submits this reply brief in connection with restitution. The government, in its September 26 letter, agrees that a large portion of the claims for lost revenues are unfounded, that some portion of the legal fee requests are not reimbursable, and that the entirety of the legal fee requests has been insufficiently supported by documentation. The remaining restitution amounts sought by the government are legally and factually unsupported.

I.  **FIFA, CONCACAF, AND THE TUSA EMPLOYEES ARE NOT VICTIMS OF THE ALLEGED OFFENSE CONDUCT**

As a threshold matter, FIFA, CONCACAF, and the three former TUSA employees[1] have no basis to seek restitution because they are not victims of Mr. Napout's alleged offense conduct.

The criminal schemes described in the Indictment charged Mr. Napout with receiving bribes in exchange for the sale of media and marketing rights held by CONMEBOL. The Indictment does not charge Mr. Napout with receiving bribes in exchange for the sale of any rights held by FIFA. In fact, FIFA does not seek restitution for any lost revenues because Mr. Napout had no role in the sale of any rights held by FIFA. The government nonetheless asserts that Mr. Napout "routinely failed to deliver. . . the full amount of honest services owed" to FIFA, and that by "falsely portraying" himself as an "honest steward[] of the sport," he "violated a central tenet of [the] organizations' by-laws." (Gov. Ltr. at 8). Violating an organization's by-laws, however, is not itself criminal. Rather, as the Supreme Court held in *Skilling v. United States*, 561 U.S. 358, 368 (2010), honest-services fraud under Section 1346 requires bribes and kickbacks in breach of a fiduciary duty. Mr. Napout did not receive or agree to receive any

---

1. Prior to receiving the government's September 26, 2018 submission, Mr. Napout was not aware that former TUSA employees sought restitution as part of Mr. Napout's sentencing. *See* Gov. Ltr. at 15. Upon receiving the government's submission, we asked for and received a copy of the TUSA employees' submission from the government, which we understand was filed under seal. Mr. Napout opposes restitution for TUSA employees for the reasons set forth by the government (*see* Gov. Ltr. at 15-16) and Traffic (*see* Traffic Ltr. at 10-11).

bribes as a FIFA official in exchange for the sale of any media or marketing rights owned by FIFA, and thus he did not commit a crime for which FIFA was the victim of honest-services fraud. *See United States v. Archer*, 671 F.3d 149, 169–70 (2d Cir. 2011) ("Critically, the district court's statutory authority to award restitution under the MVRA is limited to awards to victims of the offense of conviction.") (citations and internal quotation marks omitted); *United States v. Marino*, 654 F.3d 310, 319 (2d Cir. 2011) ("The committee believes that losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution.") (citing S.Rep. No. 104–179, at 19 (1995)). FIFA is not entitled to restitution under the MVRA.

      Nor is CONCACAF a victim of Mr. Napout's alleged offense conduct. Mr. Napout was never employed by CONCACAF, and did not owe CONCACAF any fiduciary duties. While the government relies on *United States v. Smith*, 513 F. App'x 43, 45 (2d Cir. 2013), that case merely reiterates the unremarkable principle that a defendant can be ordered to pay restitution caused by the defendant or by the reasonably foreseeable acts of his co-conspirators. Here, Mr. Napout did not cause CONCACAF's loss, and there was no evidence at trial that bribes paid by others to CONCACAF's Jeffery Webb were reasonably foreseeable to him. Indeed, the government's cooperating witness, Luis Bedoya, who occupied a position similar to Mr. Napout as the President of his country's federation, testified that he was not aware of the bribes to CONCACAF officials for the Copa Centenario. (Tr. 1604). To the extent CONCACAF sustained losses as a result of any bribery, it can still seek restitution from those who caused its losses. It cannot seek restitution from Mr. Napout.

## II.     CONMEBOL AND CONCACAF HAVE NOT ESTABLISHED ANY LOST REVENUES

Apart from the above threshold deficiency in the restitution claim, the government agrees that the "claimed restitution amounts overstate the amounts of actual losses demonstrated" by CONMEBOL and CONCACAF because such losses must be offset by the return of the media and marketing rights at issue.  The government also agrees, for this reason, that the record does not establish that CONCACAF suffered any actual losses.[2] (Gov. Ltr. at 4).  While the government purports to apply an offset, it nonetheless asserts that CONMEBOL should still be awarded $54,525,000 in restitution, consisting of bribes paid and promised for tournaments played between 2011 and 2015.  This assertion fails for the following reasons.

First, neither the government nor CONMEBOL has provided any analysis to demonstrate lost revenue associated with those tournaments.  Professor Szymanski testified only to the general principle that a person paying a bribe might be willing to pay that same amount for the underlying contract if no bribe is paid.  Professor Szymanski concededly undertook no effort to assess whether that was in fact the case here, and if so, to what extent it held true for purposes of a monetary calculation.  (*See* Trial Tr. at 196-206.)  He provided no basis upon which to assess the relevant market and likely competition, if any, within that market, nor has anyone else done so.  Simply put, using paid and promised bribes as a proxy for lost revenue here is entirely speculative, and a victim cannot recover "losses that are hypothetical or speculative." *United States v. Maynard*, 743 F.3d 374, 378 (2d Cir. 2014); *accord United States v. Zangari,* 677 F.3d 86, 91 (2d Cir. 2012) ("a restitution order must be tied to the victim's actual, provable, loss").

---

2.  Both the government and Mr. Napout also identified various problems with the assumptions underlying CONCACAF's lost revenue calculation.  Mr. Napout hereby incorporates any such faulty assumptions identified by the government and not already identified in Mr. Napout's opening brief.

3

Second, contrary to the government's suggestion, courts do *not* routinely order restitution in the amount of bribes paid or promised in analogous cases. (Gov. Ltr. at 5 n.7.) As the Second Circuit has made clear, a "sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss." *Zangari*, 677 F.3d at 93. In *United States v. Finazzo*, also an honest services fraud case, the Second Circuit rejected the district court's attempt to use the amount of bribes received as a reasonable estimate of a victim's loss. 850 F.3d 94, 118 (2d Cir. 2017). In so doing, the Second Circuit stated that such loss "is not a necessary consequence of all the kickbacks" received by the individual who accepted the bribes. *Id.* Rather, the court held that "[g]iven that we require a 'direct correlation' between a defendant's gain and a victim's loss in order for restitution to be measured according to that gain, it is not a sufficiently sound methodology for the district court to merely assume that the kickbacks were solely justified by" the difference of prices to be paid in the contract. *Id.* As in *Finazzo*, because the Government has provided no way to "determine what portion of [the co-conspirators'] gain is directly correlated with [the claimant's] loss[es]," restitution cannot be ordered.[3] *Id.*

Third, even accepting the government's theory that paid and promised bribe amounts can serve as a proxy for loss, the total amount of bribes the government alleged to have been paid or promised for all of the Copa Libertadores and Copa America tournament editions

---

3. The cases cited by the government (Gov. Ltr. at 5 n.7) do not support an order of restitution in the amount of the bribes paid, let alone promised. In *United States v. Madison*, 657 F. App'x 67 (2d Cir. 2016), there was no dispute whether the amount of bribes paid were an adequate grounds to find actual loss. Rather, the only issue considered was whether the government established a quid pro quo to support the basis for honest services fraud. In both *United States v. Gaytan*, 342 F.3d 1010, 1012 n.3 (9th Cir. 2003), and *United States v. Gamma Tech Industries, Inc.*, 265 F.3d 917, 929 (9th Cir. 2001), the Ninth Circuit found restitution for the bribes received appropriate because, under California state law, everything an employee acquires pursuant to his employment belongs to the employer. And *Gamma Tech*, as well as *United States v. Vaghela*, 169 F.3d 729 (11th Cir. 1999), are distinguishable because the amount of the bribes in each case was directly connected to the amount that the employer was overcharged by the vendor paying the bribes. Here, there is no overcharge issue.

4

from 2011 through 2023 was approximately $150 million. The government acknowledges that any calculation of loss must incorporate the value of assets returned to the victims (Gov. Ltr. at 4), and further that the rights to the 2016 through 2022 editions of the Copa Libertadores and the 2019 and 2023 editions of the Copa America were returned to CONMEBOL and later resold for a combined $1.835 *billion* dollars. Yet, the Government fails to credit this huge gain against the entirety of the much smaller aggregate amount of paid and promised bribes, and at the same time offers no analysis for carving out roughly $55 million in losses as against nearly $2 billion.[4] Because the amount gained by CONMEBOL through the renegotiated deals more than subsumes the amount of alleged loss for the entirety of the scheme, CONMEBOL has been made whole, and any additional amount awarded in restitution would be an improper windfall.

Fifth, by seeking the amount of bribes paid or promised for each separate tournament played from 2011 to 2015, the government also ignores the rapidly increasing value of the tournaments conducted in the latter years.[5] According to the PSR, the amounts paid or promised for each edition of each tournament is either relatively equal, or actually more heavily weighted to the earlier years. For example, the total amount of bribes to be paid for the five editions of the Copa Libertadores from 2011 through 2015 was $35.1 million (or $7.2 million per year), whereas the total amount for the seven additions from 2016 through 2022 was $38.5

---

4. The government argues that "Napout offers little support for the conclusion other than the figures themselves." (Gov. Ltr. at 4.) But in the same letter (*see* Gov. Ltr. at 8 n.10), the government acknowledges, as it must, that it, *not* Mr. Napout, shoulders the burden of proving the amount of loss. *See* 18 U.S.C. 3664(e) ("The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government.").

5. Professor Szymanski testified that the value of broadcast rights for these tournaments is rising steadily. (Trial Tr. at 191.) In addition, a comparison of the value from the resale of the rights to editions of the Copa Libertadores demonstrates the later sales of these rights yield larger revenue for CONMEBOL. The 2015 sale of the rights to the 2016 through 2018 editions provided CONMEBOL with roughly $145 million per tournament, whereas the 2018 sale of the 2019 through 2022 editions provide CONMEBOL with a guarantee of $350 million per edition. (*Compare* Media Rights Agreement, dated Nov. 13, 2015 (Exhibit C to ECF No. 1031) *with* Guarantee Agreement, dated Feb. 6, 2018 (Exhibit F to ECF No. 1031).)

5

million (or $5.5 million per year).  *See* PSR at ¶ 53.  Taking the government's theory of loss based on bribes, this would mean that the earlier tournaments were significantly more valuable than the later tournaments, when in reality, the exact opposite is true.  This illustration demonstrates that the government's underlying premise that paid and promised bribe amounts are reasonable estimates of lost value is faulty, and further that, to the extent the Court considers the bribe amounts as some sort of proxy, the Court should not include the entire amount proposed by the government as that amount disproportionately weights the value of the tournament rights towards the earlier years.

### III.    THE ENTITIES HAVE NOT ESTABLISHED ENTITLEMENT TO LEGAL FEES

None of the entities has established entitlement to legal fees under the MVRA.  First, as set forth above, neither FIFA nor CONCACAF is a victim of Mr. Napout's offense conduct and should not be awarded restitution for any category of claimed loss.  Second, to date, none of the entities has submitted a single underlying document to support the massive legal fee requests, despite two prior Court deadlines for submissions by victims.  *See* 7/11/2018 Scheduling Order; 8/21/2018 Scheduling Order ("by August 31, 2018 — final submissions by any victim that wishes to provide additional information to the Court on the issue of restitution as to Defendants Marin and Napout, which shall indicate the total amount of loss the victim claims to have sustained as a result of the offenses of conviction and provide all legal and factual support upon which the claim is based, including any documentary support …").[6]

---

6.  Although the Court earlier today granted the belated requests by CONMEBOL and CONCACAF (each submitted yesterday) to provide documentation for the legal fee requests, Mr. Napout objects to the belated submissions as the Court's prior scheduling orders clearly required such documentation to be submitted by August 31.  Neither entity offered any explanation for failing to adhere to the Court's prior deadline.

6

A. <u>The MVRA Does Not Permit The Claims For Investigative Fees</u>

Even if fee records had been provided, the MVRA does not permit restitution for the voluntary internal investigations performed here. The government's continued reliance on *Amato v. United States*, 540 F.3d 153 (2d Cir. 2008), for the proposition that internal investigation costs undertaken at the government's "invitation or request" is misplaced. (*See* Gov. Ltr. at 11.) To begin, *Lagos* directly rejected the holding of *Amato*. *See Lagos v. United States*, 138 S. Ct. 1684, 1688 (2018). This alone renders *Amato* void. *See OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197, 208 (2d Cir. 2007) (courts are "bound to follow Supreme Court precedent as it currently exists").[7] To the extent *Lagos* did not also explicitly overturn *Amato* in regards to investigations conducted at the government's behest, the reasoning of *Lagos* still displaces this aspect of *Amato*.

When a Supreme Court decision "casts doubt" on Second Circuit precedent, that precedent no longer controls. *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 154 (2d Cir. 2015), *as amended* (Dec. 17, 2015), *aff'd sub nom. Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018). "The intervening [Supreme Court] decision need not address the precise issue" decided by the Circuit, but "there must be a conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision." *Id.* at 155 (internal quotations, quotation marks and brackets removed); *see also Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 319 (M.D. Pa. 2004) (when circuit precedent is "obviously undermined by more

---

7. The Government erroneously argues that *Lagos* adopted the "rule" in *United States v. Papagno*, 639 F.3d 1093 (D.C. Cir. 2011), that "aside from the costs undertaken at the government's invitation or request, a victim cannot be compensated for any internal investigation expenses." (Gov. Ltr. at 11 n.13.) However, the *Papagno* court did not address the issue of internal investigations conducted at the government's behest. *See* 639 F.3d at 1100.

7

recent opinions of the Supreme Court, the district court has an obligation to recognize the former as overruled").

The rationale of *Lagos* directly undercuts *Amato*'s reasoning. *Amato* held that the plain language of § 3663A(b)(4) permitted recovery for the costs of investigations conducted before a government investigation began, 540 F.3d at 159; *Lagos* held the opposite, 138 S. Ct. at 1688. *Amato* found "no relevant common attribute linking lost income, child care expenses, and transportation expenses in 18 U.S.C. § 3663A(b)(4)," 540 F.3d at 160. In *Lagos*, however, the Supreme Court found the same words are "precisely the kind of expenses that a victim would be likely to incur when he or she … misses work and travels to talk to government investigators, to participate in a government criminal investigation, or to testify before a grand jury or attend a criminal trial." *Lagos*, 138 S. Ct. at 1688. Indeed, as argued in Mr. Napout's Sentencing Memorandum (ECF No. 1026 at 9–11), every aspect of the Supreme Court's reasoning in *Lagos* applies equally to internal investigations conducted at the government's behest. Thus, the Court should not base any restitution order on *Amato* unless and until the Second Circuit reinterprets the MVRA in a manner consistent with the Supreme Court's holdings in *Lagos*.

Finally, even accepting the government's view that the Court can order restitution for investigation fees that are necessary and incurred at the government's behest and during the pendency of the government's investigation or prosecution, the government fails to identify any fees sought by FIFA, CONMEBOL, or CONCACAF that satisfy those criteria, or even to identify any specific request or invitation made by the government to any of the entities to provide the framework for this aspect of the proceeding. The record remains devoid of any factual basis to impose restitution for legal fees.

8

The government also argues that the fees sought by CONMEBOL for work done by McDermott Will & Emery ($4,391,104.89) and Esteban Burt ($255,700) fall outside the *Lagos* framework, and are a direct result of Mr. Napout placing his interests above those of the organization based on attempts to assert a joint defense or common interest privilege among the lawyers. (*See* Gov. Ltr. at 11). It is not clear how the government purports to know what specific legal services were provided by the two identified firms, amounting to over $4.5 million, as neither the government nor CONMEBOL has provided any underlying support for the request. It is also hard to imagine that "much of" the $4.4 million of work performed by a respected U.S. law firm on behalf of its institutional client was actually done to further Mr. Napout's "personal interests in protecting himself from prosecution." (Gov. Ltr. at 11). The government should not be permitted to support a restitution claim, much less one for millions of dollars, based on wild conspiracy theories. We expect that, should the government choose to call the attorneys who performed the work to testify, the attorneys would not attribute such ill purposes to their work.[8] Indeed, we understand that a good deal of the work done by McDermott, Will & Emery, at Mr. Napout's urging and with his full cooperation, was related to renegotiating the media and marketing rights to various tournaments which generated enormous revenue for CONMEBOL, and analysis and preparation for potential litigation against various contractual counter-parties, which is the type of civil litigation work for which the MVRA does not provide restitution. *See Lagos*, 138 S. Ct. at 1688-70.

---

8. The government points merely to the assertion of a joint defense privilege among Mr. Napout and CONMEBOL, which the government characterizes as a nefarious act. Such joint defense and common interest agreements, however, are commonly formed among subjects of government investigations.

9

B. <u>FIFA Has Not Established The Necessity Of Its Trial Attendance Expenses</u>

The government contends that the Burck Affidavit sufficiently documents the expenses incurred by FIFA to prepare a witness and documents for trial, and for an attorney to attend the entire trial, arguing that FIFA is entitled to recover "all necessary costs" for such efforts. (Gov. Ltr. at 13). The Burck Affidavit, however, merely states an aggregate amount of fees sought for three different activities (providing copies of documents, preparing a witness, and attending the entire trial), without any breakdown for each of those categories, much less any documentary support. Neither the government nor FIFA cites a case in which a court found it sufficient that a lawyer merely states an aggregate total amount of fees that the lawyer seeks to recover, without more. Indeed, as the government acknowledges, the fees must be for "necessary costs," and without providing the underlying documents to support the fee request, it is impossible to determine whether those amounts were necessary.

The government also asserts that FIFA is entitled to recover the fees for having an attorney attend the entire trial, because victims have the right to attend court proceedings under 18 U.S.C. § 3771(a)(3). (Gov. Ltr. at 13). Although Section 3771(a)(3) undoubtedly gives victims the right "not to be excluded" from court proceedings, nowhere does it permit a victim the right to have an attorney attend in the victim's stead and then to seek restitution for the attorney's fees for sitting through the entire trial. Nor does the MVRA provide restitution for such fees, as they simply are not necessary to the government's investigation or prosecution of the case (and the government hasn't contended otherwise). FIFA was certainly free to send a representative to attend the trial. It cannot seek restitution for having its outside counsel do so.

## IV. FIFA AND CONMEBOL FAIL TO IDENTIFY SALARY, BENEFITS OR OTHER EXPENSES SUBJECT TO RESTITUTION

The question here is not whether the MVRA permits restitution for some portion of a person's salary based on an honest services fraud conviction, but rather whether FIFA or CONMEBOL has identified any salary, benefits or expenses that should be subject to restitution. Neither entity has done so.

### A.  FIFA

FIFA does not seek any salary or benefits, but rather expenses for trips taken between June 2009 and December 2015. The government argues that FIFA is entitled to an unidentified "substantial" portion of these expenses, because Mr. Napout "violated a central tenet of [the] organizations' by-laws." (Gov. Ltr. at 8). As argued above, however, it is not a crime merely to violate an organization's by-laws. The government never alleged or introduced evidence, much less proved, that Mr. Napout accepted bribes wearing his FIFA hat in exchange for agreeing to or approving the sale of any media or marketing rights owned by FIFA.

Regardless, there is no factual basis to impose restitution (partial or full) for the trip expenses listed in FIFA's letter, absent some evidence of misconduct on those trips. The government's attempt to distinguish *United States v. Donaghy*, 570 F. Supp.2d 411 (E.D.N.Y. 2008), misses the mark. (*See* Gov. Ltr. at 9 n.11). The government asserts that, unlike in *Donaghy*, Mr. Napout's offenses are not limited to specific dates or events, and that he was expected to provide complete and honest services each time he appeared at an event. But Mr. Napout was not, as the government suggests, convicted broadly for failing to provide honest services to his employers. Rather, the conviction was based, as it must be under *Skilling*, on the alleged receipt of specific bribes, in exchange for the sale of specific media and marketing rights. Thus, just as in *Donaghy*, where the government was able to identify the games at which the

11

referee engaged in misconduct, here the government must provide some basis for the Court to find that Mr. Napout engaged in the charged conduct on the trips listed by FIFA. It is not enough for the government merely to assert that Mr. Napout attended a World Cup match in 2014 with disloyalty in his heart, or that he failed to provide honest services during a meeting with the President of Bolivia in 2010. Absent evidence of the charged misconduct at these and the other events listed, there is simply no basis to impose restitution for such expenses.[9]

### B. CONMEBOL

Neither CONMEBOL nor the government has identified the purpose of any of the $105,000 worth of "legitimate wire transfers" made to Mr. Napout. The government contends that CONMEBOL's "proffer is sufficient to document" its claim (Gov. Ltr. at 9 n.12), but CONMEBOL's proffer consists of nothing more than stating an aggregate amount of money provided to Mr. Napout on unidentified dates and for unidentified reasons. CONMEBOL has not asserted that the $105,000 was salary, nor could it, as CONMEBOL has acknowledged that Mr. Napout did not take over $1.3 million in salary owed to him over the years. To the extent the $105,000 consists of one or more "reimbursements," the Court has no basis to determine whether all, part or none of that amount is subject to restitution without knowing what was reimbursed. For example, and hypothetically, if Mr. Napout paid for a CONMEBOL expense out of his own pocket and was later reimbursed, there would be no basis to seek restitution for that reimbursement. Without any underlying detail or documentation, restitution must be denied.

---

9. If FIFA or CONMEBOL were seeking restitution for salary (which they are not because Mr. Napout took no salary), logic might dictate that some portion of that salary would be subject to restitution based on an honest services conviction. But that logic does not extend to reimbursement for travel expenses where the government fails to establish that any of the charged misconduct occurred on a given trip.

## V.     RESTITUTION SHOULD BE APPORTIONED

The government argues that the Court cannot order restitution against those not before the Court. (Gov. Ltr. at 5 n.8). Yet there are many defendants who have been convicted and stand before the Court in connection with the bribery schemes, and apportionment makes eminent sense given the circumstances of this case. Indeed, it is unfair to those individual defendants to be sentenced by the Court that the government chose not to require Torneos, an undeniably guilty member of the charged conspiracy, to plead guilty to any offenses, thereby preventing the Court from imposing a substantial restitution order on the co-conspirator with perhaps the deepest pockets and who gained the most from the illegal conduct. Torneos paid a very substantial amount in forfeiture, and agreed with the government that such funds can be used for restitution purposes, but the government notes that it is entirely within the government's discretion whether to do so. Ironically, the government argues that the Court should not apportion restitution because it should not "require victims to await compensation." (Gov. Ltr. at 5 n.8). Yet it is the government, based on the Torneos deferred prosecution agreement, which is uniquely situated to avoid any such waiting game. The Court should, at the very least, require the government to declare its intentions with any forfeited money by an imminent date certain so as not to unfairly impose the entire onus of any restitution award on the individual defendants who are first in line for sentencing.

Mr. Napout further requests that the Court establish a mechanism by which monies received by the "victims" from any sources are reported to the government, the Court, and any defendant subject to a restitution order. Upon the receipt of any such money, whether from restitution or forfeiture payments by other defendants, insurance coverage, the prosecution or settlement of civil lawsuits, or other sources, the Court should reduce the restitution amount, if any, owed by Mr. Napout. Because it is often difficult to track such developments in a complex

13

case with multiple parties, Mr. Napout requests that the Court order a formal reporting mechanism.

## CONCLUSION

For the reasons set forth herein and in Mr. Napout's opening brief, Mr. Napout respectfully requests that the Court deny the restitution claims submitted by FIFA, CONMEBOL, and CONCACAF.

Respectfully submitted,

                **HUGHES HUBBARD & REED LLP**
                One Battery Park Plaza
                New York, NY 10004-1482
                T. 212.837.6000
                marc.weinstein@hugheshubbard.com
                /s/ Marc A. Weinstein
                Marc A. Weinstein