1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - - -X
3   UNITED STATES OF AMERICA,      : 15-CR-252 (PKC)
                                    :
4              Plaintiff,           :
                                    : United States Courthouse
5         -against-                 : Brooklyn, New York
                                    :
6   JEFFREY WEBB, ET AL.,           :
                                    : Wednesday, August 29, 2018
7              Defendants.          : 9:30 a.m.
    - - - - - - - - - - - - - - - -X
8
            TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
9            BEFORE THE HONORABLE PAMELA K. CHEN
                UNITED STATES DISTRICT JUDGE
10

11                A P P E A R A N C E S:

12  For the Government:       RICHARD P. DONOGHUE, ESQ.
                              United States Attorney
13                            Eastern District of New York
                              271 Cadman Plaza East
14                            Brooklyn, New York 11201
                              BY:  SAM P. NITZE, ESQ.
15                                 M. KRISTIN MACE, ESQ.
                                   KEITH D. EDELMAN, ESQ.
16                                 Assistant United States Attorneys

17  For Defendant 22          PIÑERA-VAZQUEZ LAW FIRM
    Juan Angel Napout:        1900 SW 3rd Avenue
18                            Miami, Florida 33129
                              BY:  SYLVIA B. PIÑERA-VAZQUEZ, ESQ.
19                                 AND
                              HUGH, HUBBARD & REED, LLP.
20                            One Battery Park Plaza.
                              New York, New York 10004-1482.
21                            BY:  MARC A. WEINSTEIN, ESQ.

22  Court Reporter:          DAVID R. ROY, RPR
                             225 Cadman Plaza East
23                           Brooklyn, New York 11201
                             drroyofcr@gmail.com
24
    Proceedings recorded by Stenographic machine shorthand,
25  transcript produced by Computer-Assisted Transcription.

1          (In open court.)

2          THE COURTROOM DEPUTY:  This is criminal cause for

3   sentencing, Docket 15-CR-252 USA versus Juan Angel Napout.

4   Will the parties please state their appearances for the

5   record.

6          MS. MACE:  Good morning, Your Honor.  For the

7   United States Kristin Mace, Sam Nitze, and Keith Edelman.

8   Good morning.

9          THE COURT:  Good morning.

10         MS. PIÑERA-VAZQUEZ:  Good morning, Your Honor.

11  Silvia Piñera-Vazquez on behalf of Mr. Napout, who is

12  present to my right.

13         THE DEFENDANT:  Good morning, Your Honor.

14         MR. WEINSTEIN:  Good morning, Your Honor.  Marc

15  Weinstein for Mr. Napout as well.

16         THE COURT:  Good morning to all of you.  All

17  right.  As everyone knows, we are here for sentencing in

18  this matter.  Let me start off by putting a few things on

19  the record.  The Defendant Juan Angel Napout was convicted

20  after the trial on December 22nd, 2017 of Counts 1, 2, and 6

21  of the superseding S2 indictment.

22         More specifically, the Defendant was convicted of

23  one count of racketeering conspiracy and two counts of wire

24  fraud conspiracy in connection with bribery schemes relating

25  to the purchase and sale of media and marketing rights for

1   the Copa America and Copa Liberatadores Soccer tournaments

2   and the Paraguayan World Cup qualifying matches.

3           The Defendant was acquitted of Counts 3 and 7,

4   both of which charged him with money laundering conspiracy

5   in connection with the Copa America and Copa Liberatadores

6   bribery scheme.

7           I have received and reviewed in anticipation and

8   preparation of sentencing the presentence report by the

9   probation department dated July 16th, 2018, as well as an

10  addendum to that report dated August 22, 2018.

11          I have also received a sentencing recommendation

12  from the probation department dated July 16th, 2018, which

13  recommends the sentence of 12 years on each count of

14  conviction to run concurrently, to be followed by two years

15  of supervised release and each count to run concurrently,

16  with special conditions.  The probation department has also

17  recommended that restitution to the victims be awarded in an

18  amount to be determined by me.

19          The parties, I have also reviewed, received and

20  reviewed the parties' respective objections to the

21  presentence report, both of which were dated August 8th,

22  2018, and the Government's response to the Defendant's

23  objections to the report, and the Government's response is

24  dated August 20th, 2018.  It does not appear that the

25  defense filed a response to the Government's objections; is

1   that right, Ms. Piñera-Vazquez?

2           MS. PIÑERA-VAZQUEZ:  That's correct, Your Honor.

3           THE COURT:  Okay.  I have also receive the

4   defendant's very voluminous sentencing submission dated

5   August 21st, 2018, which numbered about 570 pages, I

6   believe, and includes, I think, about 200 letters of support

7   for Mr. Napout.  And if I didn't say it before -- I don't

8   think I did, that's dated August 21st, 2018.

9           I have also separately received a mental health

10  evaluation of Dr. Hugh Humphrey, which is an exhibit to the

11  defense submission but came afterwards and separately and

12  also an inmate evaluation form with was submitted by

13  Ms. Piñera-Vazquez on August 27th, 2018.  And I gather it

14  was inadvertently omitted from the sentencing submission.

15          Is there anything else I should have from the

16  defense?

17          MS. PIÑERA-VAZQUEZ:  No, Your Honor.

18          THE COURT:  I have also received and reviewed --

19          MS. MACE:  I'm sorry, there was the independent

20  submission by someone directly to the Court that's on a

21  disk.

22          THE COURT:  Yes, I was going to mention that, I

23  don't think --

24          MS. PIÑERA-VAZQUEZ:  No, we did not submit that,

25  Your Honor, that was, I believe, sent directly to the Court.

1          THE COURT:  Correct.

2          MS. PIÑERA-VAZQUEZ:  Thank you.

3          THE COURT:  So next I have the Government's

4    sentencing submission dated August 24, 2018.  Is there

5    anything else I should have from the Government?

6          MS. MACE:  Your Honor, we filed a letter on

7    August 27th just with two corrections to key citations.

8          THE COURT:  Yes, I should have noted that.  I did

9    receive that and noted the corrections to the citation.

10          MS. PIÑERA-VAZQUEZ:  Your Honor, if I may, one

11    other thing, I'm not sure if you mentioned it.  We did

12    submit some pictures to Your Honor directly along with our

13    sealed submission.

14          THE COURT:  I don't think I did get those.

15          MS. PIÑERA-VAZQUEZ:  Okay, no, my mistake.

16          THE COURT:  You're sure?

17          MS. PIÑERA-VAZQUEZ:  Yeah.

18          THE COURT:  Okay.  Then as noted by the Government

19    I independently received in electronic format the e-mail

20    materials from some -- a person who is identified as Edmundo

21    in the Defendant's sentencing submission, though the

22    person's full name is in the materials I received.

23          And those materials, including videotape statement

24    and letter of support by Edmundo as well as what appears to

25    be a Spanish language television news piece about Edmundo

1   and his physical condition.

2           I have also received statements from the alleged

3   victims of the Defendant's criminal conduct regarding

4   restitution and harm caused to those organizations, which

5   include FIFA, CONMEBOL and CONCACAF; however, as indicated

6   in a docket entry from last week or the week before, I'm not

7   going to address restitution at this sentencing, but rather,

8   that will be deferred for later briefing and a hearing from

9   the parties, as well as the alleged victims.

10          Is there anything else I should have from any

11  other -- from any of the parties or otherwise?

12          MS. MACE:  I believe that's everything,

13  Your Honor.

14          THE COURT:  Okay.

15          MS. PIÑERA-VAZQUEZ:  Yes, nothing from the

16  defense, Your Honor.

17          THE COURT:  All right.  Ms. Piñera-Vazquez and

18  Mr. Weinstein, have you and your client discussed the

19  presentence report and the addendum?

20          MS. PIÑERA-VAZQUEZ:  We have, Your Honor.

21          THE COURT:  Okay.  Now, aside from the restitution

22  issue, which will be the subject of a separate hearing, is

23  either party seeking an evidentiary hearing on any

24  sentencing issue that we're going to address today?

25          From the Government?

1          MR. NITZE:  No, Your Honor.

2          THE COURT:  Ms. Piñera-Vazquez?

3          MS. PIÑERA-VAZQUEZ:  No, Your Honor.

4          THE COURT:  Okay.  Now, let's turn to the

5    guideline calculation.  As set forth in Paragraph 85 and 105

6    of the presentence report, the probation department has

7    calculated a total offense level of 43, which encompasses

8    all three counts of conviction.

9          In Criminal History Category 1 that relevants in a

10   guideline range of life, but that is statutorily capped at

11   720 months or 60 years.

12         The defense has raised objections to all of the

13   enhancements applied by the probation department.  The only

14   part of the calculation that the defense does not object to

15   are the base offense level of 6 and 7.

16         Now I have reviewed the presentence report, the

17   addendum and the parties' extensive written submission

18   regarding those objections.  And for the reasons that I will

19   explain momentarily, I am going to adopt the probation

20   department's guideline calculation in its entirety.  I do

21   not need to hear any additional arguments about the

22   objections.  The defense has certainly preserved them for

23   purposes of appeal through its written submission.

24         Let me also say that while it is important for the

25   calculations to be technically correct, they are largely

1  academic because as I will explain later due to the unusual

2  circumstances of this case, which resulted in

3  extraordinarily high guidelines range, I am going to find or

4  I do find that the guidelines range grossly overstates the

5  seriousness of the Defendant's criminal conduct, so I am not

6  going to apply the guideline range as my starting point, but

7  I will explain later what guideline range I think is a more

8  appropriate starting point.

9          So let me start and explain why I've adopted those

10  guidelines enhancements and the overall calculation.  First

11  of all as an opening comment, there was an argument made by

12  the defense in its written submission that I want to put to

13  rest.  There was a suggestion by the defense, and it runs

14  the throughout their submission that I cannot consider for

15  any purpose at sentencing acquitted conduct.

16          The money laundering counts, for example, or the

17  evidence that proves certain facts relating to the money

18  laundering charge, although quite frankly I think all the

19  evidence related to all the charges.  But it would be

20  incorrect to say that I cannot consider acquitted conduct

21  for purposes of sentencing .

22          The Second Circuit said in the *U.S. vs. Vaughan*

23  that the Court may take into account acquitted conduct if it

24  finds the conduct established by the preponderance of the

25  evidence.  So just to set the table and make sure we are all

1   on the same page, for purposes of deciding what sentencing

2   enhancements might apply or what facts have been established

3   for purposes of sentencing, the standard is a preponderance

4   of the evidence and not beyond a reasonable doubt as the

5   jury had defined at trial.  Therefore, as found in *Vaughn* by

6   the Second Circuit, I can consider acquitted conduct so long

7   as I find that that conduct or facts relating to that

8   conduct are proved by a preponderance of the evidence.  And

9   *Vaughn* is 430 F.3d 518, Second Circuit case from 2005.  And

10  in effect *Vaughn* endorses the pre-Booker Supreme Court case

11  *U.S. vs. Watts*, 519 U.S. 148 which is from 1997.

12          Now starting with the loss amount or reasonable

13  foreseeability argument relating to the 26-level enhancement

14  for the amount of loss caused by the Defendant's conduct and

15  the relevant conduct jointly undertaken by him and his

16  co-conspirators.  This would be under 2B1.1B10.

17          As the parties know, the probation department did

18  apply the 26-level enhancement for losses of between 150 to

19  $250 million.  This is based on the total calculation of

20  bribes that were paid and intended or agreed to as part of

21  the three schemes in which Mr. Napout participated.

22          Now, the objection is based on the argument that

23  Mr. Napout should not be held accountable for these losses

24  or they should not be attributed to him because one, there

25  is insufficient evidence to find that he was aware of the

1  bribes to the other soccer officials, in other words, the

2  fees bribed were reasonably foreseeable to him, or that they

3  were undertaken as part of jointly -- I'm sorry, or that it

4  was undertaken as part of jointly undertaken criminal

5  activity.

6          The second argument is that only actual loss

7  should be considered and not intended loss under 2B1.1.

8          And that the third argument is that even if the

9  intended loss is a proper measure it cannot be calculated

10  because there's no market analysis of the purported

11  undervaluation of the media contracts at issue.

12          So as everyone knows the loss amount is

13  essentially based on the bribery amount.  The evidence and

14  the arguments from the Government being that -- and this is

15  in part based on an expert -- that the bribes that were paid

16  represent money that would have been paid to the soccer

17  organizations had those contracts been negotiated fairly and

18  at arm's length and without the bribery being involved.  So

19  that the bribe money in effect went into pockets of the

20  officials rather than into the coffers of the organizations.

21          And then lastly the defendants, Defendant, rather,

22  argues that the evidence is insufficient to show that he

23  took bribes in connection with the Paraguayan World Cup

24  qualifiers.

25          First of all, I do find that the bribes that are

1   attributed to Defendant were part of the jointly undertaken

2   criminal activity, certainly at least by a preponderance.

3   The evidence at trial showed that the bribes that Mr. Napout

4   and the other soccer federation presidents took were all

5   part of the coordinated scheme and one that had to be

6   coordinated in order to succeed.  Moreover there was

7   specific evidence showing that Mr. Napout, especially when

8   his became president of CONMEBOL negotiated directly and

9   discussed directly with Mr. Burzaco who was one of the lead

10  bribers what bribes were being given, which officials were

11  receiving bribes and negotiating the amount of those bribes.

12          The evidence which the Government comprehensibly

13  marshals and summarizes at Pages 17 to 24 of its sentencing

14  submission shows all of these facts and I'm not going to

15  repeat those facts, but that's where that evidence is, I

16  think, quite thoroughly summarized.

17          The standard here, as the parties know, is set

18  forth as a two-part test.  First I have to determine that

19  the scope of the criminal activity agreed upon -- or, I'm

20  sorry, I have to determine what the scope of the criminal

21  activity agreed upon was.

22          And secondly if I find the scope of the activity

23  to which the Defendant agreed includes the conduct in

24  question, I have to make a particularized finding as to

25  whether the activity was foreseeable to the Defendant.  So

1   that is why I just recited some of those facts which I think

2   are set forth in the Government's submission.

3           In particular, as I said, I find that Mr. Napout

4   knew precisely what the scope of the bribery activity was in

5   each of these schemes because he was directly involved in

6   negotiating and discussing these schemes overall.  I will

7   recite some of the official testimony or at least highlight

8   it.  The co-conspirator Luis Bedoya testified at trial about

9   how Mr. Napout stressed to Mr. Bedoya, another conspirator,

10  that the bribe has to be received in a secure way and that

11  that is why he was receiving his bribe in cash.

12          Also the evidence showed that in 2013 and '14

13  Mr. Napout met with Burzaco and Grondona who was one of the

14  main leaders of this group in Buenos Aires to discuss the

15  ongoing bribe payments to all of the relevant soccer

16  officials.

17          In particular Mr. Napout was one of only three

18  soccer officials, along with Grondona and Romero, who

19  received full information about all of the bribes relating

20  to CONMEBOL tournaments.  Mr. Napout also discussed with

21  Grondona and Burzaco Mr. Napout's ambition to become the

22  president of CONMEBOL and the jury -- or rather I find by

23  the preponderance that by obtaining this position Mr. Napout

24  assured that he would be fully informed and in control to a

25  large extent the bribe payments to the other soccer

1   officials because obviously the president of CONMEBOL had

2   considerable control over the actions of the organization.

3           Indeed, after becoming CONMEBOL's president,

4   Mr. Napout agreed to receive what was identified as the

5   presidential treatment at trial, which meant that he would

6   receive $1.2 million per year for the Copa Libertadores

7   tournament instead of the 500,000 that the other soccer

8   officials were receiving and 3 million per addition of the

9   Copa America versus the 1 million that the other soccer

10  officials were to receive.

11          All of this evidence which I am just -- which I am

12  just highlighting some of that evidence, rather, shows that

13  Mr. Napout not only was aware of the full scope of the

14  activities being jointly undertaken by all of the soccer

15  officials but he was actually privy to much more information

16  than the others and he had a direct role in the negotiating

17  the terms of many of those agreements.

18          Certainly it was known to him that in order for

19  the plan to succeed and for these bribery schemes to

20  succeed, the officials had to operate in unison and to vote

21  in unison, to approve the media contracts and also had to

22  agree to take certain steps to prevent other competitors

23  from bidding on these contracts and to prevent the contracts

24  from being fairly put out to bid.

25          Lastly I also find that Mr. Napout in particular

1    was conscious of the need for secrecy and to keeping them

2    secret, hence these conversation with Mr. Bedoya about

3    getting his money in a secure way.

4           So for all those reasons I find that the bribes

5    pain to all the other officials were certainly part and

6    jointly undertaken criminal activity in which Mr. Napout was

7    involved.

8           I will also note that the argument that Mr. Napout

9    would not have known or should not be found to have known

10   about the amounts or the precise amounts of the bribes to

11   the other officials is not a particularly compelling

12   argument for the reasons that I've just said, namely that

13   the evidence shows that Mr. Napout, if anyone, was

14   intimately familiar with the amount that others received and

15   also negotiated at times to receive more than them.  But

16   moreover even if he didn't know it at all times and when I

17   say "it" I mean the precise amount of the other bribes that

18   wouldn't dispositive in terms of a finding that the activity

19   was jointly undertaken because certainly in participating in

20   these bribery schemes he knew that the others had to be

21   receiving bribes and acting consistent with those bribe

22   payments to vote the right way on all these contracts.

23          With respect the Paraguayan World Cup qualifiers,

24   as I said before, the defense argues that the evidence did

25   not establish by preponderance that Mr. Napout agreed to

1    receive 2.5 million in connection with those matches.  I

2    disagree and obviously I presided at the trial so I'm

3    familiar with the evidence.  But again, the Government

4    summarizes it quite well at Page 25 of its submission.  That

5    evidence includes testimony about how bribes were made in

6    connection with qualifier matches as part of the overall

7    scheme, the FIFA scheme, and more particularly the accounts

8    or cuentas, C-U-E-N-T-A-S, the ledger of Santiago Peña

9    documented the fact that under the Hoga tab, which was

10   Mr. Napout's tab, there were ledger entries indicating that

11   Mr. Napout was promised and was to receive and was partially

12   paid some bribe payments for these Paraguayan qualifying

13   matches.  The ledger was introduced, as everybody knows,

14   along with testimony of Mr. Peña and then the testimony of

15   Mr. Burzaco as well.

16          So there -- there was more of a preponderance of

17   evidence introduced at trial to establish that Mr. Napout

18   was both promise and partially received $2.5 million in

19   bribes in connection with the Paraguayan qualifying matches.

20          Thus I do find that the record demonstrates beyond

21   a preponderance that the bribes made to other soccer

22   officials in connection with the Copa America and

23   Copa Libertadores tournaments after 2010 were part of the

24   criminal activity jointly undertaken by Mr. Napout and his

25   co-conspirators with respect to those tournaments, that

1   Mr. Napout received and/or was promised $2.5 million in

2   bribes for the Paraguayan World Cup qualifiers and that the

3   value of all of the bribes either paid or promised as part

4   of these three schemes should be counted for purposes of the

5   loss amount attributable to Mr. Napout, which results in a

6   26-level enhancement under 2B1.1.

7           Now turning to the foreign conduct sophisticated

8   means enhancement.

9           MR. WEINSTEIN:  Your Honor, I apologize.  Would it

10  be possible to be heard on that before we go on?

11          THE COURT:  Go ahead.

12          MR. WEINSTEIN:  I understand Your Honor didn't

13  want to hear argument necessarily, but I think Your Honor

14  adopted some of the arguments or the marshaling of the

15  evidence that was in the Government's brief and I think we

16  have some responses we haven't been able to put on the

17  record.

18          THE COURT:  Go ahead.

19          MR. WEINSTEIN:  May I do that?

20          THE COURT:  Go ahead.

21          MR. WEINSTEIN:  May I use the podium, Your Honor?

22          THE COURT:  You can although my concern is that

23  you keep your voice up.

24          Go ahead.

25          MS. PIÑERA-VAZQUEZ:  We're prepared.

1        THE COURT:  Yes, you know the drill.

2        MR. WEINSTEIN:  Thank you, Your Honor.

3        With respect to loss amount --

4        I understand your findings, Your Honor, with

5   respect to the scope of the conspiracy.  I think one of the

6   issues we want to raise is how it is that the Government

7   marshaled that evidence in the brief.  I'm not going to go

8   through all of it, obviously, but I want to point out a few

9   issues in that the argument we have on loss amount is not

10  that the Government didn't have sufficient evidence to

11  participation overall conspiracy, that's an argument for a

12  different day.  And the way the Government marshaled its

13  evidence in its brief really goes to that.  It doesn't go to

14  whether Mr. Napout agreed upon the scope of the bribes that

15  are in those Government charts for over $150 million or that

16  it was reasonably foreseeable.  And I want to go through a

17  few of the things Your Honor said how the Government

18  marshaled its evidence and why we think it's a problem how

19  they did that for this purpose, sentencing.

20        But I want to start with what is the most glaring

21  example of how the evidence at trial could not possibly

22  support a finding that Mr. Napout agreed upon the scope of a

23  10 million-dollar bribe to Mr. Webb or that that was

24  possibly reasonably foreseeable.  That certainly there was

25  evidence about that bribe at trial.  Not a single person

1  testified connecting Mr. Napout to that bribe whatsoever.

2  He was not an CONMEBOL official, he was a CONCACAF official.

3          THE DEFENDANT:  The other way around.

4          MR. WEINSTEIN:  No, no, I'm saying Mr. Webb was

5  not a CONMEBOL official.  I understand, but Mr. Webb himself

6  was not a CONMEBOL official, he is a CONCACAF official.

7          The Government cooperators discussed that bribe.

8  They had every incentive to have the cooperators tie that

9  bribe somehow to Mr. Napout's awareness, they don't it and

10  they didn't argue it in closes whatsoever and they don't

11  touch it in their brief.  It's just not mentioned.

12          It's -- it's not clear why that 10 million is

13  being included for this purpose.  It gets them over the next

14  level of $150 million.  There's simply no evidence to make a

15  finding that that was within his agreed upon scope and

16  reasonably foreseeable to him.

17          With respect to a few of the points that

18  Your Honor had in how the Government marshaled the evidence

19  and Your Honor pointed to within the Pages 17 to 24 that

20  there is -- that the Government says there's evidence that

21  in 2013 and 2014 Mr. Napout met with both Mr. Burzaco and

22  Mr. Bedoya on frequent occasions to discuss bribes, but then

23  I know they say that in their brief but then if you look at

24  that they cite to, Your Honor, they cite to two things.  One

25  is the paragraph in the PSR that mimics the same thing

1    that's based on what the Government says, so that's

2    circular.  And they cite to two pages in the transcript to

3    that -- that is a big statement that in two years he had

4    frequent meetings with Burzaco and Grondona where they

5    discussed bribes multiples times.  That's a lot to put into

6    two pages of transcript, and when you get to that two pages

7    of transcript it simply doesn't support that.  If you look

8    to what they cite, which is Pages 380 and 381 of the trial

9    record.

10           The question after Mr. Burzaco says that during

11   those years there were meetings with him, Mr. Napout and

12   Grondona, they asked him, question:  And when Mr. Napout

13   would come to Argentina in what context would you see him?

14           Answer:  Many times in the context of having

15   meetings with me and then going to Julio Grondona's house.

16   I'm talking about 2013 and the first months of 2014 going to

17   Grondona's house having conversations, the three of us, and

18   those conversations to a great deal were regarding politics

19   and his desire to become the next CONMEBOL president.

20           There's no dispute that Mr. Napout at some point

21   had a desire to become CONMEBOL president, and as a result

22   of that, had political discussions on that topic with

23   Mr. Grondona.  But the trial testimony they cite does not

24   support the fact that there were multiple meetings in those

25   two years with Grondona where bribes were discussed.  That

1   is the issue of how they're marshaling the evidence.  They

2   make a lot of statements about what he might have known and

3   they point to a lot of trial evidence.  We're not arguing

4   there wasn't generally jointly undertaken activity but to

5   find that he was accountable for every one of those bribes

6   in the chart, there's just not evidence to support all of

7   that.  We're not saying there's not some evidence in there.

8           But another example of that, Your Honor, in

9   addition to the Webb bribe, is Mr. Bauza was not supposedly

10  in the Group of Six, he received one payment according to

11  their chart, I believe $400,000.  I'm forgetting the year

12  offhand but earlier in the period of time.  There's simply

13  no evidence that Mr. Napout agreed upon that scope of

14  activity or was aware of it.

15          And the problem with saying he was aware of the

16  entirety of -- we're talking about 20 different people

17  getting bribes for three purported schemes over the course

18  of six years is -- it goes against actually the premise of

19  the case which was there was a Group of Six that could

20  outvote everybody else, that the point of it was that it was

21  a majority voting block.  It was, according to the

22  Government's theory of that, unnecessary for them to need

23  anybody else to get anything done.  That was the whole point

24  of having the Group of Six, a voting block, so while, you

25  know, we could discuss whether he should be held accountable

1    for all the Group of Six's bribes, beyond that the evidence

2    that he would have known and it was agreed-upon scope that

3    he joined with the other 14 people it's sort of undermined

4    by the Government theory of the case against Mr. Napout.

5            The last thing on this, Your Honor, because I

6    don't want go one by one.  We did it in our brief.  They did

7    not respond to that.  They really didn't.  I understand they

8    marshaled the evidence as to why there was a broad

9    conspiracy but that's the trial.  This is sentencing, it's a

10   very different standard.  And that's the Paraguayan

11   qualifiers.

12           Your Honor rightly pointed that the Government

13   marshaled what it says is the evidence of that on Page 25.

14   If you look at the cite that they put on 25 you can skip

15   down, most of them have -- there is general discussion about

16   qualifiers generally being in the mix, we understand that.

17   We understand that's the conspiracy.  But what is the

18   evidence they marshaled here as to the fact that there was

19   actually a scheme in connection with the Paraguayan

20   qualifiers, not just that he actually got money but there

21   was a bribery scheme?  The only thing in this entire page

22   that touches on Paraguay at all is the six pages of

23   transcript from Mr. Peña from 1168, I think it's really

24   through 1174, approximately that.

25           So for starters no other person at trial testified

1  that there was such a scheme.  Mr. Peña himself had no

2  knowledge of such a scheme.  He understood from his boss

3  that he was paying Mr. Napout in connection with those

4  qualifiers.  He had no personal knowledge of how the

5  contract from 2011 came into being, whether there was an

6  agreement at the time to exchange bribes in connection with

7  that 2011 contract.  Nobody else at trial testified about

8  that.

9           In fact, they didn't even put in the contract by

10 which Ciffart got the rights for broadcasting.  They put in

11 a contract in 2011 where Ciffart then sold the right to Full

12 Play.  But as far as there being an agreement between APF,

13 the Paraguayan federation and Ciffart for those rights, they

14 didn't enter a contract and they didn't have a single

15 witness discuss what went on in connection with that

16 agreement, if there was an agreement.

17          So it's -- our argument is actually that there's

18 no evidence in the record and certainly not to make a

19 finding for sentencing purpose that that scheme existed and

20 the jury, just to be clear, didn't have to make a finding on

21 that.  It was not its own Count, so there is no jury finding

22 specifically for the Paraguayan qualifiers.

23          THE COURT:  Just to go back a minute to the

24 Ciffart agreement, is there the agreement for Ciffart to

25 sell?  And for the court reporter that's C-I-F-F-A-R-T.

1   It's traffic backwards.

2            MR. WEINSTEIN:  Two Fs, Your Honor.

3            THE COURT:  Yes, two Fs because it's Traffic

4   backwards, as I recall in the trial.

5            But if there's a contract between Ciffart and Full

6   Play to sell the rights, then the inference is that Ciffart

7   had the rights before 2011, so there was a contract signed.

8            MR. WEINSTEIN:  Yeah, yeah.  No, I'm saying

9   absolutely.  In the Ciffart and Full Play contract it

10  actually says if Ciffart had obtained these rights through

11  some kind of contract from APF.  Yeah, we're not disputing

12  that Ciffart at some point got the rights.  The issue is, I

13  think, the Government's theory would be that when Ciffart

14  got the rights from APF and Mr. Napout was its president, at

15  that time at 2011 there was some exchange of you get the

16  contract, Ciffart, I get the money.

17           First of all that contract itself is not in

18  evidence.  They never put it in.  There's reference -- we

19  understand it's got to exist but the point is nobody was

20  able to testify what happened when that contract was issued

21  and supposedly there was an agreement back.  Nobody.

22           THE COURT:  But bear in mind, I think, that is --

23  the statement you are making is true by a lot of the

24  evidence in the case and because of the nature of the secret

25  arrangements, a lot of it -- evidence is circumstantial and

1    the jury was required to draw up, as am I, inferences from

2    that evidence.  So the logical inference from everything

3    you're saying and this would be under the preponderance

4    standard is that at the time Mr. Napout was the president of

5    APF, there was a contract negotiated with Ciffart for the

6    media rights for the qualifiers and that preceded 2011

7    because in 2011 those rights were sold by Ciffart to Full

8    Play, ergo Mr. Napout as the president of APF would have had

9    to sign that contract --

10              MR. WEINSTEIN:  Can I stop you there?

11              THE COURT:  Okay.

12              MR. WEINSTEIN:  I don't think that's the case.  Of

13   course, we can't tell you for sure because they didn't put

14   in the contract.

15              THE COURT:  Let me stop you then, though.

16              MR. WEINSTEIN:  Yes.

17              THE COURT:  Coupled with that you have testimony

18   through Mr. Peña who said that I who kept this ledger very

19   faithfully and was accurate in my recordkeeping was told,

20   and this is a co-conspirator statement so it got admitted,

21   that we're paying Mr. Napout X, $2.5 million but broken down

22   into installments for the Paraguayan qualifiers and this

23   person, who obviously was handling a lot of money and took

24   his responsibilities quite seriously, distributed some of

25   that money and kept an accounting of that.

1     Why isn't that enough evidence by preponderance to
2   show that Mr. Napout who was in the position of being the
3   president and who, according to one of the co-conspirators s
4   was receiving bribes in connection with the qualifiers and
5   those rights were actually sold from Ciffart to another
6   company, Full Play.  Why isn't that enough to find by a
7   preponderance that he actually was involved in such a scheme
8   and that he did have a role in granting first the contract
9   to Ciffart and then later to another company?
10          MR. WEINSTEIN:  So for a few reasons.  Starting
11   with the contract itself, I think as I noted when Your Honor
12   was describing the potentially circumstantial inferences, we
13   don't even have a contract.  Yes, it was -- if it existed,
14   presumably it existed in some form, and came into being
15   while he was the president of the federation but as far as I
16   know he didn't sign.  So to the extent he didn't sign it
17   which, of course, we can't confirm or not because it's not
18   in evidence, that sort of undermines the premise from the
19   get-go.  But --
20          THE COURT:  But it doesn't undermine the premise
21   because you say as far as you know it didn't exist.  The
22   question is, based on the evidence that was introduced, is
23   it a reasonable inference that he was the person who signed
24   that contract in exchange for receiving these bribes that
25   were documented in the ledger.

1    MR. WEINSTEIN:  No, I don't think you can -- there

2  is no inference to be drawn from the lack of a contract that

3  he signed it, assuming it existed.

4    THE COURT:  Well, no, clearly there was a contract

5  with APF and Ciffart.  That is undisputed, right, because

6  they sold the right.  I say undisputed but that's

7  established by the selling of the rights in 2011.

8    MR. WEINSTEIN:  That's an inference I think I can

9  go with you on.

10    THE COURT:  And then there is testimony, direct

11  testimony from Mr. Peña saying I kept this ledger and I was

12  instructed to disperse $2.5 million or that that amount

13  would be dispersed over time to Mr. Napout for -- in

14  exchange for a contract that was granted -- and I don't

15  recall the testimony exactly -- but I guess granted to Full

16  Play, I guess, ultimately, right, as happened in 2011.  I

17  guess actually maybe that's more of the point here.  I don't

18  know what Ms. Mace is going to say.  The Government's theory

19  is that what Mr. Napout did was get the money to grant the

20  contract to Full Play; is that correct?

21    MS. MACE:  Your Honor, the testimony from Mr. Peña

22  and supported by Exhibit 601, which is the ledger, is that

23  the ledger is a record of bribes to soccer officials.

24    THE COURT:  Right.

25    MS. MACE:  And he testified about the fact that

1  those are personal payments, everything that's documented in

2  that ledger.

3           And with regard to the Ciffart contract and for

4  the Paraguayan rights specifically, Mr. Peña testified that

5  qualifiers were something that the Jinkises at Full Play

6  were paying bribes for and specifically with regard the

7  Paraguayan contract it doesn't matter who signed the

8  contract.  I think that's a red herring.  The issue is

9  whether Mr. Napout caused Full Play to get those rights and

10 was compensated with the bribe.  And the testimony was that

11 he did.  He received $2.5 million and it's documented with

12 exact detail exactly how much he was supposed to receive in

13 connection with every single contract payment.  And so it

14 is -- I don't think it can be disputed that the contract

15 resulted in the rights being transferred to Full Play

16 ultimately.  Yes, there is middleman in there, but they

17 resulted in Full Play taking possession of those rights and

18 in return Mr. Napout got $2.5 million promised to him that

19 he was drawing down on and that's reflected in Exhibit 601.

20           THE COURT:  So let's address that more directly

21 because you're focusing on the lack of a contract between

22 Ciffart and APF before 2011 but really the relevant one is

23 the transfer of the rights or the sale of the rights from

24 Ciffart to Full Play, which was in theory the deal that was

25 part of the bribery scheme that the Government established

1   through the ledger.

2          In other words, the contract was supposed to go to

3   Full Play and it did go to Full Play.

4          MR. WEINSTEIN:  So a few things on that, excuse

5   me.

6          First of all, I understand the inference that's

7   trying to be drawn, but when Ms. Mace said that the evidence

8   was that Mr. Peña said that that was for Mr. Napout for

9   making sure Full Play got the rights, I mean that's not what

10  he said.  I mean he said -- all he said, the only thing they

11  can rely upon at all, this entire scheme, is that he was

12  told that the payments he put in his ledger was in

13  connection with that contract.  That's it.  He has no

14  personal knowledge.  He conceded as to what -- how that came

15  about at all.

16         THE COURT:  But why does it matter?  I mean if the

17  point is this media company is paying money directly to the

18  official, the head of APF for a contract to be awarded.

19  That's bribery.

20         MR. WEINSTEIN:  But if -- here's why what happened

21  between APF and Ciffart is important not -- not necessarily

22  what happened between Ciffart and Full Play because what

23  happened between Ciffart and Full Play has no effect on APF.

24  They have already sold their rights.  The issue is whether

25  APF had sold the rights it can sell to Ciffart in exchange

1  for a bribe.  There's simply no evidence that that took

2  place because nobody at trial had any knowledge of what

3  happened.

4          THE COURT:  But.

5          MR. WEINSTEIN:  And if I could just --

6          THE COURT:  Yeah, go ahead.

7          MR. WEINSTEIN:  -- address for a moment and I

8  understand we're drawing inferences on circumstantial

9  evidence, but with respect to the ledger itself, and I

10 understand if I have no reason to doubt that Mr. Peña wasn't

11 trying to basically put down, not what he had knowledge of

12 at all but what Mariano Jinkis told him.  I mean, Mariano

13 Jinkis by all accounts from people at trial was double

14 dealing, you know, do whatever he could to help himself

15 personally.  He double dealt the Government cooperates with

16 Hawilla on yes/no, we needed all this money for bribes and

17 actually they were causing to pay a lot more, that was not

18 money they were using for bribes.

19         He's entirely untrustworthy.  There was no ability

20 to cross-examine him, so it's left to.

21         THE COURT:  Although that was explored at trial.

22         MR. WEINSTEIN:  It get that, but this is a

23 different issue.

24         I don't want to argue the trial verdict.  The

25 issue is whether the particularized findings for sentencing

1   purposes that he is actually on the hook for that stuff can

2   be made especially where there's no jury finding on this

3   issue.  They didn't charge the scheme as a separate Count, I

4   mean.

5          And so we're left with really a thirdhand

6   statement from someone that gave no details, if any at all,

7   about what actually happened that there was a contract

8   issued in 2011 or before then, where somebody agreed with

9   Mr. Napout that, hey, if you issue this we'll give you

10  bribes.  There was no testimony about that.

11         THE COURT:  Okay.  All right.  Thank you.  Is

12  there anything else you wanted to say?

13         MR. WEINSTEIN:  May I have one moment, please?

14         THE COURT:  Yes.

15         MR. WEINSTEIN:  Yeah, I apologize if I'm taking

16  more time on this issue than you anticipated.

17         But, you know, back to the insufficiency of the

18  evidence on each of the specific people and look, I'm not

19  going to argue right now whether he knew someone got 400,000

20  versus 600,000.  The issue is whether he had any reason to

21  think certain people got any money at all.  And, by the way,

22  just another example of that, he was not part of the Group

23  of Six.  He didn't sign the initial contract back in 2010,

24  which I think showed that while generally he coordinated

25  activity, you only need the Group of Six.  You don't need

1    everybody to sign a contract and, in fact, Mr. Jadue did not

2    sign what is like the key contract in this case.  It just

3    goes to show that there is no reason for him to have known

4    or think he was in the agreement with everybody to make this

5    happen and there was simply, again, no evidence at trial

6    that -- if the evidence at trial was Mr. Jadue felt like

7    left out so he becomes the 7th member of the Group of Six.

8    So you don't knee a 7th member to have voting block six and

9    the issue is whether Mr. Napout would have any reason to

10   think he was agreeing to have Mr. Jadue involved or that

11   bribes to him were reasonably foreseeable.

12          We're talking about $8.8 million worth of bribes.

13   And for sentencing purposes the record just doesn't support

14   a finding that he agreed upon that scope and that was

15   foreseeable to him.  Look, those are examples.  Obviously we

16   went through some of them and I'm not going to torture

17   Your Honor on that point but I think you understand where

18   we're coming from.

19          THE COURT:  No, I appreciate your comments.

20          Let me hear from the Government.  Thank you.  Why

21   didn't you keep that on in case you need it later, just turn

22   off the -- have Ms. Piñera-Vazquez help you with that.

23          So do respond, Ms. Mace, to the arguments about

24   his knowledge or the foreseeability of all the other bribed

25   officials, and in particular focus on the CONCACAF versus

1    CONMEBOL issue he raised as well as Mr. Bauza and this

2    notion that the Government's theory is that the Group of Six

3    was a voting block so therefore it might only be reasonably

4    foreseeable to him that would be aware of the bribes

5    received by the Group of Six but beyond that he didn't

6    necessarily think or know that bribing anyone else was

7    necessary.

8           MS. MACE:  Your Honor, I think it's important to

9    start with the elements listed in the provision 1B1.3 in

10   order and deal with them as they are set out there.

11          And the first one asked the Court to determine

12   what the scope of the jointly undertaken activity is.  And

13   so our response to the arguments in the defense brief, they

14   ask the Court to do something different than what the

15   enhancement is asking the Court to do.

16          The defense asks the Court to try to determine

17   whether Napout himself participated in the bribes of each of

18   these individual other co-conspirators and that's not the

19   right question.

20          The question is to look at what the scope of the

21   activity at issue is.  And so here --

22          THE COURT:  But isn't the test the reasonably

23   foreseeable scope?

24          MS. MACE:  That's the next step.

25          THE COURT:  Right.

1    MS. MACE:  But the first test is to determine what

2    the scope of the jointly undertaken activity is.

3    And here Mr. Napout jointly undertook to carry out

4    schemes with other soccer officials to award lucrative

5    contracts in exchange for bribes.  And so the conduct at

6    issue is the scheme and so you have the Copa America and the

7    Copa Libertadores and the Paraguayan World Cup qualifier

8    rights.  And just to step back for a moment we have not

9    asserted that Mr. Napout is responsible for all of the

10   bribes in the case.  There is many, many more that are

11   carved off here and we looked only specifically at the

12   specific scope and the conduct at issue here.

13   And I think one of the examples in the guidelines

14   is instructive in how to assess this first aspect of the

15   loss analysis.  And I'm referring to 1B1.3 Application

16   Note 4.  And there there's a pretty simple example.  But it

17   describes how Defendant A is 1 of 10 people hired by

18   Defendant B to off-load a shipment of marijuana from a ship.

19   And during the off-loading of the ship it's interrupted by

20   law enforcement and not all of the marijuana is off-loaded

21   but it's all seized and the guideline says the Defendant A

22   is responsible for the full amount of the marijuana

23   off-loaded.  It doesn't matter how many boxes he picked up

24   and carried off.  It doesn't matter if he knows who Numbers

25   9 and 10 are, if he specifically understands their degree of

1   knowledge, he knows he is there that day to off-load the

2   drugs from that ship.  And so he shows up, he does it and he

3   is responsible for that full amount of that conduct.

4          Now if there's a second ship or one the next day,

5   he's not responsible for that because what he undertook was

6   to get this ship off-loaded with the drugs.  And so here I

7   think by analogy we have the specific contract at issue and

8   what he undertook was to exchange those contracts for bribes

9   and to ensure that the bribe payments for marketing

10  companies would get those contracts and that's exactly what

11  he did and so all the other conduct that falls within that

12  scope is attributable to him.

13         Now the next step is foreseeability and that's the

14  first question and so we did not respond in the way that the

15  defense wanted us to by saying whether Mr. Napout was

16  involved in every single bribe to every single person.  We

17  said this is the scope of the conduct and this is how the

18  Court accepted that first aspect of the enhancement.

19         Then you move on to foreseeability and there was

20  ample evidence -- well, let me just say -- I'm sorry, one

21  more note on the scope, and I'll talk about Mr. Webb here.

22         So with regard to the Copa America Centenario

23  scheme the scope there was to sell these rights, including

24  the 2016 Copa America Centernario.

25         THE COURT:  Right.

1      MS. MACE:  An essential aspect of that scheme was

2  that it would be not just CONMEBOL, it would be CONCACAF and

3  CONMEBOL together.

4      THE COURT:  Right.

5      MS. MACE:  So Mr. Webb's conduct in ensuring that

6  the FIFA and the FIFA partners could get those rights were

7  absolutely within the scope of that scheme because that's

8  how they ensured that the FIFA would keep those rights.

9      And I'll just note as -- well, and so I think on

10 that first step the scope is clearly when it's clearly

11 defined, it's clear that each of the bribes that are listed

12 in the PSR with regard to those people who participated in

13 that scope, should be attributable to Mr. Napout.

14     THE COURT:  I guess the question, though, is the

15 second part of the test that we're talking about requires me

16 to make a particularized finding that it was reasonably

17 foreseeable to this Defendant that all of these other bribes

18 would be made and the one in particular that the Defendant I

19 think legitimately focuses on is the Webb slash

20 or backslash, Sanz, S-A-N-Z, bribe of $10 million.  Now I

21 gather that your argument is because the Defendant,

22 Mr. Napout, certainly was aware of the fact in order for the

23 2016 Centenario, Copa America or the Copa America Centenario

24 Tournament to go to Datisa, they had to get the buy-in quite

25 literally of the CONCACAF officials which at the time I

1  think Webb was the head of the CONCACAF; is that right?

2          MS. MACE:  Yes.

3          THE COURT:  So your argument in terms of

4  satisfying the second factor or the second part of the test

5  is that the evidence was clear that the Datisa contract

6  could only be awarded if both CONCACAF and CONMEBOL agreed

7  to give it to them to Datisa, that is.  And that satisfies

8  the particularized finding requirement.

9          MS. MACE:  Here, Mr. Napout clearly entered into

10  an agreement to undertake with the bribe-paying entities,

11  the goal of having these rights secured for Datisa and he

12  agreed and understood that all the bribes that needed to be

13  paid would be paid.  I think that's the sufficient.  But

14  here actually there's quite a bit more.

15          With regard to Jeffrey Webb, in particular, the

16  then president of CONCACAF, there's evidence at trial that

17  he was in frequent contact with the CONMEBOL executives also

18  and, in fact, there is a recording that was entered into

19  evidence, there was a discussion between José Hawilla of

20  Traffic and Aaron Davidson, another a Traffic executive and

21  this is Government's Exhibit 1702-T.  And there is a

22  discussion about these rights.  And in talking about the

23  Centenario, Davidson said to Webb that he talked to Eugenio

24  Figueredo, who was the then president of CONMEBOL in

25  Switzerland.  And quote, they talked with Jeff.  They all

1  did.  They talked.  Somehow someone said they knew that he

2  went to South America and that they received from

3  Centenario.

4         And so the evidence was they all talked to Jeffrey

5  Webb.  They understood that he was coming to South America

6  to join in this agreement.  And then, in fact, the evidence

7  was from the testimony of Mr. Burzaco that Jeffrey Webb

8  traveled to Chile where then Mr. Figueredo set up a meeting

9  between Burzaco and Webb to arrange the details of those

10 bribe payments.

11        So this is not a situation where you have CONCACAF

12 and North America completely separate, and CONMEBOL in South

13 America.  There is a joint activity to get this deal done

14 and whatever bribes needed to be paid would be, and, in

15 fact, Webb came down and made that deal in South America and

16 the evidence was they all talked to Jeff.

17             THE COURT:  Okay.  All right.

18             MS. MACE:  And so --

19             THE COURT:  Go ahead.

20             MS. MACE:  -- with that I think certainly there's

21 enough the meet the second aspect of the loss enhancement

22 with regard to foreseeability.  But even if that evidence

23 weren't there, there would still be enough that they

24 undertook this and Mr. Napout in particular understood that

25 bribes were going to be paid to each individual that

1    needs -- whose vote needed to be secured.

2          And like the example of off-loading the drugs from

3    the boat, it's not essential that he knows the name of every

4    single person or the amount or those specifics or whether

5    Person Number 11 had no knowledge, the important thing is he

6    entered into an arrangement to get the metaphor here was get

7    the drugs off the boat.  He was going to get that contract

8    secured and make sure the rights when to Datisa and that

9    they were secured there and that's activity they undertook.

10         THE COURT:  And that argument basically would

11   apply to all the other individuals that the defense is

12   pointing out?

13         MS. MACE:  Yes.

14         THE COURT:  Mr. Burzaco and some of these other

15   individuals.

16         I guess the only question, though, then is more

17   broadly again, if the scheme, though, or if the plan that

18   Mr. Napout clearly was involved in, namely gathering of this

19   Group of Six to be a voting block and thereby being able to

20   unilaterally in some way approve some of these contracts,

21   what do you say in response to the argument that therefore

22   that Mr. Napout reasonably could not have -- would not have

23   expected the other people would need to be bribed?  Because

24   you think an organization like all these media companies

25   would act in the most efficient manner, right?  They would

1   only bribe the bear minimum number of people they would need

2   to bribe.  I'm just gripping on the argument made by the

3   defense.  Wouldn't it be fair to assume that a media company

4   is going to print as little as possible and only bribe the

5   Group of Six if that's all they need to make the contracts

6   work.

7           MS. MACE:  Well, there's to reason to think that

8   that's all that they needed and, in fact, the contract ended

9   up being signed by were unanimous generally.  And even from

10  the beginning of the Group of Six the testimony with regard

11  to the formation was that back in 2010 the group was formed,

12  or at least by that date, and then Mr. Grondona, Julio

13  Grondona, the powerhouse at the time, said that if you are

14  six with me, that makes seven.  They joined together and

15  they understood that Grondona was part of this thing as well

16  and that they were joining into a system, a corrupt system

17  that was already in place.  There was -- over time there

18  were scandals about Leoz and Teixeira and others, and

19  certainly there was enough for them to understand that more

20  people were demanding bribes and they even joined forces

21  with Grondona from the very beginning.

22          THE COURT:  Okay.  Did you want to say something

23  else?

24          MR. WEINSTEIN:  I'll be quick on this one, because

25  I think the two main points, what I heard from Ms. Mace

1   about Webb is a silent concession that there's O testimony

2   at trial at all about Mr. Napout and Mr. Webb, O.  And the

3   only thing she's now sort of extrapolating is from a

4   recording between Traffic and Webb, which look, we have no

5   reason to dispute that they had some bribe agreement because

6   it's irrelevant to us.

7           THE COURT:  Right.

8           MR. WEINSTEIN:  But that the proverbial "they" had

9   some conversation.  I mean, that cannot be sufficient

10  evidence of -- that Mr. Napout agreed upon the scope of this

11  scheme with Mr. Webb.  It just -- it cannot get there.

12          THE COURT:  Okay.

13          MR. WEINSTEIN:  And just quickly the ship analogy

14  is a pretty bad analogy.  I mean, if you know that the ship

15  has a bunch of drugs, of course, you don't have to know

16  whether eight guys are unloading it or 12 guys or what their

17  names are.  Their theory of the case was he understand and

18  we're not accepting the theory, but it's their theory that

19  the ship was a Group of Six.  All the other 14 are on the

20  second ship.

21          THE COURT:  Okay.

22          MR. WEINSTEIN:  How can they possibly extrapolate.

23  It's their theory.  That analogy is not the fact of their

24  theory.

25          MS. MACE:  Your Honor.

1          MR. WEINSTEIN:  Just one second.

2          It's like multiple different ships.  The ship that

3    he was on, supposedly, was with five other guys because

4    that's all they needed.  They didn't need Jadue, they didn't

5    need Bauza, they didn't need all these people.  Osuna, I

6    mean, look we have every example in your brief, Your Honor,

7    but Osuna, I think it is, the only evidence that Figueredo

8    came of one of the cooperators and Osuna feels bad, he's not

9    included so the let me add 600,000 for him.  How is that

10   possibly within the scope of some agreed upon conspiracy and

11   reasonably foreseeable.  I mean, it's just an example but

12   this is why to go through that chart it just falls apart.

13   It cannot be the basis for a sentencing context.

14          THE COURT:  Go ahead.

15          MS. MACE:  Your Honor, I believe the defense is

16   mystifying the analysis and that example.  The question is

17   whether the scope of the criminal conduct, that scheme, the

18   jointly undertaken enterprise, and so it is the contract and

19   the sale of the contract in exchange for bribes.  And so you

20   look at each person and say were they inside that scope?

21   You don't start with Napout, you start with the scope and

22   that's the way the guideline enhancement is written.  You

23   look to the scope, you define that and then you look to each

24   thing and say is that inside or not.  And everything

25   indicates and it's clear from the trial testimony and

1   evidence that there were three separate schemes here and

2   they were unified schemes.  It was important to the bribe

3   payers, the sports marketing company that there were no

4   cracks, they couldn't go forward without Brazil and

5   Argentina and it was clear from the testimony that it was

6   critical to have the support of Brazil and Argentina and the

7   sale of the contract is that scope that is at issue here.

8   And so it doesn't work to say just because they maybe didn't

9   need an 11th person to off-load the ship that there are

10  however many boxes he carried doesn't count.  It counts

11  because the issue is that shipment, the issue is that

12  contract.

13          THE COURT:  Okay.

14          All right.  Let me say this:  I think that the

15  arguments made by the defense especially supplemented your

16  oral argument have given me some pause about the inclusion

17  of the entire scope of this conspiracy.  At the same time,

18  though, I think ultimately, the standard for including

19  relevant conduct or jointly undertaken criminal activity

20  under the 2B1.1 is more inclusive and liberal I think than

21  the defense is arguing.  At least that's my interpretation

22  of it.

23          Again, I'm going to say, though, that this is a

24  somewhat academic conversation.  But I do think it's

25  important that in terms of the principle I tend to agree

1  with the Government in using the analogy of the boat, I

2  think, is an appropriate one.  Because the scope of these

3  bribery schemes was definitely, and this was known to the

4  Defendant broad.  It did involve the participation of many

5  soccer officials and even if the Defendant believed that the

6  Group of Six might ultimately be enough, the evidence at

7  trial definitely showed by preponderance at a minimum that

8  all of the soccer officials were aware of bribes being taken

9  and the efforts of all these media companies to make bribes

10 in order to ensure these extraordinarily valuable contracts.

11        There were examples throughout the trial of

12 knowledge of certain officials getting into trouble, for

13 example, for taking bribes.  And the positions of power that

14 various officials had with respect to some of these

15 contracts in the bribe, even if they weren't part of the

16 Group of 6.  So I think based on a preponderance standard,

17 which is obviously less than the standard that would apply

18 at trial, I certainly find that the evidence shows that the

19 bribes that were made to all these different officials was

20 reasonably foreseeable to the Defendant and was within the

21 scope of the jointly undertaken activity.

22        Again, and I'm not going to belabor this -- but

23 even as to CONCACAF, I think the Government is correct that

24 the particular Copa America contract required the

25 participation and the agreement of CONCACAF to give the

1   contract to Datisa for that -- for the Centenario.  So it

2   certainly was apparent to all involved, including

3   Mr. Napout, who was quite frankly more sophisticated I think

4   than many of these presidents, that as I said before the

5   buy-in of the CONCACAF made it also essential and that

6   wouldn't just be bribing necessarily Mr. Webb but also other

7   individuals to ensure that that particular tournament came

8   to fruition and was awarded to Datisa.

9          So I am going to find still, though I'm not

10  dismissing at all the argument made by the defense, but I am

11  still going to find that the 26-level enhancement is

12  appropriate based on the evidence showing or satisfying the

13  requirement of jointly undertaken criminal activity by the

14  Defendant and the other bribed officials.

15         But as I said, it's -- it's not by no means a slam

16  dunk, to use the vernacular and sports analogy.

17         Okay.  Let me turn now to the factor of or, I'm

18  sorry, the enhancement of fourth conduct and sophisticated

19  means.  This is under 2B -- you know, what I misstated the

20  other one earlier.  This is 2B1.1B10.  And 2 levels are

21  added because the crime involved a use of sophisticated

22  means or -- or the commission of a substantial amount of the

23  crimes or the schemes outside the U.S.

24         The defense doesn't dispute that the plain

25  language of the provision would apply here but makes more of

1   a policy argument, I would say, about the purpose of the

2   enhancement which is to enhance the punishment for crimes --

3   and this is my interpretation of the argument -- that seem

4   to target victims or be focused on the U.S. as the main

5   target or individuals in the U.S. as the main targets of the

6   crime but are conducted outside for the purpose of

7   concealing the crimes or making detection harder.

8          Mr. Napout's attorneys don't cite any case law

9   that necessarily suggests that that's the only time the

10  enhancement can be applied and I think we all agree the

11  plain language of it applies.

12         But even if I were to accept that as the driving

13  purpose and I don't think the Government disagrees with that

14  characterization to some extent, but I think the purpose is

15  met here because we have a series of crimes that violate

16  U.S. law, that also use the wire facilities of the U.S.,

17  also had profits that came out of the U.S. or were going to

18  come out of the U.S. and had meetings that were conducted in

19  the U.S.  So obviously the Centenario was one of the

20  tournaments we referenced so there were direct connections

21  to victims, if you will, or targets or conduct that happened

22  in the U.S. as well.  So I think the purpose, if you want to

23  interpret it of the enhancement is met here, because a lot

24  of the conduct was conducted outside of the U.S.  I don't

25  think just incidentally, because all the perpetrators lived

1   or worked outside of the U.S., but in some part to conceal

2   what was going on with respect to criminal activity that had

3   a big impact in the U.S. and was partially conducted in the

4   U.S.

5          So I don't actually buy the argument of the

6   defense that the application shouldn't apply -- I'm sorry,

7   that the enhancement shouldn't apply here.  It plainly does.

8   There's no dispute that a substantial amount of the

9   activity, the criminal activity occurred outside the U.S.

10  and there were sophisticated means used.

11         I know the defense has made the argument that

12  Mr. Napout allegedly, but the Government -- but rather I

13  think the jury found, but defense would still dispute this,

14  but that he received his bribes in cash and nothing could be

15  less sophisticated than that.  I disagree with that because

16  cash as was tested to by an expert is perhaps the best way

17  the conceal one's criminal activity because it's not

18  traceable and here what proceeded the receipt of cash was a

19  rather elaborate scheme that involved offshore and shell

20  companies and sending of money from the company's account to

21  Buenos Aires where then it was converted into cash through

22  Cambista, C-A-M-B-I-S-T-A, or other means.

23         So the scheme for concealing the source and the

24  nature of the bribes that Mr. Napout received, the millions

25  of bribes was actually a sophisticated means to commit the

1   wire fraud conspiracy that he was involved in.  So for all

2   those reasons I find that the two level enhancement should

3   apply.

4           Did you want to be heard further on this?

5           MR. WEINSTEIN:  Yes, Your Honor.

6           THE COURT:  Okay.  Go ahead.

7           Go ahead, Mr. Weinstein.  Go ahead.

8           MR. WEINSTEIN:  Thank you, Your Honor.  So I'll

9   take the second one first, which is the sophisticated means

10  part of this.  So the guidelines state the first step,

11  sophisticated means are especially complex for intricate

12  conduct pertaining to execution of concealment and then also

13  require the Defendant himself who intentionally engaged in

14  that or caused it to happen.  So the theory, as you say, he

15  wanted cash essentially so it's less -- it's harder to

16  trace.  Let's just accept that as the theory.  If that -- if

17  getting cash as your means of payment in a case gets you to

18  sophisticated means, every money laundering conviction on

19  the basis of it's concealing the nature of the proceeds

20  automatically gets sophisticated means.  It doesn't matter

21  how you do it, it automatically gets it because concealing

22  is just an element of money laundrying.

23          THE COURT:  But I think you're skipping over the

24  steps before that.  What about the use of the shell or

25  offshore companies?

1           MR. WEINSTEIN:  Right.

2           THE COURT:  That's also part of the --

3           MR. WEINSTEIN:  Yes.

4           THE COURT:  Go ahead.

5           MR. WEINSTEIN:  My apologies.  I will address that

6     in one minute.

7           The use of cash alone, putting aside the issues

8     Your Honor just raised is like saying that if someone says

9     let's talk privately with a low voice and not over a

10    recorded line so it's we can't get caught that that's

11    sophisticated means.  I mean, that's essentially what

12    getting cash is.  It's the simplest form of doing something

13    and hoping you can't get caught.  That cannot possibly be

14    the definition of especially complex or indicate.

15          Now Your Honor raised, well, in this particular

16    case it was evidence that ultimately to get the cash there,

17    there were a whole bunch of mechanisms used.

18          THE COURT:  You're going the say that that wasn't

19    his doing.

20          MR. WEINSTEIN:  Not only that it wasn't his doing

21    but there was no evidence that he even knew of that.  So if

22    the evidence in a bribery case, any bribery case is, okay,

23    great I'll take the bribe, I would like it in cash, and even

24    if it -- I want it in U.S. dollars because even though I

25    live in Paraguay that's what people use.  It can't be that

1    you're automatically thinking, oh, they're going to use a

2    shell company or some account offshore to make it happen.

3    Of course, you might have to use foreign exchange to

4    exchange it from one currency to another, but that doesn't

5    mean it's concealed.  You want it in U.S. dollars.  That

6    doesn't mean you're trying to conceal it as a result of

7    that.  There was 0 evidence that he was aware of it.

8            Their theory, again, is that what he was

9    supposedly telling people is do this simply.  Don't use

10   wires.  There's no evidence he used -- you know, sham

11   contracts, shell companies, offshore accounts for the

12   purpose of hiding, none.

13           THE COURT:  Okay.

14           MR. WEINSTEIN:  So I understand others might have

15   decided do that to get cash places.  But this guideline

16   requires that he intentionally engaged in that conduct.

17           THE COURT:  Okay.  So move on to the other factor.

18           MR. WEINSTEIN:  Sure.

19           Look, I wouldn't consider it a policy statement

20   really.  It's the sentence commission specifically responded

21   to congressional statute, the Telemarketing Fraud Prevention

22   Act, I believe it was called in 1998 that said you must do

23   things in the guidelines to punish harsher in the context of

24   telemarketing and I know we're not saying that's the only

25   conduct.  It can be applied but where operations are located

1  in the United States and specifically for purposes of

2  avoided law enforcement here, we're going to move the base

3  of that operation all over the place.  That is what drove

4  that guideline, the sentencing commission says it.  And

5  here, you know, if the Paraguayan federation didn't move its

6  office, it is in Paraguay because operating it in the

7  United States was going to be a problem.

8          CONMEBOL did not move its office to Paraguay to

9  avoid U.S. law enforcement, that's where they are.  That's

10  where the people there work.

11          I don't think -- the argument that there then was

12  some stuff in the United States, to me is a little bit

13  beside the point.  The guideline -- the issue with the

14  guideline is were things moved outside of the United States

15  to avoid in a sophisticated way, by the way, to avoid law

16  enforcement.

17          THE COURT:  But is it notice also true that the

18  purpose of this enhancement is literally to provide for an

19  increased penalty where sophisticated concealment that makes

20  it difficult for law enforcement authorities to discover the

21  offense or apprehend the offender is the situation where

22  this should be applied, not necessarily where the precursor

23  is, the perpetrator's moved outside the U.S. or located

24  their operation outside of the U.S. specifically for that

25  purpose.  Because doesn't this enhancement also address the

1    fact of however it happened, that the actions or the

2    substantial criminal activity of the defendants was outside

3    the U.S. thereby making detection harder?  You don't think

4    that enhancement should apply in that situation?

5           MR. WEINSTEIN:  No, and here's why.  I mean, if

6    they were really doing that they just would have never

7    started wire transmission from the United States and that

8    doesn't quite make sense.

9           Okay.  We're going to have a wire that's from the

10   United States and then once it hits overseas we're going

11   conceal it.  I mean, I understand the evidence is generally

12   that certain people use accounts wherever they might be for

13   the purpose of concealing but that they did it abroad versus

14   the U.S. I don't think is the issue here because they

15   started in the U.S. and I think they had accounts overseas

16   because that's where these people lived and worked.

17          THE COURT:  Well, why wouldn't this enhancement be

18   used where a crime is committed that affects the U.S. uses

19   the U.S. wires and the banking system, there are meetings

20   conducted as part of the criminal conduct in the U.S. and it

21   seeks to gain profits that are generated in the U.S., why

22   shouldn't the enhancement be applied in that situation where

23   the Defendants are doing a lot of their work overseas, their

24   criminal activity, I should say overseas, thereby making it

25   more difficult for the Government to detect it and uncover

1   it and prosecute it?  Isn't that part of what this

2   enhancement is directed at regardless of how it is that they

3   ended up being outside of the U.S.?

4            MR. WEINSTEIN:  So I don't think so.  I think the

5   issue of the fact that it might have an impact here and they

6   did certain things here, I mean, presumably that has to be

7   the case in every criminal prosecution or else these folks

8   wouldn't have any jurisdiction.

9            THE COURT:  But the thing that is not true in

10  every prosecution is that a substantial part of the criminal

11  acts are conducted outside and we're only quibbling over

12  whether or not that intentionality of doing that outside is

13  really what the guideline is directed at.  And it doesn't

14  say that, even though I understand that your argument is

15  they say that part of the purpose, but it doesn't literally

16  say where the substantial activity is intentionally located

17  outside the U.S.

18           MR. WEINSTEIN:  Look, without a doubt that

19  subsection B does not specifically say that.  I think it's

20  entirely clear from the congressional record and the

21  sentencing commission records that that is what is captured

22  but can I give you an example of what it shouldn't apply in

23  the circumstances that you're saying?  I mean, look, this

24  anecdotal.  I'm sure you can get other examples where it

25  might have been applied.

1       I don't know if Your Honor is familiar with the

2   live law cases that qualify, correct?  Big investigation,

3   lot of foreign bankers working at foreign banks

4   manipulating, allegedly, an interest rate and some of the

5   prosecutions are here because the theory is that there is

6   some impacting the United States.

7       One of those folks was tried to conviction in the

8   Southern District and another pled out in the Southern

9   District.  The words that you're saying, the literal words

10  have to apply there.  They're foreign bankers working abroad

11  for a foreign bank.  Obviously there's some connection to

12  the U.S. because they have to have jurisdiction.  In those

13  cases the Government never asked for that enhancement and

14  the Court didn't impose it.

15      A case closer to home, Mark Johnson, the HSBC

16  trader who was involved in a foreign currency manipulation

17  of some sort was sentenced in this District about four

18  months ago.  After trial conviction, a U.K. citizen, he

19  worked abroad for a foreign bank but as far as him

20  manipulating a foreign currency trade that had some impact

21  in the U.S.  The Government did not ask for that enhancement

22  and it wasn't applied.  Look, I'm sure you can come up with

23  cases where maybe it was applied similar, but there's a

24  reason why no one even thought of it there because it

25  doesn't capture what is intended by the enhancement.

1      THE COURT:  Okay, fair enough.  I understand what

2 you're saying on both.  I'm not saying I disagree with you

3 about what the purpose of it might be.  But I'm dealing with

4 the plain language of what it says and I believe that the

5 sentencing commission would express how they wanted to apply

6 it if they wanted to limit its application in the way that

7 you say.  That it's not only that substantial criminal

8 activity occurred outside the U.S. but that it was done for

9 the purpose of preventing or minimizing the potential for

10 detection.  But they don't say that.  And that's what I'm

11 operating under.  The language itself clearly applies here.

12 And so to my mind I think barring or without the benefit of

13 to sentencing commission stating otherwise, I'm going to

14 apply this enhancement.

15      I also find that the sophisticated means applies

16 notwithstanding your argument because what was clear from

17 Mr. Napout in particular is that whatever the means were, he

18 wanted them to be concealed and though you can make an

19 argument, as you have, and not unconvincingly, just saying I

20 want it in cash would apply to pretty much any case and

21 doesn't always result or mean that sophisticated means were

22 used.

23      Here I think the circumstances were such that

24 Mr. Napout in demanding that it be concealed in some way or

25 making that the clear expectation, understood that some kind

1   of more nefarious means to disguise the source of the money

2   had to be used than simply making it cash.  In other words,

3   at some point when it left the -- when it left the bribers

4   in some way it shouldn't be traced back to them as well.  I

5   mean, that was part of his concern.  And so in order to do

6   that some means had to be -- he had to anticipate that

7   certain means had to be used that were more than just

8   converting it to cash.  So I have to believe although,

9   actually, you know, let me hear from the Government on that

10  issue because I shouldn't surmise that because they were

11  conversations between him and the people making the bribes

12  but there was no direct evidence that they discussed these

13  offshore accounts.

14          So let me hear from the Government on

15  sophisticated means issue.

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1          (In open court; 11:00 a.m.)

2          MS. MACE:  Yes, Your Honor.

3          Just to clarify one point.

4          And if I heard Mr. Weinstein right, he said that

5     there is evidence that Mr. Napout just, "Said do it simply."

6     That was not -- there is no evidence to that effect at trial.

7     It was, in fact, the opposite.

8          Mr. Napout sent Luis Bedoya to speak to Mariano

9     Jinkis and said, "Make sure they're doing it carefully that.

10    It can't be traced to us."  Mr. Bedoya went and had that

11    conversation and came back and said, "Yes, they are doing it

12    securely."  And several steps were taken to make sure it was

13    done securely.  The ledger was adjusted so that it didn't have

14    their names on it.  It had the fantasy names or the code

15    names.

16         And also, I think it's important to make clear their

17    receiving cash in this way is necessarily complicated, and I

18    think Mr. Napout understood that.  This is not a situation

19    where he was receiving bribes in Paraguayan currency and he

20    walked to his bank and deposited cash and there is no sort of

21    effort to conceal that.

22         He was going all over the world, having meetings in

23    connection with these schemes, and then he arranged for the

24    Jinkeses to pay him in bribes in a different country, in

25    Buenos Aries, not his home country in a foreign currency,

1  U.S. Dollars, and then have them transported back to Paraguay

2  for his use there.

3          Also, there are other things that he specifically

4  knew about.  He knew that there were wire transfers, he had to

5  have known, and I think it's fair to infer he knew there were

6  wire transfers in connection with the other bribes he got for

7  the transfer of the players' rights and for the vacation

8  rental.

9          And that was a situation where the money was sent

10 via a Seychelles company, Cross Trading, to a rental company

11 in Uruguay for his family to use.  And it was done in such a

12 way that it couldn't be traced to him except for the fact that

13 we uncovered the evidence that tied it together.  So several

14 steps were taken by Mr. Napout, specifically, to make sure it

15 was complicated and difficult to trace and it was not a

16 situation where he was receiving simply receiving cash in his

17 own currency in his own country.  Very, very different than

18 that.

19          THE COURT:  That was $40,000 for the rental?

20          MS. MACE:  Yes, Your Honor.

21          In addition, he received -- at the same time, the

22 evidence showed that he she have had $50,000 in receive from

23 Mariano Jinkis in Uruguay during this visit with his family to

24 the vacation rental.

25          THE COURT:  So, again, Mr. Weinstein, you make some

1    good arguments, but ultimately I believe this enhancement does

2    apply to some of the reasons that I've said.

3            You certainly make a decent argument about the

4    purpose of this foreign conduct aspect of the enhancement but,

5    again, I'm relying on the plain language of it and until the

6    Sentencing Commission makes plain their purpose of this

7    enhancement, I'm going to assume that it applies.

8            And then, secondly, I do believe there were

9    sophisticated means that were contemplated by your client in

10   order to get him the money in cash and to have it be entirely

11   untraceable from its source until it reached him as well, and

12   I had momentarily forgotten about the in kind transfers such

13   as the rental of the Paraguayan luxury apartment.  And also,

14   there were the purchase of the McCartney tickets which I'm

15   guessing was also done by wire in some way or, who knows, in

16   other words, a way to conceal the source of the tickets that

17   went to Mr. Napout.

18           MR. WEINSTEIN:  I don't want to belabor this but the

19   fact that he got paid in the form of tickets -- we're not

20   talking about the guideline that's addressing specifically

21   intricate and complex concealment.  The fact that you get a

22   payment in tickets versus cash has nothing to do with

23   sophistication of the consumer.

24           THE COURT:  Yes.  But when you have a company go

25   ahead and rent an apartment for you for $40,000 and the whole

1    point of it is not to reveal that it's being rented for you,

2    you have to acknowledge that that's some use of sophisticated

3    means.

4                MR. WEINSTEIN:  Your Honor.

5                THE COURT:  You disagree, I understand.

6                MR. WEINSTEIN:  I disagree especially in the scheme

7    of what this case is about.  And the fact that he supposedly

8    went to a different country and have someone pick up

9    the cash and drive it somewhere.  We can get to the evidence

10   on that which was essentially zero.  But the idea that that's

11   sophisticated, the question isn't here whether he was found

12   guilty, it's whether these things were sophisticated.

13               THE COURT:  Again, by a preponderance standard.  So

14   I'm going to overrule that objection.  I'm not accepting that

15   objection.  So the two-level enhancement will apply under

16   2B1.1(b)(10).

17               Now, the abuse of trust enhancement.  The defense

18   argues that's double counting.  That's an argument I rejected

19   in connection with Mr. Marin's sentencing and will do so again

20   here for the same reason which is the one that the Government,

21   I think, correctly points out in its submission that the abuse

22   of trust enhancement should apply because the 2B1.1 guidelines

23   that are used to calculate the total offense level don't

24   incorporate that in any way because the different crimes that

25   are covered by 2B1.1, which are various forms of fraud or

1   theft, aren't always -- don't always involve an abuse of

2   trust.

3           The fact that the enhancement doesn't apply where

4   official conduct is involved makes sense because the

5   guidelines, the underlying guidelines, isn't 2B1.1 for

6   purposes of the base offense level but, rather, I think 3C1.1.

7   And that guideline starts much higher and incorporates the

8   notion of the abuse of trust.  And there, the Sentencing

9   Commission made clear that that was their intent and,

10  therefore, the 2B1.1 -- sorry -- the enhancement for abuse of

11  trust shouldn't be applied.

12          So based on everything that's in the guidelines

13  itself, as well as the Sentencing Commission demonstrating

14  that it knew how to prevent double counting in this instance,

15  I'm not going to get rid of the abuse of trust enhancement and

16  that will apply.

17          MR. WEINSTEIN:  Your Honor, if I may be heard on

18  that?

19          THE COURT:  Very briefly.

20          MR. WEINSTEIN:  This is a significant legal

21  argument.

22          THE COURT:  Okay.  Go ahead.

23          MR. WEINSTEIN:  We don't dispute that there are all

24  sorts of frauds and many of them do not include an abuse of

25  trust and 2B1.1 does not address it.

1      In U.S. v. Broaderson, the Second Circuit, in a

2   fraud case, so it was applying 2F1.1 which is the predecessor

3   to 2B1.1.  So it was dealing with the same guideline

4   essentially and addressed this issue.  If the standard in the

5   Second Circuit was you only look to the section itself, the

6   base offense level, and see if the guideline says whether you

7   can or cannot apply abuse of trust, Broaderson makes no sense.

8      What they said in Broaderson was what's going to

9   cause the abuse of trust enhancement has to be independent of

10  the crime.  What we are saying is not that all fraud cases

11  have abuse of trust or not, it's that there is a very small

12  subset of fraud case us, theft of honest services, that

13  necessarily, in order to get convicted, have the abuse of

14  trust with the breach of fiduciary duty.  It has to have it

15  and, therefore, it is baked into the offense level.

16     That's the only -- in Broaderson, that's why they

17  said it has to be independent conduct.

18     And let me just the Government says Hudson, which is

19  also Second Circuit is the opposite --

20     THE COURT:  Right.

21     MR. WEINSTEIN:  -- but here's why it specifically

22  tells you this is the Second Circuit's approach.

23     Hudson, entirely different case, a Defendant drove a

24  car into two U.S. Marshals who were trying to detain him.  The

25  Court there sentenced the Defendant under 2B2 point -- it's

1    not 2B, I apologize, I'm forgetting the guideline offense.

2    But essentially aggravated assault.  And the base offense

3    level, what the Court found there, was because it was a car,

4    which is not inherently dangerous, in order to be in the

5    aggravated assault guideline, it has to -- the car was used in

6    a dangerous ways.  Also, it uses a separate enhancement for

7    using the instrument in a dangerous way couldn't be done.

8          The import of that for this case is the Court is

9    saying, you don't look to the base offense level to see if it

10   explicitly says you can or you can't add another enhancement.

11   You actually can look at the types of offenses.  There are all

12   sorts of assaults.

13         There is only a small subset of assaults, just like

14   there is a small subset of frauds, where, in order to get

15   convicted and have that base offense level to apply, it

16   necessarily includes the conduct that is also the subject of

17   the additional enhancement.  And you can't do it, and this the

18   important language.  In the Second Circuit in that case,

19   distinguished it, they disagreed with the Fourth Circuit that

20   came out the other way.  And they said, "Finally, the

21   Fourth Circuit's rejection of the defendant's argument here

22   was driven by its conclusion that double counting is always

23   permissible except when explicitly forbidden by the

24   guidelines.  I think that's what your Honor was just saying.

25         That is not the law in this circuit.  That's the

1    Second Circuit saying why it completely disagrees with the

2    Fourth Circuit.  They go on to say, "A Defendant cannot be

3    guilty of assault with a non-inherently dangerous weapon

4    unless the object is used in a dangerous way.  In some

5    circumstances, it is the use or threatened use of the object

6    which makes the assault aggravated thereby increasing the base

7    offense level and you can't also have the enhancement that

8    captures the same conduct."

9            THE COURT:  Here's the problem I'm having with your

10   argument.

11           One is I want you to reconcile the case cited by the

12   Government which is, U.S. v. Moskowitz which basically says

13   abuse of trust is not included in the base offense level of

14   2F1.1 with the case you cite, Broaderson.  Because what seems

15   common sense to me is that the 2B1.1 guidelines cover a wide

16   range of fraud and theft.  Everything from embezzlement to a

17   securities fraud or something like that.

18           But your argument would in effect -- I mean, in

19   other words, I think it would disrupt the guidelines scheme

20   because if the guideline itself does incorporates various

21   crimes that don't include abuse of trust but yet applies the

22   same guidelines to crimes that do include it or don't include

23   it, and then from the separate provision that says, Where

24   abuse of trust is involved, add two levels and I ignore that

25   because of your theory that it doesn't matter because 2B1.1

1    covers all of these.  Then it seems to me I've -- I'm not -- I

2    mean, it makes no sense in some ways the more than that.  The

3    Sentencing Commission clearly wanted to do in a case like this

4    where the conduct, the general or the base offense level,

5    rather, and the loss amounts and some of the other

6    enhancements are applied under 2B1.1, but the one enhancement

7    or the one factor that's not baked into those guidelines is

8    the abuse of trust.  And then the Commission says, Okay, where

9    that's part of the crime as here, you should add two more

10   levels because we didn't intend the 2B1.1 guidelines to cover

11   that particular form relative fraud namely honest services

12   fraud.

13            MR. WEINSTEIN:  Okay.  So I will try to make some

14   sense out of that.  I understand where you've gone and let me

15   try to make sense out of that.

16            We're not saying that it -- essentially, you can't

17   have abuse of trust in a fraud case.  And I'll give you the

18   example, a Medicare fraud or an investment fraud.  The

19   Government says that Broaderson, that we cited has been

20   cabined by the Second Circuit and they cite Ntshona.  I'm not

21   sure how to pronounce it, but I think it's N-t-s-h-o-n-a, a

22   Medicare fraud case where they said, No, no you can get it in

23   this case but that's entirely consistent with what we're

24   saying.

25            In a Medicare fraud case, the abuse of trust that

1   might be applied is unnecessary for the conviction that gets

2   you the base offense level of six or seven.  You can submit

3   false claims to Medicare and get convicted without any abuse

4   of trust.  It's only applied in some Medicare fraud cases

5   where the doctor is involved and, you know, the Court would

6   find he abused, or she abused, their trust vis-à-vis their

7   patient unnecessary to have been convicted but certainly

8   warranting an enhancement because the person in that position.

9   It's an extra -- and that's why it's consistent with

10  Broaderson.  It's independent of the offense of conviction.

11          So we are saying, absolutely, that should be the

12  law.  Simply with an investment scheme, it doesn't require an

13  abuse of trust.  You can have all sorts of investment schemes,

14  a Ponzi scheme that might not have abuse of trust.  But,

15  regardless, the elements of the offense don't say, yes, abuse

16  of trust.  It just isn't in the base offense level because of

17  what the conviction is.

18          THE COURT:  I see.

19          MR. WEINSTEIN:  Then you go on to determine the

20  facts of the case, putting aside what the elements of the case

21  were, was there something additional that warrants that

22  enhancement?  We agree.

23          In some kind of investment cases, you have a

24  discretionary account vis-à-vis your customer, they rely on

25  you, you should also get the abuse of trust.  But it wasn't

1  baked into the offense level because it wasn't necessary for

2  the offense of conviction.

3          And that's why in <u>Hudson</u>, I know it's an entirely

4  different context, but the Second Circuit says, We disagree

5  with the other circuits.  You do not look to the offense level

6  and say, Is there an explicitly conviction instruction to

7  include or not include a separate enhancement?  That is not

8  the law in this circuit.  And that is why <u>Broaderson</u> makes

9  sense.  If that was the law in the case <u>Broaderson</u> makes no

10 sense.

11         THE COURT:  All right.  Let me hear from the

12 Government on that.

13         MS. MACE:  Your Honor, I think it's important to go

14 back to the plain language of the enhancement to start there.

15 And what the defense is relying on is this provision within

16 3B1.3 that says this adjustment may not be, "Employed if an

17 abuse of trust or skill is included in the base offense level

18 or the specific offense characteristic."

19         Now, those are terms of art, they are used in a very

20 specific way in the guidelines.  And so, if you turn back to

21 2B1.1, you can see, "Base Offense Level," and that's under

22 Section A and that is a defined right here in this provision.

23 Then, you look to 2B1.1(b).  It says, "Specific offense

24 characteristics."  That is a defined term and it lists them

25 all out 1 through 19.  And so, this is the way that that term

1    is to be interpreted.

2          Moskowitz is important.  It is the more recent case

3    from the Second Circuit that specifically addressed this

4    issue.  And so, the defense is asking you to go back many

5    years before Moskowitz to look at cases, some of which don't

6    even involve fraud.  But Moskowitz says very clearly, "Because

7    abuse of a position of trust is not a specific offense

8    characteristic, and is not included in the base offense level,

9    the abuse of trust enhancement was properly applied."  So it

10   is not either of those defined terms under 2B1.1.

11         To the argument that it is somehow essential or

12   necessary to the count of conviction, we take issue with that

13   as well.  You have wire fraud conspiracy.  In the honest

14   service context even, you can have some participants who do

15   not have a position of trust.

16         So here you have the bribe payers.  They conspired

17   in the honest services wire fraud, but they will not get an

18   abuse of trust enhancement because they were not in a position

19   of trust.  They did not abuse that position.  They may have

20   other enhancements.

21         The purpose of the guidelines in these -- this part

22   of the guidelines is to distinguish between different

23   defendants so you look for the abuse of position of trust and

24   see which defendants had that and abused the that and they are

25   more culpable in this way.

1        And so, you have the bribe payers who will not get

2  this enhancement but the bribe recipients do.  So it is not

3  necessary to the count of conviction it's the defense is

4  arguing.

5        THE COURT:  What do you say to that, Mr. Weinstein?

6  That sort of hits you where your argument is.  Basically,

7  there is a form of wire fraud that doesn't involve an abuse of

8  trust.

9        So even accepting that your pre-2000 case,

10  Broaderson, should be -- sets for the this principle that

11  where it's an element of the crime, it cannot lead to a

12  separate enhancement.

13        How does that if, in fact, wire fraud doesn't always

14  have to involve abuse of trust?  Is it your argument that

15  because here an abuse of trust had to be shown, there

16  shouldn't be a separate enhancement?

17        MR. WEINSTEIN:  That's exactly right.  I think

18  that's where I started which, of course, not every wire fraud

19  requires an abuse of trust.  It's not dealt with in the

20  guideline, it's only ones, but there are a very small set of

21  some like honest services fraud, which is this case, which is

22  the same thing as the car not being inherently a dangerous

23  weapon.  It's a small subset of assaults that are different

24  than others that, yeah, the guideline doesn't say it, but it

25  is baked into your application of the base offense level

1    because it was necessary.  You don't have a conviction.  You

2    don't get there without the breach of trust.

3         THE COURT:  That's why I have a problem with your

4    argument because it really does bend, I think, or upend what

5    the guidelines are trying to accomplish.  As the authors or

6    creators of these guidelines, the Sentencing Commission wrote

7    them in a way to achieve certain results or calculations at

8    least, and it shouldn't be based on -- at least the

9    application of those guidelines -- it shouldn't be based on

10   the specifics of the case.

11        It may well be based on the elements of the cause of

12   a charge like wire fraud, for example.  But if, in fact, wire

13   fraud can be proved without abuse of trust, it strikes me that

14   then to dismiss in some way the abuse of trust enhancement

15   that they -- that the Commission provided for in a separate

16   section of the guidelines would, in some way, be undermining

17   their intent because they write these guidelines obviously to

18   apply to a broad range of crimes.

19        And I think to make it specific to the exact

20   permutation or version of the offense that's charged with

21   specific facts that support the charge, I think would thwart

22   the purpose of their scheme.  And may be Broaderson stands for

23   that to some extent, but I'm not going to apply that here

24   because I think that would be contrary to the plain language

25   of the guideline.  I think it does -- I think there is support

1   in the -- at least the <u>Moskowitz</u> decision.

2           MR. WEINSTEIN:  Moskowitz.

3           THE COURT:  And I think your argument based on a

4   slightly different statute doesn't necessarily convince me

5   you're correct partly because of the date of that decision and

6   partly because I think it would, as I said, upend the scheme

7   the commission was trying to create by very carefully create

8   the guidelines in a manner that this did on appeal.

9           Maybe you'll be right, but I don't agree with that

10  interpretation here at least in terms of the abuse of trust

11  enhancement for this honest services fraud.

12          MR. WEINSTEIN:  Your Honor, what that boils down to

13  is because 2B1.1 doesn't explicitly forbid the enhancement in

14  certain circumstances, therefore, double counting is

15  permissible.  The Second Circuit could not have been clearer

16  that the Fourth Circuit takes that view that the conclusion

17  that double counting is always permissible except when it's

18  specifically forbidding by the guidelines.

19          THE COURT:  The problem is you cal it double

20  counting.  I'm not saying it's double counting.  That's the

21  point.  The 2B1.1 guidelines don't include any enhancement or

22  in the base offense level don't bake in or in the specific

23  characteristics don't bake in the abuse of trust.  I think

24  it's not double counting.  Listen, you can preserve your

25  appeal on this.  I just happen to disagree with your

1    application to this case to this guideline for the reasons I

2    think that the Government articulated notwithstanding your

3    argument about Broaderson.  I just don't agree with that

4    analysis.  So I am going to apply the two-level enhancement

5    under 3C for abuse of trust.

6              Obstruction of justice.

7              Now, it I believe is purely a factual issue or an

8    evidentiary issue because Mr. Napout argues that there was

9    insufficient evidence to establish that he intended to

10   obstruct justice, and the Government acknowledges that the

11   intent has to reach a level of willfulness, essentially, to

12   obstruct the Government's investigation regarding the bribing

13   schemes.  This one, I think, is admittedly a close call but I

14   do find that the evidence that was adduced at trial does

15   establish willfulness, and that the Defendant intended to have

16   his computer removed to obstruct the investigation.

17             The facts that I think are most salient on this are

18   the fact that Mr. Napout signed a non-destruction order or

19   agreement just a few months before the computer was removed.

20   He specifically agreed that he would not destroy any

21   information or evidence or data relating to the alleged

22   co-conspirators in this case who are identified, and any other

23   evidence that may relate to alleged bribes.  The computer

24   contained photographs of many of the individuals Mr. Napout

25   was later charged with conspiring with in very celebratory

1    settings.

2           The Government acknowledges, obviously, the photos

3    can be interpreted in many ways.  But, certainly, the

4    Government introduced those photos to corroborate the

5    existence of a bribery scheme.  So it certainly fell within

6    the clear confines of the non-destruction order, but also it

7    could be viewed as incriminating.

8           The other piece of evidence that came from the

9    computer was the direct evidence about Mr. Napout's receipt of

10   the in effect $40,000 in bribe money to pay for the luxury

11   apartment rental in Uruguay.  And the Government used that

12   evidence at truly to show the receipt of part of these bribes

13   in kind rather than in cash.  The circumstances surrounding

14   the removal also indicate an intent to thwart the

15   investigation because there was testimony from Mr. Sanabria

16   who was one of Mr. Napout's assistants that he was told by the

17   lawyers that were hired by CONMEBOL after the investigation

18   began.  And when it appeared that there might be further

19   indictments of individuals including Mr. Napout, that the

20   lawyer told Mr. Sanabria that the computer was going to be

21   removed by the lawyers before any search was conducted.  And

22   the timing, obviously, preceded the search by just a short

23   period of time.

24          The lawyer actually sneaked the computer out of the

25   office under the cover of a jacket because there were security

1    cameras there and then a replacement, or dummy, computer was

2    put on Mr. Napout's desk, so that when the search happened by

3    the Paraguayan authorities it was represented that this was

4    Mr. Napout's computer and, of course, to didn't have any of

5    the potentially incriminating information on it.

6              It is part of a reasonable inference that the

7    ordering of this removal by Mr. Napout was for the purpose of

8    thwarting the investigation.

9              Now, the defense has argued that there was evidence

10   Mr. Sanabria said he was told that the reason that Mr. Napout

11   wanted the computer removed was because of pictures of his

12   family on it and that he wanted to prevent those from making

13   it into the public sphere.  However, that reasoning falls

14   apart because there were a myriad of ways he could have done

15   that because he had a lot of advanced notice about the

16   impending investigation reaching him months, in fact, and he

17   could have simply had Mr. Sanabria, as Mr. Sanabria had done

18   before, download the pictures of his family from the computer

19   and removed them from the computer.

20             The defense argued that he could have easily

21   destroyed the information if that was his intent to thwart the

22   investigation.  But I think the conflict of that, which the

23   Government makes persuasive, which is that he had an alternate

24   plan:  Rather than destroying the photos that might

25   incriminate him, he had a plan that if he was arrested that

1    the computer should be removed which is, in fact, what

2    happened.

3         So I don't find -- and, actually, let me say there

4    was a third option that if he was concerned about was the

5    family photos, for example, he certainly could have left the

6    computer where it was and simply made an application to the

7    Government that those shouldn't be disclosed during the trial

8    because they were totally irrelevant.

9         So the counter reasons that are offered by the

10   defense really don't make any sense to me, and the

11   circumstances under which the computer was taken and then it

12   was never disclosed that the computer was removed point to,

13   and support, the conclusion, certainly, by a preponderance

14   that Mr. Napout was attempting to obstruct the investigation

15   because of information on it that did connect him to the bribe

16   scheme and the other conspirators.

17        Mr. Weinstein, did you want to be heard further on

18   that?

19        MR. WEINSTEIN:  Yes, Your Honor.

20        THE COURT:  Go ahead.

21        MR. WEINSTEIN:  I was thinking of a sports analogy

22   that I'm 0 for 3, and this is a serious proceeding, and his

23   life is on the line.

24        So with respect to the obstruction, there are a lot

25   of points to be made.  I appreciate your Honor said at least

1   it's a close call.  For starters, I think some of the evidence

2   that your Honor referred to I don't think there was any

3   evidence that someone testified that they were going to remove

4   a computer before a search.  I understand that there

5   ultimately was a search that happened some time after his

6   arrest, but I don't think there was any evidence that someone

7   was connecting a removal of a computer to a potential search

8   warrant.

9           And the timeline here makes no sense on this theory.

10  If Mr. Napout believed as of May 27, 2015, that there was

11  incriminating information on that computer that was bad for

12  him and wanted to removed, why did he let it sit there month

13  after month while there was now a known worldwide

14  investigation, lawyers in that very office mirror imaging the

15  computers, collecting evidence, giving it over to the

16  Government, and yet, he's letting it sit there and sit there

17  and sit there.  And it's not until -- even accepting that

18  there was instruction, I'll get to that in a minute, but to do

19  something when I'm arrested, the point is he's an obstructing

20  an investigation the investigation is happening.  It's no

21  secret, it's happening in his office, lawyers are there,

22  they're collecting data and he's letting it sit on the

23  computer.  There is no explanation for why he would allow that

24  to just sit there month after month if he intended to obstruct

25  the investigation that was going on around him.

1          THE COURT:  But the counter reason, not the counter,

2     the alternative reason of wanting to keep the family photos

3     from being made public that similarly found that reasoning.

4     Why not remove those when he knows there might be an

5     investigation.  He has actually been advised he's a target,

6     right, and he signed a non-destruction letter.  So you're

7     right, he had -- but he certainly had every reason to believe

8     his computer might at some point be seized.

9          MR. WEINSTEIN:  As far as we know, the computer was

10     actually imaged prior to this ever happening.

11          THE COURT:  Here's what I can't get over.  The

12     extremity of having the computer removed.  You don't do that

13     if you're only concerned about having family photos disclosed.

14     That is such -- it's a theft of a computer under secret

15     circumstances in direct violation of a non-destruction order,

16     and it's kept from the investigators thereafter.  If, in fact,

17     all he wanted to do was remove the family photos, then take

18     your computer, remove your family photos, tell the Government

19     you removed the family photos, show them to them, but don't

20     take the entire computer and have it completely withheld and

21     the fact that it's been removed can withheld from the

22     investigators.

23          MR. WEINSTEIN:  So a few things.

24          First of all, on whether there was -- I'll get to

25     past this -- whether there was an instruction by Mr. Napout to

1    remove the computer.  I think the evidence from Mr. Sanabria

2    because he was told that Mr. Napout had expressed concern that

3    if he was ever arrested, there are family photos and one where

4    people are in bikinis on the beach on that computer.  And we

5    have heard testimony from many at the trial about safety

6    concerns for people of that stature in that area of the world.

7    That's the testimony now, whether Mr. Caseras says, I'll take

8    care of it.  Whether Mr. Caseras decided, rightly wrongly,

9    foolishly, or whatever.  The way of taking care of that would

10   be to actually remove the computer, I don't dispute that

11   that's not the smartest way to go about taking care of that.

12   But that goes to whether Mr. Napout actually instructed anyone

13   to do that, and whether the alternative that he should have

14   potentially either tampered with the computer to take stuff

15   off, should he have asked someone at the time, okay, so maybe

16   he should have asked someone.

17            THE COURT:  Let me stop you on that.

18            I already made a finding that he was involved in

19   removal of the computer, I'm not going to revisit that.

20   Again, you're preserving your argument, I understand.

21            As I understood your argument at this stage, it was

22   more about whether the evidence was sufficient to show intent

23   to obstruct the investigation.

24            MR. WEINSTEIN:  It's more of that because I did

25   understand that your Honor had made that other ruling and the

1    Government says we didn't argue whether he participated, we

2    did, we put it in a footnote.  But I didn't want to belabor it

3    for that very reason in order to address what your Honor said.

4    I think it's important to have made that argument.  The

5    question is still, Did he have the specific intent to obstruct

6    an investigation.  So let's go to, well, what is it?  Putting

7    aside that he let that same computer sit there and be imaged

8    and available for lawyers for six months and if he's arrested.

9    So if he's not arrested for another year, it's sitting there

10   for another year even assuming that instruction.  So this is

11   not getting rid of evidence this is on the off chance some day

12   I get arrested, it's sitting there for that investigation.

13              THE COURT:  Isn't that critical that if I get

14   arrested, meaning, this is now real, I'm going to get

15   prosecuted, doesn't that make sense then that's when he

16   chooses to have it removed.

17              MR. WEINSTEIN:  No.  He only gets arrested if the

18   investigation with the evidence sitting in his office leads

19   them to think that they have enough to charge him with.

20   They're in the offices getting the evidence and he doesn't do

21   anything to stop it from happening.

22              THE COURT:  But the counter, again, the alternative

23   argument, though, doesn't make any sense at all.  So steal the

24   computer because of the family photos?

25              MR. WEINSTEIN:  Look, again, I disagree with the

1  premise.

2          THE COURT:  So you're saying -- I understand.

3  You're saying he left it there because he didn't intend for it

4  to be removed.  And ultimately, to dispute the conclusion that

5  I reached already that he directed the attorney to remove it,

6  but rather, the attorney did it on his own because Mr. Napout

7  expressed concern about removing -- about the family photos.

8          MR. WEINSTEIN:  Yes.  Now, let me get past that part

9  which still is we have to get to his specific intent, and

10  okay, so what is on that computer?  We'll get to the photos in

11  a moment.  Not a single document, not one document aside from

12  the photos, I'll get there, not one document on that computer

13  that the Government introduces at trial is incriminating

14  evidence.  So there was nothing --

15          THE COURT:  What about the Uruguayan rental?

16          MR. WEINSTEIN:  Well, there is only a photo.  They

17  had other evidence of that, I believe.  We're talking about

18  photos.

19          THE COURT:  Is there also an e-mail or a wire

20  transfer record or something that connected the money being

21  sent on his behalf?

22          MS. MACE:  Yes.

23          THE COURT:  For the rental?

24          MS. MACE:  As with each of the bribes to Mr. Napout,

25  we had several pieces of evidence.  So this is certainly

1   incriminating.  It's evidence of a bribe on his own computer

2   that he caused to have taken out of his office.  There was

3   other evidence that he received that same bribe, and so this

4   was corroborating evidence.  This was in the ledger, there was

5   testimony from Mr. Peña.

6            THE COURT:  Forget about that for a minute.  In the

7   computer itself, there was a photo of the apartment.

8            MS. MACE:  Yes.

9            THE COURT:  Wasn't there also something indicating

10   that the money for the rental came from an outside source?

11            MS. MACE:  That was separate evidence not on the

12   computer.  It was corroborating evidence, certainly

13   incriminating.  It's inaccurate to say that evidence of the

14   receipt of the bribe on the computer is not incriminating.

15            THE COURT:  I think we're quibbling over document

16   versus photos.

17            MR. WEINSTEIN:  Because I want to get there, I

18   haven't finished.

19            Sticking with the document.  So there is not a

20   single document that even the Government says came from that

21   computer that incriminated him, so now we get to photographs.

22   So the issue is, in head is he thinking, "Oh, my God, there is

23   photographs," and I'll get to the apartment, "there is

24   photographs of me with these other officials at worldwide

25   events that everybody knows about."  Among, I think the trial

1 evidence was, among 90,000 photographs.

2      So we have to believe that that's -- what his

3 thinking was, I'm certainly around the world for sports events

4 with Marin looking like we're having a good time and that's

5 if, God forbid, the Government gets that photo, I'm cooked.

6 There's just no way that's what he was thinking.

7      When I first heard this obstruction argument on

8 these photos, I had a problem grasping it, but I was trying to

9 put it in some perspective. And having read now the 200-plus

10 letters from many, many friends and family around the world, I

11 sort understand these photos.

12      Everybody who encounters Mr. Napout, and we'll get

13 to this in other factors, becomes his friend, feels like

14 they're his friend and that's just how he is with people. I

15 was going to show you photos of him and his workers where you

16 wouldn't necessarily expect, Oh, he's with his workers in

17 similar photographs where he's very chummy with people.

18 That's not a guy that's thinking, oh, my God, everyone knows

19 about. The relationships are entirely known, they're

20 expected, and I've got to get rid of that computer. That

21 makes zero sense. Otherwise, we have to be careful when we go

22 to a Federal Bar Council retreat or any conference that there

23 are judges and lawyers in chummy looking photographs and

24 someone is going to thinking, Oh, my God if anyone ever finds

25 that photograph it's clear I'm in a conspiracy.

1          The fact that you can after the fact craft an

2    argument that they are relevant is not the issue.  Do we

3    really think that in his mind he was thinking that those

4    photographs are like that, God forbid, the Government gets

5    those that's a problem.  There's just no way.

6          THE COURT:  Well, I don't agree with that.

7    Obviously, being chummy with the people that you're alleged to

8    be in a bribery conspiracy could look incriminating.  It could

9    look innocent under some circumstances.  But also, of course,

10   it could look incriminating.

11         Again, what about the apartment?

12         MR. WEINSTEIN:  So, again, all of these photographs,

13   I've got to get rid of this computer because there is one

14   photograph of an apartment on the computer.  Now, look, again,

15   I understand that ultimately they can tie together the

16   relevance and I'm not saying he was --

17         THE COURT:  Hang on.  Look at it from his

18   perspective.  Ultimately, he knows that it came from bribe

19   money that was sent to pay for the rental.  So, again, we're

20   talking about what you think, or what you argue, the evidence

21   shows would motivate based on what's on the computer.  And the

22   question is if he knows there is a photograph of that rental

23   that he knows such was the theory and the evidence at trial

24   demonstrated was paid for by one of these media companies and

25   was a bribe in effect or was part of the bribe, why not, why

1    wouldn't he be motivated to have that removed?

2            MR. WEINSTEIN:  It's got no context or anything.

3    It's a photo of an apartment.

4            THE COURT:  In his mind, he knows what it is.

5            MR. WEINSTEIN:  So he's thinking there is a -- there

6    are 90,000 photographs on this thing, no bad documents.

7    90,000 photographs, and there is a picture of an apartment.

8    Yes, it's sitting there for them to take and I don't care.

9    But what is going to happen, if I ever get arrested, forget

10   removing this one photograph, if I ever get arrested, just

11   take the whole computer because.  If they find the photo of an

12   apartment.

13           THE COURT:  Let me stop you again.  The fixation,

14   though, with what's actually on the computer ignores the fact

15   that Mr. Napout may well not have remembered what all was on

16   his computer or what he may have received at some point or got

17   deleted, or what could be retrieved from the hard drive, for

18   example, if, in fact, someone got their hands on the computer.

19           So it doesn't -- he doesn't have to know perfectly

20   what's on the computer and what ultimately came off the

21   computer may not be dispositive.  The question -- the facts

22   for me that are the most compelling are the circumstances

23   under which the computer was taken.  It was after he signed a

24   non-destruction order that he specifically signed saying he

25   would not destroy any information that might relate to the

1  investigation or these individuals and they were specifically

2  named and included some of the people in the photographs.

3  Okay?

4  So that's the precursor.  He knowingly signed,

5  voluntarily signed, an agreement that he wouldn't destroy any

6  of this.  So removing the computer in and of itself with those

7  photos that you're saying he knew was on the computer of all

8  of these alleged coconspirators in and of itself shows an

9  intent to thwart the investigation.  And then the

10 circumstances, which literally under cover of dark, they're

11 taken away, the whole computer.  And nobody comes clean,

12 including him, about the fact that this computer is replaced

13 with a dummy.

14 It doesn't matter, ultimately, that he didn't know

15 all of what was on the computer.  The question is, did he do

16 this for a bad purpose knowing that he wasn't supposed to do

17 it.  Clearly, he knew.  You can't dispute that he didn't know

18 he wasn't supposed to destroy this evidence by removing it.

19 I'm calling it destroying.

20 MR. WEINSTEIN:  Which it wasn't.

21 THE COURT:  Keeping it -- okay.  If you're going to

22 say he thought that removing it from the investigators' search

23 is not destroying it then I think we have a more fundamental

24 problem.  But, again, I'm looking at the totality of the

25 circumstances the fact that he may or may not have known what

1  the 90,000 images are on it or what all the pieces of

2  information were on it, to me, isn't the most compelling fact.

3          If anything, the large volume of materials could

4  have inspired some paranoia or fear about what was actually on

5  there that could be incriminating.

6          So that argument isn't going to convince me that

7  ultimately what came out of it wasn't so much.  Again, if

8  someone is just wanting to protect their family photos there

9  are many, many ways to do that that don't involve having your

10 attorneys, or the attorneys for the organization, which are

11 accused of taking -- of depriving of money go in and steal the

12 computer.  There is no other way to describe it with them

13 stealing it.  It's a CONMEBOL computer that was supposed to be

14 in the office when the search took place.

15         Those circumstances don't add up to an innocent

16 explanation.  And again, you and I are disagreeing about the

17 premise that he instructed them to do it, but that was the

18 evidence that I heard and that's how I think I infer from that

19 that's what I think it showed.

20         So I've heard your argument again, Mr. Weinstein,

21 not to necessarily to say you're 0 for 4 for lack of trying.

22 You're definitely swinging for the fences, to use another

23 sports analogy, and hitting the wall but not making it over as

24 far as I'm concerned.

25         Again, I respect your argument and it's -- these are

1   not as clear-cut issues as I've addressed before, but I

2   disagree with you on the assessment of the evidence.

3           Now, why don't you stay here because we're going to

4   talk leadership ine enhancement.

5           MS. MACE:  May I say one thing so the record is

6   clear on the obstruction.  There is a representation that the

7   computer was imaged before, that's false.  As far as

8   everything that was presented at trial, and everything that

9   the Government knows, that did not happen.  That was the

10  single copy that was removed from the office and Mr. Sanabria

11  testified that backups did not occur until 2017.  I wanted to

12  make sure there was no ambiguity on the record.

13          THE COURT:  I think your argument was all that time

14  it could have happened and he let the computer sit there.

15          MR. WEINSTEIN:  As far as he knew, the lawyers were

16  collecting the evidence.

17          THE COURT:  Be careful on that because it sounds

18  like the same lawyers we're talking about who were supposed to

19  be representing CONMEBOL.

20          MR. WEINSTEIN:  Outside U.S. law firm in there doing

21  what they're supposed to be doing.

22          THE COURT:  All right.  Leadership enhancement.

23          I am inclined to impose this based on the evidence

24  and I'll recite the evidence and you can respond

25  Mr. Weinstein.

1    I know that you focus on the fact that Mr. Grondona

2 was the leader of CONMEBOL and the undisputed leader in many

3 ways of this bribery scheme, but I don't think that that

4 precludes Mr. Napout also occupying a leadership role.  And I

5 think the evidence that supports that conclusion by a

6 preponderance at least, which is summarized in the

7 Government's submission, at Pages 38 to 41 includes the

8 following.

9    The fact that Mr. Napout began cultivating a

10 relationship with Mr. Burzaco and Mr. Grondona in 2010 after

11 the Group of Six was formed.  That, Mr. Napout openly worked

12 toward gaining power of CONMEBOL as the president and that

13 this was something he did discuss with Burzaco on a number of

14 occasions.  That, Burzaco testified that he told Napout to

15 hold down his troops referring to the Group of Six and to keep

16 them unified so that Mr. Napout could achieve his goal of

17 becoming CONMEBOL's president was also in the record.

18    Eventually, of course, Mr. Napout became the

19 president of CONMEBOL which certainly officially anointed him

20 as leader of CONMEBOL.  And the evidence showed put him in a

21 position to negotiate about the bribes being received by the

22 various soccer officials involved in the schemes, or at least,

23 I should say, the two bribery schemes the Copa Libertadores

24 and the Copa America.

25    And, in particular, Mr. Napout negotiated or at

1  least accepted what was deemed to be the presidential

2  treatment once he became president of CONMEBOL in 2014 and

3  started then receiving a 1.2 million per year bribe for Copa

4  Libertadores and a $3 million in addition bribe for Copa

5  America and that is much more than anyone else.

6          So that evidence, which was produced at trial, to

7  me, indicates that he did occupy a leadership role.  Granted,

8  it evolved over time.  But the fact that he may have only

9  occupied that definitively in 2014 doesn't, I don't think,

10 undermines the applicability of the leadership enhancement.

11         Go ahead, Mr. Weinstein.

12         MR. WEINSTEIN:  I say there's two buckets that your

13 Honor described.  One is the effort to become president.  And

14 the other I think is the testimony of Burzaco about the

15 meeting that happened when he did become president.

16         The fact that he made efforts to become the

17 president of CONMEBOL and ultimately became the president and

18 the quotes that your Honor had of someone saying we need to

19 hold down the troops and keep them unified are political

20 issues.  The leadership role is for being leader of the

21 criminal activity, not just being the president of CONMEBOL.

22 And the fact that there were efforts to become that leader to

23 keep troops unified in that context I don't think gets him to

24 a role of criminal activity.

25         THE COURT:  Let me stop you.

1    If the criminal activity involves bribes in order to

2    award contracts that are signed by that soccer organization,

3    here CONMEBOL, don't those two end up aligning?  Because as

4    the president of CONMEBOL, he certainly had the power of

5    persuasion to get some things to happen in CONMEBOL.  And the

6    purpose of the bribery scheme was to get CONMEBOL to agree to

7    award media contracts to certain companies.

8    MR. WEINSTEIN:  Well, with respect to the awarding

9    of the contracts to certain companies, all that had already

10   happened by the time he became president.  So I guess to some

11   extent theoretically if there was another one to come, but

12   that all happened before he got into that role.  And then what

13   happens when he gets into that role is really what I think is,

14   you know, either give a leadership role or not is hinging on

15   this one meeting that Mr. Burzaco says happened in October of

16   2014 where he sat down with Mr. Napout narrow and explained to

17   him all the bribes that had been going on which, again, we

18   think also undermines that argument that he actually knew

19   about all these bribes before then but that issue is off the

20   table now.

21   Look, this is a huge this is a four-point

22   enhancement in the guidelines case that is quite high.  That's

23   the evidence to rely on.  And, your Honor, at trial or

24   post-trial, the defense gave, I think, sufficient evidence to

25   cast doubt about that particular meeting.  And it's an

1    important meeting because it's the meeting that they put the

2    leadership role on his head.  And that is it supposedly

3    happened.  And it's not, Oh, maybe he got the meeting wrong.

4    He had very specific supposed details of a meeting that took

5    place in Paraguay and who was there and how he flew there and

6    there are documents that now undermine that.

7              THE COURT:  I understand that.

8              MR. WEINSTEIN:  And, look, even if they're

9    definitive or not, they say they're suspect, I don't quite

10   understand why.  We haven't seen evidence that does place him

11   there.

12             Now, given those documents, it certainly casts

13   credibility issues on Mr. Burzaco at least as to that meeting,

14   if not other issues.  It's an important meeting for this

15   purpose.  And they say, well, so, you know, the records might

16   not have shown him and the customs records might not have

17   shown that he entered because he had testified that, you know,

18   CONMEBOL officials get in through presidential treatment.

19             First of all, he's not a CONMEBOL official so it

20   doesn't apply to him.  He's talking about the officials.  He

21   is not a member of CONMEBOL, Mr. Burzaco.  He couldn't have

22   gotten into Paraguay any other way, and I don't think his

23   testimony was they don't get officials entered into customs,

24   you get to skip the lines.

25             So that's their come back to the evidence that was

1    presented after trial about whether that meeting actually took

2    place and if it didn't take place, there is no evidence that

3    Mr. Napout did the things that Mr. Burzaco said they did at

4    that meeting.

5                 THE COURT:  Do you want to say anything else?

6                 MR. WEINSTEIN:  I think those are the main issues.

7                 THE COURT:  All right.  Have a seat.  Ms. Mace, do

8    you want to respond to that?

9                 MS. MACE:  I'll note I don't think there is a need

10   to respond to most of that.

11                In the beginning, the response to some of the

12   quotations that your Honor referred to the defense is very

13   dismissive of those, and I don't think that's appropriate to

14   just say that when Burzaco told Mr. Napout to hold down your

15   troops that was just dismissed as somehow political.  The

16   whole purpose of this relationship is for Mr. Burzaco to be

17   able to hold on to those rights and hold down your troops for

18   Torneos and the other bribe payers.  So I don't think it's

19   appropriate to undermine the significance of that type of

20   evidence.  So there is other examples of that we also put in

21   our brief.

22                The other thing I think that the defense has been

23   very dismissive of is the significance of Mr. Napout's role as

24   president.  And there's one case in particular we cited in our

25   brief maybe we didn't call attention to it enough because it

1  is so relevant here.  And that's <u>United States v. Derigei</u>, the

2  Second Circuit in 1995.

3         Here, the Court focused on the role of an individual

4  at the head of an organization that has been corrupted.  And

5  there, it was, I think, the Limousine and Taxi Commission of

6  New York City and it was the head inspector who was being

7  considered for his leadership role.  And the Court said,

8  "While the Defendant may not have been the scheme's inventor

9  or originator, he was clearly one of its leaders.  The Derigei

10 Defendant was the highest-ranking authority at the inspection

11 station and exercised control over it.  Regardless of his

12 exact role in the conspiracy, his place in the inspection

13 station hierarchy, together with his participation in the

14 conspiracy, necessarily made him a leader in the scheme.

15        The district court recognized that a corrupt

16 executive who is seen to be corrupt by subordinates leads by

17 example.  The defendant's participation in the scheme allowed

18 his subordinates to understand that bribe taking was an

19 institutional practice and that they had high-ranking

20 institutional protection for their jobs and their careers

21 notwithstanding their corruption.  The defendant's influence

22 would tend in this way to erode the inhibitions and scruples

23 of participating subordinates and to facilitate recruitment of

24 the others."

25        So here that's really important because part of the

1  whole import of this case is the effects of the corruption and

2  how far reaching it was.  And to have someone at the head of

3  CONMEBOL, the third CONMEBOL president to be indicted in this

4  case, be taking bribes and making it known to others within

5  CONMEBOL that that was okay and it was okay as an

6  institutional way of proceeding made him a leader even apart

7  from all the other evidence the defense is taking issue with.

8          THE COURT:  Okay.  I do find there is support for

9  the leadership enhancement for the reasons that I said earlier

10  and what the Government has just argued as well.

11          Mr. Napout certainly occupied a leadership role and

12  sought to exercise that role.  I think that was not only with

13  respect to the official operations of CONMEBOL.  But remember,

14  with respect to keeping the bribery scheme successful and

15  intact and also trying to maintain the secrecy of that bribery

16  scheme.

17          All right.  Lastly, let me address the forfeiture

18  issue.

19          Defense has argued that the presentence report's

20  statement that roughly 3.3 million should be awarded as

21  forfeiture or should be subject to forfeiture, I should say,

22  because this represents the amount of bribe money that

23  Mr. Napout actually received.  The evidence for that is based

24  largely on the ledger that we've been referring to that was

25  maintained by Mr. Peña and along with the ledger and

1   Mr. Peña's testimony there was testimony from an Ilario

2   Rodriguez and Mr. Burzaco about the bribes that were paid to

3   Mr. Napout both in cash and then in kind.

4        The testimony was roughly that the money was

5   disbursed from Torneos and the Jinkeses took care of the money

6   actually delivered to Mr. Napout.  The Defendant contests the

7   evidence, I think, for many of the same reasons that we

8   discussed and says does not support a finding by a

9   preponderance that Mr. Napout actually received any money.

10        Fair to say, Mr. Weinstein?

11        MR. WEINSTEIN:  I mean, I would put some accent

12   marks on it, but that is the general gist of it and I think if

13   it's -- the gist is not a single witness, they had a lot of

14   witnesses not just at trial but not called to trial, not a

15   single person observed Mr. Napout take cash or anyone on his

16   behalf take cash.

17        THE COURT:  Yes.

18        MR. WEINSTEIN:  Nobody.  And if the reliance is on a

19   ledger, just as an example, there is a -- in the Honda tab,

20   which they say is the tab for the money he got.  In 2014,

21   there is a $96,000 payment supposedly to Mr. Napout.  Mr.

22   Bedoya testified that in 2014 he got a payment of $96,000 in

23   2014 and that doesn't appear on the tab for Mr. Bedoya.

24   Presumably, it's the same $96,000 that they claim he got.  It

25   just is an example of undermining why the ledger mean he

1    necessarily got money and the Supreme Court has said unless

2    the Defendant personally got money, he can't forfeit it.

3        THE COURT:  Okay.  Did you want to respond at all to

4    what Ms. Mace said, specifically, about the $96,000.  Did you

5    want to say anything about that?

6        MS. MACE:  Your Honor, I recall there being

7    testimony about that at trial and I don't remember it

8    specifically, but I know it was addressed about minor

9    inconsistencies and dates and so forth in the letter that

10   Mr. Peña even noted that he made some errors in terms of minor

11   things that has dates.  But he testified that all of the money

12   that is accounted for there he was directed to prepare to be

13   delivered to Mr. Napout.

14       And the idea that the Government cannot prove its

15   case unless it had Mariano Jinkis here is just false.  The

16   Government is able to present its evidence through other types

17   of testimony and exhibits, and there is extensive

18   corroboration or each of the payments.

19       I will note as one example, the bribes were paid in

20   cash and there was testimony that Mr. Napout, and sometimes

21   his driver, would go to Buenos Aries to pick that up.  The

22   Government obtained hotel records and flight records to show

23   that he was actually in Buenos Aires on the dates which show

24   in those letters to corroborate the fact that he received the

25   money that Mr. Peña said he did.

1          And so, certainly, by a preponderance of the

2    evidence, there is enough to support the full amount of the

3    forfeiture noted in the government's brief.

4          THE COURT:  All right.  I will add to this,

5    Mr. Weinstein, that what you point to is the dearth of

6    evidence of any direct handoff of cash is in some ways further

7    proof of the use of sophisticated means to disguise the

8    payments or to conceal the payments, I should say.

9          The whole point of this scheme, and of Mr. Napout

10   getting the money in cash, after it was converted from wire

11   transfers through candistas, et cetera.  And picking it up in

12   hand, either through his driver or himself, was to be able to

13   say later, No one can say I got a penny from this scheme.  And

14   that, and I know you're going to find it unsatisfying, but

15   that is -- the absence of evidence is the product of a

16   successful scheme to conceal payments.  I mean, that's part of

17   it.

18         Now, I'm not saying it's insufficient evidence by

19   any stretch because linking together the testimony about the

20   disbursements of money which those who are testifying about

21   those disbursements had an interest in ensuring it got to the

22   intended recipient was quite compelling and I heard it and I

23   saw the ledger.  There may have been, and I recall this as

24   well, some discrepancies that Mr. Peña testified to.  But the

25   overall amount of roughly 3.3 million was attested to by

1   Mr. Peña.  Granted, all he could say was he was instructed and

2   did disburse it to the Jinkeses or some intermediary for

3   purposes of being converted into cash and delivered.  There

4   was argument made at trial that that money easily could have

5   been stolen by the Jinkeses for the reasons that you said

6   before that they were untrustworthy individuals.

7          However, based on the evidence that I heard and

8   based on the sort of implicit logic that the bribees are not

9   going to remain silent and they're not getting their payments

10  and there was no evidence that anyone ever complained about

11  that.  The logical conclusion was that the money reached the

12  intended recipient, albeit through these very elaborate and

13  concealed means for the purpose of keeping the bribery scheme

14  secret.

15         Go ahead.

16         MR. WEINSTEIN:  With respect to whether the fact

17  it's kept secret gets you back to sophisticated concealment.

18         THE COURT:  We'll leave that as is.  We disagree.

19         MR. WEINSTEIN:  Definitely disagree on that.

20         With respect to some of the things Ms. Mace said.

21  First of all, the $96,000 I raised wasn't one of the -- first

22  of all, it's not a minor discrepancy.  And secondly, it's not

23  one of the things that he testified about at trial.  We've

24  reviewed it, it's become clear that their own cooperating

25  witness testified that he got that money.  Yet, on it's on the

1   tab that he said Mr. Napout got the money.  It wasn't raised

2   at trial, it didn't need to be because it's being raised now

3   because the issue is before us now.

4          And whether or not -- how you get the cash to

5   someone is concealed.  The fact is there would still be

6   witnesses that one witness for one of these bribes actually

7   seeing Mr. Napout get money, or one witness for one bribe

8   seeing his driver get the money.  There wasn't one.  Nobody

9   testified to that.

10         And with respect to the driver, the only evidence

11  about this driver picking up the money that was at trial was

12  testimony by Mr. Chiriboga not that he had any knowledge of

13  it.  That his father told him, and not that his father had any

14  knowledge of it, but his father was told by Mr. Jinkis that

15  the driver went there and got money.  It's like quadruple

16  hearsay.  By the way, it wasn't clear that he said that it was

17  in furtherance of the conspiracy or after the arrests because

18  he and his father were talking.

19         But putting aside the admissibility of it for trial

20  that's long gone, that's the evidence of the driver having

21  that role.

22         THE COURT:  Well, let me say this.  I think it's

23  pretty clear that the jury heard the same argument you're

24  making now and rejected that but I, too, find that by a

25  preponderance to be sure that there is evidence sufficient to

1    establish that Mr. Napout received the intended bribes at

2    least up to the point of his arrest because all the testimony

3    from the witnesses who were involved in this scheme, and

4    especially the payors, was that for it to work, and it did

5    work, because the contracts were signed as agreed to by the

6    bribers and the bribees, people had to get their money.

7            So you could accuse the Jinkises of being thieves

8    but in this context, it wouldn't get them very far because,

9    ultimately, their goal was to get contracts which they weren't

10   going to get unless they delivered the bribes that were

11   promised.

12           So the sheer force of logic of this overarching

13   scheme that went on for years, obviously many years before the

14   Defendant was involved, but continued for four or five years

15   until his arrest while he was involved.  It thrived or could

16   only survive if people received the money.  And, therefore,

17   there was no evidence that he did not get the promised money

18   as accounted for in the ledgers over the course of many years,

19   and it was roughly 3.3 million.  I will give you this, I will

20   deduct the $96,000 from the figure to the extent that there is

21   perhaps not sufficient evidence of that particular payment

22   being made.  So that brings the figure down, and I'm going to

23   ask one of my law clerks to figure that out.  The original

24   figure was 3 million --

25           Go ahead you want to be heard?

1        MS. MACE:  Yes, your Honor.  If you are going to

2   make a contrary finding on this, then we would like to have an

3   opportunity to present those ledgers to you again.  I think,

4   and I don't have to with me today, I wish I did.  But I think

5   the date discrepancy is in Mr. Bedoya's, it's the Flemick tab.

6   It shows the --

7        THE COURT:  Flemick, a car, F-l-e-m-i-c-k.

8        MS. MACE:  And so it's on there.  It is accounted to

9   Mr. Bedoya, it's just there is a date error on that ledger.

10  So we do dispute that.  I don't know if it's worth it at this

11  stage to present on it further, but we don't agree that

12  there's a lack of evidence as to that $96,000.

13       THE COURT:  So the Government's argument is that 96

14  was paid to Mr. Bedoya and accounted for in Mr. Bedoya's tab

15  of the ledger, but also 96,000 was paid to Mr. Napout.

16       MS. MACE:  They suggested it's missing from

17  Mr. Bedoya's ledger.  It's not there's an error in the date,

18  there is no reason to doubt that each of the payments in the

19  ledger for Mr. Napout went to Mr. Napout as Santiago Peña

20  testified.

21       THE COURT:  Is the date off by a few days or by a

22  year?

23       MR. WEINSTEIN:  As far as I understand, your Honor,

24  there is no payment to Mr. Bedoya in his tab of $96,000 for

25  the year 2014.  So that's a dramatic mistake, and I don't know

1  how you get it in the context of a ledger when you're in the

2  wrong year.

3         MS. MACE:  As I recall, it is off by exactly one

4  year.  And there are several instances in which there are

5  errors like that in the ledgers overall.  It's off a payment

6  by one year.  And so, otherwise he wouldn't.

7         So, in any event, the money does show there and it

8  is consistent with Bedoya's testimony that he got the cash in

9  a very similar way that Mr. Napout was getting cash.  And that

10 it was accounted for in the same way in his ledger, it's just

11 that there was an error in the date.

12        But that doesn't undermine that Mr. Napout got the

13 why full amount that was in his ledger.  And they had the

14 opportunity to cross-examine Mr. Peña about that and

15 Mr. Bedoya and they developed that evidence, but they did not

16 in the end undermine the fact that Mr. Peña testified that

17 that full amount in the ledger under the Honda tab consequent

18 do Mr. Napout.

19        THE COURT:  So I am going to adopt the figure for

20 forfeiture which is in the presentence report which is

21 $3,376,025.88.  The discrepancy that's been pointed out by

22 Mr. Weinstein appears to have been explained at trial and I

23 shouldn't say it's a discrepancy, actually what was alleged to

24 be a discrepancy was a discrepancy Mr. Bedoya's payments one

25 year versus another, but no doubt that Mr. Bedoya did receive

1    the $96,000 that was accounted for in the ledger, albeit in

2    the wrong year, but it doesn't raise doubt as to whether or

3    not Mr. Napout received $96,000 at the same time that

4    Mr. Bedoya was improperly or incorrectly documented as

5    receiving a bribe with the same amount.

6              And, again, for the reasons I said before, I think

7    the evidence was sufficient to show that the bribes actually

8    reached Mr. Napout.

9              Mr. Weinstein, did you want to say anything further

10   on forfeiture?

11             MR. WEINSTEIN:  Last comment.

12             I think your Honor had mentioned that there was

13   essentially a jury finding on this issue.  The jury did not

14   find anything about his receipt of bribes.  They just had to

15   find he participated in the charged conspiracy.  And secondly

16   what, they also found was they acquitted him of two counts of

17   money laundering.

18             I understand the law is you can consider the conduct

19   even though there is an acquittal, but we shouldn't ignore the

20   result either.  They found that for a reason.

21             THE COURT:  That is a good point.  The standard is

22   different at trial.  And for the money laundering to some

23   extent, the jury would still have to find that he agreed to

24   engage in conduct to conceal the source of the bribes or the

25   fact of the bribes.  But, nonetheless, the jury did acquit him

1  of that.  But I can, and do, still find by a preponderance

2  that he received the bribes based on the evidence that was

3  presented at trial that I did hear and see.

4        So notwithstanding the jury's verdict and you are

5  correct that a jury didn't have to make a finding of about

6  husband actual receipt.  I separately find based on a

7  preponderance that the evidence establishes his receipt of the

8  full amount accounted for in the ledger which is the figure

9  that I mentioned a moment ago.

10        That addresses all of the objections to the

11  presentence report that I'm aware of.  Do folks need a

12  five-minute break?  I kept you for a while.

13        Take ten minutes.  Please come back a little bit

14  after 20 after 12:00.

15          (A recess in the proceedings was taken.)

16          COURTROOM DEPUTY:  All rise.

17          THE COURT:  Have a seat, everyone.

18          So as we go back on the record let me summarize.

19          MS. PIÑERA-VAZQUEZ:  My client is not here yet.

20          (Defendant enters the courtroom at 12:23 p.m.)

21          THE COURT:  Going back on the record now, let me

22  summarize where we are.

23        As I said before, I have adopted the presentence

24  report's guidelines calculation in full even after hearing the

25  arguments of the defense which certainly have some merit.  But

1  in the end, I am endorsing the presentence report's guideline

2  calculation of an offense level of 43 which does correspond to

3  a level of imprisonment a range, if you want to call it that,

4  of life, however, cabined in by the 720-month statutory

5  minimum.

6          As I said before, however, I am not going to start

7  with that life guideline, and so, let me say this now in terms

8  of sentencing factors, I do find that the guidelines, and I

9  don't even think the Government disagrees with this, overstate

10  the seriousness of the defendant's criminal conduct in this

11  matter.  And that is driven in large part because of the

12  unusually broad nature of this conspiracy which has been

13  discussed at length involve many, many conspirators over many

14  years and involving large bribery amounts and that is what

15  drove the guidelines range so high.

16          I don't think it would be appropriate at all to use

17  that as a starting point.  Rather, I've looked at what the

18  Defendant would or what the range will be if the Defendant

19  were held accountable for only 25 million which was the

20  intended amount of bribes he was to receive.  And also what

21  the guideline range would have or would be if it was based on

22  the amount of bribe money they actually received which was in

23  the range of 3.3 million.  And looking at those metrics, I

24  think a range of about 135 to 262 months, and I recognize that

25  that's not a guideline range, but that's a much broader range

1    is a more appropriate starting point for purposes of

2    determining a sentence and is a more appropriate starting

3    point when considering the other factors that relate to

4    sentencing.  So let me just start off by saying that.

5            Otherwise, are there other objections to the

6    presentence report or addendum that I haven't addressed beside

7    the guidelines from the Government?

8            (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. MACE:  No to that question, but if I may,

2    Your Honor, just note one thing with regard to what you just

3    said about the range that you're starting with.  You

4    indicated that the amount that the Defendant himself agreed

5    to receive was $25 million.

6          THE COURT:  Uh-huh.

7          MS. MACE:  And I just note that I believe --

8          THE COURT:  I think it's 24.9.

9          MS. MACE:  It should be 24.9 and I note that

10   because 25 is a threshold amount under the guidelines and so

11   to the extent that that is factoring into Your Honor's

12   decision the difference makes --

13         THE COURT:  That's actually a good point.  In

14   fact, I should have been clear.  I used the range that

15   corresponded to 24.9 which is a level enhancement of 20 for

16   the range of 9.5 to 25 million.

17         MS. MACE:  Okay.  Thank you, Your Honor.

18         THE COURT:  You are correct, that's what I did.

19         Any other objections from the defense to any part

20   other part of the presentence report?

21         MS. PIÑERA-VAZQUEZ:  No, Your Honor.

22         THE COURT:  Okay.

23         All right.  So I am adopting the presentence

24   report and addendum in full.

25         Now let's turn to the sentencing factors.  I

1    reviewed the voluminous submissions of both sides and I will

2    certainly hear further from the defense about an appropriate

3    sentence and sentencing factors.

4            MS. PIÑERA-VAZQUEZ:  Okay.  Thank you.

5            THE COURT:  Go ahead.

6            MS. PIÑERA-VAZQUEZ:  Okay.  Thank you, Judge.

7            In preparing for the presentation today,

8    Mr. Weinstein will be addressing the factors and not the

9    technical factors.  I gave a lot of thought about what

10   Your Honor's duty was in this case and how difficult the

11   task was to not have sort of a mechanical arithmetic guide

12   to sentencing, and while Your Honor's got a status

13   conference in six weeks and as the Court has pointed out is

14   very familiar with the facts of the case, the offense

15   conduct and what Mr. Napout was convicted of.  But as it's

16   stated in our memo the Court knows very little about aside

17   from the letters is Mr. Napout's history, his background and

18   his parents.  That is something that we would like to

19   address today and I beg your indulgence because I'm going to

20   take a little bit of time, hopefully not a long as this

21   morning.  But there are certain things I would like to point

22   out because it's very significant to Mr. Napout's lifestyle

23   that the Court should take into consideration certain

24   factors.

25           I would like to tell you that as defense

1    attorneys -- I don't know if Your Honor has ever been a

2    defense attorney, but as defense attorneys, we rarely have a

3    chance to get to know our client in a personal way, before

4    we're engaged.  That's because we meet or clients under

5    really difficult circumstances and our focus is on

6    representing the client against the charges and finding a

7    way to resolve the issue.

8            So rarely do I really get to know the person.  I

9    know him or her in a troubled state but not who he was

10   before.  In my 25 years of practice both as a federal

11   prosecutor and as a criminal defense attorney, Mr. Napout is

12   different.  I met him three years ago.  And I got to know

13   him and his family quite well.  I went to Paraguay several

14   times, I interviewed a lot of witnesses, I got to see his

15   daily interaction with his family, with his friends.  So we

16   have a lot of long conversations about his past and probably

17   mostly related to football and things like that.  But I feel

18   comfortable, I actually felt like -- I actually felt at one

19   point walking through the gate they actually think that I'm

20   a parent or sister or mother because we sort of have the

21   same color.  At one point I almost felt like an adopted

22   family member.  But I have to tell you, that it was only

23   upon receiving those over 200 letters that I realized that I

24   had only scraped the surface of who this man was.  To say

25   that those letters make an impact on me is to put it mildly,

1   in fact, I read those letters before going on vacation and

2   stuff.  And I read them, it took me, you know, probably four

3   or five gays because I had to make sure that the correct --

4   the letters were correct, the translation.  And I have to

5   tell you I spent the entire vacation with my family thinking

6   about Mr. Napout.  Actually thinking how can I be like Juan.

7   How can I be a better person how can I help others.  Like

8   everything -- everything it impacted me so much it was

9   engrained into my daily existence.  That hasn't happened,

10  every, in my entire life.

11          So why?  Because the letters represented a man

12  that is so rare in our day today.  A man who had the values

13  and has the values of generosity, of compassion, of empathy,

14  decency.  Decency, something that we think is everybody is

15  decent; no, a decent man.  Now one of the things that I want

16  to comment before I get into the substance of the letters is

17  that we -- you may have got in the past letters that seem

18  like they're form letters or edited by a lawyer and I think

19  that you -- when you read these letters, hopefully you

20  notice that they came in all sorts of forms, some were

21  handwritten, different fonts.  So this is sent from the

22  individuals themselves and I think that it was really

23  important also that you receive the message of how

24  passionate people in Paraguay are about Juan.  While some of

25  the letters the Court may not have received as well as

1    others because certainly some of the letters that claim that

2    the witnesses lied, they still believe in Juan's innocence,

3    we thought it was very important that you receive the

4    message unfiltered.  So that's why some of the letters may

5    not have been what you expected.

6           So going to the section on 3553 factors.  The

7    first and I'm not going to go through all the

8    characteristics, all the factors because I think we're

9    pretty detailed in our memo, I'm just going to highlight

10   some factors that I would like the Court to take into

11   consideration.

12          The first one, history and characteristics of

13   Juan.  Juan was born 60 years ago in Asunción, Paraguay to

14   two, no doubt hardworking and successful parents,

15   Miguel Angel and Teresa.  He was blessed to be born in a

16   family that was successful and had great economic power and

17   wealth in Paraguay.  Now I don't know if you've ever been to

18   Paraguay, but Paraguay is a landlocked country in

19   South America with a large indigenous population in the

20   center of the country and really, Asunción, and another

21   border city are where most of the business is at.  So the

22   opportunity in that company is limited business opportunity.

23   Everything is education and business.

24          The Government in their memo characterized their

25   argument of taking into account Mr. Napout's background as

1   if we just want the Court to take into consideration that he

2   was born into what they define as great privilege.

3          THE COURT:  Well, I think one of his friends said

4   he hey was born into a golden cradle.

5          MS. PIÑERA-VAZQUEZ:  Cradle of gold.  Yes, that's

6   right.

7          THE COURT:  Okay.

8          MS. PIÑERA-VAZQUEZ:  But the Government generally

9   seems to mischaracterize argument as we just want you to

10  give him less time because he was privileged and I just want

11  to be clear because it said it at the first page and I can

12  read directly from their memo we where they basically state,

13  and I'm reading from the Government's memo Page 1, where

14  they say, By largely ignoring the seriousness of this crime

15  and the need for deterrence and unique circumstances of tis

16  case Napout argues that -- Napout argues that substantial

17  additional incarceration is not necessary, because among

18  other things, the eight months that he spent in jail is

19  sufficient to, quote, deter an individual with Juan's

20  background.  Meaning, of course, a man who has lived a life

21  of extreme privilege.  So I'm quoting from the Government's

22  brief.  We want to get clear because we think it's very

23  important that the Court understands that we certainly are

24  not arguing that you should give Juan any less time solely

25  based on his type of position or because he was privileged.

1    He didn't choose to be born into privilege.  He was blessed.

2    What we would like for the Court to do is look at the

3    choices he made with that privilege.  I think that is what

4    we outline in our memo not because he's privileged but what

5    he chose do with that privilege.

6              So, Your Honor, I would like to just -- I know you

7    received over 200 letters from friends, family, coworkers,

8    employees, people he met through sports, community

9    organizations and even government officials.  So I just with

10   your indulgence, I would like to highlight just a few which

11   I think really go to the character of who Juan is and the

12   way he led he life for 60 years because as the Government

13   has said and this conspiracy that Juan for purposes of his

14   sentencing, because obviously we disagree with the verdict

15   started in 2010 so we're looking at a five-year period of

16   his 60-year life.

17             So the first letter I would like to highlight,

18   Your Honor, is his childhood friend Anibal Fischer.

19             THE COURT:  Why don't you spell the first name.

20             MS. PIÑERA-VAZQUEZ:  A-N-I-B-A-L, F-I-S-C-H-E-R.

21             So Anibal is a childhood friend of Juan's.  He's

22   known her for 55 years and why that's important is because

23   we wanted to demonstrate to the Court that Juan's character

24   for compassion and generosity didn't just come up five years

25   ago, just didn't come up ten years ago, you know, because

1    that's very convenient if it happens in many cases.

2           Juan, since he was a child as expressed by Anibal

3    Fischer, describes Juan as the child who was kind and

4    charitable in his daily life, who always wanted to be

5    surrounded by friends.  A child who had no qualms when it

6    came to helping others.

7           Now, describing a child, and what better example

8    is there of that than his other friend, Artura, A-R-T-U-R-A;

9    Avila, A-V-I-L-A; who describes a really specific example.

10   And when I read it I actually passed it over the first time.

11   I didn't pay much attention to it.  And then when I went

12   back and read the letters, it's such a simple, innocent

13   gesture.  He's in elementary school and he's with his

14   friend, and Artura asks, What time is it?  And Juan turns to

15   Artura and says, Don't you have a watch?  And Artura said,

16   No.  That day as they're walking home from school, they stop

17   at Juan's house.  Juan tells his friend, Wait outside.  He

18   runs into the house, grabs a watch and he hands it to his

19   friend.  I never asked for money.  I never asked for -- this

20   is not the act of a university student, not the act of an

21   adult.  It's an act of a kid, an innocent kid.  He doesn't

22   have a watch.  I have many watches.  I'll give him a watch.

23   That's how Juan led his life.  It was simple gesture, an act

24   of kindness, but it demonstrates who Juan was at an early

25   age.

1          Another friend, Roberto Vargas, Roberto Vargas who

2     also has nobody Juan for many years since they all went to a

3     private school, a Catholic private school in Paraguay.  He

4     explains how when his family was going through a really bad

5     financial situation and his parents had to mortgage their

6     house, how Juan -- he was going to have to leave school

7     because he couldn't pay the tuition.  Juan went to his

8     father and said, My friend is going to have to leave the

9     school.  His father communicated with the family and paid

10    off that debit.  And all Juan said to his friend was, This

11    is a gift for your friendship.  And later on, that

12    friendship continued, and they paid for a scholarship for

13    Juan's friend, Roberto, to study in London, England.

14          These are individuals who wrote to you and said,

15    He made difference in my life.  There are many other

16    friends, but I can't go through all of them.  I would like

17    to bring you a little bit closer to today's date, in 2010.

18    His friend, Carlos Cabral, C-A-B-R-A-L; and Carlos Cabral

19    describes how eight years ago, that's 2010, Judge, his wife

20    was diagnosed with a brain tumor.  He didn't have the money

21    to pay for his wife's surgery, out of the blue, Juan called

22    him up, and said, Don't worry about it.  I'll take care of

23    it.  All I ask is one thing:  Please don't tell anybody.

24    And he didn't.  For the last eight years, Mr. Cabral did not

25    tell one soul, but he felt compelled to write the letter to

1    Your Honor and break that pact because it was important that

2    the Court understand who Juan is and how he helped others.

3            Now, many of the letters submitted were related to

4    individuals he met through sports, because as outlined in

5    the letter, Juan's grandfather and father were big believers

6    what sports could do to a community and they supported

7    sports, not only soccer, but tennis, swimming, golf, track.

8    They believed that sports bring communities together and

9    help people move forward.  So as his father did, Juan also

10   helped people within sports and sports organizations.  He

11   did it not in a public way.  He didn't name a stadium after

12   himself.  There's no basketball or baseball court that

13   exists or a soccer stadium named after Napout.  He did it

14   quietly.  He donated land where they constructed some fields

15   so children could play right near the airport.  He

16   donated -- you heard from the letters that he donated many

17   times, uniform, travel expenses, and help athletes in those

18   expenses.

19           Now, he also helped people individually.  Let me

20   tell you about Leryn, L-E-R-Y-N; Franco, who met Juan as a

21   child because her father worked for you -- worked for Juan.

22   I'm sorry, he worked for Juan.  And as a young girl, this

23   when she was about seven years old, she had some --

24   obviously Juan or someone else saw her athletic capability

25   and she didn't have tennis shoes.  So Juan gave her her

1   first pair of tennis shoes, paid for her tennis lessons,

2   only asked that she not beat his daughters as she explained.

3   But Ms. Franco was not a really good tennis player.  But she

4   did go on to be an Olympic athlete.  She was in the Olympics

5   in 2012, 2016 and 2018 as a javelin -- I want to get it

6   right -- as a javelin thrower, and she is still a champion

7   in Paraguay.  And in that letter she writes, she says, If it

8   would not have been for Juan's gesture of tennis shoes, I

9   would not have pursued sports in my life.  And today, she's

10  actually one of the sport leaders in the country, and

11  mentions how Juan also helped other individuals that she saw

12  when she went to his house and his office.  It wasn't just

13  her.

14          There's another person which I have to mention,

15  because he's currently the Minister of Sports in Paraguay,

16  and his name is Victor Pecci, P-E-C-C-I.  Mr. Pecci was a

17  top international tennis player in the '80s, the only top

18  tennis international player that come out of Paraguay who I

19  believe played at Wimbleton and the French Open.  I don't

20  know if he played in the U.S. Open, but he certainly played

21  international and was one of the top ten.  He writes how if

22  it wouldn't have been for Napout's family support and how

23  they stood up for helping athletes in different disciplines,

24  Paraguay wouldn't be on the map nationally and

25  internationally.

1          In fact, I believe in one of letter, and I don't

2    recall which one, they explained how Mr. Napout's father,

3    Miguel Angel, actually was the first person in Paraguay to

4    provide lights, night lights on the tennis courts.  And he

5    had had the opportunity as it states in this letter, to sit

6    in many meetings with Mr. Napout and attest to his

7    commitment to helping others.

8          Now, while Juan circled himself with people that

9    were involved with sports and wanted to get ahead in that

10   way or met people through sports, he didn't only help people

11   in that arena or for that purpose.  For example, I would

12   like the mention Elbio Ramon, E-L-B-I-O, R-A-M-O-N.  He

13   met -- Mr. Ramon explains that he met Juan through APF in

14   2007 when he was part of the organization.  In 2011 he was

15   involved in a very serious car accident, a car accident that

16   left him in the ICU.  Juan was in Miami.  Somehow Juan heard

17   that he was he was going to be taken out of ICU, because it

18   was a public hospital, and he could afford a private

19   institution.  Juan flew to Paraguay, visited him in the

20   hospital, made all the financial arrangements, and for

21   that -- that's why he's here today.

22         I would like to read specifically from his letter,

23   because what his writes is very emotional because towards

24   the end of the letter Mr. Ramon says, and I quote "I can

25   only add that for me, he..." -- meaning Juan -- "...made the

1  difference between life and death, the same life that will

2  be judged before your instance [sic], and that if there was

3  only one legal means that made it possible to exchange his

4  life for mine, I would gladly lose my freedom in exchange

5  for his because in the balance of justice, he gave me back

6  my life and I would only be paying off a debit with my

7  freedom."

8          That's powerful.  I don't think I know of anybody

9  that would write that for me.  I mean, that's a powerful,

10  powerful statement from somebody, that he would give up his

11  freedom document because Juan gave him back his life.

12  That's powerful.

13          One of the themes that ran through the letters

14  was, there is no doubt that Juan was a big financial public

15  person who is generous.  And I think in two or three it

16  said, they asked me, Well, Juan, why do you help people so

17  much?  And his response was, Because God gave me wealth and

18  you give what you have.  I'm not saying I'm quoting it

19  exactly right, but...  So what Juan had was money.  And how

20  he could help others was by helping them either with medical

21  issues or education or when they had financial issues.  So

22  that's why Juan -- he didn't hoard the money.  He didn't

23  take lavish vacations and not help others.  Yes, he did

24  well.  He worked hard.  He lived well.  But he had a

25  responsibility that was engrained from his father and his

1   mother that he had to help others.  It was his

2   responsibility.

3           Now, it wasn't only money, though, that Juan used

4   to help people.  He also took the time to provide emotional

5   support.  And here I get to the letter that you received

6   from Edmundo Pardes, P-A-R-D-E-S.  And this one was another

7   one that actually did make a big impact on me, and I didn't

8   know that he was going to be sending you the video, Judge,

9   so I hope you understand why he's so grateful.  But

10  Mr. Pardes in 2003 was involved in a car accident that left

11  him quadriplegic.  He was a friend of Juan's from school.

12  But it's not like they hung out every day.  It wasn't like

13  they were related.  You know, he was a friend.  He writes in

14  his letter and I submitted it to the Court, I have lots of

15  desire to live, and Juan didn't provide any financial help

16  or anything like that, and it wasn't until Juan showed up in

17  the hospital one day and he startled Juan, and he writes --

18  I am trying to capture, I guess, what Juan told him, and I

19  would like to quote it for the Court.  He said -- Juan Angel

20  tells Danilo, D-A-N-I-L-O, "Danilo, I know this may be tough

21  but I trust in you, in your strength, combative spirit and

22  courage, in your intelligence and creativity, in your

23  integrity.  You still have a lot to give, perhaps in a

24  somewhat different way.  And do not forget you have a wonder

25  family and friends to support you.  Don't give up.  And by

1   the way, anything you need to rebuild this, do not hesitate

2   to ask."  This one voice made the difference between life

3   and death for Danilo Pardes.  And Juan went on to visit him,

4   as he writes, and support him at the hospital.

5           So it wasn't that Juan just, Oh, I got the money.

6   Let me just give it away because it's really easy to just

7   get money.  No, Juan took the time, as reflected in many

8   other letters, to do small kinds of kindness to him may have

9   been just going to hospital or visit a sick friend, but to

10  that friend as reflected in the letter, was a life-altering

11  gift.  It was for Edmundo and it was for Elbio.  Again,

12  those are powerful, powerful letter.

13          I wish I could read all the letters, but I -- I

14  don't --

15          THE COURT:  Don't worry.  I have them.

16          MS. PIÑERA-VAZQUEZ:  You have them.  I hope that

17  you read them.

18          THE COURT:  Yes.

19          MS. PIÑERA-VAZQUEZ:  I tried to point out the ones

20  that would sort of give you a picture of Juan from when he

21  was a child to today, not 30 years ago, not 40 years ago,

22  but who he is today.  Because even though as the Government

23  portrayed these acts began in 2010, he continued to do acts

24  of kindness until the day he was arrested, and he continues

25  to do it today while he's at MDC, and I will get to that in

1    a second.

2            And the other cause is -- and there's just two

3    causes that I would like to point out in the letters,

4    because I think they're kind of odd.  You know, everybody

5    supports cancer and heart and lungs.  You know, that's sort

6    of the typical go-to, you know, charities.  But there are

7    two organizations that I actually found quite interesting.

8    One was -- and I'm going to spell it because I can't even

9    pronounce it -- Comedores, C-O-M-E-D-O-R-E-S; and then it's

10   K-O apostrophe; E-J-U; Chacarita, C-H-A-C-A-R-I-T-A.  This

11   is a soup kitchen.

12           Now, this is a soup kitchen in one of the poorest

13   neighborhoods in Chacarita, feeds approximately 200 children

14   from the ages of one-year-old to 14 according to the letter.

15   Juan has been supporting that organization, as the president

16   wrote.  But not only has he been supporting it because it

17   doesn't receive any government funds -- this a

18   wholly private -- only receives funds from private donors.

19   He also explains, which I had no idea, that he also sponsors

20   a lot of orphan children in the street.  And I think what he

21   meant by that, I don't he -- because he doesn't have any

22   orphans living in his house or -- but what he meant by that

23   is that he provides substinance [sic] --

24           THE COURT:  Sustenance.

25           MS. PIÑERA-VAZQUEZ:  Sustenance, right.

1          THE COURT:  Yes.

2          MS. PIÑERA-VAZQUEZ:  Thank you.  English is my

3   second language.

4          As a result Miguel's -- as a result of Juan's

5   generosity, these children have a place to live and

6   education and food.

7          The other organization is an organization called

8   Fundacion, F-U-N-D-A-C-I-O-N; Kuna; K-U-N-A.  Now, this is a

9   nonprofit organization that defends the human rights of

10  women with a focus on women of limited resources.  I

11  actually went on the Internet -- you know, I had to make

12  sure before we submitted the letter that these organizations

13  existed and were valid.  And if you go to the website, it's

14  actually quite interesting.  It's not so much -- maybe with

15  the translation of the human rights -- but what it does is

16  it provides shelter for abused women and children, which

17  shows that Juan did not focus solely on only one type of

18  charity.  He was extremely broad and generous.  He believed

19  in women's causes.  In fact, he appointed one of the first

20  female heads of soccer to the organization.  So Juan was not

21  a person that discriminated on the basis of gender, race,

22  religion, or socioeconomics for his generosity.  He saw no

23  distinction.

24         In addition to being generous and compassionate,

25  as I've described him, Juan was a decent co-worker.  He

1   started off -- some of the letters we received were like

2   from people who started with Juan when he started at the

3   business that was owned by his father, and they described

4   how he worked from 6:00 in the morning.  Now, he didn't walk

5   into the business getting a high-paying, you know, corporate

6   job.  He went into the interior with co-workers and he

7   learned the business from the bottom up.  This is not -- his

8   father was not a man that was going to give him handouts

9   because he expected a lot from Juan.  So Juan had worked and

10  earned his way up through the company.

11          As he did, you heard from some of his co-workers

12  that he was never -- he never said, Oh, I'm the boss's son.

13  Never.  He never used that arrogance.  Never.  He was kind

14  and he was generous and he helped and volunteered for

15  projects.  And as he went on when his father died, and he

16  was only 30 -- 36?

17          THE Defendant:  Thirty-three.

18          MS. PIÑERA-VAZQUEZ:  Thirty-three years old, which

19  is young.  I think it's young, 33.  He didn't just walk in

20  and say, Okay.  I'm the boss now.  I'm taking over.  No.  It

21  took time to move up.  But now he was in a higher position

22  because his father passed away and he became what they said,

23  their boss.  Did he change the way he treated their

24  co-workers?  No.  He continued, as the letters reflect, to

25  respect them with dignity and never ever disrespect and

1   heard all their voices.

2          And by the way, I would just like to point out

3   that the business that Juan took over from his dad and

4   expanded with other families in Paraguay is one of the

5   biggest employers in Asunción and provides jobs for hundreds

6   of people.  Now, Juan is no longer actively involved in the

7   company and has long ago divested himself and gone on.  His

8   family is still involved.  But the letters support how he

9   actually treated the employees and how he actually provided

10  jobs to the families.

11         Just briefly discuss his family, because I think

12  you're going to hear from his wife a little bit later, the

13  only person you're going to hear from, if the Court allows

14  it.  I just would like to point out that they're sitting

15  here in the first bench, the immediately family:  His wife,

16  Karin; his son, Junior; his daughter, Paulina; daughter,

17  Andrea; son-in-law, Juan; his other son-in-law, Macon

18  [phonetic]; and Veronica.

19         And I'm sorry?

20         UNIDENTIFIED MALE SPEAKER:  Fernando.

21         MS. PIÑERA-VAZQUEZ:  Alejandro was the last word,

22  right?

23         THE COURT:  Fernando.

24         MS. PIÑERA-VAZQUEZ:  And then you also have other

25  family members right behind, in fact, about two or three

1    rows of support for Juan Angel.

2           Every day that we were in trial for six weeks, we

3    all stayed at the Marriott down the street and we all walked

4    over here together.  And every day his wife and his four

5    children and sometimes friends and family came.  But they

6    were here every day through thick and thin.  How amazing

7    because there were things that obviously they disagreed

8    with, things they didn't know about their father, things

9    that things that they couldn't believe what was said.  But

10   it was hard to sit here every day, but they didn't miss a

11   day.

12          Why is that important?  Why is it important that

13   this entire group of people are here?  Because I went to

14   Catholic schools all my life, and my mother taught me

15   something very important to add to that:  You reap what you

16   sow.  And I was always told that, You reap what you sow.

17   And I thought it was a story of the Bible, you know, in the

18   field.  I had no idea until I got older.  And I can't tell

19   you how important it is because it is demonstrated here

20   today in real life.  If Juan would not have been the man he

21   was as a father and as a husband, if he didn't take the time

22   to have those daily dinners with his family, to go to his

23   daughters' swim meets, to push his son to play golf, to be

24   there at the tennis lessons.  If he didn't take that time,

25   if he didn't sow those bonds when they were young, they

1   would not be here today, I submit to you.  And you've been

2   present at other sentences where there is not this type of

3   support.  And that's a testament to his character and who

4   his is as a man and as a father.

5          He wasn't the type of father who just give his

6   kids money and let them go off spend it and spend all the

7   day, you know, traveling and spending time at work.  No.

8   Because they wouldn't be here.  That's not created

9   overnight.  I know how hard it is, as I'm sure Your Honor

10  does because I have children, and it's hard to be at that

11  ballet recital.  It's hard to be at that baseball game.  But

12  you do it and you lose your life for many year, and you hope

13  in the end you gain it back and you have some free time.

14  Juan worked and he was there for his family.  You reap what

15  you sow.

16          They have visited him at MDC.  It's very hard.

17  It's very hard to see their father who was a -- their hero,

18  or as I think Paulina said in her letter, superhero.  I

19  haven't had a chance to recall -- when she thought her dad

20  walked on water, was a superhero.  And even through

21  everything that's happened, she still thinks he's a

22  superhero.  I mean, I thank God I didn't have to go there to

23  see her father like this, that raised you and go to MDC in

24  that visiting room?  It's a horrible situation, but they

25  support their father and they went.

1    The theme in the letters, and I have to mention
2    this because it also taught me a little bit about Juan's
3    personal character.  A lot of the letters from childhood to
4    today describe Juan in very similar adjectives.  And I'm
5    just going go through a list.  They describe him as being
6    peaceful; collaborative; humble; simple; avoided conflict;
7    respectful; listened to all views; friendly, not arrogant;
8    treated everyone equally; selfless.  These are traits of a
9    decent man, a man who lived his life since he was a child
10   until the day he was arrested being compassionate, generous,
11   and valuing humanity.  So in making an individualized
12   assessment as to who Juan is, we are going to take all these
13   letters and all these characteristics as far as his
14   background and the character of who he is.  That would
15   address the first factor, Your Honor.
16       As far as one of the other factors, which is
17   reflect -- that your sentence would reflect the seriousness
18   of the offense and promote respect for the law.  There's no
19   doubt that the offenses for which Juan was convicted are
20   serious.  I don't think anybody in this courtroom would
21   doubt that.  I think what is important to gain from how Juan
22   has shown the seriousness of those crimes and promote
23   respect for the law has been -- for example, I would like to
24   point out two.  Prior to trial, Juan was on strict house
25   arrest for about two years, and it varied, obviously.  It

1  was 24/7 with private security guards, but it then went into

2  a modified curfew and then a break at the end.  But for two

3  years, he was on strict -- he couldn't go to Paraguay.  He

4  couldn't go to Disney World with his grandchildren.  He

5  couldn't go to -- you know, he very limited, and whenever he

6  left his apartment, he had the go with, basically, guards.

7  And one of those people in charge of the security detail was

8  a former FBI agent, Anthony Velasquez.  Now, Mr. Velasquez

9  wrote a letter.  It was toward the end of our submission,

10  and he explained one specific instance which I think

11  demonstrates Juan's respect for the law.

12          Last year around this time -- was it around this

13  time?  Around this time we were hit with Hurricane Maria in

14  south Florida.  That was a devastating hurricane.  Well,

15  Juan's apartment was in an evacuation zone, and when you

16  have an evacuation zone, it's not just, Hey, let me just

17  hang out there out until there is -- no, no.  There's police

18  and they take you out, if you know anything about

19  hurricanes.  So Juan was required -- it was a

20  life-threatening situation -- he was required to leave.  But

21  Juan didn't just evacuate, taking advantage of the situation

22  and say, Okay.  I'm out of here.  You know, There's an

23  evacuation, I'm moving.  Let me go to a bar or whatever.  He

24  didn't take advantage of that.

25          What he did was call Mr. Velasquez and he was

1    there with his son, Junior.  He called Mr. Velasquez and

2    waited until Mr. Velasquez got there, who was securing his

3    own home, by the way.  Mr. Velasquez got a call from

4    Probation for an alternate location in South Miami, and then

5    he didn't want to drive himself there because he didn't want

6    Probation to think he was somehow going somewhere else.  He

7    waited for Mr. Velasquez, got to his apartment and he drove

8    him all the way back to Miami to a secure location.  Now,

9    that demonstrates to me that Juan respects, not only laws,

10   but regulations.  And when he then had the opportunity, a

11   perfectly good excuse to violate that, he doesn't.

12           And to this day, we filed -- I think a couple days

13   ago, I filed the counselor's report from MDC.  He's been at

14   MDC for nine months.  A model prisoner.  He hasn't --

15   evaluation, which I believe is for the month of June, as the

16   evaluation points out, Juan has outstanding response to

17   supervision and instruction.  And I'm reading from the

18   second page.  He's outstanding and he makes a real effort to

19   please the instructor; does exactly as he is told.  More

20   importantly, Juan is very hardworking, responsible, and

21   works well with others.  He is respectful and shows up

22   early, clean and ready to work.  He is always ready to

23   volunteer and take the initiative.

24           I represent a lot of people in jail.  I'll say

25   most of them really come out in good shape.  They go and

1    they work out every day.  They hang out and watch TV, and,

2    you know, fight with the other inmates.  Rarely have I seen

3    an inmate that goes, volunteers, does more than is expected

4    of him, and gets a letter from his counselor that he helps

5    others.  But you know what?  It all came together, of

6    course, because that's who Juan is as reflected in the

7    letters.  He didn't change while he's at MDC with violent

8    criminals and drug dealers.  He didn't change.  He still

9    helping others.  He works in the kitchen.  He gives food.

10   He helps other.  I mean, that's -- this is from the

11   counselor from the -- not someone that just met him -- from

12   someone -- I mean, not from someone who's known him for

13   years, but this is from someone who can attest to his

14   current.  So Juan hasn't changed.  Even though he's been

15   through hell and high water because it's been very hard and

16   I've been with him to experience it, he hasn't change.  In

17   his heart he's still the person of helping other and always,

18   always working hard.

19           I would like to address very briefly the

20   unwarranted sentencing disparities as the Court should

21   avoid.  Simply stated, the Court has sentenced three people

22   in this multiple-Defendant conspiracy.  That's Mr. Takkas,

23   who the Court has sentenced to 15 months; Mr. Trujillo, who

24   the Court has sentenced to eight months; and then last week,

25   Mr. Marin, who the court sentenced to 48 months.

1          Now, I won't get into Takkas and Trujillo because
2     they pled guilty and it's a different situation.  But
3     Mr. Marin, who went to trial with Juan, I just remind the
4     Court that he was convicted of seven counts.  He was
5     convicted of a third conspiracy, which is the Copa do
6     Brasil; Mr. Napout was not convicted of.  And he was also
7     convicted on two money laundering counts.  And as the Court
8     knows, Juan was acquitted on both of those account counts.
9     So to say that Mr. Marin was convicted of more acts and more
10    charges, especially with the money laundering, more
11    responsible, I think is a fair statement.

12          I think it's also important, certain things that
13    are different between some these individuals.  For example,
14    you heard that many of these individuals who were taking
15    bribes were also taking salaries from FIFA, CONMEBOL, and
16    CONCACAF.  Juan wasn't one of those.  Juan never took a
17    salary, and it's in the probation report.  He never took a
18    salary from APF, from CONMEBOL, or from FIFA.  And we're not
19    talking $96,000.  We're talking about $1.5 million or more.
20    So that's money that he walked away from and waived.  It
21    wasn't like it was sitting in a bag.  He waived.

22          Yes, he got paid for being at hotels.  I mean,
23    that's part of your job.  I think that's important to take
24    into consideration because it sort of undercuts the greed
25    argument the Government would like for the Court to go with,

1  which is that he committed these crimes for greed.  If he

2  was greedy -- and, of course, we disagree with the verdict.

3  But for purposes of sentencing, it's those -- if he took

4  those bribes for greed, then why on earth wouldn't he take a

5  salary?  I mean, it doesn't make sense.  It doesn't -- the

6  pieces don't fit.

7           You don't see during the trial any credit card

8  receipts or lavish spending of Prada of Chanel.  You didn't

9  see trips to the Champs-Élyseés.  You didn't see any of the

10  lavish spending that you saw with other defendants, because

11  Juan is a simple man.  His family is a simple family.  Yes,

12  they have money.  Yes, they're successful, but they don't

13  use that money to live a lifestyle of the rich and famous.

14  On the contrary, they live a lifestyle helping others.

15           Supporting their community, he's not from here.

16  He's from Paraguay.  That's the community he mainly

17  supports.

18           Collateral consequences, I think the Court

19  is aware and we've written in the memo that Juan will be

20  submitted to harsher incarceration because he is a

21  deportable alien.  He will -- and I submitted an affidavit

22  by a prison expert.  He's from the Justice Advocacy Group

23  Joel [sic] Pikler, who used to work, actually, for the BOP.

24  And he just lays out in their -- I'm not going to go into

25  all of that.  But not only will he be subjected to harsher

1   in terms of incarceration as far as location, but he also

2   doesn't have access to those prerelease and integration

3   programs to Americans who would, quite frankly, commit the

4   same crime Juan was convicted of.

5           Another thing which is really important, and I

6   know we stressed it in the memo, but this a lifelong

7   collateral consequence that Juan's going to have as a result

8   of this conviction, he will never be able to come back to

9   this country.  Never.  This is a man who had come to the

10  United States since he was young boy, has had a house here

11  for the past -- a home for the past 40, 50 years; a man who

12  loved this country so much that when he sold his apartment

13  with his wife, he actually went to the embassy and paid

14  taxes.  I don't know what taxes he paid, but he went and

15  paid taxes because he didn't want to have any problems with

16  this country.

17          This is a man who as he sits at MDC when he is not

18  working is reading the biography of George Washington and

19  Alexander Hampton and the Mayflower -- the Mayflower, which

20  I guess he has yet to read.  But this is a man who the fact

21  that he will never be able to step foot in this country

22  again will a have a significant consequence on him.

23          We also submitted under seal the medical issues.

24  I don't think we need to go into them in the open record.

25  We submitted a report and we request that you take that into

1    consideration, Your Honor.  I don't know if you want to hear

2    anything else about those.

3            So I come to the end, and what I gathered from

4    reading the transcript of Trujillo and Takkas, and I was

5    present for Mr. Marin's sentencing.  And I come to

6    deterrence, which I think the Court repeatedly mentioned is

7    one of the factors that it's considering quite heavily.

8    First off, let's talk about the specific deterrence, the

9    need to provide specific deterrence and to protect the

10   public from Mr. Napout, from Juan from committing further

11   crimes.  First of all, Your Honor, Juan will never again be

12   part of FIFA, CONMEBOL, or any sporting organization as a

13   result of this conviction.  So as far as committing any

14   crimes related to that, there is no opportunity.  There is

15   no reason that he would ever become involved again.

16           But more importantly, and respectfully, what he's

17   undergone for the last three years, two years of being away

18   from his country, 5,000 miles away, home confinement, nine

19   months at MDC, and the effect that it's had on his

20   professional and personal life is more than sufficient

21   punishment and recognizes that he will never again commit

22   those crimes.

23           As far as general deterrence, last week during

24   Mr. Marin's sentencing I sat there, and the Court made a

25   statement which I thought was very appropriate, The whole

1    world is watching.  And it it's important that the Court

2    send a message, but let's talk about who it's sending a

3    message to, because the message, it's not to the drug

4    dealers.  It's not to the violent criminals.  The message is

5    to, let's say, FIFA, CONMEBOL, and other international

6    sports organization and sports marketing executives, that's

7    who the message is to because that's what this case was

8    about.  You're not going to deter a drug dealer when you

9    impose a sentence on a white-color criminal.  And I think

10   it's fair to say that any person in a position where -- that

11   Mr. Juan sits in today, a high-level executive out there in

12   FIFA today, or the new player in CONMEBOL, what they see

13   Mr. Napout and others go through in the last three years,

14   everything they've lost, their freedom, their liberty, it's

15   quite a significant impact.  Three, four, five years of a

16   loss of freedom for a first-time offender is a strong,

17   strong message.

18          Now, while we agree with the Court that one of the

19   purposes of sentencing is to send a message, that we are a

20   nation of laws, which is, I guess, the message the Court

21   says it needs to send, if you break our laws, there are

22   consequences.  And we're going investigate and we're going

23   to go after you and there will be consequences.  That's a

24   very important message.  We don't disagree with that.  But

25   there is an equally important message that this Court has

1   the opportunity to make, and that's that we are a country of

2   humanity; a country who believes in humanity.  In our

3   divided country today, the values that are derived are

4   compassion, decency, and respect for the law.  And by

5   sending a message to the world that we are a nation of laws

6   and a nation that believes in humanity, the Court is sending

7   a very strong message.

8           And please forgive me, but I'm going to read

9   something from Senator McCain's book, God bless his soul,

10  and the book is *Character of Destiny*.  And because he is an

11  American hero and a man who stood for all the values that we

12  so lack today, he writes in his book, and it's book about

13  character and I quote from the first page in the

14  introduction:  "It is your character and your character

15  alone that will make your life happy or unhappy.  That is

16  all that really passes for destiny.  And you choose it.  No

17  one else can give it to you or deny it to you.  No rival can

18  steal it from you, and no friend can give it to you.  Others

19  can engage you to make the right choices or discourage you,

20  but you choose."

21          Juan could not choose the family that he was born

22  in, but he could choose the way he led his life and the

23  way -- and what he did with the money he was born with and

24  the success he obtained.  He made a choice.  He made a

25  choice reflected in the letters submitted, a choice of being

1    generous, a choice of helping others, a choice of treating

2    everybody with respect.

3              Now I'm sure the Government will get up here and

4    say, Yeah, he also made a choice.  He chose to commit bad

5    acts in 2010 for five years.  That's a logical

6    counterargument.  But even accepting that verdict, the

7    verdict for purposes of sentencing and accepting that

8    argument, one mistake that lasted years, according to the

9    verdict, let's say five years or that time frame, cannot

10   erase a lifetime of good acts in helping others.  Because

11   even Senator McCain in his farewell letter that we heard I

12   think yesterday or the day before, said, I have tried to

13   serve my country honorably.  I have made mistakes, but I

14   hope my love for America will be weighed favorable against

15   them.

16             Senator McCain was a man who was flawed.  He

17   recognized he was flawed, and every day he was trying to be

18   a better person.  And I'm not saying Juan is Senator McCain,

19   Judge.  Please don't get me wrong.  I'm just saying that

20   because Senator McCain represented those values that are so

21   important in our society and treasured them, Juan also

22   embodied the values of selflessness, of honesty, of helping

23   others, of generosity from the day he was born.  So like I

24   said before, this Court has the rare opportunity at this

25   time in our divided country to send a message, not only to

1    the world, but to our nation that if God forbid any of us

2    finds ourselves under Juan's situation in his darkest hour,

3    that what you did in life, how you held yourself out, how

4    you treated others with decency, respect, compassion

5    generosity, equally, that that matters.  And that is going

6    to be taken into consideration by the Court when imposing

7    sentence, because otherwise, we're only a nation of laws and

8    there really is no need for a judge.  We just impose

9    sentence, and that's it.

10           So Your Honor, thank you for the time.  I'm sorry

11   if I took a little bit too much time.  I think it's

12   important that the Court understand that even makes

13   mistakes, and the most important thing is the way you've led

14   your life, and I hope the Court will take that into

15   consideration in imposing a sentence that is sufficient, but

16   not greater than necessary to achieve the goal of

17   sentencing.

18           THE COURT:  Thank you, Ms. Piñera-Vazquez.

19           MS. PIÑERA-VAZQUEZ:  Thank you, Your Honor.

20           THE COURT:  I'll hear from the Government.

21           MS. MACE:  Thank you, Your Honor.

22           The Government, as the Court is already aware, is

23   respectfully requesting that the Court impose a sentence of

24   not less than 20 years.  We recognize that that is a very

25   substantial sentence and it's much longer than the other

1    sentences that have been imposed in this case so far, and so

2    we certainly have considered those other sentences very

3    carefully in arriving at our position that we would take

4    today before the Court.  We don't make this request lightly,

5    but was do submitted that based on everything that is before

6    the Court through trial, through the presentations leading

7    up to today, everything makes it clear that a sentence of at

8    least 20 years is not only warranted, but it is necessary in

9    this case to achieve the goals of sentencing.

10          The Government takes this position because every

11   one of the factors under 3553(a) counsels in favor of a

12   lengthy sentence and it distinguished Napout, Mr. Napout

13   from the other defendants that have been sentenced already.

14          First as to the nature and circumstances of the

15   offense.  I know the Court is very familiar with the

16   evidence in this case and very familiar with the widespread

17   corruption in organized soccer.  I won't spend time

18   discussing the gravity of the racketeering conspiracy and

19   the crimes that Mr. Napout committed.  And I won't focus

20   either on the toll it has taken on the sport.  I think the

21   Court is very aware of that.  But instead, I want to focus

22   just for a moment on Mr. Napout's own conduct.  Where

23   Defendants Marin, Trujillo ^ Costas Takkas, and others were

24   cavalier about their conduct sometimes and in some instances

25   didn't even bother to keep track of all the bribes that they

1    were receiving, Mr. Napout in contrast was having

2    calculating.  He understood the power structure and the

3    corruption in South American soccer and in world soccer, and

4    he maneuvered in that position and he positioned himself to

5    be at the center of that immense power.  He succeeded in

6    banding together a group of presidents, six presidents from

7    smaller countries in South America.  That became known as

8    the Group of Six, as Your Honor is aware.  It made up a

9    majority of CONMEBOL's ten member at the time.

10            But the Group of Six did not use this opportunity

11   to counterbalance the existing power structure.  Mr. Napout

12   drew the powerful Julio Grondona into his new center of

13   power and into this new sphere.  As I mentioned earlier

14   today, after the Group of Six was formed, ^  Julio Grondona

15   recognized the power there, and he said, If you are six,

16   then with me, that makes seven.  And Mr. Napout ensured that

17   that was so over time.  He visited Buenos Aries many times

18   and met with Mr. Burzaco and ^  Julio Grondona, and he

19   nurtured that relationship with Grondona.

20            Napout recognized the corruption in CONMEBOL, and

21   according to him, he sought power in order to make a

22   positive change.  As stated in his sentencing submission,

23   he, quote, "did not enter sports to make money.  He had more

24   than enough.  But rather his goal was to improve the

25   conditions for others."  If that was truly his goal, then he

1   abandoned it at the first opportunity.

2           No later than 2010, shortly after he came into

3   his -- or a few years after he came into his position as the

4   APF president and shortly after the Group of Six was formed,

5   and although he had more then enough money, he jumped into

6   this arrangement with Grondona and the others and he started

7   taking bribes.  As soon as he had a change to make a

8   difference and he recognized that a difference was needed,

9   he throw that chance away and he joined in with the others

10  who were already involved in corruption.  He did exactly

11  what the old guard had done before him.

12          But unlike some others, Mr. Napout understood the

13  personal risk of taking bribes, and that became clear

14  through the evidence at trial, and he was very calculated in

15  his efforts to protect himself and to avoid getting caught.

16  He took bribes in cash, for the most part, over $3 million

17  in more than 25 installments over five years.  That's been

18  referred to making as making one mistake in his life.  This

19  is not making one mistake.  Over the period of five years,

20  he calculated a way to receive this money and try to hide it

21  from law enforcement.

22          He met only with Mariano Jinkis to pick up the

23  cash in the hotel rooms as we have described earlier today

24  in Buenos Aries.  And at one point, he sent Luis Bedoya, one

25  of his co-conspirators to speak with Mariano Jinkis about

1    whether Full Play was being careful enough.  And Mariano

2    assured him that the officials' names were not associated

3    with the payments and could not be traced.  That's reflected

4    in the ledger itself, and we referred to this earlier today

5    that in the earlier years the ledger from Mr. Napout refers

6    to JAN, Juan Angel Napout.  And then later, ^  the entries

7    were changed to refer to refer to Honda, Benz, Fiat, VW,

8    Peugeot, Smart, Toyota.  Using these codes names and these

9    types of steps to evade detection by law enforcement helped

10   Mr. Napout and the other corrupt officials maintain their

11   positions by continuing to corrupt the enterprises they were

12   supposed to serve.

13          He took bribes frequently but carefully over the

14   span of those five years until he got caught.  And through

15   this time he held himself out as a reformer and he lied.  He

16   lied to FIFA.  He lied to CONMEBOL.  He lived to the APF.

17   He was stealing money this entire time.  And there has been

18   a lot of talk about his generosity today, and we do not

19   doubt that that has been a part of his life and there have

20   been many letters that were submitted to the Court that show

21   that in his personal life he demonstrated generosity and

22   cared for people in his personal life.  But that money that

23   he stole, it could have been used to go to soccer

24   development, to developing youth soccer and soccer for

25   women, to build stadiums that were needed, and he took it

1    for himself.

2            Next, I want to just talk for a moment about the

3    need to promote respect for the law and to protect the

4    public.  Shortly after the first indictment, which came out

5    in May 2015, Mr. Napout was informed that he was a target of

6    the investigation.  That was in June 2015.  Warnings were

7    not commonly given to targets.  But he did not step aside.

8    He did not allow new, uncorrupted officials to take that

9    position and actually begin the reform that was needed.  He

10   held tightly to power and he even orchestrated an

11   obstruction of justice that we have discussed here today.

12   This conduct at a time when he knew that he was under

13   investigation and refused to allow that needed reform to

14   take place, demonstrates the need to promote the respect for

15   the law and to protect the public.

16           As he said again and again in his brief, that

17   today he did not need the money; and yet, we never heard any

18   indication of remorse or even regret that this is how he

19   conducted himself.

20           With a 20-year sentence when he is released he

21   will be the age of other co-conspirators when they even

22   entered the conspiracy.  Mr. Marin was 79, and Mr. Napout

23   would be 80.  And the suggestion that there's no need to

24   protect the public against Mr. Napout, I think, is false.

25           Some of the letters that were submitted

1    demonstrate, I think in Ms. Piñera's words, that people in

2    Paraguay are passionate about Juan.  He will be given

3    opportunity, there are even letters from the soccer clubs

4    that demonstrate that he will be welcomed back.  And if he

5    is let out earlier and given a shorter sentence, he will be

6    able to return and excerpt influence there.

7            Next, as the Court has already noted in other

8    sentencings in here, there's a strong need for general

9    deterrence.

10           Sadly, this case has shown that over many years

11   one corrupt official has been replaced with another time

12   after time after time.  What we have seen is that over time,

13   corruption becomes engrained and people shrug and say,

14   That's just the way things are, especially when those

15   committing the crimes are so powerful and it seems

16   impossible that they could be stopped or that things could

17   be any different.  Mr. Napout and the other Defendants want

18   to dispute whether their contact was harmful, and frankly,

19   we think that's nonsense.  The acceptance of corruption over

20   here, even in the face of scandal and revealing that others

21   are taking bribes, if nothing else, that acceptance of a

22   corrupt way of proceeding is how soccer has been harmed.

23           Although there are many who have shrugged and said

24   that, That's just the way things are, we submit that the

25   Court has an opportunity to say, That's not the way things

1   should be, and that's not the way things have to be.

2          I think it's worth pausing for just a moment to

3   take stock of where we stand today.  Three successive

4   CONCACAF presidents have been charged.  One is fighting

5   extradition and two have pled guilty.

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; 1:31 p.m.)

2           MS. MACE:  The successive presidents of CONMEBOL

3    have been charged.  Two have fought extradition and one,

4    Mr. Napout, was found guilty following trial.  And yet, no one

5    is really surprised by that.

6           As in the Derigei case, Mr. Napout was at the top of

7    soccer for years, was the president of one of the most

8    powerful soccer organizations in the world.  He led by example

9    at CONMEBOL and at FIFA, and his participation in the criminal

10   schemes led his colleagues and his subordinates to understand

11   that bribe taking was a common practice and would not be

12   prevented or policed.

13          What is remarkable is that this official, former

14   official, who enjoyed extraordinary wealth and power that made

15   him untouchable for many years.  It is extraordinary that a

16   jury of 12 regular people from Brooklyn, New York could hold

17   him to account and call this what it is:  It's wrong, it's a

18   crime, and he engaged in it for years.  The bribes have been

19   tolerated for years, but this is the chance to make clear that

20   it shouldn't be that way and it doesn't have to be that way.

21          Through scandal after scandal and successive ways

22   waves of arrests, one thing has been clear that the corrupt

23   hold on tightly to their power.  They are not easily persuaded

24   to give up their positions or change their conduct and a

25   lengthy sentence here is necessary to persuade them of that.

1   With defendants Takkas and Trujillo, the conduct and the bribe

2   amounts were quite small in comparison to Mr. Napout's

3   conduct, and with Defendant Marin the Court noted that it was

4   lenient because of his age and although that was a proper

5   consideration.  In Mr. Marin's case, it does not apply here.

6           We respectfully submit that this is not the time for

7   unwarranted leniency that will send the wrong message.  For

8   all the reasons cited in our brief today, and our argument

9   today, we urge the Court to impose a sentence of no less than

10  20 years because we submit that's what is necessary to

11  accomplish the goals of sentencing here.

12          THE COURT:  Thank you, Ms. Mace.

13          Let me ask.  I know that you've said,

14  Ms. Piñera-Vazquez, that the wife of Mr. Napout would like to

15  say something.

16          MS. PIÑERA-VAZQUEZ:  Yes, Mr. Napout has a brief --

17          THE COURT:  Let's hear from the wife first.  Maybe

18  take your seat or give her microphone, the portable, and she

19  can use that.  That's fine.

20          (A brief pause in the proceedings was held.)

21          THE COURT:  Also, after Mrs. Napout is done, I'm

22  going to ask the Government if there are any victims that

23  would like to be heard.  You'll let me know.

24          MRS. NAPOUT:  Hello.

25          THE COURT:  Go ahead.

1          MRS. NAPOUT:  Good afternoon, your Honor.

2          First of all, I would like to thank your Honor for

3     allowing me the opportunity to address the Court.  Please

4     forgive me for reading, but this is such a critical day in the

5     life of our family that I want to make sure that I say

6     everything I would like to say.  I want to apologize up front

7     if I make a mistake or break down.  Please understand that

8     public speaking is not something I'm comfortable with.

9          It has not been easy sitting here today listening to

10    some of the things that were said.  These last 32 months were

11    very hard and extremely difficult for Juan and for the whole

12    family, especially for Juan's 86-year-old mother.  The pain we

13    are experiencing will be seared in our memory forever.

14         Juan and I have been married for over 33 years and

15    have a beautiful family of four children, two sons-in-law, and

16    four grandchildren.  We have always lived in Paraguay, our

17    home country.

18         Family has always been the most important thing in

19    our lives although Juan worked long hours, he always made

20    family a priority and made sure we had dinner every night all

21    together.  It was important for him to spend quality time with

22    our children.  He would always support and give them.

23         Your Honor, one of the qualities that I love most

24    about my husband, and there are many, is his complete lack of

25    selfishness.  Juan is a generous and compassionate man.  Since

1    I met him, I never saw him once turn away anyone in need.  So

2    many of his friends and employees approached both of us under

3    difficult circumstances asking for help for them or for their

4    relatives and Juan never even hesitated.  He always told me

5    that we were blessed with our family, health, and work and

6    that it was our responsibility to help others.

7            I don't want to take up too much of your time, but I

8    would like to give one personal example of how he impacted by

9    family.

10           I come from a family of three siblings, all of us

11   live in Paraguay.  28 years ago, in 1990, my brother and his

12   wife, Maristela, were blessed with triplets.  Sadly, one of

13   the triplets, my nephew Robert, was born with a

14   life-threatening heart defect or he would die.

15           At the time, the medical resources in our country,

16   Paraguay, were not as advanced as the ones in the

17   United States or other more advanced countries.

18           Unfortunately, my brother did not have the resources

19   to take little Robert to a hospital with the appropriate

20   technology and was prepared to have the surgery done in a

21   clinic in Paraguay.  When I explained the situation to Juan,

22   he stepped in, did all the research available at the time, and

23   took charge of helping my brother's family calling the best

24   doctors and covering all the expenses necessary to take my

25   nephew to Sao Paolo, Brazil where doctors with advanced

1   training to conduct this particular operation did their best

2   work.

3          As a direct result of Juan's help, my nephew

4   survived.  Today, he works as a pilot for a commercial

5   airline.  Like my brother's experience with Juan Angel there

6   are hundreds of others.  I think I can say with complete

7   honesty that Juan made an impact on people's lives on a daily

8   basis.

9          Now, please don't get me wrong, my husband is not

10  perfect, but then again who among us is.  But with all his

11  flaws and strengths, he's a decent and generous man who

12  treated everyone equally and never refused to help others in

13  need.

14         I must urge your Honor to use your wisdom to balance

15  everything that has been exposed here from the trial against

16  the real and true life of my husband and his actions prior to

17  this trial.  It has been shown in more than 200 letters that

18  tell about the more than 50 years of Juan angel's life and his

19  actions.

20         He always been a hard-working and well-prepared man.

21  He studied hard in his youth and prepared to succeed in life.

22  He worked more than 12 hours on a daily basis, dedicated his

23  entire life to family and friends.  Giving back to society on

24  what God gave him the blessing of having a great family and to

25  health and work.  He never had one violent incident in his

1    entire life.  On the contrary, he always looked for the

2    peaceful solution.  Though, I know Juan has learned much

3    during his time in prison, it has been hard to see him like

4    this but our support for him will never end.

5            I have no doubt that when he returns to Paraguay,

6    Juan will continue his path of helping others.  I'm sure that

7    our community will benefit much more having him back

8    dedicating his time and energy left at his age and helping

9    others.

10           I humbly ask your Honor that you take into

11   consideration Juan's good character and good deeds when

12   imposing sentence and give his mother, our children,

13   especially our grandchildren, the opportunity to have their

14   son, father, and grandfather back again in their lives.  We

15   love him and need him back in Paraguay with our family and

16   friends.

17           Please, your Honor, reach deep into your heart,

18   balance my husband's life this morning and have mercy in

19   imposing a sentence that will return him home soon.  Thank

20   you.

21           THE COURT:  Thank you.

22           Let me turn to the Government for a minute.  Are

23   there any victims that you are aware of that want to make a

24   statement at this time or representatives of the victims.

25           MS. MACE:  I understand that there are

1  representatives of at least three victims here:  FIFA,

2  CONMEBOL, and CONCACAF.  Based on my prior discussions, they

3  don't wish to be heard in connection with the restitution.

4  Let me verify it appears that that's true.

5       THE COURT:  Thank you very much.  I'll hear now from

6  Mr. Napout.

7       You, sir, have the right to make a statement at this

8  time.  Would you like to say something?

9       Be mindful of using the microphone.

10       THE Defendant:  Thank you very much, your Honor.  I

11  will be very brief.  I think that you already heard enough of

12  all the legal points and I just want to take the opportunity

13  to thank my family and thank the friends who have come here to

14  support us.  It's very important.

15       And I come upon you, your Honor, as humble as I can

16  and I know that America is a compassionate country.  I just

17  want to ask you for your compassion.  I just beg you for your

18  mercy, your Honor.  That's all I have to say.

19       Thank you, your Honor.

20       THE COURT:  Thank you, Mr. Napout.

21       Folks, we're going to take a five-minute break.  It

22  will be much shorter.  Just in five minutes please return.

23       COURTROOM DEPUTY:  All rise.

24       (Defendant exits from the courtroom at 1:46 p.m.)

25       (A recess in the proceedings was taken.)

1        (Defendant enters the courtroom at 1:50 p.m.)

2        COURTROOM DEPUTY:  All rise.  Have a seat, everyone.

3        THE COURT:  I have considered very carefully the

4   relevant factors set forth by Congress in Title 18, United

5   States Code, Section 3553(a) which includes at least the

6   modified advisory guideline range that I indicated before to

7   ensure that I impose a sentence that is sufficient, but not

8   greater than necessary, to comply with the purposes of

9   sentencing.

10       Those purposes include the need for the sentence to

11  reflect the seriousness of the crime, to promote respect for

12  the law, to provide just punishment for the offense, to deter

13  criminal conduct by this Defendant and others who would seek

14  to engage in this type of crime and to protect the public from

15  future crime by the Defendant.

16       I've also considered the nature and circumstances of

17  the offenses in this case and the history and characteristics

18  of the Defendant.

19       In addition, I've considered the need to avoid

20  unwarranted disparities between similarly situated defendants.

21  Let me discuss my consideration of those factors in particular

22  or in detail.

23       First of all, as I think everyone agrees, the crimes

24  of which Mr. Napout was convicted are serious crimes.  They

25  involved three separate bribery schemes that resulted in

1   $150 million plus in bribes being promised and partially paid

2   to corrupt soccer officials.  The crime, in addition to the

3   losses that it caused to these various soccer organizations,

4   resulted in the destruction of the public's confidence and the

5   reputation of professional soccer.  There is no question about

6   that.

7           These were not victimless crimes despite the defense

8   arguments to the contrary that no one was harmed.  These

9   bribery schemes deprived soccer organizations including FIFA,

10  CONMEBOL, and APF of millions of dollars in revenue from media

11  and marketing companies.  These were contracts that were

12  negotiated not at arm's length, not with proper bidding, but

13  rather were steered to these companies because of bribes taken

14  by the Defendant and his co-conspirators.  And that money,

15  that bribe money, should have gone to those organizations at a

16  minimum.

17          Indeed, as the letters even submitted by the

18  Defendant show, these organizations do more than just organize

19  professional soccer tournaments, but they seek to promote the

20  sport of soccer and also organize and sponsor events for

21  underprivileged youth in disadvantaged neighborhoods so that

22  they can learn sportsmanship and a love for the sport of

23  soccer.  And the Defendant himself recognizes this based on

24  the myriad of letters I've received.  He is someone in

25  particular who understood intimately and personally how

1    important these soccer organizations are to people in Paraguay

2    and throughout the world.

3               So the theft in the millions, in the hundreds of

4    millions, of money that should have gone to these

5    organizations is absolutely a serious crime that does warrant

6    significant punishment.

7               The defendant's motivation for this crime also makes

8    it more serious and less understandable.  There is no

9    question, and it's even supported by the letters I've

10   received, that supported letters, that, and as I quoted

11   earlier, Mr. Napout was born in a "cradle of gold," that was

12   one of the letters that I read.

13              He was born into privilege.  His family was one of

14   the most prosperous and well-respected and socially esteemed

15   families in Paraguay.  Mr. Napout himself, not without hard

16   work, grew the business of his family and participated in its

17   successful management for a number of years and achieved

18   himself a high social standing and class and obviously a very

19   comfortable lifestyle.

20              He then turned to professional soccer, and with

21   great ambition, he wanted to lead the major organizations not

22   only in Paraguay but ultimately on the international stage

23   including CONMEBOL which he eventually did achieve.

24              At the time he started to engage in this bribery

25   scheme, based on the record before me, to appears that his

1   family's business was earning on average for him $75,000 per

2   month.  The report indicates that he got net profit instead of

3   salary from that business.  So this was a person who committed

4   this crime not because of need but because of greed or some

5   other misplaced value.

6          Now, I know Ms. Piñera-Vazquez tries to rebut this

7   portrayal of the Defendant as greedy, but there is no other

8   explanation for why he might have gotten -- not might, sorry

9   -- what would have motivated him to get involved in this

10  crime.  And I should be careful because the defense arguments

11  never acknowledge, and I understand why, that the Defendant

12  has been convicted of these wire fraud schemes notwithstanding

13  his maintenance of his innocence and the fact that he's going

14  to appeal the conviction.  But the jury found otherwise, and

15  so, this was a person who, for no reason, other than obtaining

16  millions of dollars that he didn't need, got involved in the

17  separate bribery schemes.

18         Now, I won't belabor this point, but there is a need

19  for general deterrence for the obvious reasons that there was

20  and perhaps still a rampant culture of corruption in

21  international soccer and other sports, and clearly, a message,

22  a very strong message, of deterrence has to be sent to others

23  who would engage in that type of conduct that will be met with

24  serious consequences that you cannot steal millions in bribes

25  from these organizations and have it go unpunished.

1      So it's not just about the arrest and the trial and

2 the conviction and the shame that's attendant with that, and

3 that's not an argument that I'm particularly fond of, but

4 accepting it as it is, there has to be a strong message that

5 there is a real consequence, that people do go to jail because

6 they commit these crimes, and that it won't be a slap on the

7 wrist.  And for at that reason, I think there is a need for

8 general deterrence it's quite strong here.

9      I know, Ms. Piñera-Vazquez, you mention that the

10 impact of three to five years for a first-time offender may be

11 great, but I don't agree with that.  I think something more

12 than that is required because first-time offender or no, three

13 to five years is not necessarily significant when you weigh

14 that against the prospect of getting millions and millions of

15 dollars for your yourself and for your family.

16      The need to avoid unwarranted disparities amongst

17 similarly situated defendants.  As everybody knows, I've

18 sentenced three defendants in this case:  Mr. Trujillo,

19 Mr. Takkas, and Mr. Marin.

20      Mr. Marin is perhaps the most apt comparator, but

21 for reasons that have already been discussed, his situation is

22 different.  He is 86 years old and the sentence I impose was

23 significantly reduced because of his age and the likelihood

24 that jail would be much harder on him in his extremely

25 advanced age than other defendants.

1          As the Government said, that situation does not, or

2   that factor, does not pertain here.  Mr. Napout is a

3   significantly younger man.

4          The other distinction I would make is that

5   Mr. Napout was much more involved in this conduct than

6   Mr. Marin.  I know that you argue, Ms. Piñera-Vazquez, that

7   this Mr. Marin was convicted of more counts.  But looking at

8   the conduct itself and the number of years and the amount of

9   money and bribes that Mr. Napout was going to get, his crime

10  is far more serious.  He was promised $24.9 million in bribes

11  between now and 2026.  And actually, going back, I guess, to

12  2010 to 2026 and Mr. Marin was involved for only three years

13  during the time that he was the president of his country's

14  federation.

15         So, unfortunately, Mr. Napout's conduct, regardless

16  of what he was convicted of, is far more serious.  And it's

17  reflected to some extent in the guidelines of his leadership

18  role.  The fact that he engaged in obstructive conduct, and

19  the dollar amount itself to some extent, although I've largely

20  mitigated that.

21         So looking at Mr. Marin's sentence of four years is

22  really not a particularly apt comparison for those reasons.

23         Mr. Trujillo obtained, or was only held responsible

24  for $425,000.  So if I were literally to do the math based on

25  the amount of bribe money that he was held accountable for,

1    and it's even money he was supposed to receive, Mr. Napout's

2    crime is 58 times more serious and that would be a sentence of

3    almost 40 years.  I don't think these particularly

4    mathematical calculations make a lot of sentence, but it is

5    one metric if you want to look at it that way in terms of

6    comparison.

7            Mr. Takkas, he was the bag man, for lack of a better

8    word, for Mr. Webb and transported $3 million and he got a

9    15-month sentence, though, he never got a penny of any of the

10   bribe money which was intended for someone else.

11           So, in this case, there aren't particularly apt

12   comparators.

13           Now, I know the defense has pointed out other cases

14   Mr. Edelman's, in particular, that they think gives some

15   context for comparison of similarly situated defendants.  Not

16   soccer officials, but other individuals who engaged in

17   large-scale fraud.  I'm going to talk about the Edelman case

18   in a moment.

19           Let me now address what the defense has argued very

20   strongly favor for a lenient sentence or what they say are the

21   most salient factors for purposes of giving a more lenient

22   sentence.

23           First and foremost, is Mr. Napout's good character

24   and good deeds.  There is no question based on all the letters

25   I've received and everything I've heard from

1   Ms. Piñera-Vasquez's argument that Mr. Napout is a generous,

2   charitable, and kind man and has many done many good deeds for

3   many people from a very young age all through the period that

4   he was involved in these bribery schemes.  That is not

5   doubted.

6           And I do think what Judge Rakoff said in Edelman

7   applies here.  As the parties know in the Edelman case,

8   Judge Rakoff had received, as he noted in his decision, over a

9   hundred letters of support attesting to Mr. Edelman's good

10  works.

11          And Judge Rakoff wrote with respect to that

12  evidence, "If ever a man is to receive credit for the good

13  work he has done, and his immediate misconduct assessed in the

14  context of his overall life hither to, it should at the moment

15  of his sentencing should be assessed in the moment of his

16  sentencing when his very future hangs in the balance."

17          And that was quoted by the defense in their

18  submission and I think aptly so in this case.  There's no

19  question, as I said, that Mr. Napout's life is characterized

20  by generosity and kindness.

21          And as in Edelman, I've received 200-plus letters

22  attesting to his good works and his good character throughout

23  his life.  Certainly, an outpouring of letters.

24          But I do have to note that in Edelman part of the

25  reason Judge Rakoff gave a less strict sentence was because he

1    found that Edelman's crime, which involved a $50 million fraud

2    conspiracy, was one in which the Defendant was, and I quote,

3    "Sucked into the fraud not because he sought to inflate the

4    company's earnings, but because as the president of the

5    company he feared the effects of exposing what he had

6    belatedly learned was the substantial fraud perpetrated by

7    others."

8              That is not the case here, and as the Government has

9    argued and the evidence showed Mr. Napout entered into an

10   ongoing scheme of bribery and corruption that was rife in

11   FIFA, CONMEBOL, and professional soccer but he wasn't sucked

12   into this bribery scheme.  He willingly engaged in it and he

13   perpetuated it and he used it to his better advantage even

14   than over his other colleagues who were soccer federation

15   presidents.  So that mitigating factor, which Judge Rakoff

16   considered in reaching his sentencing decision, does not apply

17   here.

18             And therein lies the dilemma, I think, in this case.

19   I'm having difficulty, or have had difficulty, when reading

20   all this information in reconciling the two different

21   portraits of the Defendant.

22             The first one painted by the defense team and his

23   many supporters is one of someone who is a good, honest,

24   upstanding, virtuous and simple man and has been so throughout

25   his life.

1     But contrasting that is the one that I saw painted

2 at trial based on the evidence of a man who was stealthy,

3 sneaky, calculating, and greedy.  Someone who negotiated for

4 his own benefit and this is not helping others but this is

5 helping himself get promises of over $20 million of bribe

6 money and then started to receive that money in secret ways to

7 avoid getting caught.

8     And then, when it appeared that the investigation

9 was circling in on him, he participated in this obstruction

10 scheme to basically have his computer removed.  But even if I

11 didn't consider that, the difficulty that I'm having is that

12 the evidence that I saw over the course of the multi-week

13 trial portrayed Mr. Napout as someone who did not seek to to

14 expose corruption, who did not act virtuously or honestly, or

15 for the greater good of his country who looked up to these

16 soccer players and who depended on him as the fiduciary of the

17 Paraguayan Soccer Federation and CONMEBOL, and as an executive

18 of FIFA to do the right thing to make sure these organizations

19 got money they deserved from negotiating fairly media and

20 marketing contracts with all of these different companies.

21     Instead, he did what everybody else did which is he

22 started taking these massive bribes.  And worse yet, he

23 started negotiating for more bribe money for himself or at

24 least started accepting it.  Maybe the characterization of

25 negotiating is too strenuous.  But he certainly, based on the

1    evidence I saw and heard at the trial, starting accepting it.

2         So to borrow again from Judge Rakoff's analogy, I

3    will certainly put weight, and substantial weight, in the

4    balance for the defendant's good works, his charity and his

5    generosity which he has a long history.  And as you correctly

6    point out, Ms. Piñera-Vazquez, up until his 55th or 54th year

7    of his life that was, at least based on the record before me,

8    what characterized his life.

9         But, on the other side of that balance, I cannot

10   ignore the jury's verdict I cannot ignore the evidence that I

11   saw and heard at trial that revealed another aspect of

12   Mr. Napout's character and his conduct that he is someone who

13   would, as a character reference, and did, in fact, steal

14   millions from his beloved soccer organization and for no other

15   reason than greed or maybe because of status or maybe because

16   of a sense of entitlement but for no good purpose.

17        And this is a side of his character that based on

18   these two opposing pictures that are being painted for me are

19   at odds to be sure.  And I think the defense very aptly

20   characterized it in a situation when it entitled the section,

21   "Contrast and Human Nature."  That's exactly what the defense

22   wrote.  Then they wrote the defendant's conviction stands in

23   stark contrast to the manner in which he led his life and

24   adhere to the rule of law.  I agree with that, but the problem

25   is those are the two sides of balance that have to be applied

1   here at sentencing.  So the seriousness of the conduct, the

2   lack of actually in understandable motivation like financial

3   desperation that goes in one side of the balance as does the

4   need for general deterrence.  It weighs heavily on that side

5   against what is a considerable counterbalance of good works

6   and good deeds up until that point and maybe even continuing

7   through that point.

8          What seems to me the only way to reconcile these two

9   opposing images that Mr. Napout had a public face, one that is

10  reflected in all the letters I've seen and all of the

11  accolades he seems to justly deserve from the public in

12  Paraguay and maybe even beyond of his generosity, charity, and

13  kindness.

14         But then this hidden character that he had, a hidden

15  life, if you will, that he kept from the public all the while

16  perpetuating this notion that he was a good guy, he was an

17  honest guy, he was someone who was going to root out

18  corruption and be transparent, but all the while taking bribes

19  to the tune of 3.3 million accepted by the time he got

20  arrested and then with a promise of 20-plus million more to

21  come.

22         So it's not perhaps impossible to reconcile these

23  two things.  One is public, one is hidden, and that's exactly

24  the way Mr. Napout, according to the evidence I heard, and as

25  was established at trial, that's the way he wanted it.  He

1   wanted it to be secure and he didn't want the public to know.

2        So I have certainly weighed his good work, but as I

3   said, they are only one part of the balance sheet of the

4   scales that have to be applied here.

5        The need for specific deterrence.  I don't think

6   there's a great need for specific deterrence for a few

7   reasons.  And not necessarily the reasons that the defense

8   argues.

9        I certainly don't think that just eight months in

10  jail and the extreme shame is enough to deter someone from

11  committing crimes especially where if someone has always

12  managed to maintain a face of honesty and goodness all the

13  while doing corrupt deeds.  That suggests to me somebody who

14  has managed to perpetuate a self-image that many endorse or

15  believe in, and a public image that they certainly foster of

16  honesty but while still serving themselves in a certain way

17  that's corrupt and illegal.

18       So, again, I don't think that specific deterrence

19  has been served by the shame and the eight months, and even in

20  the conditions of his pretrial release which I know the

21  defense describes as destructive but, quite frankly, I think a

22  lot of people in the world would like to live under such

23  restrictive circumstances which included being out every day

24  from 7:00 a.m. to 5:00 p.m., living in a nice apartment in

25  Florida with an adjoining apartment for his family and having

1  dinner every day with his mother and being able to swim and

2  engage in other activities that he enjoyed in a country that

3  he apparently loves in the United States.

4          And let me go back for a minute.  I do have to say

5  that what you said, Ms. Piñera-Vazquez, is correct:  You reap

6  what you sow.  And that is why I think the character and the

7  prior good acts which are good character and the current bad

8  acts.  They do in some sense balance each other out and also

9  to some extent they cancel each other out.  So your words are

10  correct, but they cut both ways.

11          But to go back to specific deterrence.

12          First of all, the fact that Mr. Napout may be banned

13  from professional sports or soccer doesn't mean he may not

14  commit some other illegal conduct.  Financial crimes can be

15  committed in all sectors.

16          I also think, based on the letters I've received,

17  that Mr. Napout may have actually get a hero's welcome when he

18  returns to Paraguay and that may be he will be welcomed back

19  into the same circles.  So I don't think there's any

20  absoluteness or finality to his being banned from professional

21  soccer, and certainly, from being -- having access to money

22  where he can commit or having opportunities to commit other

23  kinds of crimes like this.

24          Secondly, the fact, and I know this is a tricky

25  thing to say, but the fact that there hasn't been any

1    expression at all by Mr. Napout without accepting

2    responsibility or culpability.

3           I understand why he cannot do that and should not do

4    that, but without even acknowledging that what the evidence at

5    trial shows, or what the Government's overall investigation

6    shows about the massive corruption that existed in all levels

7    of soccer when he was there and in power, no acknowledgement

8    of that or how it should be stamped out is something that

9    doesn't reflect or doesn't necessarily bode well for his

10   potential to recidivate or to re-offend of perhaps there's

11   some notion that this isn't so bad.  Perhaps there's some

12   perception on his part that this is how business is done, I

13   don't know.  But if I'm weighing a factor, and if the defense

14   wants me to find that there's no need for specific deterrence,

15   I'm not convinced by what he has put forth so far and what

16   I've seen in the record.  And about the reasonable

17   opportunities that will still exist for him should he decide

18   he wants to commit another financial crime or fraud.  So I

19   consider that a neutral factor.

20          The mental health issues that I referenced I think

21   merit consideration.  There's no question that prison will in

22   some ways be difficult for Mr. Napout in a way that's not

23   common necessarily to other defendants.  So I've given that

24   some consideration and I won't belabor that point.

25          The fact that Mr. Napout is a non-resident alien of

1   the U.S. and, therefore, will be under more restrictive

2   conditions in prison I don't give that much weight at all

3   because that's certainly not uncommon.

4          Resident aliens or not non-resident aliens,

5   foreigners, are convicted all the time about have to suffer

6   the same conditions in prison.  This doesn't distinguish

7   Mr. Napout in any way, it's just the fact of our system.  And

8   also, I want to mention that the expert that the defense hired

9   says that one of the consequences will be Mr. Napout will be

10  confined most likely to be a low-security prison rather than a

11  minimum security camp.  I don't know if I think that's such an

12  onerous, terrible, or unusual circumstance that it warrants a

13  lesser sentence.  A low-security prison certainly has many

14  features of the security camp that has activities and it

15  should be good, reasonable medical care, though, it may not be

16  as extensive at the minimum security camp but that isn't

17  compelling enough reason, in my mind, to grant a lower

18  sentence.

19         The Government cites the case of U.S. v. Duque, 256

20  Fed. App'x, 486.  It's a Second Circuit case from 2007 which

21  stands for the proposition that collateral effects based on a

22  defendant's status as a deportable alien are, "Run of the

23  mill," that's a quote, "and do not warrant a downward

24  variance."  And I generally tend to agree with that.

25         Certainly, the circumstances cited to me that relate

1   to Mr. Napout's incarceration of his immigration status are

2   not extraordinary or compelling.

3         Also, with respect to not being able to return to

4   the U.S., that's another collateral consequence that's

5   unfortunate but that is a consequence of the defendant's own

6   doing. Violating our laws appropriately deprives him of the

7   right to come back to the U.S., and there's really nothing

8   unusual about that nor do I think it's a factor that warrants

9   a lesser sentence. Sadly, if he loved our country so much,

10   one would hope he wouldn't commit a crime against it. Again,

11   I don't find that to be a compelling mitigating factor or a

12   mitigating fact at all.

13         So, summing it up, I have begun, as I said, even

14   from a theoretical point of consideration from a much lower

15   sentencing range than the one calculated in the guidelines

16   that I did adopt, I started off at a point of 135 to

17   262 months because, as I said before, given the unusual

18   circumstances of this case, the appropriately calculated

19   guidelines overstate the seriousness of Mr. Napout's conduct.

20         I have given some wait weight to the mitigating

21   factors of Mr. Napout's prior good works and his health

22   issues, mental health issues.

23         In terms of arriving at a sentence that I think is

24   certainly lower than the Government is requesting and lower

25   still from the range that I just mentioned.

1          I also want to make the point that I would have

2     arrived at the sentence regardless of what the sentencing

3     range was.

4          And, as another point of reference, even if all the

5     enhancements were stripped away for the ones that had been

6     disputed obstruction of justice foreign conduct or

7     sophisticated means.

8               MS. MACE:  Leadership.

9               THE COURT:  Abuse of trust.

10              MS. MACE:  Leadership position.

11              THE COURT:  And leadership.

12         And if I applied only a 20-level enhancement for the

13    amount of money that Mr. Napout was promised as part of that

14    scheme the range would be 78 to 97 months still, so it's

15    basically a Level 27.

16         Just to give you some idea of the fact that even

17    taking away some of these enhancements that have been

18    disputed, there is significant guideline range that would be

19    applied based solely on the conduct that was proved at trial

20    in terms of his own conduct what he agreed to take in terms of

21    bribes.

22         But, again, the sentence I'm about to announce is

23    one that I would have given regardless of what the guidelines

24    are because I found ultimately that they were not that helpful

25    and I am imposing a sentence of nine years.  That is to run

1  it's on each count to run concurrent, that's 108 months.  It

2  is obviously far less than the Government was seeking, but I

3  think it is the right and just sentence in this case which I

4  think are considerable compassion and deference or weight

5  being given to Mr. Napout's prior life and his good works as

6  well as some of his health issues.

7         I am imposing a term of two years supervised release

8  to follow that will run concurrently on each count as well the

9  special conditions that apply to the supervised release are to

10 comply with any restitution and forfeiture order or provisions

11 that are imposed that upon request from Probation to provide

12 full financial disclosure to Probation and, if deported, not

13 to illegally reenter the United States.

14         In addition, there will be a special condition that

15 Mr. Napout will not serve in any official role and/or hold any

16 title in FIFA, CONMEBOL, APF or any professional soccer

17 organization.  Those terms will be spelled out in more detail

18 in the judgment.

19         Regarding a fine.  I do find that the Defendant has

20 a means to pay a fine even recognizing that there will be a

21 determination of restitution which will take priority.  But

22 nonetheless, I do think a fine is appropriate given the degree

23 of fraud that was contemplated here.

24         So I'm imposing a fine of $500,000 on Count One,

25 which is the racketeering conspiracy count, and $250,000 on

1   Counts Two and Six respectively for a total or $1 million.

2            I will note that the defendant's financial

3   circumstances are somewhat unclear to me based on the

4   probation department's report, but the parties seem to agree

5   that Mr. Napout's net worth is at least over $5 million, and

6   also that there is $13 million being held in cash as part of

7   his bail.

8            The only reason I didn't impose a higher fine is

9   because there is a priority of restitution which will be

10  substantial in this case it would appear.  And also, it's

11  unclear to me how much of the cash that that's been deposited

12  in the court for bail in the clerk's office, or bail is the

13  defendant's money versus the family members' money because I

14  think that 13 million, as far as I understood it, was a

15  pooling of family resources.

16           MS. PIÑERA-VAZQUEZ:  Family and friends, it's not

17  only family.

18           THE COURT:  Okay.  So, at this point, I'm going to

19  impose a million dollar fine.

20           As I mentioned earlier, forfeiture is going to be

21  ordered in the amount of $3,374,025.88.  And regarding the

22  fine and forfeiture, do the parties want to discuss and come

23  up with a proposal far a schedule for those that's what you

24  did in the case of Mr. Marin.

25           MS. PIÑERA-VAZQUEZ:  For restitution?

1    THE COURT:  No, fine.

2    MS. PIÑERA-VAZQUEZ:  For a hearing?

3    THE COURT:  Well, no, for a schedule.  In other

4 words, the fine can be paid immediately in theory because

5 there's money there to satisfy it.  But I think the last time

6 the Government was a little concerned about whether or not

7 that would lead to money to be used for restitution if I

8 remember correctly.

9    MS. MACE:  That was the consideration.  And so,

10 because of the principle that your Honor referred to that

11 restitution should come first, even though temporally, it will

12 come second here that we need to ensure that restitution will

13 be paid.

14    I don't think that that should have any effect on

15 the amount of the fine or the forfeiture because, as the

16 defense has argued, that the restitution should be zero.  So

17 it may be that there's more than enough in the bond to satisfy

18 what's there, I think it would be prudent to reserve judgment

19 on the schedule until the restitution amount is determined and

20 if restitution is less we can move Ford media payment from the

21 mind.

22    MS. PIÑERA-VAZQUEZ:  Can I be heard so the record is

23 clear?

24    We would object to any of the bond money going

25 towards either the fine or the forfeiture until we have the

1    due process rights to a hearing on where the money came from

2    because as stated because some of it is not Mr. Napout's

3    money.

4              THE COURT:  I don't think what you're saying is at

5    odds with what Ms. Mace is proposing.  I'm going to issue an

6    order containing fine amounts scheduled to be determined

7    following the resolution of proceedings and with additional

8    briefing being allowed by parties to satisfied and general.

9              MS. MACE:  I would just like to note for the record,

10   I don't want to belabor this point out, because I think we

11   will have an opportunity to do so later.  But no one was

12   revealed to the Government or the Court as a source of that

13   money.  And if it did not come from Mr. Napout, that would it

14   be to the determination of bond it was represented that

15   Mr. Napout's money and that was the understanding that we had

16   until we got to sentencing.

17             And so, we will sort that out later in terms of

18   whether or not the money can be used and I understand the

19   defense wants to be heard on that.  We will want to be heard

20   on that as well but for today's purposes, I think all that is

21   required is that upon the Government's motion which we're now

22   making that the Court order under 28 U.S.C. 2044 that that

23   money be held so that that determination can be made.

24             THE COURT:  Yes, I certainly would order the money

25   be held subject to further argument about the appropriate

1    disposition of it relating to Mr. Napout.  I don't know what

2    the bona fides of the argument or what arguments were made

3    before about the source of the money but let's reserve on

4    that.

5            MS. PIÑERA-VAZQUEZ:  One thing I would like to

6    address because I was part of that representation.  The

7    Government never requested an Nebbia on this hearing on this

8    weapon.

9            THE COURT:  A Nebbia hearing?

10           MS. PIÑERA-VAZQUEZ:  Yes.

11           So what Ms. Mace is actually incorrect.  We've

12   always represented that this is a family pool of money.  In

13   fact that's what we said at the modification hearing.

14           So, just to be clear, because I don't want it to

15   appear as if we just got here today and decided it was

16   everybody else's money but Mr. Napout's.

17           THE COURT:  We'll revisit this issue later.  And,

18   obviously, both sides will have a full opportunity to brief or

19   discuss that issue or argue that issue.

20           Restitution, as everyone knows, will be decided

21   later subject to the previously set schedule.  But in no event

22   will it be decided later than November 20th.  And I'm using

23   Mr. Marin's sentencing as the 90-day marker for that.  But I

24   want to decide both of those defendants' restitutionary

25   amounts by that date.  We will combine hearings and the

1  evidence will be largely the same and arguments will be

2  largely the same.

3          Lastly, I must impose $100 as a special assessment

4  for each count of conviction and that totals $300.  That is

5  due immediately.

6          Is there anything else I need to discuss relating to

7  the sentence, not the right of appeal.

8          MS. PIÑERA-VAZQUEZ:  Yes.

9          MR. WEINSTEIN:  Two things.

10          One is I want to make sure, your Honor had said that

11  we deal with the schedule on the fine issue subsequently.

12          THE COURT:  Yes.

13          MR. WEINSTEIN:  I want sure if your Honor meant the

14  scheduling when we will want potentially work out with them

15  whose money it is or come to the Court, or if you meant the

16  actual payment schedule.

17          THE COURT:  I meant the payment schedule.

18          MR. WEINSTEIN:  So my concern in is that I know this

19  was different from Mr. Marin we would not want to delay the

20  entry of a judgment on the sentencing.

21          THE COURT:  Right.  Okay.  So I will go ahead and

22  enter the judgment with the understanding that at some point

23  it will have to be amended because restitution will be

24  determined later.  I don't think it affects -- I mean, what I

25  can say is that the schedule for the fine will also be set at

1    a later date.

2          So, again, contemplating an amendment after the

3    schedule but that no money on the fine is due as of yet until

4    after we determine the restitution and the priority of

5    restitution.

6          MS. MACE:  So if the Court is going to enter a

7    judgment that includes, excuse me, the fine and forfeiture, I

8    think it would be appropriate to set a date now or there's --

9    I understand that it's possible the Court would amend that in

10   the future but perhaps the Court could set the day after the

11   last possible date before restitution as a due date for that

12   money.  Then if no restitution is ordered, then the money will

13   become due immediately thereafter and a fine and the

14   forfeiture.  If there is some additional assessment that needs

15   to be made, then the parties can make an application.

16         THE COURT:  Here's another option since this

17   sentencing is obviously one week after Mr. Marin's and the

18   restitution deadline is, therefore, one week later.  Would the

19   parties think it is workable to basically set up a very quick

20   briefing schedule right after restitution is decided to sort

21   out these issues about the schedule for the fine and I guess

22   as necessary any forfeiture payments once the resolution

23   figures are set.  Does that make sense?  In other words, I can

24   issue the amended judgment in this case, I have another week

25   until November 27th to do that.

1     MS. MACE:  I think that would be fine, your Honor,

2  if there is some schedule set in the judgment now.  So a

3  proposal can be in that week or maybe in the end of that week

4  so issues can be resolved in the course of that week.

5          THE COURT:  So assuming that the week is --

6          (Discussion held off the record.)

7          THE COURT:  So if November 20th is a Tuesday, and

8  hopefully, I can actually resolve the restitution prior to

9  that date, let's assume worst case scenario that's the day in

10  which restitution was stayed for both Mr. Marin and Mr. Napout

11  the parties could then brief by Thursday.  So it's their

12  opening submission about what the appropriate schedule is, no.

13          MS. MACE:  I don't have a calendar, but I'm guessing

14  that might be Thanksgiving or --

15          THE COURT:  That Thursday or the one after.

16          COURTROOM DEPUTY:  The Thursday -- Thanksgiving is

17  the 27th.

18          THE COURT:  So you're right.  All right.

19          (Discussion held off the record.)

20          THE COURT:  Let's do this folks.  The fact that I

21  have until the 28th doesn't mean you folks won't know what the

22  lay of the land on restitution is before then.  So why don't

23  you start your briefing on the schedule for the fine and

24  forfeiture.  Include in that as well not only the schedule for

25  the payments but also the source if you want to argue that it

1  should come out of this cash that's in being used for bail

2  part of your argument.

3          So why don't we start that briefing we have

4  November 20th so we don't run afoul of the holiday.  So how

5  about the 13th of November.  You submit some opening letter

6  briefs is all you need to do.  Making an argument for what the

7  schedule should be and maybe assume certain restitution

8  amounts that would probably make sense.

9          You can think about this and always propose a

10  different schedule of the 13th everyone files a make it five

11  pages, folks, okay a five-page letter-brief putting forth your

12  position what the schedule should be for million dollar fine

13  and the 3.3 million roughly in forfeiture given a likely event

14  of restitution amount being decided a certain restitution

15  amount being set, rather.  And then you can respond to each

16  others on the 20th.  And then I can reach make a decision on

17  the schedule then the holidays on me basically and my law

18  clerks.

19          All right.  So I have until the 27th then to render

20  a decision about the schedule and issue an amended order for

21  Mr. Napout.

22          MS. MACE:  So will the Court set a date that will be

23  in place now in the form of this these briefs if anyone wants

24  to file one would be a motion to amend the judgment.

25          THE COURT:  Yes.  Why don't we do it that way just a

1   motion to amend the judgment to include a schedule.

2            MS. MACE:  I think a schedule needs to be set.  It

3   would be a motion to amend the judgment to change the

4   schedule.

5            THE COURT:  I guess.  I'm not sure if I have to set

6   the schedule now.

7            MS. PIÑERA-VAZQUEZ:  You don't, your Honor, you

8   don't have to set a schedule.  You've imposed an incarceratory

9   sentence, supervised release, you established a fine, that's

10  all that has to be.

11           THE COURT:  The tricky part is restitution.  It is

12  the only part that I have 90 extra days.  I think Ms. Mace may

13  be right, although I've never addressed this issue.  I should

14  set a schedule that can be amended.  So why don't we set a

15  schedule that if we do you know the full amount of the fine

16  and the forfeiture will be due on November 27th unless it's

17  amended so.

18           MS. MACE:  Thank you.

19           MS. PIÑERA-VAZQUEZ:  I have no doubt we're going to

20  be filing a motion to amend, so can we make it a little bit

21  later on, like, some time next year January if after.

22           I think November 27th we're definitely going to be

23  filing a motion.

24           THE COURT:  That's what you're going to argue about.

25  You going to argue to me that it should be next year, two

1    years from now, or on a graduated schedule.  So I'm just

2    setting a precise date by which because I have to make a

3    decision by then anyway so you can't run the risk that this

4    will go into effect, I have to amend by then because we have a

5    restitution order.

6                MS. MACE:  Unless there is a scenario on which the

7    full amount could be paid immediately and then the Court just

8    left that in place.  And if that were the case to should be

9    paid immediately there would nobody reason to wait a year for

10   that payment.

11               THE COURT:  You'll have your chance to argue about

12   the schedule before then.  If you want to build in more time

13   that's fine.  If you all feel more comfortable you would like

14   a little more time because, the one thing you didn't build in

15   was oral argument on this we could set it back even further.

16   Start your briefing on November 6th, responses on

17   November 13th, argument on November 20th, and then I'll render

18   a decision on the 27th.

19               If nothing else, it will give you some idea of which

20   way I might be leaning on the 20th when we have oral argument

21   and then I know you folks and you will not happy unless you

22   get to say something about what you write.  So perhaps we

23   should especially with Mr. Weinstein.

24               MR. WEINSTEIN:  I take that personally.

25               THE COURT:  You make Ms. Piñera-Vazquez like look a

1   wallflower.

2           10:00 a.m. on November 20th for oral argument.

3   Okay.  All right.

4           So we set that schedule and I will issue an order

5   with a fine with the due late being November 27th as well as

6   for the forfeiture I'm also going to impose interest if it's

7   not paid by deadlines which will be the judgment rate of

8   interest which I think fluctuates depending on when the

9   default happens.

10          Okay.  Anything else regarding the judgment, a

11  recommendation as to designation.

12          MR. WEINSTEIN:  That was the last matter.  We would

13  ask that your Honor recommend to the Bureau of Prisons that

14  Mr. Napout be designated to FCI Miami in Florida to facilitate

15  visits for his family from South America and then that he not

16  be designated to one of BOP's privately contracted facilities.

17          THE COURT:  I will certainly make that

18  recommendation.  Do you want him to be designated because once

19  a judgment issues he will be designated and he probably won't

20  be here for restitution hearing although it takes some time

21  for that.

22          MR. WEINSTEIN:  So I think what we would ask is to

23  have the designation go through and then we will speak to

24  Mr. Napout and maybe the Government about whether or not he is

25  then transferred immediately upon designation or might be an

1   order that he should not be transferred until the end of the

2   restitution proceedings.

3           THE COURT:  It would have to be pursuant to a writ

4   or something.  So if the Government asked me to sign one, I

5   would order one so that he could stay here for the hearing and

6   then be sent to his personal national designation should this

7   the become OP most faster than usual.

8           Okay.  I think we've covered everything related to

9   this sentence itself.

10          Mr. Napout, you have the right to appeal your

11  conviction and sentence.  Any notice of appeal must be filed

12  within 14 days of the filing of entry of judgment or within

13  14 days of the filing of the notice of appeal by the

14  Government.

15          Now, all of that maybe affected by the fact that

16  there's going to be an amended judgment.  I'll let you folks

17  figure out whether or not the 14 days runs from the date of

18  issuance of the first judgment.  I suggest the defendants err

19  on this side caution.  Go ahead and file your notice with

20  14 days of the initial judgment.  But, obviously, no appeal

21  will happen until the final judgment is issued.

22          I actually think it should only apply after I issue

23  the amended judgment since, but since one never knows if such

24  a judgment might issue except for you folks here know that you

25  shouldn't it rely on that and obviously you should use caution

1    in that regard.

2           If you request to fil an appeal, Mr. Napout, the

3    clerk will prepare and file a notice of appeal on your behalf.

4    And if you cannot afford to pay for the cost of an appeal or

5    appellate counsel, you have the right to apply for leaving to

6    appeal in forma pauperis which means you can have filing fee

7    waived and ask for court-appointed counsel.

8           Is there anything else that I need address appeal

9    rights in either side.

10          MS. MACE:  No, your Honor.

11          THE COURT:  Open counts to dismiss in this case.

12          MS. MACE:  No open counts but there are underlying

13   indictment that we will anticipate making a motion to after

14   any appeal but right now we are not making a motion.

15          THE COURT:  Anything else we need to resolve before

16   I excuse everybody?

17          MR. WEINSTEIN:  Yes, your Honor.

18          Although based on what we heard today, I can predict

19   the outcome but we need to raise with your Honor a renewed

20   request for bail pending appeal.

21          THE COURT:  That would be denied.  I don't find that

22   Mr. Napout has the likelihood of succeeding on appeal with

23   respect to the conviction to be sure and I think sentence I

24   have just imposed.  One that's substantively and procedurally

25   reasonable and I don't think there is a basis to find that it

1    will be vacated.

2            So for all those reasons, I'm not going to grant.  I

3    don't think he had a likelihood of succeeding on appeal which

4    is obviously one of the factors.

5            Did the Government want to be heard on this at all?

6            MS. MACE:  We oppose release for all the reasons

7    that your Honor noted in addition to the reasons that we

8    offered at the time of remand following the conviction the.

9    Defendant is an extreme flight risks and a danger to the

10   community and reasons evidence of which was presented at trial

11   also support for denial of bail.

12           THE COURT:  I do think that actually there is a

13   heightened flight risk here to be sure.  Mr. Napout obviously

14   knows now full well what has happened in terms of his

15   conviction and sentence and the sentence I imposed is

16   obviously significant.  So his reasons for wanting to flee are

17   concrete now.  And moreover, he knows that regardless of what

18   happens he wouldn't be allowed to stay in the U.S.

19           So the combination of what I find not to be a

20   likelihood of success on appeal coupled with the flight risk

21   here prompts me to deny the request.  But obviously it's

22   something that you can take up with the Court of Appeals as

23   well.

24           MR. WEINSTEIN:  Of course.  I think the standard is

25   a substantial question.  I don't think that would change your

1 Honor's decision.

2       THE COURT:  No.  But thank you.

3       MR. WEINSTEIN:  But just to make the record.

4       THE COURT:  You are right.  I should actually -- I

5 don't think there is a substantial question, certainly on the

6 conviction, for appeal.  I know that there were motions to

7 dismiss.  There were challenges to the application of wire

8 fraud and money laundering statutes here I am fully familiar

9 with those.  I think the Circuit will agree, so I don't think

10 there's a substantial question here.

11       You have raised, I think, what are some questions

12 maybe substantial questions more on the application of some of

13 these guidelines.  But, again, as I said a moment ago, the

14 sentence I imposed is largely divorced from the guidelines.

15 As calculated, as reduced, and even as further reduced, if you

16 stripped away all the enhancements you objected to, I impose a

17 sentence that I thought was proposed based on the sentencing

18 factors and especially on the defendant's personal

19 characteristics.  So for all those reasons I'm denying that

20 request but obviously you will prick that up with the Court of

21 Appeals.

22       I guess you will be to able to do that while final

23 judgment is still pending, though.

24       MR. WEINSTEIN:  That's why what I wanted to ensure

25 was that there was a final judgment entered and that I don't

1  think restitution affects that at all because there's that's a

2  separate order shall.  But if there is an issue here as to a,

3  I'm sorry, a fine schedule that is somehow going to --

4          THE COURT:  It won't.

5          MR. WEINSTEIN:  -- delay the entry of a final

6  judgment if it's not then I think we're fine.

7          THE COURT:  Well, the word is "final."  I'm going to

8  issue the judgment.

9          MS. MACE:  And I think, your Honor, it would be a

10 final judgment and to should be to indicated that it is and

11 this is part of why we ask for a specific date.  There can be

12 a notion to amend the judgment thereafter but we should have a

13 final judgment that indicates forfeiture and fine are due on

14 November 27th.  There has been discussion that there is likely

15 to be an application to amend that but that should become a

16 final order.

17         THE COURT:  We will docket it as such and then I

18 think it triggers not only the notice of appeal period but

19 also then presumably your right to make the bail application

20 to the Court of Appeals as well.  Okay.

21         MR. WEINSTEIN:  May Mr. Napout have a brief moment

22 to talk to his family?

23         THE COURT:  If the marshals are willing to do that

24 just a few minutes.

25         MR. WEINSTEIN:  I know Mr. Marin was afforded that

1   opportunity last week.

2           THE COURT:  Would you indulge me and indulge member.

3           THE MARSHAL:  Okay, Judge, sure.

4           THE COURT:  I do appreciate it.

5           (Defendant exits from courtroom at 2:46 p.m.)

6           (WHEREUPON, this matter was adjourned.)

7

8                              *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25