**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 15 CR 252 (S-2)(PKC)** |
| | : | |
| **JUAN ANGEL NAPOUT,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

# MOTION FOR SENTENCE MODIFICATION ON BEHALF OF JUAN ÁNGEL NAPOUT

**HUGHES HUBBARD & REED LLP**
Marc A. Weinstein

Attorneys for Juan Ángel Napout

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................................... 2

    Mr. Napout's Detention .................................................................................................... 2

    Extraordinary and Compelling Circumstances: COVID-19 Outbreak ............................. 4

    Conditions of Confinement and Spread of Coronavirus .................................................. 6

ARGUMENT ........................................................................................................................... 11

I.      THE UNPRECEDENTED HEALTH CRISIS, COUPLED WITH MR.
       NAPOUT'S AGE, IS AN "EXTRAORDINARY AND COMPELLING
       REASON" TO MERIT A SENTENCE REDUCTION. .................................................. 11

II.    THE COURT NEED NOT WAIT FOR MR. NAPOUT TO EXHAUST
       ADMINSTRATIVE REMEDIES. .................................................................................. 13

      A.     The First Step Act does not create a mandatory full administrative
            exhaustion requirement for a motion to reduction a sentence pursuant to
            18 U.S.C. § 3582(c)(1)(A)(i). ............................................................................. 13

            1.     The statute's plain text gives this Court the power to consider the
                 motion without requiring full administrative remedies. ......................... 13

            2.     The First Step Act's legislative history also supports a finding that
                 this Court has the power to grant compassionate release without
                 requiring full administrative exhaustion. .............................................. 16

            3.     Futility excuses Mr. Napout from first exhausting the BOP
                 administrative appeals process. .............................................................. 17

III.   IN THE ALTERNATIVE, THE COURT SHOULD RELEASE MR. NAPOUT
       ON BAIL PENDING APPEAL AND THROUGH THE COURSE OF THE
       PANDEMIC ..................................................................................................................... 18

CONCLUSION ....................................................................................................................... 21

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i),  Juan Ángel Napout ("Napout") moves this Court to modify his sentence of imprisonment to (i) reduce the sentence to time served so that Mr. Napout can be released from prison, or (ii) permit Mr. Napout to serve the next six months of his sentence in home confinement.  In the alternative, Mr. Napout renews his motion for release pending appeal pursuant to Federal Rule of Appellate Procedure 9(b) and 18 U.S.C. § 3143(b).

## INTRODUCTION

Mr. Napout seeks extraordinary relief because he, and the country, are faced with extraordinary circumstances.  COVID-19 is a killer, and the death toll climbs exponentially each day.  The virus preys most fatally on (i) people over the age of 60, and (ii) people with certain preexisting medical conditions.  It has been widely recognized that once an inmate or staff at a prison facility tests positive for the virus, it is likely to spread, and spread quickly.  That trend has started.

Mr. Napout is 61 years old.  The government opposes Mr. Napout's request for release because he **only** falls into one of the two groups most susceptible to death from the virus.  We understand that it's the government's position that if they consented to Mr. Napout's release, it means there is a blanket rule that any inmate over 60 years old must also be released.  While we do not speak for other inmates over 60 years old, if such a rule is what is necessary to prevent the spread of the pandemic throughout the prison system and to prevent the death of not one, but many inmates in either of the susceptible categories, then such a blanket rule is called for in these extraordinary times.  We understand the government also objects because to date there has not been a positive test reported in FCI Miami, where Mr. Napout is incarcerated, and thus the government suggests taking a wait and see approach.  That kind of cavalier approach can be fatal.  That has been the government's approach in other cases, and not surprisingly, positive

tests are now springing up around the country's prison facilities. The first federal inmate death due to the virus has been reported. The government's approach is callous, shortsighted and dangerous, and has been proven to be the wrong approach time and time again around the globe, in our country, and in the prisons. We ask the Court to chart a different path, one that prioritizes human health and safety, even for those in the inmate population.[1]

Mr. Napout has no history of violence—whether pre-dating the offense conduct, as part of the offense conduct, or since his incarceration. He poses no danger to the community. He has been a model prisoner for more than 27 months. He has not had a single infraction in either prison facility. He teaches many classes to other inmates, despite the fact that his foreign status prevents him from receiving sentencing credit for his work. As a human being, and one who has done everything the right way while incarcerated, he deserves the opportunity to remain as safe as possible from this deadly pandemic.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Mr. Napout's Detention*

After an indictment charging Mr. Napout was unsealed in December of 2015, Mr. Napout was arrested in Switzerland. Mr. Napout waived extradition, and was released on the condition that he post a $20 million appearance bond, surrender his passports, and submit to highly restrictive home confinement conditions. Mr. Napout fully complied with strict release conditions during his two years on release, and he never missed a required court appearance.

---

1. Indeed, on March 30, 2020, two members of Congress wrote a letter to Attorney General Barr imploring him to "use every tool at [his] disposal to release as many prisoners as possible, to protect them from COVID-19." Letter from Representatives Jerrold Nadler and Karen Bass to the Honorable William P. Barr, The House Judiciary Committee (March 30, 2020), *at* https://bit.ly/39trXYM.

Indeed, he took extraordinary measures to ensure his compliance when forced to evacuate his residence during a catastrophic hurricane.

Mr. Napout was sentenced on August 29, 2018 to 9 years' imprisonment following his conviction for non-violent offenses: honest-services-wire-fraud conspiracy and RICO conspiracy. In December 2017, after trial, Mr. Napout was remanded to custody at the Metropolitan Detention Center in Brooklyn, where he remained until his transfer to FCI Miami, a low security facility, in November 2018. He is projected for release on October 11, 2025.

Throughout his period of incarceration, both at MDC and in Miami, Mr. Napout has been a model prisoner. He has not had a single infraction. During his 11 months at the MDC, a notoriously difficult facility to be housed in, Mr. Napout had no disciplinary problems, and received commendations from his supervisors for his work and long hours in the MDC's kitchen. Since his transfer to Miami, Mr. Napout has continued to follow every prison rule. He is as reliable a prisoner as can be found in the system. Although a Paraguayan citizen, Mr. Napout teaches classes on U.S. history, geography, math and Spanish to other inmates.[2] He was selected to act in a play, "Choices", for the Warden and guests of FCI Miami. A sentencing court, of course, does not know how a defendant will actually respond to the circumstances of serving a prison sentence at the time sentence is imposed. A court can only hope that a defendant chooses the course that Mr. Napout has chosen despite the difficult circumstances.

Mr. Napout also suffers from various health conditions that will be exacerbated by continued confinement during this crisis. First, Mr. Napout has mental health issues as he suffers

---

2. Mr. Napout teaches these classes even though federal law prevents him from receiving any credit against his sentence due to his citizenship status. Ironically, the teacher of the U.S. history class cannot receive credit for teaching the class because he is not a U.S. citizen, while the American inmates who take the class can receive credit even though they know very little about U.S. history.

from panic and anxiety attacks. The severity and frequency of these attacks will only increase due to the impending feelings that he is helpless to keep himself safe from the virus in the prison environment, and that he is in a high-risk mortality group if he contracts the virus. Moreover, FCI Miami is now in lockdown due to the virus for an indefinite period of time. The lack of visitation or contact with the outside world while on lockdown will certainly add to Mr. Napout's documented anxiety. Second, Mr. Napout has high blood pressure and high cholesterol levels, with the high blood pressure also likely to be exacerbated by the current health crisis.

***Extraordinary and Compelling Circumstances: COVID-19 Outbreak***

As of April 1, 2020, the new strain of coronavirus, which causes COVID-19, has infected over 875,814 people, leading to at least 43,721 deaths worldwide.[3] On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[4] On the last day of February, the CDC reported that the United State had only 15 cases, but by March 9, Florida's Governor DeSantis declared a Public Health Emergency.[5] Miami's Mayor Suarez declared a State of Emergency on March 12, 2020.[6] On March 13, President Trump declared a national emergency.[7] On March 22, 2020, Governor DeSantis sent a letter to request that President

---

3.   *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (Apr. 1, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).

4.   *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), *at* https://bit.ly/2W8dwpS.

5.   Fla. Exec. Order No. (Emergency Management - COVID-19 Public Health Emergency) (2020), *at* https://www.flgov.com/wp-content/uploads/2020/03/EO-20-52.pdf.

6.   *City of Miami Declares State of Emergency*, The City of Miami (Mar. 12, 2020), *at* https://bit.ly/3bGl5c9.

7.   *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (Mar. 13, 2020), *at* https://bit.ly/2xEPSaj.

Trump declare a Major Disaster for the State of Florida.[8]  As of April 1, 2020, Florida has nearly

7,000 coronavirus cases, and nearly 58% of those cases are in three south Florida counties:

Broward, Palm Beach, and Miami-Dade.[9]  South Florida has the same number of infection

epicenters like New York had only a couple of weeks ago.

Despite efforts such as mass home quarantines and social distancing (both of which are

impossible in prison), the outbreak has only worsened, and government experts now predict that

between 100,000 and 240,000 will die.[10]  If the calls for mitigation efforts, such as social

distancing, had been ignored, as they largely are in prisons, the predicted death toll would be

even worse, and in the millions.   Experts also agree that the key question is not how to stop this

virus now, but how to prevent the pandemic from overwhelming the healthcare system's capacity

to provide the infected with medical care.[11]  That is especially sobering given the present

severity of this public health crisis.  The number of infections in the United States has, for at

least the past 7 days, risen by more than 10,000 each day.  In each of the past three days, that

number of new infections exceeded 20,000.[12]  Nearly 1 in 5 of the world's infections are now in

the United States.  The growing death rate in our country is even more foreboding: on March 31,

---

8.  Letter from Ron DeSantis to The Honorable Donald J. Trump ("Request for Major Disaster Declaration COVID-19"), The Governor of Florida (Mar. 22, 2020), *at* https://bit.ly/2WIU4k1.

9.  *Florida coronavirus update for Wednesday: DeSantis announces 3-day stay-home order for entire state*, Orlando Sentinel (Apr. 1, 2020), *at* https://bit.ly/3bJBlsY.

10.  Philip Rucker and William Wan, *Trump projects up to 240,000 coronavirus deaths in U.S., even with mitigation efforts*, The Washington Post (Mar. 31, 2020), *at* https://wapo.st/2UwFJpl.

11.  Eliza Barclay and Dylan Scott, *How canceled events and self-quarantine saves lives, in one* chart, Vox (Mar. 10, 2020 9:50 AM), *at* https://bit.ly/2QZPx94.

12.  *Case in U.S.*, CDC (April 1, 2020), *at* https://bit.ly/344aPrG (updated regularly).

the total number of COVID-19 deaths reached 3,433 patients, nearly *double* the number of deaths reported only three days prior.[13]

More alarming for Mr. Napout is the data reflecting increased vulnerability among the population of 50 to 64-year-olds. As of March 16, 18% of those infected were between the ages of 55 and 64, and 17% of those requiring hospitalization fell within the 55-64 age demographic.[14] Extrapolating from early data in China, scientists at *The Lancet* estimated the death rate for 60–69 age group as 3.99%. For comparison, that rate for younger age groups was 1.25% (50–59), 0.295% (40–49), 0.146% (30–39), and 0.0600% (20–29).[15]

Yesterday, the U.N. Secretary-General called on the world to mobilize and support the weakest health care systems.[16] "The world is facing an unprecedented test," he said. "And this is the moment of truth."

### Conditions of Confinement and Spread of Coronavirus

Conditions of confinement create the ideal environment for the transmission of contagious disease.[17] Despite limitations on inmate movement, inmates continue to cycle in and out of BOP facilities from all over the world and the country. The BOP, in a non-exhaustive list, acknowledges a large number of exceptions that can lead to inmate transfers. Disturbingly, there

---

13.  *US Historical Data*, The COVID Tracking Project (April 1, 2020), *at* https://covidtracking.com/us-daily/ (updated regularly).

14.  *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12 – March 16, 2020*, CDC *at* https://bit.ly/2y7eVml.

15.  Robert Verity, et al., *Estimates of the severity of coronavirus disease 2019: a model-based analysis*, The Lancet, 5 (March 30, 2020), *at* https://bit.ly/2JwvfQu.

16.  Transcript of UN Secretary-General's virtual press encounter to launch the Report on the Socio-Economic Impacts of COVID-19, United Nations Secretary-General (March 31, 2020), *at* https://bit.ly/2dNE8CY.

17.  Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

are reports that inmates are in fact being moved despite not falling within one of the listed exceptions, and that inmates being moved are given exit screenings rather than actual COVID-19 tests, despite the widespread knowledge that infected persons can go completely asymptomatic.[18] Regardless, people who work in the facilities must leave and return daily, providing the virus ample opportunity to take root. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal facilities.[19] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" infection control is challenging in these settings."[20] Outbreaks of the flu regularly occur in prisons, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[21] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases. Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prison," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency." Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country. Counties and cities across this country have begun releasing inmates from jail in response to COVID-19.

---

18. Letter from Representatives Jerrold Nadler and Karen Bass to the Honorable William P. Barr, The House Judiciary Committee (March 30, 2020), *at* https://bit.ly/39trXYM.

19. Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

20. "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), *at* https://bit.ly/2W9V6oS.

21. Nicole Wetsman, *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), *at* https://bit.ly/2TNcNZY.

Notably, New York City Mayor de Blasio announced the release of nearly 1,000 inmates across the state, and New Jersey Chief Justice Rabner signed an order for the temporary release of 1,000 prisoners on March 24.   Around the same time, Oklahoma and California announced they were suspending new admissions to their prisons.   The governor of Colorado then issued an executive order giving the Department of Corrections the power to refuse to admit people to the state's prisons.

Conditions within the Bureau of Prisons' ("BOP" or "Bureau") facilities are equally as dangerous for vulnerable populations.   On March 25, 2020, Senators Booker and Harris introduced a bill that would allow tens of thousands of people in federal custody to be released during the COVID-19 outbreak.[22]   On March 26, 2020, Attorney General Barr issued a directive to the Director of the Bureau of Prisons to increase the use of home confinement "to protect the health and safety of BOP personnel and the people in our custody."   On March 27, 2020, Congress passed the CARES Act, which drastically expands the Bureau's ability to use home confinement in order to protect vulnerable populations both in and out of the BOP's custody. *See* S. 3548, 116th Cong. § 12003 (2020).

Despite measures in place to stop the spread of coronavirus in federal prisons, the disease has already taken root.   As of April 1, the BOP has acknowledged that 29 federal inmates have tested positive for coronavirus.[23]   One of those inmates, a 49-year-old housed at the low security FCI Oakdale facility in Louisiana, died on March 28.   Thirty staff members have also tested positive.   These numbers will only continue to grow as those who are unknowingly infected

---

22.  Nathalie Baptiste, *Cory Booker Just Demanded the Release of Vulnerable Federal Inmates*, Mother Jones (Mar. 25, 2020), *at* https://bit.ly/2UDc7oZ.

23.  *COVID-19 Coronavirus*, Bureau of Prisons (Apr. 1, 2020), *at* https://bit.ly/3atNXnP.

come into close contact with inmates and prison personnel.  When, not if, the first case hits FCI Miami, the growth will likely be exponential.  On Rikers Island, for example, in the course of one week, a civil investigator for the Department of Corrections died from the virus, the top doctor warned that a "storm is coming," three additional correction officers tested positive, eight prisoners started showing symptoms, and Mayor de Blasio announced that at least 40 vulnerable inmates would be released.[24]  On March 23, 2020, less than a week later, there were at least 39 positive cases among those in custody, 21 positive cases among staff, and more than 200 officers, medical personnel, and inmates in quarantines.[25]  As of March 29, the number of infected persons in New York City jails reached 139, representing an infection rate over seven times higher than New York City's.[26]

The BOP failed to adequately respond to the spreading pandemic and the disasters at other prisons.  The BOP is only just beginning to feel the overwhelming force of this virus.  At FCI Oakdale, where the 49-year-old inmate died, stories of an overwhelmed and inept system are emerging.[27]  Corey Trammel, a union representative for correctional officers, noted that calls for a stop to family visits came weeks before a directive was actually issued.  FCI Oakdale's prison labor program, where more than 100 people make inmate clothing, did not cease operation until the first inmate tested positive.  Now, Trammel is calling for better protective equipment,

---

24.  Julia Marsh and Ben Feuerherd, *NYC to Release 40 Coronavirus-Prone Inmates form Rikers as Early as Today*, New York Post (Mar. 19, 2020), *at* https://bit.ly/2UqexIV.

25.  Reuven Blau and Rosa Goldensohm, *Rikers Inmates Pepper Sprayed for Demanding Medical Care, Sources Say*, The City (Mar. 23, 2020), *at* https://bit.ly/2wvaxxD.

26.  *COVID-19 Infection Tracking in NYC Jails*, The Legal Aid Society (Mar. 29, 2020), *at* https://bit.ly/2UNOwlv (updating regularly).

27.  *See* Kimberly Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, The Washington Post (Mar. 29, 2020), *at* https://wapo.st/3arHoC2.

something more than the basic masks they have been issued, but Trammel believes all Oakdale prison staff have already been exposed. "We should all be in quarantine," he said. "We should not be going in to spread this monster of a virus." But all the officers at FCI Oakdale are not in quarantine. Many work 36-hour shifts to cover for those who have tested positive or who have quarantined themselves. None of this is confidence inducing. Instead, this first test-case demonstrates BOP's inability to stop an outbreak after discovering the first few infections. Without a concerted effort to release non-violent offenders who do not pose a risk to the community and reduce the prison population, the story of FCI Oakdale will surely repeat itself over and over in one facility after another, needlessly turning many inmates' stays into death sentences. For those vulnerable to this quick-spreading and lethal disease, the reality is this: aside from nursing homes and cruise ships, there is no more dangerous place than prison.

As briefly mentioned above, Congresspersons have recognized this danger as well. In response, in part, to the failure at Oakdale, Representatives Nadler and Bass of the House Judiciary Committee sent a letter to Attorney General Barr calling on the Attorney General to "use every tool at [his] disposal to release as many prisoners as possible, to protect them from COVID-19."[28] Specifically, the letter calls on AG Barr "in the most urgent terms" to use the BOP's authority under 18 U.S.C. § 3582(c)(1)(A)(i).

Releasing vulnerable inmates also protects more people than just the individuals released, as acknowledged in AG Barr's directive to the Bureau of Prisons to expand the use of home confinement.[29] This coronavirus – which is widespread, can be carried by persons who do not show symptoms of illness, and can go completely undetected for as long as 14 days – is no

---

28. *Supra*, n.1.

29. *See* Attorney General William Barr, Memorandum for Director of Bureau of Prisons, Mar. 26, 2020.

longer traceable by travel history and other screening mechanisms promised by BOP. No non-violent inmate is truly safer in a crowded penitentiary, and the community is not safer, when the inmate has a home nearby in which to isolate. Releasing inmates such as Mr. Napout to home confinement reduces the danger to the inmates, BOP personnel and their families, and the Florida community.

## ARGUMENT

I.   **THE UNPRECEDENTED HEALTH CRISIS, COUPLED WITH MR. NAPOUT'S AGE, IS AN "EXTRAORDINARY AND COMPELLING REASON" TO MERIT A SENTENCE REDUCTION.**

Under 18 U.S.C. § 3582(c)(1)(A)(i), the Court may modify a term of imprisonment upon a finding that there are "extraordinary and compelling reasons" to merit a reduction. We respectfully submit that this unprecedented public health crisis, coupled with Mr. Napout's age, his health-related issues, and pristine prison record clearly warrants a finding of "extraordinary and compelling reasons" to merit a reduction in Mr. Napout's sentence and is consistent with the factors under 18 U.S.C. § 3553(a).

This Court certainly could not have anticipated the emergence and devastating effect of COVID-19 when it sentenced Mr. Napout. But, now, several unanticipated consequences arise from the continued confinement of Mr. Napout. First, such confinement raises the likelihood of spread amongst other prisoners, staff, and the public.

Second, and as a consequence, the health care system – already short on personal protective equipment and ventilators, the key equipment for fighting the spread of this illness and keeping critical patients from suffocating to death – will become increasingly overwhelmed as understaffed and underequipped prisons are forced to rely on local hospitals.

Third, continued confinement risks dealing Mr. Napout and those around him the ultimate punishment – a death sentence. Failure to act swiftly here risks an outcome that nobody

11

intended.  The virus is spreading throughout the BOP.  As documented above, the Bureau has already demonstrated an inability to stop the virus from reaching the facilities and there is no reason to believe the Bureau will be more successful than the general population in preventing a few infections from turning into a catastrophic outbreak.  Mr. Napout should be under strict home confinement, not in the close confines of prison, when this pandemic inevitably reaches FCI Miami.  The need to remove him and other non-violent offenders who are vulnerable to this dangerous virus from federal penitentiaries clearly satisfies § 3582(c)(1)(A)(i)'s requirement that the Court find "extraordinary and compelling reasons" to merit a reduction.

Fourth, the Court initially factored Mr. Napout's mental health issues into its sentence.  The Court could not have predicted the current conditions Mr. Napout faces, which conditions will undoubtedly exacerbate those issues.  Mr. Napout now has a real fear of dying in prison without seeing his family again, and of not having any ability to protect himself from that outcome.  His facility is now in lockdown, indefinitely due to the virus, which further impacts on mental health conditions.

Fifth and finally, Mr. Napout has served a significant portion of his original sentence. When the Court sentenced Mr. Napout in 2018, it had no ability to predict how he would fare as a prisoner.  He has demonstrated over the course of the past 27 months that he could not have responded any better.  This is an insight into the person before the Court that the Court does not have the benefit of considering at the time of the original sentence.  In light of the current circumstances and his record during incarceration, Mr. Napout has demonstrated that he is worthy of renewed consideration for a lower sentence.  In the alternative, we request that the Court modify Mr. Napout's sentence, ordering that he serve the next six months in home confinement and return to FCI Miami to serve the remaining portion of his sentence at the end of

12

the period of home confinement.  The six month period should be adequate to assure that incarceration at FCI Miami no longer exposes Mr. Napout to potential death from the virus.

## II.    THE COURT NEED NOT WAIT FOR MR. NAPOUT TO EXHAUST ADMINSTRATIVE REMEDIES.

On March 30, 2020, Mr. Napout sent a letter to the warden at FCI Miami to request that the Bureau release Mr. Napout to home confinement pursuant to the CARES Act, or, if not, that the Bureau move this Court to reduce Mr. Napout's sentence in light of the pandemic.  Although 30 days have not lapsed since March 30, we respectfully request that this Court consider this application now, before it is too late. There is no time to wait.  The Bureau's continued reluctance to release inmates with any speed makes an administrative appeal likely futile.  But even if successful, if such an administrative decisions comes too late, it is for naught.  This Court has the power to create an exception to an exhaustion provision where, as here, the exhaustion provision is not jurisdictional.

### A.    The First Step Act does not create a mandatory full administrative exhaustion requirement for a motion to reduction a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

#### 1.    The statute's plain text gives this Court the power to consider the motion without requiring full administrative remedies.

The First Step Act's compassionate release provision grants the sentencing court the power to reduce a prisoner's sentence in two circumstances: when "(i) extraordinary and compelling reasons warrant such a reduction" or "(ii) the defendant is at least 70 years of age" and meets other criteria. The statutory text does not require exhaustion of administrative remedies in all contexts. Instead, it permits courts to modify a term of imprisonment once it has been imposed:

> (1) in any case—
>
> (A) . . . the court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . .

18 U.S.C. § 3582(c)(1)(A). This language does not make exhaustion of administrative remedies mandatory, but rather gives the Court the authority to reduce a sentence even without exhaustion of remedies in two contexts.

The question then is whether this Court has the power, in light of the COVID-19 pandemic, to create an exception to the 30-day period set by Congress. The Supreme Court has clearly held that the courts' power to create exceptions to a statutory exhaustion requirement depends on the language of the statute. "[A] statutory exhaustion provision stands on a different footing [from a judicially created one]. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).

In the Prison Litigation Reform Act of 1995 (PLRA) cases, such as *Ross*, the Supreme Court ruled that courts do not have the power to create emergency exceptions to the exhaustion requirement because Congress created a mandatory requirement. It reached this conclusion because the PLRA used mandatory language in setting out the administrative remedies exhaustion standard.

Notably, the PLRA's exhaustion language is significantly different from the FSA's language. The PLRA language reads:

> *No action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted.*

14

*Ross*, 136 S. Ct. at 1856; 42 U.S.C. § 1997e(a) (emphasis added).  The Supreme Court focused on the "no action shall be brought . . . until" language in the PLRA.  "[T]he PLRA's text suggests no limits on an inmate's obligation to exhaust — irrespective of any 'special circumstances.'"  *Id.*; *see also Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("There is no question that exhaustion is mandatory under the PLRA.").  Given this mandatory language, the Court concluded "mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account."  *Id.*

By contrast, the FSA lacks the mandatory language found by the *Ross* court to be controlling for the PLRA exhaustion requirement.

This makes sense in light of the fact that district courts must take into account factual developments that post-date exhaustion in deciding the motion for a reduction in sentence. Section 3582(c)(1)(A) requires consideration of the § 3553(a) factors. The Supreme Court has said that, when conducting the analysis under § 3553(a), a district court must consider the individual and his circumstances as they exist at that moment.  *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (holding that a sentencing court must base Section 3553(a) analysis is on "the most up-to-date picture" of a defendant's history and characteristics).  When the focus of the court's decision is on whether extraordinary and exceptional circumstances exist, the constantly changed facts about the COVID-19 pandemic need to be considered.  To require re-exhaustion of these new facts would leave prisoners without the ability to seek relief from the court.  That is plainly contrary to the First Step Act's language and the legislative intent to permit prisoners to file such motions on their own behalf.

The courts' power under § 3582(c)(2) also supports this view that administrative exhaustion is not jurisdictionally required.  Subsection (c)(2) grants courts the power to "reduce

the term of imprisonment" "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C.994(o) . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ." Circuit courts have found that the district courts have jurisdiction to consider the motion to reduce a sentence because the courts are empowered generally to have jurisdiction over federal criminal cases. In other words, § 3582(c) is not the source of the court's jurisdiction. *See United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment. . . [n]or is subsection (c) phrased in jurisdictional terms."); *see also United States v. Calton*, 900 F.3d 706, 710–11 (5th Cir. 2018) (citing *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1243 (11th Cir. 2017); *United States v. May*, 855 F.3d 271, 274–75 (4th Cir. 2017); *United States v. Trujillo*, 713 F.3d 1003, 1005 (9th Cir. 2013); *United States v. Green*, 886 F.3d 1300, 1306 (10th Cir. 2018) . Accordingly, § 3582(c) generally should not be understood to impose jurisdictional prerequisites.

### 2. The First Step Act's legislative history also supports a finding that this Court has the power to grant compassionate release without requiring full administrative exhaustion.

The *Ross* Court also held that the history of the PLRA confirmed that the statutory language is mandatory. The Court found the PLRA's history "underscores the mandatory nature of its exhaustion regime" because the PLRA replaced a predecessor "statutory scheme [that] made exhaustion 'in large part discretionary'" and "substituted an 'invigorated' exhaustion provision." *Id.* at 1857–58.

In contrast, the First Step Act's amendments were a response to the BOP's failure to "properly manage the compassionate release program, resulting in inmates who may be eligible

16

candidates for release not being considered." U.S. Dep't Justice, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (2013); *see also* Shon Hopwood, *Second Looks & Second Chances*, 41 Cardozo L. Rev. 83 (Oct. 2019).[30]  The changes made to section 3582(c)(1)(A), labeled "Increasing the Use and Transparency of Compassionate Release," were intended to reform sentencing decisions and increase the use of the "compassionate release" provisions that already existed by allowing for prisoners to file the motion themselves instead of relying on the BOP Director as gatekeeper. *See* 164 CONG. REC. H10358 (daily ed. Dec. 20, 2018).  Senator Cardin noted the First Step Act "expands compassionate release and expedites compassionate release applications." 164 CONG.REC. S7774 (daily ed. Dec. 18, 2018); *see United States v. Young*, No.2:00-CR-00002-1, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 4, 2020) (noting intent to expedite compassionate release applications).

### 3.   Futility excuses Mr. Napout from first exhausting the BOP administrative appeals process.

As the Second Circuit has explained, "a number of exceptions apply that allow courts to excuse a party's failure to exhaust administrative remedies" "if an exhaustion requirement is judicially imposed instead of statutorily imposed." *Beharry v. Ashcroft*, 329 F.3d 51 (2d Cir. 2003). "Specifically, exhaustion of administrative remedies may not be required when '(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in

---

30. More specifically, the Inspector General found the BOP: (1) failed to provide adequate guidance to staff regarding the medical and nonmedical criteria for compassionate release consideration; (2) had no timeliness standards for reviewing compassionate release requests, and timeliness standards for inmate appeals do not consider the special circumstances of medical compassionate release requests; (3) did not have formal procedures to inform inmates about the compassionate release program; and (4) failed to have a system to track compassionate release requests, the timeliness of the review process, or whether decisions made by institution and Regional Office staff are consistent with each other or with BOP policy. U.S. Dep't Justice, The Federal Bureau of Prisons' Compassionate Release Program, p. 11.

certain instances a plaintiff has raised a substantial constitutional question.'" (citing and quoting *Howell v. INS*, 72 F.3d 288, 291 (2d Cir. 1995) and citing *McCarthy v. Madigan*, 503 U.S. 140, 146–49 (1992)).

In the compassionate release context, courts have recognized that under the right circumstances, seeking relief from the BOP can be futile and so exhaustion of administrative remedies is waived. *Thody v. Swain*, No. CV 19-09641-PA (DFM), 2019 WL 7842560, *2 (C.D. Cal. Nov. 25, 2019) (acknowledging the court's discretion to excuse the failure to exhaust administrative remedies before bringing a habeas petition) (citing *Fraley v. United States Bureau of Prisons*, 1 F.3d 924 (9th Cir. 1993) (where Regional Director would have "almost certainly" denied administrative appeal based on BOP policy, further application for administrative remedies would be futile)); *Merth v. Puentes*, No. 1:19-cv-00251-LJO-SAB-HC, 2019 WL 3003684, 3 (E.D. Cal. July, 10, 2019) (holding administrative exhaustion of the First Step Act's good time credits provision futile and so waived).

Here, the BOP has demonstrated a great reluctance to properly address the COVID-19 outbreak, let alone to actually release prisoners. Moreover, Mr. Napout does not have the time to go through the administrative appeals process. Every day brings a great risk of serious and irreparable harm. The Court should recognize an exception to the exhaustion provision here to save Mr. Napout from infection and possible death.

## III.   IN THE ALTERNATIVE, THE COURT SHOULD RELEASE MR. NAPOUT ON BAIL PENDING APPEAL AND THROUGH THE COURSE OF THE PANDEMIC

As an alternative mechanism for temporary release during the health crisis, we renew our prior motion for bail pending appeal. We recognize that the Court denied bail after sentencing, and that the Second Circuit upheld that decision, but these are extraordinary times. Other courts

have recently reconsidered prior bail determinations due solely to the pandemic, and we request that the Court do the same.

As the Court is well aware, the standard for releasing a defendant pending appeal is whether there is (1) "clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person or the community if released," and (2) the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal, [or] an order for a new trial . . . ." 18 U.S.C. § 3142(b); *see also United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004) (if the required showing under second 3142(b) is made, "the statute establishes a right to liberty that is not simply discretionary but mandatory . . . ."). While we maintain that Mr. Napout satisfies these standards, we also note that the rules simply did not contemplate the emergency circumstances present here, which the Court cannot ignore.

We will not rehash the arguments made in 2018, but will only highlight those necessary or new. First, Mr. Napout is not and has never been a danger to society. The offense conduct was non-violent, he has no history of violence, and he has had a perfect disciplinary record in prison. Second, Mr. Napout is not a flight risk, and there are conditions that would mitigate any potential risk of flight. Mr. Napout and his family secured his release after waiving extradition from Switzerland with a substantial bail package consisting of money and property. He will surrender his passports. He can be placed on 24-hour home confinement in his family's apartment in Miami, which is consistent with the need for people to self-quarantine during the pandemic. He can be placed on monitoring. That confinement can be enforced by a Voice ID System. Third, in light of worldwide travel restrictions, it is virtually impossible to travel abroad even if Mr. Napout had his travel documents (which he would not) and an instinct to flee (he does not). Nor can he flee to neighboring countries, as the Mexican and Canadian borders are

closed to all non-essential personnel.  Fourth, the Court now has the benefit of considering Mr. Napout's unblemished record as an inmate.  He has followed every rule and been as productive an inmate as the system permits.  He has served a significant portion of his sentence.  Having made it this far, he would not now risk significantly expanding his prison sentence by fleeing.

With respect to the merits of Mr. Napout's appeal, we add only that argument in the Second Circuit occurred on November 6, 2019.  The panel permitted argument for close to 90 minutes, which is quite rare and well beyond the length of most arguments.  The Circuit has not issued an opinion to date.

In light of the unprecedented outbreak, other courts have reconsidered prior bail determinations.  For example, on March 12, 2020, Southern District of New York Judge Edgardo Ramos remanded a defendant to FDC Miami, following a guilty verdict at trial.  *USA v. Scott*, 17-cr-630 (ER) (S.D.N.Y. Mar. 12, 2020).[31]  Just two weeks later, on March 30, 2020, Judge Ramos reversed course over the government's objection and ordered the release of the defendant, based solely on the "compelling reason" of the coronavirus crisis.  *Id*. (S.D.N.Y. Mar. 30, 2020) (ECF no. 253).  Similarly, Judge Nathan in the Southern District of New York reversed a prior remand order because, since the initial bail hearing, "the unprecedented and extraordinarily dangerous nature of the COVID_19 pandemic has become apparent" and that while (at the time) "there is not yet a known outbreak among the jail and prison populations, inmate may be at a heightened risk of contracting COVID-19 should an outbreak develop."  *United States v. Stephens*, at 2, 15-cr-95 (AJN) (S.D.N.Y. Mar. 18, 2020) (citation omitted).

---

31.   *See* Frank G. Runyeon, *Ex-BigLaw Atty's Freedom Ends After Backer Bails on Him*, Law360 (Mar. 12, 2020), *at* https://www.law360.com/articles/1253027/ex-biglaw-atty-s-freedom-ends-after-backer-bails-on-him.

Mr. Napout likewise deserves reconsideration. At the time of Judge Nathan's decision, the number of New York cases had grown from 44 to 2,382, about a third of the number of confirmed cases in Florida today. More significantly, at that time, there had been no reported cases in federal prisons, and the government's position was that the BOP had a plan in place to prevent any cases. That unrealistic position has now been proven false. An outbreak at FCI Miami is a matter of when, not if. At 61, Mr. Napout is particularly susceptible to this virus' harsh effects. Mr. Napout poses a greater danger to the community at FCI Miami than he would at an apartment a short distance away, under strict confinement measures.

## CONCLUSION

Mr. Napout is among the vulnerable population at heightened risk of getting very sick or dying from the novel coronavirus rapidly spreading across our country and through our country's prisons. For all the above reasons, he should be granted release.

Respectfully submitted,

**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, NY 10004-1482
T. 212.837.6000
marc.weinstein@hugheshubbard.com
/s/ Marc A. Weinstein
Marc A. Weinstein