UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JUAN ANGEL NAPOUT,<br><br>Defendant. | Case No. 15 CR 252 (S-2)(PKC) |

# RENEWED MOTION FOR SENTENCE MODIFICATION
## ON BEHALF OF JUAN ÁNGEL NAPOUT

**HUGHES HUBBARD & REED LLP**
Marc A. Weinstein

Attorneys for Juan Ángel Napout

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................................... 2

    The COVID-19 Outbreak Reaches FCI Miami ............................................................... 2

    Strict Lockdown Procedures Have Drastically Altered the Conditions of Confinement ................. 5

    The Bureau Has Failed to Respond to Mr. Napout's Petition for Early Release ............................. 7

ARGUMENT .............................................................................................................................. 8

    THE UNPRECEDENTED HEALTH CRISIS AT FCI MIAMI, COUPLED WITH MR. NAPOUT'S AGE AND THE CONDITIONS OF CONFINEMENT, PRESENT "EXTRAORDINARY AND COMPELLING REASON" TO MERIT A SENTENCE REDUCTION. ........................................................................................................................ 8

CONCLUSION ........................................................................................................................... 12

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), Juan Ángel Napout ("Napout") hereby files this renewed motion to modify his sentence of imprisonment to (i) reduce the sentence to time served so that Mr. Napout can be released from prison, or, alternatively, (ii) permit Mr. Napout to serve the remainder of his sentence in home confinement.

## INTRODUCTION

Mr. Napout filed his initial motion to modify his sentence on April 1, 2020, at an early stage in the pandemic, based on an extraordinary and compelling health threat. The Court nonetheless denied the motion, finding that (i) there were then no reported COVID-19 cases at FCI Miami, the prison in Miami at which Mr. Napout is held, and (ii) Mr. Napout had not yet exhausted his administrative remedies with the Bureau of Prisons (the "Bureau").

Mr. Napout now renews his motion because both circumstances have changed, for the worse:

- The Bureau has failed to contain COVID-19, which has now hit FCI Miami, and hard, with fifteen confirmed cases among the inmate population after reporting none just over one week ago.[1] If past at other Bureau facilities is prologue, we can expect these numbers to rise significantly in the coming days and weeks.

- Mr. Napout has now exhausted his administrative remedies, to the extent that is required under 18 U.S.C. § 3582(c)(1)(A)(i). The Bureau has completely failed to respond to Mr. Napout's petition for release (let alone within the required time to do so).

Instead, the Bureau has attempted to address the COVID-19 health threat by implementing a highly restrictive open-ended lockdown that has drastically altered the terms of confinement, so much so that Mr. Napout is now required to serve a significant part of his sentence under harsher conditions than this Court could have predicted at the time of sentencing.

---

1. *COVID-19 Coronavirus*, Bureau of Prisons (July 7, 2020), https://bit.ly/3atNXnP (updating regularly).

The Court should release Mr. Napout in light of these extraordinary and compelling circumstances as well as for the reasons set out in his Motion for Sentence Modification dated April 1, 2020 (ECF No. 1328) and his Letter in Support of Sentence Modification dated April 7, 2020 (ECF No. 1340).

## FACTUAL AND PROCEDURAL BACKGROUND

### The COVID-19 Outbreak Reaches FCI Miami

Since the time Mr. Napout filed his motion, the public health emergency has taken a turn for the worse, especially in Florida, where Mr. Napout is imprisoned at FCI Miami. On July 5, 2020, the seven-day average for daily new cases in the U.S. hit a record high for the 27th day in a row.[2] That same day, Florida reported a record number of new cases in a single week—59,036.[3] In total, as of July 7, 2020, Florida has had over 213,700 coronavirus cases, nearly 1 case for every 100 persons in Florida, more than all but two states—California and New York—and a drastic increase from the nearly 6,400 cases we reported in the initial motion.[4] A disproportionate number of these cases are in South Florida, which includes Miami-Dade, Broward, and Palm Beach counties.[5]

As anticipated in Mr. Napout's initial motion, the virus has infiltrated FCI Miami, where it will likely have devastating effects, as well as nearby FDC Miami, where it has already caused

---

2. *See Coronavirus Updates: Seven-Day Average Case Total in the U.S. Sets Record for 27th Straight Day*, The Washington Post (July 5, 2020 10:14 PM), https://wapo.st/2VPpTq8.
3. Paola Pérez, *Florida Breaks Coronavirus Record with 59,036 New Cases Reported in One Week*, Orlando Sentinel (July 5, 2020), https://bit.ly/38sHppg.
4. *See* Richard Tribou, Coronavirus Has Infected Nearly 1 out of 100 People in Florida; 63 New Deaths Takes Toll to 3,841, Orlando Sentinel (July 7, 2020 10:53 AM), https://bit.ly/3gzECgB.
5. *Id.*

2

one inmate death. Nine days ago, there were no inmate infections at FCI Miami—as of today, there are fifteen. For its part, FDC Miami now reports ten inmate infections. As thousands of inmates have experienced at other prisons, this deadly virus spreads rapidly in spite of lockdowns and attempts to implement social distancing. The virus will spread, and spread quickly, once an inmate or staff at a prison facility tests positive. This pattern has repeated itself in multiple prisons, time and time again with devastating effects.[6] The pattern will not change if non-violent and vulnerable inmates remain in Bureau facilities instead of at home and under quarantine.

In addition to the spread of the virus to FCI Miami, new data shows that 50 to 64-year-olds are at an increased risk. Using data through June 6, the CDC reports that those aged 50–64 were about five times more likely to require hospitalization than those in the 18–29 age range.[7] Now at age 62, Mr. Napout sits towards the upper bounds of the 50–64 age range. Those aged 65–74 were over seven times more likely to require hospitalization than the 18–29 range. Recognizing this disparate impact, Congress is currently considering bipartisan legislation that would confirm that Mr. Napout's age alone, regardless of whether he suffers from any comorbidities, is sufficient for a finding of "extraordinary and compelling circumstances" justifying early release.[8] This bill merely recognizes what we already know: those who are **60** or older, as well as those with certain preexisting conditions, are at a greater risk of succumbing

---

6. *See* Bureau of Prisons, *supra*, n.1 (listing twenty-five facilities with at least fifty confirmed cases).
7. *Coronavirus Disease 2019 (COVID-19): Older Adults*, CDC (June 25, 2020), https://bit.ly/3dZ2U1Y.
8. *See* COVID-19 Safer Detention Act, S. 4034, 116th Cong. § 5 (2020).

3

to COVID-19's harshest effects, and, so long as they are not a risk to the public, they should not be left in prison to await the virus' onslaught.[9]

Mr. Napout unfortunately also suffers from various health conditions that will be exacerbated by continued confinement during this crisis. First, Mr. Napout has mental health issues, suffering as he does from panic and anxiety attacks. The severity and frequency of these attacks will no doubt increase, given that he cannot keep himself safe from the virus in the prison environment and that he is in a high-risk mortality group. Moreover, as described in more detail below, FCI Miami is now subject to a mentally taxing indefinite virus-imposed lockdown. To compound the stress, Mr. Napout has been cut off from visitors during this period of lockdown, having not seen a family member since March 13. Not surprisingly, Mr. Napout has been taking anxiolytics and antidepressants since April 2020. Second, Mr. Napout suffers from high blood pressure and high cholesterol levels, with the high blood pressure also likely to be exacerbated by the current health crisis.

Despite calls for action from inmates, advocates, and Congresspersons alike, the Bureau has failed to protect those in its custody. Their efforts to release non-violent offenders who do not pose a risk to the community and reduce the prison population has been slow and inept.[10] The story of FCI Oakdale, described in the initial motion as one of the first major outbreaks at a Bureau facility, has repeated itself in one facility after another, needlessly turning many inmates'

---

9. *See id.* ("[I]n the case of a defendant who is, according to guidance form the Centers for Disease Control and Prevention, considered to be at a higher risk for severe illness from COVID-19, <u>including because the defendant is 60 years of age or older</u> or has an underlying medical condition, such risk shall be considered to be an extraordinary and compelling reason under subparagraph (A)(i) of such section 3582(c)(1).") (emphasis added).

10. In a little over three months, the Bureau has released an additional 4,619 inmates—3.2% of its inmate population. Bureau of Prisons, *supra*, n.1.

4

stays into death sentences. Since the initial motion, when the Bureau reported only 29 confirmed cases, the Bureau has reported that an additional 7,281 federal inmates have tested positive.[11]. The Bureau further reports that twenty-five facilities that have had at least fifty inmates test positive, thirteen facilities have had more than 100 confirmed cases, and six facilities have had at least 599 confirmed cases.[12] Of course, as in the general population, the number of actual cases is likely many times higher than the number of confirmed cases.[13] Regardless, the numbers confirm that the Bureau has been unable to contain the spread of the virus and protect those in its custody once the virus has breached the doors of a given facility. For those vulnerable to this quick-spreading and lethal disease, the reality is this: aside from nursing homes and cruise ships, there is no more dangerous place than prison.

*Strict Lockdown Procedures Have Drastically Altered the Conditions of Confinement*

FCI Miami has responded to the virus by imposing a strict—and open-ended—lockdown. Before the COVID-19 outbreak, Mr. Napout was allowed outside of his cell from 6:00 a.m. to 8:30 p.m. every day. During those hours, he could walk outside, exercise, and eat in the dining room. He would also teach and take classes, go to the library, write e-mails, talk on the phone, watch television, and receive visits from his family and attorneys.

Since the COVID-19 outbreak, however, those aspects of his confinement have been restricted, altering the sentence this Court envisioned for Mr. Napout, who, because of his foreign citizenship, is already serving time at a minimum security facility rather than a camp.

---

11. Bureau of Prisons, *supra*, n.1.

12. *Id.*

13. *See Commercial Laboratory Seroprevalence Survey Data*, CDC (June 26, 2020), https://bit.ly/31Lq9u9 (documenting a likely rate of infection more than ten times higher than reported cases in all six regions from which data were collected, one of which was South Florida).

For example, prior to the pandemic's onset, Mr. Napout's dedicated family visited him often, including a March 7 visit from his wife and a March 13 visit from his son. Those visits abruptly ended the next day when the Bureau stopped allowing any visitors to the prison, including from Mr. Napout's family and attorneys. Mr. Napout has not seen his immediate family members for nearly four months, and does not know when the next time visitors will be allowed.

On March 31, FCI Miami began the first of three prolonged lockdowns. For the first sixty days of this lockdown, Mr. Napout was only allowed to leave his cell to shower, e-mail, and use the telephone, and then for forty minutes only three times a week. Mr. Napout was not otherwise allowed to go outside—to walk, exercise, or for any other reason. Under these severe restrictions, Mr. Napout spent 166 hours and 40 minutes confined to his cell each week, and one hour and 20 minutes outside of his cell. After sixty days, these restrictions were relaxed somewhat, but Mr. Napout was still only allowed to leave his cell for three hours a day, and then allowed outside for fresh air for a single hour only one day per week.

Following the killing of George Floyd in Minneapolis, FCI Miami went into an even more extreme form of lockdown, allowing Mr. Napout to leave his cell for only twenty minutes, three times a week. This lasted for ten days, when the restrictions again were relaxed to allow for inmates to leave their cells for three hours each day. However, this only lasted until June 29, when FCI Miami confirmed its first cases of COVID-19.

Yesterday, FCI Miami imposed still harsher restrictions. Now, Mr. Napout will be allowed to leave his cell on an extremely limited basis: (i) on Monday, Wednesday, and Friday, for 20 minutes to shower; and (ii) on Tuesday and Thursday, for 20 minutes to use the telephone or computer. He will not be allowed to leave his cell at all on Saturday and Sunday. These restrictions will be in place for twenty-one days, but that assumes that inmates will stop testing

6

positive—a dubious assumption. More than likely, Mr. Napout will be in near solitary confinement for the foreseeable future.

These restrictions, which have lasted close to four months now, with no end in sight, are extraordinary for a non-violent, first-time offender who not only has no disciplinary infractions in prison, but has been and continues to be a model prisoner in every way. These are living conditions that the Court could not have foreseen at the time of sentencing. Mr. Napout, who as noted suffers from a documented anxiety condition, now lives almost entirely confined to a single cell. He has almost no time outside of that small, enclosed space, has little to no in-person interaction, has very little opportunity to speak on the telephone with his family and attorneys, and is completely unable to go outside for fresh air or exercise or have any visitors. This, in addition to the knowledge that a deadly virus is making its way through the facility, is certain to exacerbate Mr. Napout's anxiety, which the Court considered at sentencing. The conditions in place now, in light of Mr. Napout's non-violent nature and unblemished prison conduct,[14] thus effect a much harsher punishment on Mr. Napout than is necessary.

***The Bureau Has Failed to Respond to Mr. Napout's Petition for Early Release***

On March 30, 2020, Mr. Napout sent a letter to the warden at FCI Miami to request that the Bureau release Mr. Napout to home confinement pursuant to the CARES Act, or, if not, that the Bureau move this Court to reduce Mr. Napout's sentence in light of the pandemic. At the April 10 hearing, in response to the Court's inquiry on this subject, the Government represented that they had been in contact with the Bureau and anticipated a response "within the allotted time frame"—meaning within thirty days from the date the request was submitted. Nevertheless, the

---

14. *See* Motion for Sentence Reduction, at 2-4, ECF No. 1328 (describing Mr. Napout's surrender, compliance with strict release conditions, and model conduct while in Bureau custody).

thirty-day period allowed for the Bureau to respond has long since passed, and Mr. Napout has still not received any word from the Bureau. Accordingly, there can be no claim that Mr. Napout's request for relief is barred by 18 U.S.C. § 3582(c)(1)(A).

## ARGUMENT

**THE UNPRECEDENTED HEALTH CRISIS AT FCI MIAMI, COUPLED WITH MR. NAPOUT'S AGE AND THE CONDITIONS OF CONFINEMENT, PRESENT "EXTRAORDINARY AND COMPELLING REASON" TO MERIT A SENTENCE REDUCTION.**

Under 18 U.S.C. § 3582(c)(1)(A)(i), the Court may modify a term of imprisonment upon a finding that there are "extraordinary and compelling reasons" to merit a reduction. This Court certainly could not have anticipated the emergence and devastating effect of COVID-19 when it sentenced Mr. Napout. But, now, there are at least three unanticipated consequences from the continued confinement of Mr. Napout that warrant a finding of "extraordinary and compelling reasons" and a reduction in Mr. Napout's sentence consistent with the factors under 18 U.S.C. § 3553(a).

First, continued confinement risks dealing Mr. Napout and those around him the ultimate punishment—a death sentence. Failure to act swiftly here risks an outcome that nobody intended. The virus has already infected inmates housed at FCI Miami, and, as set forth above, the Bureau has repeatedly failed to stop a few infections from turning into a catastrophic outbreak. Mr. Napout should be under strict home quarantine, not in the close confines of prison, as this pandemic makes its way through FCI Miami. The threat to Mr. Napout's health is an "extraordinary and compelling reason" meriting a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i).

Moreover while the Court considered Mr. Napout's mental health issues at sentencing, it could not have predicted the current conditions Mr. Napout faces. Mr. Napout now has a real

8

fear of dying in prison without seeing his family again, and of not having any ability to protect himself from that outcome. His facility is now on an indefinite lockdown due to the virus, exacerbating mental health conditions.

Second, and as described above, the lockdown conditions currently in place—and likely to be in place for months every time there is a new outbreak—are far harsher than the conditions this Court likely intended to impose at the time of sentencing. There is no reason to believe that the Court intended to impose a sentencing in which Mr. Napout, a non-violent first-time offender, would be confined to his cell for all but a few hours a week, unable to visit with family or even go outdoors. The ongoing restrictive conditions of confinement make this term of imprisonment far different than the one imposed by the Court in August 2018.

Third, Mr. Napout has served a significant portion of his original sentence. That point becomes much clearer when viewed in light of the much shorter effective sentence a similarly-situated United States citizen would serve. As a citizen of Paraguay, Mr. Napout is ineligible for most programs that would entitle him to some form of early release. Mr. Napout's good behavior will earn him a reduction of 486 days from his prison term, after which he would be remanded to ICE custody for an indeterminate period while awaiting deportation. His American counterparts would be eligible for (i) credits for time participating in or teaching recidivism reduction programs,[15] (ii) release from FCI Miami to prerelease and reentry programs up to twelve months before his release,[16] and (iii) release to home confinement as an elderly non-

---

15. *See* 18 U.S.C. § 3632(d)(4)); *see also* U.S. Dep't of Justice & Bureau of Prisons, *Evidence-based Recidivism Reduction (EBRR) Programs and Productive Activities (PA)*, https://bit.ly/2VI3z1A.

16. *See* 18 U.S.C. § 3624(c)(1).

9

violent offender.[17]  If he were a United States citizen and eligible for these programs, his time behind bars would be reduced by at least an additional 594 days, his effective sentence would be six years, and he would have already served almost half of his sentence.

Proposed legislation amending the criteria for release to home confinement for elderly offenders would highlight this disparity between United States citizens and their foreign counterparts.  Under the current regime, credits awarded for good conduct cannot be used to accelerate eligibility for prerelease on home confinement.  However, the United States Senate is considering a bill—already passed by the House of Representatives—that would change the eligibility requirements, allowing otherwise-eligible elderly and ill inmates to qualify for release on home confinement after serving two-thirds of their "net" sentence instead of two-thirds of their imposed sentence.[18]  In other words, these inmates would meet the time-served eligibility requirement once they served two-thirds of their imposed sentence minus the amount of good conduct time they had earned.  Under this proposed scheme, a similarly situated United States citizen would serve approximately 1,980 days behind bars.  As a Paraguayan, Mr. Napout's sentence would be reduced for good conduct but would otherwise remain unaffected.  He would still serve approximately 2,754 days behind bars (plus any subsequent detention by ICE)—over two years longer than his American counterparts.

---

17. *See* 34 U.S.C. § 60541(g).

18. *See* Elderly Home Detention Pilot Program Technical Corrections Act of 2019, S. 3035, 116th Cong. (2019); H.R. 4018, 116th Cong. (2019) (amending 34 U.S.C. § 60541(g)(5)(A)(ii) "by striking 'to which the offender was sentenced' and inserting 'reduced by any credit toward the service of the prisoner's sentence awarded under [18 U.S.C. § 3624(b)].'").

10

Another bill under consideration, the COVID-19 Safer Detention Act mentioned above, would make the disparity even greater. Under this bill, the same technical corrections would be made to the calculation of early release for inmates over sixty, but the qualifying amount of time served would be changed to two-thirds of the imposed sentence to one-half.[19] Under this regime, Mr. Napout, because he is from Paraguay, would still serve approximately 2,754 days behind bars. A similarly situated United States citizen would serve about 1,512 days, a difference of over forty months. Mr. Napout, if he were a United States citizen, would already have completed three-fifths of his sentence.

The 18 U.S.C. § 3553(a) factors thus now weigh in favor of a reduced sentence. For example, given the directives by Congress and Attorney General Barr to release non-violent and vulnerable inmates due to the pandemic, there is no diminished general deterrence. No potential offender would interpret Mr. Napout's early release as a show of leniency or a slap on the wrist; it would be interpreted for what it is—a responsible display of mercy in light of an unprecedented health crisis. As for specific deterrence, the combination of the time Mr. Napout has spent in prison, the lockdown conditions he has endured, and the overall toll that the criminal charges, conviction, and imprisonment have taken on Mr. Napout and his family have been more than adequate to ensure that Mr. Napout will comply with the law upon his release. Congress has determined through various statutes, such as early release programs described above, that inmates of his age are sufficiently deterred to permit early release, and even though those statutes

---

19. *See* S. 4034, 116th Cong. § 5 (2020) (amending 34 U.S.C. § 60541(g)(5)(A)(ii) by "striking '2/3 of the term of imprisonment to which the offender was sentence' and inserting '1/2 of the term of imprisonment reduced by any credit toward the service of the offender's sentence awarded under [18 U.S.C. § 3624(b)].").

11

only benefit United States citizens, there has been no finding (nor would one make sense), that foreign inmates require significantly longer sentences for deterrence purposes.

The landscape has changed drastically since this Court sentenced Mr. Napout in 2018. A pandemic is now spreading throughout Mr. Napout's facility that will cause him serious illness or, at the very least, exacerbate his documented anxiety. Mr. Napout now lives in conditions far harsher than this Court intended to impose. A model prisoner, he now lives in near solitary isolation, unable to leave his cell to walk, breathe fresh air, or visit with his family. He simply waits to see when he will contract this deadly disease. In light of these changed circumstances, Mr. Napout's sentence should be lowered to time served. In the alternative, we request that the Court modify Mr. Napout's sentence, ordering that he serve any remaining term of imprisonment in home confinement.

## CONCLUSION

Mr. Napout is among the vulnerable population at heightened risk of getting very sick or dying from the novel coronavirus rapidly spreading across our country and through our country's prisons. For all the above reasons and those set forth in his initial motion, Mr. Napout should be granted a sentence modification.

Respectfully submitted,

**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, NY 10004-1482
T. 212.837.6000
marc.weinstein@hugheshubbard.com
/s/ Marc A. Weinstein
Marc A. Weinstein

cc:　　All counsel of record via ECF