

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SPN/MKM/KDE

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 13, 2020

By ECF

The Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Juan Ángel Napout
     Criminal Docket No. 15-252 (S-2) (PKC)

Dear Judge Chen:

  The government respectfully submits this letter brief in opposition to defendant Juan Ángel Napout's renewed motion for a sentence reduction (the "Motion" or "Mot."), filed on July 7, 2020, and supplemented on July 13, 2020, in which he again asks the Court to reduce his sentence by two-thirds based on generalized concerns about the Coronavirus Disease-2019 ("COVID-19") pandemic. ECF Dkt. Nos. 1409, 1410. Although the country continues to grapple with the spread of the disease, which requires restrictive measures both inside and outside of prison facilities, the circumstances relevant to Napout have not changed since he filed his motion three months ago except that (1) the Second Circuit has now affirmed his conviction, and (2) the first cases of COVID-19 infection have been reported at the Bureau of Prisons ("BOP") facility where Napout is serving his sentence. For the reasons set forth below and in its Memorandum in Opposition to Defendant's Motion to Reduce Sentence filed on April 9, 2020 (ECF Dkt. No. 1359), which is incorporated herein by reference, the Court should again deny Napout's request.

I. Background

  On April 1, 2020, Napout filed a motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) in which he sought a reduction of his sentence to time served or, in the alternative, a sentence modification to allow him to serve part of his term of incarceration at his condominium in South Florida. See ECF Dkt. No. 1328. The government opposed the motion. ECF Dkt. No. 1359. On April 10, 2020, after hearing oral argument, the Court denied the motion, holding both that Napout had failed to satisfy the exhaustion requirement set forth in Section 3582(c)(1)(A) and on the ground that, in any event, Napout had failed to

establish "extraordinary and compelling reasons" sufficient to warrant his release under the statute. ECF. Dkt. Entry dated Apr. 10, 2020; ECF Dkt. No. 1365 (detailing authorities on exhaustion).[1]

Napout renewed his motion for release on July 7, 2020 based in part on the first reported positive COVID-19 tests among the inmate population at FCI Miami, the low security Bureau of Prisons ("BOP") correctional facility where Napout is presently incarcerated. Mot. at 1-3. Napout seeks a reduction of his sentence to time served or, in the alternative, an order directing that he be released to serve the remainder of his sentence on home confinement. Id. at 1, 12. Napout is scheduled to be released, following completion of his 108-month term of incarceration, on August 9, 2025. To date, Napout has served approximately 33% of the sentence imposed by the Court.

As of July 13, 2020, the BOP reports that 20 inmates and 7 staff members have tested positive and have active cases of the virus. See COVID-19 Cases, https://www.bop.gov/coronavirus/. BOP officials have indicated that, in addition to following national BOP operations, which is based on guidance from the Centers for Disease Control, World Health Organization, and other agencies, see generally https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response, FCI Miami has taken specific steps to address the recent positive cases. Specifically, on July 7, 2020, the facility instituted a three-week quarantine to mitigate the spread of COVID-19. As of that date, inmates primarily remain in their cells except when allowed out in groups of six to shower and, twice a week, to use computers and telephones.

The DOJ and BOP also continue their broader efforts to mitigate the risks posed by the pandemic, including by proactively identifying prisoners and pretrial detainees whose particular circumstances warrant their release from custody. Consistent with the Attorney General's March 26, 2020 memorandum, the BOP is "reviewing all inmates who have COVID-19 risk factors, as described by the CDC, to determine which inmates are suitable for home confinement" and thus far has released more than 6,850 inmates on home confinement. See BOP, "COVID-19 Home Confinement Information," available at https://www.bop.gov/coronavirus/. This effort requires careful analysis of each inmate's particular circumstances, the spread of the disease, and the resources required of BOP and Probation Department personnel, among others, to ensure orderly transfer of inmates cleared for release into the community.

---

[1] The motion also sought release, in the alternative, on bail pending appeal. The Court denied this application as well. See Order, ECF Dkt. Entry dated April 14, 2020. The Second Circuit has since affirmed the judgments against Napout and co-defendant José Maria Marin in their entirety. See United States v. Napout, --- F.3d ---, 2020 WL 3406620 (2d Cir. June 22, 2020).

II.   Discussion

Napout argues that his sentence should be reduced chiefly because (1) more than a dozen inmates at FCI Miami have tested positive for COVID-19 since his initial application, (2) data from the CDC show that Napout is at elevated risk for complications from the virus, and (3) protective measures implemented by the facility to address the pandemic have rendered Napout's term of incarceration more onerous than the Court could have predicted when it sentenced him. None of these arguments supports a finding of an "extraordinary and compelling reason" for release, and the § 3553(a) factors continue to weigh heavily against early release.

A.   Applicable Law

After a defendant has exhausted his administrative remedies,[2] 18 U.S.C. § 3582(c)(1)(A)(i) permits a Court to modify an already imposed sentence only upon a showing of "extraordinary and compelling reasons." If a court finds such "extraordinary and compelling reasons," it may "modify a term of imprisonment" when, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," and to the extent a reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the court "finds that extraordinary and compelling reasons warrant such a reduction." Id.; see also United States v. Gotti, 2020 WL 497987, at *2 (S.D.N.Y. Jan. 15, 2020) ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

The United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)"), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age, or a need to care for a child, spouse, or registered partner. See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2

---

[2] The BOP has advised that it is still considering Napout's request for compassionate release but that he is ineligible to serve the remainder of his sentence on home confinement because of his immigration status and, if released from custody, would be transferred to the custody of Immigration and Customs Enforcement. The government does not oppose the Court proceeding directly to the merits of Napout's motion.

(E.D.N.Y. Feb. 13, 2009). As the Court recognized in Traynor, Congress indicated that § 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

A generalized concern of contracting COVID-19 does not constitute an "extraordinary and compelling reason" supporting release. See, e.g., United States v. Scarpa, No. 18-CR-123 (CAB) (E.D.N.Y. June 10, 2020) (denying request for compassionate release of 67-year-old defendant with underlying conditions serving a 30-month sentence because none of his conditions are "terminal" and the argument that "his underlying medical conditions may make him at graver risk of suffering more serious complications from COVID-19 . . . is too speculative to support compassionate release," and collecting cases); United States v. Pikus, No. 16-CR-329 (AMD) (E.D.N.Y. May 19, 2020) (observing that "[c]ourts in this Circuit have interpreted this standard as requiring a showing that the defendant is uniquely situated with respect to the risk of infection of COVID-19" and collecting cases).

A defendant seeking relief under § 3582(c)(1)(A) "bears the initial burden to put forward evidence that establishes an entitlement to a sentence reduction." United States v. Greenhut, No. 18-CR-00048 (CAS), 2019 WL 6218952, at *1 (C.D. Cal. Nov. 21, 2019); Cannon v. United States, No. CR 11-048 (CG), 2019 WL 5580233, at *2 (S.D. Ala. Oct. 29, 2019) ("[T]he defendant has the burden to show circumstances meeting the test for compassionate release."); see also United States v. Jones, 836 F.3d 896, 899 (8th Cir. 2016) (same under § 3582(c)(2)); United States v. Hamilton, 715 F.3d 328, 337 (11th Cir. 2013) (same); United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

    B.    Napout Has Not Demonstrated Extraordinary or Compelling Reasons Warranting His Release

        1.    The Presence of Positive Cases at FCI Miami Does Not Support Release

Napout's primary argument is that the recent increase in cases at FCI Miami presents a growing emergency requiring his immediate release from prison in light of his age of 62. The argument is unavailing. Although the BOP is taking seriously the first reported cases of COVID-19 at FCI Miami, the presence of the virus at the facility does not constitute "extraordinary and compelling" reasons warranting release for every "white-collar" criminal over 60, as Napout suggests.[3] Cf. United States v. Haney, No. 19-CR-541 (JSR), 2020 WL

---

[3] See Mot. Hearing Tr. dated April 10, 2020 at 30 ("COURT: But, Mr. Weinstein, think about what you're saying. So the white collar criminals who are 60 and above and,

4

1821988, at *5 (S.D.N.Y. Apr. 13, 2020) (denying motion of 61-year-old defendant because, if "age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release and that would arguably have a devastating effect on a national community that is now itself so under stress").

Napout's argument is premised on the false assertion, without supporting authority, that the BOP "has repeatedly failed to stop a few infections from turning into a catastrophic outbreak." Mot. at 8. In fact, the BOP has demonstrated an ability to mitigate and manage the effects of COVID-19 and provide appropriate medical care for its inmates. For example, as this Court is well aware, many inmates at the Metropolitan Detention Center in Brooklyn relied on similar rhetoric in seeking release after cases were first reported in that facility. Their dire predictions, however, have not come to pass due to the steps taken by the BOP to control the spread of the virus. See, e.g., United States v. Amador-Rios, No. 18-CR-398 (RRM), Order dated Apr. 12, 2020, at ECF Dkt. No. 99 ("There is nothing to suggest that the parade of horribles that Drs. Giftos and Williams speculate might happen is actually happening or is imminent at MDC. To the contrary, there is nothing to suggest that the Bureau of Prisons will be unable to mitigate or manage the effects of COVID-19, or will be unable to handle the medical needs of any inmate at MDC."); United States v. Pandrella, No. 19-CR-122 (MKB) (E.D.N.Y. May 6, 2020), Hearing Tr. at 11 ("MDC has many procedures in place, and these procedures appear to be working. In over a month, the number of inmates have remained considerably low – the number of inmates that have been infected with COVID-19 . . . ."). FCI Miami, like the MDC, is taking appropriate steps to protect inmates at the facility, including implementing a lockdown, which ensures social distancing, in addition to the extensive procedures the BOP has implemented nationwide.[4]

It bears noting that, as Napout acknowledges, FCI Miami's rising case count corresponds to the rising count in the broader South Florida community in which he proposes to reside should he be released to home confinement. See, e.g., Mot. at 2 (collecting sources). To date there are 20 confirmed cases of COVID-19 (and 0 deaths) in FCI Miami's population of 998 inmates, or 2.0% of the inmate population. In Miami-Dade County, where Napout seeks to live, there are 64,444 confirmed cases (and 1,139 deaths) in a population of

---

quite frankly, many of them are, they all should be freed . . . . MR. WEINSTEIN: Exactly – ").

[4] Napout describes BOP efforts to release non-violent offenders as "slow and inept" but provides no support for the statement except to cite to outdated numbers indicating that the BOP has released 3.2% of its inmate population. Mot. at 4, n.10. In fact, the current data reflects that approximately 5.3% of inmates have been released. See www.bop.gov/coronavirus/. A news account of the contested statements of a single union representative, as recounted in Napout's supplemental filing, does little to advance Napout's argument. ECF Dkt. No. 1410.

approximately 2.7 million people, or 2.4%.[5] In other words, there is no evidence that the rate of infection in the FCI Miami inmate population is any greater than in the general population in the county where Napout seeks to be released. Moreover, although Napout essentially concedes that social distancing is being enforced in FCI Miami (see Mot. at 6 ("More than likely, Mr. Napout will be in near solitary confinement for the foreseeable future.")), he fails to acknowledge that the same cannot be said of his condominium complex in Sunny Isles Beach, Florida, where his living situation would be uncontrolled at best.[6] Specifically, he would be living with and in frequent contact with family members and other apartment dwellers, who, like any residents of Miami-Dade County, have a significant risk of exposure any time they go to the grocery store or run errands, as well as when they receive any visitors or deliveries to the home. Cf. United States v. Davenport, No. 17-CR-61 (LAP) (S.D.N.Y. Apr. 9, 2020) (Dkt. 255, at 2) (denying as insufficiently compelling 18 U.S.C. § 3582(c)(1)(A) motion of defendant with diabetes and heart disease; explaining "that there are no current cases of COVID-19 at Schuylkill but that Haverford, the town in which [the defendant] proposes to be released, has one of the highest rates of COVID-19 infection in the Commonwealth of Pennsylvania"). In this context, Napout's age and health conditions, including high blood pressure, high cholesterol, and mental health issues, do not provide extraordinary or compelling reasons supporting his release. See, e.g., United States v. Rabuffo, No. 16-CR-148 (ADS), 2020 WL 2523053, at *3-4 (E.D.N.Y. May 14, 2020) (denying relief for 61-year-old defendant sentenced to 16 months for tax-evasion with no underlying conditions); see also United States v. Lytch, 02-CR-891 (ARR) (E.D.N.Y. May 8, 2020), ECF Dkt. No. 630, at 4 ("[W]hile at least hypertension is a recognized health condition which heightens an individual's risk with regard to COVID-19, [the defendant] has not presented sufficient evidence that he currently suffers from a preexisting condition, particularly in light of his relatively young age [of 55]").

        2.        The Data Referenced in Napout's Motion Do Not
                  Support Modification or Termination of His Sentence

Napout points to various data and related sources in support of his argument, but none of the cited authorities supports the relief he seeks. Napout argues, for example, that the virus is sure to spread quickly at FCI Miami because it has done so "time and time

---

[5] The county-by-county data is available at https://usafacts.org/visualizations/coronavirus-covid-19-spread-map/, which is the data relied upon by the CDC. See https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[6] At a detention hearing before trial, counsel for Napout described Napout's "compound" as being multiple units of "a complex like Trump Tower," a building with a pool, a gym, a weight-lifting area, a recreation area for games like ping-pong, and a common lobby from which Napout's family takes the elevator up to their floor. See Detention Hearing Tr., dated November 22, 2016, at 4, 7, 13, 16-23. Online real estate listings for other units in the same complex indicate that there are 30 floors and 241 residences in the complex.

again with devastating effects" at other BOP facilities. Mot. at 3. In support of this claim, Napout cites to BOP data "listing twenty-five facilities with at least fifty confirmed cases." Id. at 3, n.6. The government assumes that Napout is referring to the list of facilities and confirmed cases available in the "COVID-19 Cases" section of the BOP COVID-19 resource page, available at https://www.bop.gov/coronavirus/ (the government was unable to reach the cited authority through the link provided by Napout). The data on BOP's COVID-19 Cases page indicates that, as of July 13, 2020, there were seven BOP facilities with more than 50 current active cases among the inmate population. The data also indicate that 16 BOP facilities have more than 50 recovered inmates and that, of those 16 facilities, 10 currently have fewer than 10 active inmate cases and only 2 have more than 50 active inmate cases. Thus, if anything, the data reflects the success of BOP's efforts to treat patients and limit the spread of the virus under difficult circumstances.

Napout also cites to CDC data from June 6 indicating that those aged 50-64 were five times more likely than those in 18-29 range to require hospitalization after contracting the virus. Mot. at 3. Napout notes further that his age, 62, places him at the older end of the range. The cited data merely indicate that, as was true at the time of Napout's original application, "[a]s you get older, your risk of being hospitalized for COVID-19 increases." CDC, COVIDE-19, Your Health, Older Adults (updated June 25, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. The data also indicates that adults aged 50-64 years are substantially less likely to be hospitalized than adults aged 65-73 years old, that the greatest risk for severe illness from COVID-19 is among those aged 85 or older, and that 8 in 10 COVID-19-related deaths have been among adults aged 65 or older. The basic principle that risk increases with age is not new and does not provide a basis for releasing Napout and effectively eliminating the bulk of his sentence.[7] The Court previously found that Napout "is only at a slightly higher risk of experiencing more serious consequences from the virus, if contracted, than younger inmates," a fact that has not changed in the three months since his first application. See Order dated April 14, 2020, ECF Dkt. No. 1365, at 2.

### 3. Napout's Conditions of Confinement and Status as a Foreign National Do Not Provide a Basis for Early Release

Napout argues that he should be released because the current conditions of confinement, including restrictions implemented to slow the spread of the virus, are harsher than those the Court anticipated at the time that it imposed sentence. Mot. at 9. Napout argues further that because he is a foreign national he will not receive credit for programs that otherwise might entitle him to early release. Id. Napout contends that, but for these

---

[7] Napout also notes that Congress is contemplating legislation that would make his age alone sufficient to support a finding of extraordinary and compelling circumstances justifying early release, Mot. at 3 (citing the COVID-19 Safer Detention Act, S. 4034, 116th Cong. § 5 (2020)), but the introduction of proposed legislation does not convey Congressional intent, much less signify a change in law or policy.

restrictions, he would already have served "almost half" of his sentence. Id. at 9-10. These arguments are unpersuasive, to say the least, as support for his request for immediate release.

The government does not dispute that Napout's conditions of confinement are, at present, more onerous than they would have been but for the pandemic, but the restrictions imposed by the BOP during the pandemic do not constitute extraordinary or compelling circumstance warranting a five-year reduction in Napout's sentence. Life has become more difficult for every inmate in BOP custody – and for virtually everyone else, in and out of prison. The government does not take temporary restriction on Napout's movement and human interaction lightly, but he is incarcerated for serious crimes and advances arguments that do little to distinguish him from any other inmate. See, e.g. Scarpa, ECF Dkt. No. 300, at 8 ("The conditions Scarpa complains of from his time in solitary confinement—a lack of interaction with other people, the inability to get Vitamin D, and weight loss—are also not terminal and do not warrant compassionate release."); United States v. Dodge, No. CR 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (observing that defendant cannot satisfy his burden through "sweeping allegations about a prison's ability or lack thereof to contain an outbreak" and emphasizing that "the spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances" because "those circumstances are applicable to all inmates who are currently imprisoned and hence are not unique to any one person"); United States v. Pressley, No. 4:17-CR-196, 2020 WL 3472573, at *5 (E.D. Tex. June 25, 2020) (same); United States v. Koons, No. CR 16-214-05, 2020 WL 1940570, at *4 (W.D. La. Apr. 21, 2020) (same); United States v. Gagne, No. 18-CR-242 (VLB), 2020 WL 1640152, at *5 (D. Conn. Apr. 2, 2020) (denying compassionate release motion where defendant failed to show that "her specific medical conditions, medications, and conditions of confinement" would "uniquely and adversely affect her" and indicating that BOP lockdown of facility was "a preventative measure" tending to show facility's focus on the medical risk).

Napout's arguments relating to the credits he would have received if he were a United States citizen are similarly unavailing. The Court understood that Napout would face some restrictions as a result of his status as a foreign national when it imposed sentence, see, e.g., Sent. Tr. at 167-69 (stating that restrictive conditions potentially resulting from Napout's immigration status did not warrant "much weight at all because that's certainly not uncommon" and finding that and that such circumstances were "not extraordinary or compelling"), and, in any event, even if Napout were deemed to have served "almost half" of his six year sentence – which, again, he has not – he still would be nowhere near to qualifying for home confinement based on the amount of time served, see 18 U.S.C. § 3624(c)(2) (authorizing placement of inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter); 34 U.S.C. § 60541(g)(5)(A)(ii) (providing for release to home confinement of defendants at least 60 years old based on various conditions, including having served two-thirds of the term of imprisonment imposed).

### C. The 3553(a) Factors Weigh Heavily Against Release

Even if the Court were to find that Napout is eligible for a sentencing modification, which he is not, the Court nevertheless must "consider all the Section 3553(a) factors to the extent they are applicable, and may deny [the motion for release] if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances." Gotti, 2020 WL 497987, at *2.

As detailed in the government's opposition to Napout's initial motion for compassionate release, the sentencing factors in 18 U.S.C. § 3553(a) – which caused the Court to impose a sentence of 108 months' imprisonment less than two years ago – all weigh against release. See generally Gov. Opp'n, ECF Dkt. No. 1359, at 18-20; see also Scarpa, ECF Dkt. No. 300, at 10 ("The Court's assessment of the relevant § 3553(a) factors has not changed since Scarpa's sentencing, even upon renewed consideration of those factors in light of Scarpa's motion for compassionate release due to COVID-19"). As the Court remarked at sentencing, there is "no question" that Napout was convicted of "absolutely a serious crime that warrant[s] significant punishment," particularly since Napout committed the offenses "not because of need but because of greed." Sent. Tr. at 153-56. The evidence presented, which revealed Napout to be "stealthy, sneaky, calculating, and greedy," also did not "bode well for his potential to recidivate or to re-offend." Id. at 162, 167. And the need for general deterrence is as strong now as it was at the time of sentencing. See id. at 156 (statement of the Court that "clearly, a message, a very strong message, of deterrence has to be sent to others").

Napout's primary argument is that the deterrent rationale served by sentencing is no longer at issue. But the need for general deterrence that the Court cited in imposing a sentence of 108 months in prison is served by ensuring that a defendant serves the entirety of his sentence; permitting Napout to be released after serving a third of his sentence is plainly inconsistent with the Court's calculus.

Napout's claim that the interest in specific deterrence has been addressed by "the time Mr. Napout has spent in prison, the lockdown conditions he has endured, and the overall toll" of the case is meritless. Mot. at 11. As the Court is aware, Napout's misconduct included not only his illicit receipt of millions of dollars in bribes in violation of his fiduciary duties but also his brazen obstruction of justice "at a time when he knew that he was under investigation and refused to allow. . . needed reform to take place." Sent. Tr. at 143; see also id. at 164 (describing Napout's "hidden life"). And, importantly, Napout has never accepted responsibility for any of his misconduct, demonstrating that the need for specific deterrence remains. In short, the Court recognized the real need for specific deterrence in imposing its 108-month sentence – well below the applicable Guidelines – and Napout's citation to the "overall toll" of the case does not alter this decision.[8]

---

[8] Napout again cites to early release programs to argue that Congress has decided that "inmates of his age are sufficiently deterred to permit early release." Mot. at 11. Napout

9

III. Conclusion

       For the foregoing reasons, Napout's motion for a modified sentence under 18 U.S.C. § 3582 should be denied.

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By:    /s/
      Samuel P. Nitze
      M. Kristin Mace
      Keith D. Edelman
      Assistant U.S. Attorneys
      (718) 254-7000

cc:    Counsel of record (by ECF)
      Clerk of Court (PKC) (by ECF)

---

recognizes that these programs do not apply to him, but even if they did, he still would have served less than half of his sentence. See id. at 10. And, as stated above, Napout's other citations to proposed but not enacted legislation offers no insight into Congress's views of the need for incarceration; the best indication of that is the current sentencing regime, which requires Napout to serve the remainder of his sentence.