

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Office:+1 (212) 837-6000
Fax: +1 (212) 422-4726
hugheshubbard.com

Marc A. Weinstein
Partner
Direct Dial: +1 (212) 837-6460
Direct Fax: +1 (212) 299-6460
marc.weinstein@hugheshubbard.com

July 15, 2020

VIA EFILE

Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza
New York, New York 11201

    Re:    <u>United States v. Webb et al.</u>, 15 CR 252 (S-2) (PKC)

Dear Judge Chen:

    We submit this reply letter in further support of Juan Angel Napout's renewed motion (the "Motion") for a sentencing modification.

    The Government, at bottom, takes the position that this motion should be denied because circumstances "have not changed" since the Court denied Mr. Napout's prior motion for compassionate release or bail on April 10, 2020. Nothing has changed? Really? Before responding to this remarkable position, we must first notify the Court that the health crisis at FCI Miami has dramatically worsened in the 24 **hours** since the Government filed its opposition brief. Yesterday afternoon, the Bureau of Prisons reported that inmate infections skyrocketed from 20 to **79**, and staff infections increased from 6 to 7.

    Perhaps now the Government will acknowledge that something has indeed changed. But when it comes to Mr. Napout, a first-time, non-violent offender, the Government to date has simply been unwilling to accept that there could ever exist a fact or development that might warrant some consideration for compassion or cut against the need for Mr. Napout to serve a nine-year sentence.

    As set forth below and in the Motion, (1) Mr. Napout has provided an extraordinary and compelling reason for compassionate release, and (2) a renewed look at the sentencing factors under 18 U.S.C. § 3553(a) warrant a sentence reduction.

### I. Mr. Napout Presents Extraordinary and Compelling Reasons for Compassionate Release[1]

To repeat the obvious, as an inmate at FCI Miami, Mr. Napout is in imminent danger of contracting COVID-19. As of July 5, 2020, the BOP reported no inmate cases of the disease at FCI Miami. When Mr. Napout filed the Motion on July 7, the BOP had reported 11 inmate cases. By the time the Government filed its opposition on July 13, the number of inmate infections had almost doubled, increasing to 20.

This dramatic increase of cases from 0 to 20 in a period of just 8 days, however, was not enough to move the Government. Rather, in its opposition, the Government continues to tout the BOP's pandemic protocols and assure the Court that such protocols mitigate the risks of inmate infections. Of course, the Government said exactly the same thing in response to the first motion in early April. Then, the BOP was reporting "only" several hundred inmates with positive COVID-19 test results across the country, and the Government suggested that FCI Miami somehow had the magic elixir, as that facility had not yet reported a single case. By the time the Government filed its opposition to this Motion on July 13, more than 8,000 federal inmates have tested positive. Ninety-five inmates have died from the disease. And close to 900 staff members have contracted the virus. Yet according to the Government, nothing has changed. What has to happen for the Government to acknowledge that the BOP's protocols do not mitigate the risks inmates face from the disease? At what point will the Government accept that the federal prison system is unable to keep inmates and staff safe, notwithstanding its desire and efforts to do so? Will the needle finally move for the Government now that **59** more FCI Miami inmates tested positive within the past 24 hours?

The Government cites to a number of cases in which courts have noted that MDC Brooklyn has taken steps seemingly sufficient to curtail the number of positive tests at that facility (Opp. at 5[2]), and argues that FCI Miami, "like the MDC, is taking appropriate steps to protect inmates at that facility." The health crisis at FCI Miami, however, is now spiraling out of control, completely undermining the government's claim that FCI Miami is able to protect Mr.

---

1. There is no dispute that the First Step Act permits Mr. Napout to move for compassionate release because more than 30 days has elapsed since he applied to the Warden of FCI Miami for release. At the April 10, 2020 hearing on Mr. Napout's first motion, the Government represented to the Court that it anticipated that the Warden would consider and rule upon Mr. Napout's application within the allotted time frame. The 30-day window closed on April 28. Almost four months have passed since Mr. Napout submitted the application, and still no decision. While the Government represents that Mr. Napout's application is still under consideration by the Warden, the Government concedes that there is no procedural bar to this Motion.

2. Citing *United States v. Haney*, 19-CR-541 (JSR), 2020 WL 1821988 (S.D.N.Y. April 13, 2020), *United States v. Amandor-Rios*, 18-Cr-398 (RRM) (April 20, 2020), and *United States v. Pandrella*, No. 19-Cr-122 (MKB) (E.D.N.Y. May 6, 2020).

Napout and the other inmates at the facility.[3] To the extent the comparison between the MDC and FCI Miami was apt 24 hours ago (and it was not), it is apt no longer.[4]

The deadly virus is raging through FCI Miami. There can be no more extraordinary, compelling, and urgent reason for a compassionate release. The Government states that the United States Sentencing Guidelines and the BOP's policy statements "primarily limit" compassionate release to certain specific medical conditions, advanced age, and family circumstances. (Opp. at 3.) Yet, the government fails to acknowledge that Sentencing Guidelines Section 1B1.13(1)(D) also expressly permits release for "an extraordinary and compelling reason other than, or in combination with," the reasons listed by the Government. If this is not such an extraordinary and compelling other reason, than what is? There is no doubt that the Court has the discretion to find that the deadly and urgent health crisis staring Mr. Napout in the face satisfies this standard.

The Government, however, continues to quibble whether Mr. Napout, who is 62 years old, is particularly susceptible to grave harm if he contracts that disease. Astoundingly, the Government so quibbles even though a federal statute deems Mr. Napout and other inmates over the age of 60 to be "elderly" for purposes of sentencing relief, *see* 34 U.S.C. 60541(g)(5)(A)(ii), and pending legislation acknowledges that inmates over the age of 60 are, according to the CDC, particularly susceptible to serious medical harm and death from the virus. *See* COVID-19 Safer Detention Act, S. 4034, 116th Cong. § 5 (2020). The Government posits that if the Court were to find that Mr. Napout presents an extraordinary and compelling case due merely to his age (62 years) combined with the onset of the virus, the BOP would have to open its doors to a flood of white-collar criminals over 62-years old on that same basis. Not so, for three reasons.

First, there is an undeniable health crisis at FCI Miami, which does not exist at every other federal prison facility.

Second, the Government does not support its rhetoric with any statistics. It does not, for example, provide the number of inmates at FCI Miami who are non-violent, first-time offenders over 62-years old and eligible for compassionate release. While we do not have access to such

---

3. In a footnote, the Government states that a news account of a single FCI Miami union representative does little to advance Mr. Napout's argument (Opp. at n.4), but does not explain why that is so, much less seek to refute the information in the article. Given the recent and dramatic spike in cases at the facility, it appears that the union representative, not the Government, had it right.

4. For that reason, most of the other COVID-19 compassionate release cases cited by the Government are similarly inapposite. *See, e.g.*, *United States v. Davenport*, 17-Cr-61 (LAP) (S.D.N.Y. April 9, 2020) (noting no currently reported cases at the defendant's facility, FCI Schuylkill); *United States v. Rabuffo*, 16-CR-148 (ADS), 2020 WL 2523053 (E.D.N.Y. May 14, 2020) (noting no reported cases at FCI Danbury at time of motion); *United States v. Dodge*, 2020 WL 3668765 (W.D. La. July 6, 2020) (noting only five reported cases at FCI Butner); *United States v. Koons*, 2020 WL 1940570 (W.D. La. April 21, 2020) (noting no reported cases at FCI Texarkana); *United States v. Pressley*, 2020 WL 3472573 (W.D. Tex. June 25, 2020) (no reported cases at FMC Carswell Camp facility).

statistics for FCI Miami, the BOP's aggregate statistics suggest there would be very few in this category. According to the BOP website, only 6% of federal inmates are over the age of 60. *Inmate Age*, BOP (July 4, 2020), https://www.bop.gov/about/statistics/statistics_inmate_age.jsp. In fact, only 3.2% are in the 61-65 age group, which is the only relevant group, as the Government acknowledges that people 65 and older are particularly susceptible to grave harm from the virus. Moreover, the BOP website also reveals that less than 6% of all federal inmates are serving time due to fraud or other white-collar crimes. *Offenses*, BOP (July 4, 2020), https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp. Thus, it is highly likely that the percentage of such inmates who are also between the age of 61-65 are very few, and that the Government is sounding a false alarm bell.

Third, Mr. Napout also suffers from hypertension. In fact, his blood pressure levels have spiked since the lockdowns started, and the medical staff at FCI Miami have prescribed a medication, twice daily, to attempt to address it. Even though, as the CDC acknowledges, COVID-19 is still a relatively new disease and "there are limited data and information regarding the impact of underlying medical conditions on one's susceptibility to severe illness from COVID-19," *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CDC (June 25, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, there is evidence that higher blood pressure raises a COVID-19 patient's susceptibility to severe illness and death. *See id.*; *see also Aff. Of Epidemiologist Katie Lin Brasher-Beaudry* ¶ 2, *United States v. White*, No. 13-cr-20653-1 (E.D. Mich.), ECF No. 51-1 ("[T]he majority of credible data and research related to the relationship between hypertension and COVID-19 suggests that hypertension puts patients at a higher risk of becoming ill with COVID-19, experiencing severe symptoms, being hospitalized and/or dying."); *United States v. Goins*, No. 11-CR-20376, 2020 WL 3064452 (E.D. Mich. June 9, 2020) (citing cases that recognize the increased risk COVID-19 poses to patients with either pulmonary or non-pulmonary hypertension). In fact, many courts around the country have granted compassionate release in circumstances similar to Mr. Napout, recognizing that the pandemic presents the type of extraordinary and compelling reasons required for such a release. *See, e.g.*, *United States v. Richardson*, No. 2:17-cr-000048-JAM, 2020 WL 3402410 (E.D. Cal. June 19, 2020) ("[T]his Court finds that hypertension or obesity alone—regardless of age—place a defendant at higher risk of COVID-19 complications."); *United States v. Field*, 18-CR-426 (JPO) (S.D.N.Y. May 4, 2020) (ECF No. 38) (releasing 35-year-old – housed at a facility with 32 positive cases among staff and 15 among inmates – who suffered from "nonphysical health conditions that present challenges for self-care" and hypertension); *United States v. Williams*, No. 06-CR-0143 (WMW/FLN), 2020 WL 3097615 (D. Minn. June 11, 2020) (granting joint motion to release obese 50-year-old who suffered from heart disease and who was not projected for release until September 2027); *United States v. Mattingley*, 6:15-cr-0005-NKM-JCH (W.D. Va., May 14, 2020) (ECF No. 154) (releasing 57-year-old double amputee with hypertension and diabetes and noting that his age and hypertension heighten his susceptibility to COVID-19's effects); *United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199 (S.D.N.Y., May 8, 2020) (releasing 60-year-old with hypertension and hyperlipidemia, among other ailments, and noting that "[t]his Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension") (citing cases); *United States v. Foreman*, No. 3:19-cr-62 (VAB), 2020 WL 2315908 (D. Conn. May 11, 2020) (releasing overweight 58-year-old with non-pulmonary hypertension even though outbreak of 27 active cases was at adjacent facility); *United States v. Sawicz,* No. 08-cr-287 (ARR), 2020 WL

1815851, at *2 (E.D.N.Y. Apr. 10, 2020) ("The COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension, justifies waiver [of the exhaustion requirement] . . . [and] extraordinary and compelling reasons warrant the defendant's release from prison."); *United States v. Scparta*, No. 18-CR-578, 2020 WL 1910481 (waiving exhaustion and releasing, "[w]ithout any hesitation," 55-year-old stuck in BOP quarantine prior to release to home confinement where defendant suffered from sleep apnea, high cholesterol, and hypertension and noting the "shocking" number of cases where there the facility "has had 65 inmates and 25 staff members positive for COVID-19, and five inmates have died"); *United States v. Rountree*, No. 1:12-CR-0308 (LEK), 2020 WL 2610823 (N.D.N.Y. May, 18, 2020) (releasing 56-year-old with diabetes and hypertension after about 85 months of a 188-month sentence even though his facility had zero confirmed cases); *United States v. Delgado*, 3:18-CR-00017-VAB (D. Conn. Apr. 30, 2020) (ECF No. 76) (releasing obese 36-year-old with asthma and sleep apnea after "roughly 29 months of his 120-month sentence").

Finally, the Government, comparing the rates of infection in FCI Miami and in the surrounding communities, suggests that the 2% rate within the prison walls is not surprising or cause for alarm because it is consistent with what is happening in the general public. This is a false comparison. The infection rate at FCI Miami is based on positive results for just the past week, while the cases in the surrounding areas have been building up for months. Regardless, the 2% rate cited by the Government is now wildly outdated, as the infection rate at FCI Miami spiked at least 4 times higher in just a few hours after the Government filing. More to the point, Mr. Napout cannot do anything to keep himself safe within the prison. He must share a cell. He must shower and share the bathroom with other inmates. He must interact with prison staff. He does not have protective equipment. If the Court ordered home confinement, he will, literally, be confined to his home. That others in the general public, and particularly those of much younger age groups, choose to ignore preventative measures does not mean that Mr. Napout will be equally as likely to contract the disease while confined to his home as the more irresponsible segment of society, and certainly not as likely as when in prison. The Government points to the fact that Mr. Napout's apartment is in a complex that has a gym and a pool. But the gym, like all other gyms, is presumably closed due to the pandemic. And Mr. Napout is motivated to remain safe and healthy, not to take risks with his health. Regardless, the Court can fashion conditions of confinement to address any legitimate concerns.

## II.   A Renewed Consideration of the Section 3553(a) Factors Warrants a Sentence Reduction

A renewed and objective consideration of the sentencing factors under 18 U.S.C. § 3553(a) warrants a reduction of Mr. Napout's sentence.

A reduction in Mr. Napout's sentence for a compassionate release due to the deadly pandemic will not impact the general deterrence from the Court's initial sentence. The message the Court sent to potential offenders when it imposed sentence in August 2018 remains—the commission of bribery and corruption in global sport will result in a substantial term of imprisonment and hefty monetary penalties. The fact that Mr. Napout might be released early because a deadly virus is rampaging through his prison facility does not alter that message or

undermine general deterrence. The Government offers nothing to suggest that the goals of general deterrence have not been met here.

As for specific deterrence, the Government offers nothing concrete to demonstrate that continued incarceration is required to satisfy that goal. It offers no empirical or other data to even suggest, much less demonstrate, that after spending close to three years in prison, and the last four months in lockdown, Mr. Napout requires some additional time in prison to deter him from violating the law if released. In fact, based on his age, the nature of his offense, his level of education, and his status as a first-time offender, statistics show that Mr. Napout is highly unlikely to commit crimes upon his release. *See* United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (2016) (reporting that recidivism rates decrease with educational level; and that first-time offenders and fraud offenders are less likely to reoffend than offenders with criminal histories and offenders convicted of other federal crimes).[5] Courts have recognized that recidivism rates decline substantially for people over age 50. *See United States v. Williams*, No. 06-CR-0143 (WMW/FLN), 2020 WL 3097615, at *2 (D. Minn. June 11, 2020) (granting compassionate release to 50-year old inmate incarcerated at FCI Elkton in the face of substantial positive virus results in facility's inmate population). The Government's specific deterrence argument is thus nothing but unsupported speculation.

The Government also blithely dismisses the significance of the inequitable treatment of foreign citizens as compared to United States citizens when it comes to the length of a term of imprisonment and the credits an inmate can earn against a sentence. But the sentencing regime clearly results in unwarranted sentencing disparities between foreign nationals such as Mr. Napout and United States citizens who have similar records and similar offense conduct. *See* 18 U.S.C. § 3553(a)(6). When it comes to the length of actual incarceration for identical sentences imposed for identical crimes, the statutory regime discriminates against Mr. Napout simply based on his status as a Paraguayan citizen.

Finally, the need to provide restitution to victims, *see* 18 U.S.C. § 3553(a)(7), also weighs in Mr. Napout's favor, as he has satisfied the restitution obligations imposed by the Court (as well as the forfeiture and fine obligations). His satisfaction of these significant financial penalties also weighs against the unfounded argument that additional specific deterrence is necessary.

In sum, upon reconsideration of the various sentencing factors, and in light of the deadly pandemic, a sentence modification is warranted. When the Government initially argued for, and the Court imposed, a long term of incarceration, nobody intended for the sentence to equate to a death sentence. That has become a distinct possibility now. At the end of the day, the Court must weigh, on one hand, the likelihood of a man contracting the disease in prison and suffering serious illness or death (with the distinct possibility that he will never see his family again) against, on the other hand, vague and speculative notions of deterrence which are contrary to empirical data on recidivism rates. There comes a time when the risks taken should weigh in favor of life over some perceived potential for minimal incremental deterrent value, particularly

---

5. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

where the inmate under consideration does not pose a threat to the safety of any individual or the public at large. We respectfully urge the Court to grant Mr. Napout compassionate release before it is too late.

Respectfully submitted,

/s/ Marc A. Weinstein
Marc A. Weinstein

CC: All counsel of record via ECF